## UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| EGENERA, INC., | |
| Plaintiff, | Civil Action No. 1:16-cv-11613 |
| v. | JURY TRIAL DEMANDED |
| CISCO SYSTEMS, INC., | PUBLIC VERSION |
| Defendant. | |

## CISCO SYSTEMS, INC.'S OPENING BRIEF IN SUPPORT OF ITS MOTION TO EXCLUDE THE REASONABLE ROYALTY OPINIONS OF DR. RYAN SULLIVAN

# <u>TABLE OF CONTENTS</u>

<u>Page</u>

I.     INTRODUCTION ..................................................................................................1

II.    FACTUAL BACKGROUND ..................................................................................3

      A.     Egenera's Infringement Allegations ..........................................................3

      B.     Dr. Sullivan's Report ................................................................................4

             1.     The Flawed "Acquisition Approach"...........................................5

             2.     The Flawed "Cost Savings Approach" .........................................6

III.    LEGAL STANDARD............................................................................................7

IV.    ARGUMENT ........................................................................................................8

      A.     The Court Should Exclude Dr. Sullivan's Reasonable Royalty Opinions As Unreliable Because They Improperly Assume Infringement Of Non-Accused UCS Deployments.........................................................................9

      B.     The Court Should Exclude Dr. Sullivan's "Acquisition Approach" Methodology Because It Improperly Assumes Infringement Of Billions Of Dollars Of Non-Accused Components. ..............................................13

      C.     The Court Should Exclude Dr. Sullivan's "Cost Savings Approach" Methodology Because It Is Based On The Unreliable Principle That Costs Saved By Cisco's Customers Equals Cisco's Profit.............................................16

V.     CONCLUSION...................................................................................................19

# **TABLE OF AUTHORITIES**

**Page(s)**

**Cases**

*Core Wireless Licensing S.A.R.L. v. LG Elecs., Inc.*,
   No. 2:14-CV-911, 2016 WL 4440255 (E.D. Tex. Aug. 23, 2016) ................................. 13

*Cornell Univ. v. Hewlett-Packard Co.*,
   609 F. Supp. 2d 279 (N.D.N.Y. 2009) ............................................................................. 12

*Daubert v. Merrell Dow Pharm., Inc.*,
   509 U.S. 579 (1993) .............................................................................................. 1, 7, 13

*Enovsys LLC v. AT&T Mobility LLC*,
   No. 11-CV-5210, 2015 WL 10383057 (C.D. Cal. Aug. 10, 2015) ............................ 7, 12

*Festo Corp. v. Shoketsu Kinzoku Kogyo Kabushiki Co., Ltd.*,
   No. 88-CV-1814, 1993 WL 1510657 (D. Mass. Apr. 27, 1993) .............................. 12, 19

*Georgia-Pac. Corp. v. U.S. Plywood-Champion Papers, Inc.*,
   446 F.2d 295 (2d Cir. 1971) ...................................................................................... 8, 12

*Kumho Tire Co. v. Carmichael*,
   526 U.S. 137 (1999) ........................................................................................................ 7

*Lindemann Maschinenfabrik GmbH v. Am. Hoist & Derrick Co., et al.*,
   895 F.2d 1403 (Fed. Cir. 1990) ..................................................................................... 19

*MiiCs & Partners, Inc. v. Funai Elec. Co.*,
   No. 14-CV-804, 2017 WL 6268072 (D. Del. Dec. 7, 2017) ......................................... 13

*Prism Techs. LLC v. AT & T Mobility, LLC*,
   No. 12-CV-122, 2014 WL 4705403 (D. Neb. Sept. 22, 2014) ...................................... 17

*Rembrandt Soc. Media, LP v. Facebook, Inc.*,
   22 F. Supp. 3d 585 (E.D. Va. 2013) ........................................................................... 7, 12

*Rite-Hite Corp. v. Kelley Co.*,
   56 F.3d 1538 (Fed. Cir. 1995) ....................................................................................... 12

*Trans-World Mfg. Corp. v. Al Nyman & Sons,  Inc.*,
   750 F.2d 1552 (Fed. Cir. 1984) ..................................................................................... 19

*Ultratec, Inc. v. Sorenson Commc'ns, Inc.*,
   No. 13-CV-346, 2014 WL 5361940 (W.D. Wis. Oct. 21, 2014) ................................... 18

## TABLE OF AUTHORITIES (cont'd)

**Pages**

*Uniloc USA, Inc. v. Microsoft Corp.*,
  632 F.3d 1292 (Fed. Cir. 2011)............................................................................. 13

*WesternGeco L.L.C. v. ION Geophysical Corp.*,
  No. 9-CV-1827, 2012 WL 2911968 (S.D. Tex. July 16, 2012)........................................ 19

## **Rules**

Fed. R. Evid. 702 ................................................................................................ 1, 7

