# EXHIBIT 12

```
 1              IN THE UNITED STATES DISTRICT COURT

 2             FOR THE DISTRICT OF MASSACHUSETTS

 3

 4    EGENERA, INC.,

 5           Plaintiff,

 6        vs.                           Civil Action No.

 7    CISCO SYSTEMS, INC.,              1:16-cv-11613-RGS

 8           Defendant.
     _____
 9

10

11          (THIS TRANSCRIPT IS DESIGNATED AS

12          CONFIDENTIAL - ATTORNEYS' EYES ONLY)

13

14    VIDEOTAPED DEPOSITION OF RYAN SULLIVAN, PH.D.

15

16                Friday, June 22, 2018

17                     9:05 a.m.

18

19          San Diego Marriott Hotel Del Mar

20                 San Diego, California

21

22

23   Reported by:

24   Harry Alan Palter

25   CSR No. 7708, Certified LiveNote Reporter
```

```
 1    Q    And Exhibit 1 is your resume; correct?
 2    A    Attachment A-1 to Exhibit 1 is my current
 3  resume or sometimes referred to as a CV.
 4    Q    And it was accurate as of April 2018 when you
 5  submitted your report; correct?
 6    A    To the best of my knowledge, yes.
 7    Q    And are there any changes that you would need
 8  to make to attachment A-1 to Exhibit 1?
 9    A    I suppose some of the numbers regarding
10  deposition testimony and expert reports could be updated
11  for information or events that have occurred since I
12  submitted my initial report.  Aside from that, I think
13  all of it is -- again, to the best of my knowledge -- I
14  believe it is accurate.  I've done my best to include
15  the salient points and highlights of my background and
16  experience.  But, of course, by its very nature, it is a
17  summary, and thus, incomplete.
18    Q    And you are not an engineer; correct?
19    A    That's right.
20    Q    And you are not a computer scientist; correct?
21    A    I would not consider myself a computer
22  scientist, per se.  Although, as an economist and a
23  statistician, I do a lot of work relating to computers
24  and coding, for example.
25    Q    You are not an expert in data centers; correct?
```

```
 1    A    I have expertise in economics and finance as it
 2  relates to the marketplace of data centers; yet, by way
 3  of example, I do not operate data centers or work in an
 4  engineering capacity as it would relate to data -- data
 5  centers.
 6    Q    You are not a technical expert in data centers;
 7  correct?
 8    A    Not from an engineering perspective; yet,
 9  economics, finance, and statistics are often considered
10  technical fields.
11    Q    You are not an engineering expert in servers;
12  correct?
13    A    That's right.
14    Q    And you're not here offering technical opinions
15  about how the accused products work; correct?
16    A    Well, I'm not quite sure I understand your
17  question.
18         I do have opinions relating to contributions of
19  the technology at issue to the products.  So perhaps you
20  could clarify?
21    Q    Aside from contributions regarding the
22  technology at issue to the products, you are not here to
23  offer any opinions on how the products themselves
24  actually work; correct?
25    A    I'm not sure I'm following your question in
```

1   10:35 A.M.

2   BY MR. HARRITS:

3        Q    Dr. Sullivan, you do not have any opinions

4   about whether or not Cisco infringes the '430 patent;

5   correct?

6        A    That's right.

7        Q    And so for the purposes of your analysis, you

8   assume that Cisco infringes the '430 patent; correct?

9        A    That is an assumption that is part of the role

10  of calculating damages in this case.

11       Q    And you'd agree with me that if Cisco does not

12  infringe the '430 patent, it does not have to pay

13  damages to Egenera; correct?

14       A    I could not say with certainty what all the

15  legal claims are or remedies may be.

16       Q    To the best of your knowledge, if Cisco does

17  not infringe the '430 patent, it does not have to pay

18  damages to Egenera; correct?

19            MR. WILLIAMS:  Objection.  Calls for a legal

20  conclusion.

21            THE WITNESS:  I could not say for the reasons I

22  just described.  My understanding would be if there is

23  not a finding of liability as it relates to the claim of

24  infringement of the '430 patent, then the reasonable

25  royalties would not apply.

