# EXHIBIT 1

## PUBLIC – REDACTED VERSION

Message

| | |
|---|---|
| **From:** | Manca, Peter [/O=EGENERA, INC./OU=VERN/CN=RECIPIENTS/CN=MANCA] |
| **Sent:** | 6/11/2007 9:11:54 PM |
| **To:** | All [all@egenera.com] |
| **Subject:** | Egenera wins another patent - and this is the BIG one! |

All,

Egenera has been granted a patent for "Reconfiguration, Virtual Processing System, Cluster, Network and Method" or as we like to call it - PAN. Yes, after many, many years, we were finally granted the patent for the Processing Area Network architecture. It's patent number 7,231,430 and the inventors are Vern Brownell, Pete Manca, Ben Sprachman, Paul Curtis, Ewan Milne, Max Smith, Alan Greenspan, Scott Geng, Dan Busby, Ted Duffy, and Pete Schulter.

This is a huge milestone in our history. This was the first patent we applied for and it represents a significant part of our IP. Congratulations to the inventors and special thanks to Max Smith for working tirelessly with the patent office to push this through.

Pete

---------------------------
Pete Manca
Chief Technology Officer & EVP Engineering
Egenera, Inc
██████████
SKYPE: pete.manca
Blog:http://blogs.egenera.com/pete_manca/

CONFIDENTIAL – ATTORNEY'S EYES ONLY                                                EGENERA01567366

# EXHIBIT 2

CONFIDENTIAL - OUTSIDE ATTORNEYS EYES ONLY

Page 1

1                    GEORGE CHEN

2        IN THE UNITED STATES DISTRICT COURT

3              DISTRICT OF MASSACHUSETTS

4

5    EGENERA, INC.

6            Plaintiff    Civil Action

7                         No. 1:16-cv-11613-RGS

8    vs.

9    CISCO SYSTEMS, INC.

10           Defendant

11   ------------------------

12

13    CONFIDENTIAL - OUTSIDE ATTORNEYS EYES ONLY

14            VIDEOTAPED DEPOSITION OF

15                  GEORGE CHEN

16             Concord, Massachusetts

17             Monday, March 12, 2018

18

19

20

21

22

23

24   Reported by: Deborah Roth, RPR-CSR

25   Job No: 139020

CONFIDENTIAL - OUTSIDE ATTORNEYS EYES ONLY

Page 27

1                    GEORGE CHEN

2    or independent contractor with any business

3    directly or indirectly competitive with the

4    company's business."

5             Do you see that?

6    A.   Yes.

7    Q.   And is that what you were talking

8    about, about not hiring away Egenera

9    employees?

10   A.   Yes.

11   Q.   All right.  You can put Exhibit 1

12   aside, sir.

13             As the director of professional

14   services at Egenera, did you have an

15   understanding of how Egenera's BladeFrame

16   product worked?

17             MR. HARRITS:  Objection.  Vague.

18   A.   I don't -- I'm not a technical

19   software developer.  I don't understand the

20   -- how the product is assembled.

21   Q.   Did you ever assist in the

22   installation of a BladeFrame product?

23   A.   Not with the software.  I once, I

24   believe, plugged in a few blades, but that

25   was the extent of my activities personally.

CONFIDENTIAL - OUTSIDE ATTORNEYS EYES ONLY

1              GEORGE CHEN

2      Q.  You were the director of professional

3  services, correct?

4      A.  Correct.

5      Q.  So you managed the team of

6  consultants that performed the installations

7  of the BladeFrame product?

8      A.  Yes.  That is correct.

9      Q.  You personally, however, never

10  performed an installation of the BladeFrame

11  product?

12      A.  Yes, that is correct.

13      Q.  So you have no opinion on how the

14  BladeFrame is set up or configured?

15          MR. HARRITS:  Objection.  Vague.

16      A.  I have never installed a BladeFrame.

17  I don't know how one gets installed or how

18  it gets configured.

19      Q.  Okay.  Were you aware that Egenera

20  patented its intellectual property in --

21  strike that question.

22          Were you aware that Egenera

23  obtained patents on some of its technology?

24      A.  Yes.  I'm aware that patents were

25  taken to protect some of its technology.

CONFIDENTIAL - OUTSIDE ATTORNEYS EYES ONLY

Page 29

1                        GEORGE CHEN

2       Q.  And you were aware of that while you

3   were working at Egenera?

4              MR. HARRITS:  Objection.  Vague.

5       A.  I was aware that there were patents.

6   I'm not aware of what patents they were or

7   what they protected, but I was told that

8   there were some -- there was some IP that

9   they had.

10             (Exhibit 2 was marked for

11              identification.)

12      Q.  The court reporter has handed you

13   what has been marked as Exhibit 2 to your

14   deposition.  It bears the production number

15   EGENERA01567366.

16             Do you see that, sir?

17      A.  Yes, I do.

18      Q.  This email is -- well, first of all,

19   do you recall seeing this document?

20      A.  No, I do not.

21      Q.  This is an email sent from Peter

22   Manca to an address "All," all@egenera.com

23   on June 11, 2007.

24             Do you see that, sir?

25      A.  Yes, I do.

CONFIDENTIAL - OUTSIDE ATTORNEYS EYES ONLY

Page 30

1                    GEORGE CHEN

2      Q.  And that would have been during your

3   time at Egenera, correct?

4      A.  I do not know the exact dates that I

5   was at Egenera.

6      Q.  Well, you told me you left around

7   2009; is that right?

8      A.  I believe that's the case, but that's

9   a long time ago.  I'd have to look at my

10  profile --

11     Q.  Okay.

12     A.  -- to really know the dates.

13     Q.  Well, we may have a document to

14  refresh your memory --

15     A.  Okay.

16     Q.  -- on that, but is it your belief

17  that you left after June of 2007?

18     A.  Yes, it is.

19     Q.  And it is your belief that you were

20  employed at Egenera prior to June of 2007?

21     A.  I believe so.

22     Q.  We just looked at Exhibit 1, which is

23  your invention, confidentiality, noncompete

24  agreement, and it's dated April 21, 2005.

25     A.  Okay.

CONFIDENTIAL - OUTSIDE ATTORNEYS EYES ONLY

Page 31

1                    GEORGE CHEN

2       Q.  So I'll ask you one more time, is it

3    your belief that you were employed at

4    Egenera on June 11, 2007?

5       A.  I believe so.

6       Q.  Do you have any reason to believe

7    that you did not receive a copy of this

8    email while employed at Egenera?

9       A.  I have no reason to believe I did not

10   receive one.

11      Q.  All right.  This email says, "Egenera

12   has been granted a patent for

13   'Reconfiguration, Virtual Processing System,

14   Cluster, Network and Method,' or as we like

15   to called it - PAN."

16             Do you see that?

17      A.  Yes, I do.

18      Q.  Do you recall that Egenera had a

19   patent on PAN technology and received that

20   patent while you were employed at Egenera?

21             MR. HARRITS:  Objection.  Vague.

22      A.  I understood PAN to be comprised of

23   multiple pieces of technology, potentially

24   of multiple patents.  I did not understand

25   what patents performed what within the PAN

# EXHIBIT 3

1

2        IN THE UNITED STATES DISTRICT COURT

3          FOR THE DISTRICT OF MASSACHUSETTS

4    -----------------------------------x

5    EGENERA, INC.,

6                      Plaintiff,

7       vs.                        C.A. No.

8    CISCO SYSTEMS, INC.,          1:16-CV-11613-RGS

9                   Defendant.

10   -----------------------------------x

11

12            HIGHLY CONFIDENTIAL PURSUANT

13               TO PROTECTIVE ORDER

14

15      30(b)(6) VIDEOTAPED DEPOSITION OF CISCO

16    SYSTEMS, INC. by and through SCOTT CLARK

17               Boston, Massachusetts

18               March 8, 2018

19

20

21

22   Reported by:

23   Michael D. O'Connor, RMR, CRR, CRC

24   Job No: 138756

25

Page 38

1                CLARK - HIGHLY CONFIDENTIAL

2          Q.  I'm going to hand you what's been          09:50

3    marked as Exhibit 5.                                 09:50

4               MR. CAMPBELL:  For the record, it         09:50

5    bears the Bates label EGENERA01567366.               09:50

6          Q.  Mr. Clark, do you recognize this as        09:50

7    an e-mail?                                            09:50

8          A.  I recognize it as an e-mail, yes.          09:51

9          Q.  And do you see it says it's from           09:51

10   Peter Manca?                                          09:51

11         A.  Yes.                                        09:51

12         Q.  Who is Peter Manca?                         09:51

13         A.  At the time, Peter Manca was the head      09:51

14   of engineering.                                       09:51

15         Q.  For Egenera?                                09:51

16         A.  Yes, for Egenera.                           09:51

17         Q.  It says sent June 11, 2007.  Do you        09:51

18   see that?                                             09:51

19         A.  I do, yes.                                  09:51

20         Q.  Okay.  You were employed by Egenera        09:51

21   at that time, correct?                                09:51

22         A.  I was, yes.                                 09:51

23         Q.  Then it says "To:  All."  Do you see       09:51

24   that?                                                 09:51

25         A.  Correct.                                    09:51

1            CLARK - HIGHLY CONFIDENTIAL

2       Q.  The e-mail address is                    09:51

3   All@Egenera.com.  Do you see that?               09:51

4       A.  I do see that.                           09:51

5       Q.  Do you know whether you received          09:51

6   e-mails addressed to All@Egenera.com?            09:51

7       A.  I assume I did.                           09:51

8       Q.  And the subject is "Egenera wins         09:51

9   another patent - and this is the big one!"       09:51

10      Do you see that?  The subject line.          09:51

11      A.  Oh, the subject line.  Yes.              09:52

12      Q.  Do you see that?                         09:52

13      A.  I do, yes.                               09:52

14      Q.  Do you recall receiving this e-mail?      09:52

15      A.  I do not.                                 09:52

16      Q.  When did you first start talking to      09:52

17  Nuova?                                           09:52

18      A.  I don't recall.  It would have been     09:52

19  probably late in the summer of 2007, I would     09:52

20  guess, by September timeframe.                   09:52

21      Q.  And did you reach out to them or did     09:52

22  they reach out to you?                           09:52

23      MR. McDAVIT:  Objection.  Compound.          09:52

24      A.  Actually, I was reached out to by        09:52

25  someone who used to work for me at EMC who was at 09:52

Page 302

                    CLARK - HIGHLY CONFIDENTIAL

1

2          A.  I did not, no.                                05:00

3          Q.  Okay.  Other than your counsel, did          05:00

4   you talk to anyone about Topic 79?                       05:00

5          A.  No, I didn't.                                 05:00

6          Q.  Okay.  Mr. Clark, do you understand           05:00

7   that this is a patent infringement case?                 05:00

8          A.  I do, yes.                                    05:00

9          Q.  Have you looked at the patent that is         05:00

10  involved in this case?                                   05:00

11         A.  I do -- I did look at the original            05:00

12  document that was given, I think, initially,             05:00

13  probably two years ago or whatever, and I did            05:01

14  review it.                                               05:01

15         Q.  Okay.  And did you talk to anybody at         05:01

16  Cisco about it?                                          05:01

17         A.  I did not, no.  Quite frankly, at a           05:01

18  technical level, I didn't understand the details         05:01

19  of the patents regardless.                               05:01

20         Q.  Did you form any opinions about               05:01

21  whether Cisco UCS infringes the patents?                 05:01

22         A.  I did, yes.                                   05:01

23         Q.  What was your opinion?                        05:01

24         A.  They don't.                                   05:01

25         Q.  What is that opinion based on?                05:01

Page 303

CLARK - HIGHLY CONFIDENTIAL

1

2    A.   The opinion is based on the way                05:01

3  customers use UCS, the use cases of UCS that were    05:01

4  particularly initially the primary use cases of      05:01

5  UCS that I don't think you generate even if you      05:01

6  did that type of work in any of the customers I      05:01

7  was aware of that Egenera ever had.                  05:01

8    Q.   Are you familiar with what a patent           05:01

9  claim is?                                            05:02

10   A.   No, I'm not.                                  05:02

11   Q.   Did you read the patent claims of the         05:02

12  patents-in-suit?                                    05:02

13   A.   I read the document I was given.   If         05:02

14  they were in that, then again, I read that          05:02

15  probably back in 2016 sometime.  So it was a        05:02

16  while ago.                                          05:02

17   Q.   Okay.  Do you understand that whether         05:02

18  you infringe or not is an analysis of the patent    05:02

19  claims in the accused products?                     05:02

20   A.   Yeah, I don't understand the details          05:02

21  of how they, you know, measure patents against      05:02

22  each other.                                         05:02

23   Q.   So you don't understand the details           05:02

24  of how infringement is determined?                  05:02

25          MR. McDAVIT:   Objection.  Calls for a      05:02

Page 313

CLARK - HIGHLY CONFIDENTIAL

1

2      Q.  And then used it at Cisco?                    05:13

3      A.  Yeah.  But it's a standard run book.         05:13

4  You take off Cisco or Egenera and go out to any      05:13

5  customer environment or any vendor, and you're       05:13

6  going to see something that's probably 99 percent    05:13

7  the same, as it's a standard run book template or    05:14

8  format.                                              05:14

9      Q.  Does that refresh your recollection          05:14

10  as to any other documents you kept from your time   05:14

11  at Egenera?                                          05:14

12      A.  No, it doesn't.                              05:14

13      (Clark Exhibit 60, Service                       05:14

14  Description, marked for identification)             05:14

15      Q.  We'll get a stapler after.  I didn't        05:14

16  have a stapler for these.  I will hand you what's   05:14

17  been marked as Exhibit 60.  I also didn't have      05:14

18  access to make the cover sheet.  So for the         05:14

19  record, Exhibit 60 is labeled "Highly               05:14

20  Confidential Attorneys' Eyes Only," bears the       05:14

21  Bates number CISCO000224966.                        05:14

22      Do you recognize this document, Mr.             05:14

23  Clark?                                              05:14

24      A.  It looks like a service description.        05:14

25      Q.  What is a service description?              05:15

Page 314

CLARK - HIGHLY CONFIDENTIAL

1

2     A.   A service description is what service         05:15

3  groups use to explain the types of services they     05:15

4  have or package services, and so on.                  05:15

5     Q.   And this is a service description for         05:15

6  Egenera for its utility hosting accelerator?          05:15

7     A.   Is that what it is?  I guess so.              05:15

8     Q.   At the bottom it says "Egenera                05:15

9  copyright 2007 Confidential and Proprietary."         05:15

10     Do you see that?                                  05:15

11     A.   Yes.                                         05:15

12     Q.   Do you know why you would have this          05:15

13  document in your possession?                         05:15

14     A.   I don't.  Although, I probably               05:15

15  created them for Egenera, and probably used          05:15

16  industry standard formats to create them with.       05:15

17  So I'm not even sure they could be confidential      05:15

18  and proprietary to Egenera.                          05:15

19     Q.   You don't recall how you came to             05:15

20  maintain this in your possession?                    05:15

21     A.   I don't, no.                                 05:15

22     Q.   Does it refresh your recollection as         05:15

23  to any other documents that you may have kept        05:16

24  from Egenera?                                        05:16

25     A.   It doesn't, no.                              05:16

Page 315

1          CLARK - HIGHLY CONFIDENTIAL

2          (Clark Exhibit 61, Document entitled,      05:16

3     "Transitional Managed Services," marked for     05:16

4     identification)                                 05:16

5          Q.  I hand you what's been marked as       05:16

6     Exhibit 61.  Again, I didn't have the ability to  05:16

7     print the cover sheet, so this is a document     05:16

8     labeled from Cisco labeled attorneys' eyes only,  05:16

9     and bears the Bates number CISCO000224967.       05:16

10         Do you recognize Exhibit 61, Mr.            05:16

11    Clark?                                           05:16

12         A.  I actually don't, no.                   05:16

13         Q.  Do you see in the overview there it     05:16

14    says, "The Managed Services Group are part of    05:16

15    Egenera's Professional Services organization     05:16

16    focused on reducing the risk of progressing      05:16

17    applications to production status"?              05:16

18         Do you see that?                            05:16

19         A.  I do see that, yes.                     05:16

20         Q.  You were part of --                     05:17

21         A.  Managed services?                       05:17

22         Q.  That's right.  You were part of the     05:17

23    professional services organization, correct?    05:17

24         A.  That's correct, yes.                    05:17

25         Q.  Do you know why you would have this     05:17

Page 316

1          CLARK - HIGHLY CONFIDENTIAL

2    document in your possession?                    05:17

3         A.  I don't, no, unless I just -- no, I    05:17

4    don't.                                          05:17

5         Q.  Does that refresh your recollection    05:17

6    as to any other documents you may have kept from 05:17

7    Egenera?                                         05:17

8         A.  Clearly I must have kept a few.         05:17

9              (Clark Exhibit 62, Document entitled,  05:17

10   "Professional Services Oracle RAC on Egenera    05:17

11   Measurable Value and Differentiation," marked for 05:17

12   identification)                                  05:17

13        Q.  I hand you what's been marked as        05:17

14   Exhibit 62.  Again, I didn't have the ability to 05:17

15   print the cover sheet, because this production   05:17

16   was just made.  But it is labeled "Attorneys'    05:17

17   Eyes Only."  Bears the Bates number              05:17

18   CISCO00226819.                                   05:18

19             Do you recognize this document, Mr.    05:18

20   Clark?                                           05:18

21        A.  I don't actually, no.                   05:18

22        Q.  Do you see it's titled "Professional    05:18

23   Services Oracle RAC on Egenera Measurable Value  05:18

24   and Differentiation"?                            05:18

25        A.  Yes.                                    05:18

Page 317

CLARK - HIGHLY CONFIDENTIAL

1

2     Q.  Would you understand this to be an          05:18

3     Egenera document?                               05:18

4     A.  I would assume it is, yeah.  I don't         05:18

5     see Egenera -- sorry, I was going to say, I don't  05:18

6     see -- it says on Egenera.  So I assume it's from  05:18

7     Egenera.                                         05:18

8     Q.  Do you know why you would have this          05:18

9     document in your possession?                     05:18

10    A.  I don't, no.                                 05:18

11    Q.  Does it refresh your recollection as         05:18

12    to any other documents you may have kept from    05:18

13    Egenera?                                         05:18

14    A.  I'm sure there must be more if you're        05:18

15    asking that question.  So no.                    05:18

16    Q.  Does it refresh your recollection --         05:18

17    do these documents refresh your recollection as  05:18

18    to how you may have kept certain of these        05:19

19    documents?                                       05:19

20    A.  It really doesn't, no.                       05:19

21         (Clark Exhibit 63, Invention,               05:19

22    Confidentiality and Noncompete Agreement, marked 05:19

23    for identification)                              05:19

24    Q.  I hand you what's been marked as             05:19

25    Exhibit 63, a document bearing the Bates number  05:19

# EXHIBIT 4

Highly Confidential
Outside Attorneys Only

Page 1

1           IN THE UNITED STATES DISTRICT COURT
              DISTRICT OF MASSACHUSETTS
2

3    EGENERA, INC.,              §
                                 §
4           Plaintiff,           §
                                 §
5    V.                          §   Civil Action No.
                                 §   1:16-cv-11613-RGS
6    CISCO SYSTEMS, INC.,        §
                                 §
7           Defendant.           §
     _____ §

8

9

10

11            HIGHLY CONFIDENTIAL

12           OUTSIDE ATTORNEYS ONLY

13

14

15        VIDEOTAPED DEPOSITION OF

16            RICHARD HINSON

17             Austin, Texas

18       Thursday, March 1, 2018

19

20

21

22   Reported by:

23   MICHEAL A. JOHNSON, RDR, CRR

24   JOB NO. 138179

25

Highly Confidential
Outside Attorneys Only

Page 73

1                    R. HINSON - 3/1/18

2          A.   It is.                                08:37AM

3          Q.   Was he the CEO at that time?          08:37AM

4          A.   I believe so.                         08:37AM

5          Q.   Okay.  And you were working at        08:37AM

6    Egenera at that time, right?                     08:37AM

7          A.   I was, yes.                           08:37AM

8          Q.   Okay.  And the -- do you see the      08:37AM

9    third line down, it says, "To: All," and it's   08:37AM

10   got an e-mail address "all@egenera.com"?  Do    08:38AM

11   you see that?                                    08:38AM

12         A.   Yes.                                  08:38AM

13         Q.   Would you have received this          08:38AM

14   e-mail?                                          08:38AM

15         A.   I should've got it.                   08:38AM

16         Q.   Okay.  Do you recall receiving this   08:38AM

17   e-mail?                                          08:38AM

18         A.   No, I do not.                         08:38AM

19         Q.   Okay.  And you see the subject line   08:38AM

20   is, "Egenera wins another patent - and this is  08:38AM

21   the BIG one!"  With "big" in capital letters.   08:38AM

22   Do you see that?                                 08:38AM

23         A.   Yes, I can see that, yes.             08:38AM

24         Q.   If you go down to the second          08:38AM

25   paragraph, you see where it says, "This is a    08:38AM

# EXHIBIT 5

```
 1            IN THE UNITED STATES DISTRICT COURT
                FOR THE DISTRICT OF MASSACHUSETTS
 2

    EGENERA, INC.,                §
 3                                §
    VS.                           §   C.A. NO. 1:16-CV-11613-RGS
 4                                §
    CISCO SYSTEMS, INC.           §
 5
 6
 7

        ***ATTORNEYS' EYES ONLY - HIGHLY CONFIDENTIAL***
 8
 9

            ORAL AND VIDEOTAPED DEPOSITION OF
10                      JASON SHAW
                     MARCH 14, 2018
11
12

            ORAL AND VIDEOTAPED DEPOSITION OF JASON
13  SHAW, produced as a witness at the instance of the
    Plaintiff and duly sworn, was taken in the above
14  styled and numbered cause on Wednesday,
    March 14, 2018, from 10:02 a.m. to 2:58 p.m., before
15  Tamara Chapman, CSR, RPR, CRR in and for the State
    of Texas, reported by computerized stenotype
16  machine, at the offices of McKool Smith, 300 West 6th
    Street, Suite 1700, Austin, Texas, pursuant to the
17  Federal Rules of Civil Procedure and any provisions
    stated on the record herein.
18
19
20
21
22
23
24
25    Job No. 139023
```

Page 85

J. SHAW - 3/14/18 - HIGHLY CONFIDENTIAL - AEO

1

2          Q.  Hand you what I'm marking as Exhibit 5.

3              And I'll represent to you, Mr. Shaw, that

4      there's actually several different documents together

5      in one exhibit here.  But do you see on the first          11:56

6      one, it's to jason.d.shaw@gmail.com?

