```
 1                  UNITED STATES DISTRICT COURT
                    DISTRICT OF MASSACHUSETTS
 2

 3

 4

 5
     * * * * * * * * * * * * * *
 6   EGENERA, INC.,                *
           Plaintiff              *
 7                                *    CIVIL ACTION
           vs.                    *    No. 16-11613-RGS
 8                                *
     CISCO SYSTEMS, INC.,         *
 9         Defendant
     * * * * * * * * * * * * * *
10

11

12

13

14          BEFORE THE HONORABLE RICHARD G. STEARNS
               UNITED STATES DISTRICT COURT JUDGE
15                      AND A JURY
                    CIVIL JURY TRIAL DAY 3
16                    August 4, 2022

17

18

19                              Courtroom No. 21
                                1 Courthouse Way
20                              Boston, Massachusetts 02210

21

22            JAMES P. GIBBONS, CSR, RPR, RMR
               LISA McDONALD, RPR, RMR, CRR
23                Official Court Reporter
               1 Courthouse Way, Suite 7205
24             Boston, Massachusetts  02210
                jamesgibbonsrpr@gmail.com
25
```

```
1    APPEARANCES:

2    On behalf of the Plaintiff:

3         ROPES & GRAY LLP (By Andrew N. Thomases, Esq., and
      James R. Batchelder, Esq.) 1900 University Avenue, East
4    Palo Alto, California 94303
                           - and -
5         ROPES & GRAY LLP (By Josef B. Schenker, Esq. and
      Rachael S. Bacha, Esq.) 1211 Avenue of the Americas, New
6    York, New York 10036-8704
                           - and -
7         ROPES & GRAY LLP (By Scott Taylor, Esq., Emma
      Notis-McConarty, Esq. and Nicholas Bortz, Esq.)
8    Prudential Tower, 800 Boylston Street, Boston,
      Massachusetts 02199
9
      On behalf of the Defendant:
10
           DESMARAIS LLP (By Tamir Packin, Esq., Peter C.
11    Magic, Esq., Jonas McDavit, and John M. Desmarais, Esq.)
      230 Park Avenue, New York, New York 10169, on behalf of
12    the Defendant

13

14

15

16

17

18

19

20

21

22

23

24

25
```

| | |
|---|---|
| 1 | P R O C E E D I N G S |
| 2 | (9:00 a.m.) |
| 3 | THE CLERK:  All rise for the jury. |
| 4 | (Whereupon, the Court and jury entered the courtroom.) |
| 5 | THE CLERK:  Court is open.  You may be seated. |
| 6 | Resuming on the record in Civil Action No. 16-11613, |
| 7 | Egenera, Inc. versus Cisco Systems, Inc. |
| 8 | THE COURT:  Good morning, counsel. |
| 9 | Good morning, jurors.  Thank you for everyone being on |
| 10 | time this morning.  We're actually early.  We're off to a |
| 11 | really great start. |
| 12 | Since this is a trial about patents and inventions, |
| 13 | you have to keep in mind the name Willis Carrier, who |
| 14 | invented air conditioning. |
| 15 | (Laughter.) |
| 16 | THE COURT:  So we are very grateful to him. |
| 17 | All right.  We're ready to resume. |
| 18 | MR. BATCHELDER:  Thank you, your Honor.  Jim |
| 19 | Batchelder representing Ropes & Gray. |
| 20 | We are interrupting Mr. Manca's testimony, and we are |
| 21 | calling adversely Scott Clark. |
| 22 | THE COURT:  Yes, I recall. |
| 23 | THE CLERK:  Please raise your right hand. |
| 24 | **SCOTT CLARK, sworn** |
| 25 | THE CLERK:  Could you please introduce yourself, |

1    spelling your last name for the record?

2         THE WITNESS:   Good morning.   My name is Scott

3    Clark, and my last name is C-L-A-R-K.

4         MR. BATCHELDER:   May I proceed, your Honor?

5         THE COURT:   You may.

6                    **DIRECT EXAMINATION**

7    **BY MR. BATCHELDER**

8    Q    Mr. Clark, good morning.

9    A    Good morning.

10   Q    You and I have not met before, correct?

11   A    That's correct.

12   Q    You at one time worked for Egenera, correct?

13   A    Yes.

14   Q    And then ultimately you came to work for Cisco; is that

15   right?

16   A    Yes.   Yup.

17   Q    And you left Egenera approximately what time?

18   A    I left Egenera I believe around October 2007.

19   Q    And you were not fired from Egenera?

20   A    No, I wasn't.

21   Q    What do you currently do for employment?

22   A    Excuse me?

23   Q    What do you currently do for employment?

24   A    I'm retired.

25   Q    When did you leave Cisco?

```
1    A    September of 2019.

2    Q    And you were not fired by Cisco either?

3    A    No, I wasn't.

4    Q    So you started working with Egenera around May or June

5    2004; is that right?

6    A    Yes, that's correct.

7    Q    And you left around October 2007?

8    A    Yes.

9    Q    And while you were at Egenera, you were vice president

10   of what's called professional services?

11   A    Correct.

12   Q    All right.

13             MR. BATCHELDER:  Your Honor, may we approach to

14   hand the witnesses a binder, please?

15             THE COURT:  You may.

16        (Pause in proceedings.)

17   Q    If I could ask you to turn, sir, to the first tab in the

18   binder, which was Exhibit 2 in your deposition.

19             You will see this is entitled "Scott Clark:

20   Professional Services."

21             MR. BATCHELDER:  I should say, too, this document

22   is PX-BOI.

23   Q    And it's titled "Scott Clark: Professional Services,"

24   and does this accurately summarize your title as VP of

25   professional services at Egenera?
```

```
 1   A   Yes.

 2   Q   All right.

 3           Well.  Let's take a look.

 4           If you could look at this first sentence.  It

 5   labels you there as, "As head of Professional Services,

 6   Scott Clark..." that's you, right?

 7   A   That is me, yes.

 8           MR. BATCHELDER:  Your Honor, let me move this into

 9   evidence, PX-BIO.

10           THE COURT:  Very well.

11           MR. BATCHELDER:  So let's put that up and highlight

12   that first sentence.

13           THE CLERK:  497.

14           (Plaintiff's Exhibit No. 497 received in evidence.)

15   Q   And then the last sentence of the first paragraph, would

16   you read that, please, the one that is highlighted.

17   A   "Under his leadership, these dynamic project teams of

18   seasoned and motivated professionals quickly deliver

19   quantifiable solutions and transfer a wealth of knowledge

20   and best practices to enable clients to better understand

21   and utilize Egenera software and hardware."

22   Q   And that was accurate, right?

23   A   Yes, yup.

24   Q   Okay.

25           MR. BATCHELDER:  And then let's highlight next
```

1 please, Mr. Fitzgerald --

2 Q Would you read that passage that's highlighted beginning

3 with the word "Responsible," please?

4 A "Responsible for building out Egenera's professional

5 services business, Clark is characterized with providing a

6 complete portfolio of competencies, tools, and best

7 practices to insure Clients realize full benefits and value

8 of the BladeFrame and PAN Manager software as well as

9 implement and optimize a fully operational utility computing

10 infrastructure."

11 Q And that was accurate?

12 A Yes, it was.

13 Q Okay.

14   And the professional services organization that

15 you led was responsible for helping customers move to and

16 use the BladeFrame product?

17 A Yes.

18   Well, to achieve the outcomes from the BladeFrame

19 product, you know, the benefits they expected to deliver.

20 Q And helped customers to transition from the product they

21 were using at the time to BladeFrame, correct?

22 A Correct, yup.

23 Q BladeFrame was the only Egenera product you were

24 involved in selling?

25 A Yes.

1          I wasn't directly involved in the selling, but,

2     yes, that was the only product Egenera sold.

3     Q    But you would teach customers how to use it?

4     A    We would.

5          You know, if you think about it in the context of,

6     you know, learning how to drive a car, we could teach people

7     how to drive the car, but we didn't know how to build the

8     car, fix the car, or go under the hood.  So we would teach

9     them that.

10    Q    You did customer visits, though, when you were at

11    Egenera, correct?

12    A    Absolutely, yup.  Sure.

13    Q    You were provided training at Egenera about what its

14    BladeFrame was capable of doing as compared with other

15    server products?

16    A    Actually, no, we didn't do training per se.  There was

17    actually a training group at Egenera that did the training

18    with customers.

19    Q    But you did know, when you were working there, that

20    BladeFrame could do things that other servers could not,

21    like run virtual and physical applications as though they

22    were virtual?

23    A    Yes, yes.  At high level absolutely.  Nontechnical

24    level, but, yes.

25    Q    And you knew what PAN Manager was, right?

1   A   Yes, I did.

2   Q   What was it?  It was a management system that Egenera

3   used to manage the BladeFrame.

4   Q   And when you were at Egenera, you knew that it was

5   awarded patents, correct?

6   A   I'm sorry, it was a what?

7   Q   When you were at Egenera, you knew that it was awarded

8   patents, correct?

9   A   Yes, we had patents, yup.

10          MR. BATCHELDER:  Let's pull up the '430 Patent,

11   please, which is JTX-001.

12   Q   And you knew about this patent at the time, correct?

13   A   I knew we had patents.  I don't know that I knew this

14   specific patent.

15   Q   You understand that this patent is the one at issue in

16   this case, right?

17   A   I do, yes.

18   Q   Let's take a look at when the patent issued.  It was

19   June 12, 2007.  Do you see that there, sir?

20   A   Yup.  Yes, I do.

21   Q   And, in fact, you knew about this patent the day before

22   it officially issued, didn't you?

23   A   I quite probably did.  I assume we were notified inside

24   Egenera.

25   Q   Let's take a look at that.

1          MR. BATCHELDER:  If we can pull up PX-BCC.

2     Q    This was Exhibit 5 to your deposition, and you see this

3     is an email from Peter Manca?

4     A    Yes, I do, yup.

5     Q    And he was chief technology officer at the time?

6     A    He was.  And a very good guy.

7          (Reporter interrupts.)

8          THE WITNESS:  Sorry.  I said, "And a very good

9     guy."

10         I'm sorry.  I shouldn't have said that.

11         MR. BATCHELDER:  You may want to move your

12    microphone a little bit closer to you.

13         Thank you.

14    Q    So this is an email on June 11, correct?

15    A    Yes.

16    Q    And it starts the day before the patent officially

17    issued as we just saw, correct?

18    A    Correct.

19    Q    And it's to all Egenera employees, correct?

20    A    Yes.  It looks that way, yup.

21    Q    And you were an Egenera employee at the time, right?

22    A    I was.

23    Q    So you would have received this email, right?

24    A    Yes, I assume I would have, absolutely.

25    Q    And the subject line is, "Egenera wins another patent -

1    and this is the BIG one!" with B-I-G in all caps, right?

2         Do you see that?

3    A    Yes, I do.

4    Q    And you saw that at the time, right?

5    A    Yes.

6    Q    And then the first sentence says, "Egenera has been a

7    patent for "Reconfiguration, Virtual Processing System,

8    Cluster, Network and Method," or as we like to call it -

9    PAN.  Yes, after many years, we were finally granted the

10   patent for the Processing Area Network architecture.  It's

11   Patent number 7,231,430."  Do you see that there part?

12   A    I see that part, yes.

13   Q    And then it names the inventors, among others, Vern

14   Brownell and Peter Manca, correct?

15   A    Correct.

16   Q    So you saw all that at the time, too, right?

17   A    Yes.

18   Q    Okay.  And then it goes on to say in the next paragraph

19   "This is a huge milestone in our history," correct?

20   A    Yes.

21   Q    Okay.  So you knew about all this at this time?

22   A    Yes, I did.

23        MR. BATCHELDER:  For the record, let me say that

24   this document, PX-BCC, is also JTX-499.

25   Q    All right.

 1              So a few months after this email, that is, after

 2     this June 11, 2007, email we've been looking at, somebody

 3     reached out to you about a job at Nuova, correct?

 4     A    No, that's not actually how it happened.

 5     Q    Where did I go wrong?

 6     A    I had a friend at Cisco who used to work for me at EMC

 7     called and said -- because he knew I was looking for a job.

 8     I had already been pursuing a couple of other opportunities.

 9              And he said that a couple of executives that I knew

10     from my time at EMC, Soni and Prem, were starting a new

11     company that Cisco had invested in, and if I wanted to, that

12     he would reintroduce me, which he did.

13              So they didn't directly reach out to me, and I

14     didn't even initially directly reach out to them.  I was

15     reintroduced to them.

16              MR. BATCHELDER:  Sir, I'm sorry.  Would you mind

17     pulling the microphone just a little bit closer.  You can

18     pull up the black device towards you, actually.

19               Thank you so much.

20     Q    That person that you were in contact with, that was

21     Chris McCarthy; is that right?

22     A    That's correct.

23     Q    And he was at Cisco?

24     A    He was at Cisco, but he worked for me, and we worked

25     together at EMC.

1    Q    In your first conversation you were talking, though,

2    about a job at Nuova, right?

3    A    Yes.  He said that Nuova -- the execs I knew from EMC at

4    the time who were at Andiamo, were now at Nuova.  Cisco

5    invested in them.  He thought they would be looking for

6    somebody to lead the services team, the professional

7    services team.

8    Q    So someone at Cisco was talking to you about a job at

9    Nuova?

10   A    A friend who was at Cisco, a friend and former

11   colleague, yup.

12   Q    And he put you in touch with someone name

13   Mr. Shahpurwala?

14   A    Yes, Faiyaz Shahpurwala.

15   Q    And you discussed a potential job at Nuova also with

16   Mr. Shahpurwala?

17   A    Well, he was giving me, I think, Faiyaz -- because Cisco

18   had invested in Nuova.  And he, I believe, was actually on

19   the board overseeing Nuova.  He was giving me the context so

20   I understood, you know, what was the relationship between

21   Cisco and Nuova.

22          And he did because I think he was on the board.  He

23   was helping them -- you know, they're a relatively small

24   company -- you know, find personnel.

25   Q    He was on the board the Nuova?

1    A    I believe he was.  I don't know that for a fact, but I'm

2    pretty sure.

3    Q    But he was a Cisco employee?

4    A    He was a Cisco employee, correct.

5    Q    And he was talking to you about a job at Nuova?

6    A    He was giving me context about the job that they were

7    looking for, but he didn't have the details.

8    Q    Is it right then -- let me just back up.

9         When you first spoke with Mr. Shahpurwala, he

10   actually proposed that you come in as an executive at Cisco

11   to provide support for Nuova, right?

12   A    He did, yes.

13   Q    But then ultimately you went to Nuova initially not

14   Cisco as an employee?

15   A    Correct, yes.

16   Q    You mentioned a moment ago that you ran the professional

17   services organization at Egenera, right?

18   A    Yes, I did.

19   Q    And then you did the same thing when you got to Nuova,

20   you ran the professional services organization at Nuova,

21   right?

22   A    Yes.

23        Built and ran it.

24   Q    Once you joined Nuova, when did you first think it was

25   likely that Cisco would acquire Nuova?

```
 1   A   You know, at the time I didn't have any idea of the time
 2   frame.  I knew there was a strong probability Cisco would
 3   acquire them because they had invested, I think, quite a bit
 4   of money in them.  And they had previously bought some of
 5   the companies that the executives at Nuova started.
 6   Q   And ultimately that did happen, Cisco acquired --
 7   A   Yes, it did.
 8   Q   When was that?
 9   A   When did Cisco buy Nuova?
10           It was, I think, April of 2008.  It's right before
11   we released and shipped our Nexus 5000 switch.
12   Q   Over your time at Cisco, you were promoted to vice
13   president, correct?
14   A   Yes, I was.
15   Q   When did that happen?
16   A   I think a couple years after Cisco acquired Nuova.
17   Q   So roughly spring 2010?
18   A   Probably, yeah.  I don't really remember the exact date.
19   Q   Turning to this lawsuit.
20           During the course of this case, Cisco designated
21   you to speak on behalf of Cisco, the company, on certain
22   subject matter topics.
23           Do you recall that from your deposition?
24   A   Yes, yeah, from the deposition, yes.
25   Q   So you were designated as a Cisco corporate
```

1    representative?

2    A    Yes.

3    Q    Let's go back to your time at Nuova.

4         You started shortly after you left Egenera, so

5    roughly October 2007?

6    A    Yes, that would be about the time.

7    Q    And you said you joined Cisco in about April 2008 when

8    Cisco acquired Nuova?

9    A    Yes.

10   Q    So you worked at Nuova during the full time period from

11   roughly November 2007 through March 2008?

12   A    Yes, yup.

13        MR. BATCHELDER:  Can we please have PX-BOH.

14   Q    This was Exhibit 1 to your deposition.  You recognize

15   this is your LinkedIn page that you authored?

16   A    Yes.

17        I don't actually update my LinkedIn page often.

18        MR. BATCHELDER:  Your Honor, I move PX-BOH into

19   evidence?

20        THE COURT:  Very well.

21        **(Plaintiff's Exhibit No. 498 received in evidence.)**

22   Q    And you see on the bottom it's dated -- "2016" is the

23   printout, which is right around the time of your deposition

24   in this matter, correct?

25   A    I'm sorry.  Can you repeat that question?

1    Q    Sure.

2         You see at the very bottom there is a 2016 date?

3    A    I'm sorry -- oh, yes.

4         Okay, I do see it.

5    Q    And that was right around the time of your deposition in

6    this matter, correct?

7    A    I think the deposition was 2018, I think it was, yeah.

8    Q    Yes?

9    A    Yes.

10        I'm sorry, I'm kind of looking at these dates and

11   then the other dates.

12   Q    No problem.

13        So let's just look at what it says under your

14   "Experience."  So it says, the top line, "Vice President -

15   Advance Services - Data Center/Cloud & IT Transformation,

16   Cisco Systems."  Do you see that?

17   A    Yes.

18   Q    It says, "2007 to present (9 years)," correct?

19   A    Yes, it does.

20   Q    And that's just not accurate, is it, sir?

21   A    Well, it's not accurate, but I would guess the reason I

22   put that is when Cisco acquires companies they consider

23   those employees Cisco employees from the date I would join

24   whatever company they acquired.  We were the 132nd

25   acquisition.  So I guess that's probably why.

1          But, then again, I don't used LinkedIn to any

2     serious level.  But that's probably why I put that there.

3     Q    Just so we're clear, you listed your time at Cisco, your

4     time before at Egenera, but you didn't put anything in here

5     about you having had a position at Nuova in the interim,

6     right?

7     A    Yes.

8          But that wasn't secretive.  That was -- as I said,

9     Cisco considered, when they acquired a company, that those

10    people, from a Cisco perspective, had been Cisco employees

11    from the date I started with that company.

12         That's all it was.  There was nothing nefarious

13    about it.

14    Q    It is the case, sir, that there was a time that you did

15    not want Egenera to know about the work you were doing at

16    Nuova?

17    A    Yeah, there might have been a time.  You know, we were a

18    company that was, you know, what we call "pre-revenue."  We

19    hadn't shipped products yet.  So we tried to minimize, you

20    know, public exposure, or public notice of what we were

21    doing, like a lot of startup companies do.

22    Q    And you actually took active steps to conceal from

23    Egenera the work that you were doing at Nuova and the fact

24    that you worked at Nuova, right?

25    A    I don't know that I concealed the fact that I worked at

1    Nuova.

2              I didn't intentionally try to conceal information.

3    It wasn't like there were things Egenera was looking for

4    from me or the other way around.

5              MR. BATCHELDER:  Let's take a look at PX-BOZ, which

6    was Exhibit 29 to your deposition.

7        If we could go to the next page, Mr. Fitzgerald.

8    Q   Let's go to the bottom of this thread.  This was email

9    exchange between you and a Dana Mathews?

10   A   Dana Mathews', yeah, a friend of mine, yup.

11             MR. BATCHELDER:  Your Honor, I move PX-BOZ into

12   evidence.

13             THE CLERK:  What number do you have on that?

14             MS. NOTIS-McCONARTY:  501.

15             THE COURT:  501.

16             **(Plaintiff's Exhibit No. 501 received in evidence.)**

17   Q   So going to the bottom of the email thread, it's from

18   Dana Mathews, a friend of yours, right?

19   A   Yes, he is, yes.

20   Q   And he was hoping to get as job at Egenera, right?

21   A   Yeah, I think he was looking for a job at Egenera and

22   elsewhere, yup.

23             MR. BATCHELDER:  If we can go up higher in the

24   email exchange, Mr. Fitzgerald.

25   Q   You responded to him and you said, "If you talk to them,

1    feel free to use me as a reference - though please do not

2    mention Nuova systems in any manner (I'm at Cisco).  I can

3    explain when we talk."

4         Do you see that?

5    A   I do see that.  Yes, I do.

6    Q   And then higher up in the email thread you said, "Again,

7    you can use my name to open the door, but just don't mention

8    Nuova Systems," right, that's what you told him?

9    A   Yup.

10   Q   Okay.

11        All right.  When you were at Egenera you were

12   familiar with documents called "statements of work," or

13   "service descriptions" for Egenera's clients, right?

14   A   Absolutely, yes.

15   Q   And you prepared them?

16   A   Yes, I did.

17        I created most of them, and they were, you know,

18   from industry templates.

19   Q   And when you left Egenera for Nuova, you took an Egenera

20   "statement of work" with you, right?

21   A   Yes, I did, yup.

22   Q   And you then took it with you from Nuova to Cisco, and

23   it was actually in your files at Cisco, right?

24   A   Yes, I believe it was, yup.

25        MR. BATCHELDER:  Let's take a look at PX-AKB.

1   Q    This is that document, sir?

2   A    Yes.

3          MR. BATCHELDER:  Your Honor, I move PX-AKB into

4   evidence.