## I.      INTRODUCTION

Egenera's damages expert, Dr. Sullivan, applies two methodologies—the "acquisition approach" and the "cost savings approach"—to arrive at per-server royalty rates that he multiplies by the number of Unified Computing System ("UCS") servers sold to calculate his alleged reasonable royalty.  Dr. Sullivan's methodologies for arriving at his royalty rates, as well as his methodology for calculating the number of servers to which the royalty should attach (*i.e.*, the royalty base) are fundamentally flawed because they assume infringement of products that are not accused and assume certain profits by Cisco without any basis in fact.  This results in alleged reasonable royalty figures that are inherently unreliable and unhelpful to a jury.  The Court therefore should exclude Dr. Sullivan's reasonable royalty opinions pursuant to *Daubert* and Federal Rule of Evidence 702.

Dr. Sullivan's method for calculating the number of servers in his royalty base is unreliable because it inexplicably includes UCS configurations that Egenera does ***not*** accuse of infringement. In other words, Dr. Sullivan assumes Cisco's infringement through certain UCS servers that Egenera's technical expert readily admits ***do not*** meet the asserted patent claims.  For this reason alone, Dr. Sullivan's damages numbers are unreliable and not sufficiently tied to the relevant facts.

Dr. Sullivan's methodologies in arriving at his per-server royalty rates of $1,050 ("acquisition approach") and $1,062 ("cost savings approach") also are flawed.  In one of the key steps of Dr. Sullivan's "acquisition approach" royalty rate methodology, he sums the accused products' revenue with billions of dollars of revenue from non-accused components and divides that total revenue by the number of UCS servers sold.  Adding the revenue from non-accused components creates an artificially high revenue per-server, which Dr. Sullivan uses to arrive at his per-server royalty rate.

The Court should exclude Dr. Sullivan's "cost savings approach" methodology for a different reason; it is premised on the unreliable principle that Cisco's profit from UCS is equal to the amount of costs a customer saves in migrating to UCS from a competitor's product. Dr. Sullivan's economic assumption—that a supplier's (Cisco's) profits exactly equal a customer's cost savings—has not been used or tested in any patent damages cases, has not been subjected to peer review, has no potential error rate (and is subject to wide variability depending on additional implicit assumptions), and certainly has not attracted widespread acceptance. In other words, Dr. Sullivan's approach fails all the hallmarks of reliability.

Moreover, Dr. Sullivan's economic assumption and corresponding methodology represent a radical departure from the facts of this case—Dr. Sullivan's methodology results in estimated Cisco profits (defined by Dr. Sullivan as the revenue minus its total variable cost, *i.e.*, "contribution margin") that are over five times higher than Cisco's ***actual*** UCS contribution margins calculated using well-accepted Generally Accepted Accounting Principles (GAAP), which Dr. Sullivan failed to consider when developing and applying his methodology.

Allowing Dr. Sullivan to present his unreliable methodologies and resulting opinions would confuse the jury and would not aid the jury in determining a reasonable royalty. The Court therefore should exclude Dr. Sullivan's unreliable "cost-savings" and "acquisition" methodologies, as well as his application of any such rates to his substantially inflated server royalty base.

## II.     FACTUAL BACKGROUND

### A.     Egenera's Infringement Allegations

On April 7, 2017, Egenera served preliminary infringement contentions.  *See* Ex. 37[1] (Preliminary Infringement Contentions).  Egenera's preliminary infringement contentions accused Cisco of infringing U.S. Patent No. 7,231,430 (the "'430 Patent") "by making, using, offering for sale, selling, and importing in to the United States" over 100 UCS components.  *Id*. at 2.

But certain UCS components have never been accused of infringement in this case. Egenera never accused UCS server memory components of meeting any claim of the '430 Patent. *Id*.  Egenera also never accused staple articles or commodities of commerce, such as replacement batteries, packaging, cable access bars, plastic panels, cable management rings, cable management straps, rack doors, mounting screws, or cage nuts as a basis for any infringement allegation.  *Id*. On December 29, 2017 and February 14, 2018, Egenera amended its infringement contentions without accusing any additional UCS components of meeting any claim of the '430 Patent.

On June 19, 2018, Cisco deposed Dr. Jones, Egenera's technical expert.   Dr. Jones confirmed that Egenera does not accuse UCS deployments without a fabric extender or an input/output module ("I/O module") of infringement:

```
15        Q.    Fair enough.  You don't have an opinion
16   that customers that use UCS without using fabric
17   extender or I/O module infringe any claim of the
18   '430 patent.  Right?
19        A.    That's correct.
```

Ex. 11 (Jones Dep. Tr.) at 196:15-19.

Dr. Jones also explained at his deposition that UCS server memory components are not a basis for Egenera's infringement allegations:

---

[1] All exhibits are attached to the Declaration of Michael Rhodes, filed concurrently.

```
3        Q.    You did not analyze whether increased
4   memory capacity of UCS servers compared to others in
5   the industry is attributable to the '430 patent.
6   Right?
7        A.    I think the specific ability to
8   increase the memory is, alone is not attributable to
9   the '430 patent.
```

*Id.* at 190:3-9.