1  correct?
2  A   Well, they are both reliable approaches.
3  Q   But you don't say one is more reliable than the
4  other; correct?
5  A   No.  I would not think of it that way; rather,
6  I think of them as both being reliable.
7  Q   So you don't have any opinion about whether or
8  not the cost-savings approach is more reliable than
9  the -- than the acquisition approach; correct?
10 A   Again, I have not thought about it in the way
11 you're asking.  I simply think of both approaches as
12 being reliable.
13 Q   So it's your opinion that both approaches are
14 equally reliable; correct?
15 A   I have not thought about it as equally more or
16 less reliable.  I simply think of both approaches as
17 being reliable.
18 Q   You do not provide an opinion that Egenera is
19 entitled to lost profits; correct?
20 A   That's right.
21 Q   And you didn't do any calculations to figure
22 out what, if any, lost profits Egenera is entitled to;
23 correct?
24 A   I've looked at the commercial relationship
25 between Egenera and Cisco as detailed in my report.  And

1  that certainly has significant impact in terms of how
2  one should think about a reasonable royalty.  But I have
3  not separately calculated an amount of lost profits as a
4  separate remedy apart from a reasonable royalty.
5      Q   Handing you what's marked as Sullivan
6  Exhibit 6.
7          (Exhibit 6 marked)
8  BY MR. HARRITS:
9      Q   It is the -- a document bearing EGENERA00570512
10 and contains an Egenera General Purchase Agreement; is
11 that correct?
12     A   I see a letter on the first page where the
13 subject is relating -- or states:  "Execution of General
14 Purchase Agreement, two copies."  And then the second
15 page, I see at the heading, "General Purchase
16 Agreement."
17     Q   If you could please turn to page 8 of the
18 document.  It ends in EGENERA519.  This is Exhibit 6.
19         Do you understand that Exhibit 6 relates to the
20 purchase of a BladeFrame system from Egenera by Cisco
21 Systems?
22         MR. WILLIAMS:  Counsel, if you're going to ask
23 him to generally talk about the document, you might give
24 him a chance to review it.
25         MR. HARRITS:  He has a chance to review it.

```
 1        Q    Right.  But it's an "or."  It can be thought of
 2   as this or that.  Is that not how you mean that?
 3        A    Maybe you lost me.
 4             You said you were reading from my report, but
 5   then you didn't.  So now I'm lost.  Maybe just try
 6   again.
 7        Q    Well, you say:  It can be thought of as a
 8   surplus to Cisco of $3,574 per server; correct?
 9        A    Your paraphrasing makes it really difficult for
10   me to agree with your question.  I can -- I can
11   elaborate, but when you're paraphrasing like that, it
12   makes it difficult.  Or you can just ask me a separate
13   question, independent of the report.
14        Q    Let me try a separate question.
15             Is it your opinion that the $3,574 of cost
16   savings is profit to Cisco?
17        A    Yes, it is additional profit to Cisco.
18        Q    So in your opinion, Cisco makes an additional
19   $3,574 of profit for each server it sells; correct?
20        A    That's not quite right, but it's close.
21             So there is additional profit that Cisco earns
22   of this magnitude on a per-server basis.  But there's
23   more to it than that, given that this is as it relates
24   to the benefits of the patented technology.
25        Q    Okay.  So -- now, you'd agree with me that
```

```
 1   understand it.
 2        Q    And do you understand that Dr. Jones has
 3   accused more than one way of using UCS of infringing?
 4        A    That sounds familiar to me; yet that is an
 5   infringement question for Dr. Jones.
 6        Q    So your analysis is based on the assumption
 7   that Dr. Jones is correct in each of the ways he says
 8   that UCS infringes the '430 patent?
 9        A    No.  I have simply assumed infringement.
10        Q    So your analysis is not based in any way on how
11   Dr. Jones alleges UCS infringes; is that fair?
12        A    I'm not sure I follow the question.  However, I
13   simply assume infringement as articulated in my report.
14        Q    So your analysis is not based on how Dr. Jones
15   alleges UCS infringes; correct?
16        A    It's based upon an assumption of infringement.
17   It's not based upon the infringement analysis I guess is
18   probably the best way I could put it.
19        Q    Okay.
20        A    I have to say, I'm really struggling with your
21   questions, because these are all infringement questions
22   for Dr. Jones; whereas, you know, I have assumed
23   infringement for purposes of my analysis.
24             (Brief pause)
25        Q    You based your analysis -- your analysis is
```

| | |
|---|---|
| 1 | Q  So what does the blade server unit base |
| 2 | represent? |
| 3 | A  While, I detail it more in my report, in |
| 4 | effect, this is the unit base of blade servers which |
| 5 | serves as a metering mechanism to determine or measure |
| 6 | the extent of use of the patented technology as the |
| 7 | servers are used as part of the UCS system. |
| 8 | Q  What do you mean by "metering mechanism"? |
| 9 | A  A means of counting.  Being able to measure the |
| 10 | extent of use. |
| 11 | As I explain in my report, the number of |
| 12 | servers is a reasonable measure of the extent of use of |
| 13 | technology because the benefits scale with the number of |
| 14 | servers. |
| 15 | Q  So the blade server unit base is a measure of |
| 16 | the extent of use of the '430 patent? |
| 17 | A  I think generally, the number of servers serves |
| 18 | as a measure of the extent of use, given that the |
| 19 | servers are being used in infringing UCS systems that |
| 20 | naturally include more than just the servers. |
| 21 | Q  So it's your opinion, then, that all the |
| 22 | blade -- everything listed in the blade server unit base |
| 23 | of Exhibit 5 are used in an infringing UCS system? |
| 24 | A  I did not follow that. |
| 25 | Q  Is it your opinion that all the blade servers |