7          A.  Yes.

8          Q.  And that's you?

9          A.  Yes.

10         Q.  Okay.  And it's from Google Alerts?            11:57

11         A.  Yes.

12         Q.  And then the subject is "Google Alert -

13     Egenera"?

14         A.  Yes.

15         Q.  Okay.  Did you set up a Google Alert to --      11:57

16     for Egenera?

17         A.  I don't recall when I may have set this

18     up, but it would appear that I have a Google Alert

19     set up for a keyword "Egenera" to send me

20     notifications from Google.  But I don't know when I      11:57

21     would have set that up.

22         Q.  Okay.  What does a Google Alert do?

23         A.  It's -- my understanding is, it's to

24     identify when things hit the news on different

25     topics, so I could get notification to go and look at    11:57

Page 86

J. SHAW - 3/14/18 - HIGHLY CONFIDENTIAL - AEO

1  those news articles.

2       Q.  Okay.  And you set up an alert just for

3  when there was a news article related to Egenera?

4       A.  I'd have to go back and look at my Google     11:57

5  configuration, but it would appear that I have one

6  for keyword "Egenera."  And, again, I'm not sure when

7  I would've set this up.  It may have been while I was

8  still working there.

9       Q.  Well, you can see the date of this one is     11:58

10  August 22, 2008?

11       A.  Yes, I see that.

12       Q.  Where were you working at that time?

13       A.  On August 22nd, 2008, I would have been

14  working at Cisco Systems.                              11:58

15       Q.  And you can check, but these should be in

16  date order.  And if you flip to the last one, it's

17  dated December 18th, 2009.

18          Do you see that in the last one?

19       A.  Yes.  Yeah.                                   11:58

20       Q.  So during the period of August 2008 to

21  December 2009, you were working at Cisco.  Correct?

22       A.  I was working at Cisco on December 18th,

23  2009, yes.

24       Q.  And it looks like the last one you          11:59

Page 87

1        J. SHAW - 3/14/18 - HIGHLY CONFIDENTIAL - AEO

2        forwarded to Steve Morin.

3             Do you see that?

4        A.  Yes.

5        Q.  Who is Mr. Morin?                               11:59

6        A.  Steve Morin was someone who I worked with

7   at Egenera.  He was another technical support

8   engineer.  I don't know if Steve was still at Egenera

9   at that time.  I don't think so.  I think he had

10  moved on.                                                11:59

11       Q.  Do you know where he was?

12       A.  I believe if -- when he left -- I know he

13  worked at Microsoft for a period of time and then --

14  yeah.  And I -- I'm not sure when he went there.

15       Q.  And the second line down you write,           11:59

16  "Knowledge moving stuff from Egenera?"

17            Do you see that?  Question mark.

18       A.  Yes.

19       Q.  What does that mean?

20       A.  I'm not sure what that is referring to or     11:59

21  why I forwarded this, but I'm guessing someone was --

22  someone I knew was probably looking for a system

23  administrator with experience using Egenera.  And

24  removing stuff from Egenera probably suggests

25  migrating off of Egenera if I were to guess, but I     12:00

1          J. SHAW - 3/14/18 - HIGHLY CONFIDENTIAL - AEO

2     don't recall the -- what preceded this for me to send

3     this to -- to Steve.

4          Q.  It looks like these Google Alerts are

5     generally set up to send you an alert to your Gmail          12:00

6     account.  Is that correct?

7          A.  Yes.  It looks like it.

8          Q.  Do you recall if you canceled the alert

9     after December 2009 or whether it kept going?

10         A.  I'm actually not sure because I haven't          12:01

11    looked at my Google Alerts in a long time.  I'm not

12    really sure what's configured in there.

13         Q.  Do you know if you ever canceled it?

14         A.  I'm not sure.  I'd have to go and check.

15         Q.  You would agree with me that, flipping          12:01

16    through these, these are all Google Alerts that you

17    received.  Is that correct?

18         A.  These look like Google Alerts that were

19    sent to my Gmail account, but I honestly don't recall

20    reading a lot of Google Alert e-mails.  So I honestly          12:02

21    don't know how many of these I received and actually

22    read.

23         Q.  Well, based on the fact that you have

24    them, you received them.  Correct?

25              MR. RHODES:  Objection; vague,          12:02

Page 89

1    J. SHAW - 3/14/18 - HIGHLY CONFIDENTIAL - AEO

2    calls for speculation.

3         A.   These e-mails presumably were sent to my

4    Gmail account.

5              MR. RHODES:  And, Counsel, just so       12:02

6    you know, I have reviewed the issue and we don't

7    see any problem with you showing him documents

8    that list him as the custodian in the metadata.

9              MR. CAMPBELL:  Thank you.

10             (Exhibit 6 was marked.)                   12:02

11        Q.  I'll hand you what's been marked as

12   Exhibit 6.  Do you recognize this, Mr. Shaw, as an

13   e-mail thread?

14        A.  (Pause.)

15             This looks like some e-mails regarding the  12:03

16   beta program -- the Unified Computing Systems beta

17   program when I was at Cisco.

18        Q.  Okay.  And the e-mail at the top in this

19   exhibit is from Tracy Chan.  Do you see that?

20        A.  Yes.                                        12:03

21        Q.  Who is Tracy Chan?

22        A.  Let's see.  Tracy Chan was a product

23   manager on the marketing team at Nuova Systems and --

24   and ultimately Cisco after the acquisition.

25        Q.  Okay.  It was also to you.  Correct?        12:04

Page 166

J. SHAW - 3/14/18 - HIGHLY CONFIDENTIAL - AEO

1

2          MR. RHODES:  Objection;

3     foundation.

4          A.  I don't recall.  I know there were

5     discussions on patents, but I -- I was not involved          02:39

6     in those.

7          Q.  Okay.  Do you recall any discussions about

8     Egenera being awarded patents?

9          A.  I do not.

10         Q.  Okay.  Do you recall -- for the first --          02:39

11    remind me.  For the first how many years -- for the

12    first some number of years, help me out, you were in

13    Egenera's main office outside of Boston.  Right?

14         A.  Yes.  I worked at Egenera's corporate

15    office when I joined in January 2001.  And at some          02:40

16    point in 2004 I moved to Kansas City.

17         Q.  Okay.  Do you recall any plaques, awards,

18    anything of that hanging on the walls of Egenera's

19    office related to receiving patents?

20         A.  I do not.          02:40

21              (Exhibit 42 was marked.)

22         Q.  I hand you what's been marked as

23    Exhibit 42.  Do you recognize this as an e-mail from

24    Peter Manca?

25         A.  Yes.          02:40

Page 167

1          J. SHAW - 3/14/18 - HIGHLY CONFIDENTIAL - AEO

2          Q.   Okay.   And it was sent June 11th, 2007.

3     Correct?

4          A.   Yes.

5          Q.   You were with Egenera at that time?          02:40

6          A.   I was.

7          Q.   And it was sent to all.   Do you see that?

8          A.   Yes.

9          Q.   So you would have received this e-mail.

10    Correct?                                                02:40

11         A.   Yes, I would have received this e-mail.

12         Q.   Okay.   And the subject is "Egenera wins

13    another patent - and this is the BIG one!"

14              Do you see that?

15         A.   Yes.                                          02:41

16         Q.   Do you recall receiving this e-mail?

17         A.   I do not.

18         Q.   Do you recall any references to Egenera's

19    technology as patent protected?

20              MR. RHODES:   Objection; vague.               02:41

21         A.   I do not.

22         Q.   Mr. Shaw, when you left Egenera, did you

23    retain any Egenera documents?

24         A.   I did not.

25              (Exhibit 43 was marked.)                      02:42

# EXHIBIT 6



# PAN Manager Configuration and Installation Guide

**September 2012**

**PM7.3**

# Copyright

Copyright © 2011-12 Egenera, Inc. All rights reserved. This product is protected by U.S. and international copyright and intellectual property laws. Egenera products are covered by one or more patents listed at http://www.egenera.com/patents.

This document, and the product described in it, is furnished under license and may only be used in accordance with the terms of such license. The content of this document is furnished for information purposes only and is subject to change without notice.

Egenera, Egenera stylized logos, PAN, PAN Manager, PAN Domain, PAN Advanced, PAN Enterprise, pNode, and PAN OPServer (POPS), PAN Agent, PAN Tools are trademarks or registered trademarks of Egenera, Inc. in the United States and/or other countries.

AMD is a trademark of Advanced Micro Devices, Inc.

EMC, CLARiiON, and Symmetrix are registered trademarks of EMC Corporation.

IBM and BladeCenter are registered trademarks of International Business Machines Corporation.

Intel and Xeon are trademarks of the Intel Corporation in the United States and other countries.

Linux is a registered trademark of Linus Torvalds.

Microsoft and Windows are either registered trademarks or trademarks of Microsoft Corporation in the United States and/or other countries. The virtual VGA console uses Microsoft Terminal Services Advanced Client (TSAC), which is a copyright of Microsoft Corporation.

MindTerm is copyright AppGate AB.

NEC and NEC Express5800 are either registered trademarks or trademarks of NEC Corporation.

Red Hat is a registered trademark of Red Hat, Inc. in the United States and other countries.

Sun, Sun Microsystems, the Sun Logo, Solaris, and the Java logo are trademarks or registered trademarks of Sun Microsystems, Inc. in the United States and other countries.

SUSE is a registered trademark of SUSE LINUX Products GmbH, a Novell business.

VMware, Virtual SMP, ESX, vSphere and VMotion are registered trademarks or trademarks of VMware, Inc.

Xen, XenSource, XenServer, and XenEnterprise are either registered trademarks or trademarks of Citrix Systems, Inc. in the United States and/or other countries.

All other company and product names are trademarks or registered trademarks of their respective holders.

Printed in the United States of America.[120920:143612]

Egenera, Inc., 80 Central Street, Boxborough, Massachusetts 01719.

# Contents

## Preface

Customer Support ........................................................................................ xi

Document Conventions ............................................................................. xii

## Chapter 1:  Preparations For PAN Manager

Overview ................................................................................................... 1-2

Chassis Preparation: Connections and Network Configuration Requirements ....... 1-2

Preparing the PAN OPServers: Rack Server or ESX VM Installation ................... 1-3
    Network Configuration Requirements on a Rack Server ............................... 1-6
    ESX Host Network Configuration Requirements ........................................ 1-7

PAN OPServer Minimum Requirements ................................................... 1-9

General Site Preparation Requirements ................................................... 1-10

## Chapter 2:  Setup and Configuration for HP BladeSystem c7000 Enclosures

Overview of Configuration Procedures ...................................................... 2-1

Chapter Goal ............................................................................................. 2-2

Information Requirements ......................................................................... 2-2

CONFIDENTIAL – ATTORNEY'S EYES ONLY      EGENERA00339797

Terminology Used Throughout This Chapter ...................................................... 2-3

**Task 1:** Ensure Required Chassis Pre-installation Requirements Are Complete .... 2-4

**Task 2:** Review Networking and Chassis Information ........................................... 2-6

**Task 3:** Prepare the HP BladeSystem c7000 Enclosure to Communicate with
PAN Manager ....................................................................................................... 2-8

      **Subtask a:** Configure the Chassis OA ............................................................ 2-9

      **Subtask b:** Configure Required Settings on Virtual Connect Manager ........ 2-12

## Chapter 3:  Setup and Configuration for NEC SIGMABLADE-H Enclosures

Overview of Configuration Procedures ................................................................ 3-1

Chapter Goal ...................................................................................................... 3-2

Information Requirements ................................................................................... 3-2

Terminology Used Throughout This Chapter ...................................................... 3-3

**Task 1:** Ensure Required Chassis Pre-installation Requirements Are Complete .... 3-4

**Task 2:** Review Networking and Chassis Information ........................................... 3-6

**Task 3:** Prepare the NEC SIGMABLADE-H Enclosure to Interact with PAN Manager
3-7

## Chapter 4:  Setup and Configuration for IBM BladeCenter H Enclosures

Overview of Configuration Procedures ................................................................ 4-1

Chapter Goal ...................................................................................................... 4-2

CONFIDENTIAL – ATTORNEY'S EYES ONLY                          EGENERA00339798

Information Requirements .................................................................... 4-2

Terminology Used Throughout This Chapter ........................................ 4-3

**Task 1:** Ensure Required Chassis Pre-installation Requirements Are Complete .... 4-4

**Task 2:** Review Networking and Chassis Information .......................... 4-5

**Task 3:** Prepare the IBM BladeCenter H Enclosure to Interact with PAN Manager 4-6

## Chapter 5:  PAN OPServer Setup and Configuration on a Rack Server

Overview of Configuration Procedures ................................................. 5-1

Chapter Goal ...................................................................................... 5-2

Terminology Used Throughout This Chapter ........................................ 5-2

**Task 1:** Ensure Required PAN OPServer Pre-installation Requirements Are Complete 5-4

**Task 2:** PAN OPServer Preparation ................................................... 5-5

**Task 3:** Install RHEL 6.*n* on each PAN OPServer ............................. 5-6

**Task 4:** Run the Post_OS_Install Script ............................................ 5-9

**Task 5:** Install PAN Manager on each PAN OPServer ......................... 5-16

**Task 6:** Configure a PAN Manager Global IP Address: ...................... 5-18

**Task 7:** Join the PAN OPServers ...................................................... 5-19

## Chapter 6:  PAN OPServer Setup and Configuration on an ESX VM

Overview of Configuration Procedures ................................................. 6-1

CONFIDENTIAL – ATTORNEY'S EYES ONLY                    EGENERA00339799

Chapter Goal ............................................................................................ 6-2

Terminology Used Throughout This Chapter ......................................... 6-2

**Task 1:** Ensure Required PAN OPServer Pre-installation Requirements Are Complete
6-4

**Task 2:** PAN OPServer Preparation .................................................... 6-5

**Task 3:** Install RHEL 6.*n* on the PAN OPServer ................................ 6-8

**Task 4:** Run the Post_OS_Install Script ............................................. 6-11

**Task 5:** Install PAN Manager on the PAN OPServer ........................... 6-16

**Task 6:** Configure a PAN Manager Global IP Address: ....................... 6-18

## Chapter 7:  Add a Domain To Your PAN

Choices and Procedures for Adding or Removing a Domain ................................. 7-1
    Chapter Goal ....................................................................................... 7-2
    About Adding a Domain ....................................................................... 7-2

Adding PAN Domain Licenses to a PAN ............................................................. 7-4

Adding a Domain to a PAN ................................................................................. 7-5
    Next Steps ........................................................................................... 7-8

To Rename a Domain .......................................................................................... 7-8

## Appendix A: Upgrading, Maintenance, and Recovery Procedures

Upgrading the PAN Manager Application ............................................................ A-2

Stopping or Restarting PAN Manager ................................................................. A-3

Removing PAN Manager Software and Data From A PAN OPServer ................. A-5

CONFIDENTIAL – ATTORNEY'S EYES ONLY                                    EGENERA00339800

Modifying the Management Network in your PAN ............................................... A-7

Modifying the IP Address of One or Both PAN OPServers ................................. A-8

Removing a Domain from PAN Manager ........................................................... A-11

Replacing a Failed PAN OPServer in a Rack Server Installation ...................... A-12

Manually Adding a PAN Manager Account to a pNode ..................................... A-13

Adding a pNode to a Running System ............................................................... A-14

Creating bond0 and bond1 ............................................................................... A-15

# Index

CONFIDENTIAL – ATTORNEY'S EYES ONLY                                          EGENERA00339801

**PM7.3**

CONFIDENTIAL – ATTORNEY'S EYES ONLY

EGENERA00339802

# Preface

Welcome to PAN Manager PM7.3. The *PAN Manager Configuration and Installation Guide* includes the following chapters:

- Chapter 1, "Preparations For PAN Manager"
- Chapter 2, "Setup and Configuration for HP BladeSystem c7000 Enclosures"
- Chapter 3, "Setup and Configuration for NEC SIGMABLADE-H Enclosures"
- Chapter 4, "Setup and Configuration for IBM BladeCenter H Enclosures"
- Chapter 5, "PAN OPServer Setup and Configuration on a Rack Server"
- Chapter 6, "PAN OPServer Setup and Configuration on an ESX VM"
- Chapter 7, "Add a Domain To Your PAN"
- Appendix A, "Upgrading, Maintenance, and Recovery Procedures"

**Audience** — *PAN Manager Configuration and Installation Guide* is for datacenter administrators with the following experience:

CONFIDENTIAL – ATTORNEY'S EYES ONLY
EGENERA00339803

- **For PAN Manager installs on RHEL6 on two PAN OPServers** — comprehensive experience with **Red Hat Enterprise Linux 6** (RHEL6) installations; an ability to work with network administrators to setup advance networking configurations on each PAN OPServer.

- **For PAN Manager installs on an ESX virtual machine (VM) PAN OPServer that is running RHEL6** — comprehensive experience with the VMware vSphere product and configuring ESX clusters and guest VMs; an ability to work with their network administrators to set up appropriate networking on the PAN OPServer.

Successful PAN Manager configuration and install requires experience in the following areas:

- Configuring data center networks

- Setting up LAN infrastructure

- Setting up SAN infrastructure

- Installing the RHEL 6.$n$ operating system

- Linux administration, including aggregated network interface configurations

**Topics** — Read this book to learn about:

- Performing essential hardware and network configuration tasks

- Making required chassis configurations in order to allow PAN Manager to communicate and manager chassis resources

- Doing one of the following:

  - Installing and configuring PAN Manager software on two PAN OPServers each running RHEL 6.$n$ on a rack server. Then you join PAN Manager on each PAN OPServer.