5          THE COURT:  Very well.

6          THE CLERK:  502.

7          **(Plaintiff's Exhibit No. 502 received in evidence.)**

8   Q    You see on the bottom it says "statement of work,"

9   correct?

10  A    Yes.

11  Q    And you will see on the top right it has Egenera's logo,

12  correct?

13  A    Yes, it does, yup.

14  Q    And you recognize this document as what was called a

15  "service description," right?

16  A    Correct.

17  Q    And a "service description" is what service groups use

18  to explain the types of services they are or package of

19  services, right?

20  A    Yes.  Out of an industry-standard document and format,

21  yup.

22  Q    So on that cover page on the bottom right you see it

23  says "Confidential and Proprietary"?

24  A    Yes.

25  Q    And then in the lower left-hand corner it has an Egenera

```
1    copyright.  Do you see that?

2    A    Yes, I do, yes.

3    Q    And it says contact profservices@egenera.com, right?

4    A    Correct.

5    Q    And that was your group, right?

6    A    Correct.

7    Q    And it's your testimony that in this case that you don't

8    know how this document would have made its way into your

9    files at Cisco, right?

10   A    Well, I think if I think back on this, you know, I, over

11   the years, like most people, when you go from company to

12   company, and there are standard formats in the industry that

13   they use are carried forward, so I can see how I would have

14   had this and some other documents from Egenera and perhaps

15   other places.  You know, use them as templates, if you will,

16   that are kind of billed-out services.

17           Because these are -- if you look in the industry,

18   as you know, the formats of these, and, quite frankly most

19   of the verbiage, which is completely nontechnical, is pretty

20   standard across, if you look at the Utility Hosting and from

21   other vendors.

22   Q    Sir, you mentioned a moment ago you were deposed in this

23   case, right?

24   A    Correct.

25   Q    And there was a court reporter there?
```

```
 1    A    Yes.

 2    Q    Taking down what was being said?

 3    A    Yes.

 4    Q    And before the deposition began you put up your right

 5    hand and promised to tell the truth?

 6    A    Yes, I did.

 7    Q    Just like you did here, right?

 8    A    Yes.

 9         MR. BATCHELDER:  Mr. Fitzgerald, can we play the

10    clip from at that deposition, page 314, lines 12 through 25.

11    Q    And this is directed to this exhibit from your

12    deposition.

13         (Videotape played.)

14         "QUESTION:  Do you know why you have this document

15    in your possession?

16         "ANSWER:  I don't.  Although I probably created

17    them for Egenera and probably used industry-standard formats

18    to create them with.  So I'm not even sure they could be

19    confidential and proprietary to Egenera.

20         "QUESTION:  You don't recall how you came to

21    maintain this in your possession?

22         "ANSWER:  I don't, no.

23         "QUESTION:  Does it refresh your recollection as to

24    any other documents that you may have kept from Egenera?

25         "ANSWER:  It doesn't, no."
```

1    Q    All right.  You also took with you to Cisco an Egenera

2    runbook document, correct?

3    A    Yes, I did, yup.

4            MR. BATCHELDER:  Let's look as PX-CCC.

5            THE WITNESS:  What tab would that be?

6            MR. BATCHELDER:  That's Tab No. 7.

7    Q    Is this that runbook document?

8    A    Yes, it is.

9            MR. BATCHELDER:  Your Honor, I move PX-CCC into

10   evidence.

11           THE COURT:  Very well.

12           THE CLERK:  503.

13           **(Plaintiff's Exhibit No. 503 received in evidence.)**

14   Q    This document was in your files as Cisco; you understand

15   that, sir?

16   A    Yes.

17   Q    You're familiar with runbooks, correct?

18   A    Yes, I am.

19   Q    A runbook is a document provided to a customer so they'd

20   know what they have, what they're doing, how to run the

21   system, correct?

22   A    Yes, and also how it fits into their procedures and

23   processes in the data center.

24   Q    You see at the bottom of this document there is an

25   Egenera copyright?

1    A    Yes, I do.

2    Q    That's in the lower left.

3         And in the lower right you'll see there's a

4    "Confidential and Proprietary" stamp?

5    A    Yes.

6    Q    And again it refers to your professional services group

7    at Egenera?

8    A    Yes, it does, yup.

9    Q    But then there is also Cisco-related stuff on here,

10   isn't there?

11   A    Yeah, I think this was a template that I was probably

12   using to start creating some of the service --

13   Q    To be clear, you didn't just take this document from

14   Egenera, you used it for Cisco?

15   A    Yes, but it was, as I said, a standard format in the

16   industry.  And there was absolutely no technical information

17   in this.

18   Q    But it was Egenera's property, right?

19   A    I guess, it was, yes.  I mean, I wrote them.  I think I

20   was the one that labeled them "confidential and

21   proprietary," but, yeah, it was Egenera's property.

22   Q    So you actually even put a Cisco copyright on this

23   document, didn't you?

24   A    (No response.)

25   Q    You see there, sir, it says, "Copyright 2005 Cisco All

1   rights Reserved"?

2   A    Yes.

3   Q    Then you say "Prepared by: Cisco," on this Egenera

4   document, right?

5   A    Yup.

6   Q    Okay.

7        And you did other things, too.  You kept gathering

8   additional Egenera information even once you were at Cisco,

9   right?

10  A    Yeah, market intelligence on what's going on in the

11  market, yes, yup.

12       MR. BATCHELDER:  Well, let's take a look at

13  JTX-148.

14  Q    You knew at your time at Cisco that Egenera and a

15  company call Dell had entered into some kind of partnership,

16  correct?

17  A    Yes, I did.

18  Q    And this document JTX-148, this was in your files at

19  Cisco, you understand that, too, right?

20  A    Yes.

21  Q    And it was a draft document, correct?

22  A    Correct.  That's what it looks like.

23  Q    And the title of it is "Dell PAN System Beats Cisco

24  UCS," correct?

25  A    Yes.

1    Q    So this was a competitive intelligence report, correct?

2    A    Yes.  That's exactly what it looks like, yup.

3    Q    And it was a competitive intelligence report generated

4    by some combination of Egenera and Dell, as it reflects in

5    the little logos on this document, right?

6    A    Looks that way.

7    Q    So this is a proprietary document of Egenera and Dell,

8    right?

9    A    I assume it is, yes.

10   Q    Their property, right, not Cisco's?

11   A    Yup.

12   Q    And the second bullet there, if we can look down, Mr.

13   Fitzgerald, says, "Dell PAN system impressed prospect with

14   integrated high availability disaster recovery, dynamic

15   flexibility and simplicity."  Do you see that?

16   A    Yes, I do.

17   Q    "HA" or "high availability," that was an important

18   aspect of Egenera's product.  You understood that at the

19   time, right?

20   A    I did, but high availability is an important aspect of

21   any server product.  But, yes.

22   Q    Let's go to bottom right of the document -- actually the

23   bottom left.

24            It says, "Egenera and Dell propriety:  Use by

25   permission only."  Do you see that?

1    A    I do.  I do.

2    Q    And in December 2009, you had already left Egenera,

3    correct?

4    A    That's correct.

5    Q    But that's the date on this document, right?

6    A    Yes, yup.

7    Q    But somehow you got your hands on it?

8    A    I believe I probably got it from a customer.  The

9    customer was typically the best source.

10   Q    Sir, let me just be clear.

11        It's your sworn testimony in this case that you

12   don't know how you would have come to be in possession of

13   this document, correct?

14   A    That's why I said I would guess I got it from a

15   customer.

16   Q    You don't know how you came to be in possession of the

17   document, right?

18   A    Yes.

19   Q    That's what you're telling the jury?

20   A    Yes.

21   Q    It was a useful document to Cisco, though, because but

22   it provided a list of critical feedback that Egenera and

23   Dell had gathered about UCS, right?

24   A    (No response.)

25   Q    See where it says, "Critical feedback heard against

1   Cisco UCS"?

2   A    Yes.

3           That's a good comparison at the time, yup.

4   Q    So once Cisco was selling UCS, your colleagues at Cisco

5   would ask you to make comparisons between UCS and

6   BladeFrame, right?

7   A    They would, yup, at kind of an outcome level, not at a

8   technical level, yup.

9           MR. BATCHELDER:  Well, let's look as PX-BPH.

10  Q    You see that's Clark Exhibit 46.  That was a deposition

11  exhibit of yours.

12          MR. BATCHELDER:  Let's go to the next page, please.

13  Q    You see at the top that's an email that you sent,

14  correct?

15  A    Yup.

16          MR. BATCHELDER:  Your Honor, I move PX-BPH into

17  evidence.

18          THE COURT:  Very well.

19          THE CLERK:  504.

20          **(Plaintiff's Exhibit No. 504 received in evidence.)**

21          MR. BATCHELDER:  Looking down to the very bottom

22  email in the thread, please.

23      Are you able to find that?

24      Even lower down.  All the way to the bottom, yeah.

25  Q    So you said there, It would make sense if you could

1    connect -- and you were addressing migrating from Egen to

2    UCS.  Do you see that?

3    A   Yes, I do.

4    Q   So you're talking about this customer, GXS, correct?

5    A   Yes.

6    Q   And they were an Egenera customer, and you were trying

7    to move them off of Egenera and onto the UCS system, right?

8    A   Correct.  The sales team was telling them to move them

9    to UCS.

10   Q   And then you say, "The key is to show them we can

11   migrate lower risk than other vendors (we can due to

12   knowledge of the Egenera uniqueness,)" correct?

13   A   Yes.

14   Q   And you had that knowledge because you worked at Egenera

15   and Andrey Kvasyuk, who's also on this email, he worked at

16   Egenera, right?

17   A   Yes.  He had that knowledge, but also knowledge of the

18   operating systems Egenera used, and so on, which are really

19   where the complications of a migration come about.

20   Q   And Mr. Kvasyuk even had worked for you at Egenera right

21   before he moved to Cisco?

22   A   That's correct, he did.

23   Q   All right.

24            And Jason Shaw is also on this email, right?

25   A   Yes.

1    Q    Cisco also hired him from Egenera?

2    A    Yes.  He didn't work for me, but, yes, they did, yeah.

3    Q    All right.

4              MR. BATCHELDER:  And then let's go to the next

5    email above that.

6    Q    You get a response, and you say "Good detail, thanks."

7    Do you see that?

8    A    Yes.

9              MR. BATCHELDER:  And then let's go above that.

10   Q    Let's look at what they come up with.

11             There's Andrey Kvasyuk, your man from your team at

12   Egenera who came to Cisco, and he says, "pServer config and

13   features."  Do you see that?

14   A    Yes, I do.

15   Q    What is the pServer?

16   A    PServer is what Egenera used to run an application.

17   Q    And "config" is "configuration"?

18   A    Configuration, yes.

19   Q    And the first thing he says is "How to mimic Egenera

20   HA," do you see that?

21   A    Yes.

22   Q    And "HA" is that high availability feature we talked

23   about a moment ago as being so important?

24   A    Yes.

25             High availability, as I said, every customer needs

1   high availability.

2   Q   And then below he also says, "How to mimic Egenera Blade

3   Failover."  You see that?

4   A   I do.

5   Q   So your objective was to have UCS mimic Egenera's

6   BladeFrame product, correct?

7   A   Yeah, our objective was to show how we could provide

8   similar outcomes or functions that Egenera has.

9   Q   To mimic Egenera's product, right?

10  A   Yes, to get to the customer the same level of high

11  availability, as an example, or, you know, failover, yup.

12          But not at a --

13  Q   To be clear, those are the words of your team, though,

14  "mimmick Egenera," right?

15  A   Yes.

16          But "mimmick" is to create a similar outcome.  It

17  is not to, you know, try to do -- in fact, actually, I think

18  this shows pretty clearly that the technologies were

19  different.  Because for us to get to the type of Egenera

20  high availability that apparently this customer wants, we

21  have to use third-party capabilities on top of UCS.

22  Q   Mr. Kvasyuk certainly was familiar with these benefits

23  of the BladeFrame from all his work at Egenera?

24  A   Yeah, he would have been, absolutely.

25  Q   Okay.

```
 1              Then you also offered to your Cisco colleagues that
 2    you could gather additional confidential information from
 3    Egenera and about Egenera, correct?
 4    A   Yes, yup.
 5              MR. BATCHELDER:  Can we take a look, please, at
 6    PX-AJO.
 7    Q   And that's you at the top, "Scott Clark"?
 8    A   It is, yes.
 9              MR. BATCHELDER:  Your Honor, I move PX-AJO into
10    evidence.
11              THE CLERK:  505.
12              (Plaintiff's Exhibit No. 505 received in evidence.)
13    Q   And this is an email exchange between you and a Gregory
14    Tademoto?
15    A   Correct, yes.
16    Q   And the subject is "Egenera."  Do you see that?
17    A   Yes, it is.
18    Q   And he had some questions for you about Egenera PAN
19    manager, correct?
20    A   He did, yeah, high-level questions, yup.
21    Q   But you were a good person to ask those questions to
22    because you used to work at Egenera, right?
23    A   That would be true, yes.
24    Q   And then you respond with some information, right?
25    A   Yes.
```

1    Q    And after that initial response, you say to him, "I can

2    get more current info if needed (confidentially and off

3    record.)"  Do you see that, sir?

4    A    I do, sir.

5    Q    And then in another document you agreed to share with

6    the Nuova leadership not-yet-announced information about

7    that Egenera collaboration with Dell that we talked about a

8    moment ago?

9    A    Yes, yup.

10        MR. BATCHELDER:  Let's take a look --

11   A    On market intelligence, yup.

12        MR. BATCHELDER:  Let's look that PX-AFK.

13        So if we could highlight the bottom, the email from Rob

14   Lee.

15   Q    First of all, let me just say, that's you at the top,

16   "Scott Clark," right.

17   A    Yes, it is.

18        MR. BATCHELDER:  And, your Honor, I move PX-AFK

19   into evidence.

20        THE COURT:  Very well.

21        THE CLERK:  506.

22        **(Plaintiff's Exhibit No. 506 received in evidence.)**

23   Q    So we have that email from Rob Lee where he reaches out

24   to you saying he "wanted to gather comments/edits on our

25   proposed course of action with Dell."  Do you see that?

1    A    Yes.

2    Q    So you were responding to be competitive threat of the

3    relationship between Egenera and Dell, correct?

4    A    It looks that way, yes.

5    Q    And then you did respond.

6         MR. BATCHELDER:  Can we see that, please?

7    Q    And you said, "Here are some comments/thoughts and data

8    points."  And you say at the beginning of Point No. 2, "they

9    have announced (and some not yet announced) plans."

10        Do you see that?

11   A    I do see that.

12   Q    So somehow you were getting ahold of plans that had not

13   been announced, right?

14   A    Yeah, or these were things that were being discussed

15   while I was still at Egenera.

16        (Reporter interrupts.)

17   A    But, yes, I'm giving them information.

18        Again, kind of market data, but, yes, because Cisco

19   had a very large relationship with Dell as well.

20   Q    You were offering to provide plans that had not yet been

21   announced in the marketplace, right?

22   A    Yes, yup.

23   Q    And this email went further, right?

24        MR. BATCHELDER:  Let's look above it, please,

25   Mr. Fitzgerald.

1    Q    This from Simanta Chakraborty, right, and he was copied

2    on your underlying email, correct?

3    A    That's correct, yes.  Simanta worked for me.

4    Q    Who is Simanta Chakraborty?

5    A    He worked for me, and he was the one I had primarily

6    building up our professional services team.

7    Q    And he responds to you, "Scott, this is definitely new

8    data to the players involved."  Do you see that?

9    A    Yes.

10   Q    And he says, "You may want to reach out to Nuova

11   leadership as well as Gary and Jim, if not Rob."

12          Do you see that?

13   A    Yes.

14   Q    And by "Nuova leadership," you understood him to refer

15   to the top four executives at Nuova, right?

16   A    Most likely, yes.

17   Q    And you understood that Rob was -- excuse me, that Gary

18   was the senior vice president and COO of Cisco at the time?

19   A    Yes.

20   Q    And he wanted you to send this information to all those

21   top executives?

22   A    Yes.

23   Q    And you responded, "Will do," right?

24   A    Yes.

25   Q    So, in fact, you then did get your hands on some

1   not-yet-announced information from Egenera, right?

2   A   Apparently, yes, yup.

3   Q   And then you sent that information straight to the

4   executive team at Nuova, right?

5   A   I assume I did, if I said "Will do."

6           MR. BATCHELDER:  Let's look at PX-CDI, please.

7   Q   That's you at the top, Scott Clark?

8   A   It is, yes.

9           MR. BATCHELDER:  Your Honor, I move PX-CDI into

10  evidence.

11          THE COURT:  Very well.

12          THE CLERK:  507.

13          **(Plaintiff's Exhibit No. 507 received in evidence.)**

14  Q   And let's take a look at the bottom of this email

15  thread.  You'll see there's an email here from a Nick

16  Cheetham at Egenera.com, right?

17  A   Yes, I do.

18  Q   And you knew Nick Cheetham?

19  A   I did, yeah.  I think he was -- at the time, I think he

20  was head of sales at Egenera.

21  Q   He sent this to the Egenera sales force, correct?

22  A   Yes.

23  Q   And he also sent it to Peter Manca, correct?

24  A   It looks that way, yes.

25  Q   And he was the chief technology officer at Egenera?

1    A    Yes, he was.

2    Q    And he also sent it to Vern Brownell, right?

3    A    Yup.

4    Q    He was the founder, okay.

5         And he also sent it to someone named Greg Lyon,

6    right?

7    A    Yes.

8    Q    And then Greg Lyon forwarded it on and highlighted that

9    information in the lower right-hand corner about his

10   position; do you see it?

11   A    I do.

12   Q    And he sends it on to Peter Avioli and says, Things are

13   well here... I'm in my new role at Egenera, right?

14   A    Yes.

15   Q    And Peter Avioli was at Cisco?

16   A    Correct.  He was, I think, in the product management

17   group or services.

18   Q    And then if we look up in the chain, Peter sends it to

19   you, right?

20   A    Correct.

21   Q    And you thank him for that in the chain in the email

22   just above this, and you do that at 7:30 p.m. on a Sunday

23   night.

24        You say, "Thanks Peter," correct?

25   A    Yes.  Yup.

1    Q    And then three minutes later you forward the Egenera

2    sales force information that Nick Cheetham had circulated,

3    you send that to the top executives at Cisco, right?

4    A    I don't know that I did that.  I think I sent it to --

5    at the time to Soni, David, and Ed, I believe.

6    Q    Well, let's take a look.

7    A    But it would be market -- you know, market input that I

8    would forward, yup.

9              MR. BATCHELDER:  Let's take a look, please, at

10   PX-AFG.

11   Q    So keeping in mind that you sent that "Thanks, Peter"

12   email at 7:30 p.m. on a Sunday night, you can see at the top

13   here you sent this one 3 minutes later, right?

14   A    Yup, yup.

15   Q    And you took the email from Nick Cheetham that had been

16   sent internally to Egenera, correct?

17   A    Yes, but forwarded from Egenera.

18   Q    And you knew this information in that email was

19   Egenera's property, right?

20   A    I assume there was probably some confidential stuff,

21   like I think it had sales compensation plans, but I think

22   the announcement, I believe at this time, had already been

23   announced in the market of the Dell-Egenera relationship.

24   Q    The email that Nick Cheetham sent within Egenera, that

25   was Egenera's property, that email, right?

```
 1    A    Yeah, I guess it was.

 2              MR. BATCHELDER:  Your Honor, I hope I didn't forget

 3    to do this, but if I did, PX-AFG I would like to move into

 4    evidence?

 5              THE COURT:  I don't think that is in evidence yet.

 6              THE CLERK:  508.

 7              (Plaintiff's Exhibit No. 508 received in evidence.)

 8    Q    So you took that same email from Nick Cheetham, right,

 9    the same one we just looked at, right?

10    A    Yes.

11    Q    And you stripped out the interaction with Peter Avioli,

12    right, that was gone, and you forwarded it to the executive

13    team at Nuova, right?

14    A    Yes.

15              Well, not the entire executive team, a couple of

16    people.

17    Q    You sent it, among other people, to Soni Jiandani,

18    right?

19    A    Head of marketing, correct.

20    Q    And you sent it to Ed Bugnion, correct?

21    A    Bugnion, yes.

22    Q    And Ed Bugnion was one of the lead architects of UCS,

23    right?

24    A    He was.  He was one of the founders.

25    Q    Let's see what you said to him when you forwarded it on.
```

1          First of all, I noticed that you changed the

2    subject line, didn't you?

3    A   Yes, I did.

4    Q   You changed it to "Dell PAN Manager Sales -

5    Confidential," correct?

6    A   I did, yes.

7    Q   The importance was high, correct?

8    A   Correct.

9    Q   And you said to them, "Some details zoom on Dell Egenera

10   relationship and sales model.  Please delete after review."

11        Do you see that, sir?

12   A   I do see that.

13        MR. BATCHELDER:  Your Honor, I pass the witness.

14        THE COURT:  All right.

15    All right, jurors, because he was called as part of

16   opposing the party's case, this will actually now be direct

17   examination.

18                     **CROSS-EXAMINATION**

19   **BY MR. McDAVIT**

20   Q   Good morning, Mr. Clark.

21   A   Good morning.

22   Q   Please introduce yourself to the jury.

23   A   My name's Scott Clark.

24   Q   Where do you normally live?

25   A   I normally live 13-and-a-half miles due west from here

1    in Wellesley.

2    Q    Do you have a family?

3    A    I do, yup.

4    Q    And who are they so jury knows your family?

5    A    My wife, Pat, who next September, on September 18th,

6    will be my wife of 40 years, and I've got two adult

7    children, a daughter who works in Lynn, Mass, and a son

8    who's carpenter in Colorado.