**B.    Dr. Sullivan's Report**

On April 20, 2018, Egenera served the Report of Ryan Sullivan, Ph.D. ("Sullivan Opening Report").  *See* Ex. 8 (Sullivan Opening Report).  The Sullivan Opening Report set forth two methodologies—the "cost savings approach" and the "acquisition approach"—for calculating an alleged reasonable royalty.  *See* Ex. 8 (Sullivan Opening Report) at 75, 83.  In each approach, Dr. Sullivan purports to identify a per-server reasonable royalty rate that he applies to a royalty base—the total number of UCS servers that he assumes meet the '430 Patent claims.

Dr. Sullivan made no determination of infringement—a task that he admittedly is not qualified for—and instead assumed the infringement of certain UCS configurations and components.

```
3        Q   Dr. Sullivan, you do not have any opinions
4   about whether or not Cisco infringes the '430 patent;
5   correct?
6        A   That's right.
```

Ex. 12 (Sullivan Dep. Tr.) at 53:3-6.

```
14       Q   So your analysis is not based on how Dr. Jones
15   alleges UCS infringes; correct?
16       A   It's based upon an assumption of infringement.
17   It's not based upon the infringement analysis I guess is
18   probably the best way I could put it.
```

4

*Id.* at 128:14-18; *see id.* at 10:18-11:13.

However, Dr. Sullivan's infringement assumptions directly contradict both Egenera's infringement contentions and Dr. Jones's technical opinions.  For example, Dr. Sullivan confirmed that he did not exclude from his royalty base UCS deployments that do not use fabric extenders or I/O modules, and that he assumed all such deployments infringe:

```
19          You have not made a separate determination
20   whether UCS systems that do not use fabric extenders
21   should be included in your server unit base; is that
22   fair?
23      A   I have not made a determination of what
24   infringes and what does not infringe.  I simply have
25   assumed infringement.
```

*Id.* at 140:19-25.

```
1      Q   And you have not made a separate determination
2   whether UCS systems that do not use I/O modules should
3   be included in your server unit base?
4      A   Again, I have not made a determination of what
5   infringes and what does not infringe; rather, I have
6   simply assumed infringement for purposes of my analysis.
```

*Id.* at 141:1-6.

### 1.      The Flawed "Acquisition Approach"

Dr. Sullivan's acquisition approach purports to determine the amount Cisco would be willing to pay for the '430 Patent based on Cisco's acquisition of Nuova Systems, Inc. ("Nuova"), the company that originally developed the UCS technology.  First, Dr. Sullivan uses the Nuova acquisition price and projections of future sales to determine the alleged percentage of revenue that Cisco paid per UCS server (13.3%).  Ex. 8 (Sullivan Expert Report) at ¶¶172-173; *id.* at Attachment I-2.  Next, Dr. Sullivan multiplies that 13.3% by his calculated "UCS revenue per

server" to determine a per-server royalty rate. *Id.* at ¶173; *id.* at Attachment I-3. In order to calculate his alleged "UCS revenue per server," Dr. Sullivan adds all U.S. sales in this case—including sales of server memory components and other non-accused products, which significantly inflates the per-server revenue—and divides that sum by the number of UCS servers sold. *Id*. at E-3. Next, Dr. Sullivan applies a 55.3 % "technological apportionment factor." *Id*. at I-4. The result of Dr. Sullivan's analysis is a per-server royalty rate of $1,050. *Id.* at ¶174.

## 2.    The Flawed "Cost Savings Approach"

Dr. Sullivan's cost savings approach first seeks to determine the total cost of ownership savings to a customer who migrates to Cisco UCS from a competing deployment. Dr. Sullivan then assumes that all of a UCS customer's cost savings must equal Cisco's "additional profit." Ex. 12 (Sullivan Dep. Tr.) at 85:15-17. More specifically, Dr. Sullivan opined that a customer's total cost of ownership savings equaled Cisco's revenue minus its total variable cost (*i.e.*, Cisco's contribution margin). *See* Ex. 8 (Sullivan Expert Report) at ¶155. ███████████████████████

████████████████████████████████████████████████████████

███████████████████████████████████     *Id*. at ¶¶46, 155.

Next, Dr. Sullivan opines that the parties to a hypothetical negotiation would agree to award over 2/3 of the profits to Cisco and less than 1/3 of the profits to Egenera yielding a royalty rate of $1,062 per server. *See id.* at ¶¶163-165. Dr. Sullivan did not factor Cisco's actual contribution margin into his reasonable royalty analysis, and calculated a reasonable royalty rate that represents a payment to Egenera of more than ████████████████████████

████████████████, despite Dr. Sullivan's contention that over 2/3 of profits should go to Cisco. *See id.* (Sullivan Expert Report) at ¶165; Ex. 10 (Becker Supplemental Report) at ¶6.