1   in the blade server unit base attached in E-5 are used
2   in an infringing UCS system?
3       A   My understanding is that the blade servers that
4   are comprised of the unit base are used in infringing
5   UCS system.
6       Q   Does your damage analysis differentiate between
7   system and methods claims?
8       A   I have not made a separate distinction under
9   system or method claims.  I treat the patent as a single
10  invention.
11      Q   And, similarly, for the rack servers -- so to
12  calculate your rack server unit base, you started with a
13  total number of rack servers sold -- correct? -- minus
14  the foreign sales and the sales with no revenue?
15      A   Not quite.
16      Q   What am I missing there?
17      A   So I identified the rack servers that were sold
18  by Cisco in the time period that's noted.  And I then
19  excluded non-U.S. sales and made adjustments for
20  zero-revenue sales, along within the other adjustments
21  that are described in attachment E-5.
22      Q   Which is removing rack servers use of UCS Mini
23  configuration and then removing the share of rack
24  servers that are not used with UCS Manager?
25      A   There are a couple of adjustments in attachment

1    Q   Other than what's listed in attachment E-5, did
2    you do any other apportionment to get your server unit
3    base to account for noninfringing deployments?
4        MR. WILLIAMS:  Objection.  Vague.
5        THE WITNESS:  I did not make further
6    apportionments to the unit base; rather, I did make
7    further apportionments to the royalties.
8    BY MR. HARRITS:
9    Q   Okay.  If the additional number of servers used
10   in your server unit base in attachment E-5 used in
11   deployments that did not infringe, would that have an
12   effect on your royalty analysis?
13   A   If the number of systems that infringe is
14   different, then that would cause numbers to be
15   different.
16   Q   Did you assume that Cisco UCS systems that do
17   not include fabric extenders infringe the '430 patent?
18   A   I'm sorry.  Say that again?
19   Q   Did you assume that Cisco UCS systems that do
20   not include fabric extenders infringe the '430 patent?
21       MR. WILLIAMS:  Objection.  It's beyond the
22   scope.  Foundation.
23       THE WITNESS:  I have simply assumed
24   infringement as alleged.  I have not -- this is the same
25   question as the whole line you were asking a while back

1  say, you didn't make any determination of whether or not
2  servers that were sold without an output model should be
3  included.  Sorry.  Module.
4           THE WITNESS:  Okay.
5           THE REPORTER:  Do it again, please.
6           MR. HARRITS:  Absolutely.
7           MR. PACKIN:  Why don't we take a break.
8           MR. HARRITS:  Let's take a break.
9           THE VIDEOGRAPHER:  We are off the record at
10 2:26 P.M.
11          (Off the record)
12          THE VIDEOGRAPHER:  We are back on the record at
13 2:37 P.M.
14 BY MR. HARRITS:
15    Q    So I think there might have been a little bit
16 of confusion at the end of the last session.  We were
17 talking past each other.  So I just want to try and
18 clear the record up.
19          You have not made a separate determination
20 whether UCS systems that do not use fabric extenders
21 should be included in your server unit base; is that
22 fair?
23    A    I have not made a determination of what
24 infringes and what does not infringe.  I simply have
25 assumed infringement.