  - Initializing an ESX VM running RHEL 6.$n$ on one PAN OPServer to configure and install PAN Manager software

- Adding up to sixteen domains to PAN Manager with appropriate licenses

CONFIDENTIAL – ATTORNEY'S EYES ONLY                    EGENERA00339804

After you complete the required setup and installation steps, see *PAN Manager Administrator's Guide* to use PAN Manager to set up your PAN domain and subsequently build, boot, and manage pServers under PAN Manager control.

# Customer Support

### HP BladeSystem c7000 Enclosure Support

For hardware installation/configuration support, related OS drivers, firmware upgrade, and release notes information for the HP BladeSystem c7000 Enclosure, see the documentation available on the HP website (http://www.hp.com/go/bladesystem/documentation).

### IBM BladeCenter Support

For hardware installation and configuration support, related OS drivers, firmware upgrade, and release notes information for the IBM BladeCenter H Enclosure, see the documentation available on the IBM website (http://www-03.ibm.com/systems/bladecenter/hardware/chassis/).

### NEC SIGMABLADE system Support

For hardware installation/configuration support, related OS drivers, firmware upgrade, and release notes information for the NEC SIGMABLADE-H Enclosure,see the documentation available on the NEC website (http://www.nec.com) and navigate to the SIGMABLADE-H microsite of your choice of country.

CONFIDENTIAL – ATTORNEY'S EYES ONLY                                  EGENERA00339805

### Egenera Global Technical Support

For the latest support, downloads, release notes, and other information resources regarding PAN Manager software, please use the following contact information:

| | |
|---|---|
| **Internet** | http://www.egenera.com/support-services-overview.htm |
| **Telephone** | +1-866-301-3117 |

# Document Conventions

| Convention | Description |
|---|---|
| > | Directory-level delimiter used to navigate the left pane of the PAN Manager GUI.<br><br>**Example**: **Resources > Ethernet Connections** |
| *Sans serif italics* | Variable text, such as a path, a filename, or an LPAN name.<br><br>**Example**: `lpan -c` *lpanname* |
| `Sans serif` | Text that must be typed as shown.<br><br>**Example**: Type `root` at the login prompt. |
| **Bold** | The name of a field or window element appearing in a GUI. It also highlights default values in PAN Manager man pages.<br><br>**Example**: In the **Users** page... |
| *Italics* | Text that is emphasized.<br><br>**Example**: Do *not* connect the power. |
| `[text]` | Text that is optional to a command. |
| `{text}` | A set of choices, one of which is required. |

CONFIDENTIAL – ATTORNEY'S EYES ONLY                          EGENERA00339806

| Convention | Description |
|---|---|
| \| | Separation of mutually exclusive choices in syntax lines. |
| | **Example**: lpan [-aD \| -rD]{*switch* \| *SCSI_ID*} *lpanname* |
| **Note** | Information of importance or that may not fit in main text. |
| **Caution** | Failure to heed a caution could result in loss of data. |
| ⚠ | **Warning** — Failure to heed a warning could result in physical harm to the user or the hardware. |

CONFIDENTIAL – ATTORNEY'S EYES ONLY                                         EGENERA00339807

CONFIDENTIAL – ATTORNEY'S EYES ONLY

EGENERA00339808

# Chapter 1

# Preparations For PAN Manager

If you are:

- Installing PAN Manager for the first time, follow the instructions in this and the following chapter.

- Upgrading an existing PAN Manager installation, you can skip this installation-focused chapter and move directly to the section "Upgrading the PAN Manager Application" on page A-2.

This chapter outlines the datacenter infrastructure and hardware preparations you must complete in order for PAN Manager to communicate properly with your domain and for pServers to properly access your SAN and Ethernet networking environment. It includes the following sections:

- "Chassis Preparation: Connections and Network Configuration Requirements" on page 1-2

- "Preparing the PAN OPServers: Rack Server or ESX VM Installation" on page 1-3

- "PAN OPServer Minimum Requirements" on page 1-9

- "General Site Preparation Requirements" on page 1-10

CONFIDENTIAL – ATTORNEY'S EYES ONLY                    EGENERA00339809

# Overview

PAN Manager is a software application that manages the resources of a single domain. After you configure the PAN OPServer(s) for networking over your premises network, you install PAN Manager. A PAN OPServer must always be **dedicated exclusively to running PAN Manager**. As long as the chassis can connect to your premises network and SAN environment and each PAN OPServer can connect to your premises network, the PAN Manager application can manage the domain.

# Chassis Preparation: Connections and Network Configuration Requirements

To ensure PAN Manager can communicate with the domain to make configurations and contact pServers running on chassis pNodes, each **domain** requires the following redundant connections made to the chassis:

- **For communicating domain configuration data:** A connection that provides non-VLAN tagged access to the management network that allows communication between the chassis management interfaces and the PAN OPServer(s).

- **For pServer contact:** Connections on a pair of 10GB Ethernet switch ports that provide access to the VLANs designated for LPAN private management use (for private management communication between pServer heartbeat agents and PAN Manager).

CONFIDENTIAL – ATTORNEY'S EYES ONLY                          EGENERA00339810

# EXHIBIT 7

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS
(BOSTON)

| | |
|---|---|
| EGENERA, INC., | |
| **Plaintiff,** | Civil Action No.  1:16-cv-11613-RGS |
| v. | |
| CISCO SYSTEMS, INC., | JURY TRIAL |
| **Defendant.** | |

## DECLARATION OF SCOTT GENG

I, Scott Geng, do hereby declare as follows:

1.      I am the Chief Technology Officer and Executive Vice President of Engineering of Egenera, Inc. ("Egenera") and an inventor of U.S. Patent No. 7,231,430 (the "'430 patent").

2.      Since joining Egenera on June 19, 2000, I have had several roles at the company. From June 19, 2000 until December 2000, I was Member of Technical Staff. From December 2000 until June 14, 2003, I was Software Development Manager. From June 15, 2003 until August 9, 2004, I was Director of Engineering. From August 10, 2004 until October 31, 2009, I was Vice President of Engineering. From November 1, 2009 until October 31, 2014, I was Senior Vice President of Engineering. Since November 1, 2014, I have been Chief Technology Officer and Executive Vice President of Engineering for Egenera.

3.      During my first few years at the company, I was initially responsible for the design and development for service clusters to support application high availability within the process area network architecture and later, for managing the software development projects related to our Interframe (later re-named "BladeFrame") product that was developed and sold. As

Software Development Manager, I managed the development of all the features of PAN Manager and related software products except for the Microsoft Windows Server virtualization drivers.

4.      I have reviewed the publicly-filed version of Cisco Systems, Inc.'s Opening Brief in Support of its Motion for Summary Judgment of Invalidity of U.S. Patent No. 7,231,430 (the "'430 patent").

5.      I have been asked to respond to the allegations made by Cisco that Peter Schulter is an inventor of the '430 patent based on the contribution Cisco alleges he made to "virtual LAN proxy" functionality.

6.      As a preliminary matter, the "virtual LAN proxy" functionality described in the '430 patent operates, at a high level, is the way by which processing resources internal to the platform are able to communicate with external networks.

7.      In our Interframe computing platform—later commercially released as BladeFrame—this "virtual LAN proxy" functionality was located in what were initially called "Interframe Controller Nodes" (or "IFC Nodes"), but later became known as "cBlades." These IFC Nodes were to allow processing resources (like application nodes or blades)—which may have virtual interfaces, virtual MAC addresses, and other virtual components—to communicate with networks external to the Interframe. Having IFC Nodes to handle this was necessary because we did not intend for our application nodes to have direct connectivity with external networks. For instance, the IFC Nodes were to be able to translate virtual MAC addresses for internal processing resources such that devices external to the Interframe could still communicate with the internal processing resources. This functionality was discussed and understood before Mr. Schulter joined Egenera on October 2, 2000. When Mr. Schulter joined the company, he was involved in taking the ideas like virtual LAN proxy that we had already conceived of and making

them a reality in the Interframe product.

8.     As I will explain, and as I also testified at my deposition with reference to several documents, the "virtual LAN proxy" functionality was conceived of before Mr. Schulter joined Egenera on October 2, 2000. Although the specific phrase was not used, the functionality is described in several documents pre-dating Mr. Schulter's employment at Egenera. The documents I plan to discuss did not just suggest goals we had at the time, or reflect that we had merely aspired to goals we thought we were unlikely to reach. Instead, the documents provided details of the product we were already at work building.

9.     One exemplary document is "The Egenera Interframe: A New Architecture for Internet Application Processing" ("The Egenera Interframe Document"). This document is dated June 30, 2000, and lists '430 patent co-inventors Ewan Milne and Paul Curtis as authors. The Egenera Interframe Document includes at least the following discussion relevant to "virtual LAN proxy" functionality:

> The Egenera Interframe[TM] consists of a cabinet containing individual processing modules, as well as cabling for power distribution, communications between the modules, and external I/O interfaces.
>
> ***
>
> There are two basic modules in the system.  Interframe™ Controller modules (IFC modules) perform I/O processing and system management functions, but do not run application software.  All of the external I/O interfaces are connected to the IFC modules.  Application Processor modules (AP modules) run application software, but do not contain any I/O interfaces other than the interface card for the system interconnect.  Application Processors are able to perform I/O operations via a message-passing interface to the Interframe™ Controllers. External network interfaces on the Interframe™ Controllers forward incoming TCP/IP traffic to the Application Processors by examining the fields in the packet header to route the packet to the appropriate destination.
>
> ***
>
> A distributed network implementation that allows AP nodes with no physical network interface to utilize the network interfaces on the IFC nodes. The IFC

nodes must be able to multiplex network traffic from several AP nodes onto one physical network interface, and demultiplex the incoming network traffic and send it to the appropriate AP nodes. Some packet filtering logic will be required. This could be extended for simple application load-balancing.

\*\*\*

The version 1 software will consist of the basic functionality described above. This software will provide equal or better functionality when compared with an off-the-shelf Linux cluster solution. The primary value of the Interframe™ with this software release will be the improved packaging technology, which provides a shorter installation time and a more manageable system.  In addition, the use of the interconnect to allow the AP nodes to perform I/O through the IFC nodes results in a more cost-effective system and a more cost-effective installation for the customer. The machine will not require separate ports on the Gigabit Ethernet LAN and Fiber Channel SAN switches for each node in the Interframe, only the AP nodes. The functionality on the IFC nodes that provides routing of incoming network traffic to the appropriate AP nodes can be used to provide a simple application load balancing solution that can remove the requirement for an external network load balancing device.

10.     As can be seen from the above excerpts, The Egenera Interframe Document confirms how our application nodes were only able to communicate with external networks through IFC Nodes. The Egenera Interframe Document also discusses how IFC Nodes handle network traffic from multiple application nodes going out onto that external network, and how the IFC nodes handle traffic from the external network coming back into the Interframe platform.

11.     Another relevant document is "Egenera Interframe I/O Architecture" (the "Egenera Interframe I/O Architecture Document"). This document is dated September 29, 2000, and lists '430 patent co-inventor Max Smith as author. I discussed this document, including its disclosure related to "virtual LAN proxy," at my deposition. The Egenera Interframe I/O Architecture Document includes at least the following discussion relevant to "virtual LAN proxy" functionality:

*1.1 I/O Overview*

Application nodes of an Egenera Interframe system have none of the conventional I/O devices usually found on personal computers: they have no floppy disk drive,

no hard disk drive, no CD-ROM drive, no USB or parallel or serial ports (with the exception of an Emergency Management Port), no Ethernet card, no video, no keyboard, and no mouse. . . . Drivers in the operating system kernel loaded on the application nodes, communicating over the Interframe's Giganet switch fabric to I/O server logic on the Interframe's two Interframe controller nodes, simulate availability of hard disk drives, Ethernet cards, and serial consoles to application programs running on application nodes. The two Interframe controller nodes perform all actual I/O on behalf of the entire system.

\*\*\*

Similarly, the Interframe administrator can configure simulated Ethernet interfaces on specific application nodes, together with simulated connections among them or to a simulated router for interconnecting to the external network. When an application node requests transmission of a network packet, the network driver in the node's operating system kernel determines whether the packet is destined for another application node within the Interframe or for the external network. Packets destined for another application node are sent directly to that node through the Interframe's Giganet switch. Packets destined for the external network are forwarded through the Giganet switch to one of the Interframe controller nodes, where I/O logic forwards the packet out onto the actual external network interface. Inbound packets arriving from the external network are routed by I/O logic on the Interframe controller node through the Interframe's Giganet switch to the proper application node, where the network driver in that node's operating system kernel in turn delivers them to their ultimate recipient.

\*\*\*

*1.2 Network I/O*

\*\*\*

In addition, the architecture provides for the simulation of up to some number (how many?) of Ethernet-like ports on each application node, and the simulation of four routers for access to each of the system's actual external high-speed network connections.

\*\*\*

*1.2.1.1 Simulated Ethernet I/O over Giganet*

\*\*\*

Our simulated MAC addresses, however, need only be unique within a single Egenera Interframe system, as none of our simulated Ethernet segments depart the confines of the system.

\*\*\*

*1.2.2.1 Simulated Routers*

All the external network traffic generated by the application nodes must be routed through the four Gigabit Ethernet interfaces on the Interframe controller nodes. Application nodes have no other access to the external network.  In order for an application node to access the external network, the Egenera administrator must configure a simulated network interface card on the node and configure simulated cabling between that card and a simulated router on an Interframe controller node. The administrator must then configure routing rules for that router which will determine how incoming and outgoing network traffic applicable to that node is handled by the router.

12.     As can be seen from the above excerpts, the Egenera Interframe I/O Architecture Document also confirms how our application nodes were only able to communicate with external networks through IFC Nodes. The Egenera Interframe I/O Architecture Document also discusses how IFC Nodes handle network traffic that comes from virtual interfaces, including using virtual MAC addresses, within the Interframe platform. This confirms, for instance, that the IFC Nodes would handle necessary MAC address translation so that devices external to the Interframe platform would not need to deal with addressing schemes internal to the Interframe platform.

13.     A third relevant document is "Egenera Interframe Architecture" (the "Egenera Interframe Architecture Document"). This document is dated October 1, 2000, and lists '430 patent co-inventor Max Smith as author. I noted this document at my deposition. The Egenera Interframe Architecture Document includes at least the following discussion relevant to "virtual LAN proxy" functionality:

*1 Introduction*

***

Application nodes themselves have no Ethernet or disk I/O. All application node I/O is routed indirectly through two Interframe controller nodes that actually interface to the external Ethernet and storage area network. Application nodes communicate with the Interframe controller nodes and among themselves via pre-wired connections through two high-speed switch nodes. All critical components are replicated, so no single failure can prevent system operation.

***

*5.8.1 Configuration*

***

The node's configuration also expresses the virtual Ethernet network interfaces that will be simulated for the node when it boots. This permits the node to be reached from the external high-speed Ethernet network.

14.     As can be seen from the above excerpts, The Egenera Interframe Architecture Document confirms how our application nodes were only able to communicate with external networks through IFC Nodes. The Egenera Interframe Architecture Document also discusses how IFC Nodes handle network traffic that comes from virtual interfaces within the Interframe platform.

15.     It is also worth noting that these documents I have just described are just some of the documents created before Mr. Schulter joined Egenera that describe the Interframe computing platform we were building. Other documents confirm that our ideas were not simply goals before Mr. Schulter joined Egenera. For instance, a Marketing Requirements Document (dated August 4, 2000), Product Roadmap (version 1.0, dated August 5, 2000; version 0.2, dated June 26, 2000), and Project Plan (dated July 17, 2000) all confirm we were hard at work on the Interframe before Mr. Schulter joined Egenera.

16.     On September 11, 2001, Egenera demonstrated its BladeFrame computing platform—what the Interframe came to be known as—in Atlanta, Georgia. Mr. Schulter was of great help implementing and coding what became known as the BladeFrame. He was also involved in the conception of certain ideas related to BladeFrame, as recognized by his named inventor status on 6,971,044.

17.     I have also been asked to provide details regarding the way in which our PAN Manager software was provided to users.

18.     The PAN Manager installation image was historically delivered via a hard copy media image (*e.g.*, CD or DVD). However, with the release of PAN Manager 7 in May of 2011, Egenera changed the installation delivery mechanism to be via network download of an ISO disk image. This was done to conform with how the industry was delivering software-only products at that time. During installation, materials on the CD, DVD, or ISO would be put on the system being installed. These materials include the guides I discuss below.

19.     It has always been the case that Egenera included the latest PAN Manager product documentation as part of the installation media (*e.g.*, the CD or DVD). Egenera maintained that same practice even after the shift to a downloadable installation image.

20.     So, with the release of PAN Manager 7, Egenera customers were expected to download the installation image to install the product. And, after installing the product, customers had easy access to the product documentation via a link in the PAN Manager graphical user interface.

21.     Egenera also made the latest product documentation available via the same webpage that the customer used to download the installation image, so that customers could access the latest documentation at any time without needing access to PAN Manager.

22.     With the release of PAN Manager 7.3.10 in September of 2012, Egenera included specific language in the product documentation to indicate that the PAN Manager product was protected by Egenera-owned patents, including with a reference to www.egenera.com/patents. Customers downloading ISOs had direct visibility to that language via several PAN Manager guides, including the PAN Manager Configuration and Installation Guide, PAN Manager Web Service API Primer, PAN Manager Command Reference, and PAN Manager Administrator's Guide. Each of those guides included a reference to www.egenera.com/patents. And once PAN

Manager 7.3.10 was released, all Egenera users with access to the support portal had visibility to that language.

23.     In my experience, it was typical for PAN Manager users to refer to the Egenera product documentation. For instance, the PAN Manager Configuration and Installation Guide was used to initially install and configure PAN Manager. And PAN Manager users would use the Administrator's Guide to understand the concepts of the PAN architecture. Furthermore, PAN Manager users also learned about how to use the PAN Manager user interface using the Command Reference Guide. It was also a common practice for our support team to refer customers to the Administrator's Guide to understand how to accomplish certain tasks. These common practices would have given users ample exposure to the language referring to our patent website in the PAN Manager documentation.

I DECLARE UNDER PENALTY OF PERJURY OF THE LAWS OF THE UNITED STATES THAT THE FOREGOING IS TRUE AND CORRECT.

**Dated: August 30, 2018**                          Respectfully submitted,

Scott Geng

# EXHIBIT 8

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| **EGENERA, INC.,** | |
| **Plaintiff,** | Civil Action No. 1:16-cv-11613-RGS |
| **v.** | |
| **CISCO SYSTEMS, INC.,** | JURY TRIAL |
| **Defendant.** | |

**EGENERA, INC.'S SUPPLEMENTAL AND AMENDED OBJECTIONS AND
RESPONSES TO CISCO SYSTEMS, INC.'S FIRST SET OF
INTERROGATORIES (NO. 5)**

Pursuant to Rules 26 and 33 of the Federal Rules of Civil Procedure, Plaintiff Egenera, Inc. ("Plaintiff" or "Egenera") hereby provides this Supplemental and Amended Response to Defendant Cisco Systems Inc.'s ("Cisco") First Set of Interrogatories to Egenera (No. 5) as follows:

**PRELIMINARY STATEMENT**

Egenera's responses to these interrogatories are made to the best of its present knowledge, information, and belief. Egenera has not completed its investigation of the facts relating to this case, has not completed discovery in this action, and has not completed preparation for trial. These responses are at all times subject to such additional or different information that discovery or further investigation may disclose and, while based on the present state of Egenera's knowledge, are subject to such refreshing of recollection and such additional knowledge of facts as may result from Egenera's further discovery or investigation. By responding to Cisco's interrogatories, Egenera does not waive any objection that may be

applicable to: (1) the use, for any purpose, by Cisco of any information provided in response; or (2) the admissibility, relevance, or materiality of any of the information to any issue in this case.