9    Q    Where did you go to college?

10   A    University the New Hampshire.

11   Q    What did you study there?

12   A    Business administration.

13   Q    Do you have a technical degree, Mr. Clark?

14   A    I don't, no.

15   Q    Are you an engineer or a scientist any kind?

16   A    No, I am not.

17   Q    Do you sow software coding?

18   A    No, no.

19   Q    So again, when did you start working at Egenera?

20   A    2004.

21        MR. McDAVIT:  Can I have the document camera,

22   please.

23   Q    I think it will be helpful if we all orients ourselves

24   as to what time we're talking about here.

25        So you started working in 2004 at Egenera?

```
 1    A    Yes.

 2    Q    When did you leave Egenera?

 3    A    2007, October of 2007.

 4    Q    Okay.

 5              And what did you do for Egenera again while you

 6    were there?

 7    A    I ran the professional services group.

 8    Q    What does the professional service group do?

 9    A    We basically try to help the customers, you know,

10    achieve the business benefits and outcomes or whatever

11    technology they buy.

12    Q    And can you please explain to the jury what you do for

13    customers in their specific-use cases that they might have.

14    A    We'll show them -- you know, we'll help them decide what

15    applications to bring over because they would be a best fit.

16    Q    You were explaining to counsel for Egenera a real-world

17    sort of analogy you had for what a professional services

18    organization does?

19    A    In real simple manner, you know, if you in think of us

20    driving a car, we'd usually, hopefully, get lessons.  And we

21    instruct customers on how to drive the car.  But we don't do

22    anything at how to design the car, or how to build the car,

23    how to fix the car.

24    Q    Did you design any products or software while you were

25    the Egenera?
```

```
1    A   No, absolutely not.

2    Q   Do you know how to design data center products?

3    A   Unfortunately, no, no.

4    Q   And again, when did you leave Egenera, what time of

5    year?

6    A   Fourth quarter of 2007.

7    Q   Why did you leave Egenera at that time?

8    A   Well, you know, I was -- had been in the industry at

9    that time quite a bit, 30 years almost.

10            And it was pretty easy to see, some of the leading

11   indicators, that the business was going to be in trouble.

12   We had lost some really good salespeople.  The sales

13   activity had dropped significantly.  And a lot of that was

14   because, you know, the competition, the market moves pretty

15   past.  Competition like Hewlett-Packard, IBM, and others had

16   caught up, in some cases kind of exceeded, what Egenera

17   could do.

18   Q   So again, why was Egenera -- and who were they losing

19   sales to at that time --

20   A   I think they were losing it HP.  They were losing it to

21   IBM.  They were losing it to a company called VMware, which

22   did not operate on the Egenera products.

23   Q   So why did you go to Nuova in 2007?

24   A   Because I knew the execs, and I had trust in them, and

25   they actually had had a great track record.
```

1    Q    What products were you primarily focused on when you

2    first got to Nuova?

3    A    Well, you know, I was focused on both products in terms

4    of the Nexus 5000 switch and UCS, but the urgent product was

5    the Nexus 5000, which we released a year or so before UCS.

6    Q    And the Nexus 5000 switch, was that competing with

7    anything that Egenera offered?

8    A    Not that I'm aware of, no.

9    Q    When did you become a Cisco employee?

10   A    They acquired us in April of 2008.  So we all became

11   Cisco employees at that point.

12   Q    So during your time at Nuova and then when you started

13   at Cisco, again, what was the organization that you were

14   hired into and what were you supposed to do?

15   A    At Nuova, I was, you know, to frame out the services and

16   hire a pretty substantial team globally.

17   Q    And at any time from when you joined Nuova until the UCS

18   launched, did you work on the design or development of UCS?

19   A    No.

20   Q    Did you have the technical ability to do that if you

21   wanted to?

22   A    No.  There's no way I would have been able to do any of

23   that.

24   Q    Do you know how the Egenera software works on the

25   BladeFrame?

1    A    At a high level I knew the outcomes a customer could

2    get.

3    Q    Did you code the software?

4    A    Absolutely not, no.

5    Q    Do you know how the BladeFrame, specific to coding like

6    we were talking about earlier, do you how the BladeFrame

7    programs the network topology on a network?

8    A    No.  I don't know.  I don't know how to do that.

9    Q    Now, after you joined Nuova and then you went to Cisco,

10   did there come a time when folks starting asking you for

11   jobs?

12   A    Yes, there did.

13   Q    Please tell us whether any of the people that contacted

14   you were engineers or working on the product design of the

15   BladeFrame?

16   A    No.  No, they wouldn't have been contacting me.

17   Q    If you're thinking about this time frame, again, why

18   were so many folks leaving Egenera at that time?

19   A    Well, I think, you know, I think probably many of them

20   saw the same thing I did, which was, you know, the sales

21   activity was down.  The competition was -- had really

22   significantly improved.  And so I suspect they saw the same

23   thing.

24        I hadn't seen these numbers before the other day,

25   but this is exactly what I was seeing.  I'm not at all,

1    surprised, unfortunately, that the numbers dropped so

2    dramatically.

3    Q    What companies was Nuova hiring from?  We heard about

4    Egenera folks, but what was Nuova hiring from?

5    A    We were mostly hiring from, you know, there were HP and

6    IBM folks, quite a few of them.  And there were a lot of

7    folks that we hired from the industry, you know, VMwear and

8    other places.

9    Q    Tell us why did you want to avoid hiring people from

10   Egenera when you moved to Nuova and Cisco?

11   A    One, I had no interest in helping accelerate the demise

12   of Egenera.  I really didn't.  I had good friends there.  I

13   loved the company.  It kind of broke my heart to leave,

14   quite frankly.

15   Q    What was the reason why you were expecting to get a lot

16   of job applications from people at Egenera when you were at

17   Cisco?

18   A    Well, one, I hope it's because they knew us and trusted

19   me and others as good people to work with.

20          And I think the other is they saw, I think, and I

21   don't remember when it was, I know sometime over the

22   following year after I left Egenera had a couple of layoffs.

23   So I'm sure that spooked people, and they would be looking

24   for opportunities with people they trust.

25   Q    So let's give a little more color to that and what you

1    actually told the hiring managers at that time.

2            Now, do you remember counsel from Egenera showed

3    you an email that you sent to Mr. Chakraborty at Cisco?

4    A    Yes.

5    Q    Again, who is Mr. Chakraborty?

6    A    He worked for me and he was helping.  He was really

7    doing the hiring of the team in the US?

8    Q    Let's look at what you told Mr. Chakraborty.

9            MR. McDAVIT:  And for the transcript this is DX-QT,

10   which I will move into evidence as whatever the next number

11   is...

12       JTX-509.

13       **(Defendant's Exhibit No. 509 received in evidence.)**

14   Q    So again, this is -- what time period are we talking

15   about, Mr. Clark?

16   A    Looks like November of 2008.

17   Q    So I just want to focus in on -- first of all, there's

18   an acronym in this email chain that's called "R-I-F" or RIF.

19           What does that stand for?

20   A    In the industry that's a reduction of workforce.

21   Basically it's a layoff.

22   Q    And what did Mr -- so if I'm just focusing in on this

23   email that you wrote to Mr. Chakraborty.  What were the

24   concerns you were expressing as to why people at Egenera

25   were leaving the company?

1    A    Well, I think they -- people were leaving because they

2    wanted to protect themselves and their families and find a

3    job at a perhaps more stable or stronger company.

4    Q    What was it about -- what was Egenera going through at

5    that time again?

6    A    Well, I think the sales and revenues were declining,

7    which meant their expenses needed to be reduced which meant

8    they probably, you know, unfortunately, the cost for people

9    is sometimes the first place people go to reduce expenses.

10   Q    What hiring guidance did you give Mr. Chakraborty?

11   A    I gave Simanta the hiring guidance of, I did not want

12   any proactive recruiting at Egenera.  And I wasn't

13   comfortable -- you know, we can't stop people from calling

14   us.  I mean, they called to look for jobs because they need

15   to have a job.  But I did not want to, quite frankly,

16   exacerbate the issues that Egenera was already having on

17   their own.

18   Q    Now, also counsel for Egenera asked you some questions

19   about some documents that you had in your files that were

20   Egenera documents.  Do you remember that?

21   A    Yes.  Yes, I do.

22   Q    So at a general level, can you please explain whether

23   any of the documents that you were shown, that this jury has

24   seen, provide any details about the inner workings of a

25   Egenera product?

 1    A    Not at all, no.  Absolutely not.

 2    Q    Did you take any documents to Nuova or Cisco that

 3    describes how the BladeFrame work?

 4    A    No.  Not at a technical level at all, no.

 5    Q    Did any of Egenera documents that you might have had in

 6    your possession convey any technical details about the inner

 7    workings of the BladeFrame's architecture?

 8    A    No, they didn't.

 9    Q    Egenera's counsel showed you a specific email about a

10    partnership between Dell and Egenera.  Do you recall that?

11    A    Yes, I do.  Yup.

12         MR. McDAVIT:  Let me get this up for a second.

13    Q    This is the email chain that we were talking about.

14         Now, Mr. Clark, what is this email?

15         I think you were explaining it a little bit to

16    counsel, but I think he might have not let you get give a

17    full explanation.

18    A    It's a sales update email, is what it looks like to me

19    on a -- you know, announcing the relationship and

20    partnership with Dell.

21    Q    What does this email have to do with the technical

22    operation of any Egenera product?

23    A    Zero, nothing.

24    Q    And again, why do you think you instructed the people

25    that you forwarded this to to delete it after reviewing it?

 1    A    Just because it probably did, you know, include some

 2    confidential information.  Like it had stuff I think on the

 3    sales programs and stuff that Egenera has.

 4    Q    What does this document have to do with infringement of

 5    a patent?

 6    A    Absolutely nothing.

 7    Q    Egenera's counsel also sent you a document -- or showed

 8    an email chain, and I think it was shown in opening

 9    statements as well, that you could possibly get information

10    confidentially and off the record.  Do you recall that?

11    A    Yes, I do, yup.

12    Q    I'm just going to put this up.

13          What is this email chain?

14    A    I'm answering some general questions from Greg Tademoto.

15    Q    What's going on in this email?

16    A    He's asking me some questions about, you know, Egenera

17    PAN manager.  Does it only run on Egenera, which it did only

18    run on Egenera.

19    Q    What access did you have to anyone at Egenera that has

20    any technical information about the BladeFrame or the

21    software running on it?

22    A    I had no direct access or indirect access.

23    Q    Did you pass on any technical information about any

24    Egenera product to Cisco?

25    A    No, absolutely not.

1   Q   Now, one thing that this case is about is about patents,

2   right?

3   A   Yes, yup.

4   Q   And I believe counsel showed you the '430 Patent, which

5   is the subject of this case, right?

6   A   Yes.

7   Q   Do you see the -- I'm going to zoom in a little bit so

8   it's a little bigger for all of us.

9        Do you see when this patent was published?

10  A   July 10, 2003.

11  Q   And when it's published, when was this patent available

12  for the whole world to read?

13  A   I assume July 10, 2003.

14  Q   And I'm going to zoom out a little bit.

15       This is Figure 1 from the patent in this case, the

16  '430 Patent.

17       Do any of the documents that you've seen today or

18  the documents that might have been in your possession have

19  any of this sort of detail, technical detail?

20  A   No, not at all, no.

21  Q   Do you even understand the technical details and the

22  level of -- excuse me, the technical details of the

23  BladeFrame on the level that's discussed in this patent?

24  A   No, I wouldn't.  That's well beyond my capability.

25       MR. McDAVIT:  Thank you.

```
1              I'll pass the witness.

2                  THE COURT:  Anything further?

3                          REDIRECT EXAMINATION

4    BY MR. BATCHELDER

5    Q    Mr. Clark, you mentioned something about Egenera

6    revenues during your testimony just now, correct?

7    A    Yes, I did.

8    Q    You talked about product revenues, right?

9    A    Yes.

10   Q    You didn't talk about total annual revenues, did you?

11   A    No.

12   Q    You said revenues had gone down in 2007, but actual

13   total Egenera revenues had gone up as compared to 2006,

14   right?

15   A    I don't think I actually said they went down in 2007.

16           I said I saw indications that they would start to

17   decline.

18   Q    Well, let's take a look.

19           In 2007 total annual revenues actually increased,

20   right?

21   A    It looks like that, yup.

22   Q    Okay.

23           You also, if I understood you right in your

24   testimony just now, said that you and your team didn't have

25   any contact with the UCS engineering side of things; is that
```

1    right?

2    A    Yes.  Not at a design engineering level, not at all, no.

3    Q    So you had no ability, you and your team, to influence

4    any of the features of UCS?

5    A    Oh, we definitely gave input on what we saw in the

6    market and what customers needed as in, This is the outcome;

7    but we didn't give, you know, technical details, no.

8    Q    Well, let's -- in your job role you worked closely with

9    the technical services team, right?

10   A    Yes, yes.  I guess we did.

11   Q    And you even attended meetings at Nuova with the

12   technical services team, right?

13   A    Yup.

14   Q    Yup.

15   A    Because what we tried to do was link the work, let them

16   know the work we did and what customers use for, so they

17   could better support them.

18   Q    And then at Nuova and Cisco and you and your team

19   interfaced directly with UCS engineers to pick what features

20   UCS should have, right?

21   A    To suggest features.

22   Q    I'm sorry.  I can't hear you.

23   A    To suggest features that we saw customers needed, yes.

24        MR. BATCHELDER:  Let's take a look, please, at

25   PX-AF9 (sic), and can we have that presented to the witness.

```
1          May I approach, your Honor?

2               THE COURT:  You may.

3               MR. BATCHELDER:  I'm sorry.  It's PX-AFN.

4               THE WITNESS:  Thank you.

5    Q   And you'll see at the top there's an email from

6    Mr. Kvasyuk to you, correct?

7    A   Yes, yup.

8    Q   And that's the same Mr. Kvasyuk we talked about before

9    who had worked under you at Egenera and Cisco hired over?

10   A   Yes, yup.

11   Q   Well, let's take a look.

12          He says, "I started a list of differences."  Do you

13   see that?

14   A   Yes.

15   Q   And then in his table he lists a "parameter," and that

16   means a feature, right?

17   A   Yes.

18   Q   And then the second column is "Egenera," right?

19   A   Yup.

20   Q   And third the column is "UCS"?

21   A   Correct.

22   Q   And then he does a comparison, right?

23   A   Correct, yup.

24          MR. BATCHELDER:  Before I forget, I would like to

25   move PX-AFN into evidence.
```

1          THE COURT:  Very well.

2          THE CLERK:  510.

3          **(Plaintiff's Exhibit No. 510 received in evidence.)**

4    Q    Let's take a look at a few of those comparisons.

5          So on the "Blade" feature -- again, remembering

6    that Egenera's BladeFrame is in that second column, and UCS

7    is in the third.

8          For the Blade he says, "Blade provisioning is

9    instant.

10         "Blade un-provisioning instant.  Does not affect

11   running system, only after reboot.

12         "Blade re-provisioning:  New blade can be assigned

13   even in the running system without affecting it.  Only after

14   reboot.  It gives an option to change configuration in

15   advance and restart the system on time."

16         Do you see that?

17   A    Yes.

18   Q    So that sounds pretty good, right?

19   A    Yup.

20   Q    And then for UCS it says:

21         "Blade association takes a LOT of time.

22         "Blade dis-association: takes a lot of time.  Can

23   not be performed on running system, system is shutdown as

24   power off.

25         "Blade re-provisioning:  Impossible without

1    shutting down the system," right?

2    A    Yes.

3    Q    So at the time that was an advantage for Egenera as

4    compared to UCS as it existed then, right?

5    A    Yes, it looks like it.

6    Q    Okay.

7              Let's look at another feature.

8              This feature is the "Overall resource add on the

9    fly" feature or parameter.

10             And for Egenera he says, "Very quick and easy.

11   Nondisruptive."

12             Do you see that?

13   A    Yes.

14   Q    And for UCS, at the time anyway, he says "disruptive,"

15   right?

16   A    Yes.

17   Q    And then let's go to the top and see what he says.

18             So having said to you, "I started the list of

19   differences..." he then goes on to say --

20             MR. BATCHELDER:  If you'd just highlight that next

21   sentence, Mr. Fitzgerald.

22   Q    "It can be used as a backbone for discussion with

23   engineers."  Do you see that?

24   A    Yup.

25   Q    So he's doing a detailed comparison between these

1    products, and he's going to go to the engineers and say,

2    Make UCS more like BladeFrame in the ways that he's

3    identified here, right?

4    A    Yeah, I think this -- you know, this is kind of a

5    standard affair where you look at what the outcomes are that

6    a company can produce and then what our limitations are, and

7    the engineers need to figure out at a technical level if

8    there is something they can do to improve that.

9    Q    Then he goes on to say in the next sentence, "I'm

10   planning to add HP column too.  But I need to understand

11   myself how it works."

12        Do you see that?

13   A    Yes.

14   Q    So he could do it for Egenera because he used to work

15   there and he had inside knowledge about Egenera, right?

16   A    He had normal knowledge that every employee would have,

17   yeah.

18   Q    But he didn't have any of that knowledge about HP?

19   A    I think probably because HP had added quite a few new

20   things to their server, which is one of the reasons why I

21   think Egenera was losing business, but he needed to --

22   Q    He needed to get up to speed.

23   A    Absolutely.

24        MR. BATCHELDER:  All right.  Let's take a look at

25   another document, PX-AEX.

```
1              May I approach, your Honor?

2                   THE COURT:  You may.

3                   THE WITNESS:  Thank you.

4   Q   And that's you, Scott Clark, at the top, right?

5   A   It is.

6                   MR. BATCHELDER:  Your Honor, I move PX-AEX into

7   evidence.

8                   THE COURT:  511, I think.

9                   (Plaintiff's Exhibit No. 511 received in evidence.)

10  Q   So let's go to the bottom email thread here.

11              This is from the Andrey Kvasyuk we talked about,

12  right?

13  A   Yes.

14  Q   And he's writing to you, right?

15  A   Yes.

16  Q   And he's focusing on some of the same features we just

17  looked at.

18              He says, "UCS 'blade decommissioning' is very

19  similar to Egenera 'soft-eject,'" correct?

20              And he said, "This is how we simulate blade crash

21  with both systems without actual crash."

22              Do you see that?

23  A   I do see that, yes.

24  Q   And says, "With UCS at this moment, 'decommissioning'

25  can be triggered by user only," correct?
```

1    A    Correct.

2    Q    That was a bad thing, right?

3    A    That was a what?

4    Q    That was a bad thing, right?

5    A    Yes, yup.

6    Q    That was a feature you wanted to change?

7    A    I guess, yes.  Yup.

8    Q    And he says down below, "If we have this feature or at

9    least if we can tell that this is a work in progress, then

10   we have very solid argument in cases like GXS or other

11   Egenera customers," right?

12   A    Correct.

13   Q    He wanted to say to these customers, We're going to get

14   better.  We're going to be able to simulate Egenera, right?

15   A    We're going to give you the same outcome that you get

16   with Egenera, yeah.

17            Just like, I think, every other server vendor was

18   doing, yes.

19   Q    Then at the bottom he says, "I can prepare specs."  Do

20   you see that?

21   A    Yup.

22   Q    And "specs" means "specifications," right?

23   A    I assume he probably was referring to the comparison you

24   showed, or that type of comparison.

25   Q    Do you understand the word "specs" to mean

1    "specifications"?

2    A   Yeah, but specifications can be in multiple bubbles.

3    Q   Sir, just focusing on that question, do you understand

4    "specs" to be a shortening of "specifications"?

5    A   Yes.

6    Q   So he says, "I can prepare specs and submit them to

7    Brian Schwartz and Mike Dvorkin," correct?

8    A   Yup.

9    Q   And they were at the kernel of the UCS engineering team,

10   right?

11   A   Mike was.

12        I think Brian was actually in product management,

13   if I recall.

14   Q   But Mike Dvorkin was at the kernel of the UCS

15   engineering team?

16   A   Because Mike was the senior architect, absolutely.

17   Q   And he says, "Based on my previous conversations with

18   Mike, it can be easily (let's say relatively easily)

19   implemented," right?

20   A   Yes.

21   Q   And that's the Mike Dvorkin that was at the kernel of

22   the UCS engineering team?

23   A   Correct.

24   Q   Okay.

25   A   But implemented in this manner of finding a way to

1    create that outcome, not to design and build it the way

2    Egenera did.

3    Q    And then let's see how that gets reacted to.

4            If we can go up an email, there's Jason Shaw,

5    right?

6    A    Yup.

7    Q    And Cisco hired him from Egenera, right?

8    A    I don't know -- yes, he had been at Egenera.  I don't

9    know if he went somewhere else before Cisco, but, yes.

10   Q    And he says, "This sounds great," exclamation point,

11   right?  Do you see that?

12   A    Yes, I do.

13   Q    And he says, "I hope there's not a lot of pushback from

14   engineering to implement this," right?

15   A    Yes.

16   Q    And then you respond at the top, "makes sense."  Do you

17   see that?

18   A    Yes.

19   Q    You say, "There will be other Egenera customers we will

20   be able to use it for."  Do you see that, sir?

21   A    Yes, I do, yup.

22   Q    Sir, in your testimony just now when Cisco's counsel was

23   questioning you -- I just want to make sure I heard you

24   right.

25           Can we come back to JTX-508, please.

1           This was originally PX-AFG.

2           And this is the email where you say, "Please delete

3    after review."