On June 8, 2018, Egenera served the Supplemental Report of Ryan Sullivan, Ph.D. to address Cisco's actual profit information. *See* Ex. 9 (Sullivan Supplemental Report). Dr.

Sullivan's 6 page supplemental report did not assert any new reasonable royalty theories, did not change the analysis underlying his "cost savings approach" or "acquisition approach," did not recalculate his alleged reasonable royalty rate with Cisco's actual contribution margin, and did not change his (incorrect) assumptions regarding infringement.  *Id*.  Instead, Dr. Sullivan argued that his "cost savings approach" was validated because ███████████████████████████████████ ████████████████████████████████████████████████████████████████  *Id*. Dr. Sullivan did not compare his customer cost savings based estimate of Cisco's contribution margin to Cisco's actual contribution margin, information that Cisco provided.  *Id*.

## III.   LEGAL STANDARD

"[T]he trial judge must determine . . . whether the expert is proposing to testify to (1) scientific knowledge that (2) will assist the trier of fact to understand or determine a fact in issue. This entails a preliminary assessment of whether the reasoning or methodology underlying the testimony is scientifically valid and of whether that reasoning or methodology properly can be applied to the facts in issue."  *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 592–93 (1993). "[T]he trial judge must ensure that any and all scientific testimony or evidence admitted is not only relevant, but reliable."  *Id*. at 589.  Expert testimony is permitted at trial only if:  (1) the testimony is based on sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the expert reliably applied the principles and methods to the facts of the case. Fed. R. Evid. 702.  The Court's gate keeping function is not limited to only scientific testimony, but instead extends to all expert testimony.  *See Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 148–49 (1999).

Expert opinions regarding reasonable royalties should be excluded if they are based on an inflated royalty base.  *See, e.g.*, *Rembrandt Soc. Media, LP v. Facebook, Inc.*, 22 F. Supp. 3d 585, 595 (E.D. Va. 2013) ("Rembrandt's expert apportioned improperly when calculating a royalty

base, and his expert testimony must be excluded on that basis alone.  His testimony would be unreliable under *Daubert*, and allowing such inflated numbers before a jury would be prejudicial even if Facebook has the opportunity to cross-examine the expert about the royalty base."); *Enovsys LLC v. AT&T Mobility LLC*, No. 11-CV-5210, 2015 WL 10383057, at *6 (C.D. Cal. Aug. 10, 2015) (excluding plaintiff's damages expert's opinion because "the royalty bases established by Calculation 1 and Calculation 2 [of plaintiff's exert] are impermissibly broad and unreliable").

## IV.    ARGUMENT

Each of Dr. Sullivan's two methodologies—the "acquisition approach" and the "cost savings approach"—arrive at a per-server royalty rate, either $1,050 (under the "acquisition approach") or $1,062 (under the "cost savings approach"), that Dr. Sullivan multiplies by the same royalty base:  the number of UCS servers that he assumes infringe.  But Dr. Sullivan's royalty rates, as well as his royalty base, are unreliable because:

- Dr. Sullivan's royalty base includes servers that were part of admittedly non-infringing system configurations;

- Dr. Sullivan's "acquisition approach" royalty rate is based on a calculation that includes the sales of ***billions*** of dollars of UCS components that fall outside of Egenera's infringement allegations; and

- Dr. Sullivan's "cost savings approach" royalty rate is based on an unreliable principle divorced from economics, and more importantly, the facts of this case—that Cisco's profit exactly equals a customer's cost savings.

The Court should perform its gatekeeping function and exclude Dr. Sullivan's reasonable royalty analysis because both his "acquisition approach" and "cost savings approach" apply unreliable principles when calculating royalty rates, those methodologies are not sufficiently tied

to the facts of this case, and the royalty base to which both rates are applied improperly assumes

infringement of non-accused servers.[2]

A. **The Court Should Exclude Dr. Sullivan's Reasonable Royalty Opinions As Unreliable Because They Improperly Assume Infringement Of Non-Accused UCS Deployments.**

The Court should strike both of Dr. Sullivan's reasonable royalty theories because they

rely on a royalty base calculation that unreasonably and improperly assumes infringement of

servers in UCS deployments that Egenera's technical expert does not allege infringe.  For example,

Egenera's technical expert, Dr. Jones, confirmed that Egenera does not accuse UCS configurations

without a fabric extender or I/O module of infringement:

```
20        Q.   So it's correct that in -- you have not
21   opined that UCS deployment that does not include a
22   fabric extender or I/O module infringes any claim of
23   the '430 patent.  Correct?
24        A.   I believe that's correct, because
25   that's what's identified for the internal network.
```

Ex. 11 (Jones Dep. Tr.) at 195:20-25.

```
15        Q.   Fair enough.  You don't have an opinion
16   that customers that use UCS without using fabric
17   extender or I/O module infringe any claim of the
18   '430 patent.  Right?
19        A.   That's correct.
```

*Id*. at 196:15-19.  Dr. Jones's expert report confirms this opinion.  *See* Ex. 5 (Jones Expert Report

Appendix A) at ¶¶158-159.