1   Q   And you have not made a separate determination
2   whether UCS systems that do not use I/O modules should
3   be included in your server unit base?
4   A   Again, I have not made a determination of what
5   infringes and what does not infringe; rather, I have
6   simply assumed infringement for purposes of my analysis.
7           MR. WILLIAMS:  We're done.
8           MR. HARRITS:  Silence.
9   BY MR. HARRITS:
10  Q   Now, looking at attachment E-6 to your report,
11  E-6 calculates the average numbers of servers sold per
12  customer; is that correct?
13  A   It's the number of blade and rack servers per
14  customer with ID.
15  Q   And the values you use for the blade servers
16  sold to customers with IDs and rack servers sold to
17  customers with IDs are not the same values as your blade
18  server unit base and your rack server unit base; is that
19  correct?
20  A   That's right.
21  Q   So your average number of servers per customer
22  includes servers that you have not included in your
23  infringing server base.
24  A   No.  That's not right.
25  Q   Well, why is the number that you used in

```
 1   UCS system, which is in part why I have, you know,

 2   apportioned and isolated to the contributions of

 3   the '430 patent.

 4   BY MR. HARRITS:

 5        Q    If we look at Exhibit J-2 -- strike that.

 6             Is it your view that the '430 patented features

 7   creates the basis of consumer demand for UCS?

 8        A    From what I have seen, the technology claimed

 9   in the '430 patent as manifested in UCS, is a

10   significant driver of demand; yet, I am not assuming or

11   opining that it is the basis of demand.

12             Furthermore, my analysis does not -- or is

13   not -- based upon a belief or an assumption that the

14   '430 is the basis for demand.

15        Q    So you would agree with me that the entire

16   market value rule should not be applied in this case?

17             MR. WILLIAMS:  Objection.  Calls for a legal

18   conclusion.  Outside the scope.  Foundation.

19             THE WITNESS:  Well, I have not applied the

20   entire market-value rule for purposes of my nationals.

21             That aside, there is substantial evidence

22   demonstrating that the patented technology claimed in

23   the '430 patent as manifested in UCS is the primary

24   driver of demand for UCS; yet, again, nonetheless, I

25   have not attributed all of the demand to the '430 patent
```

1   demonstrated by substantial evidence.  Mounting screws
2   can be one part of the package, which is line-itemed
3   out, but yet driven by the UCS system.
4          As I indicated earlier, the technology claimed
5   in the '430 patent as implemented by Cisco is a primary
6   driver of the UCS system.  It is the key driver of
7   demand.  However, I have apportioned the royalties
8   specifically to the unique contributions of the '430
9   patent separate and apart from other factors such that I
10  clearly am not using the entire market value rule.
11       Q   So it's your understanding that the UCS
12  components such as mounting screws are sold as a system
13  rather than as separate components?
14       A   That strikes me as a legal question in terms of
15  what constitutes a sale.  However, according to Cisco,
16  all of the items that they produced in their financial
17  data were all sales that were part of the unified UCS
18  system.
19       Q   So it's your understanding that when someone
20  purchases a UCS system, you couldn't purchase mounting
21  screws separately from Cisco? -- separately from someone
22  who -- strike that.
23          So your -- it's your opinion that things like
24  mounting screws cannot be purchased separately for use
25  within UCS?

1        MR. WILLIAMS:  Objection.  Vague.
2        THE WITNESS:  I'm not rendering that opinion.
3   BY MR. HARRITS:
4        Q    Do you have an opinion as to whether things
5   like mounting screws or cabling can be purchased
6   separately from Cisco for use with UCS?
7        A    What do you mean by "purchased separately"?
8        Q    So your analysis is based on the assumption
9   that various UCS components are not sold individually;
10  is that correct?
11       A    No.
12       Q    How does your analysis take into account that
13  various UCS components can be sold individually?
14       A    Well, as I've been describing and as detailed
15  in my report, the sales data are provided on a line-item
16  basis.  And as described in the -- I believe it was
17  interrogatories and deposition testimony of Cisco, that
18  the financial data that were supplied are all the sales
19  that are attributable to the UCS system.  And Cisco has
20  explained that the UCS system is a unified system.
21            As such, the sales of the individual pieces are
22  all being comprised towards the unified system.
23       Q    So your analysis is based on the assumption
24  that various UCS components are sold only as a single
25  system?

1        DECLARATION UNDER PENALTY OF PERJURY

2

3        I, Ryan Sullivan, Ph.D., do hereby certify

4   under penalty of perjury that I have read the foregoing

5   transcript of the proceedings taken on June 22, 2018;

6   that I have made such corrections as appear noted on the

7   Errata Sheet, attached hereto, signed by me; that my

8   testimony as contained herein, as corrected, is true and

9   correct.

10

11        Dated this  3rd   day of  August       , 20 18 , at

12   San Diego              , California.

13

14

15   _____

16              Ryan Sullivan, Ph.D.

ERRATA SHEET

Page No. 156    Line No. 20

Change: "my nationals." to "my analyses."

Reason for change: Typographical error

Page No. 166    Line No. 14

Change: "the technology" to "the patented technology"

Reason for change: Typographical error

Page No. 170    Line No. 12

Change: "terms of that's what's" to "terms of what's"

Reason for change: Typographical error

Page No. 170    Line No. 17

Change: "and 909" to "and 99"

Reason for change: Typographical error

Page No. 182    Line No. 19

Change: "commercialization, the" to "commercialization of the"

Reason for change: Typographical error

Page No. 184    Line No. 4

Change: "I would have to look for." to "I would have to look."

Reason for change: Typographical error

Page No. 187    Line No. 6

Change: "situations not." to "and situations where it would not."

Reason for change: Typographical error

_____           August 3, 2018
Ryan Sullivan, Ph.D.                    Dated