## **GENERAL OBJECTIONS**

The following general objections are made to each and every interrogatory, definition, and instruction and are in addition to any specific objections that are raised in response to each interrogatory separately.

1.     Egenera objects generally and specifically to each and every interrogatory, definition, and instruction to the extent that it purports to impose burdens or duties on Egenera that exceeds the scope of reasonable and permissible discovery or that exceeds the requirements of the Federal Rules of Civil Procedure and the Local Rules of this Court, or any applicable ruling of this Court.

2.     Egenera objects to each and every interrogatory, definition, and instruction to the extent that it seeks discovery prior to the date such information is to be exchanged pursuant to the Local Rules, the schedule in this case, and/or a specific agreement between parties for limited discovery.

3.     Egenera objects to each and every interrogatory, definition, and instruction to the extent that it seeks information that is not relevant to the subject matter of this proceeding or reasonably calculated to lead to the discovery of admissible evidence.

4.     Egenera objects to each and every interrogatory, definition, and instruction to the extent that it seeks the disclosure of information protected by the attorney-client privilege or the attorney work-product doctrine, and other applicable law, privilege, immunity, protection, or doctrine, or to the extent such interrogatory, definition, and instruction seeks the impressions, conclusions, opinion, legal research or theories of Egenera's attorneys or their agents. The

inadvertent production of any privileged document or information shall not constitute wavier of any applicable objection or privilege. For purposes of responding to these demands, Egenera will interpret such interrogatory, definition, and instruction as excluding information subject to the attorney-client privilege and attorney work-product doctrine.

5.      Egenera objects to each and every interrogatory, definition, and instruction to the extent that it seeks to discover trade secrets or any other commercially sensitive, confidential, or proprietary information, the disclosure of which could be damaging to the business or property of Egenera or other related business entities. Egenera also objects to the extent that each interrogatory, definition, and instruction seeks the confidential or proprietary information of third parties, some of which may have non-disclosure or confidentiality agreements with Egenera. Egenera will provide such information only to the extent it can do so consistent with its obligations to any third parties.

6.      Egenera objects to each and every interrogatory, definition, and instruction to the extent that it calls for a legal conclusion. Any response by Egenera shall not be construed as providing legal conclusion regarding the meaning or application of any terms or phrases used in Cisco's interrogatories, definitions, or instructions.

7.      Egenera objects to each and every interrogatory, definition, and instruction to the extent that the information sought is a matter of public record or uniquely within the knowledge of Cisco or non-parties, or to the extent that the information sought is as readily determinable by Cisco as by Egenera. Egenera further objects to each and every interrogatory, definition, and instruction to the extent that the information sought is not within Egenera's possession, custody, or control.

8.      Egenera objects to each and every interrogatory, definition, and instruction to the

3

extent that it renders any interrogatory compound or to the extent that it contains multiple inappropriate subparts. Such interrogatories constitute separate interrogatories that count toward the limit on interrogatories that Cisco is permitted to propound. Egenera objects to each and every interrogatory, definition, and instruction that would exceed such limit.

9.      Egenera objects to each and every interrogatory, definition, and instruction to the extent that it seeks to require Egenera to do more than conduct an examination of those files or sources that reasonably may be expected to yield responsive information or an inquiry of those persons who reasonably may be expected to possess responsive information.

10.     Egenera objects to each and every interrogatory, definition, and instruction to the extent that it either calls for Egenera to form and then render an expert opinion, or to the extent that it requires disclosure of expert reports, analysis, finding or assessments that Egenera is not yet required to disclose pursuant to the Local Rules, the Federal Rules of Civil Procedure, or this Court's orders.

11.     Egenera objects to each and every interrogatory, definition, and instruction to the extent that it is vague, ambiguous, unintelligible, overly broad, or unduly burdensome.

12.     Egenera objects to each and every interrogatory, definition, and instruction as premature to the extent it imposes a duty on Egenera to take a position on claims that require construction but for which Egenera has not yet been required to take such a position pursuant to the Local Rules, the Federal Rules of Civil Procedure, or this Court's orders.

## **DEFINITIONS**

The following objections are made to Cisco's "Definitions" and are in addition to any specific objections that are raised in response to each interrogatory separately.

1.      Plaintiff objects to Defendant's definition of the terms "Defendant" and "Cisco"

to the extent the definitions: (1) cause any interrogatory to exceed the permissible scope of discovery under the Federal Rules of Civil Procedure; (2) include any entities unknown to Plaintiff; and (3) are overly broad, rendering the interrogatory unduly burdensome and not relevant to any claim or defense nor reasonably calculated to lead to the discovery of admissible evidence.

2.      Plaintiff objects to Defendant's definition of the terms "Plaintiff" " and "Egenera" to the extent the definitions: (1) cause any interrogatory to exceed the permissible scope of discovery under the Federal Rules of Civil Procedure; (2) include any corporation, business, entity or individuals other than Egenera, Inc. or its employees; (3) are overly broad, rendering the interrogatory unduly burdensome and not relevant to any claim or defense nor reasonably calculated to lead to the discovery of admissible evidence; (4) call for information subject to attorney-client, work product, third party confidentiality, or other privileges and protections. Plaintiff further objects to the definitions as overly broad, at least to the extent they include "all" delineated persons/entities without regard to the relevancy of any subject matter and without temporal limitations. Plaintiff further objects to the definitions as being overly broad as they include persons/entities that are unknown, outside of Plaintiff's control, and/or outside the scope of this litigation.

3.      Plaintiff objects to Defendant's definition of "Patents-in-Suit" to the extent it exceeds U.S. Patent Nos. 7,231,430 and 6,971,044.

4.      Plaintiff objects to Defendant's definition of "Accused Instrumentality" to the extent it exceeds the products accused of infringement in this action, as described in Egenera's infringement contentions (including any amendments and supplementations thereto).

5.      Plaintiff objects to Defendant's definition of "prior art" as it is unduly broad,

5

misstates the law, improperly attempts to shift Defendant's burden, and includes unclear and undefined terms.

6.      Plaintiff objects to Defendant's definition of "communication" to the extent it seeks to expand the definition of that term beyond that of the Federal Rules of Civil Procedure, this Court's orders, or any other applicable rule or order.

7.      Plaintiff objects to Defendant's definition of "document" to the extent it seeks to expand the definition of that term beyond that of the Federal Rules of Civil Procedure or this Court's orders.

8.      Plaintiff objects to Defendant's definition of "identify" as it is overbroad and to the extent it seeks to expand the definition of that term beyond that of the Federal Rules of Civil Procedure, this Court's orders, or any other applicable rule or order.

9.      Plaintiff objects to Defendant's request regarding Fed. R. Civ. P. 33(d) (paragraph 19) as it is overbroad and to the extent it seeks to expand beyond what is required of Egenera in the Federal Rules of Civil Procedure, this Court's orders, or any other applicable rule or order.

## INTERROGATORIES

**INTERROGATORY NO. 5:** Separately for each Accused Instrumentality, identify the date on which Egenera contends that Cisco received actual or constructive notice of infringement of each Patent-in-Suit, and identify the complete factual and legal bases for Egenera's contention that Cisco received actual or constructive notice of infringement, including without limitation an identification and description of the content of all communications that Egenera contends constitute notice of infringement, why such communications allegedly constitute notice of infringement, and an identification of any other communications or facts that Egenera contends are relevant to the issue of notice of infringement, and why they are allegedly relevant.

## RESPONSE TO INTERROGATORY NO. 5:

Plaintiff hereby incorporates its general objections as if set forth fully herein. Plaintiff objects to this interrogatory as prematurely requesting a legal conclusion. Plaintiff also objects to this interrogatory as calling for information in Cisco's possession, custody, or control. Plaintiff further objects to usage of the term "Accused Instrumentality" to the extent it differs from the products and functionality accused in this case, which are found in Egenera's infringement contentions.

Subject to and without waiving the foregoing general and specific objections, Plaintiff responds as follows:

The date Cisco's received actual notice was, at the latest, August 5, 2016, the date the current law suit was filed. In late 2008 and early 2009, the parties also discussed Egenera's patented technology and its business.

Cisco also gained constructive notice as early as 2013 and potentially as early as 2010 through Egenera's marking of its BladeFrame, PAN Manager, and related products as patented as well as notices on Egenera's website.

Discovery is ongoing, and Plaintiff reserves all rights, including the right to supplement and/or revise its response as discovery progresses.

**FIRST SUPPLEMENTAL RESPONSE TO INTERROGATORY NO. 5:**

Documentation for Egenera's PAN Manager, including versions offered by Egenera's partners, included the following language at least as of September 2012:

Copyright © 2001-2015 Egenera, Inc. All rights reserved. This product is protected by U.S. and international copyright and intellectual property laws. Egenera products are covered by one or more patents listed at http://www.egenera.com/patents.

The same or similar language has been included in all versions of Egenera's PAN Manager, including versions offered by Egenera's partners, since that time. The listed website, http://www.egenera.com/patents, identifies several Egenera patents, including the patents-in-suit.

Discovery is ongoing, and Plaintiff reserves all rights, including the right to supplement and/or revise its response as discovery progresses.

**SECOND SUPPLEMENTAL RESPONSE TO INTERROGATORY NO. 5**

An exemplary screenshot from Egenera's PAN Manager version 8 is shown below.

8

## Copyright

Copyright © 2001-2015 Egenera, Inc. All rights reserved. This product is protected by U.S. and international copyright and intellectual property laws. Egenera products are covered by one or more patents listed at http://www.egenera.com/patents.

This document, and the product described in it, is furnished under license and may only be used in accordance with the terms of such license. The content of this document is furnished for information purposes only and is subject to change without notice.

Egenera, Egenera stylized logos, PAN, PAN Manager, PAN Domain, PAN Advanced, PAN Enterprise, pNode, and PAN OPServer (POPS), PAN Agent, PAN Tools are trademarks or registered trademarks of Egenera, Inc. in the United States and/or other countries.

AMD is a trademark of Advanced Micro Devices, Inc.

EMC, CLARiiON, and Symmetrix are registered trademarks of EMC Corporation.

IBM and BladeCenter are registered trademarks of International Business Machines Corporation.

Intel and Xeon are trademarks of the Intel Corporation in the United States and other countries.

Linux is a registered trademark of Linus Torvalds.

Microsoft and Windows are either registered trademarks or trademarks of Microsoft Corporation in the United States and/or countries. The virtual VGA console uses Microsoft Terminal Services Advanced Client (TSAC), which is a copyright of Microsoft Corporation.

MindTerm is copyright AppGate AB.

NEC and NEC Express5800 are either registered trademarks or trademarks of NEC Corporation.

Red Hat is a registered trademark of Red Hat, Inc. in the United States and other countries.

Sun, Sun Microsystems, the Sun Logo, Solaris, and the Java logo are trademarks or registered trademarks of Sun Microsystems, Inc. in the United States and other countries.

SUSE is a registered trademark of SUSE LINUX Products GmbH, a Novell business.

VMware, Virtual SMP, ESX, vSphere and VMotion are registered trademarks or trademarks of VMware, Inc.

Xen, XenSource, XenServer, and XenEnterprise are either registered trademarks or trademarks of Citrix Systems, Inc. in the United States and/or other countries.

An exemplary screenshot from https://www.egenera.com/patents/, from August 23, 2017, is shown below.

| PAT. NO. | Title |
|---|---|
| 8,086,755 | Distributed multicast system and method in a network |
| 7,861,110 | System, method, and adapter for creating fault-tolerant communication busses from standard components |
| 7,809,546 | System and method for emulating serial port communication |
| 7,787,388 | Method of and a system for autonomously identifying which node in a two-node system has failed |
| 7,305,581 | Service clusters and method in a processing system with failover capability |
| 7,296,182 | Disaster recovery for processing resources using configurable deployment platform |
| 7,231,430 | Reconfigurable, virtual processing system, cluster, network and method |
| 7,228,265 | System< and method for emulating serial port communication |
| 7,178,059 | Disaster recovery for processing resources using configurable deployment platform |
| 7,174,390 | Address resolution protocol system and method in a virtual network |
| 7,032,108 | System and method for virtualizing basic input/output system (BIOS) including BIOS run time services |
| 6,971,044 | Service clusters and method in a processing system with failover capability |
| 6,953,232 | Latching mechanism for securing a computer component into a housing |
| 6,927,974 | Simplified power and data connector for use with chassis system that houses multiple processors |

Discovery is ongoing, and Plaintiff reserves all rights, including the right to supplement and/or revise its response as discovery progresses.

## THIRD SUPPLEMENTAL RESPONSE TO INTERROGATORY NO. 5

Documents supporting Egenera's response to Interrogatory No. 5 include, without limitation, EGENERA00339795, EGENERA00338234, and EGENERA00459143. Cisco also became aware of the '430 patent due to its hiring of Egenera employees who were aware of the '430 patent and associated application. This was at least because of company-wide discussion of the patent, its application, and the technology underlying the same. Company-wide emails to all employees went out regarding the patent and technology, such as that found at EGENERA01567366. Cisco was furthermore aware of the '430 patent because the Examiner in the U.S. Patent and Trademark office cited the '430 during the prosecution of Cisco's own patents and patent applications, including in U.S. Patent Nos. 7,526,527, and 7,664,823, and U.S. Patent Application Nos. 20030218986 (Andiamo systems), and 20070112931.

Furthermore, Cisco was made aware of the '430 patent and its relationship with UCS in 2009 through email and/or in person discussions amongst the following: John Morgridge, Ned Hooper, John Chambers, and Mike Thompson. Specifically, Mr. Thompson made Cisco aware of Egenera's intellectual property and its relevance to Cisco. Supporting documents include, without limitation, EGENERA02225378, EGENERA02224406, EGENERA02231244, EGENERA02225382, EGENERA02231170, EGENERA02231240, and EGENERA02280908.

Discovery is ongoing, and Plaintiff reserves all rights, including the right to supplement and/or revise its response as discovery progresses.

## FOURTH SUPPLEMENTAL RESPONSE TO INTERROGATORY NO. 5

Pursuant to the parties' March 20, 2018 meet and confer, Egenera further responds that, as Kevin Kerrigan testified in his March 13, 2018 deposition, Egenera's PAN Manager guide was marked with a website (which went live in August 2012) listing patents for Egenera's PAN

11

Manager and/or BladeFrame products, including U.S. Patent No. 7,231,430, by approximately September 2012. Egenera further responds Egenera's PAN Manager guide referencing the patent website was available by at least October 25, 2012.

**FIFTH SUPPLEMENTAL AND AMENDED RESPONSE TO INTERROGATORY NO. 5**

Upon further investigation, Egenera marked all versions of PAN Manager released after September 2012 (*i.e.*, PAN Manager 7 and subsequent releases). Specifically, as previously stated, documentation for Egenera's PAN Manager, including versions offered by Egenera's partners, included the following language in all versions released after September 2012:

> This product is protected by U.S. and international copyright and intellectual property laws. Egenera products are covered by one or more patents listed at http://www.egenera.com/patents.

The listed website, http://www.egenera.com/patents, identifies several Egenera patents, including the patent-in-suit. However, licenses to earlier versions of PAN Manager were sold after September 2012, in particular PAN 6 and BladeFrame with PAN Manager. From the start of the fourth quarter of 2013 until the end of 2016, Egenera booked only 4 licenses in the United States to versions prior to PAN 7, compared to over 300 licenses in the United States to PAN 7 and later versions. As such, Egenera's marking was substantially consistent and continuous as of Q4 2013. Accordingly, Cisco also gained constructive notice as of the fourth quarter of 2013.

12

Dated: August 29, 2018.                    */s/ John B. Campbell*

Mike McKool (*admitted pro hac vice*)
Texas State Bar No. 13732100
mmckool@McKoolSmith.com
Christopher Bovenkamp (*admitted pro hac vice*)
Texas State Bar No. 24006877
cbovenkamp@McKoolSmith.com
Avery Williams (*admitted pro hac vice*)
Texas State Bar No. 24075282
awilliams@McKoolSmith.com
**MCKOOL SMITH, P.C.**
300 Crescent Court Suite 1500
Dallas, TX 75201
Telephone: (214) 978-4000
Telecopier: (214) 978-4044

John B. Campbell (*admitted pro hac vice*)
Texas State Bar No. 24036314
jcampbell@McKoolSmith.com
Kevin L Burgess (admitted pro hac vice)
Texas State Bar No. 24006927
kburgess@McKoolSmith.com
James E. Quigley (*admitted pro hac vice*)
Texas State Bar No. 24075810
jquigley@McKoolSmith.com
Jordan Z. Carson
Texas State Bar No. 24101599
jcarson@McKoolSmith.com
**MCKOOL SMITH, P.C.**
300 W. 6th Street, Suite 1700
Austin, TX 78701
Telephone: (512) 692-8730
Telecopier: (512) 692-874

David L. Evans (BBO #156695)
devans@murphyking.com
Steven M. Veenema (BBO #672097)
sveenema@murphyking.com
**MURPHY & KING, P.C.**
One Beacon Street, 21st Fl.
Boston, Massachusetts 02108-3107
Telephone: (617) 423-0400
Fax: (617) 423-0498

**ATTORNEYS FOR PLAINTIFF
EGENERA, INC.**

13

## CERTIFICATE OF SERVICE

The undersigned certifies that the foregoing document was served via electronic mail on all counsel of record on system on August 29, 2018.

*/s/ John B. Campbell*

# EXHIBIT 9

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 1

UNITED STATES DISTRICT COURT

DISTRICT OF MASSACHUSETTS

Case No. 1:16-cv-11613

- - - - - - - - - - - - - - - - - - X

EGENERA, INC.,

                    Plaintiff,

     v.

CISCO SYSTEMS, INC.,

                    Defendant.

- - - - - - - - - - - - - - - - - - X

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

VIDEO DEPOSITION OF KEVIN KERRIGAN, CPA

Tuesday, March 13, 2018, 9:01 a.m.

Westborough, Massachusetts

Reported by:

Kimberly A. Smith, CRR, CRC, RDR

Job no: 21105

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 241

1          The inclusion of the sentences referring
2     to the egenera.com/patents website is what you're
3     referring to, correct?
4          A.   Yes.  I had asked Mr. Geng when it was
5     added to the documentation.
6          Q.   So that website, www.egenera.com/patents,
7     when did that website go live?
8          A.   It went live in August of 2012.
9          Q.   And has it been live ever since?
10         A.   To the best of my knowledge, it has.
11         Q.   Any doubts about that?
12         A.   No.
13         Q.   How did that -- Who created that website?
14         A.   Dana Morris.
15         Q.   Who is that?
16         A.   He's a marketing person.
17         Q.   And why did Mr. Morris create the website?
18         A.   I asked him to.
19         Q.   And why did you ask him to do that?
20         A.   So I think this -- the answer relates to
21     discussions with legal counsel.
22         Q.   Counsel advised you to create the website?
23              MR. WILLIAMS:  Objection.
24              Don't answer that.
25              MR. McDAVIT:  Are you instructing him

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 248

1      A.  Yes.

2      Q.  Was there a board of directors decision in

3   2012 to not engage in patent litigation?

4      A.  Not that I recall, no.

5      Q.  Did you advise the board on patent

6   litigation in 2012?

7      A.  No.

8      Q.  What's your understanding as to why the

9   website listing Egenera's patents was created?

10          MR. WILLIAMS:  Objection, asked and

11   answered.

12          If you can answer that without discussing

13   communications between you and your counsel, you can

14   go ahead.  But I think we've been through this.

15          THE WITNESS:  Yes.  I can't answer that.

16   BY MR. McDAVIT:

17      Q.  So all of the information you know as to

18   why it was -- why it was necessary to create would

19   have come from counsel; is that fair?