4           MR. BATCHELDER:  Can you highlight that at the top,

5    Mr. Fitzgerald.

6    A   Yes, yup.

7    Q   And I want to make sure I heard you right.  I thought

8    that when Cisco's counsel was asking you about this

9    document, I thought that you told this jury why you said

10   that.  Did I hear that right?

11   A   I believe I did, yes.

12   Q   Because when you were under oath at your deposition in

13   2016, six years closer in time to this event, let's take a

14   look at what you said.

15          MR. BATCHELDER:  This is 133 of Mr. Clark's

16   deposition, line 23 through 25.

17          "QUESTION:  Why did you ask them to delete it after

18   review?

19          "ANSWER:  I don't know.  I don't recall."

20   Q   Was that your testimony, sir?

21   A   It is.  Yes, it is.

22          MR. BATCHELDER:  Pass the witness, your Honor.

23          THE COURT:  Any last questions?

24          THE WITNESS:  Not a very good picture.

25          MR. McDAVIT:  Just a couple, your Honor.

1          **RECROSS-EXAMINATION**

2     **BY MR. McDAVIT**

3     Q   Mr. Clark, just one question.  Counsel from Egenera

4     showed you an email from Mr. Kvasyuk.  Do you remember that?

5     A   Yes.

6     Q   He showed you an email that he sent to you.  Can you

7     explain what that email is?

8     A   I mean, it's a normal kind of product comparison of

9     feature capabilities of one product versus another, and

10    where we're stronger or limited in.

11          MR. McDAVIT:  Can I have the document camera,

12    please.

13    Q   This is JTX-229.  Did there come a time where

14    Mr. Kvasyuk put that into a PowerPoint presentation?

15    A   I believe he did, yes.

16    Q   And in the final draft that's the PowerPoint

17    presentation, did he add some information about who won each

18    of these specs when you're preparing to sell to a customer?

19    A   He did, yes, yup.

20    Q   And if you just talk about the failover, because I think

21    counsel for Egenera spoke a little bit about it, what was

22    the conclusion when you were preparing to talk to the sales

23    team that you came up with?

24    A   It was kind of, you know, there was no winner, no clear

25    winner there.

```
 1              We can do it.  We did it differently than Egenera,
 2     and they did it differently than us.
 3     Q   Again, is there any technical information in these
 4     customer presentations that would teach you how to build a
 5     BladeFrame?
 6     A   Not at all, no.
 7     Q   And did you take any documents from Egenera to Cisco
 8     that would teach you how to build a BladeFrame?
 9     A   Absolutely not.
10              MR. McDAVIT:  Nothing further, your Honor.
11              THE COURT:  Thank you, Mr. Clark.  That concludes
12     your testimony.
13              THE WITNESS:  I'm done?
14              THE COURT:  You're excused.
15              THE WITNESS:  Thank you.
16              THE COURT:  We'll resume now with Mr. Manca, I
17     believe.
18              THE CLERK:  Please remember you're still under
19     oath, sir.
20         Thank you.
21                      **PETE MANCA, resumed**
22              THE COURT:  MR. Desmarais.
23              MR. DESMARAIS:  Thank you, your Honor.
24
25
```

1          <u>CROSS-EXAMINATION, (Cont'd.)</u>

2     BY MR. DESMARAIS

3     Q    Welcome back, Mr. Manca.

4     A    Thank you.

5     Q    And good morning, I guess, still?  Yeah.

6          Okay, so, first --

7          MR. DESMARAIS:  May I have the document camera,

8     please.

9          So, just for the record, I think we had a mix-up on

10    the trial exhibit number.  This exhibit that's on the screen

11    was referred to in the prior testimony of Mr. Brownell and

12    Mr. Manca as JTX-490.

13         But it turns out there are two 490s.

14         So we'll refer to this as DDX-3.14.  And it will be

15    the same document that was referred to with Mr. Brownell and

16    Mr. Manca earlier.

17    Q    So I put DDX-3.14 up on the screen, sir, which we talked

18    about last time when you were here.

19         Now, when we were  -- when we were ending

20    yesterday, we were talking about this period 2004 to 2006.

21         Do you remember we were talking about this?

22    A    Yes, I do.

23    Q    And one of the things I asked you about the 2004 time

24    period was whether Egenera was interested in being acquired

25    by Cisco in the 2004 meeting with Cisco.  And you testified

1    about that.  And I think you said that was not the point of

2    the meeting, right?

3    A    That's correct.

4    Q    So let's look at -- at the time, Mr. Thompson was the

5    CEO OF Egenera, right?

6    A    In 2004, I think it was Mr. Dutkowsky, if I recall.

7    Q    Okay, but Mr. Thompson became the CEO of Egenera later

8    in time, right?

9    A    Later in time, yes.

10   Q    Let's see what Mr. Thompson says about the meetings in

11   2004 with Cisco.

12        MR. DESMARAIS:  Would you please play clip 176, and

13   that's Thompson page 26 line 2.

14        MR. THOMASES:  Objection, your Honor.  This has not

15   been designated testimony.  It was not taken while he was

16   employed.  So it's not a statement of a party opponent.

17        MR. DESMARAIS:  It's directly impeaching this

18   witness with the CEO of Egenera, your Honor.

19        THE COURT:  All right.  For that purpose it can be

20   used.

21        MR. DESMARAIS:  Thank you, your Honor.

22      (Videotape played.)

23        "QUESTION: So 2004, Egenera was out -- or

24   performing outreach to a number of companies, one of which

25   was Cisco, is that right?

1          "ANSWER:  I believe so.

2          "QUESTION:  And the general purpose of the outreach

3   Egenera was making to various companies in 2004 was to see

4   if they would be interested in acquiring Egenera?

5          "ANSWER:  We were considered a hypergrowth company

6   at that time, so they were testing the market.

7          "QUESTION:  Testing the market to see if anyone is

8   interested in acquiring?

9          "ANSWER:  Correct."

10  Q   And, in fact, it was you and the current CEO of Egenera

11  -- what was his name?

12  A   Bob Dutkowsky.

13  Q   -- who were leading that charge in 2004, going out and

14  seeing who would be interested in acquiring Egenera, right?

15  A   Not to my recollection, no.

16         MR. DESMARAIS:  Let's see T-177 which is page 27,

17  line six, of Mr. Thompson's testimony.

18         "QUESTION:  And your understanding, as far as who

19  was leading the efforts to contact companies to gage

20  interest in acquiring Egenera in 2004 was Bob Dutkowsky and

21  Peter Manca?

22         "ANSWER:  Yes."

23  Q   Okay now --

24         MR. DESMARAIS:  May I have the document camera

25  back, please.

1    Q    Now when we broke yesterday we were talking about

2    specifically 2006 and how by that time Egenera had tried to

3    sell itself in 2004, was going to try an IPO but canceled

4    it, and then in 2006 Hewlett-Packard launched a new product.

5             That's where we broke yesterday, right?  Do you

6    remember that?

7    A    I think that was your -- yeah, I still don't agree with

8    Mr. Thompson's testimony.  I don't recall that we were

9    trying to sell ourselves in 2004.

10   Q    Okay.  You can disagree with Mr. Thompson.

11   Mr. Thompson was the CEO of Egenera right before you, right?

12   A    Before me, but not in that time frame.

13   Q    Now, in 2006 Hewlett-Packard launched a new product

14   competitive with Egenera, right?

15   A    They launched a new product.

16   Q    And it was in 2006, right, you're aware of that?

17   A    You were going to show me some Gartner report yesterday.

18   I can't remember the exact date they launched it, but I do

19   recall them launching a product around that time frame.

20   Q    You have your binder from yesterday?

21   A    I do, yes.

22             MR. DESMARAIS:  It's DX-IP, but I think it has a

23   JTX number, so give me a second and I will see.

24        DX-IP in the binder, but it's also in the trial record

25   as JTX-489.

1    Q    Do you recognize this as a Gartner report that -- and

2    Gartner is one of those services that studies the market and

3    provides reports that companies use and rely on, right?

4    A    That's right.   This is a Magic Quadrant.

5    Q    And that's sort of a market intelligence report?

6    A    For blade servers specifically.

7    Q    And if we look at what they say about HP, "Building on

8    the acquisitions of Compaq and RLX Technologies, HP has been

9    a blade market leader throughout this decade.   Since the

10   2006 introduction of its latest blade generation, HP has

11   recaptured market leadership and now sells more blade

12   servers than the rest of the market combined."

13        Do you see that?

14   A    I do.

15   Q    And this Gartner report was generated in 2009, right?

16   A    Okay, but that's talking about a very specific blade

17   product.   RLX was only a blade server vendor.   They were not

18   a virtualization vendor or had any of the technology that we

19   had other than blades.

20   Q    My question is, this report was in 2009, right?

21   A    Was it 2009?

22   Q    Yes.   You can see on the first page, October 2009.

23   A    Okay, 2009, October 2009.

24   Q    And the report says, "HP has recaptured leadership and

25   now sells more blade servers than the rest of the market

1    combined," right?

2    A    I see that, yes.

3    Q    And in this time period -- and I think you told us

4    yesterday, this is 2006.

5            In this time period you told us yesterday you were,

6    in fact, competing with HP.  You were, in fact, in customer

7    accounts losing sales to HP, right?  Whether you liked their

8    product or not or whether it's the same as Egenera or not,

9    in customer accounts, from time to time, you were losing

10   sales to HP?

11   A    We won some.  We lost some.

12   Q    That's called competition?

13   A    That's right.

14   Q    I know you want -- you and Mr. Brownell want to talk

15   about, well, they didn't have all the features of Egenera,

16   so they're not really competing.  But in the proper, common,

17   plain meaning of "competition," you went to customers, you

18   sold against HP, and HP started to win some sales from you,

19   right?

20   A    That's true, sure.

21   Q    And they started that, and it ramped up in 2006 with the

22   new release of the product that we just read about, right?

23   A    Yeah.

24           It didn't really describe when it ramped up.  It

25   talked about they acquiring technologies in 2006 and by 2009

1    becoming the majority.

2    Q    Sir, isn't it true that in 2008, for instance, in

3    several of your board presentations, Egenera reports losing

4    revenue to HP.  And HP, in fact, is the only competitor you

5    talk about at the board level in that time frame; isn't that

6    a fact?

7    A    I don't have knowledge of all the board materials but

8    that could have been the case.  I wasn't on the board at

9    that time.

10   Q    But you got board slide decks all the time during that

11   time frame, didn't you, sir?

12   A    I reviewed quite a few of them, yes.

13   Q    And you know that's the case, right --

14   A    I specifically can't recall that, but again, I don't

15   have any reason to disbelieve you.

16   Q    Do we need to look?

17   A    We can if you want.  I can't remember every board

18   presentation I reviewed.

19   Q    But you do remember HP was a competitive concern for

20   your BladeFrame in this time period, true?

21   A    HP was a competitor at that time frame, yes.

22   Q    Now, during this time frame when Egenera started --

23   sales started to weaken in 2006, 2007, 2008, HP wasn't the

24   only competitor, right?

25   A    Well, if we're talking specifically about blade servers,

1    no, there were other technology companies that had blade

2    servers.

3    Q    I'm talking about competitors to Egenera's BladeFrame.

4            Isn't it true, sir, that competition started to

5    ramp up and HP was not your only competitor?  And I'm

6    talking about the time period before Cisco launched the UCS.

7    A    I believe IBM had a blade product at that time.

8    Q    And RLX had a product?  They were a competition to you,

9    right?

10   A    Well, RLX was HP, as we just saw.

11   Q    And Sun had a competitive product to you, right?

12   A    I don't recall Sun having a blade product.  They may

13   have.  I don't remember that?

14   Q    Compaq, Fujitsu, IBM, they all had products you competed

15   against in this time frame?

16   A    Well, Compaq was HP as we just saw, too, right?

17   Q    So the answer to my question is yes?

18   A    HP did, yeah.

19   Q    And IBM?

20   A    IBM did.

21   Q    Now, you will agree with me, won't you, that when HP

22   launched its new product and the competition with the

23   companies we just talked about was getting going, Egenera

24   started to miss its revenue targets, right?

25   A    Yeah, I would agree with that.

1    Q    And we talked yesterday about some trouble that Egenera

2    was having early on, and we looked at some of the trouble

3    tickets.  And there was trouble with their Windows operating

4    system, and we talked about the drivers and the software you

5    had to deal with because of Windows.

6              Do you remember that conversation we had yesterday?

7    A    I do.

8    Q    And that was -- those trouble tickets we were talking

9    about in 2004, right?

10   A    That's correct.

11   Q    And you said at the time, I think in response to one of

12   the answers, that you solved those problems?

13   A    That's correct.

14   Q    But you know, sir, don't you, that four years later in

15   2008 you were still having problems with the BladeFrame with

16   Windows, and it was -- the same software problems you were

17   having, you were still having them in 2008, weren't you?

18   A    I would think they would be different problems by 2008.

19              And again, as I said testified yesterday, it's very

20   typical for technology companies to have bugs in products.

21   Every technology company does.

22   Q    The problem you had in 2008 were problems with the

23   drivers working with the Windows operating system on the

24   BladeFrame, true?

25   A    They may have been, but they were different problems by

1    2008.

2    Q    Because the Windows operating system was upgraded by

3    Microsoft, right?

4    A    Widows was upgraded, and we had fixed the problems we

5    had talked about in 2004.

6           MR. DESMARAIS:  Let's take a look as DX-CS.

7        We will mark that as JTX-511, your Honor.

8           THE CLERK:  512.

9           MR. DESMARAIS:  I'll make it 512.  Sorry.

10          **(Defendant's Exhibit No. 512 received in evidence.)**

11   Q    Now, this is an email to you September 2008, right?

12   A    That's correct.

13   Q    And it's "Urgent Conformity of Windows Drivers"; is that

14   right?

15   A    Yes, it says that, yeah.

16   Q    And Windows drivers is what we were talking about with

17   the 2004 trouble tickets yesterday, right?

18   A    Yes, but this is a very different problem.

19          MR. DESMARAIS:  Now, let's flip to the second page,

20   down here at the bottom of the stream.

21   Q    "And together with Microsoft/Austria, they analyze the

22   status of the Egenera drivers."

23          Do you see that?

24   A    I do.  It's a little blurry on --

25   Q    The focus takes a few minutes sometimes.

1              (Pause in proceedings.)

2    Q    "And together with Microsoft/Austria they analyze the

3    status of the Egenera drivers."  Do you see that?

4    A    I do.

5    Q    "The 'real' hardware drivers are signed but not the

6    Egenera 'virtual devices.'"  Do you see that?

7    A    Yes, I see that.

8    Q    And when that says "Egenera virtual devices," what it's

9    talking about is the software that Egenera had to create to

10   work on the BladeFrame with Windows, right?

11   A    Well, it's talking about the virtual device drivers we

12   wrote for Windows and specifically about the signing

13   procedure for Microsoft.

14   Q    And drivers are software, right?

15   A    Drivers are software, right.

16   Q    And it says up top, "no certification, no productive

17   operation on BladeFrame."  Do you see that?

18   A    I do.

19   Q    If we go back to the first page on the bottom.

20              It says, "Fears that impacts not only this

21   important customer Logis IT but also Raiffeisen and planned

22   projects there.

23              "So I really need sufficient statement on the

24   Windows driver signing issue from Egenera asap."  Do you see

25   that?

1    A    I do.

2    Q    And these two companies that it talks about here, Logis

3    IT 'Raiffeisen, were big customers, right?

4    A    They were.

5    Q    And, in fact, they were customers of your OEM partner

6    Fujitsu, right?

7    A    That's correct, but we're not talking about bugs here.

8    Q    So it was not surprising that around this time you

9    started to have some issues with your relationship with

10   Fujitsu as well?

11   A    Let me clarify.  We're not talking about bugs in that

12   email.

13   Q    Sir, I'm asking you questions.  I would like you to

14   answer my questions, and if you want to clarify, you can

15   have your counsel ask you.  We are on a timed -- we've got a

16   time allotment here, and I would like you to focus on what

17   it is I'm asking you, okay?

18   A    Okay.

19   Q    So around this same time, when these two companies were

20   having trouble with the BladeFrame, they had been sold their

21   BladeFrame by Fujitsu, your partner, right?

22   A    Fujitsu Siemens, yes.

23   Q    Yes.

24        And right around this time, Fujitsu Siemens started

25   a renegotiation with you to change the relationship and

1    lessen their exposure to Egenera; isn't that right?

2    A    I'm not sure I'd characterize it that way.

3          We renegotiated the contract.  So we went from a

4    yearly commit, which was challenging for them, to a

5    quarterly commit, which was better for us as a company.

6    Q    They dramatically slashed how much BladeFrame they were

7    buying in this time period, 2008, isn't that true?

8    A    They lowered their commitment to us, and they, in

9    exchange gave us back quarterly commitments, which was more

10   valuable to us as a company.

11         MR. DESMARAIS:  Let's see clip K-1 from the

12   Kerrigan deposition 206, line 15.

13         (Videotape played.)

14         "QUESTION:  And this is the renegotiation that you

15   were referring to?

16         "ANSWER:  Okay, yeah.

17         "QUESTION:  Is that correct?

18         "ANSWER:  It looks correct.

19         "QUESTION:  And these are -- so the minimum

20   purchases that Fujitsu was committing to make from Egenera

21   went from $178 million, which we saw in the previous

22   exhibit, to 60 million in 2007/2008; do you see that?

23         "ANSWER:  Um-hum, yes."

24   Q    Now, this trouble you had with these two clients of

25   Fujitsu about the Windows operating system and the drivers

1   and software that Egenera had to make, wasn't limited to

2   those two accounts, right?  This was something that you

3   saw -- you saw a lot of trouble tickets in this time

4   regarding Windows, right?

5   A   I can't define a "lot" or not.

6         But the trouble we're talking about is a signing --

7   Windows procedure for signing your drivers.  It was not a

8   bug.

9   Q   And there were a number of them, right?

10  A   I can't sit here and say -- I mean, we had that problem

11  in general at that time.  So it would affect every Windows

12  client.  But again, we got our drivers signed by Microsoft

13  and we fixed it.

14        MR. DESMARAIS:  All right.  Well, let's take a

15  look -- we'll get there --

16  Q   Now, you showed us in this time period -- we're talking

17  about this time period here, 2007, 2008.  You showed us an

18  award.  I think it was you that showed us this award, which

19  is PX-VZ.  I'm not sure what the JTX number was.

20        But do you remember this, you showed us this, in

21  2008?

22  A   I don't remember if that was in my testimony or not, but

23  that certainly looks like a press release that we put out,

24  yes.

25  Q   And the award that you got was Best Virtualization

1    Solution, right?

2    A    That's correct.

3    Q    And that was in 2008.

4         But if you look at other awards that were

5    available, in addition to the best virtualization category,

6    other categories included Best Presentation, Best Blade

7    Server Hardware, and Best Data Center Innovation, right?

8    A    It seems that way, yes.

9    Q    Now, let's talk about what was going on at Egenera in

10   2008.

11        In light of what was happening with the revenue

12   from 2007 to 2008 where it was going in 2009, despite your

13   award that you got, on Best virtualization Solution, Egenera

14   decided that it needed to take a deep look inside about

15   whether the BladeFrame was going to be a product that they

16   could ever make any money on, correct?

17   A    I think businesses are always evolving, and at that time

18   we were contemplating a software business, and expanding our

19   market share, our use of software.  So I think that defines

20   what we were doing at that time.

21   Q    So the answer to my question is yes, right?

22   A    Well, no, we continued selling BladeFrames for many,

23   many years.

24   Q    That wasn't my question, sir.

25   A    Can you repeat it, please?

```
 1    Q   Yes.

 2             In this time period, 2008, in light of what all was

 3    goings on, the increased competition, the trouble with the

 4    software, the economy, you know, all that was going on, you

 5    took a look inside of yourself, the company, and assessed

 6    whether the BladeFrame was something that you could keep

 7    selling, manufacturing and selling, right?

 8    A   I think that's fair.  I think that's just good business

 9    practice.

10    Q   Because up until this point, from the launch of the

11    BladeFrame through 2008, every single year, except maybe

12    one, Egenera lost money selling the BladeFrame, right?

13    A   I can't recall every financial year, but I think that

14    was also part of the plan.  As a venture-backed company,

15    you're not really looking to make money.  You're looking to

16    acquire customers and market share.

17    Q   So the answer to my I question is, yes?

18             Despite all this revenue, it was costing you more

19    to make and sell the BladeFrame than you were taking in in

20    revenue, true?

21    A   I think that's generally true.  I don't know all the

22    numbers off the top of my head, but I think that's generally

23    true.

24             MR. DESMARAIS:  So if we look as JTX-57, which is a

25    document written by you called "The future of PAN," do you
```

1    see that?

2    A    I do.

3    Q    And PAN is your software?

4    A    That's correct.

5    Q    And it's May 2008, right?

6    A    Yes.

7    Q    Now, if we turn to page 4, we talk about on page 4, "New

8    technology has leveled the playing field a bit, but it's

9    brought on more complexity."  Do you see that?

10   A    I do.

11   Q    And when you talk about "level the playing field,"

12   you're talking about competition, right, your competitors?

13   A    I think that's a fair assessment, yes.

14   Q    And if we look at -- up above you talk about how Egenera

15   is spending massive amounts of R&D, spend going towards

16   technology that we receive no benefit from (OS drivers,

17   which is what we've just been talking about, and

18   certifications.)  Do you see that?

19   A    I do.

20   Q    And it's fair to say that Egenera was, in fact, spending

21   massive amounts on R&D to deal with those issues?  That's

22   what you wrote, right?

23   A    That's what I wrote.

24   Q    And if we look at the next page, as a result of that,

25   you were recommending that you get out of the OS business

1    entirely, right?