Nonetheless, Dr. Sullivan admitted that his analysis is not based upon Dr. Jones's

infringement allegations and instead simply assumes of infringement:

---

[2]  This motion is moot in the event the Court grants (as is appropriate) Cisco's Motion For
Summary Judgment Of Noninfringement Of U.S. Patent No. 7,231,430.

```
14      Q   So your analysis is not based on how Dr. Jones
15   alleges UCS infringes; correct?
16      A   It's based upon an assumption of infringement.
17   It's not based upon the infringement analysis I guess is
18   probably the best way I could put it.
```

Ex. 12 (Sullivan Dep. Tr.) at 128:14-18.

Even more egregious, Dr. Sullivan testified that his analysis *assumed* infringement of UCS

deployments that did not include either fabric extenders or I/O modules—*i.e.*, deployments that

Dr. Jones readily admitted are not accused:

```
19          You have not made a separate determination
20   whether UCS systems that do not use fabric extenders
21   should be included in your server unit base; is that
22   fair?
23      A   I have not made a determination of what
24   infringes and what does not infringe.  I simply have
25   assumed infringement.
```

*Id.* at 140:19-25.

```
1      Q   And you have not made a separate determination
2   whether UCS systems that do not use I/O modules should
3   be included in your server unit base?
4      A   Again, I have not made a determination of what
5   infringes and what does not infringe; rather, I have
6   simply assumed infringement for purposes of my analysis.
```

*Id.* at 141:1-6.

Dr. Sullivan's calculations reflect his testimony.  Attachment E-5 to Dr. Sullivan's report

shows every adjustment that Dr. Sullivan made to his "server unit base."  As can be seen in

Attachment E-5, Dr. Sullivan adjusted for the servers sold in "UCS Mini configurations" and the

"Share of racks used with[out] UCS Manager," because Egenera does not accuse those

10

deployments of infringement, but Dr. Sullivan did not remove the servers found in UCS configurations without a fabric extender or I/O module:



Ex. 8 (Sullivan Expert Report) at Attachment E-5.

```
1      Q   Other than what's listed in attachment E-5, did
2   you do any other apportionment to get your server unit
3   base to account for noninfringing deployments?
4          MR. WILLIAMS:  Objection.  Vague.
5          THE WITNESS:  I did not make further
6   apportionments to the unit base; rather, I did make
7   further apportionments to the royalties.
```

Ex. 12 (Sullivan Dep. Tr.) at 137:1-7.

```
25     Q   Is it your opinion that all the blade servers
1   in the blade server unit base attached in E-5 are used
2   in an infringing UCS system?
3      A   My understanding is that the blade servers that
4   are comprised of the unit base are used in infringing
5   UCS system.
```

*Id*. at 134:25-135:5.

Dr. Sullivan multiplied the number of servers he assumed infringed by his calculated per-server royalty rates to determine each of his alleged reasonable royalties.  *See* Ex. 8 (Sullivan Expert Report) at ¶¶235, 237.  But it is unreasonable, unreliable, and improper to assume that UCS configurations without I/O modules or fabric extenders infringe—and include those configurations in the royalty base—when Egenera's technical expert readily conceded that they do not.  Nor does Dr. Sullivan even attempt to quantify the number of such servers, preventing a finder of fact from performing the subtraction, and preventing Cisco from cross-examining Dr. Sullivan on the number of servers that should have been excluded from his calculations.

Dr. Sullivan's reliance on an improperly inflated royalty base renders his reasonable royalty opinions unreliable.  *See, e.g.*, *Festo Corp. v. Shoketsu Kinzoku Kogyo Kabushiki Co., Ltd.*, No. 88-CV-1814, 1993 WL 1510657, at *23 (D. Mass. Apr. 27, 1993) (explaining that sales of non-accused items do not "create a separate sum on which the royalty is calculated"); *Cornell Univ. v. Hewlett-Packard Co.*, 609 F. Supp. 2d 279, 285–86 (N.D.N.Y. 2009) (citing *Rite-Hite Corp. v. Kelley Co.*, 56 F.3d 1538, 1549 n. 9 (Fed. Cir. 1995)) ("An over-inclusive royalty base including revenues from the sale of non-infringing components is not permissible."); *Envsys LLC v. AT&T Mobility LLC*, No. 11-CV-5210, 2015 WL 10383057, at *6 (C.D. Cal. Aug. 10, 2015) (excluding plaintiff's damages expert's opinion because "the royalty bases . . . are impermissibly broad and unreliable" and "any probative value they may have is outweighed by the dangers of prejudice, confusion of the issues, and the risk of misleading the jury").