20      A.  Correct.

21          MR. WILLIAMS:  Well --

22          THE WITNESS:  Sorry.

23          MR. WILLIAMS:  That's okay.

24   BY MR. McDAVIT:

25      Q.  Before -- and just to be clear, before

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 249

1    August of 2012, the egenera.com/patents website did
2    not exist, correct?
3        A.   Correct.
4        Q.   And before August of 2012, no PAN Manager
5    software was marked with a patent number, correct?
6        A.   That is my understanding, yes.
7        Q.   And before August of 2012, no BladeFrame
8    hardware was marked with an Egenera patent number,
9    correct?
10       A.   Yes.  That's my understanding, yes.
11       Q.   And you're answering those questions as
12   Egenera's corporate representative on the marking
13   topics, correct?
14       A.   That's correct.  Yes.
15            MR. McDAVIT:  Mr. Kerrigan, I'm going to
16   hand you Exhibit 14 to your deposition.  It's an
17   email string bearing Bates No. 02280901.
18                    (Kerrigan Exhibit 14 was marked
19                     for identification.)
20   BY MR. McDAVIT:
21       Q.   So this is an email string from August 28,
22   2012 between you and Dana Morris.  Is Dana Morris a
23   he or a she?
24       A.   It's a he.
25       Q.   So between you and Mr. Morris.  And so this

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 252

1          A.  She is a marketing person.  She's in the

2     marketing department.

3          Q.  Does she work for you?

4          A.  No.  She doesn't.  She reports to Pete

5     Manca.

6          Q.  And who is Virginia Gehrig?

7          A.  She is also part of Scott Geng's group.

8     She works in the documentation group.

9          Q.  Does she have a subordinate or superior

10    relationship to Bob Percy?

11         A.  She may.  I don't remember specifically how

12    the group is structured.  She may.

13              MR. McDAVIT:  I'm going to hand you

14    what's marked as Exhibit 15 to your deposition.

15    It's an email EGENERA02280905.

16                   (Kerrigan Exhibit 15 was marked

17                    for identification.)

18    BY MR. McDAVIT:

19         Q.  Have you seen this email chain before?

20         A.  Yes, I believe I have.  Yes.

21         Q.  When?

22         A.  I mean, I don't remember specifically but

23    I'm sure I would have seen it in August of 2016.

24         Q.  Have you seen it since August of 2016?

25         A.  Not that I specifically recall.

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 253

1       Q.  So let's go back to the first email in

2   time.

3       A.  Um-hum.

4       Q.  So at the bottom of the page 22080905-1,

5   there's an email from Bob Percy to Maryellen Edwards;

6   do you see that?

7       A.  Yes.

8       Q.  And that's Friday, July 29, 2016.

9              Do you see that?

10      A.  Yes.

11      Q.  And he's inquiring about the pointer to the

12  egenera.com/patents website; do you see that?

13      A.  Um-hum.

14      Q.  And then he's reporting that he's not able

15  to find the Egenera patent info at this or any other

16  location on the website; do you see that?

17      A.  I do.

18      Q.  So as of July 29, 2016, that website was

19  not active, correct?

20      A.  On the date that he checked it, I would

21  agree that it must not have been visible to him.

22      Q.  Why was Mr. Percy looking for the

23  egenera.com's patent website in July -- late July of

24  2016?

25              MR. WILLIAMS:  Objection, calls for

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 255

1        A.  Yes.  Yes.

2        Q.  And so she's copying Virginia Gehrig, Bob

3   Percy, yourself, and somebody named Marc Shelley.

4             Who's that?

5        A.  He also works in the marketing department.

6        Q.  So Maryellen is asking Ms. Surprenant to

7   check on the Web page, right?

8        A.  Yes.

9        Q.  And she's referring to an "old site."

10  What's that?

11            MR. WILLIAMS:  Objection, calls for

12  speculation.

13            THE WITNESS:  So where do you see the

14  "old site"?

15  BY MR. McDAVIT:

16       Q.  So in that new email.

17       A.  Oh, yes.  Yes.  So I think what happened is

18  the marketing team updated the website, so they

19  refreshed it, created new content for it.  And it

20  appears that the patent page got dropped as part of

21  that.  And so that's what she's referring to.

22       Q.  When did it create -- when was that refresh

23  done?

24       A.  That was done -- I believe it was done in --

25  in 2016.  I believe it was done in early to mid 2016.

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 256

1       Q.  What makes you say that?

2       A.  Because I believe Maryellen did it in the
3   first year that she was with the company.  And I
4   believe she started in 2015.

5       Q.  So she could have done it in 2015, right?

6       A.  I don't believe that is true.

7       Q.  Do you know when she did -- So let me step
8   back.

9           Your belief that it was in 2016, that
10  the website was refreshed by marketing, is based on
11  your recollection that Maryellen Edwards did it,
12  correct?

13      A.  Yes.  It's based on that and based on the
14  fact that now that I'm remembering this and seeing
15  this, I believe there was a conclusion that it had
16  not been missing for a long period of time.  That
17  Bob's identification of this was soon after the
18  website had been revised.

19      Q.  And did you have discussions about this
20  with Mr. Percy?

21      A.  No.

22      Q.  Is there any other documentation of the
23  fact how long that egenera.com/patents website was
24  missing?

25      A.  Yes.  There would be documentation -- Well,

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 257

1    there would be documentation about when the refresh

2    was done and when it went live.

3        Q.  And how do you know that the refresh caused

4    the site to go missing versus it had been missing

5    before that?

6        A.  I can't think of any other reason why it

7    would have gone missing.  I can't think of any other

8    reason why it would have.  I mean, that was the only

9    time the website was altered.

10       Q.  Well, you said to me earlier that from time

11   to time, marketing will make changes to the website,

12   right?

13       A.  That's true.

14       Q.  So before Maryellen Edwards was hired at

15   the company, there were -- marketing made changes to

16   the website, right?

17       A.  Well, but Dana Morris would have been

18   making those changes, and he was the one that added

19   the page.  So I was referring to refreshes where

20   there's a redesign of the entire site as opposed to

21   content being edited on the site.

22       Q.  At any point between 2012 and 2016, did

23   Egenera redesign its website?

24       A.  Not that I'm aware of.  Not that I'm aware

25   of.

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 263

1    so Lou Volpe, Pete Manca, Jim Phillips, they would

2    have definitely been on the board.  So Kneeland

3    stepped in the place of another Phillips partner,

4    Bob Crants.  I don't remember when that took place.

5    I believe it would have been prior to July of 2016.

6    So it probably would have been Kneeland on the board

7    at that time.

8        Q.  Had you presented to the board of directors

9    a scenario for engaging in patent litigation against

10   Cisco as of July 29, 2016?

11       A.  So I recall a meeting with attorneys from

12   McKool Smith who participated in that meeting.

13       Q.  So there was a meeting that -- where

14   attorneys were present with the board of directors;

15   is that what you're saying?

16       A.  Okay, wait.

17            MR. WILLIAMS:  And I'm just going to

18   remind you not to disclose the contents of any

19   communications with your attorneys.

20            THE WITNESS:  Let me just think for one

21   second.  I'm trying to remember how this worked.  So

22   you're talking about prior to July of 2016, right?

23   That's the time frame you're talking about?

24   BY MR. McDAVIT:

25       Q.  So this first email from Mr. Percy where he

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 264

1    reports that the URL for egenera.com/patents did not
2    work is dated Friday, July 29, 2016.
3         A.  Right.
4         Q.  So at that time, had you had discussions
5    with the executives at the company about filing
6    patent litigation on behalf of Egenera?
7         A.  So my recollection is that we had
8    discussions with the board earlier that year in
9    2016.
10        Q.  And who was present at that meeting?
11        A.  So all of the board members, I believe,
12   and -- and me, I believe, myself.
13        Q.  That was before attorneys from McKool --
14   that was without attorneys from McKool Smith,
15   correct?
16        A.  So I remember a meeting specifically,
17   and it included a representative from McKool Smith.
18   And I can't recall if there was a separate meeting
19   without that individual or not.  I just don't
20   remember.
21        Q.  Did the board of directors make a decision
22   to go forward with patent litigation in a separate
23   meeting where attorneys were not present?
24        A.  Yes.  The decision would not have been made
25   with an attorney in the room.  It would have been

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 265

1    made either in executive session or by written

2    action, I believe.

3         Q.  And when was that decision made?

4         A.  So I don't recall specifically, but I

5    believe it was in early 2016, January.

6         Q.  So as of Mr. Percy's email, you had already

7    made a decision to go forward with patent litigation,

8    correct?

9         A.  I believe that is correct, yes.

10        Q.  And at any time between the meeting in

11   early 2016 and Mr. Percy's email, had you checked

12   the URL for www.egenera.com/patents?

13        A.  I don't recall personally checking it, no.

14        Q.  Did anyone at Egenera check it?

15             MR. WILLIAMS:  Objection, calls for

16   speculation.

17             THE WITNESS:  Not that I'm aware of.

18             MR. McDAVIT:  I'm going to hand you

19   Exhibit 16 to your deposition.  It's another email

20   chain.

21                  (Kerrigan Exhibit 16 was marked

22                   for identification.)

23             MR. WILLIAMS:  I think we've been going

24   for about an hour; is that right?  Would you like a

25   break?

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 270

1    not do that.

2                    MR. McDAVIT:  Exhibit 17 to your

3    deposition is an email chain, Bates number is

4    EGENERA02280906.

5                        (Kerrigan Exhibit 17 was marked

6                        for identification.)

7    BY MR. McDAVIT:

8        Q.  So this is a continuation of the same

9    conversation.  If you look at -- if you can verify

10   that it continues on from Exhibit 16 -- or 17.

11   Sorry.

12       A.  Um-hum.

13       Q.  Do you see that?

14       A.  I do.

15       Q.  So I just want to -- the question I have is

16   on the bottom of the first page, there's an email

17   from Samantha Surprenant to you and others that

18   announces that "egenera.com/patents is now a valid

19   page."

20                    Do you see that?

21       A.  I do.

22       Q.  So at least between Mr. Percy's email and

23   Ms. Surprenant's email on August 8, you'd agree that

24   that URL was not valid, correct?

25       A.  Okay.  Let me just think for one second.

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 271

1    So from the time Bob -- Yes.   I would agree that it

2    seems likely that the page was not visible during

3    the time Bob noticed it and prior to Sam adding it

4    back.

5        Q.   And you don't know before -- when before --

6    Strike that.

7             You don't know at what point before

8    Mr. Percy emailed that that URL had become invalid,

9    correct?

10            MR. WILLIAMS:   Objection, misstates his

11   testimony.

12            THE WITNESS:   I don't know definitively.

13   But it seems likely it would have been related to

14   the website refresh that was done, I believe, a

15   short time before he had identified that.

16   BY MR. McDAVIT:

17       Q.   And when you made the decision with the

18   board to commence patent litigation in this action

19   in early 2016, you did not visit the

20   egenera.com/patents website, correct?

21       A.   That's correct.   I do not recall doing

22   that.

23            MR. McDAVIT:   All right.   Let's take a

24   break.

25            THE VIDEO OPERATOR:   Okay.   The time is

# EXHIBIT 10

**PUBLIC – REDACTED VERSION**

**To:** Maryellen Edwards[                    ]
**Cc:** Virginia Gehrig[                    ]; Bob Percy[          ], Kevin Kerrigan[                    ]; Marc Shelley[          ]
**From:** Samantha Surprenant
**Sent:** Mon 8/1/2016 12:49:03 PM
**Importance:** Normal
**Subject:** RE: Egenera Patent Info?
**Received:** Mon 8/1/2016 12:49:05 PM

I ll wait until Kevin gets back to discuss.   One suggestion is to create a redirect from http://www.egenera.com/patents that would take the person directly to our legal page http://www.egenera.com/legal.com.   The legal page talks about patent infringement.

/ses

**From:** Maryellen Edwards
**Sent:** Saturday, July 30, 2016 6:13 AM
**To:** Samantha Surprenant <                    >
**Cc:** Virginia Gehrig <                    >; Bob Percy <                    >; Kevin Kerrigan <                    >; Marc Shelley <                    >
**Subject:** Re: Egenera Patent Info?

Hi Sam,
Can you check to see if we still have this page available somewhere from the old site? CC ing Kevin too   Kevin, in the event that the page doesn t exist any more (and that s very likely), do we need to refer to a patent list in our collateral? It s not something I ve done before but it could be unique to documentation.

Thanks,
Maryellen

**From:** Bob Percy <                    >
**Date:** Friday, July 29, 2016 at 1:30 PM
**To:** Maryellen Edwards <                    >
**Cc:** Virginia Gehrig <                    >
**Subject:** Egenera Patent Info?

Hi Maryellen,

In our end user documentation, we have this pointer to Egenera patent info:

   Egenera products are covered by one or more patents listed at http://www.egenera.com/patents.

I m not able to find the Egenera patent info at this or any other location on the website. Is there any still there? If so, could you send me its location?

Thanks!

Bob

# EXHIBIT 11

**PUBLIC – REDACTED VERSION**

**To:**        Samantha Surprenant[&#9608;&#9608;&#9608;&#9608;&#9608;&#9608;&#9608;]: Maryellen Edwards[&#9608;&#9608;&#9608;&#9608;&#9608;&#9608;]: Bob
Percy[&#9608;&#9608;&#9608;&#9608;&#9608;&#9608;&#9608;&#9608;]
**From:**    Kevin Kerrigan
**Sent:**     Tue 8/9/2016 11:24:23 AM
**Importance:**        Normal
**Subject:**    RE: Patents Page on Website

Thank you.

**Kevin Kerrigan**
**Senior Vice President,**
**Chief Financial Officer,**
**Secretary and Treasurer**
**Egenera Inc. | Converge. Unify. Simplify.!"**
&#9608;&#9608;&#9608;&#9608;&#9608;&#9608;&#9608;

http://www.egenera.com
http://blog.egenera.com
  

---

**From:** Samantha Surprenant
**Sent:** Monday, August 08, 2016 5:34 PM
**To:** Kevin Kerrigan; Maryellen Edwards; Bob Percy
**Subject:** Patents Page on Website

Hi folks,

http://www.egenera.com/patents/ is now a valid page.   Kevin, I didn t add it to a menu anywhere, but if someone searched, they can find it.  Or if they type in the web address http://www.egenera.com/patents/, they ll find it too.

/ses

---

**From:** Kevin Kerrigan
**Sent:** Monday, August 08, 2016 4:59 PM
**To:** Samantha Surprenant < &#9608;&#9608;&#9608;&#9608;&#9608;&#9608;&#9608;&#9608; >
**Subject:** RE: Patents

I think we should have a separate page that aligns with the url they are referencing too. Thanks

**Kevin Kerrigan**
**Senior Vice President,**
**Chief Financial Officer,**
**Secretary and Treasurer**
**Egenera Inc. | Converge. Unify. Simplify.!"**
&#9608;&#9608;&#9608;&#9608;&#9608;&#9608;&#9608;

http://www.egenera.com
http://blog.egenera.com
  

---

**From:** Samantha Surprenant
**Sent:** Monday, August 08, 2016 4:52 PM
**To:** Kevin Kerrigan; Maryellen Edwards

Ok, so do you want a separate web page (www.egenera.com/patents) that just lists our patents and can link to the government site (http://patft.uspto.gov) for more descriptive info?

/ses

**From:** Kevin Kerrigan
**Sent:** Monday, August 08, 2016 4:50 PM
**To:** Samantha Surprenant < ██████████ >; Maryellen Edwards < ██████████ >
**Subject:** RE: Patents

Wow, great job!!! Not sure where you got that but it looks correct.

**Kevin Kerrigan**
**Senior Vice President,**
**Chief Financial Officer,**
**Secretary and Treasurer**
**Egenera Inc. | Converge. Unify. Simplify.!"**
████████ (office)

http://www.egenera.com
http://blog.egenera.com

**From:** Samantha Surprenant
**Sent:** Monday, August 08, 2016 4:48 PM
**To:** Kevin Kerrigan; Maryellen Edwards
**Subject:** Patents

Kevin,

This is what I found for Assignee  Egenera  .  Do we own Xterity Patterns too, or Forte?

|   | PAT. NO. | Title |
|---|----------|-------|
| **1** | 8,086,755 | Distributed multicast system and method in a network |
| **2** | 7,861,110 | System, method, and adapter for creating fault-tolerant communication busses from standard components |
| **3** | 7,809,546 | System and method for emulating serial port communication |
| **4** | 7,787,388 | Method of and a system for autonomously identifying which node in a two-node system has failed |
| **5** | 7,305,581 | Service clusters and method in a processing system with failover capability |
| **6** | 7,296,182 | Disaster recovery for processing resources using configurable deployment platform |
| **7** | 7,231,430 | Reconfigurable, virtual processing system, cluster, network and method |
| **8** | 7,228,265 | System and method for emulating serial port communication |
| **9** | 7,178,059 | Disaster recovery for processing resources using configurable deployment platform |

| 10 | 7,174,390 | Address resolution protocol system and method in a virtual network |
| 11 | 7,032,108 | System and method for virtualizing basic input/output system (BIOS) including BIOS run time services |
| 12 | 6,971,044 | Service clusters and method in a processing system with failover capability |
| 13 | 6,953,232 | Latching mechanism for securing a computer component into a housing |
| 14 | 6,927,974 | Simplified power and data connector for use with chassis system that houses multiple processors |

**From:** Kevin Kerrigan
**Sent:** Monday, August 08, 2016 4:19 PM
**To:** Samantha Surprenant <​█████████████████​>; Maryellen Edwards <​█████████████████​>
**Subject:** example

http://www.nutanix.com/patents/

**Kevin Kerrigan**
**Senior Vice President,**
**Chief Financial Officer,**
**Secretary and Treasurer**
**Egenera Inc. | Converge. Unify. Simplify.!"**
█████████████)

http://www.egenera.com
http://blog.egenera.com
  

# EXHIBIT 12

## PUBLIC – REDACTED VERSION

HIGHLY CONFIDENTIAL – ATTORNEY'S EYES ONLY

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| EGENERA, INC., | |
| **Plaintiff,** | Civil Action No. 1:16-cv-11613-RGS |
| **v.** | |
| CISCO SYSTEMS, INC., | JURY TRIAL |
| **Defendant.** | |

### EGENERA, INC.'S SUPPLEMENTAL OBJECTIONS AND RESPONSES TO CISCO SYSTEMS, INC.'S FIRST SET OF INTERROGATORIES (NOS. 4-5)

Pursuant to Rules 26 and 33 of the Federal Rules of Civil Procedure, Plaintiff Egenera, Inc. ("Plaintiff" or "Egenera") hereby provides this Supplemental Response to Defendant Cisco Systems Inc.'s ("Cisco") First Set of Interrogatories to Egenera (Nos. 4-5) as follows:

### PRELIMINARY STATEMENT

Egenera's responses to these interrogatories are made to the best of its present knowledge, information, and belief. Egenera has not completed its investigation of the facts relating to this case, has not completed discovery in this action, and has not completed preparation for trial. These responses are at all times subject to such additional or different information that discovery or further investigation may disclose and, while based on the present state of Egenera's knowledge, are subject to such refreshing of recollection and such additional knowledge of facts as may result from Egenera's further discovery or investigation. By responding to Cisco's interrogatories, Egenera does not waive any objection that may be applicable to: (1) the use, for any purpose, by Cisco of any information provided in response; or (2) the admissibility, relevance, or materiality of any of the information to any issue in this case.

1

HIGHLY CONFIDENTIAL – ATTORNEY'S EYES ONLY

## GENERAL OBJECTIONS

The following general objections are made to each and every interrogatory, definition, and instruction and are in addition to any specific objections that are raised in response to each interrogatory separately.

1.      Egenera objects generally and specifically to each and every interrogatory, definition, and instruction to the extent that it purports to impose burdens or duties on Egenera that exceeds the scope of reasonable and permissible discovery or that exceeds the requirements of the Federal Rules of Civil Procedure and the Local Rules of this Court, or any applicable ruling of this Court.

2.      Egenera objects to each and every interrogatory, definition, and instruction to the extent that it seeks discovery prior to the date such information is to be exchanged pursuant to the Local Rules, the schedule in this case, and/or a specific agreement between parties for limited discovery.