2    A    No.  I was listing a number of options, and that was one

3    option.

4    Q    Because the high cost of this operating system business,

5    right?

6    A    But again, this is a list of options that we could have

7    looked at to create a strategy going forward.

8    Q    That's what I asked you.

9          In 2008, because of what was going on, you did a

10   self-reflection and you looked at, Can we go forward with

11   the BladeFrame, right?

12   A    We looked at a number of options here.

13         We were looking at -- again --

14   Q    Sir, my questions are simple.

15         I'm just asking you, you were looking.  That's all

16   I'm asking.  Yes or no.

17   A    We were doing strategy.  That's right.  We were having

18   strategy discussions.

19   Q    Because, you wrote, "This burden" -- and this is the OS

20   business burden.  "This burden is difficult to maintain, as

21   we spend money porting our drivers and testing/certifying

22   solutions every time we produce a new blade frame or the OS

23   vendor comes out with a new version."

24         An OS vendor coming out with a new version, you're

25   talking about every time Microsoft releases a new version of

1   Windows, right?

2   A   That's one example, yes.

3          MR. DESMARAIS:  Please turn, if you would, to

4   DX-EY?

5   A   Okay.

6   Q   DX-EY is an architecture review from November of 2008,

7   right?

8   A   Yes.

9          MR. DESMARAIS:  And, your Honor, I will mark that

10   JTX-513.

11          THE COURT:  Very well.

12          **(Defendant's Exhibit No. 513 received in evidence.)**

13          MR. DESMARAIS:  Now, let's see here.  If we go to

14   slide four.

15   Q   The title on this slide is "Business challenges with

16   today's Architecture."  Do you see that?

17   A   I do.

18   Q   And the architecture you're talking about is BladeFrame,

19   right?

20   A   That's correct.

21   Q   And it says, "Too many resources working on Driver

22   Porting," right?

23   A   Yes.

24   Q   And it says, "Over 50 percent of our software resources

25   work on OS drivers."  Do you see that?

1    A    I do.

2    Q    And "OS" again, is operating system drivers, like we

3    were just talking about, right?

4    A    That's correct.

5    Q    And you say, "Complicated drivers require large QA" --

6    that is that, "quality assurance?"

7    A    Quality assurance.

8    Q    And "REL" what is that, "release"?

9    A    Release engineering.

10   Q    And "DOC effort" is meaning you've got to document what

11   you've done?

12   A    Documentation team, yes.

13   Q    So the next point is the "Return on investment is

14   questionable."  Do you see that?

15   A    I do.

16   Q    And you're talking about, just to be clear, the

17   BladeFrame, right?

18   A    That's what the architecture team is talking about here,

19   yes.

20   Q    Right.

21        And they say there is "No value for supporting

22   standard operating systems," right?

23   A    That's correct.

24   Q    And they say, the "Customer impact is too severe,"

25   right?

```
1   A    I see that.

2   Q    And what they're talking about is all these problems

3   you've been having with the trouble tickets.  Every time

4   Microsoft updates the operating system, the BladeFrame

5   doesn't work, and you have to go out and fix it, right?

6   A    Yeah -- not -- we have to resign the drivers, to be more

7   accurate.

8   Q    It says right under that, "Impossible to be TTM with OS

9   vendors."

10        What that means is time to market with the

11  operating system vendors, right?

12  A    That's right.

13  Q    So when you had trouble with the operating system, or

14  they updated the operating system, the BladeFrame wasn't

15  getting to market on time or the customers who had one were

16  having troubles with it, right?

17  A    Well, no.

18        It means if Microsoft came out with a new operating

19  system, we had to resign our drivers.  And so there was a

20  delay between when the operating system vendor released

21  their product and when we could release our version.

22  Q    Exactly.

23        And that delay was too severe for your customers.

24  That's what this architecture review team is saying?

25  A    That's what the architecture team is saying, yes.
```

1    Q   And this is November 2008; is that right?

2    A   I believe that was the date.

3    Q   Now, if we flip a little bit further to page -- it looks

4    like six.

5            "Technical challenges with today's Architecture,"

6    and again this is the BladeFrame, right?

7    A   That's correct.

8    Q   And it says the "Drivers are often complicated," right?

9    A   Yes.

10   Q   And I think we wrote that on our pad already yesterday

11   so I won't do it again.

12           But this next one down says, "Bridging IO causes

13   performance issues with bandwidth and latency."  Do you see

14   that?

15   A   I do.

16   Q   So let's add that to our BladeFrame list from yesterday.

17       (Pause in proceedings.)

18   Q   And it also says -- and again this is the BladeFrame --

19   "Hard to keep up with emerging standards," and in particular

20   they cite fiber channel over Ethernet.  Do you see that?

21   A   I do.

22   Q   Let's add that to our list.

23       (Pause in proceedings.)

24   Q   Now, as a result of this architecture review, it's true,

25   isn't it, that Egenera, in fact, made the decision to

1   transition away from the BladeFrame -- and again, this is

2   2008 -- made the decision to transition away from the

3   BladeFrame and become more of a software-centric company; is

4   that fair?

5   A   No, I wouldn't agree with that.  We made the decision to

6   add software as a software product to our portfolio so we

7   could address some of these concerns.  But we continued

8   developing hardware and selling it for many years after that

9   time frame.

10          MR. DESMARAIS:  Let's see clip M233, which is your

11  deposition at page 239, line 11.

12          "QUESTION:  At some point Egenera made a decision to be

13  -- shifted its strategy to become software-centric, correct?

14          "ANSWER:  I would say that's correct."

15  Q   And up until this point, you had, in fact, been --

16          MR. DESMARAIS:  May I have the document camera

17  back, please?

18          THE COURT:  Can we do this one more question and

19  take the morning recess?

20          MR. DESMARAIS:  We can stop.

21          MR. THOMASES:  Your Honor, under the Rule of

22  Completeness, can I read the rest of that passage?

23          THE COURT:  Yes, in about 25 minutes.

24          MR. THOMASES:  Okay.  Thank you.

25          THE COURT:  All right, jurors, let's take the

1    morning break.  I think you've earned it.

2         Twenty-five minutes.    We'll come back at 11:15.

3             THE CLERK:  All rise.

4         (Recess.)

5                   PETER MANCA, RESUMES THE STAND

6             THE CLERK:  All rise for the jury.

7         (Jury enters.)

8         (Court enters.)

9             THE CLERK:  Resuming on the record, Civil Action

10   Number 16-11613 Egenera v. Cisco.

11            THE COURT:  All right, you want to read something

12   into the record.

13            MR. THOMASES:  Yes, thank you.  This is from the

14   same deposition that they just played from the March 16,

15   2018 deposition of Mr. Manca.

16        Question to Mr. Manca:  "At the time you reached out to

17   Mr. Chapman, had Egenera made the decision to be a

18   software-only company?

19        "ANSWER:  I don't remember the exact decision date.  I

20   wouldn't characterize us ever as a software-only company,

21   but we were certainly exploring a software product line to

22   augment our existing product lines.

23        "QUESTION:  At some point, Egenera shifted from being a

24   hardware/software company to be a software-focused company,

25   is that fair?

1        "ANSWER:  I mean, we still sell hardware today.  We

2    still support our hardware.  I would say that our strategy

3    shifted to be more software-centric.  I would put it that

4    way."

5        Thank you, your Honor.

6            THE COURT:  Okay.  Let's resume.

7            MR. DESMARAIS:  Thank you, your Honor.

8                    **CROSS-EXAMINATION**, Cont'd

9    BY MR. DESMARAIS:

10   Q   Well, let's explore that a little bit, Mr. Manca.

11   By -- up until this point we're talking about in 2008, you

12   at Egenera had been planning to release a product called the

13   BladeFrame 2, right, which was the next version of

14   BladeFrame, correct?

15   A   That's correct.

16   Q   But based on all that we've been talking about with what

17   was going on at Egenera, and just look inside and

18   consideration of the future of your business, by October of

19   2008, you canceled the BladeFrame 2 project, right?

20   A   That's correct.

21   Q   Decided not to release the new version of the

22   BladeFrame, right?

23   A   That's correct.

24   Q   And as part of Egenera's decision to cancel the

25   BladeFrame 2, was part of this becoming more

1   software-centric, right?

2   A   Yes, we were looking at producing a software product to

3   augment our existing BladeFrame.

4   Q   And now, your counsel just read some of your deposition,

5   and I think you testified that in your view, you wanted to

6   keep selling BladeFrame, right?

7   A   That's correct.

8   Q   Now, you know that Mr. Thompson was a CEO in 2008,

9   right?

10  A   I believe he was, yes.

11  Q   So in 2008, it would have been his decision, not yours,

12  right, his and the Board's?

13  A   I think that's fair, yes.

14  Q   Let's take a look at Thompson clip 15 which is at page

15  90, line 11.

16          "QUESTION:  All right, Mr. Thompson.  At least by

17  October 30th, 2008, Egenera had made the decision to stop

18  selling hardware and transition to a software-only company,

19  yes?

20          "ANSWER:  Yes."

21  Q   Now, if I could go back to the document camera, please.

22          Now, that was October 2008.  Cisco's UCS wasn't

23  launched until almost a year later in July 2009, is that

24  right?

25  A   That's when UCS was launched, yes.

1    Q    Now, I told the jury in my opening statement that I was

2    going to prove bedrock fact number one, which was that the

3    demise of the BladeFrame was not due to Cisco's UCS, and

4    let's just be clear, the decision to cancel the BladeFrame 2

5    project had nothing to do.  In fact, Cisco's UCS wasn't even

6    launched until almost a year later, isn't that right?

7    A    UCS didn't factor in our decision to cancel BladeFrame

8    2.

9    Q    Did not, right?

10   A    Did not.

11   Q    Thank you.  And it was a business decision, it was a

12   business strategy decision at Egenera to cancel the

13   BladeFrame 2 and to become more software-centric, and that

14   business decision had nothing whatsoever to do with the

15   Cisco UCS, true?

16   A    I think that's true.

17   Q    Now, yesterday in your testimony, and maybe I misheard

18   it, but you seemed to imply that you may have lost some

19   revenue of the BladeFrame before the launch of the Cisco

20   UCS, but you know that's not true, right?

21   A    No, I would disagree with that.

22   Q    You have no data whatsoever that would indicate

23   Egenera's BladeFrame lost any customers between 2001 and the

24   launching of UCS, do you?

25   A    Well, in 2008, our customers were telling us that Cisco

1   was reaching out to them introducing a new project, Project

2   California, and that certainly stalled some sales at that

3   time in 2008.

4   Q   Let's see Manca 226, which is your deposition, sir, at

5   page 278, line 20.

6        "QUESTION:  You're not aware of anything today that

7   would indicate that your revenue was impacted by the rumors

8   of Cisco UCS coming out, true?

9        "ANSWER:  I have no specific data to show you on

10  that."

11       In fact, we asked you just what you said just a minute

12  ago, we asked you, did any customers tell you that, and you

13  said "no" at your deposition about that too, didn't you?

14  A   I think there's lot more context in that deposition than

15  that one snippet.

16  Q   Let's see Manca clip number 229 please, which is page

17  273 at 22.

18       "As Egenera's CEO and its corporate representative,

19  is there a specific conversation that Egenera had with a

20  customer, before UCS was released, wherein that customer did

21  not purchase an Egenera product because of the rumors that

22  Cisco was going to release a server product?

23       "ANSWER:  Sitting here today, I can't recall

24  anything with any specificity that I could answer this for

25  the fourth time."

1          MR. DESMARAIS:  May I have the document camera,

2     please.

3          MR. THOMASES:  Your Honor, per the Rule of

4     Completeness, can I read the questions and answers right

5     before that?

6          THE COURT:  Okay.  Let's not read from the entire

7     deposition.

8          MR. DESMARAIS:  There's going to be redirect, your

9     Honor.

10          THE COURT:  That was my thought.

11          MR. THOMASES:  Would you like me to wait, your

12     Honor?

13          THE COURT:  Thank you.

14     BY MR. DESMARAIS:

15     Q   Now, there's been some back and forth between the

16     parties on these revenues, so I want to clarify what's going

17     on.  We've been showing, and what I referred to in my

18     opening, was the revenue of the BladeFrame because we're

19     accused of copying BladeFrame, and bedrock fact number one

20     is about the demise of BladeFrame.

21          You, on your counsel's side, keep showing Egenera

22     annual revenues in total, right?  That's the difference

23     between those two charts?

24     A   Yes.

25     Q   Now, out here in these years, post 2009, maybe even

1   including 2009, on your chart, that has at least three

2   components, right?  It has whatever BladeFrames, if you sold

3   any, and we're going to talk about that, but it also

4   includes services, right?

5   A   That's correct.

6   Q   Services is, if you already sold a BladeFrame and it's

7   at a customer installation, and they're having trouble with

8   it, you've got to do some upkeep with it, and you're

9   charging them to service the BladeFrames they have already

10  purchased in the past; that's what "services" is, correct?

11  A   In some cases.  In some cases, it's professional

12  services as well where we do things on behalf of the

13  customer and we charge them for that.

14  Q   Right.  And then the third category is software sales,

15  right?

16  A   That's right.

17  Q   So if we look at these numbers on your charts, it

18  doesn't tell us whether you're actually selling any

19  BladeFrames, does it?

20  A   Well, not specifically.  I'm assuming that it was inside

21  those numbers.

22  Q   Right.  You have to go look; was there a BladeFrame sold

23  then, correct?

24  A   That's right.

25  Q   And if we look at the actual numbers, which you know

1    were produced in the case, it looks more like this is for

2    actual BladeFrame sales; don't you know that, sir?

3    A    I haven't seen this slide, but I assume it was produced

4    and accurate.

5    Q    You were the CEO of the company, right?

6    A    In 2009, yes.

7    Q    And you're telling this jury that you kept on selling

8    the BladeFrame, and the BladeFrame sales in 2011, '12, '13,

9    '14, '15 were essentially nonexistent, sir?

10   A    '11 was close to 10 million, it looks like.  '10 was

11   close to 40 million.  Not sure I'd call that nonexistent,

12   but --

13   Q    A shadow of the former BladeFrame sales, right?

14   A    Sure, but at that point we were evolving the company.

15   Q    Well, let's talk about that.  That's exactly where I

16   want to go next.

17          In 2008, when you started to -- when your sales

18   started to fall, 2008, 2009, we heard some testimony about

19   the reasons for that.  It's true, isn't it, that Egenera

20   intentionally reduced its sales after 2008 because of its

21   plan to transition to a software-only company.  That was

22   intentional, right?

23   A    I think it was a combination of that and the financial

24   crisis, and we had a reduction in force in that timeframe.

25   Q    Let's look at Thompson 16, please, which is at page 201,

1    line 21.

2              And against, he's the CEO at this time, right?

3    A    In 2008, yes.

4              "QUESTION:  Would you agree that Egenera's

5    reduction in sales of BladeFrame after 2008 was intentional,

6    as a part of its plan to transition to a software-only

7    company?

8              "ANSWER:  It was intentional based on two things;

9    one, the economic downturn and reducing expenses, and

10   transition to software-only."

11             And in fact, as a result of those things, the

12   financial crisis and your business decision to phase out the

13   BladeFrame, Egenera executed a plan to reduce BladeFrame

14   sales to zero on purpose.  Right?

15   A    I'm not sure I would characterize it as "zero."

16   Q    Let's look at Thompson clip 17, which is page 202, line

17   17.

18             "QUESTION:  As a result of the financial downturn

19   and Egenera's decision to transition to a software-only

20   company in 2008, it executed on a plan to reduce BladeFrame

21   sales, ultimately down to zero, right?

22             "ANSWER:  Eventually."

23             And it's true, isn't it, that after 2008, Egenera

24   was no longer attempting to directly sell the BladeFrame to

25   any new customers; that was, Egenera was not doing that, was

1    it?

2    A    To any?

3    Q    New customers.

4    A    I don't recall that in 2008.  I think we continued

5    selling the BladeFrame at that point.

6    Q    Let's look at Thompson 158, page 112 line one.

7         "QUESTION:  In the United States, Egenera was no

8    longer attempting to directly sell to any new customers

9    after the point in late 2008 in which it had laid off a

10   significant percent of its sales and services force, true?

11        "ANSWER:  Well, BladeFrame.  So our

12   hardware/software business, I'm sure the company would have

13   been opportunistic to sell to anybody, but we weren't going

14   to continue to support hardware, future hardware products.

15   So it's unlikely that a buyer would buy that product.  From

16   a software point of view, on Dell hardware, we continued to

17   aggressively sell."

18   Q    May I have the document camera, please.  Let me show you

19   JTX-344.

20        MR. DESMARAIS:  May I approach, your Honor?

21        THE COURT:  You may.

22             (Document handed to witness.)

23   Q    Now, this is, in fact, the Board of Directors meeting at

24   Egenera at that timeframe when those decisions were made,

25   October 2008, right?

1    A    It looks that way, yes.

2    Q    And let's look, if we could, at page 18.

3              Okay.  Do you see the transition to a pure play

4    software company, do you see that?

5    A    I do see that.

6    Q    And that's "pure" play software company, true?

7    A    That's what it says.

8    Q    Yes.  And it talks about the BladeFrame business, right?

9    A    It does.

10   Q    And it says, "No sales or marketing investment in

11   selling to new accounts."

12             Do you see that, sir?

13   A    I do.

14   Q    And that was October 2008, almost a year before the UCS

15   even launched a product, right?

16   A    Yes.

17   Q    Now, as of 2009, Egenera was not even making any new

18   BladeFrames; you weren't manufacturing, were you?

19   A    I think we continued to manufacture blades, c-blades,

20   processing blades.

21   Q    Let's see Thompson clip 160, which is page 201, line

22   three.

23             "QUESTION:  "How about 2009?

24             "ANSWER:  I'm not certain.  Remember, at this time,

25   we're morphing the software; so the revenue decline was,

1    one, intentional, based on the fact that we were no longer

2    producing hardware, and also based on the economy and

3    budgets getting slashed."

4           Now, because of this business decision that Egenera

5    made before Cisco launched the UCS, Egenera fired half its

6    sales force in 2008 because they didn't need them anymore

7    because they weren't selling BladeFrames anymore, right?

8    A   We were still selling BladeFrames at that point.

9    Q   You fired half of your sales force in 2008 because of

10   the decision to phase out the BladeFrame, true?

11   A   No.  It was because of the economic downturn and the

12   shift in business strategy.  It was a combination of the

13   two.

14   Q   So you agree, it was in combination with the business

15   strategy that we just talked about, right?

16   A   Yes, but we didn't stop selling BladeFrame.

17   Q   You laid off half your sales force, true?

18   A   True.

19   Q   Forty people, forty salespeople, right?

20   A   I believe you.  I don't have those numbers in front of

21   me.

22   Q   That sounds right though, doesn't it?

23   A   That sounds about right, yeah.

24   Q   In fact, in this October 2008 timeframe, because of the

25   shift to a more software-centric company, it wasn't just the

1    salespeople.  You wiped out, across the whole company in

2    every department, almost a third of your work force, right?

3    A   Again, I don't have the numbers in front of me but that

4    sounds fairly accurate.

5    Q   And in your words, "across the board," heads across the

6    board, the whole company, right?

7    A   Yes, we had to deal with 2008, which was a very

8    challenging time.

9    Q   And you will agree with me, won't you, that this work

10   force reduction, and all these people out of work, was due

11   to the combination of your Egenera business decision to

12   switch to software and the economy at the time, and it had

13   nothing do with Cisco and the UCS, correct?

14   A   Well, again, in 2008 we had heard about Project

15   California, and as I just testified, it certainly impacted

16   our sales, so I wouldn't say they're completely not related.

17   Q   Let's see Manca 233, which is your deposition at page

18   463 line one.

19        "QUESTION:  And the reduction in force was not as a

20   result of Cisco, correct?

21        "ANSWER:  Yeah, I think that's an accurate

22   statement."

23        Now, these 90 some odd people, 87, 90, however many

24   it was that you fired, were looking for new jobs, right,

25   would you expect?

```
1    A   I would expect they would be.
2    Q   And you would agree with me, wouldn't you, that it's
3    normal, in fact typical in your industry, that people go
4    between the competing companies, right?
5    A   That is typical.
6    Q   In fact, in the early years, Egenera hired from
7    competitors, right?
8    A   It's hard to say we had competitors back in the early
9    years, but we hired from other server vendors, if that's
10   what you're getting at.
11   Q   Yeah, you hired from IBM, HP, Sun, Hitachi, didn't you?
12   A   We did.
13   Q   And there's nothing wrong with that.  It's normal?
14   A   I would agree with that.
15   Q   You even hired from Cisco?
16   A   We did.  None of those employees took information or
17   generated a product that competed with the companies they
18   came from though.  I think that's the distinction.
19   Q   Sometimes when employees are switching companies, they
20   bring files with them, sir?
21   A   Sometimes.
22   Q   Please turn if you would to DX-UX, and I'll mark this as
23   JTX-514, your Honor.
24           (Defendant's Exhibit No. JTX-514 received in
25           evidence.)
```

1          MR. DESMARAIS:  May I have the document camera,

2    please.

3    Q    This is a Hitachi Business Plan from November 2, 1999,

4    is that right, sir?

5    A    Looks that way.

6    Q    And do you see down at the bottom, it has an Egenera

7    production number, right?

8    A    I see that, yeah.

9    Q    This was produced to us in this litigation from your

10   files, true?

11   A    That is true.

12   Q    And prior to joining Egenera, you worked for Hitachi,

13   right?

14   A    I did.

15   Q    And just because you have Hitachi's business plan in

16   your files doesn't mean you copied Hitachi's product or

17   infringed on Hitachi's patent.