The Court also should exclude Dr. Sullivan's unreliable royalty calculation because his inflated base cannot be cured through cross-examination.  *See, e.g.*, *Rembrandt*, 22 F. Supp. 3d at 595 ("Rembrandt's expert apportioned improperly when calculating a royalty base, and his expert

testimony must be excluded on that basis alone.  His testimony would be unreliable under *Daubert*, and allowing such inflated numbers before a jury would be prejudicial even if Facebook has the opportunity to cross-examine the expert about the royalty base."); *Uniloc USA, Inc. v. Microsoft Corp.*, 632 F.3d 1292, 1318-1322 (Fed. Cir. 2011) (ordering a new trial on damages after plaintiff's counsel mentioned multi-billion dollar revenue figure, including accused and non-accused sales, because neither cross examination nor a curative jury instruction could prevent the prejudice created by revealing the large revenue figure).

Dr. Sullivan has offered no reasonable royalty opinions applying the correct "server unit base," and no analysis even identifying the number of accused UCS servers.  Therefore, the Court should exclude both of Dr. Sullivan's reasonable royalty opinions.

**B.     The Court Should Exclude Dr. Sullivan's "Acquisition Approach" Methodology Because It Improperly Assumes Infringement Of Billions Of Dollars Of Non-Accused Components.**

The Court should strike Dr. Sullivan's opinion based on an "acquisition approach" because Dr. Sullivan's calculated royalty rate relies on a per-server revenue amount that:  (1) improperly includes billions of dollars of non-accused Cisco products, such as server memory components; and (2) impermissibly includes staple articles and commodities of commerce that do not themselves infringe.  The inclusion of billions of dollars of revenue from non-accused components into his "UCS revenue per server" calculation wildly inflates the royalty rate, rendering Dr. Sullivan's opinion unreliable and unhelpful to the jury.  *See, e.g.*, *MiiCs & Partners, Inc. v. Funai Elec. Co.*, No. 14-CV-804, 2017 WL 6268072, at *3 (D. Del. Dec. 7, 2017) (excluding testimony of damages expert who used both patented and unpatented features of an accused product in order to calculate a patent royalty rate); *Core Wireless Licensing S.A.R.L. v. LG Elecs., Inc.*, No. 2:14-CV-911, 2016 WL 4440255, at *10–11 (E.D. Tex. Aug. 23, 2016) (ordering new damages trial when expert based a royalty rate calculation on a non-accused product); *Uniloc*, 632 F.3d at 1320–

21 (ordering a new trial on damages after patent owner's counsel mentioned multi-billion dollar
total revenue figure including accused and non-accused sales).

The royalty rate for Dr. Sullivan's "acquisition approach" hinges on his alleged "UCS
revenue per server."  Cisco's UCS revenue data includes data from thousands of separately-sold
components ranging from accused server blades to non-accused mounting screws.  And Dr.
Sullivan admits that not all of those components need to be purchased with the accused UCS
components:

```
23        So your -- it's your opinion that things like
24   mounting screws cannot be purchased separately for use
25   within UCS?
 1            MR. WILLIAMS:  Objection.  Vague.
 2            THE WITNESS:  I'm not rendering that opinion.
```

Ex. 12 (Sullivan Dep. Tr.) at 160:23-161:2.  However, without any justification, Dr. Sullivan
calculates his "UCS revenue per server" by including billions of dollars of revenue from non-
accused components (such as server memory components and staple articles and commodities of
commerce that do not themselves infringe), and dividing that total revenue by the number of UCS
servers sold.

Dr. Sullivan has no basis for artificially inflating the per-server revenue by including
revenue from non-accused peripheral components.  For example, Dr. Sullivan does not purport to
apply the "entire market value rule" or assume that the '430 patented features are the basis for
demand of non-accused UCS components:

```
15     Q   So you would agree with me that the entire
16   market value rule should not be applied in this case?
17            MR. WILLIAMS:  Objection.  Calls for a legal
18   conclusion.  Outside the scope.  Foundation.
19            THE WITNESS:  Well, I have not applied the
20   entire market-value rule for purposes of my nationals.
```

14

Ex. 12 (Sullivan Dep. Tr.) at 156:15-20; *id.* at 221:2-3 (Sullivan Dep. Errata) (changing "my nationals" to "my analysis").

```
12              Furthermore, my analysis does not -- or is
13   not -- based upon a belief or an assumption that the
14   '430 is the basis for demand.
```

*Id.* at 156:12-14.