3.      Egenera objects to each and every interrogatory, definition, and instruction to the extent that it seeks information that is not relevant to the subject matter of this proceeding or reasonably calculated to lead to the discovery of admissible evidence.

4.      Egenera objects to each and every interrogatory, definition, and instruction to the extent that it seeks the disclosure of information protected by the attorney-client privilege or the attorney work-product doctrine, and other applicable law, privilege, immunity, protection, or doctrine, or to the extent such interrogatory, definition, and instruction seeks the impressions, conclusions, opinion, legal research or theories of Egenera's attorneys or their agents. The inadvertent production of any privileged document or information shall not constitute wavier of any applicable objection or privilege. For purposes of responding to these demands, Egenera will

HIGHLY CONFIDENTIAL – ATTORNEY'S EYES ONLY

interpret such interrogatory, definition, and instruction as excluding information subject to the attorney-client privilege and attorney work-product doctrine.

5.      Egenera objects to each and every interrogatory, definition, and instruction to the extent that it seeks to discover trade secrets or any other commercially sensitive, confidential, or proprietary information, the disclosure of which could be damaging to the business or property of Egenera or other related business entities. Egenera also objects to the extent that each interrogatory, definition, and instruction seeks the confidential or proprietary information of third parties, some of which may have non-disclosure or confidentiality agreements with Egenera. Egenera will provide such information only to the extent it can do so consistent with its obligations to any third parties.

6.      Egenera objects to each and every interrogatory, definition, and instruction to the extent that it calls for a legal conclusion. Any response by Egenera shall not be construed as providing legal conclusion regarding the meaning or application of any terms or phrases used in Cisco's interrogatories, definitions, or instructions.

7.      Egenera objects to each and every interrogatory, definition, and instruction to the extent that the information sought is a matter of public record or uniquely within the knowledge of Cisco or non-parties, or to the extent that the information sought is as readily determinable by Cisco as by Egenera. Egenera further objects to each and every interrogatory, definition, and instruction to the extent that the information sought is not within Egenera's possession, custody, or control.

8.      Egenera objects to each and every interrogatory, definition, and instruction to the extent that it renders any interrogatory compound or to the extent that it contains multiple inappropriate subparts. Such interrogatories constitute separate interrogatories that count toward

HIGHLY CONFIDENTIAL – ATTORNEY'S EYES ONLY

the limit on interrogatories that Cisco is permitted to propound. Egenera objects to each and every interrogatory, definition, and instruction that would exceed such limit.

9.      Egenera objects to each and every interrogatory, definition, and instruction to the extent that it seeks to require Egenera to do more than conduct an examination of those files or sources that reasonably may be expected to yield responsive information or an inquiry of those persons who reasonably may be expected to possess responsive information.

10.      Egenera objects to each and every interrogatory, definition, and instruction to the extent that it either calls for Egenera to form and then render an expert opinion, or to the extent that it requires disclosure of expert reports, analysis, finding or assessments that Egenera is not yet required to disclose pursuant to the Local Rules, the Federal Rules of Civil Procedure, or this Court's orders.

11.      Egenera objects to each and every interrogatory, definition, and instruction to the extent that it is vague, ambiguous, unintelligible, overly broad, or unduly burdensome.

12.      Egenera objects to each and every interrogatory, definition, and instruction as premature to the extent it imposes a duty on Egenera to take a position on claims that require construction but for which Egenera has not yet been required to take such a position pursuant to the Local Rules, the Federal Rules of Civil Procedure, or this Court's orders.

## **DEFINITIONS**

The following objections are made to Cisco's "Definitions" and are in addition to any specific objections that are raised in response to each interrogatory separately.

1.      Plaintiff objects to Defendant's definition of the terms "Defendant" and "Cisco" to the extent the definitions: (1) cause any interrogatory to exceed the permissible scope of discovery under the Federal Rules of Civil Procedure; (2) include any entities unknown to

HIGHLY CONFIDENTIAL – ATTORNEY'S EYES ONLY

Plaintiff; and (3) are overly broad, rendering the interrogatory unduly burdensome and not relevant to any claim or defense nor reasonably calculated to lead to the discovery of admissible evidence.

2.      Plaintiff objects to Defendant's definition of the terms "Plaintiff" " and "Egenera" to the extent the definitions: (1) cause any interrogatory to exceed the permissible scope of discovery under the Federal Rules of Civil Procedure; (2) include any corporation, business, entity or individuals other than Egenera, Inc. or its employees; (3) are overly broad, rendering the interrogatory unduly burdensome and not relevant to any claim or defense nor reasonably calculated to lead to the discovery of admissible evidence; (4) call for information subject to attorney-client, work product, third party confidentiality, or other privileges and protections. Plaintiff further objects to the definitions as overly broad, at least to the extent they include "all" delineated persons/entities without regard to the relevancy of any subject matter and without temporal limitations. Plaintiff further objects to the definitions as being overly broad as they include persons/entities that are unknown, outside of Plaintiff's control, and/or outside the scope of this litigation.

3.      Plaintiff objects to Defendant's definition of "Patents-in-Suit" to the extent it exceeds U.S. Patent Nos. 7,231,430 and 6,971,044.

4.      Plaintiff objects to Defendant's definition of "Accused Instrumentality" to the extent it exceeds the products accused of infringement in this action, as described in Egenera's infringement contentions (including any amendments and supplementations thereto).

5.      Plaintiff objects to Defendant's definition of "prior art" as it is unduly broad, misstates the law, improperly attempts to shift Defendant's burden, and includes unclear and undefined terms.

HIGHLY CONFIDENTIAL – ATTORNEY'S EYES ONLY

6.      Plaintiff objects to Defendant's definition of "communication" to the extent it seeks to expand the definition of that term beyond that of the Federal Rules of Civil Procedure, this Court's orders, or any other applicable rule or order.

7.      Plaintiff objects to Defendant's definition of "document" to the extent it seeks to expand the definition of that term beyond that of the Federal Rules of Civil Procedure or this Court's orders.

8.      Plaintiff objects to Defendant's definition of "identify" as it is overbroad and to the extent it seeks to expand the definition of that term beyond that of the Federal Rules of Civil Procedure, this Court's orders, or any other applicable rule or order.

9.      Plaintiff objects to Defendant's request regarding Fed. R. Civ. P. 33(d) (paragraph 19) as it is overbroad and to the extent it seeks to expand beyond what is required of Egenera in the Federal Rules of Civil Procedure, this Court's orders, or any other applicable rule or order.

HIGHLY CONFIDENTIAL – ATTORNEY'S EYES ONLY

Manager and/or BladeFrame products, including U.S. Patent No. 7,231,430, by approximately September 2012. Egenera further responds Egenera's PAN Manager guide referencing the patent website was available by at least October 25, 2012.

**INTERROGATORY NO. 6:** Separately, for each Patent-in-Suit, identify every instrumentality ever designed, developed, manufactured, tested, used, made, sold, or offered for sale in the United States, or imported into the United States by or on behalf of Egenera or any Egenera licensee, that falls within the scope (or that Egenera reasonably believes or has ever asserted falls within the scope) of any claim of any of the Patents-in-Suit, and for each such instrumentality, state the time periods during which it was sold and whether (and if so, how) it was marked with the patent number of any of the Patents-in-Suit, and identify all documents that relate to such marking.

**RESPONSE TO INTERROGATORY NO. 6:**

Plaintiff hereby incorporates its general objections as if set forth fully herein. Egenera objects to this interrogatory as that it calls for information on the activities of Egenera licensee as not in the possession, custody, or control of Egenera. Plaintiff objects to this interrogatory as seeking disclosure of information that is not relevant to the issues in this case or is not reasonably calculated to lead to the discovery of admissible evidence as it asks for information regarding "every instrumentality ever designed, developed, manufactured, tested, used, made, sold, or offered for sale in the United States, or imported into the United States by or on behalf of Egenera or any Egenera licensee." Egenera further objects to this interrogatory as prematurely calling for a legal conclusion.

Subject to and without waiving the foregoing general and specific objections, Plaintiff responds as follows:

Egenera has continuously sold and marketed its BladeFrame System (including related software) since at least December 21, 2001. Additionally, Dell and Fujitsu have had the right to sell Egenera's patented technology under the trade names Dell PAN (see *e.g.*,

HIGHLY CONFIDENTIAL – ATTORNEY'S EYES ONLY

dell.com/downloads/global/solutions/Dell%20PAN%20System_WEB.pdf?c=sg&l=en&s=lca)
and Primergy, (see *e.g.*, fujitsu.com/global/products/computing/servers/primergy/) respectively,
at different times. Other companies, such as HP, IBM, and NEC, have also partnered with
Egenera, (egenera.com/certified-hardware-platforms/).

Egenera incorporates its response to Interrogatory No. 5 (including any amendments or
supplements thereto) in regards to marking.

Egenera will produce and identify non-privileged documents that exist in its possession,
custody, or control from which further information responsive to this Interrogatory may be
ascertained, in accordance with FED. R. CIV. P. 33(d), if any are uncovered after a reasonable
search.

Discovery is ongoing, and Plaintiff reserves all rights, including the right to supplement
and/or revise its response as discovery progresses.

**FIRST SUPPLEMENTAL RESPONSE TO INTERROGATORY NO. 6:**

"Interframe" was the original name of the commercial product under development by
Egenera based on the technology disclosed in the '430 patent, but later came to be called
Bladeframe. No products were ever sold under the name "Interframe."

**SECOND SUPPLEMENTAL RESPONSE TO INTERROGATORY NO. 6:**

Certain versions of the BladeFrame System, Dell PAN and Primergy embodied Egenera's
patented technology. All versions of the identified products practiced the '430 patent when
including necessary hardware and/or software. Similarly, all versions of products produced by
third-parties that included Egenera's PAN Manager practiced the '430 patent when including
necessary hardware and/or software. Egenera was not in control of versioning products produced
by third parties that included PAN Manager.

HIGHLY CONFIDENTIAL – ATTORNEY'S EYES ONLY

At the appropriate time, Egenera's experts may include information responsive to this Interrogatory in one or more expert reports. Such reports are incorporated herein by reference.

Discovery is ongoing, and Plaintiff reserves all rights, including the right to supplement and/or revise its response as discovery progresses.

**INTERROGATORY NO. 7:** Identify all negotiations regarding the licensing (actual or attempted) and/or sale (actual or attempted), or other financial transaction (actual or attempted), of any of the Patents-in-Suit or any technology relating to the Patents-in-Suit by or on behalf of Egenera, including without limitation when those negotiations took place; the parties to the negotiations, including the individuals who participated in the negotiations; any demands, offers, or counteroffers; all documents relating to such negotiations; and the results of such negotiations, including without limitation whether or not an agreement was reached and an identification of that agreement by production number.

**RESPONSE TO INTERROGATORY NO. 7:**

Plaintiff hereby incorporates its general objections as if set forth fully herein. Plaintiff further objects to this interrogatory as vague and ambiguous as to "all negotiations" and "other financial transaction (actual or attempted)".

Subject to and without waiving the foregoing general and specific objections, Plaintiff responds as follows:

Egenera has been approached by organizations including █████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████

Egenera will produce and identify non-privileged documents that exist in its possession, custody, or control from which further information responsive to this Interrogatory may be ascertained, in accordance with FED. R. CIV. P. 33(d), if any are uncovered after a reasonable search.

HIGHLY CONFIDENTIAL – ATTORNEY'S EYES ONLY

Dated: April 3, 2018.

*/s/ James E. Quigley*

Mike McKool (*admitted pro hac vice*)
Texas State Bar No. 13732100
mmckool@McKoolSmith.com
Christopher Bovenkamp (*admitted pro hac vice*)
Texas State Bar No. 24006877
cbovenkamp@McKoolSmith.com
Avery Williams (*admitted pro hac vice*)
Texas State Bar No. 24075282
awilliams@McKoolSmith.com
**MCKOOL SMITH, P.C.**
300 Crescent Court Suite 1500
Dallas, TX 75201
Telephone: (214) 978-4000
Telecopier: (214) 978-4044

John B. Campbell (*admitted pro hac vice*)
Texas State Bar No. 24036314
jcampbell@McKoolSmith.com
Kevin L Burgess (admitted pro hac vice)
Texas State Bar No. 24006927
kburgess@McKoolSmith.com
James E. Quigley (*admitted pro hac vice*)
Texas State Bar No. 24075810
jquigley@McKoolSmith.com
Jordan Z. Carson
Texas State Bar No. 24101599
jcarson@McKoolSmith.com
**MCKOOL SMITH, P.C.**
300 W. 6th Street, Suite 1700
Austin, TX 78701
Telephone: (512) 692-8730
Telecopier: (512) 692-874

David L. Evans (BBO #156695)
devans@murphyking.com
Steven M. Veenema (BBO #672097)
sveenema@murphyking.com
**MURPHY & KING, P.C.**
One Beacon Street, 21st Fl.
Boston, Massachusetts 02108-3107
Telephone: (617) 423-0400
Fax: (617) 423-0498

**ATTORNEYS FOR PLAINTIFF
EGENERA, INC.**

HIGHLY CONFIDENTIAL – ATTORNEY'S EYES ONLY

## CERTIFICATE OF SERVICE

The undersigned certifies that the foregoing document was served via electronic mail on all counsel of record on system on April 3, 2018.

*/s/ James E. Quigley*

# EXHIBIT 13

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS
## (BOSTON)

| | |
|---|---|
| EGENERA, INC., | |
| **Plaintiff,** | Civil Action No. 1:16-cv-11613-RGS |
| v. | |
| CISCO SYSTEMS, INC., | **JURY TRIAL** |
| **Defendant.** | |

## DECLARATION OF KEVIN KERRIGAN IN SUPPORT OF PLAINTIFF EGENERA, INC.'S RESPONSES IN OPPOSITION TO CISCO SYSTEMS, INC.'S MOTIONS FOR SUMMARY JUDGMENT OF NO PRE-SUIT DAMAGES, INDIRECT INFRINGEMENT, OR WILLFULLNESS (DKT. 145) AND NO INJUNCTIVE RELIEF (DKT. 147)

I, Kevin Kerrigan, do hereby declare as follows:

1.     I am the Chief Executive Officer for Plaintiff Egenera, Inc. ("Egenera"). I was hired in February of 2008 as Vice President, Finance. I was promoted to Chief Financial Officer in October of 2009. I became CEO of Egenera in May of 2018.

2.     Egenera partnered with HP, Dell, Fujitsu, IBM, and NEC to distribute PAN Manager on hardware sold by HP, Dell, Fujitsu, IBM, and NEC.

3.     As part of Egenera's agreements with HP, Dell, Fujitsu, IBM, and NEC, Egenera designed versions of PAN Manager designed to run on HP, Dell, Fujitsu, IBM, and NEC servers.

4.     Egenera still sells its PAN Manager software internationally. PAN Manager is also available for sale in the United States.

5.     Egenera has never licensed its patents.

6.     From October 1, 2013 to August 5, 2016, Egenera did not sell BladeFrames in the

United States.

7.      On May 27, 2016, Egenera refreshed its website, which is most likely the reason for http://www.egenera.com/patents becoming unavailable.

8.      On August 8, 2016, the web address http://www.egenera.com/patents became available again.


I DECLARE UNDER PENALTY OF PERJURY OF THE LAWS OF THE UNITED STATES THAT THE FOREGOING IS TRUE AND CORRECT.

Dated: August 29, 2018                          Respectfully submitted,

                                                _____
                                                Kevin Kerrigan

-2-

# EXHIBIT 14

CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 1

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS


```
------------------------
                       )
EGENERA, INC.,         )
          Plaintiff    )
                       )
vs.                    ) Case No. 1:16-cv-11613
                       )
CISCO SYSEMS, INC.,    )
          Defendant    )
                       )
------------------------
```

CONFIDENTIAL - ATTORNEYS' EYES ONLY

VIDEOTAPED DEPOSITION OF PETER MANCA

MONDAY, OCTOBER 16, 2017

12:18 P.M. - 3:32 P.M.

BOXBOROUGH, MASSACHUSETTS


REPORTED BY:  Sandra A. Deschaine, CSR, RPR,

CLR, RSA

Job No. 19842

CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 26

1          A.   I believe that's true.

2          Q.   So, Mr. Manca, when was your first

3    meeting with someone with Cisco -- at Cisco?

4          A.   The first meeting that I can find

5    in records was in January of 2002.

6          Q.   And who was that meeting with?

7          A.   Who within Cisco?

8          Q.   Yes, let's start there.  Who with

9    it -- I'm sorry.  Let me re-ask.

10              Who was the meeting with at

11   Cisco?

12         A.   I don't have that information

13   handy with me here.  I think it's in -- it's

14   certainly emails that you have access to in

15   discovery, but I don't have the Cisco names

16   memorized, that's for sure.

17              MR. QUIGLEY:  Also object to

18         outside the scope.

19         Q.   Who was at those meetings from

20   Egenera?

21         A.   It was Rich Fichera and a Kevin

22   Janssons.

23         Q.   Can you spell those names for the

24   court reporter, please?

25         A.   Richard, R-i-c-h-a-r-d, Fichera,

CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 30

1          A.   I don't recall the sales

2     organization, how we were split up or

3     categorized back in 2002.

4          Q.   Do you know how he wound up being

5     the person to contact Cisco?

6          A.   No, I do not.

7          Q.   Is Mr. Janssons still with

8     Egenera?

9          A.   No, he is not.

10          Q.   When did he leave?

11          A.   I do not know.

12          Q.   More than five years ago?

13          A.   Yes.

14          Q.   More than ten years ago?

15          A.   I can't say for sure.

16          Q.   After January 2002, when was the

17     next meeting between Egenera and Cisco?

18          A.   The next meeting I believe or

19     contact point was a meeting in January of

20     2004, where I believe Cisco new venture teams

21     reached out to Egenera to strike up a

22     conversation.

23          Q.   And who initiated the contact

24     between Cisco and Egenera at that time?

25                MR. QUIGLEY:   Object and vague,

CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 31

1        ambiguous.

2        A.    From my reading of the emails, it

3    looks like Cisco initiated the contact.

4        Q.    And who at Cisco?

5        A.    I believe that person was Ammar

6    Hanafi.

7        Q.    And who did he contact?

8        A.    Mariam Ganem.

9        Q.    And who is she?

10       A.    At the time she was our vice

11   president of sales operations.

12       Q.    Is Ms. Ganem still with the

13   company?  I'm sorry.  Let me rephrase.  Is

14   Ms. Ganem still with Egenera?

15       A.    No, she's not.

16       Q.    When did she leave?

17       A.    She left in 2009.

18       Q.    Do you know where she is today?

19       A.    No, I do not know.

20       Q.    When she left Egenera, do you know

21   where she went?

22       A.    No, I do not.

23       Q.    And what was her responsibility in

24   2004, as vice president of sales operations.

25       A.    She was responsible for the

CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 51

1  combined PowerPoint presentation.

2        Q.   And who was doing most of the

3  talking at that meeting from the Egenera

4  side?

5        A.   Mostly me and Vern Brownell.

6        Q.   And who was doing most of the

7  talking from the Cisco side?

8             MR. QUIGLEY:  Objection.  Outside

9        the scope.

10       A.   I don't recall.

11       Q.   During the meeting, did Egenera

12  tell Cisco that it had filed a patent

13  application --

14             MR. QUIGLEY:  Objection.  Outside

15       the scope.

16       Q.   -- for this technology?

17             MR. QUIGLEY:  Same objection.

18       A.   I believe we did.

19       Q.   Is that -- and how do you know?

20             MR. QUIGLEY:  Same objection.

21       A.   Best of my recollection, it was

22  actually in the PowerPoint.

23       Q.   So there's a PowerPoint

24  presentation that list -- that you had filed

25  a patent application?

CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 53

1    that question.

2         Q.    Sure.   So you had said to me that

3    you think there was a PowerPoint presentation

4    that was given to Cisco that mentioned that

5    Egenera had patents, correct?

6              MR. QUIGLEY:   Same objections.

7         A.    Correct.

8         Q.    Besides that PowerPoint

9    presentation, is there anything else from

10   that meeting, either documents or any other

11   notes that you took or something else, that

12   would indicate to you that you had made a

13   communication to Cisco that you had

14   intellectual property on the BladeFlame

15   product?