18   A    No, we didn't compete with Hitachi and didn't produce a

19   product that looked like an Hitachi product.

20   Q    Whether you did or not, just because you have an Hitachi

21   business plan in your files that you shouldn't have brought

22   with you from Hitachi, doesn't mean anything about whether

23   you infringed some patent, does it, sir?

24   A    No, but I don't see this being marked as "confidential"

25   either, so I'm not sure -- I think I testified in my

1   deposition I really don't know where it came from.

2   Q   It came from your files.

3   A   Oh, I know it came from the files.

4   Q   You used to work at Hitachi?

5   A   I don't see "confidential" on this, do you?

6   Q   Oh, I'm sorry, do you think Hitachi makes its business

7   plans public in 1999?

8   A   I can't answer for Hitachi.  They may have.

9   Q   You're not serious, are you, sir?

10   A   I don't --

11   Q   This document has pricing in it.  There's future

12   pricing.  It has pricing that's not even finalized.  Are you

13   telling this jury you think this is not confidential?

14   A   I don't see it marked "confidential" is what I'm saying.

15   Q   Okay.  But you know it is confidential.

16   A   I don't know.  I don't really know where I got it from,

17   and that's exactly what I testified in my deposition as

18   well.

19   Q   You see how it's Hitachi's financial plan here?

20   A   I see that, yes.

21   Q   It's got assumptions about its financial plans, do you

22   see that?

23   A   I see that, yeah.

24   Q   Do you see where it talks about emerging market

25   opportunities, emerging market opportunities, utilities,

1    status, tactics.  Do you see that?

2    A   I see that, yeah.

3    Q   Do you see how it's got "pain points" for competitors?

4    Do you see how it has pricing, subject to review?  Do you

5    think Hitachi published their confidential business plan

6    with pricing that wasn't even finalized?

7    A   You'd have to ask Hitachi that question.

8    Q   I'm asking you because it was in your files.

9    A   Yeah, I -- again, it's not like we competed with

10   Hitachi.

11   Q   Whether you did or not, sometimes when employees leave

12   companies, they accidently, or intentionally, or what have

13   you, take documents with them, right?

14   A   I think that's a fair statement.

15   Q   And it doesn't mean, because I have a document, that

16   they infringe a patent, right?

17   A   The document itself, no.

18   Q   You have to look and see:  Is the product meeting the

19   patent claim, right?  That's how you discern a patent?

20   A   That's my understanding, yes.

21   Q   In fact, that's not the only document that was produced

22   in this case from Egenera's files that didn't belong there,

23   right?  You know that.

24   A   Actually, I don't know.  I'm sure you'll show me.

25   Q   Take a look at DX-UZ.

1    MR. DESMARAIS:  I'll mark this JTX-515, your Honor.

2    **(Defendant's Exhibit No. JTX-515 received in**

3    **evidence.)**

4    Q   This is an email from Dan Busby to you and others on

5    May 2006, do you see that?

6    A   I do.

7    Q   And he sends you a slide set, do you see that?

8    A   I see that.

9    Q   It's on the vFrame marketing pitch, do you see that?

10   A   I do.

11   Q   And you know the vFrame is a Cisco product, right?

12   A   Yes, that's my understanding.

13   Q   Right.  So Egenera has in its files a pitch deck about

14   the vFrame that Daniel Busby sent to you, right?

15   A   That's what this implies, yeah.

16   Q   And if we look at the document, it says, "vFrame and I/O

17   consolidation," do you see that?

18   A   I do.

19   Q   And do you see in the footer how it says -- I don't know

20   if it's going to come out in the document camera but I'll

21   try.  See how it says "Cisco Confidential"?

22   A   I do.

23   Q   And this was in Egenera's files and Mr. Busby sent it to

24   you, right?

25   A   That's what that email implies, yes.

1    Q    And now, you know, sir, don't you, that it's normal in

2    the industry that you're in, or that you were in, for

3    companies to get competitive intelligence on each other;

4    what's going on, what are the product features, what's the

5    pricing.  They try to get that information.  They get it

6    from customers, the salespeople talk.  That's normal to

7    gather competitive intelligence, isn't it, sir?

8    A    That's correct.

9    Q    In fact, Mr. Busby, who sent you that vFrame document,

10   it was part of his job, you employed him, to gather that

11   type of information on your competitors, right?

12   A    Well, it was part of the job.  He was a product manager.

13   That's part of what a product manager does.

14   Q    Yeah, it's part of what people do.  They get competitive

15   intelligence about pricing and marketing on the products and

16   what the features are, and you employed this man to do it

17   and he did it, right?

18   A    Looks that way, yes.

19   Q    Now, putting ourselves back in time again to late 2008,

20   in this timeframe when you decided to become a more

21   software-centric company and you did all the layoffs, the

22   other thing you decided to do at that time, so you were

23   changing sort of what's going to happen to Egenera, you

24   decided to try to sell yourself again, right?

25   A    I think there were some attempts during that timeframe.

1    Q   Let's take a look at JTX-356.  This is an Investor

2    Update from December 22, 2008, right?

3    A   Yes, it looks that way.

4    Q   And an Investor Update would be to somebody like

5    Mr. Phillips here, right?

6    A   Yes.

7    Q   Let's look at the first page.  "M&A Update," do you see

8    that?

9    A   I do.

10   Q   M&A stands for "mergers and acquisitions"?

11   A   That's correct.

12   Q   And it says, "You're prepared to sign a Jefferies

13   Engagement Letter," do you see that?

14   A   I do.

15   Q   And Jefferies is one of those big Wall Street investment

16   bankers, right?

17   A   They are an investment banker, yes.

18   Q   And you were getting an engagement letter with Jefferies

19   to try to sell Egenera, right?

20   A   Yeah, I think that's correct.

21   Q   And in that discussion with Jefferies, and in this

22   Investor Update, you talked about what are the negatives of

23   trying to sell Egenera at this time in the end of 2008,

24   right?

25   A   Yes, it looks that way, yeah.

1   Q   And the negative is, one of them is transition from

2   hardware to software, true?

3   A   It reads that way, yeah.

4   Q   It also talks about your revenues declining, right?

5   A   Yes.

6   Q   It also talks about your balance sheet issues, do you

7   see that?

8   A   I do.

9   Q   And balance sheet issues, we talked about this earlier,

10  just to be clear, at this time in the end of '08, you had

11  never made money selling the BladeFrame because it was way

12  too expensive to make, you had to employ too many software

13  engineers making that complicated software, so you were

14  paying more to make it than you were collecting in a sale,

15  true?

16  A   It's true that we weren't profitable at that point.

17  Q   And then it talks about another negative is the RIF, and

18  that's a nice way of saying you fired all those people,

19  right?

20  A   It stands for "Reduction In Force."

21  Q   Right.  Just to be clear, so we don't lose track of the

22  timeline, Cisco didn't come on the market with a product

23  until almost a year later, right?  This is October of 2008.

24  A   Yes, maybe a half year later.

25  Q   July 2009, right?

1    A   Okay, but as I mentioned, there were certainly rumors

2    and indications from our customers that Project California

3    was coming out.

4    Q   Now, let's look at "M&A Update."  By the way, in the

5    negatives to try and sell you, it doesn't say anything about

6    Project California, right?

7    A   No, it doesn't.

8    Q   Okay.  Now, the M&A Update, let's look at who Jefferies

9    wants to shop Egenera around to:  IBM, HP, Cisco, Avocent,

10   SUN, Lenovo, Rackable, Dell and FSC.  That's Fujitsu, right?

11   A   That's correct.  Fujitsu/Siemens.

12   Q   So that's one, two, three, four, five, six, seven,

13   eight, nine companies, right?

14   A   Yes.

15   Q   Let's turn to DX-VP.

16        MR. DESMARAIS:  All right.  And I'll mark this as

17   JTX-516.

18        **(Defendant's Exhibit No. JTX-516 received in**

19        **evidence.)**

20   Q   Now, this is a January 6 email from Mike Thompson.

21   That's the CEO at the time, is that right?

22   A   That's correct.

23   Q   And you're copied on this, right?

24   A   Yes.

25   Q   And it's a Jefferies update?

```
1    A    Yes.

2    Q    And it shows an increased list of people that Jefferies

3    is going to market and try to sell Egenera to, right?

4    A    Yes.

5    Q    And it adds to the list we just reviewed, Adaptec,

6    Brocade, Citrix, EMC, F5, MSFT.  That's Microsoft, right?

7    A    Yes.

8    Q    NEC, NetApp, Novell, Oracle, SAP, Symantec, BMC, and

9    VMWare, right?

10   A    Yes.

11   Q    So that's -- we have nine, 10, 11, 12, 13, 14, 15, 16,

12   17, 18, 19, 20, 21, 22, 23, right?

13   A    Sure.  Yes.

14   Q    So Jefferies is trying to sell Egenera to these 23

15   companies in this timeframe, end of '08, early '09, right?

16   A    That's correct.

17   Q    And Cisco is one of those companies, right?

18   A    Yes.

19   Q    In fact, you know, don't you, that Mr. Thompson who was

20   CEO at the time actually reached out to Cisco and said, Hey,

21   consider us, buy us, right?

22   A    I think he did.

23   Q    And he visited with Cisco and tried to convince Cisco to

24   buy Egenera, correct?

25   A    I believe so.  I wasn't in those meetings, but I believe
```

1    that's correct.

2    Q    And Cisco told Mr. Thompson that, Hey, we bought a

3    BladeFrame from you, and it was crashing and rebooting and

4    crashing and rebooting.  We're not interested, right?

5    A    I don't know that that's what they told Mike Thompson.

6    Q    Well, it's fair to say though, isn't it, that although

7    Jefferies, one of the biggest Wall Street banks, tried to

8    sell to you 23 companies and not a single one of these

9    companies made an offer to buy Egenera, true?

10   A    That's accurate, yes.

11   Q    Now, you talked a lot in your direct about the meetings

12   with Cisco in 2001, 2004, 2008, and Cisco hiring people from

13   Egenera, and I think you even said that we stole your

14   technology or something along those lines, so I want to

15   explore that a little bit with you.

16          Now, first of all, you know this is a patent case,

17   right?

18   A    I do.

19   Q    And if Egenera had any actual evidence of Cisco stealing

20   BladeFrame technology, you could have sued us for theft of

21   trade secrets; you know that, right?

22   A    I'm not an expert in law, but I believe you.

23   Q    But you didn't do that, right?  You sued us on your

24   patent.  You didn't sue us for stealing any trade secrets,

25   right?

1    A    That's correct.

2    Q    And you talked about, at these meetings, that there was

3    a confidentiality agreement, right?

4    A    That's right.

5    Q    And that confidentiality agreement says, if anybody uses

6    the information that's shared at those meetings in a way not

7    permitted, that would breach the agreement, right?

8    A    I think that's generally how it reads, yes.

9    Q    And if Cisco in fact did that, and you could prove it,

10   if you had any proof that that actually happened, you could

11   have sued us for breach of the nondisclosure agreement,

12   right?

13   A    We could have, yes.

14   Q    But you didn't do that either.  This is a patent case.

15   It's not a theft trade secret case, and it's not a breach of

16   confidentiality case, right?

17   A    That's right.

18   Q    So the only issue for this jury in this case is, not did

19   we hire some employees, and not did we breach your NDA.  The

20   issue for this group is, does our product work like your

21   patent claim, right?

22   A    Yes, that's correct.

23   Q    Now, one of the things you said yesterday took me off

24   guard, caught me off guard.  You said that if Cisco had told

25   you they were going to go into the server market, you would

1  have never signed the NDA and never had the deep dive with

2  them.  Do you remember you said that?

3  A   I do, yup.

4  Q   Well, let's take a look at that NDA.  That's JTX-50

5  which you showed the jury yesterday, right?

6          It says on page two that, "The disclosing party" --

7  that's you, right?  That's Egenera?

8  A   I think this is a two-way NDA so both sides could be

9  disclosing information.

10  Q   So it could be either Cisco or Egenera?

11  A   That's right.

12  Q   "The disclosing party acknowledges that the receiving

13  party may currently or in the future be developing

14  information internally, or receiving information from the

15  other parties that is similar to the confidential

16  information.  Nothing in this agreement will prohibit the

17  receiving party from developing or having developed for its

18  products, concepts, systems or technologies (sic) that are

19  similar to or compete with the products, concepts, systems

20  or technologies (sic) contemplated by or embodied in the

21  confidential information provided the receiving party does

22  not violate any of the obligations under this agreement."

23          Do you see that, sir?

24  A   I do.

25  Q   It says right in the nondisclosure agreement that either

1    side can make competing technologies or competing products,

2    and that has nothing to do with the prohibitions in this

3    agreement, sir?

4    A    Well, it says as long as it doesn't violate any of the

5    obligations in this agreement.

6    Q    Exactly.  And you didn't sue us for violating any of the

7    obligations of the agreement.  You sued us in a patent case,

8    right?

9    A    That's correct.

10   Q    Now, you are one of the inventors on the patent, right?

11   A    I am.

12   Q    So let's talk a little bit about the patent.  It's

13   JTX-1, right?

14         MR. DESMARAIS:  Mr. Herzka, do you happen to have

15   my opening slides here?  If you don't, it's okay, I can go

16   on the screen.

17       I can go on the screen if it's easier.  Can I have the

18   overhead projector, please.

19         MR. HERZKA:  I have them.

20         MR. DESMARAIS:  Okay.  So go to the slide that

21   shows the Figure 1, please.  It should be the second one or

22   the next one.  There we go.

23   Q    So Figure 1 of your patent discloses the system diagram

24   for the BladeFrame, right?

25   A    Yes.

```
1    Q   Next slide, please.
2            Figures 2A-C disclose the communication links for
3    the BladeFrame, right?
4    A   That's correct.
5    Q   Next slide, please.  Figures 3A-B disclose the
6    networking software architecture for the BladeFrame, true?
7    A   Correct.
8    Q   Next slide, please.  Figures 4A-C disclose the driver
9    logic, right?
10   A   Yes.
11   Q   Next slide, please.  Figure 5 discloses all the service
12   clusters, right?
13   A   Yes.
14   Q   Next slide, please.  Figure 6 describes the storage
15   software architecture, is that right?
16   A   Yes.
17   Q   Next slide, please.  Figure 7 discloses the
18   processor-side storage logic, is that right?
19   A   Yes.
20   Q   Next slide, please.  Figure 8 discloses the storage
21   address mapping logic, is that true?
22   A   That's correct.
23   Q   And lastly, Figure 9 discloses the cluster management
24   logic, do you see that?
25   A   I do see that.
```

1    Q    And if we look at your patent and we go to column 2.

2    May I have the overhead projector back, please.

3          Right under the description of those drawings, we

4    see something called a "Detailed Description," right?

5    A    Yes.

6    Q    And that detailed description goes Figure by Figure and

7    gives deep technical detail on each of those Figures we just

8    looked at.  That's what follows, right?

9    A    I think that's what it's doing.  Yeah, I don't have this

10   memorized but I think that's what it's doing.

11   Q    Right.  And this, just to be clear, this is the patent

12   on the BladeFrame, right?

13   A    This is the '430 patent that covers PAN Manager and

14   BladeFrame.

15   Q    It covers the BladeFrame, right?

16   A    Well, PAN Manager architecture as well.  And the

17   architecture that runs on the BladeFrame is part of the

18   patent as well.

19   Q    Let's just make sure we're talking about the same

20   language.

21   A    Okay.

22   Q    The patent requires hardware, right?

23   A    I'm not an expert in patent law, so I'm not sure I could

24   answer that, but the implementation of the patent is on

25   hardware, yes.  I don't know if we're speaking the same

1    language here or not.

2    Q   Let's just be clear because I want to get to the bottom

3    of this.  The patent is on -- we can agree the patent is on

4    the BladeFrame, right?

5    A   Yeah, I think of the patent as BladeFrame and PAN

6    Manager.  That's what I think of the patent because it's

7    describing the architecture that runs on BladeFrame.

8    Q   Let's break it into two pieces.  We'll talk about PAN

9    Manager in a moment.  First I want to talk about BladeFrame.

10   A   Okay.

11   Q   It's the patent on the BladeFrame, right?

12   A   Again, I don't want to get tricked into a legal thing

13   here because I don't know.

14   Q   I'm not trying to trick you.

15   A   It's the patent of BladeFrame and PAN Manager.

16   BladeFrame is the implementation of the patent.

17   Q   Let's see Manca clip 308, please, which is page 487.

18   Line 11.

19            MR. DESMARAIS:  Can we switch back to the video,

20   please.

21            "QUESTION:  The '430 patent that's at issue in this

22   case describes the architecture of BladeFrame, right?

23            "ANSWER:  Yes.

24            "QUESTION:  And the '430 patent was published and

25   issued in 2007, right?

1      "ANSWER:  I believe that was the date.

2      "QUESTION:  So as of 2007, it was a public record

3  as to the architecture that you had invented, right?

4      "ANSWER: Yes, it was.

5      "QUESTION:  So anyone, not just Cisco, anyone could

6  have picked up the '430 patent and read it and seen what you

7  had invented, right?

8      "ANSWER:  Certainly.

9      "QUESTION:  Okay.  So what information, beyond

10  what's in the '430 patent, did any one person --

11      Sorry, that was longer than I expected.

12  Q   Now, if we could go back to the document camera, please.

13      In fact, in that question and answer, they were

14  talking about the date the patent issued, but you know,

15  don't you, that it was actually published the first time

16  back in July of 2003, right?

17  A   That's correct.

18  Q   So all those Figures in the Description was public as of

19  2003, right?

20  A   That's correct.

21  Q   And you know that it's a tenet of patent law that a

22  patent has to teach somebody skilled in the art how to make

23  and use the invention, right?  That's a requirement of law?

24  A   I think that's correct, yeah.

25  Q   Okay.  Now, let's talk a little bit about, you talked in

1    your direct about the folks that Cisco hired, and now, we

2    already discussed that, you know, in this 2008 timeframe,

3    you fired almost 90 people, right?

4    A   We had a layoff in that timeframe, yes.

5    Q   And there were other fires and layoffs in the following

6    years, right?

7    A   That's correct.

8    Q   And you did expect those people to get jobs, right?

9    A   We hoped that they would.

10   Q   Yeah.  And it is true, Nuova and Cisco hired a few of

11   those people, right?

12   A   Several, yes.

13   Q   Take a look at this.  You showed us this chart in your

14   direct and you said that these are employees hired by Cisco.

15   Do you see that?

16   A   I do see that.

17   Q   And that's not exactly accurate, is it, sir?

18   A   Well, I think they were hired by Nuova and Cisco, to be

19   more specific.

20   Q   Right.  If you wanted to be accurate to the jury, this

21   would have said "Cisco or Nuova," right?

22   A   Yeah, I think that's accurate.

23   Q   Right.  Because Cisco and Nuova were separate companies

24   in 2005, in 2006, in 2007, and the beginning of 2008.  They

25   were separate companies, right?

1    A    Sure, but Cisco was the major investor in Nuova.

2    Q    But they were separate companies?

3    A    Technically, yeah.

4    Q    And you know that the accused product in this case was

5    designed at Nuova, not Cisco, right?

6    A    I don't know exactly what Nuova did versus what Cisco

7    did, but I knew Nuova had a big piece of UCS product for

8    sure.

9    Q    So which of these employees were at Nuova in 2006 and

10   2007?

11   A    I don't, I don't know the exact answer to that.

12   Q    Wouldn't that be what you want the jury to know?  You

13   want to know who went to Nuova to design the UCS, and

14   instead, you're showing them a chart -- do you know how big

15   Cisco is, sir?

16   A    It's a large company.

17   Q    And people on this chart went to Cisco.  You don't even

18   know what they're doing at Cisco, do you?

19   A    Well, I know, for example Satinder Sethi was both at

20   Nuova and Cisco.

21   Q    Okay.  So that's one.

22   A    Scott Clark is another example.

23   Q    Okay.  We just heard from him.  He didn't take anything

24   technical.  You just heard his testimony.  So that's two.

25   A    I wasn't here for his testimony.

1    Q   Oh, fair point.  Sorry about that.

2         So who on this list went to Nuova in 2006, in 2007

3    and worked on the design of the UCS product?  Tell me one of

4    them.

5    A   I think that's a better question for Nuova or Cisco.  I

6    can't tell you.  I don't know what their jobs were when they

7    got there.

8    Q   We heard earlier in this case that this case was filed

9    in 2006 -- '16, 2016, right?

10   A   Correct.

11   Q   You know, sir, that for the last several years, these

12   two companies have been exchanging files and deposing each

13   others' witness; we've been doing it for years, right?

14   A   Yes.

15   Q   We know everything about what was going on in Egenera

16   and Egenera knows everything about what was going on at

17   Cisco and Nuova; discovery is completed; this is the jury

18   trial, right?

19   A   Yes, it is.

20   Q   Tell the jury who stole a trade secret or software code

21   and worked at Nuova on the development of the product.  This

22   is the jury trial.  You're casting aspersions on these

23   people.  Show us your evidence.

24   A   I don't think I'm casting aspersions.  I'm telling you

25   there's a fact pattern here where --

1    Q    Where is it?  Where is the software code?  Where is the

2    technical theft?  Who did it?

3    A    You would have to ask Cisco that question.

4    Q    You've had years of discovery of Cisco.  You have all

5    our files.  You've deposed all our people.  Who is the

6    culprit?

7    A    I can't answer that question.

8    Q    As you sit here today at the jury trial, you have

9    absolutely no proof that any employee of Egenera took any

10   engineering documents or any source code when they came to

11   Nuova or Cisco.  True?

12   A    No.  Not that I know of, source code or specification.

13   They certainly took knowledge with them.

14   Q    I'm sorry, what?

15   A    They took knowledge with them.

16   Q    I'm not asking whether they took knowledge.  Every human

17   who changes the room they're in takes knowledge with them.