A particularly glaring example of Dr. Sullivan's erroneous attempts to inflate the accused UCS revenue base relates to off-the-shelf memory that can be purchased for UCS servers. Egenera's technical expert readily confirmed that Egenera does not accuse these server memory products of infringement.  Ex. 11 (Jones Dep. Tr.) at 190:3-9. ████████████████



Ex. 63 (Sullivan Expert Report) at Attachment J-3 (sorted by highest revenue components) (annotations added). ████████████████████

The remainder of the parts list in Dr. Sullivan's report is also littered with other non-accused components.  For example, Dr. Sullivan also chose to include the revenue for replacement

batteries, packaging, cable access bars, plastic panels, cable management rings, cable management straps, rack doors, mounting screws, cage nuts, and hundreds of other non-accused staple articles and commodities.  *See* Ex. 8 (Sullivan Expert Report) at Attachment Ex. J-3.  This fatal flaw renders Dr. Sullivan's opinions unreliable because it significantly and improperly overstates the revenue per server attributable to the accused components, and the revenue per server number forms the basis of Dr. Sullivan's $1,050 per-server royalty.[3]  The Court should exclude this unreliable opinion.

      **C.**    **The Court Should Exclude Dr. Sullivan's "Cost Savings Approach" Methodology Because It Is Based On The Unreliable Principle That Costs Saved By Cisco's Customers Equals Cisco's Profit.**

The Court should also strike Dr. Sullivan's "cost savings" methodology because it is based upon the unreliable assumption that a customer's cost savings equals Cisco's profit and fails to properly account for the facts of this case—Cisco's actual contribution margin.  At root, Dr. Sullivan's methodology seeks to split the profit between Cisco and Egenera—where Dr. Sullivan defines profit as "the difference between [Cisco's] revenue and total variable cost, [*i.e.*, Cisco's contribution margin]."  *See* Ex. 8 (Sullivan Expert Report) at ¶155.  Although Dr. Sullivan purports to award Egenera roughly 1/3 of the profit and allow Cisco to keep the rest, his effective royalty rate to Egenera is roughly ███████████████████████

██████████████████████████████████████████

██████████████████████████████████████████

█████████████████████████

---

[3] To reach $1,050, Dr. Sullivan multiplies his calculated $14,254 "UCS revenue per server" by a 13.3% share of revenue that Cisco allegedly agreed to pay Nuova (the company that originally developed UCS) to acquire the UCS technology, and then by a 55.3% apportionment factor aimed at removing value from the accused components that is not created by the '430 Patent.  Ex. 8 (Sullivan Expert Report) at ¶¶46, 166-174; *id.* at Tables E-3, I-3, I-4.

Dr. Sullivan provides no economic justification for his principle that Cisco's customer's savings "represent[s] . . . the difference between [Cisco's] revenue and its total variable cost." *Id.* at ¶155. Instead, Dr. Sullivan makes the *ipse dixit* statement that Cisco can "capture a significant share of the marketplace and sell its products at a premium" without providing any explanation as to **how much** additional market share Cisco can capture, **what** premium Cisco could sell any accused product at, and **why** Cisco's costs would not increase by allegedly incorporating Egenera's technology. *Id.*

Dr. Sullivan's "cost savings approach" premise—that Cisco's customer's total cost of ownership savings represent "the difference between [Cisco's] revenue and its total variable cost [*i.e.*, Cisco's contribution margin]"—finds no support in economic literature or the facts of this case. Ex. 8 (Sullivan Expert Report) at ¶155 (asserting that a UCS customer's total cost savings "can be thought of as . . . profit to Cisco"); *see* Ex. 8 (Sullivan Dep. Tr.) 85:15-17. Furthermore, Dr. Sullivan's economic principle has not been used or tested in any patent damages cases, has not been subjected to peer review, has no known potential error rate, and has not attracted widespread acceptance. Tellingly, Dr. Sullivan cites no authority for his premise.

The Court should reject Dr. Sullivan's attempt to confuse the jury by conflating two different economic principles—a customer's cost savings and Cisco's contribution margin—in his analysis. Other courts have rejected similar attempts to merge together disparate economic concepts through conclusory reasoning. *See, e.g.*, *Prism Techs. LLC v. AT & T Mobility, LLC*, No. 12-CV-122, 2014 WL 4705403, at *4–7 (D. Neb. Sept. 22, 2014) (excluding a damages opinion when "syllogistic reasoning" was the basis for combining revenue with cost savings); *Ultratec, Inc. v. Sorenson Commc'ns, Inc.*, No. 13-CV-346, 2014 WL 5361940, at *3 (W.D. Wis. Oct. 21,

2014) (excluding royalty rate damages expert opinion based upon an arbitrary subtraction of short term profit from long term profit).[4]

The unreliability of Dr. Sullivan's unsupported assumption is apparent when comparing Dr. Sullivan's estimate of Cisco's contribution margin with his estimate of revenue.   For example, Dr. Sullivan claims that ███████████████ is $14,254 and that, according to Cisco's "cost savings tool" from 2009, the cost savings per UCS server is $21,768.  *See* Ex. 8 (Sullivan Expert Report) ¶¶46, 151.  Thus, applying Dr. Sullivan's economic principle that a customer's cost savings equals Cisco's profits results in Cisco realizing $21,768 of profit every time that it sells a server for ████████████████████████████████.