16             MR. QUIGLEY:   Same objections.

17        A.    From that meeting, I don't recall

18   anything other than the PowerPoints.

19        Q.    Do you recall yourself or anyone

20   else from Egenera telling any Cisco

21   representative that you had intellectual

22   property on the BladeFlame product?

23             MR. QUIGLEY:   Same objections.

24        A.    I imagine, as part of the

25   PowerPoint, we reviewed that slide and

CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 55

1   two purposes.  The one with Mr. Christensen

2   was really about selling a BladeFlame product

3   to Cisco's IT group for their use.  And then

4   the meeting with Ammar Hanafi was really a

5   follow up from the April 15th meeting.

6           Q.   Okay.  There's two separate

7   meetings that you're thinking about in May of

8   2004; is that correct?

9           A.   That is correct.

10          Q.   All right.  So there was one

11  meeting in California with you and Mr. Harris

12  from Egenera and Mr. Christensen from the

13  Cisco side; correct?

14          A.   That's correct.

15          Q.   And that was about selling

16  BladeFlame to Cisco's IT group for their --

17  for Cisco's internal use, true?

18          A.   Yes, that's correct.

19          Q.   Okay.  And then there's another

20  meeting that same month between yourself and

21  Mr. Hanafi that followed up from the April

22  2004 meeting, correct?

23          A.   Correct.  It was the same day.

24          Q.   The same day.

25               Was it also in California?

CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 56

1        A.   Yes, it was.

2        Q.   Okay.  And who else attended from

3   Egenera to meet with Mr. Hanafi?

4        A.   Just me.

5        Q.   And what was the purpose of

6   meeting, in general, with Mr. Hanafi?  It

7   sounds like it was a different -- let me

8   ask -- let me tell you why I'm asking.  It

9   sounds like it was of a different nature than

10  the meeting with Mr. Christensen, which seems

11  like it was a general sales type meeting.

12           So what was the purpose of the

13  meeting with Mr. Hanafi?

14       A.   The meeting with Mr. Hanafi was

15  really a follow-up meeting from the April

16  15th meeting.

17       Q.   And what was the general purpose

18  of those communications?

19       A.   It was really more of a follow up,

20  just check in to see what the progress was

21  and whether Cisco wanted to go forward or not

22  with leveraging our technology.

23       Q.   When you say "go forward," what

24  were you expecting would be the follow up

25  from those meetings?

CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 57

1            MR. QUIGLEY:   Objection, vague,

2       ambiguous, scope.

3            A.   I mean, I think the expectation

4  was that there would either be additional

5  meetings or Cisco would make a proposal to us

6  to leverage our technology in some way.

7            Q.   When you say leverage your

8  technology, what do you mean by that?

9            A.   Utilize it.

10           Q.   When you say -- when you say

11  "utilize it," do you mean incorporate

12  Egenera's technology into Cisco's product?

13           A.   Yes, that's one way that they

14  could utilize the technology.

15           Q.   Was a proposal ever made along

16  those lines, from Cisco to Egenera, in 2004?

17           A.   Well, that was certainly the whole

18  point of the meetings, was to see if there

19  was a way for Cisco to leverage our

20  technology in their products.

21           Q.   Right.   And I understand that.

22           But from -- in 2004, at either

23  the -- either meeting you had with -- well,

24  let me step back.

25           After the May meeting with

CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 61

1    was going to utilize Egenera's technology?

2              MR. QUIGLEY:  Same objections.

3         A.   Again, I'll try to answer it the

4    same way I did before.  I don't have a record

5    of that, but I believe there had to have been

6    communication between Cisco and Egenera to

7    finalize or end the process, you know, that

8    we had undertaken.

9         Q.   And what do you believe the -- in

10   the 2004 time frame, what do you believe was

11   the process that Cisco was going to

12   undertake, on their side, with respect to

13   going forward with Egenera's technology?

14             MR. QUIGLEY:  Same objections.

15        A.   My understanding is that Cisco was

16   evaluating our technology to determine

17   whether they could leverage it in their own

18   products.

19        Q.   Besides Mr. Hanafi, was there

20   anyone else that communicated that to you

21   from Cisco?

22             MR. QUIGLEY:  Same objections.

23        A.   I recall speaking to a Mario

24   Mazzola about that.

25        Q.   When did you speak to Mr. Mazzola?

CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 62

1        A.   I don't know the exact date.   It
2   was prior to the April 15 meeting.
3        Q.   And what was the form of
4   communication?
5        A.   It was a phone call.
6        Q.   And when was that phone call?
7        A.   I don't -- I don't recall the
8   exact date.
9        Q.   Was it after the NDA was signed?
10       A.   Again, I don't recall that exact
11   date.
12       Q.   And how -- did you call
13   Mr. Mazzola, or did he call you?
14       A.   I don't remember who initiated the
15   phone call.
16       Q.   How was it arranged?
17       A.   I believe it was arranged -- I
18   don't recall exactly.  I think it might have
19   been arranged through Vern Brownell, but I
20   don't recall exactly.
21       Q.   Did Mr. Brownell know Mr. Mazzola?
22       A.   I don't know.
23       Q.   I think you said to me before you
24   don't have any record of this phone
25   conversation; is that fair?

# EXHIBIT 15

## PUBLIC – REDACTED VERSION

HIGHLY CONFIDENTIAL – ATTORNEY'S EYES ONLY

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| **EGENERA, INC.,** | |
| **Plaintiff,** | Civil Action No. 1:16-cv-11613-RGS |
| **v.** | |
| **CISCO SYSTEMS, INC.,** | JURY TRIAL |
| **Defendant.** | |

**EGENERA, INC.'S SUPPLEMENTAL OBJECTIONS AND RESPONSES TO CISCO
SYSTEMS, INC.'S FIRST SET OF INTERROGATORIES (NOS. 1 AND 8)**

Pursuant to Rules 26 and 33 of the Federal Rules of Civil Procedure, Plaintiff Egenera, Inc. ("Plaintiff" or "Egenera") hereby provides this Supplemental Response to Defendant Cisco Systems Inc.'s ("Cisco") First Set of Interrogatories to Egenera as follows:

**PRELIMINARY STATEMENT**

Egenera's responses to these interrogatories are made to the best of its present knowledge, information, and belief. Egenera has not completed its investigation of the facts relating to this case, has not completed discovery in this action, and has not completed preparation for trial. These responses are at all times subject to such additional or different information that discovery or further investigation may disclose and, while based on the present state of Egenera's knowledge, are subject to such refreshing of recollection and such additional knowledge of facts as may result from Egenera's further discovery or investigation. By responding to Cisco's interrogatories, Egenera does not waive any objection that may be applicable to: (1) the use, for any purpose, by Cisco of any information provided in response; or (2) the admissibility, relevance, or materiality of any of the information to any issue in this case.

HIGHLY CONFIDENTIAL – ATTORNEY'S EYES ONLY

## GENERAL OBJECTIONS

The following general objections are made to each and every interrogatory, definition, and instruction and are in addition to any specific objections that are raised in response to each interrogatory separately.

1. Egenera objects generally and specifically to each and every interrogatory, definition, and instruction to the extent that it purports to impose burdens or duties on Egenera that exceeds the scope of reasonable and permissible discovery or that exceeds the requirements of the Federal Rules of Civil Procedure and the Local Rules of this Court, or any applicable ruling of this Court.

2. Egenera objects to each and every interrogatory, definition, and instruction to the extent that it seeks discovery prior to the date such information is to be exchanged pursuant to the Local Rules, the schedule in this case, and/or a specific agreement between parties for limited discovery.

3. Egenera objects to each and every interrogatory, definition, and instruction to the extent that it seeks information that is not relevant to the subject matter of this proceeding or reasonably calculated to lead to the discovery of admissible evidence.

4. Egenera objects to each and every interrogatory, definition, and instruction to the extent that it seeks the disclosure of information protected by the attorney-client privilege or the attorney work-product doctrine, and other applicable law, privilege, immunity, protection, or doctrine, or to the extent such interrogatory, definition, and instruction seeks the impressions, conclusions, opinion, legal research or theories of Egenera's attorneys or their agents. The inadvertent production of any privileged document or information shall not constitute wavier of any applicable objection or privilege. For purposes of responding to these demands, Egenera will

HIGHLY CONFIDENTIAL – ATTORNEY'S EYES ONLY

interpret such interrogatory, definition, and instruction as excluding information subject to the attorney-client privilege and attorney work-product doctrine.

5.      Egenera objects to each and every interrogatory, definition, and instruction to the extent that it seeks to discover trade secrets or any other commercially sensitive, confidential, or proprietary information, the disclosure of which could be damaging to the business or property of Egenera or other related business entities. Egenera also objects to the extent that each interrogatory, definition, and instruction seeks the confidential or proprietary information of third parties, some of which may have non-disclosure or confidentiality agreements with Egenera. Egenera will provide such information only to the extent it can do so consistent with its obligations to any third parties.

6.      Egenera objects to each and every interrogatory, definition, and instruction to the extent that it calls for a legal conclusion. Any response by Egenera shall not be construed as providing legal conclusion regarding the meaning or application of any terms or phrases used in Cisco's interrogatories, definitions, or instructions.

7.      Egenera objects to each and every interrogatory, definition, and instruction to the extent that the information sought is a matter of public record or uniquely within the knowledge of Cisco or non-parties, or to the extent that the information sought is as readily determinable by Cisco as by Egenera. Egenera further objects to each and every interrogatory, definition, and instruction to the extent that the information sought is not within Egenera's possession, custody, or control.

8.      Egenera objects to each and every interrogatory, definition, and instruction to the extent that it renders any interrogatory compound or to the extent that it contains multiple inappropriate subparts. Such interrogatories constitute separate interrogatories that count toward

HIGHLY CONFIDENTIAL – ATTORNEY'S EYES ONLY

the limit on interrogatories that Cisco is permitted to propound. Egenera objects to each and every interrogatory, definition, and instruction that would exceed such limit.

9.      Egenera objects to each and every interrogatory, definition, and instruction to the extent that it seeks to require Egenera to do more than conduct an examination of those files or sources that reasonably may be expected to yield responsive information or an inquiry of those persons who reasonably may be expected to possess responsive information.

10.     Egenera objects to each and every interrogatory, definition, and instruction to the extent that it either calls for Egenera to form and then render an expert opinion, or to the extent that it requires disclosure of expert reports, analysis, finding or assessments that Egenera is not yet required to disclose pursuant to the Local Rules, the Federal Rules of Civil Procedure, or this Court's orders.

11.     Egenera objects to each and every interrogatory, definition, and instruction to the extent that it is vague, ambiguous, unintelligible, overly broad, or unduly burdensome.

12.     Egenera objects to each and every interrogatory, definition, and instruction as premature to the extent it imposes a duty on Egenera to take a position on claims that require construction but for which Egenera has not yet been required to take such a position pursuant to the Local Rules, the Federal Rules of Civil Procedure, or this Court's orders.

## **DEFINITIONS**

The following objections are made to Cisco's "Definitions" and are in addition to any specific objections that are raised in response to each interrogatory separately.

1.      Plaintiff objects to Defendant's definition of the terms "Defendant" and "Cisco" to the extent the definitions: (1) cause any interrogatory to exceed the permissible scope of discovery under the Federal Rules of Civil Procedure; (2) include any entities unknown to

HIGHLY CONFIDENTIAL – ATTORNEY'S EYES ONLY

Plaintiff; and (3) are overly broad, rendering the interrogatory unduly burdensome and not relevant to any claim or defense nor reasonably calculated to lead to the discovery of admissible evidence.

2.      Plaintiff objects to Defendant's definition of the terms "Plaintiff" " and "Egenera" to the extent the definitions: (1) cause any interrogatory to exceed the permissible scope of discovery under the Federal Rules of Civil Procedure; (2) include any corporation, business, entity or individuals other than Egenera, Inc. or its employees; (3) are overly broad, rendering the interrogatory unduly burdensome and not relevant to any claim or defense nor reasonably calculated to lead to the discovery of admissible evidence; (4) call for information subject to attorney-client, work product, third party confidentiality, or other privileges and protections. Plaintiff further objects to the definitions as overly broad, at least to the extent they include "all" delineated persons/entities without regard to the relevancy of any subject matter and without temporal limitations. Plaintiff further objects to the definitions as being overly broad as they include persons/entities that are unknown, outside of Plaintiff's control, and/or outside the scope of this litigation.

3.      Plaintiff objects to Defendant's definition of "Patents-in-Suit" to the extent it exceeds U.S. Patent Nos. 7,231,430 and 6,971,044.

4.      Plaintiff objects to Defendant's definition of "Accused Instrumentality" to the extent it exceeds the products accused of infringement in this action, as described in Egenera's infringement contentions (including any amendments and supplementations thereto).

5.      Plaintiff objects to Defendant's definition of "prior art" as it is unduly broad, misstates the law, improperly attempts to shift Defendant's burden, and includes unclear and undefined terms.

HIGHLY CONFIDENTIAL – ATTORNEY'S EYES ONLY

6.      Plaintiff objects to Defendant's definition of "communication" to the extent it seeks to expand the definition of that term beyond that of the Federal Rules of Civil Procedure, this Court's orders, or any other applicable rule or order.

7.      Plaintiff objects to Defendant's definition of "document" to the extent it seeks to expand the definition of that term beyond that of the Federal Rules of Civil Procedure or this Court's orders.

8.      Plaintiff objects to Defendant's definition of "identify" as it is overbroad and to the extent it seeks to expand the definition of that term beyond that of the Federal Rules of Civil Procedure, this Court's orders, or any other applicable rule or order.

9.      Plaintiff objects to Defendant's request regarding Fed. R. Civ. P. 33(d) (paragraph 19) as it is overbroad and to the extent it seeks to expand beyond what is required of Egenera in the Federal Rules of Civil Procedure, this Court's orders, or any other applicable rule or order.

HIGHLY CONFIDENTIAL – ATTORNEY'S EYES ONLY

Discovery is ongoing, and Plaintiff reserves all rights, including the right to supplement and/or revise its response as discovery progresses.

## FOURTH SUPPLEMENTAL RESPONSE TO INTERROGATORY NO. 1

After further discovery and review, below is a table with supplemental information to Egenera's Response to this Interrogatory.

| Name | Title | Time Period |
|------|-------|-------------|
| Jack DeJovin | Account Executive | ███████ |
| Roger Fairbanks | Consulting Program Manager | ███████ |
| Elias Risorto | Account Executive | ███████ |

After further discovery and review, below is a table listing the reason for departure (*i.e.*, voluntary or involuntary) of former Egenera employees that Egenera currently understands to have at some point been employed by Cisco.

| Name | Reason for Departure |
|------|----------------------|
| Jack DeJovin | ███ |
| Roger Fairbanks | ███ |
| Elias Risorto | ███ |

Discovery is ongoing, and Plaintiff reserves all rights, including the right to supplement and/or revise its response as discovery progresses.

**INTERROGATORY NO. 8:** Identify all interactions between Egenera and Cisco regarding any actual or potential Egenera product or technology, including without limitation "an Egenera BladeFrame system with the PAN Manager" (Compl., D.E. 1 ¶ 15); any actual or potential "meetings" between Egenera and Cisco in 2004 (such as alleged in Compl., D.E. 1 ¶¶ 2, 15) or any other time; any actual or potential business partnership or exchange of technology between Egenera and Cisco; any actual or potential investment by Cisco in Egenera; or any potential acquisition of Egenera by Cisco. For each such interaction, identify all people involved and all documents relating to the interaction (including, without limitation, any notes and communications internal to Egenera).

## RESPONSE TO INTERROGATORY NO. 8:

Plaintiff hereby incorporates its general objections as if set forth fully herein. Plaintiff further objects to this interrogatory as vague and ambiguous as to "any actual or potential

HIGHLY CONFIDENTIAL – ATTORNEY'S EYES ONLY

Egenera product or technology" or "exchange of technology". Plaintiff also objects to this interrogatory as it seeks disclosure of privileged, work product, or otherwise protected information. Plaintiff further objects to Defendant's interrogatory as overly broad and unduly burdensome as it seeks disclosure of information that is more appropriately sought using depositions. Plaintiff also objects to this interrogatory as calling for information in Cisco's possession, custody, or control.

Subject to and without waiving the foregoing general and specific objections, Plaintiff responds as follows:

In 2004, Cisco expressed an interest in Egenera and its PAN technology and product. The companies entered into a mutual non-disclosure agreement and Cisco purchased an Egenera BladeFrame system with PAN Manager. After this NDA and purchase, the parties held meetings during which Egenera disclosed the details of its then patent-pending technology (now patented) and the benefits flowing from that technology. These meetings were held in both California and Massachusetts, and included in person and teleconference attendance. Shortly after the 2004 timeframe meetings ceased, Cisco began hiring employees from Egenera. Egenera currently understands that the following individuals from Cisco participated in the 2004 timeframe meetings: Ammar Hanafi, Peter Ruh, Ray Wu, April Chou, Krish Sivakumar, Grace Koo, Elango Ganesan, Douglas Hoffman, Mario Mazzola, Soni Jiandani, and Luca Cafiero. Cisco is likely to have further knowledge of other participants on behalf of Cisco, particularly individuals involved but that did not correspond or meet with Egenera. Egenera currently understands that the following individuals from Egenera participated in the 2004 timeframe meetings: Vern Brownell, Charles Pease, Mike Thompson, Peter Manca, Thomas Sheehan, and Bob Dutkowsky.

HIGHLY CONFIDENTIAL – ATTORNEY'S EYES ONLY

The parties had further discussions in 2008 and 2009 regarding Egenera and Egenera's PAN technology and product, but Cisco ended those discussions as well. Egenera currently understands that the following individuals from Cisco participated in the 2008 timeframe discussions: Ed Chapman. Cisco is likely to have further knowledge of other participants on behalf of Cisco, particularly individuals involved but that did not correspond or meet with Egenera. Egenera currently understands that the following individuals from Egenera participated in the 2008 timeframe discussions: Peter Manca, Mike Thompson, and Christine Crandell.

Around the same time as the 2008 timeframe discussions, Cisco acquired Nuova and released its first Project California/UCS products.

Over the years, Egenera believes Cisco hired at least the following Egenera employees with knowledge and insight related to Egenera, its technologies, and its patents:

| Name | Egenera Dates | Egenera Title |
|---|---|---|
| Avioli, Peter J | | Value Engineer |
| Bellmare, Chris | | Account Executive |
| Butler, Steven | | Account Executive |
| Carr, Jed | | Principal Knowledge Transfer Consultant |
| Chakour, Jonathan | | Account Executive |
| Chakravarthi, Sarvajith | | Director Manufacturing Operations |
| Chen, George | | Technical Delivery Consultant |
| Clark, Scott | | Director Professional Services |
| Goldsmith, Stacey | | Vice-President Professional Services |
| Gong, Tao | | EMEA Technical Director |
| Heal, Michael | | Principal Software Engineer |
| Herring, Hunter | | Vice-President Sales |
| Hinson, Richard | | Principal Technical Consultant |
| Horsefield, Steven | | Account Executive |
| Iacavone, Michael | | Principal Firmware Engineer |
| Jacobson, Rachael | | Account Executive |
| Kleidon, Ulrich | | Senior Recruiter |
| Kvasyukm Andrey | | Senior Consultant SAP Solutions |
| Larochelle, Mark | | Senior Technical Consultant |
| Lincoln, Blaine | | Manager Inside Sales |
| Lyon, Greg | | Technical Support Engineer |
| Mannal, Brad | | Technical Director - Dell US |
| Moulton, Jeremy | | Account Executive |

HIGHLY CONFIDENTIAL – ATTORNEY'S EYES ONLY

| NAME | EGENERA DATES | EGENERA TITLE |
|---|---|---|
| Pease, Charles | | Technical Support Engineer |
| Poler, Daniel | | Account Executive |
| Quinn, Michael | | Senior Tech Consultant |
| Richardson, Robert | | Vice-President Sales |
| Rodgers, Timothy | | Account Executive |
| Roy, Ron | | Forecast Planning Manager |
| Schlueter, Paul | | Sales Engineer |
| Sethi, Satinder | | Account Executive |
| Shaw, Jason | | Sales Engineer |
| Singh, Anujar | | Sales Engineer |
| Valente, Chris "Buzzy" | | Sales Engineer |
| Yousefi, Laurie | | Director Solutions Marketing |

Individuals with knowledge of the interactions between Egenera and Cisco are listed above and in Egenera's initial disclosures (including any amendments or supplementations thereto) which are incorporated herein by reference.