18   What I'm asking you is, you don't have a shred of proof that

19   any employee left Egenera with engineering documents or

20   software code about how to make the BladeFrame, do you?

21   A    We would have no way of knowing that.

22   Q    That's why they invented the discovery system in the

23   U.S. Courts.  We've just been looking for that information

24   for years, and no one has found any, right?

25   A    If you tell me that's correct, I believe you.

1   Q   All these employees that came to Nuova and Cisco -- by

2   the way, you didn't put the dates down on here of when they

3   made the move either, right?  So you don't have what their

4   job was.  You don't have what the dates were.  Right?  But

5   let's just assume that all these people came from Egenera.

6   They all had employment agreements at Egenera, right?

7   A   That's correct.

8   Q   And you know those employment agreements say in them, if

9   Egenera has a beef with where these people are going, you

10  could have enforced that employment agreement and stopped

11  them from going to Cisco or Nuova; you could have done that,

12  right?

13  A   We could have.

14  Q   But you didn't do that either.  You let all these

15  people -- you were frankly laying most of them off.  You let

16  all these people go to Cisco and Nuova and you never filed

17  an employment action to stop that, did you?

18  A   It wasn't our business to be a lawsuit company.  We were

19  trying to build a company, not sue everybody.

20  Q   Now, you talked about, when you were on direct -- let's

21  just shift gears a little bit.  You talked in your direct

22  about your patent, and you talked about the patent figures,

23  right?  You talked a little bit about what was written in

24  the detailed text, right?

25  A   Yes.

1    Q    You didn't talk at all about the patent claims, right?

2    A    I did not.

3    Q    And this jury, to find infringement, needs to compare

4    the product to the patent claims, right?

5    A    Yes.

6    Q    Not the product to the Figures, right?

7    A    Right.

8    Q    Not the product to specification, right?

9    A    I guess.  Again, I'm not a legal expert in this but I

10   think that's correct.

11   Q    They have to compare the product to the claim?

12   A    That makes sense.

13   Q    Yeah.  And you did talk a little bit about the

14   application being filed at the patent office, right?

15   A    That's correct.

16   Q    And you mentioned that it took, I think you said five

17   years?  Is that what you said?

18   A    That's about right, yeah.

19   Q    And now, the patent wasn't just sitting there for five

20   years.  Stuff was happening, right?

21   A    Yeah.  There's give-and-take with the patent office on

22   every patent, I think.

23   Q    Yeah, and let's talk about that give-and-take with the

24   patent office because I think it's important to this point I

25   just made, about you've got to infringe the claims, not the

1    rest.  Right?  Because when you first filed the patent with

2    those Figures and the Description, you had a set of claims

3    that you wanted to be your invention, right?

4    A    Yeah.  I think we had a broad set of claims at that

5    point.

6    Q    That's right.  And you filed that application, right?

7    A    That's right.

8    Q    And the patent examiner rejected it and he said, You

9    can't have all that because there already are data center

10   products been invented; you weren't the first.  Right?

11   A    Well, I think -- yes, that's true, but I think that's --

12   this is what patent processing is about, right?

13   Q    Exactly.

14   A    You create a broad set of claims, and the patent office

15   has discussions with you, and you edit it and finally you

16   get awarded the patent because it's unique.

17   Q    Exactly.  So to summarize at a high level, what happened

18   with Egenera is not unusual.  I'm not saying it is.

19   A    Yes, that's right.

20   Q    You filed it and it got rejected.  You met with the

21   examiner.  You had a conversation about what you really

22   invented.  You amended those claims, made them narrower.

23   Then the patent office rejected them and you went back, and

24   little by little, you narrowed the claims and then at the

25   end, you get claims that you got a patent.  That's how it

1 works, right?

2 A That's how it works.

3 Q And I told the jury in my opening statement that in the

4 claims at issue in this case, and I pointed them to a couple

5 lines, and we don't need to -- by the way, I just want to

6 see if you were -- you were here for my opening, right?

7 A I was.

8 Q I said that the part -- and this is just one part --

9 part of the claims at issue in this case that talk about

10 setting up the network by programming the CPUs, that that

11 language was added during this back-and-forth with the

12 patent office, and you don't disagree with that?

13 A I don't remember the details of that, but again, I don't

14 disagree with it.

15 Q So the claims of your patent are, in fact, narrowed from

16 the broader description that you started with, right?

17 A As we discussed, that's part of the patent process.

18 Q Now, one of the things you mentioned yesterday was this

19 GNIC, right, and how your patent talks about a GNIC, do you

20 remember that?

21 A The Gigabit NIC, yes.

22 Q You showed us this?

23 A That was one of the slides, yes.

24 Q Is it Gigabit or Giganet?

25 A I think it's Giganet actually.

1    Q    That's what I thought because you kept saying "Gigabit,"

2    but you meant Giganet.

3    A    Gigabit, that was a company back in those days.

4    Q    Yeah.  Okay.  And what that stands for is Giganet

5    Network Interface Card, right?

6    A    That's correct.

7    Q    And as you show us here, the GNIC, or Giganet Network

8    Interface Card is separate from the CPU?

9    A    Well, on the processing blade, it was a separate

10   component on the processing blade.

11   Q    And they do different things, right?  The CPU is the

12   brains of the operation, and the Giganet interface card is

13   what interfaces the processor blade to the Giganet network

14   outside, right?

15   A    The Giganet network within the BladeFrame, yes.

16   Q    Yes, within the BladeFrame products.

17   A    Yes.

18   Q    I didn't mean outside the BladeFrame.  I'm sorry.  With

19   it outside the processor blade but within the BladeFrame?

20   A    That's correct.

21   Q    So let's write that down.

22            GNIC is not the same as the CPU.  And you agree

23   with that, right?

24   A    Yes.

25   Q    And I think you testified that you never sort of

1   analyzed a Cisco UCS and you never looked at the software

2   code for the Cisco UCS, right?

3   A   That's right.

4   Q   But even though you didn't do that, you know anyway,

5   don't you, that the Cisco UCS does not have a Giganet

6   Network Interface Card; you know that, right?

7   A   That's correct, I know that, yes.

8   Q   And because you never looked at the Cisco UCS and you

9   didn't look at the source code, you don't actually know how

10  the Cisco UCS establishes its network topology, do you?

11  A   No, I don't have any expertise in Cisco UCS networking.

12  Q   But you do know there are differences between the

13  BladeFrame and the Cisco UCS, don't you, sir?

14  A   Well, I think we just looked at one.  The network is

15  different.

16  Q   Right.  And there are other differences, right?

17  A   Sure.  I'm sure there are.

18  Q   Let's take a look at JTX-129 please.

19        This is the Solutions and Technical Overview, the

20  Dell PAN system, do you see that?

21  A   Yes.

22  Q   All right.  Let's go to page 44, please, slide 44.  So

23  this is comparing the Dell system with the PAN Manager

24  software on it versus some competitor's, true?

25  A   It looks that way, yes.

1    Q    Okay.  And if we look at this first row, it's comparing

2    the Dell PAN Manager to Cisco, right?

3    A    Yeah.  Yes, I think so.  It looks like a sales slide to

4    me.

5    Q    And that would be the Cisco UCS, just so we're all on

6    the same page, right?

7    A    I don't know.  I mean, this is a sales slide.  I could

8    assume that, but what's the date on this deck?

9    Q    Good question.  I don't see that it's dated.  You don't

10   recognize it?

11   A    No, I don't.  It looks like a sales deck.

12   Q    Okay.  While we're talking, maybe somebody on my team

13   can find a date on the thing but I don't see a date either.

14          But in any event, you don't doubt it's an Egenera

15   presentation deck, a sales deck, right?

16   A    Yes.

17   Q    So let's look at how -- well, and also, the Dell PAN

18   Manager was in the post 2008 timeframe, right?

19   A    Yes.

20   Q    Okay.  And in fact, it would be post July 2009 because

21   it's dealing with the Cisco UCS, right?

22   A    Well, I don't know that.  That's why I was asking the

23   date on this.

24   Q    Okay.  Well, let's look at what it's telling us anyway,

25   comparing your product with the Cisco UCS, and it has these

1    funny figures up top, and is what it's saying is:  If this

2    is the case, and we'll talk about this in a minute, Walk.

3    Right?  Walk if the customer wants to do this.  In other

4    words "walk" meaning tell the salesperson not to bother

5    because PAN Manager with Dell can't compete against Cisco,

6    right?

7    A    That's the way I read it, yes.

8    Q    And this one is, there is a shooting man there.  And

9    "compete" when this is the customer's issue, right?

10   A    That's right.

11   Q    Okay.  So let's look at that.  So we see that one of the

12   differences between the Cisco UCS and your product with

13   Dell's equipment, is that if the customer is a bandwidth

14   bigot, that means the customer wants a lot of bandwidth,

15   right?

16   A    That's right.

17   Q    Or if they need a scale greater than a hundred -- is

18   that blades, is that what that is?

19   A    I would read it that way, yes.

20   Q    Yeah.  Then Egenera says just walk away because they

21   cannot compete with the scalability and the bandwidth of

22   Cisco, true?

23   A    Yeah, with Dell on PAN because of the limitations on

24   that system.  Or I should say PAN on Dell.

25   Q    All right.  So let's continue our list.

1                    Okay.  Let's see what else is in here.  Let's look

2      at slide 29.  Okay, this one is talking about scale/size and

3      network/fabric and throughput, do you see that?

4      A   Yes, I see at the bottom, yes.

5      Q   And Cisco and HP are doing a lot better than BladeFrame

6      on scale and size, true?

7      A   No, this was not BladeFrame.  This was Dell PAN.

8      Q   I'm sorry, thank you for correcting me.

9                    Cisco and HP are doing a lot better than the

10     Egenera PAN Manager on the Dell equipment, true?

11     A   That's right.  It's due to limitations of the Dell

12     hardware at the time.

13     Q   Your salespeople were told to just walk away if that was

14     what the customer's concern was, right, scale and size?

15     A   That's right.

16     Q   Similar for a network and fabric throughput, Cisco and

17     HP, Dell PAN Manager from Egenera couldn't compete with

18     Cisco HP, you would walk away rather than try to sell,

19     right?

20     A   Yes, again, due to the limitations of the hardware from

21     Dell.

22     Q   Right, and just so the jury understands, what we're

23     talking about here, and thank you for correcting me, this is

24     not BladeFrame.  This is when they transitioned to software,

25     and Dell PAN Manager is -- PAN Manager is the Egenera

1    software on a Dell piece of equipment, is that true?

2    A    That's correct.

3    Q    Okay.  So this is in the post, sort of switch to

4    software-centric, right?

5    A    This is when we started offering, this is our first

6    software product I think we offered on other hardware

7    besides BladeFrame.

8    Q    Okay.  So let's add these to the list.  Scale/size.

9    Network/fabric throughput.

10          Okay.  Now, let me, before we go on, I should mark

11   these two -- can I have a sticker, please.  I'll mark these

12   entries as JTX-517.

13          MR. THOMASES:  Your Honor, these are demonstrative

14   only.  They should not be marked as JTX.  These are the

15   attorney's hand notes.

16          MR. DESMARAIS:  It reflects the witness' testimony

17   exactly.

18          THE COURT:  Well, the jury will decide what

19   reflects the witness' testimony.  But to make it as an

20   exhibit, it's a demonstrative, that's one thing.

21          MR. DESMARAIS:  Okay.  We'll have this as a

22   demonstrative.  Thank you, your Honor.

23   Q    Okay.  Let's switch gears.  Now, we talked about the

24   launch of the UCS by Cisco in July 2009, right?

25   A    Yes.

1    Q    Please turn to JTX-28.

2         This is an Egenera document talking about the

3    announcement of Cisco's UCS, right?

4    A    Looks that way, yes.

5    Q    And if we turn to the next slide, it talks about how

6    "the hardware component is entirely of Cisco design,

7    including networking fabric and interconnects.  The entire

8    network fabric is based on Cisco's own 6100 networking

9    technology," do you see that?

10   A    I do.

11   Q    And this is an Egenera presentation, right?

12   A    Yes.

13   Q    And you know, don't you, that Cisco has many patents on

14   the UCS, right?

15   A    I assume they do.

16   Q    And soon after this announcement that the UCS was coming

17   out, you looked to see if the UCS infringed any Egenera

18   patents, right?

19   A    Well, we looked to see -- we're trying to understand UCS

20   at this point, so we looked to see if there are any patents

21   that we could use to understand this announcement that came

22   out in March.

23   Q    No, I'm sorry, I was shifting gears.  So you looked to

24   see if Cisco had patents on the UCS, right?

25   A    We did.

1    Q    And you found a whole bunch of Cisco patents on UCS,

2    right?

3    A    I don't know if we found on UCS.  We found a bunch of

4    Cisco patents.  I don't even remember if they were specific

5    to UCS.

6    Q    But you know Cisco has patents on UCS?

7    A    I believe that, sure.

8    Q    But you also looked at Egenera patents to see if the UCS

9    was infringing any Egenera patents, right?

10   A    I don't know.  At what timeframe?

11   Q    Well, let's take a look at DX-AF.

12        MR. THOMASES:  Your Honor, objection.  This

13   document would be subject to your order on motion in limine

14   number 7 by Egenera and that order is Docket 412.

15        THE COURT:  If I haven't seen the document, I'm not

16   sure it relates to the motion.

17        MR. DESMARAIS:  I don't believe that's correct,

18   your Honor.

19        What motion is that?  This doesn't have anything to do

20   with that.  You looking at the right document?

21        MR. THOMASES:  Yes.

22        MR. DESMARAIS:  Where does it say that?

23        (Counsel converse.)

24        MR. DESMARAIS:  No, we disagree with that, your

25   Honor.

```
 1                THE COURT:  I'll give you the benefit of the doubt
 2      but I'll look at it after we close, subject to being
 3      stricken.
 4                MR. DESMARAIS:  Okay.  So this will be JTX-518?
 5                THE CLERK:  517.
 6                MR. DESMARAIS:  Yes, thank you.
 7                (Defendant's Exhibit No. JTX-517 received in
 8                evidence.)
 9      Q    Now, this is an email to you dated May 27, 2009, right?
10      A    Yes.
11      Q    And it says -- I'll zoom in on that part.  There is one
12      here on May 26 first from Ken Oestreich to Pete Manca,
13      right?
14      A    Yes.
15      Q    And this one is May 26, right?
16      A    Yeah.
17      Q    And it says, "I'm sure you've been thinking about this -
18      but it certainly seems now that both Cisco's UCS, as well as
19      HP's Matrix products, not to mention Xsigo's stuff, smell of
20      componentry that we might have patents for, and try to
21      defend."  Do you see that?
22      A    I do.
23      Q    And you got that email and you responded to it up above,
24      right?
25      A    I did.
```

1    Q   And this is Pete Manca the next day, and you talk about

2    intellectual property question, right?

3    A   Yes.

4    Q   And what you said is, "We've reviewed infringement

5    against Scalent, Cisco, and recently HP, and haven't come up

6    with anything obvious as of yet."

7            Right?  That's what you wrote, right?

8    A   "As of yet" I think is the important part there.

9    Q   And this is after the UCS announcement, right?

10   A   But prior to UCS being delivered to the field, right.

11   Q   And after your patent had already issued; you had it in

12   your hands, right?

13   A   Yes.

14   Q   Okay.  And you didn't see any obvious similarities

15   between the UCS announced products and your patent, right?

16   A   All we had at this point was marketing announcements.

17   We didn't have a product on the market.  So at that

18   particular time, that I stand behind that statement; we

19   didn't see anything at that point.

20   Q   And you were familiar with your '430 patent, right?  You

21   were, in fact, very proud of that one, the one this case is

22   about?

23   A   Yes.

24   Q   Now, you, looking back, you agree now, I know we dispute

25   when, but you agree now the BladeFrame is no longer being

1    manufactured and sold by Egenera, right?

2    A   Yeah, I think that's accurate.  I'm not at Egenera, but

3    I don't think it's being manufactured or sold anymore.

4    Q   And you know, as far as you know, as we stand here

5    today, nobody has ever offered Egenera money for any of its

6    patents including the BladeFrame, including the '430 patent,

7    right?

8    A   Yeah.  I can only speak up to 2018 when I left the

9    company, but that's accurate up to 2018.

10    Q   And we know looking back over time, you tried an IPO but

11    you canceled that, right?

12    A   Correct.

13    Q   You tried a couple times to sell yourself.  You tried on

14    your own, and then you tried with Jefferies, the investment

15    bank, and nobody has ever made an offer to buy Egenera on

16    the BladeFrame, right?

17    A   That's correct.

18    Q   And you're not at Egenera any longer, right?

19    A   No, I'm not.

20    Q   And Mr. Brownell, who testified earlier, was a CEO

21    earlier than you, and he's not at Egenera anymore, correct?

22    A   That's correct.

23    Q   And we're going to hear maybe from Mr. Thompson, and he

24    was the CEO before you.  We saw him at some clips.  And he

25    left Egenera too, correct?

1    A    That's right.

2    Q    Now, you told us yesterday that you have shares in

3    Egenera, right?

4    A    Yes.

5    Q    But you said you feel like you don't have a financial

6    stake in this case because you have what are called "common

7    shares," right?

8    A    That's correct.

9    Q    And what you meant by that is that other people, like

10   Mr. Phillips here, has preferred shares, right?

11   A    That's correct.

12   Q    And just for the jury's benefit, somebody who has

13   "preferred shares" gets the money before anybody who has

14   common shares, right?

15   A    That's correct.

16   Q    So, if you did sell yourself, or you did do an IPO, or

17   you came into money in any way, Mr. Phillips and his venture

18   capital colleagues are getting the money, not you and the

19   other employees at Egenera, right?

20   A    Depends on the time I guess.  If you're talking about

21   today, certainly.

22   Q    Okay.

23   A    Depends what point in time you're talking about.

24        MR. DESMARAIS:  No further questions, your Honor.

25   Pass the witness.

1          THE COURT:  All right.  Further questions?

2                  **REDIRECT EXAMINATION**

3     BY MR. THOMASES:

4     Q    Good afternoon, Mr. Manca?

5     A    Good afternoon.  I'll try to be brief because I know

6     you're trying to go home today.

7          All right.  I'm going to cover some of the material

8     that Cisco's counsel discussed with you, some of it starting

9     yesterday.  There was a lot of discussions about drivers,

10    especially in 2004.  Does every hardware system that has to

11    run on an operating system have a driver?

12    A    Yes.

13    Q    Are there frequently issues for people who make hardware

14    to run on operating systems with drivers?

15    A    It's part of the development of a system; you develop

16    code, you have bugs, you fix the bugs, you improve.  That's

17    a pretty typical development environment.

18    Q    And in the beginning of Egenera's time selling

19    BladeFrame, were most of the BladeFrames hosting Linux or

20    hosting Microsoft windows?

21    A    Linux.  We didn't come out with a Microsoft product

22    until I think 2004 timeframe.

23    Q    And in the early 2000s, Microsoft was rolling out new

24    changes to their driver program, right?

25    A    They were.  They created what we used to call WHQLs,

1    Windows Hardware Qualification Lab which was their, the

2    mechanism they used to qualify device drivers for their

3    operating system at that time.

4    Q    So do you believe it was common for people to have

5    issues with Windows' new driver program?

6    A    Yeah, I do.  I mean Windows is a complicated operating

7    system, so yeah, I think it would be common.

8    Q    Would you be surprised that Cisco has had problems

9    implementing drivers for their hardware?

10   A    No, I think it's typical for any company.

11   Q    And we discussed this a little yesterday, but you called

12   the driver problem from Windows a "bug," right?

13   A    That's right.

14   Q    And at that time, in 2004, what percentage of

15   BladeFrames, approximately, were running Windows?

16   A    In 2004, I can't say the exact percentage, but it was a

17   very low number.

18   Q    And was this bug in the driver for Windows, the cause of

19   Egenera deciding not to elect to have its initial public

20   offering?

21   A    No, it had nothing to do with that.

22   Q    So if Cisco implied that, that would be incorrect?

23   A    That's correct.

24   Q    They also showed some of that email correspondence

25   about -- with colorful language from Wall Street, do you

1   recall that?

2   A   I do.

3   Q   And one of them talked about an iPerf benchmark, do you

4   recall that?

5   A   I do.

6   Q   What is a benchmark?

7   A   Benchmark is the testing tool that tests for, you can

8   test for bandwidth, scalability.  It can test for a lot of

9   different things, but it's something that's done in the lab

10  with a testing effort.

11  Q   Was that BladeFrame with that colorful language being

12  used on a trading floor at a Wall Street company?

13  A   Not if it was running iPerf.  No.  That's a testing

14  situation.

15  Q   Now, Lehman Brothers was a large client of BladeFrame,

16  right?

17  A   Right.

18  Q   And after that email with colorful language, did they

19  still buy BladeFrames?

20  A   Quite a few.

21  Q   There was also an email from one of your large customers

22  called Savvis.  Did Savvis continue to buy BladeFrames even

23  after that colorful language?

24  A   They did.  They became our largest customer.

25  Q   And when did Savvis stop buying BladeFrames?

1    A    Right about the time Cisco UCS came out.

2    Q    Do you know, is that because Cisco stole that account

3    and started selling UCS to Savvis?

4    A    Cisco definitely sold UCS to Savvis.  If I recall, it

5    was on their press release.

6    Q    There were some discussions about Windows in 2008, and

7    although counsel tried to cut you off, you were trying to

8    say it was not a bug.