Finally, the unreliability of Dr. Sullivan's contribution margin estimate—and the resulting effective royalty rate—███████████████████████████████.  Dr. Sullivan's "cost savings" royalty of $1,050 represents a significant effective royalty rate on Cisco's server revenue: █████████████████████████████████.[5] ████████████████████████████████████  *See* Ex. 10 (Becker Supplemental Report) at ¶6.  Thus, Dr. Sullivan opines that the parties would "split" Cisco's UCS contribution margin ███████████████████████ by giving Egenera ███ of Cisco's UCS revenue and the "remainder" to Cisco.  That leaves Cisco with a ***negative*** return. That approach also violates the axiom that hypothetical reasonable royalty "negotiations would

---

[4] Dr. Sullivan's supplemental report seeks to sidestep this obvious problem by asserting that Cisco's UCS revenue minus its "cost of goods sold," *i.e.*, its gross profit margin, confirms that his profit number is reasonable.  *See* Ex. 9 (Sullivan Supplemental Report) at ¶4.  But it is the contribution margin, *i.e.*, "the difference between [Cisco's] revenue and its total variable cost"— not gross profits—that underlies Sullivan's profit-split opinion. Ex. 8 (Sullivan Expert Report) at ¶155.   And Cisco's gross profit percentage cannot demonstrate that Sullivan's assumption regarding Cisco's contribution margin is reasonable.
[5] If more accurate UCS server revenue were used, the effective royalty percentage would be even higher.

leave the licensee with a reasonable profit, otherwise it would not be willing to negotiate," and violates Dr. Sullivan's own economic opinion that the parties would split Cisco's profits by allowing Cisco to keep roughly 2/3 and giving Egenera the remaining 1/3.  *Festo*, 1993 WL 1510657 at *22 (citing *Trans-World Mfg. Corp. v. Al Nyman & Sons, Inc.*, 750 F.2d 1552, 1568–69 (Fed. Cir. 1984)).

Other courts have found that reasonable royalty calculations well above an accused infringer's profits are unreliable.  *See, e.g.*, *Lindemann Maschinenfabrik GmbH v. Am. Hoist & Derrick Co., et al.*, 895 F.2d 1403, 1408 (Fed. Cir. 1990) (rejecting jury finding of royalty rate above infringer's profit level because such a result would be "absurd"); *WesternGeco L.L.C. v. ION Geophysical Corp.*, No. 9-CV-1827, 2012 WL 2911968, at *2 (S.D. Tex. July 16, 2012) (excluding expert's reasonable royalty opinion that assumed accused infringer would have "agreed to a huge, profit-eliminating . . . royalty obligation for itself").

## V.   CONCLUSION

For the foregoing reasons, Cisco respectfully requests that this Court exclude Dr. Sullivan's unreliable "cost-savings" and "acquisition" methodologies, as well as his application of any such rates to his substantially inflated server royalty base.

Dated: August 8, 2018             By:   /s/ Michael R. Rhodes
                                        John M. Desmarais (*admitted pro hac vice*)
                                        jdesmarais@desmaraisllp.com
                                        Paul A. Bondor (*admitted pro hac vice*)
                                        pbondor@desmaraisllp.com
                                        Jonas R. McDavit (*admitted pro hac vice*)
                                        jmcdavit@desmaraisllp.com
                                        Tamir Packin (*admitted pro hac vice*)
                                        tpackin@desmaraisllp.com
                                        Peter C. Magic (*admitted pro hac vice*)
                                        pmagic@desmaraisllp.com
                                        Brian Leary (*admitted pro hac vice*)
                                        bleary@desmaraisllp.com
                                        Lindsey Miller (*admitted pro hac vice*)
                                        lmiller@desmaraisllp.com
                                        Robert C. Harrits (*admitted pro hac vice*)
                                        rharrits@desmaraisllp.com
                                        Michael R. Rhodes (*admitted pro hac vice*)
                                        mrhodes@desmaraisllp.com
                                        Elizabeth Weyl (*admitted pro hac vice*)
                                        eweyl@desmaraisllp.com
                                        Carson Olsheski (*admitted pro hac vice*)
                                        colsheski@desmaraisllp.com
                                        DESMARAIS LLP
                                        230 Park Avenue
                                        New York, NY 10169
                                        Telephone: (212) 351-3400
                                        Facsimile: (212) 351-3401

                                        Kevin G. Kenneally (BBO # 550050)
                                        Kevin.Kenneally@leclairryan.com
                                        John W. Moran (BBO # 664914)
                                        John.Moran@leclairryan.com
                                        LECLAIRRYAN
                                        One International Place, Suite 1110
                                        Boston, Massachusetts 02110
                                        Telephone: (617) 502-8220
                                        Facsimile: (617) 502-8270

                                        *Counsel for Defendant Cisco Systems, Inc.*