Egenera will produce and identify non-privileged documents that exist in its possession, custody, or control from which the answer to this Interrogatory may be further ascertained, in accordance with FED. R. CIV. P. 33(d), if any are uncovered after a reasonable search.

Discovery is ongoing, and Plaintiff reserves all rights, including the right to supplement and/or revise its response as discovery progresses.

**FIRST SUPPLEMENTAL RESPONSE TO INTERROGATORY NO. 8**

Egenera further understands that Brian Christianson participated in the 2004 timeframe meetings on behalf of Cisco. Egenera further understands that John Morgridge and Ned Hooper participated in the 2008 timeframe meetings on behalf of Cisco.

Egenera incorporates by reference, pursuant to FED. R. CIV. P. 33(d), the following documents, which relate to the above-described interactions between the parties: EGENERA00027956, EGENERA00028583, EGENERA00029130, EGENERA00029556, EGENERA00065194, EGENERA00066234, EGENERA00066541, EGENERA00066818, EGENERA00146694, EGENERA00570508, EGENERA00570512.

HIGHLY CONFIDENTIAL – ATTORNEY'S EYES ONLY

Discovery is ongoing, and Plaintiff reserves all rights, including the right to supplement and/or revise its response as discovery progresses.

## SECOND SUPPLEMENTAL RESPONSE TO INTERROGATORY NO. 8

After further discovery and review, "Chris Valente" was mistakenly listed in the above table in Egenera's Response to this Interrogatory.

Egenera further incorporates by reference its response to Interrogatory Number 5, including all supplementations and amendments thereto.

Discovery is ongoing, and Plaintiff reserves all rights, including the right to supplement and/or revise its response as discovery progresses.

## THIRD SUPPLEMENTAL RESPONSE TO INTERROGATORY NO. 8

Egenera incorporates its response to Interrogatory Number 1 (including all supplementations and amendments thereto).

HIGHLY CONFIDENTIAL – ATTORNEY'S EYES ONLY

Dated: April 12, 2018.                          /s/ James E. Quigley

Mike McKool (*admitted pro hac vice*)
Texas State Bar No. 13732100
mmckool@McKoolSmith.com
Christopher Bovenkamp (*admitted pro hac vice*)
Texas State Bar No. 24006877
cbovenkamp@McKoolSmith.com
Avery Williams (*admitted pro hac vice*)
Texas State Bar No. 24075282
awilliams@McKoolSmith.com
**MCKOOL SMITH, P.C.**
300 Crescent Court Suite 1500
Dallas, TX 75201
Telephone: (214) 978-4000
Telecopier: (214) 978-4044

John B. Campbell (*admitted pro hac vice*)
Texas State Bar No. 24036314
jcampbell@McKoolSmith.com
Kevin L Burgess (admitted pro hac vice)
Texas State Bar No. 24006927
kburgess@McKoolSmith.com
James E. Quigley (*admitted pro hac vice*)
Texas State Bar No. 24075810
jquigley@McKoolSmith.com
Jordan Z. Carson
Texas State Bar No. 24101599
jcarson@McKoolSmith.com
**McKool Smith, P.C.**
300 W. 6th Street, Suite 1700
Austin, TX 78701
Telephone: (512) 692-8730
Telecopier: (512) 692-874

David L. Evans (BBO #156695)
devans@murphyking.com
Steven M. Veenema (BBO #672097)
sveenema@murphyking.com
**MURPHY & KING, P.C.**
One Beacon Street, 21st Fl.
Boston, Massachusetts 02108-3107
Telephone: (617) 423-0400
Fax: (617) 423-0498

**ATTORNEYS FOR PLAINTIFF
EGENERA, INC.**

HIGHLY CONFIDENTIAL – ATTORNEY'S EYES ONLY

## CERTIFICATE OF SERVICE

The undersigned certifies that the foregoing document was served via electronic mail on all counsel of record on system on April 12, 2018.

*/s/ James E. Quigley*

# EXHIBIT 16

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS
(Boston)


EGENERA, INC.,                    |
                                  |
            Plaintiff,            |
                                  |
        v.                        |   Civil Action No.
                                  |   1:16-cv-11613-RGS
                                  |
CISCO SYSTEMS, INC.,              |
                                  |
            Defendant.            |
_____|




        HIGHLY CONFIDENTIAL - OUTSIDE COUNSEL ONLY

        VIDEO DEPOSITION OF VERN BROWNELL

                BURNABY, BC, CANADA

                MARCH 29, 2018






U.S. LEGAL SUPPORT
Website:  www.uslegalsupport.com



REPORTED BY: TAMBI BALCHEN, RPR, CRR, CSR NO. 9166
Certified Shorthand Reporter (State of California)

```
 1              dive.

 2      Q     Would you give notes about the discussion?

 3   MR. WILLIAMS:  Objection.  Vague.

 4   THE WITNESS:

 5      A     What do you mean notes?

 6   MR. McDAVIT:

 7      Q     After you had the meeting, would it be

 8            typical for you to describe what was said

 9            at -- at the meeting in notes?

10      A     There -- I'm sure there were people that

11            were taking notes.  I don't recall.

12      Q     Was -- is it typical for -- for Egenera to

13            have after-action reports for --

14      A     No, --

15      Q     -- meetings?

16      A     -- we weren't as disciplined as we should

17            have been about that.

18   MR. WILLIAMS:  Let him finish his question.

19   THE WITNESS:   I'm sorry.

20   MR. WILLIAMS:  It's okay.

21   MR. McDAVIT:

22      Q     So, do you recall writing an after-action

23            report after meeting with the folks from

24            Cisco in April of 2014?

25      A     No.  I might have, but I don't recall.
```

```
 1    Q    Besides what's in front of you in Exhibit 9

 2         and Exhibit 10 to your deposition and your

 3         recollection sitting here today, do you

 4         have any other -- anything else about that

 5         meeting that you recall?

 6    A    No.  Just that -- no.

 7    Q    And if -- if you look at Exhibit 2 to your

 8         deposition, which is the 430 patent, that

 9         patent was issued after this meeting;

10         correct?

11    A    It was issued after this meeting, yes.

12    Q    Did --

13    A    It was filed in 2002.

14    Q    And did you mention -- and I think we --

15         you said earlier to me that you don't recall

16         ever mentioning any application numbers to

17         the people at Cisco, right?

18    A    Well, you could look through here.  I don't

19         know, is it in here?

20    Q    You can take a look.

21    A    I don't recall, you know.

22    Q    Okay.  So, without looking through it, you

23         don't recall?

24    A    No.

25    Q    If you did, it would be in that -- in the
```

```
 1              presentation which is Exhibit 10 to your

 2              deposition, right?

 3     A        Yes.

 4     Q        And, to be clear, if you did tell Cisco

 5              about a patent application number, it

 6              would be in Exhibit 10 to your deposition,

 7              correct?

 8     A        No, not necessarily.  I mean, it could have

 9              been a discussion that we just had without

10              this material, right?

11     Q        And you don't recall --

12     A        No, as I said before, I don't recall, no.

13     Q        Did anyone at Egenera who was at the

14              meeting with Cisco tell Cisco about the

15              patent application?

16     MR. WILLIAMS:  Hold on.  Just one second.

17     THE WITNESS:   Sorry.

18     MR. WILLIAMS:  Your mike fell.  There you go.

19     THE WITNESS:

20     A        No, I don't.  I don't recall.

21              This is a good product description of

22              UCS.

23     MR. McDAVIT:

24     Q        At some point did Egenera explore filing an

25              initial public offering?
```

# EXHIBIT 17

## PUBLIC – REDACTED VERSION

**To:**    Thompson, Mike[         ]
**From:**    Epstein, Dave
**Sent:**    Mon 11/24/2008 11:26:28 PM
**Importance:**    Normal
**Subject:**    Re: Meeting with Thompson of Egenera - Any interest in meeting him? jpm
**Received:**    Mon 11/24/2008 11:27:08 PM

I know a guy (Rob Salvango) in the same group - director level - but he does most enterprise buyouts. Strange that Ned has a consumer title. I can make Rob aware. I suspect hed be called in if they're serious.
-DaveE

Dave Epstein

---

**From:** Thompson, Mike
**To:** Arnone, Miles ; Brownell, Vern ; Collatos, William ; DiSabato, Joe ; Dutkowsky, Bob ; Epstein, Dave; Glazer, John ; Huelskamp, Tim ; Kane, Chuck ; Kimball, Rick ; Paul, Brian ; Phillips, James ; Rogers, Hartley ; Shamapant, Venu ; Srinivasan, Krishna ; Thompson, Mike ; Volpe, Louis
**Sent:** Mon Nov 24 14:31:19 2008
**Subject:** FW: Meeting with Thompson of Egenera - Any interest in meeting him? jpm

Dave,
You asked on the call last week who I am meeting with at Cisco.  It looks like it will be Ned Hooper after all.  Do you know him (info below)?
Mike

**Ned Hooper**
**Senior Vice President, Corporate Development and Consumer Group**
Cisco Systems, Inc.

Ned Hooper is Senior Vice President of Corporate Development and the Consumer Group at Cisco. In his Corporate Development role, Hooper is responsible for Cisco's global growth strategy through business development activities including acquisitions, equity investment, and the incubation of innovative technologies. As the leader of the Consumer Group, Hooper's charter is to manage Cisco's consumer organization and strategy, initially focused on delivering the network as the platform in the home.

---

**From:** [       ]  [mailto:[        ]]
**Sent:** Friday, November 07, 2008 10:16 PM
**To:** Thompson, Mike
**Subject:** Fwd: Meeting with Thompson of Egenera - Any interest in meeting him? jpm

FYI

-----Original Message-----
From: John Morgridge (morgridg) <[         ]>
To: [     ]
Sent: Fri, 7 Nov 2008 8:37 pm
Subject: FW: Meeting with Thompson of Egenera - Any interest in meeting him? jpm

Nick, suggest golf in the am at Stanford and then a visit to Cisco. Tash and I enjoy having dinner with you in the pm. jpm

---

**From:** Ned Hooper (nhooper)
**Sent:** Saturday, October 25, 2008 2:00 PM
**To:** John Morgridge (morgridg)
**Subject:** RE: Meeting with Thompson of Egenera - Any interest in meeting him? jpm

I am tentatively in India that week.  If you send me his contact info, I can have my admin set it up.

Ned

**From:** John Morgridge (morgridg)
**Sent:** Saturday, October 25, 2008 12:57 PM
**To:** Ned Hooper (nhooper)
**Subject:** RE: Meeting with Thompson of Egenera - Any interest in meeting him? jpm

Ned, does the afternoon of 12/3 work for you? If so I will set it up. jpm

---

**From:** Ned Hooper (nhooper)
**Sent:** Saturday, October 25, 2008 8:20 AM
**To:** John Morgridge (morgridg)
**Subject:** RE: Meeting with Thompson of Egenera - Any interest in meeting him? jpm

Would be a good meeting.  We know the company, but I don't know Mike.  Will you make the connection?

Ned

---

**From:** John Morgridge (morgridg)
**Sent:** Friday, October 24, 2008 9:24 PM
**To:** Ned Hooper (nhooper)
**Subject:** Meeting with Thompson of Egenera - Any interest in meeting him? jpm

# EXHIBIT 18

## PUBLIC – REDACTED VERSION

**To:** jchambers@cisco.com[jchambers@cisco.com]
**Cc:** Ned Hooper[nhooper@cisco.com]
**From:** Thompson, Mike
**Sent:** Wed 5/13/2009 2:57:39 PM
**Importance:** Normal
**Subject:** FW: Cisco email
**Received:** Wed 5/13/2009 2:58:57 PM

John,

We haven t met.  I am the CEO and Chairman of Egenera.  I am reaching out to you because we are in the final phase of an M&A process and thought a discussion might be of interest.  Your organization has passed on this opportunity but, now that UCS is announced along with your new data center product direction, I continue to think about the incredible value we can provide Cisco.  Here are some reasons to reconsider:

1.      We have a   prime   installed base (1,400 systems - $500M in aggregate revenue) that can serve as the early adopter market for your UCS product helping you to create a fast start to this business;

2.      We have a company with 7+ years of experience selling new innovation into the heart of the data center;

3.      We have a high quality global service organization with people, processes and tools to support systems running enterprise class, mission critical applications;

4.      We have an outstanding team of software engineers with deep skills in unified fabric, infrastructure virtualization and management/automation software, and;

5.      We have relevant IP and patents which may prove to be of great value to Cisco.

The acquisition of Egenera would provide you with an immediate footprint in the heart of the data center with a high quality, well respected service organization.

Sorry for the email intrusion but thought it would be worth one more try.  Can we arrange a call to discuss further?

Best Regards, Mike


Mike Thompson
Chairman and CEO

Egenera - Delivering the Reliable Dynamic Data Center

███████  (office)

http://www.egenera.com
http://blog.egenera.com
http://twitter.com/egenera

# EXHIBIT 19

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 1

          IN THE UNITED STATES DISTRICT COURT

           FOR THE DISTRICT OF MASSACHUSETTS


        -----------------------
                               )
        EGENERA, INC.,         )
               Plaintiff       )
                               )
        vs.                    ) Case No. 1:16-CV-11613
                               )
        CISCO SYSEMS, INC.,    )
               Defendant       )
                               )
        -----------------------



        HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

         VIDEOTAPED DEPOSITION OF MICHAEL R. THOMPSON

                THURSDAY, MARCH 15, 2018

                WESTBROUGH, MASSACHUSETTS






        REPORTED BY:  Sandra A. Deschaine, CSR, RPR,

        CLR, RSA

        Job No. 21084

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 23

1    attorneys are covering the cost of the suit;

2    is that right?

3         A.   That's my understanding.

4         Q.   Egenera's attorneys?

5         A.   Correct.

6         Q.   Mr. Thompson, we're going to look

7    at some documents related to the meetings,

8    but let me start by asking a few questions

9    about the meetings before we get to those

10   documents.

11             What was the purpose of your

12   meeting with Cisco -- in 2008, correct?

13        A.   Correct.  To determine if they

14   were interested in acquiring the company.

15        Q.   And what was the answer?

16        A.   The answer was no.

17        Q.   Your contact at Cisco was Ned

18   Hooper for your meeting?

19        A.   Both John Morgridge and Ned

20   Hooper.

21        Q.   John Morgridge set the meeting up

22   for you.  Is that basically right?

23        A.   That's correct.

24        Q.   And Ned Hooper at the time is the

25   one who was going to hear you out and take

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 188

1        Q.    Mr. Thompson, you never identified
2   to Cisco any patent application of Egenera's,
3   right?
4        A.    Not that I recall.
5        Q.    And, Mr. Thompson, you never
6   identified to Cisco -- I'm sorry, the number
7   -- strike that.  Let me rephrase.
8             Mr. Thompson, you never identified
9   to Cisco the '430 patent; is that true?
10        A.    True.
11        Q.    Mr. Thompson, did you ever
12   identify to Cisco a particular acquisition
13   price that you wanted them to consider?
14        A.    Not that I recall.
15        Q.    Did you ever identify to Cisco --
16   let me rephrase.
17             Mr. Thompson, did you ever request
18   of Cisco that they consider entering into any
19   kind of IP licensing agreement with
20   Egenera?
21        A.    Not that I recall.
22        Q.    Mr. Thompson, did you ever tell
23   Cisco that you or anyone else thought that
24   Cisco was infringing any Egenera intellectual
25   property?

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 190

1    you know, what you communicated to Cisco.

2          A.   Yeah, I thought I answered that.

3    I said I don't recall.

4          Q.   You may have as part of that

5    answer.  It was just that there was other

6    stuff going on in there not relevant to the

7    question.  So I just want to keep the Q & A

8    focused on the actual issue that I'm asking

9    about.  So let me go back to that question.

10         You never told Cisco, Mr.

11   Thompson, that you or anyone else at Egenera

12   thought Cisco UCS was infringing any of

13   Egenera patents, right?

14         A.   Not that I recall.

15              MR. MAGIC:  Okay.  Why don't we

16        take a break.

17              THE VIDEOGRAPHER:  The time is

18        4:02.  We're off the record.

19   (Recess taken at 4:02 p.m. to the 4:19 p.m.)

20              THE VIDEOGRAPHER:  We are back on

21        the record.  The time is 4:19.

22              MR. CAMPBELL:  I want to designate

23        the transcript Highly Confidential,

24        Attorneys' Eyes Only.

25   BY MR. MAGIC:

# EXHIBIT 20

Highly Confidential - Attorneys' Eyes Only

Page 1

1              IN THE UNITED STATES DISTRICT COURT

2                 DISTRICT OF MASSACHUSETTS

3

4    EGENERA, INC.,

5              Plaintiff,              Case No.

6       vs.                           1:16-cv-11613-RGS

7    CISCO SYSTEMS, INC.,

8              Defendant.

     _____

9

10

11

12    ** HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY **

13

14       VIDEOTAPED DEPOSITION OF BRIAN CHRISTENSEN

15             Redwood Shores, California

16               Friday, March 16, 2018

17

18

19

20

21

22

23

24   REPORTED BY:

     CYNTHIA MANNING, CSR No. 7645, CLR, CCRR

25   JOB NO. 139181

Highly Confidential - Attorneys' Eyes Only

Page 32

1    and direction to the team.                              13:18

2         Q.   Okay.   Fair to say that you could have

3    accessed it if you had wanted to, you just -- that

4    wasn't your job?

5         A.   If I asked Krish to provide me access, yes,  13:18

6    likely I would have received access.   Yes.

7         Q.   Is there anyone on the team of -- sorry.

8              Is there anyone on the team of 160 people

9    that you were managing that could not have obtained

10   access to the Egenera BladeFrame that was installed   13:19

11   in the San Jose Building 5 data center?

12         A.   Within my team, we had two teams.   We had a

13   team that supported our business application data

14   centers (e.g, our internal e-mail and ERP systems)

15   and the team that supported our engineering R&D       13:19

16   activities.   About one-third of that team supported

17   our engineering R&D activities that would have had

18   access to the physical data center.

19              That does not mean they would have access

20   to log in and do -- working with the Egenera          13:19

21   product.   That would have been a subset of those 40

22   people that would have had access to it.

23         Q.   All right.   So about 40 people, which is

24   the subset of your team that supported the R&D

25   engineering activities, could have had physical       13:20

Highly Confidential - Attorneys' Eyes Only

Page 33

1    access to the machine and some subset of those 40        13:20

2    people would have had login credentials so they

3    could actually work with it?

4           MR. PACKIN:  Objection to form;

5    mischaracterizes testimony.                               13:20

6           THE WITNESS:  Yes.

7    BY MR. WILLIAMS:

8        Q.  Did I get that right?

9        A.  Forty people would have been a subset --

10       Q.  Okay.                                             13:20

11       A.  -- of that team that would have had access.

12       Q.  And do you know how many people actually

13   had credentials that would allow them to log in to

14   the system and work on it?

15       A.  Krish's entire team was approximately 10         13:20

16   people, and it would have been a subset of Krish's

17   team; so it would have likely been under five people

18   that would have had access.

19       Q.  Do you know which likely five people would

20   have had access?                                          13:21

21       A.  The only name that I can remember right now

22   is Bruce Blaylock that would have had access at that

23   time.

24          I do know that Sidney Morgan replaced Krish

25   at some point of time, but I don't remember the           13:21