9    A    That's right.

10   Q    What was it?

11   A    So in 2008 timeframe, Microsoft changed their

12   requirement for what's called "sign drivers".  So when you

13   build a driver, a device driver for Microsoft, Microsoft

14   tests it in their lab, and if it works to their

15   specifications and their qualifications, they sign it.  It's

16   called "signing a driver."

17       So in 2008, they changed their procedure on how to

18   sign a driver, and the result of that isn't that the driver

19   doesn't work.  The result of that is, it hadn't gone through

20   and got the signature from Microsoft yet.  So when you boot

21   the operating system, you get a message that says you're

22   running unsigned drivers.  Doesn't mean it's not working.

23   It's just, Microsoft has yet to sign it yet.

24   Q    Do you know if Microsoft prioritizes very large hardware

25   companies to sign their drivers over small companies

1    Egenera?

2    A    Of course they did.

3    Q    So you would have a longer time to wait for Microsoft

4    than someone like Cisco?

5    A    That's right.

6    Q    There was some discussion of HP starting in the 2004,

7    2006 timeframe?  Did HP have any virtualized data center

8    system like the BladeFrame?

9    A    No.  No, they bought RLX and Compaq that were -- they

10   were blade vendors.

11   Q    And before Cisco released to UCS, did any company have

12   anything like the BladeFrame?

13   A    Nothing that was that close, no.

14   Q    There was some discussion of the transition to include

15   software in your products offering, do you recall that?

16   A    I do.

17   Q    Can we put up JTX-57 at page five.  This is a document

18   counsel used with you.  Let's put page one so the jury can

19   recognize it again.  "The Future of PAN."  Can we go to page

20   five at the bottom.  Item four says, "PAN is the PLAN,"

21   which I think you wrote as kind of a catchy little phrase,

22   "but our core value today is PAN Manager.  This is not to

23   denigrate the hardware in any way, but realistically,

24   customers buy our product for the value brought by PAN."

25        Was that accurate when you wrote that.

1    A    That was very accurate.

2    Q    So you're not denigrating the hardware.

3    A    No, not at all.

4    Q    And so a lot of the value is in the software that runs

5    the hardware, right?

6    A    That's right.

7    Q    And there is a discussion of PAN Manager running on

8    Dell, right?

9    A    Yes.

10   Q    So essentially, Dell is providing the hardware and PAN

11   Manager is the software running that, correct?

12   A    That's right.  We did that on a number of platforms;

13   Dell being one example.

14   Q    Fujitsu being another?

15   A    Fujitsu, HP, IBM.  So several companies parted with us.

16   Q    Now, there was discussion of your time at Hitachi in

17   this document that you weren't sure how it got into your

18   files.  It wasn't marked confidential.  But just tell the

19   jury about your departure from Hitachi; was it amicable?

20   A    It was very amicable, you know.  The office at the

21   time -- we were a subsidiary of -- a subsidiary.  Hitachi is

22   a very large company, and that office in Waltham,

23   Massachusetts, they were looking at downsizing that office,

24   so when I left and other people left, they actually weren't

25   that sad about it.  It helped them from having to do a

1    layoff themselves.

2    Q   So, they were okay with you departing, and the office

3    was shutting down.  So that business plan may not ever have

4    been intended to be implemented?

5    A   That's right.  Then we actually engaged with them to see

6    if there was any way we could work together as well.  So it

7    was a very good relationship we had, I still had with

8    Hitachi back then.

9    Q   There was some discussion of Fujitsu and they played

10   some testimony from Mr. Kerrigan, and you remember that?

11   A   Yes.

12   Q   And there was a thing called a "commitment," and the

13   commitment was changed.

14   A   That's right.

15   Q   But it was beneficial for you because quarterlies are a

16   better benefit for Egenera?

17   A   That's right.  We had a -- the way it worked in the

18   beginning is we had just one number and they had to hit it

19   on a yearly basis, and if they didn't hit that number, there

20   were certain penalties in the contract and things like that,

21   and it was hard for them to hit their numbers, an aggressive

22   sales goal, and it was hard for us to run our business

23   waiting for the end of the year seeing if they were going to

24   hit the number, whether they were going to get penalties and

25   et cetera, so part of the renegotiation is we gave up on

1     some of the revenue commitment for getting quarterly

2     commitments for them, which allowed to us actually run our

3     business tighter, if you will, on a quarterly basis.

4     Q   And a commitment contract isn't a cap on sales, correct?

5     A   No.

6     Q   It's a minimum sales?

7     A   It's a minimum sales contract, that's right.

8     Q   So they could still have sold much more than the

9     commitment?

10    A   That's right.

11    Q   Let's please put up PDX-07.17 which is now JTX-496.

12    This is the revenues.  Now, counsel for Cisco put this up

13    and was saying that all you need to look at is a portion of

14    the reported revenues of Egenera, do you recall that?

15    A   I do.

16    Q   Do you think it's more accurate to look at total

17    revenues of the company?

18    A   It is.  The service revenue is a very important part.

19    It's the recurring part of the revenue, which is important

20    for the company.  It's a very sticky revenue.  So we had a

21    lot of emphasis on services revenue.

22    Q   Now, obviously, the financial crisis hit in 2008.

23    A   Right.

24    Q   And you mentioned that there were rumors because Project

25    California was being announced by Cisco because by that time

1    Cisco owned Nuova, is that right?

2    A    I believe so, yes.

3    Q    And so customers were holding off from buying

4    BladeFrame, correct?

5    A    Oh, yeah.  We had many discussions with customers about

6    wanting to test UCS and it was delaying our sales.

7    Q    And counsel played a snippet of your deposition saying

8    you couldn't recall exact customers, and I stood up and

9    wanted to read the rest of it but we waited for this time.

10             MR. THOMASES:  If I could approach, your Honor, to

11   provide the transcript?

12             THE COURT:  You may.

13      (Witness handed transcript.)

14   Q    Can you please look at your deposition, the same one,

15   right at the same location that counsel looked at with you,

16   where they snippetted out a piece at page 272, line 13 to

17   line 6.

18   A    Okay.

19   Q    Did you identify in your deposition a customer that was

20   holding off buying BladeFrame because -- in 2008 because

21   Cisco had kind of preannounced UCS?

22   A    I think I identified Savvis.

23   Q    And that is the customer who then dropped BladeFrame and

24   went with the UCS as soon as it was available, correct?

25   A    That's correct.

1    Q    Now, counsel for Cisco was trying to denigrate Mr. Busby

2    for forwarding a document to you.  Can we put up JTX-515

3    which was previously marked DX-UZ.  Just the first page.

4    This is in 2006, and he calls it vFrame Marketing Pitch,

5    correct?

6    A    Yes.

7    Q    So he's just forwarding you a Cisco marketing pitch?

8    A    That's correct.

9    Q    Do companies, sometimes when they have a marketing

10   pitch, leave on a footer that says "confidential"?

11   A    It's always easier to mark something confidential.  You

12   do that by default.

13   Q    But isn't "marketing," going out to the public to try to

14   sell and market your product?

15   A    That's what marketing is, yes.

16   Q    So did you believe that this document was confidential a

17   year after it was written?

18   A    No, not at all.

19   Q    There was a lot of discussion of the 2008 timeframe,

20   after the economic crisis in 2008, and they put up a lot of

21   information about the investment bank Jefferies and started

22   counting companies that Jefferies was talking to, correct?

23   A    That's correct.

24   Q    That wasn't necessarily Egenera talking to those

25   companies, that was an investment bank talking to the

1   companies?

2   A   That's right.  They were trying to cast a wide net,

3   which I think is typical.

4   Q   And if we put up JTX-356, just the cover page, or we can

5   look at any pages, is December 22, 2008.

6   A   Yes.

7   Q   That's just months after Lehman Brothers went bankrupt,

8   Bear Stearns went bankrupt, some of your biggest clients,

9   and the whole credit industry shut down.  There was a

10  mortgage crisis everywhere, and a lot of people

11  unfortunately were laid off, right?

12  A   That's correct.

13  Q   Okay.  And you're obviously a very small company at that

14  time?  You can answer.

15  A   Oh, yes.  I'm sorry.

16  Q   And so, is it a surprise that in this economic turmoil,

17  that an investment banker was looking to see if anyone was

18  interested in buying Egenera?

19  A   No, it's not, it's not a surprise.  I mean it's -- I

20  mean, I'm not surprised they came up empty in that time

21  because as you said, it was a very, very difficult time.

22  Q   And the companies that were listed by Jefferies were

23  also impacted and had issues having credit and borrowing

24  money, correct?

25  A   Everybody in that time, sure.

1    Q    So do you think that the fact that no one wanted to buy

2    Egenera was because they thought the BladeFrame technology

3    was bad?

4    A    No, I think it was a challenging time.

5    Q    Economically?

6    A    Economically, yes.

7    Q    Now, counsel put up the '430 patent and all the Figures

8    and asked you some questions, but is it your understanding

9    the Figures are only examples of the invention?

10   A    That's exactly right.

11   Q    And do you remember in my opening statement where we

12   went through and listed, and I said, "illustrating one

13   embodiment of the invention."

14   A    That's right.

15   Q    So those don't limit the invention, correct?

16   A    No, they don't.

17   Q    And he also discussed the GNIC, the Giganet NIC card

18   that was described in the patent and is in the BladeFrame,

19   right?

20   A    Yes.

21   Q    Okay.  And we saw, when we walked through yesterday, it

22   is programmed by the BladeFrame, correct?

23   A    That's correct.

24   Q    And so, what is "program" in the BladeFrame; CPU only,

25   GNIC only, or both?

1    A    It's both.  The PAN Manager software running on the

2    control runs that program.  The GNIC in this case, the NIC,

3    and then the CPU, the processor.

4    Q    Now, we saw some snippets from Mr. Thompson.  They were

5    trying to contradict you regarding your meetings in 2004.

6    Do you recall that?

7    A    I do, yup.

8    Q    Again, they only took snippets, not the full amount, but

9    let me ask you this, was Mr. Thompson in any of your

10   meetings with Mr. Hanifi?

11   A    No.

12   Q    Was he in the meeting in April 15th in Marlborough,

13   Massachusetts where you and Vern Brownell gave the 68-page

14   PowerPoint deck?

15   A    No.

16   Q    Was he in California when you gave the technical

17   presentation to the Cisco chief technology officer?

18   A    No.

19   Q    Was he in the walkout meeting and then the walkout

20   conversation that you had with Mr. Hanifi?

21   A    No.

22   Q    Can we please -- well, let me just say, could it be that

23   he was mistaken about his recollection of 2004?

24   A    Certainly.  It's hard for me to speak for him.

25   Q    In 2004, in all your meetings between you and Mr. Vern

1  Brownell and Cisco, did you ever try to sell yourself to

2  Cisco, as Cisco's counsel said?

3  A    No.

4  Q    Can we please play Mr. Thompson's deposition testimony,

5  we're going to go more complete now, at page 56 starting at

6  lines 12 to 20.  Sorry.  Wrong one.

7          Twenty-two please, lines five through 16.

8          "QUESTION:  I'd like to switch gears and talk about

9  meetings between Egenera and Cisco.  Mr. Thompson, you had

10  some direct involvement with at least one meeting with

11  Cisco, right?

12          "ANSWER:  Yes.

13          "QUESTION:  And you were in the loop behind the

14  scenes as to other meetings between Cisco and Egenera,

15  right?

16          "ANSWER:  Yes.

17          "QUESTION:  Such as in 2004, right?

18          "ANSWER:  I don't recall activity in 2004."

19      Okay.  So there you see he's not recalling 2004, so

20  maybe other places in the deposition he was thinking of 2008

21  instead of 2004.  Could that be possible?

22  A    It could be.  Again, it's hard for me to speak for

23  Mr. Thompson.

24  Q    Do you think your memory of 2004 is better than

25  Mr. Thompson's since you were actually in those meetings?

1   A   I do.

2   Q   Let's play the same, Mr. Thompson deposition at page 29,

3   lines 18 through 30, line 4.

4       "QUESTION:  Sir, you don't know firsthand what

5   information Egenera actually presented to Cisco in 2004, is

6   that true?

7       "ANSWER:  That's correct.

8       "QUESTION:  You didn't attend any meeting between

9   Cisco and Egenera in 2004?

10      "ANSWER:  That's correct.

11      "QUESTION:  Whatever knowledge you have of the

12  meetings between Egenera and Cisco in 2004 is based on what

13  you heard afterward from your team?

14      "ANSWER:  That's correct."

15      Okay.  He was not at the meetings in 2004.  That

16  confirms your testimony, right?

17  A   That's correct.

18  Q   And let's turn to the same deposition of Mr. Thompson at

19  page 193 lines 13 to 18.

20      "QUESTION:  Am I correct that you don't know who

21  from Cisco attended any meetings between Cisco and Egenera

22  in 2004?

23      "ANSWER:  Correct."

24      So again, you were at the meetings, Mr. Thompson

25  wasn't.  The one snippet Cisco pulls out could have been he

1    misstated the year or maybe just misremembered, right?

2    A    That's correct.

3    Q    Because he did meet in 2008 but not 2004?

4    A    That's right.

5    Q    Cisco discussed the NDA with you, remember that?

6    A    Yes.

7    Q    Can you know what information from the meetings that you

8    had with Cisco is being used internally at Cisco?

9    A    I would have no way of knowing that.

10   Q    Do you have any privy to the conversations that happen

11   after those meetings?

12   A    Inside of Cisco?

13   Q    Inside of Cisco?

14   A    No, none at all.

15   Q    Do you have any privy into what information Mr. Mazzola

16   used from those meetings when he founded the company and

17   built the Project California?

18   A    No.  I'm not privy to Cisco internal discussions.

19   Q    Do you have any internal, knowledge of internal meetings

20   between Mr. Mazzola and his team that he ordered to design

21   the product?

22   A    No, I would have no way of knowing that.

23   Q    So because you have no way of knowing it, it's not a

24   surprise that you couldn't bring a suit for breach of that

25   contract, right?

1    A    That's right.

2    Q    Now, Cisco's counsel was a little tricky because he said

3    you have no direct evidence of stealing or copying.  You

4    remember that?

5    A    I do.

6    Q    Do you know what "circumstantial evidence" is?

7    A    I have a rough idea, yes.

8    Q    And do you remember the judge instructed the jury on

9    circumstantial evidence?

10    A    Yes, I do recall that.

11    Q    And he gave an example of how, if his coffee was warm in

12    the desk and his work papers from the night before there?

13    Do you recall that?

14    A    Yes, I do.

15    Q    Do you have circumstantial evidence that Cisco copied

16    the UCS?

17    A    I think the answer is yes.  I mean, we met with them

18    under the pretense of having a partnership.  They purchased

19    the BladeFrame, they hired a number of people, and then they

20    developed the product and delivered it to market that looks

21    very similar to our BladeFrame.  So that to me is

22    circumstantial evidence for sure.

23    Q    And he also asked you a question about whether copying

24    was even relevant to the question of infringement.  Do you

25    recall that?

 1    A    I do.

 2    Q    And do you understand there's also a claim of willful

 3    infringement above and beyond infringement in this case?

 4    A    Yes.

 5    Q    Do you know that willful infringement includes whether

 6    the jury has to decide whether there has been copying or

 7    some other bad faith, reckless-disregard behavior by Cisco?

 8    A    Yes.

 9    Q    Is your understanding that the behavior of Cisco in the

10    interactions with Egenera would be in bad faith?

11    A    I think that way, yes.

12            MR. THOMASES:  I pass the witness, your Honor.

13            THE COURT:  Any last questions?

14            MR. DESMARAIS:  Just one quick thing on the

15    deposition, your Honor.

16                       **RECROSS EXAMINATION**

17    BY MR. DESMARAIS:

18    Q    Now, Mr. Manca, on the issue of -- may I have the

19    document camera, please.  On the issue of, counsel asked you

20    about whether any customers didn't buy your product before

21    the UCS was launched, and you've pointed out Savvis is the

22    only one you could come up with, right?

23    A    Um hmm.  Yes.

24    Q    And he showed you a piece of the deposition?

25    A    Yes.

1    Q    Let's look at what you actually said with that issue.

2    This is page 273 line 7.

3              "QUESTION:  What did Savvis tell you and when?

4              "ANSWER:  Well, I don't know exactly what they told

5    us, but the gist of the conversations was that they're

6    evaluating technology from Cisco that looks an awful lot

7    like Egenera BladeFrame.

8              "QUESTION:  When was that conversation?

9              "ANSWER:  I don't recall.

10             "QUESTION:  And who was it with?

11             "ANSWER:  I don't recall the executives' names at

12   Savvis.

13             "QUESTION:  And was it before or after the UCS was

14   released?

15             "ANSWER:  I don't recall.

16             "QUESTION:  Was there a -- as Egenera's CEO and its

17   corporate representative, is there a specific conversation

18   that Egenera had with a customer before the UCS was released

19   wherein that customer did not purchase an Egenera product

20   because of the rumors that Cisco was going to release a

21   server product?

22             "ANSWER:  Sitting here today, I can't recall

23   anything with any specificity that I could answer this for

24   the fourth time."

25         Because you, in fact, at that deposition, were asked

1    that question over and over and over again, and four times

2    you said you don't know any specific customer.

3         Were you asked those questions and did you give those

4    answers and were you under oath to tell the truth?

5    A    Yes.

6              MR. DESMARAIS:  No further questions, your Honor.

7              THE COURT:  Thank you, Mr. Manca.  You are excused.

8    You've been very patient.

9                   [Mr. Manca steps off the stand.]

10             THE COURT:  We have six or seven minutes left.

11   Let's see if we can introduce the next witness so we know

12   tomorrow who our guest is going to be.

13             MR. THOMASES:  Your Honor, the next witness is by

14   deposition designation.  Should we start the video or would

15   you like to excuse the jury a little early today?

16             THE COURT:  Well, you can start the video and we

17   can at least meet the person and be prepared.

18             MR. THOMASES:  We'll have it to you.  It's going to

19   be Mr. Ammar Hanafi.  Mr. Hanafi was --

20             THE COURT:  There's three or four minutes.  He

21   should introduce himself and tell us who he is.

22             MR. THOMASES:  Okay.  Thank you.

23        (Deposition video of Ammar Hanafi played from its

24   beginning to the timestamp of 10:32:13.)

25             THE COURT:  It's one o'clock.  All right, jurors.

1    You have been very patient.  Another interesting day.  We're

2    doing very well I think in terms of the schedule, thanks to

3    you.  And so I hope we just keep the progress up.  So 9:00

4    tomorrow morning.  We will resume promptly then.

5         If you give Danni the disputed documents, we'll look at

6    it in terms of the motions in limine.

7              THE CLERK:  All rise.

8         (Whereupon the proceeding adjourned at 1:01 p.m.)

```
 1                        I N D E X

 2   WITNESS:              DIRECT    CROSS   REDIRECT   RECROSS

 3   SCOTT CLARK

 4   By Mr. Batchelder       4                  53

 5   By Mr. McDavit                    41                   64

 6   PETE MANCA, Resumed

 7   By Mr. Desmarais                  66                  157

 8   By Mr. Thomases                          140

 9   AMMAR HANAFI (Via videotape)   159

10                      E X H I B I T S

11   PLAINTIFF'S                                    IN EV.

12   No. 497    Scott Clark: Professional Services    6

13              doc

14   No. 498    Clark LinkedIn page                  16

15   No. 501    6/5/08 Mathews-Clark email thread    19

16   No. 502    6/21/07 Statement of Work            21

17   No. 503    Runbook document                     24

18   No. 504    11/5/09-11/6/01 email chain          29

19   No. 505    4/20/08 Clark-Tademoto emails        33

20   No. 506    9-24-08 - 9-26-08 email chain        34

21   No. 507    4/6-4/7/08 email chain               37

22   No. 508    4-6-08 emails                        40

23   No. 510    Egenera vs UCS chart                 56

24   No. 511    11/18/09 Kvasyuk-Clark email chain   59

25                        CONT'D
```

| 1 | DEFENDANT'S | | IN EV. |
|---|---|---|---|
| 2 | 509 | 11/6/08 email thread | 48 |
| 3 | 512 | Email chain | 75 |
| 4 | 513 | 11/17/08 Architecture review. | 84 |
| 5 | JTX-514 | Hitachi Business Plan 11-2-99 | 102 |
| 6 | JTX-515 | Email from Busby to Manca - May | 106 |
| 7 | | 2006 | |
| 8 | JTX-516 | January 6 email from M.Thompson | 110 |
| 9 | JTX-517 | Email to Manca 5-27-2009 | 136 |
| 10 | | | |
| 11 | | | |
| 12 | | | |
| 13 | | | |
| 14 | | | |
| 15 | | | |
| 16 | | | |
| 17 | | | |
| 18 | | | |
| 19 | | | |
| 20 | | | |
| 21 | | | |
| 22 | | | |
| 23 | | | |
| 24 | | | |
| 25 | | | |

```
1                    C E R T I F I C A T E

2

3        We, James P. Gibbons, Official Court Reporter for the

4   United States District Court for the District of

5   Massachusetts, and Lisa McDonald, RPR, RMR, CRR, do hereby

6   certify that the foregoing pages are a true and accurate

7   transcription of our shorthand notes taken in the

8   aforementioned matter to the best of our skill and ability.

9

10  /s/James P. Gibbons                August 4, 2022
        James P. Gibbons

11

12  /s/Lisa McDonald
        Lisa McDonald

13

14

15                  JAMES P. GIBBONS, CSR, RPR, RMR
                        Official Court Reporter
                      1 Courthouse Way, Suite 7205
16                    Boston, Massachusetts 02210
                        jmsgibbons@yahoo.com

17

18

19

20

21

22

23

24

25
```