```
 1                  UNITED STATES DISTRICT COURT
                      DISTRICT OF MASSACHUSETTS
 2

 3

 4

 5
     * * * * * * * * * * * * *
 6   EGENERA, INC.,              *
             Plaintiff           *
 7                               *     CIVIL ACTION
             vs.                 *     No. 16-11613-RGS
 8                               *
     CISCO SYSTEMS, INC.,        *
 9           Defendant
     * * * * * * * * * * * * *
10

11

12

13

14           BEFORE THE HONORABLE RICHARD G. STEARNS
               UNITED STATES DISTRICT COURT JUDGE
15                        AND A JURY
                    CIVIL JURY TRIAL DAY 8
16                     August 11, 2022

17

18

19                             Courtroom No. 21
                               1 Courthouse Way
20                             Boston, Massachusetts 02210

21

22           JAMES P. GIBBONS, CSR, RPR, RMR
             CHERYL PALANCHIAN, RPR, RMR, CRR
23              Official Court Reporter
             1 Courthouse Way, Suite 7205
24            Boston, Massachusetts  02210
                 jamesgibbonsrpr@gmail.com
```

```
 1    APPEARANCES:

 2     On behalf of the Plaintiff:

 3         ROPES & GRAY LLP (By Andrew N. Thomases, Esq.,
       and James R. Batchelder, Esq.) 1900 University Avenue,
 4     East Palo Alto, California 94303
                                 - and -
 5         ROPES & GRAY LLP (By Josef B. Schenker, Esq. and
       Rachael S. Bacha, Esq.) 1211 Avenue of the Americas,
 6     New York, New York 10036-8704
                                 - and -
 7         ROPES & GRAY LLP (By Scott Taylor, Esq., Emma
       Notis-McConarty, Esq. and Nicholas Bortz, Esq.)
 8     Prudential Tower, 800 Boylston Street, Boston,
       Massachusetts 02199
 9
        On behalf of the Defendant:
10
            DESMARAIS LLP (By Tamir Packin, Esq., Peter C.
11     Magic, Esq. and John M. Desmarais, Esq.) 230 Park
       Avenue, New York, New York 10169, on behalf of the
12     Defendant

13

14

15

16

17

18

19

20

21

22

23

24
```

```
1                       P R O C E E D I N G S
2              THE CLERK:  All rise for the jury.
3         (Whereupon, the jury entered the courtroom.)
4         (Whereupon, the Court entered the courtroom.)
5              THE CLERK:  Court is open.  You may be seated.
6         Resuming on the record in Civil Action No. 16-11613,
7    Egenera, Inc. versus Cisco Systems, Inc.
8         Mr. Jeffay, you are reminded that you remain under
9    oath.
10             THE WITNESS:  Yes.
11             THE COURT:  Good morning, counsel.
12        And a special good morning, jurors.  We are off again
13   at nine o'clock precisely, and the pupils are ready to begin
14   school.
15             MR. PACKIN:  Yes, your Honor.
16                    **KEVIN JEFFAY, resumed**
17                 **DIRECT EXAMINATION, (Cont'd.)**
18   BY MR. PACKIN
19   Q    Okay, Professor Jeffay, let's just sort of remind the
20   jury what we were up to yesterday, and you had given a
21   technology background on servers, switches, LANS, which are
22   groups of servers, and then virtual LANS and virtual groups
23   of servers, right?
24   A    Sure.  Correct.
```

1    Q    And how did Egenera solve the problems in the '430

2    patent, given that everything was already out there in the

3    prior art?

4    A    So again, one of the key things that Egenera did was

5    they wanted to create a network of processors.  And

6    previously the dominant approach was to create networks of

7    servers.

8         So by creating networks of processors, this would

9    allow them to increase the capacity of a processor area

10   network because you could bring new processors into the

11   network to -- if you needed more computational power.  And

12   then because of that and other aspects of their patent,

13   they -- this would also allow them to solve the cabling

14   problem so that cables wouldn't become a mess.

15        MR. PACKIN:  Let's go through the next slide.

16   We're at 38 now.

17   Q    Can you tell us what you're showing here?  There's a lot

18   going on here.

19   A    So this is Figure 1, that we've seen many times now, and

20   I've just overlaid some of the text from the patent that

21   just explains what these numbered parts are.

22        And what I want to focus on initially are the

23   processing nodes that are on the left that are shaded in

24   red, and the fact that they will have processors, and those

1    are shaded in yellow.  They'll have a network interface

2    card, and that's shaded in blue.  And they'll also have some

3    -- what's just called local memory, or just memory.

4         And we'll see that these are all fairly generic

5    components to have in a server.

6         MR. PACKIN:  Is it okay, your Honor, if Professor

7    Jeffay could come down to explain?

8         THE COURT:  He can.

9         MR. PACKIN:  Thank you.

10       (Whereupon, the witness stepped down.)

11       THE WITNESS:  So this is our famous magnet board,

12   board, and what I am trying to illustrate here are going to

13   be the components of a server.

14       So the large box in the middle is supposed to represent

15   the motherboard.  So it's a printed circuit board.

16       And for context we have a chassis over here.

17       So this would be one of the blades that you turn

18   horizontally and slide into the chassis.

19       And then on the right-hand I'm going to have some

20   illustrations of network that the server will be talking to.

21       So there's some network cloud, and there's some

22   physical connection into the network.

23   Q   So how does this gray board relate to the physical

24   servers that we saw yesterday and earlier this week?

1   A    Well, the physical servers don't have a single-layer

2   motherboard.  They actually have multiple layers.  But think

3   of this as this is the bottom of the server.  This is the

4   substrate onto which the components go.

5           And if I can see this up close, I'm just trying to

6   illustrate all the wiring, all the little solder channels

7   that are on the motherboard that allow electrical signals to

8   go between all the components.

9   Q    Let's start by building our servers, and I think we

10  should start with the brains.  What are the brains?

11  A    The brains, as you've heard many times, are the CPU.  So

12  that was the big chip that was passed around last time.  And

13  CPU, remember, stands for "central processing unit."  And

14  the word "central" emphasizes that it's the sort of the

15  centerpiece of the server.

16          So we will just build our server with a couple of

17  CPUs.  And I said yesterday that you can think of a server

18  as just a very beefy computer.  And one of the ways in which

19  it's very beefy is that it has multiple CPUs.

20          So I'm go to make a server for four CPUs.  By

21  having four CPUs, what that means is the server can be

22  running four programs at once or responding to four times

23  the number of requests for service than a server with one

24  CPU could.

1  Q   One of the other components that we had talks about was

2  the memory chips that I had pulled out.  Do you have a

3  magnet for that one, too?

4  A   Yes.  So we just have one magnet that shows a bunch of

5  memory banks.

6          So the memory is important because the programs

7  that the CPUs execute are stored in memory, and so one of

8  the other ways in which a server is a beefy computer is it

9  just will have a lot more memory than you would have in your

10  typical laptop or desktop computer.  But the more CPUs you

11  have, the more memory you're going to need.

12  Q   How about the network interface card that we have been

13  hearing about, do you have one of those?

14  A   I do.  And I don't have anything to -- any fancy

15  graphics, just sort of show it, because network interface

16  cards take all kinds of shapes and sizes.

17          So I'm just going to use a blue rectangle.

18          So the server will have a network interface card,

19  and, as name implies, this is the physical interface to the

20  network.

21          So this connector would actually plug into this

22  card, and this is a card that actually is responsible for

23  transmitting and receiving data over the network.

24  Q   Let's start by talking about Egenera's patent.  And I am

1    going to add the Egenera logo here to make sure that we are

2    focused on the patent.

3          What components within the server was Egenera

4    focused on programming in order to establish the virtual

5    local area network topology?

6    A    So the thing that's interesting about the '430 Patent is

7    their focus on the processor.

8          So let me highlight -- this is a magnet board

9    highlight.  I'll highlight the CPU.

10          So, as I said, you know, the traditional approach

11    for making a network of computers was to make a network of

12    servers.  And what Egenera wanted to do was something

13    different and to have a network of CPUs.  So the focus in

14    the Egenera system really is on the CPU.

15    Q    So how in the patent would you set up, for example, a

16    network of top two CPUs here?

17    A    So any time you're building a network, you have to have

18    some way of communicating with the end points of the

19    network.  And if the CPUs are going to be -- the nodes, if

20    you will, in this network, the CPUs are going to need

21    addresses.

22          So just like you can't communicate with someone by

23    the Postal System if they don't have an address, you can't

24    commute with a CPU in a processor area network, if they

1    don't have an address.

2         So we'll give the CPUs some addresses.

3         And the type of address we are going to give is

4    this thing that we've heard about, the MAC address.  And

5    again, MAC is an acronym.  It's not a particularly

6    insightful acronym.  So we'll just call it an address.

7         And because we are making a processor area network,

8    each one of these CPUs is going to get a MAC address, and

9    that's going to allow messages to be addressed directly to a

10   CPU.

11   Q   And so remind us, in the patent what is this called,

12   this group of CPUs that are networked together?

13   A   So it's called a processor area network.  So let me sort

14   of highlight that.  We'll make a little blue cloud to just

15   illustrate that here's one server.  The server has four

16   CPUs, but within this server there exists a processor area

17   network of two CPUs.

18   Q   Now, in Egenera's patent, what happens if one of these

19   CPUs were to fail?

20   A   So this is another interesting aspect of Egenera's

21   patent.

22        Because they are making a network of CPUs and not a

23   network of servers, if a single CPU fails, they can recover

24   from that.

1          The CPU is effectively a node on the network, and

2     it has an identity, or what the patent calls a

3     "personality," and that personality is defined by its MAC

4     address.

5          So if this processor fails, one of the things the

6     patent describes is how in software you can migrate the MAC

7     address of the failed CPU to a good CPU, and then this good

8     CPU will take on the identity of the failed CPU and thereby

9     preserve your processor area network.

10         So you still have a processor area network, two

11    CPUs.  It will just be this top and bottom out there.

12         So although a CPU failed, the processor area

13    network can continue.

14    Q   Now, is this failover process described in the patent

15    itself?

16    A   It is.  It's described towards the back of the patent.

17    Q   Since you don't have the slides in front of you, I will

18    hand you the actual patent.

19         MR. PACKIN:  And, Mr. Herzka, I think we've got a

20    blowup for the jury, which is the next slide.

21    A   So if the jury wanted to look for this in their

22    patent -- unfortunately, patents don't number the pages.

23    Instead, they number columns.  So we refer to them by column

24    numbers.

1    So in the back there's column number 27, about two

2    pages from the end of the patent.  And there is some text

3    that I think is on the slide that you're looking at, that

4    says that, for example, Within a processor area network,

5    processors have a personality, an identity, and it's defined

6    by their virtual MAC address.

7    And further down in column 27 it talks about this

8    failover process, where, if a processor fails, the identity

9    or the personality can migrate from the failed CPU to a good

10   CPU, and therein the processor area network survives the

11   failure of the processor.

12   Q   Now, is this idea of concreting a network of processors,

13   is that also in the patent claims?

14   A   It is.

15   Because the focus is on creating a processor area

16   network, the processors themselves create the networks.  And

17   that's the motivation behind this element that we have been

18   hearing a lot about, the fact that the processors are

19   programmed to establish a virtual local area network

20   topology.  So the processors are programmed to form things

21   like this processor area network.

22   Q   What we see on the screen, sorry, that's part of the

23   claim that we've been talking about?

24   A   Yes.  So that's from this specification.  That's from

1    the body of the patent that that language repeats in the

2    claims.

3    Q    So just so we're absolutely clear, because this one's

4    important, what server component is programmed in the

5    Egenera patent in order to establish the virtual local area

6    network topology?

7    A    So I think the easiest way to think about it is, again,

8    what the core idea -- a core idea in the '430 Patent was

9    this notion of a network of processors.  And because it's a

10   network of processors, the processors themselves are

11   programmed to form the network topology.

12   Q    So now let's switch over and talk about Cisco.  So let's

13   get rid of some of these.

14        Let me add "Cisco," just so there's no confusion

15   here.

16        Now in Cisco, what component is programmed in order

17   to establish a network topology?

18   A    So the first thing to note is all the basic components

19   of the server are the same, and that's because these are all

20   very generic components.  Every server is going to have

21   CPUs.  It's going to have memory.  It's going to have a

22   network interface card.

23        The thing that's unique about UCS is they,

24   themselves, designed and built a custom networks interface

1    card.  So it's a specialized network interface card, and

2    it's going to be the network interface card that establishes

3    the virtual local area network topology because in UCS

4    they're trying to make a network of servers.  They're using

5    the more traditional approach, rather than the approach that

6    Egenera took, making a network of processors.

7    Q   Do you have a magnet board version of highlighting for

8    that one too?

9    A   I don't, because to show -- I can highlight the network

10   interface card.  I just can't highlight the network of

11   servers because it would be too big.

12   Q   Yes.

13           Now, the network interface card, we hear the terms

14   NIC, VIC, network adapter.  I think that's most of them?

15   A   There may be more, I mean --

16   Q   For the purposes of this case within the Cisco product,

17   are they all interchangeable?

18   A   They are.  They're all synonyms.  They're all the same.

19           I mean, it's unfortunate that everything's an

20   acronym, and then for the same thing they have multiple

21   acronyms that do the same thing?

22           But an adapter is the same notion as a card.  And

23   what Cisco calls a VIC, a virtual interface card, is the

24   same as the network interface card.

1  Q   So now we're going to add one more layer of acronyms.

2           What's this VNIC that we've heard about?

3  A   Okay.

4           So with -- because Cisco is making a network of

5  servers, there is function out in the network in the

6  switches that they use, and these are these things that are

7  called the "fabric interconnects."

8           So the fabric interconnect is running some

9  special-purpose software that's going to program the network

10 interface card so that it can establish the virtual local

11 area network topology.

12          So again, as I say, the first thing it will do is

13 it will virtualize the network interface card.  So

14 virtualization is always a tough thing to get your head

15 around, but the way to think about it is it's basically

16 taking one device and making it look like multiple devices?

17          So in this case if I wanted to decree two VNICS,

18 the UCS Manager, running on the fabric interconnect, would

19 communicate with the network interface card to create three

20 network -- virtual NICs.

21          So the idea here is that there's one physical NIC,

22 but in software, we make it look like there's two.

23          So, for example, two CPUs might want to use the

24 network interface card at the same time.  There's only one

1    physical card, but they can think they're using it at the

2    same time because in software it appears like there's really

3    two NICs.

4    Q    Now, where is this VNIC located physically?

5    A    It's on the network interface card.  The VNIC is created

6    on the network interface card.

7    Q    I think we heard Dr. Jones say that yesterday, too.  Do

8    you and Dr. Jones agree on that?

9    A    We are in agreement that the VNIC is created on the

10   network interface card.

11   Q    Now, if I wanted to create a network in UCS, Cisco's

12   product, of the top two CPUs like you did in Egenera's

13   patents, how can I do that?

14   A    You can't.  You can't create a network of just arbitrary

15   CPUs.   So you could not create a network of the two CPUs.

16          What you can do is you can create a network of

17   servers.

18          And again, that's the more traditional way in which

19   you create a virtual local area network.

20   Q    Then you told us earlier about MAC addresses in the

21   patent and the CPUs having MAC addresses.

22          Does Cisco's UCS product also use MAC addresses?

23   A    It does.

24          And at the level which we're talking about this,

1    any device that will communicate over the network,

2    anything -- physical device, or in this case a virtual

3    device, the one that's actually doing the transmission and

4    reception of packets is going to need an address.  And so it

5    will need a MAC address.

6          So as part of the process of programming the

7    network interface card, a virtual MAC address will be

8    associated with each of the VNICS.  So in this way, although

9    there is one physical network interface card, it will look

10   to software running on the server as if there's two network

11   interface cards.

12   Q    Is that something that Dr. Jones agrees with you on?

13   A    Yes, I think we are in agreement about this.

14   Q    Okay.  So now in Cisco's UCS, what happens if one of

15   these CPUs fails?

16   A    Well, because Cisco has a fundamentally different design

17   philosophy, they're building a network of servers, if an

18   individual CPU fails, it would be exactly like if the CPU in

19   your laptop failed.  And, unfortunately, that would mean

20   your laptop is dead.  In this case it would mean the server

21   is dead.

22          So if a single CPU fails, you can't recover from

23   that like you can in the Egenera system.

24   Q    Just to be clear, in the Egenera system we saw software

1    commands can replace the CPU.

2            In Cisco's system, is there any way for software

3    commands to replace the failed CPU?

4    A    No.

5            Replacing a failed CPU would be a hardware

6    operation.  You'd have to remove the server from the

7    chassis.  You saw Mr. Jayakrishnan do it, get out your

8    screwdrivers and unscrew the CPU and replace it.

9    Q    Now, we heard about service profiles yesterday and the

10   fabric interconnect.

11           Is there anything you could do if your server dies

12   using software?

13   A    So if the CPU dies, the server dies.  But you can

14   recover from that in the sense of you can replace the entire

15   server with another server.

16           So although the server may be dead, the network

17   interface card is still able to function, and because of

18   software that's running on the fabric interconnect, what the

19   software can do is it can reassign these MAC addresses.  So

20   the MAC addresses are sort of like the SIM card in your

21   phone.  They define the personality or the identity of the

22   server.  And we can assign the MAC addresses to a second

23   server.  And in so doing, that second server would be able

24   to replace the first server that failed.

1          So in software you can recover from the failure,

2     but you do it by replacing the entire server with a new

3     server.

4          MR. PACKIN:  I think we are done with the magnet

5     board for now.

6          THE WITNESS:  Okay.

7          MR. PACKIN:  I will move it out of the way, and you

8     can go back to the stand.

9       (Whereupon, the witness resumed the stand.)

10    Q   Okay.  Now, that we have gone through that, do you have

11    a slide that helps you, sort of, recap what you've just

12    shown the jury?

13    A   Yes, I made a summary slide to summarize the three

14    basics points, and that is, in the '430 Patent, the focus is

15    on -- excuse me.

16          The networking focus is on programming the CPUs

17    because, again, we are trying to create a network of CPUs.

18          In Cisco UCS, the focus is on programming the

19    network interface card, which there's one for the server

20    because we are trying to make a network of servers.

21          Again that's the more traditional way in which one

22    makes a virtual local area network.

23          So the idea is the patents is about a network of

24    CPUs, and UCS is about a network of servers.

1              And, as a result of this, they both have some

2    ability to failover.  In the patent, you can recover from

3    the failure of an individual processor on a server; whereas,

4    you can't do that on UCS, but you can recover by replacing

5    the entire server.

6    Q    So now let's talk about infringement and

7    noninfringement, and let's start at the beginning.

8              What part of the claim are we supposed to be

9    looking -- I'm sorry.  What part of the patent?

10   A    So if we go back to the video that was shown right at

11   the start ofthe trial, the gentleman giving the presentation

12   said, The most important part of the patent are the claims.

13   And these are these numbered paragraphs at the back.

14             And the idea is the claims define the boundaries of

15   what is and what isn't the invention.

16             So you can sort of think about the claims like a

17   fence.  If you're on one side of the fence, you infringe.

18   If you're on the other side of the fence, you don't

19   infringe.

20   Q    Let's talk about how the jury can figure out which side

21   of the fence Cisco is on.  Do you have a simple analogy to

22   explain the process?

23   A    I do.

24             So on this slide, I made up a patent.  This is not

1    a real patent.  It's -- I'm making this hypothetical, really

2    really simple invention, which is a pair of headphones that

3    go directly in your ears.  So this might be something

4    someone invented.  And if they invented this, they have to

5    have a way of describing what they invented, and what they

6    invented is in the claims, because the claims define what

7    the invention is.

8            So in this patent I might have a claim that

9    describes my invention as -- it's a set of headphones, and

10   the headphones include a volume adjustor, a right earpiece,

11   a left earpiece, and an audio jack.

12           And if the Patent Office agrees with me that this

13   is an invention, then I have an invention, and it's defined

14   by these four things.

15           So anything that has these four things -- any pair

16   of headphones that has these four things would be infringing

17   my patent.

18   Q   So let's takes an example of a pair of headphones to

19   figure out whether or not they infringe.

20           So let's say we've got this other pair of

21   headphones as the product, what do we do?

22   A   Well, so say someone else invents some headphones, and

23   they kind of look a little similar.  I mean, they go in the

24   ear.  And I might think that this product is infringing my

```
 1    patent.
 2            So the way we determine that is you would look at
 3    the accused product and you would compare it to the claims
 4    to see if it has each and every element of the claims.
 5    Q   So let's go ahead and walk through that process.  Start
 6    with the first element.
 7    A   So you would look at product -- you first look at the
 8    patent.  The patent says you have to have a volume adjuster.
 9    So do these earbuds have a volume adjustor?  It turns out
10    they do.
11            So it may be -- this is starting to look a little
12    bit like my invention?
13            Does it have a left earpiece and right earpiece?
14    Well, it clearly does.  So this starts to look a lot like my
15    invention.
16            And then we come to the last element, which is an
17    audio jack.  So the headphones I invented, you had to plug
18    in.  You had to plug into an audio source.  These ones are
19    wireless, so they communicate via radio to some base station
20    that transmits the music.
21            So the accused product here would not have this
22    last element because it doesn't have an audio jack and
23    instead, they're wireless.  Because it's missing this one
24    element, these new earbuds would not infringe my headphone
```

1    patent.

2    Q    So even though you have three out of the four elements,

3    that's not good enough for infringement?

4    A    Correct.  You have to have all of them.  No matter how

5    long the claim is, no matter whether you think an element is

6    complicated or simple, you have to have them all in order to

7    infringe.

8    Q    Well, if you looked at the wired headphones, the patent,

9    and you made an improvement by making the wireless

10   headphones, how come that's not infringing?

11   A    It's not infringing because your improvement, we say,

12   took it outside of the patent.  And specifically what that

13   means is your improvement was that you didn't do something

14   that was in the original patent, and instead, you did

15   something different.

16   Q    So how does that relate to the fence that you showed

17   earlier?

18   A    Well, what it says is that maybe we're awfully close to

19   the fence, but you are on the other side because the fact

20   that your headphones are wireless and the patented

21   headphones were wired -- or sorry, had an audio jack, means

22   that you are not on the infringing side of the fence.

23   Q    Let's look at the next slide.  What's this wall of text

24   that we're looking at?

1    A    Well, this unfortunately is a wall of words.  This is

2    the entirety of claim 3, which is one of the claims that's

3    asserted in this litigation.

4    Q    And you just mentioned being close to the fence.  Is

5    Cisco UCS close to Egenera's fence?

6    A    In my opinion, no.  And I think the evidence that I'll

7    walk through shows that Cisco purposely tried to go way away

8    from the fence for good technical reasons, for reasons

9    that -- they wanted to have their system to have benefits

10   that they could only get by doing things fundamentally

11   differently than what Egenera did.

12   Q    Okay.  Why is Egenera's claim 3, why is it so long?

13   A    Well, when -- as we heard in that video, when you apply

14   for a patent, there is some back-and-forth between the

15   inventor and the patent office where they discuss the

16   invention.  And if the patent examiner thinks that somebody

17   already invented what you did, you don't get a patent.  And

18   so an examiner may think, well, the way you're defining your

19   invention, someone else has already invented that, and you

20   can come back and say, well, let me make my definition of

21   the invention more specific.  I'll add more detail to it,

22   and maybe by adding more detail, then you can get a patent.

23        And that's what happened here.  Egenera had to add

24   a lot more detail to their definition of the invention in

1  order to get a patent.

2  Q   Are these claims, are they in the patent that the jury

3  has in their binders?

4  A   Yes.  This is -- at the very back of the patent, these

5  are these numbered paragraphs.  So the one that is numbered

6  three, which starts at the bottom of one column and goes to

7  the top of the next column is what's reproduced on the

8  slide.

9  Q   Okay.  So now I see here on the next slide that you've

10 highlighted a couple of portions of the claim.  Why did you

11 do that?

12 A   What I've highlighted here are three particular elements

13 of the claim that I'm going to focus on this morning, and

14 I'm going to make the case that Cisco does not do these

15 three elements.

16         Specifically, it does not program the CPUs to

17 establish a virtual local area network topology.  We haven't

18 talked about some of these other elements as much, but we

19 will.

20         There is a notion of identifying the corresponding

21 storage address in the storage area network; Cisco does not

22 do that.  And then there is a notion of having to modify

23 communication messages that are going out to an external

24 network like the internet, and UCS does not do that.

1   Q   Now, just because you're giving these three examples,
2   does that mean you think the rest of the claim elements are
3   all in UCS?
4   A   No.  I had issues with many of these claim elements.
5   These are just the three that I'm going to focus on this
6   mourning.
7   Q   Let's turn to the next slide.  Now we're at 48.  It
8   looks very similar to the previous slide.  What are you
9   showing here?
10  A   This is another wall of words, but the key thing is in
11  the upper left-hand corner, you can see that I've
12  highlighted this number 7.  So this is a different numbered
13  paragraph, and this is the body of the second claim that's
14  being alleged to be infringed.
15          It's worded differently, but for these three
16  elements that I'm going to focus on, they're also in claim 7
17  in more or less the same language.
18  Q   So are you going to walk through each of these claims
19  separately or are you going to do it together?
20  A   No.  The advantage of focusing on these three elements
21  is they're virtually the same between claim 3 and claim 7,
22  so we can just deal with them once in claim 3, and that
23  analysis will apply to claim 7.
24  Q   Is that what Dr. Jones did also?

1   A    He did the same approach as well.

2   Q    Okay.  Which one of these requirements of the claims are

3   we going to start with?  I think this is the one that we've

4   been hearing a lot about so far.

5   A    Yes.  Let's start with the one that we've been hearing

6   the most about, this notion that you have to program the

7   CPUs to establish the network topology.

8   Q    Okay.  We've got this -- looks like a court order.

9   What's this about?

10  A    This is a court order.

11          When there is a dispute in a patent case about the

12  meaning of what certain terms mean, his honor will help

13  guide the analysis by defining some of the terms for all of

14  us.  And in his order, this is where he defines the term

15  "computer processor."

16          So in the claim language itself, it uses the term

17  computer processor, and the court said that computer

18  processor will mean a CPU, and so that's why we've been

19  using computer processor and CPU interchangeably.

20  Q    Did you apply the Court's constructions or definitions

21  for your whole analysis in this case?

22  A    Yes.  All of my analysis I applied -- I'm just showing

23  one construction here.  There were many others.  I applied

24  all of them.

1    Q    And Dr. Jones mentioned a person having ordinary skill

2    in the art.  Did you apply that in your analysis as well?

3    A    I did.

4    Q    What does that mean?

5    A    What it means is that when you're trying to understand

6    what a claim means or what it covers, you interpret the

7    language through the lens, if you will, of a person of

8    ordinary skill in the art.  So the fact that I might have a

9    Ph.D. and I've been an academic for a long time, I read the

10   patent as if I was essentially one of my graduate students,

11   or someone who has the level of skill that Dr. Jones

12   articulated.

13   Q    Okay, with that in mind, let's go back to the specific

14   claim language that we're focused on.

15              What are you showing the jury here in your slide

16   51?

17   A    So this is just another blowup of a portion of claim 3

18   and claim 7, the two claims at issue, and this is just

19   highlighting where in the claims the language that we're

20   going to focus on here, which is this notion of programming

21   the set of computer processors to establish the specified

22   local area network topology.

23   Q    All right.  So before we get into it in detail, at a

24   high level, why don't you think this programming the CPUs

1    element is met?

2    A    Because it all comes back to a fundamental design

3    difference between UCS and Egenera.

4         Egenera wanted to make servers where you could

5    create networks or processors.

6         Cisco wanted to do the more traditional approach of

7    making networks of servers, and because Cisco is making

8    networks of servers and not processors, they don't program

9    the processors to establish the network topology.

10   Q    And we've heard about some of benefits of using Cisco's

11   approach versus Egenera's throughout this trial?

12   A    Yes, and there are benefits that will befall Cisco

13   because they're using this traditional approach of just

14   making a network of servers.

15   Q    Now, we heard earlier that it took Egenera a long time

16   to get this patent, I think they said five years in the

17   patent office.  Have you looked through all of that?

18   A    Yes.  The record of goings on in the patent office as it

19   relates to this patent is a public document.  Anybody can

20   get it.  And I received a copy of it and reviewed it.

21   Q    Now, was this requirement of programming said

22   corresponding set of processors to establish the virtual

23   local area network topology, was that in Egenera's patent

24   from the beginning in the claims?

1    A    No.  When they initially went to the patent office and

2    asked for a patent, they were defining their invention much

3    differently, and I have a slide that illustrates the

4    language, or part of the language, from the initial

5    application.

6            So what I'm showing here is just a portion of the

7    original claim language, and we can see here that what they

8    were originally -- how they were originally defining their

9    invention was that there was logic to define this virtual

10   processing area network, and it contained a virtual local

11   area communication network.  So they were just claiming the

12   communication network rather than the means by which you

13   establish the network.

14   Q    So what we're showing here, this January 7, 2002 which

15   is JTX-2 at page 44, this is what Egenera initially was

16   trying to get?

17   A    Correct.

18   Q    Now, after Egenera tried to get the patent with the

19   language that we see here, what happened?

20   A    Well, the patent office reviewed this application, and

21   they said, I'm sorry, but someone else has already invented

22   what you're claiming to have invented.  So because someone

23   else had already done what Egenera was claiming, Egenera

24   could not get a patent.

1    Q    Okay.  Let's look at the next slide, and this is JTX-2

2    at page 109, and you highlight here Office Action Summary.

3    What's that all about?

4    A    So when the patent office takes an action, they issue

5    this document that's called an "Office Action," and here,

6    it's a document with a bunch of checked boxes.  And the key

7    thing here is that the patent office is telling Egenera that

8    the claims that they have used to define their invention,

9    claims 1-20 are rejected, meaning you can't have a patent on

10   those claims.

11   Q    So is that the end of the story, or what happens next?

12   A    No.  Egenera is free to edit their claims, to rewrite

13   them, and that's called making an amendment.  So they can

14   amend their claims to try and add more detail, more specific

15   information to try and convince the patent office that with

16   this additional detail, now we have something that's really

17   new.

18   Q    So is that -- using your fence analogy, start with a big

19   fence and the patent office said no, no, that's not all your

20   property, then you have to make your fence smaller?

21   A    That's the analogy that's often used, that often when

22   you go to the patent office, you take a very grandiose view

23   of your invention.  You say it covers all of this territory.

24   And the patent office may say, no, huge chunks of that

1    territory are already owned by somebody else, you need to

2    reign in your fence, and you do that by making your

3    definition of your invention more specific.

4    Q    Okay.  So let's go to the next slide.  This is the same

5    JTX-2 at page 132-134.

6          What are you showing here?

7    A    This is another type of proceedings in the patent office

8    where, if an inventor disagrees with an examiner, they can

9    reach out to the examiner and they can have a discussion,

10   and the patentee, the inventor, can try and convince the

11   patent examiner, no, we really, really do have an invention

12   here.  And when they have a meeting like this, it's called

13   an interview, and the examiner will write a summary of that

14   interview, and that summary becomes part of the records in

15   the patent office.

16   Q    And why do you have the red underlining on the screen on

17   the bottom there?

18   A    So what I'm underlining here is that this was a

19   constructive interview, and as a result of the interview,

20   the examiner is recommending to the applicant, to the

21   inventors, that they change their claim language to focus on

22   some specific things.

23          And one of the things that they're suggesting that

24   they focus on is the -- is how these processors create the

1    virtual processing network.

2          So essentially what they're saying is, add more

3    implementation details into your patent, into your claims,

4    and then maybe you'll get a patent.

5    Q   Okay.  So let's move from slide 54 to slide 55.  Did

6    Egenera actually do that?

7    A   Yes.  I think it's fair to say that they followed the

8    examiner's advice and they amended or edited their claims,

9    and what I'm showing here is the edited claim.

10         This is stylized text.  It's used in the patent

11   office.  The way it works is you repeat the original text,

12   and then anything you want to get rid of, you don't just

13   delete it, you strike it out with a line through it.  And

14   then anything you add, you underline.  So all of the text

15   that's lined through, that was deleted, and all the text

16   that was underlined is added.

17         So they made a number of additions to the claim,

18   and the one that I'm highlighting in yellow is that this is

19   where they added the requirement that or -- part of the

20   definition of their invention is that you have to program

21   the computer processors and the internal communications

22   network to establish the specified virtual local area

23   network topology.

24   Q   And why is it -- so the underlining means they added

1    language and the strike-through means they deleted it?

2    A    Correct.

3    Q    And why is it important to show that Egenera added this

4    requirement after the patent office said you can't have a

5    patent without it?

6    A    Because what it shows is that this claim element that

7    we've heard so much about is really important, that if

8    Egenera had not added, had not made this amendment, they

9    probably would not have received the patent.

10   Q    Okay.  Let's go to the next slide here.

11         Last week when the trial started, Mr. Desmarais

12   told the jury that Bedrock Fact Number 2 was this patent

13   claim requires that you set up a network by programming the

14   CPUs, and that element was added to the claim in a meeting

15   or, in a meeting, and after the meeting at the patent

16   office, and Egenera wouldn't have a patent if that wasn't in

17   the claim.

18         Do you agree with that?

19   A    I do.

20   Q    Has anyone at this trial disputed that?

21   A    I don't believe so.

22   Q    Okay.  Let's go to the next slide here and turn to the

23   language that was added to see if UCS does that.

24         Why does Cisco -- well, does Cisco UCS do that?

1   A   No.  As I've said several times now, Cisco UCS does not

2   do this because they're building networks in a fundamentally

3   different way.  They're building networks of servers, not

4   networks of processors.

5           Cisco UCS will program the network interface card,

6   not the CPUs.

7   Q   Well, how do you know that network interface cards and

8   CPUs aren't the same thing?

9   A   Well, I know that as a technologist based on all my

10  experience, but the patent itself differentiates, explicitly

11  differentiates, between network interface cards and

12  processors.

13  Q   And so is the patent's differentiation, is that

14  consistent with your experience as a computer scientist?

15  A   It is.  And this is an example of a differentiation,

16  that the patent is listing processors and network interface

17  cards, the yellow boxes and the blue boxes, it's listing

18  them as separate devices.  The processors are 106 and the

19  network interface cards are labeled 107.  They're separate

20  devices.

21  Q   So the text that you have, that's from the column and

22  then it has numbers that corresponds to the figures, is that

23  how it works?

24  A   Yes, that's how it works.  When we cite the patent, we

1    refer to the column number, and then you'll notice between

2    the columns, there's line numbers, and so that's a cite to

3    column 3 and lines 13-20.

4    Q    Now, did you also review -- we've heard a lot about this

5    at this trial already, so I won't belabor it.  But did you

6    also review documents that describe Cisco's programming of

7    the network interface card versus the CPU in order to

8    establish network topology?

9    A    Yes, I looked at several documents that confirm that

10   Cisco programs the network interface card.

11   Q    So I've turned to the next slide 59.

12          Let's just remind the jury, what are you showing on

13   the top on the left side of the slide before we get to the

14   right side?

15   A    Just to orient the jury in terms of where things are

16   happening on a UCS server, I have a picture of my

17   Magna-Board that's more or less configured the way that I

18   just configured it.

19   Q    And what is the right side of DDX-559, which is JTX-182

20   at 84.  What's that showing?

21   A    This is some screenshots of the UCS Manager program, and

22   we heard that the manager program is what allows a user, a

23   customer, to assign MAC addresses to create virtual NICs and

24   assign MAC addresses to those virtual NICs.

1   Q   And remind us again, where is that VNIC or virtual NIC,

2   where is that located on the server?

3   A   It's on the physical network interface card as shown in

4   the figure on the left of the slide.

5   Q   Okay.  And does Dr. Jones agree with you on that?

6   A   Yes.  I think we are in agreement on this, that the

7   actual virtual NIC creation happens on the physical NIC.

8   Q   How about the testimony of Mr. Dvorkin and

9   Mr. Jayakrishnan, is that consistent with your analysis?

10  A   Yes.  When I read their deposition transcripts, they --

11  their testimony about how virtual NICs are created is

12  consistent with my -- results of my analysis.

13  Q   So both Cisco's engineers and Egenera's witness agree

14  that the VNIC is located on the network interface card; is

15  that right?

16  A   Yes.  I think everyone is in agreement with that.

17  Q   Okay.  Let's look at what Dr. Jones is saying, since

18  he's got to be saying something here.  So he was asked this

19  question, "Why is programming the NIC equivalent to

20  programming the processors?"

21          Let me start with your answer.

22          Do you think programming the network interface card

23  is equivalent to programming the CPU in order to establish

24  the network topology?

```
1    A    No.  Programming a CPU is straightforward, and
2    programming a network interface card is not programming a
3    CPU.  They are completely separate devices.
4    Q    Let's look at -- so Dr. Jones, I think he was talking,
5    before we got to his answer, he was talking about a bunch of
6    different physical components, but I highlighted the bottom
7    part, which I think goes to the heart of what he's saying,
8    they're equivalent.  So let's start with the first part.  He
9    says, So they're within the same enclosure.
10          Does the fact that the CPUs and the network
11   interface cards, that they're in the same physical server
12   box, does that make the programming of the two equivalent?
13   A    No.  The fact that they're in the same enclosure really
14   has no bearing on this question.
15   Q    How about his second reason?  He says, "The virtual
16   interface cards," and that's, again, another word for
17   "network interface cards," he says "they're not independent
18   of the CPUs."  Do you agree with that reasoning?
19   A    No.  I don't.
20          As I explained when we were at the magnet board, if
21   a CPU, for example, fails on a UCS server, the UCS Manager
22   can communicate with the physical network interface card to
23   migrate the identity of that server to a new server.
24          So even though a CPU may have failed, the network
```

1    interface card can still receive and transmit data over the

2    network.

3    Q    Okay.  Let's go to the next slide, and I want to show

4    the jury what Nuova has been saying since way back in 2006.

5    This isn't a new thing.  What are you showing the jury here?

6    This is JTX-187 at 15?

7    A    This is a document that the jury has seen before in this

8    case.  It is an internal document from Nuova, from 2006.

9    This was what was called a PRD, and this is about system

10   management.

11          And in this particular section of the document,

12   what I've highlighted here is that Nuova is documenting that

13   their platform differs significantly from Egenera.

14          So they have some understanding of Egenera's

15   platform, and they're purposely trying to be different than

16   Egenera.  And one of the ways in which they're trying to be

17   different directly relates to this claim element.

18          And in this blow out towards the bottom, what I've

19   highlighted here is that they're saying that Egenera relies

20   on low-level agents and drivers running on the server.  And

21   we've heard a lot about that.  That means that you modify

22   the operating system.

23          So Egenera is relying on modifying the operating

24   system because -- they need to do that because ultimately

1    the CPUs that execute the operating system are going to be

2    establishing the network topology.

3            Nuova does a completely different approach.  They

4    rely on --

5            MR. THOMASES:  Objection.

6         Your Honor, in limine number 9 on this?

7            THE COURT:  No, I think he's all right.

8    Q    You can keep going.

9    A    Thank you.

10           Nuova is relying on what they call out-of-band

11   mechanisms, meaning off of the CPU, and in particular via

12   Menlo and Palo.  Remember, Menlo and Palo were the code

13   names for the network interface card.

14           So the net of this is that it's saying that they're

15   explicitly documenting that Egenera is going to rely on

16   software as part of the operating system.  Nuova is going to

17   relay on hardware on the network interface card.

18   Q    Okay.  Now, this looks very familiar on the next slide.

19   Why are you also showing JTX-201 at page 42 and 43?  This is

20   slide 65.

21   A    Yes.  This is virtually identical text, and I'm just

22   highlighting this because even in future documents, they're

23   still calling attention -- Nuova is still calling attention

24   to the fact that there are noticeable differences.

1          And here I would also so notice in the highlighted

2     text at the top that they're talking about differences in

3     philosophy.

4          So that means that, you know, they're really

5     thinking about the system differently than the way Egenera

6     thought about its system.

7  Q    So Egenera has suggested that because Mr. Sethi who came

8     from Egenera wrote this document, that somehow means that

9     UCS is a copy.  Does that mean that UCS is a copy?

10 A    No.  This text, as I say, is virtually identical to the

11    text in the previous document that I understand was written

12    by Mr. Dvorkin.

13 Q    And does it say it's a copy or does it say it's

14    different?

15 A    No, it's -- again, it's explicitly calling out that

16    they're different, and again, they're different because of

17    different philosophy.  They're thinking about this

18    differently, and, therefore, the system is going to be

19    fundamentally different.

20 Q    Okay.

21         MR. PACKIN:  Now, you have some green things here.

22    Sorry about that.

23      Let me just go to the ELMO because I think somehow the

24    slides got switched, and we'll get back to the slide deck in

1    a minute.

2        Mr. Herzka, while we're on this one, can you make sure

3    the other slides are okay also?

4

5    Q    Okay, so we're on slide 66.

6            Just to recap, how does this relate, this whole

7    thing that you've been talking about, relate to Figure 1?

8    A    So it relates to Figure 1 because what I'm trying to

9    illustrate here is that the Egenera approach was to focus on

10   the CPU and programming the CPU because they wanted to make

11   a network of processors.

12           And the Cisco approach was to make a network of

13   servers, so they focused on the network interface card; and

14   the network interface card is not the same as the CPU, and

15   the patent acknowledges that the network interface card is

16   not the same as the CPU.

17   Q    Okay.  So where does that -- where does that leave us

18   with respect to this element of programming the CPUs to

19   establish the network topology?

20   A    Well, these are the reasons why I say that Cisco does

21   not program the CPUs to establish the virtual local area

22   network topology because it's being done in UCS via the

23   network interface card.

24   Q    Okay.  I'm going to the next slide, and this is what

1    Mr. Desmarais told the jury at the beginning of last week

2    regarding Bedrock Fact Number 3.

3              Do you agree or disagree with that?

4    A    I believe all of this is a correct and true statement.

5    Q    So Cisco UCS does not set up the network by programming

6    the processors?

7    A    Correct.  Because they're not trying to make a network

8    of processors.

9    Q    How about the fact that UCS programs the network

10   interface cards and the network interface cards were

11   designed at Nuova?

12   A    That is a fundamentally different approach, and because

13   it is a fundamentally different approach, Cisco does not

14   need to and does not program the CPUs.

15   Q    And what does that mean with respect to -- I mean, I

16   think we all agree that the NIC is not a CPU at this point,

17   right?

18   A    I would hope so.

19   Q    What does that mean with respect to infringement?

20   A    It means that UCS cannot infringe claims 3 and 7 of the

21   '430 patent because it does not contain this important

22   element that was added to the claims in order to get the

23   patent to issue.

24   Q    And so are we done with the first reason?

1   A   Yes.

2   Q   Okay.  Let's --

3        MR. PACKIN:  If we can go back to Mr. Herzka, I

4   think we have that figured out.

5   Q   We're on slide -- okay, so are we going to stop there?

6   A   No.  We're going to -- I'd like to talk about two more

7   claim limitations, the first one being one that we haven't

8   heard a whole lot about, but it's this notion of -- that

9   addresses have to be translated in the patent and part of

10  that process you have to identify a corresponding storage

11  address.

12  Q   And what are you showing here with respect to the claim

13  language?

14  A   These are excerpts of claim 3 and claim 7, and I'm just

15  highlighting in blue where the specific language that I'm

16  going to be talking about is located in the claims.

17  Q   Okay.  Let's look at the next slide.

18       What part of Figure 1 are we talking about?

19  A   So now we're going to talk about the lower right-hand

20  side of Figure 1 that says "SAN" in it.

21       And "SAN" is yet another acronym.  It stands for

22  "storage area network," and you can think about this as,

23  this is where the discs live, this is where the data lives

24  within the Egenera system.

1    Q    Okay.  So now we're on slide 76.

2         This is the board that Dr. Jones showed to the

3    jury; is that right?

4    A    Yes.  I actually couldn't see the board from where we

5    were sitting, but I understand this is the board.

6         MR. PACKIN:  I'm going to go back to here so we can

7    figure out -- because I said "76" because I see that on the

8    screen, but I think in our binders, I think it's 73.

9         So can we go back to the ELMO, and we'll do it this way

10   so we can get that sorted out.  This is the nontechnological

11   approach.

12   Q    Okay, so this is slide 73.  So why are you putting this

13   red box on Mr. Jones' exhibit?

14   A    This is what I understood Dr. Jones to be pointing to as

15   the messages that are involved in the identifying of the

16   corresponding storage address elements of the patent.

17   Q    Okay.  And let's go through these one by one and start

18   by zooming in here.  I think we could just zoom in, or I

19   could just do this.

20        Now, why did you put a box on the FLOGI to FDISC?

21   A    Just because this is one of the messages that I believe

22   Dr. Jones pointed to as saying that there is going to be an

23   address translation as part of an FLOGI message coming into,

24   say, the fabric interconnect and an FDISC message coming out

1    of the fabric interconnect.

2    Q    And what's -- remind us, what is required for the claim

3    element, what needs to go into it?

4    A    The claim elements exists because in the patent, you had

5    one type of network on the internal side and another type of

6    network in the storage network, and as messages would come

7    from the internal network to the storage network, because

8    they were different types of networks, there had to be some

9    translation of the messages, and part of the translation was

10   you had to translate addresses, and part of the process of

11   translating addresses was you would identify a corresponding

12   address for an incoming message.  And I've highlighted the

13   FLOGI versus FDISC because this message can't satisfy this

14   limitation because neither FLOGI or FDISC are actually

15   addresses.

16   Q    Okay.  And did Dr. Jones actually agree with that when I

17   asked him questions?

18   A    He did.

19   Q    And so what does that mean with respect to the FLOGI and

20   FDISC as it applies to this particular limitation?

21   A    It means that particular message can't satisfy this

22   limitation because it's not an address.

23   Q    Okay.  Let's go, we're going to go through these one by

24   one.  What are you showing in the red box here, the box in

1    red?

2    A    This is what I understood was Dr. Jones' second example

3    of how this limitation might be met, and here he was showing

4    a message coming into a network interface, and a particular

5    tag was added to the message called a VN-Tag; and then as

6    this message left the fabric interconnect, the tag was

7    removed.

8    Q    And does Dr. Jones agree with you that the VN-Tag was

9    removed?

10   A    Yes.

11   Q    So there is no dispute that the VN-Tag does not go

12   outside the fabric interconnect?

13   A    Correct.  The claims are going to require that you

14   translate the address, and then the address go all the way

15   to the storage network.  So here, if the alleged

16   modification or alleged translation was adding a VN-Tag, he

17   agrees that the VN-Tag was taken off.  So the VN-Tag does

18   not go to the storage area network, and therefore, it can't

19   satisfy this claim element.

20   Q    All right.  So let's go to the last thing.  Surely

21   there's something that we should be talking about here.

22            What's the last thing that you boxed in red?

23   A    The last one was -- I understood Dr. Jones to claim

24   there is a third type of message that -- for which there is

1    an address translation identifying the corresponding storage

2    address.  And this is a message that goes into the fabric

3    interconnect with a VLAN ID and comes out with something

4    called a VSAN ID.

5    Q    Okay.  Now, are VLAN IDs and VSAN IDs, are those

6    addresses?

7    A    No.  In the field, they're most commonly referred to as

8    tags.

9    Q    And is that actually -- when Dr. Jones was giving his

10   explanation, is that the words that he actually used?

11   A    Yes, he referred to these IDs as tags.

12   Q    How about Mr. Brownell when I asked him the question,

13   what did he say?

14   A    Well, we can see his testimony here, and he thought it

15   was called a tag, and he was just unsure whether or not it

16   was an address.

17   Q    Okay.  So now, given that everybody knows that these

18   things are tags, how is Dr. Jones saying that these tags

19   could possibly be addresses?

20   A    Well, he's not saying they're addresses.  He's simply

21   saying they act as addresses.  And I would disagree with his

22   statement.

23   Q    And why is he saying that they act as addresses?

24   A    Well, I believe his more fulsome testimony was that

48

```
1    they're involved in -- I think he phrased it as "the routing
2    of the messages."
3    Q   And do you agree with that?
4    A   No.  I don't.
5    Q   Okay.
6              And let's look what Mr. Chen said.  So we all saw
7    Mr. Chen's testimony last Friday.  It was long, but I think
8    this one is actually a relatively clear example.  What is
9    Mr. Chen telling us here?
10   A   Right.  So Mr. Chen was the one that gave us that fairly
11   dense set of testimony.
12             What he's saying here is that the VLAN ID of a
13   packet coming into the fabric interconnect is not used in
14   making a forwarding decision.
15             And so, I think this contradicts Dr. Jones' claim
16   that things like VLAN IDs are used for the routing of
17   packets.
18   Q   So Mr. Chen is specifically saying that the VLAN IDs are
19   not used as addresses?
20   A   Correct.
21   Q   Okay.  Let's try again with the slideshow.  We're
22   keeping it dynamic here.
23             This one is good because we have animations on this
24   one, so just in time.  Let me just make sure I'm at the
```

1    right place.

2           Okay.  I want to talk to you about how else you --

3    what else you looked at to figure out whether there was any

4    basis to say that VSAN or VLAN IDs are equivalent to storage

5    addresses.  Did you look at the patent itself?

6    A    I did, and the patent does not say that VLAN IDs are

7    storage addresses -- or VSAN IDs are storage addresses.

8    Q    How about Cisco's documents, what do Cisco's documents

9    say about whether or not VSAN IDs are storage addresses?

10   A    I didn't find any Cisco documents that say VSAN IDs are

11   storage addresses.

12   Q    Did Dr. Jones show any?

13   A    I don't believe he did.

14   Q    How about Egenera documents, what did Egenera documents

15   say about whether VSAN IDs are storage addresses?

16   A    They talk about VSAN IDs, but they never say that the

17   VSAN ID is a storage address or equivalent to a storage

18   address.

19   Q    I think you said VSAN.  I think you meant VLAN ID,

20   right, Egenera's documents?

21   A    Egenera's, yes.  They don't say for either VLAN or VSAN,

22   they don't say either is a storage address.

23   Q    Okay.  And did Dr. Jones show us any documents, Egenera

24   documents, that say a VSAN ID is a storage address?

```
 1    A    I don't believe he did.

 2    Q    How about Cisco's VSAN patents, do those say that VSAN

 3    IDs are storage addresses?

 4    A    So we haven't talked about this, but Cisco actually has

 5    patents on VSAN technology, and those Cisco patents do not

 6    say that VSAN IDs are equivalent to -- are network addresses

 7    or are equivalent to addresses.

 8    Q    And you have "required feature" on the bottom.  What

 9    does that mean?

10    A    It just simply means that the operation of UCS that

11    Dr. Jones was pointing to that will result in the message

12    that he's relying on is not a required feature.  It's

13    optional in UCS.  So it's not a central part of UCS.

14    Q    So all the jury has to go on is Dr. Jones' say-so?

15    A    Yes, that appears to be the case.

16    Q    Let's look at what Egenera's inventors said about VSAN

17    and VSAN IDs.  What did they say?

18    A    Well, essentially they said that these were not part of

19    their inventions.  They did not invent VSAN or VSAN IDs.

20    Q    Okay.

21         If we look at the next slide.  I think you

22    mentioned Cisco's patents earlier, and I just have to do

23    this Exhibit thing for the record first.

24         MR. PACKIN:  So DX-SD is JTX-564; DX-SH is JTX-565;
```

1    and DX-SK is JTX-566; and I offer those, your Honor.

2           THE COURT:  Very well.

3    **(Exhibit No. JTX-564 received in evidence.)**

4    **(Exhibit No. JTX-565 received in evidence.)**

5    **(Exhibit No. JTX-560 received in evidence.)**

6    Q   All right, so what are the documents that I just offered

7    in evidence?

8    A   I believe those are three patents that have been issued

9    to Cisco on some various aspects of VSANs, these virtual

10   storage area networks.

11   Q   And what do they tell you about who was using an

12   invented technology related to the VSAN?

13   A   It tells me two things, that Cisco has some innovation

14   in the space.  They have patents related to VSANs, and as I

15   mentioned, these patents never say, they don't equate VSAN

16   IDs with addresses.

17   Q   All right.  Well, let's take a step back here because

18   we've been talking about everything that's not an address.

19          Surely the messages need to have an address in

20   order to get to storage.  Do they have an address?

21   A   Of course.  I mean, we know that if a processor

22   generates a message for storage in the UCS system, it does

23   make it to the storage network.

24   Q   Okay.  Let's look at what Dr. Jones' packet capture

1   showed us, and what are you showing on this slide here on

2   the left and the right?

3   A   This is an excerpt from Dr. Jones' expert report where

4   he did what's called a packet capture of looking at packets

5   that are coming into the fabric interconnect and going out

6   of the fabric interconnect.

7         And this is not very easy to digest, but what I'm

8   highlighting here is some elements of the fibre channel

9   packet that comes into the fabric interconnect and the fibre

10  channel packet that goes out of the fabric interconnect.

11  And what I'm specifically calling out are these two fields

12  in the packet that are "D_ID" and "S_ ID."  The D stands for

13  destination, the S stands for source.

14        And what these are, are the addresses of the

15  destination; where is this fiber channel packet going to,

16  which particular node in the storage network.  And the S_ID

17  is who sent it.  So this is an identifier of an element of

18  the storage network that's on the server.

19        And the point here is just simply that the actual

20  addresses that are used to deliver the message to the

21  storage network -- to an element in the storage network

22  don't change.

23        The address coming in, the addresses on the left,

24  are exactly the same as the addresses on the right.  So the

1    addresses were never translated.

2    Q   So just to be clear, what do Dr. Jones' own tests

3    confirm with respect to this element of whether or not there

4    is identification of a corresponding storage address?

5    A   It confirms that the actual address that's used to

6    deliver the message to the element in the storage network

7    that's going to service this request does not change.

8    Q   Okay.

9    A   There's no address translation required, so there's no

10   identifying of the corresponding storage address.

11   Q   Why don't addresses, storage addresses, need to be

12   changed in Cisco's approach?

13   A   Well, that's a great question, because it goes to

14   another fundamental design difference between UCS and

15   Egenera, and in particular, to a networking technology that

16   Cisco invented and uses in UCS.

17   Q   Okay.  Let's give the jury a brief overview of that.

18           So what's that technology called, and I think we've

19   heard about it briefly earlier?

20   A   Yes.  It's called "fibre channel over Ethernet."

21           Fibre channel is the name of the protocol that's

22   used to talk on the storage network.  Ethernet is the name

23   of the protocol that's used to talk on the server side of

24   the storage network.  And Cisco invented something called

1    "fibre channel over Ethernet," which allows you to send
2    fibre channel protocol messages on an Ethernet network.
3    Q    Okay.  Let's take a look at how that fibre channel over
4    Ethernet works and how come it doesn't need to change these
5    storage addresses.  So let's start with the animation.  What
6    are you starting with here?
7    A    So the way fibre channel over Ethernet works is it uses
8    a technique that's called "encapsulation."  Encapsulation
9    just simply means you put one letter inside another letter.
10         So what I'm showing here is a server.  If a server
11   needs to communicate with a storage device, it's going to
12   generate an Ethernet message, and that's the blue envelope.
13   And inside that Ethernet message, it's going to put a fibre
14   channel message, and that's the orange envelope.
15         So we put the orange envelope inside the blue
16   envelope, and then send the blue envelope to the fabric
17   interconnect.
18   Q    So let's go ahead and do that.  What happens next?
19   A    Then as part of the fibre channel over Ethernet
20   protocol, the fabric interconnect is going to open up the
21   Ethernet envelope and it's going to take out the orange
22   fibre channel envelope, and it's simply going to look at the
23   destination address on the fibre channel envelope and then
24   just send the fibre channel message to the storage device

1    that has that address.

2            So because it's using this protocol, fibre channel

3    over Ethernet, it does not need to translate addresses, and

4    therefore, it doesn't perform the step of identifying a

5    corresponding address.

6    Q   Now, did Cisco have patents related to its innovative

7    approach of fibre channel over Ethernet?

8    A   Yes.  Cisco is recognized as the inventor of this fibre

9    channel over Ethernet protocol.

10           MR. PACKIN:  And your Honor, I offer DX-SG as

11   JTX-567.

12           THE COURT:  Okay.  So admitted.

13   **(Exhibit No. JTX-567 received in evidence.)**

14   Q   Actually, these names on the inventors of the Cisco

15   patent, I think we've heard about them at this trial.

16           Who is Mr. Luca Cafiero?

17   A   We have heard that name before, and my understanding is

18   that's the same Luca Cafiero that we've heard of who was one

19   of the founders of Egenera -- sorry, of Nuova.

20   Q   How about Silvano Gai.  I think I heard Mr. Dvorkin

21   mentioned Mr. Gai yesterday, right?

22   A   He did.  He was also at the time an employee of Nuova.

23   Q   So this patent is from July 2009.  How come it's

24   assigned to Cisco technology and not to Nuova?

1    A   My understanding is at this point in time Cisco had

2    acquired Nuova and undoubtedly acquired the patents that

3    they had.

4    Q   Let's look at what the Nuova original documents say

5    about whether or not Cisco is modifying an address.

6            What are you showing here on?  This is slide 88,

7    JTX-187 at 15.

8    A   This is the same document that we looked at before from

9    2006, this PRD document.  Again, this is a document that

10   explicitly calls out how Nuova wants to do things

11   differently than Egenera.  And one of the ways they want to

12   do things differently has to do with the way they do I/O.

13   "I/O" stands for input/output, and that refers, for example,

14   to communicating with the storage devices.  And they're

15   saying that in Egenera's model, they needed to use a

16   gateway.

17           So remember in the patent, they had one type of

18   network internally and another type of network on the

19   storage network, and they need to translate between them,

20   and that translation function happens in something that in

21   the field we call a "gateway."  A gateway is something that

22   sits between two different types of networks, and this

23   gateway converts the I/O.

24           So Egenera's model was based on a gateway to

1    convert I/O, and the Cisco -- or the Nuova approach at that

2    time, and today, was different, to not use a gateway.

3    Q    How does that relate to the patent element that we're

4    talking about in terms of identifying the corresponding

5    storage address?

6    A    If you can get away from using a gateway, you don't have

7    to perform the step of identifying a corresponding storage

8    address because the storage addresses that are going to be

9    generated by the processor can go all the way to the storage

10   network without having to be changed.

11   Q    And does Egenera dispute that it has this centralized

12   I/O gateway?

13   A    No.

14   Q    Mr. Brownell admitted that even here in this courtroom?

15   A    Correct.  Mr. Brownell, his name -- is the first

16   inventor on the patent, and he was asked if they had a

17   centralized I/O gateway and he agreed.

18   Q    Now, have you reviewed any Cisco documents about whether

19   or not Cisco has the gateway?

20   A    I have.

21   Q    Let's take some examples.  Now we're on slide 90,

22   JTX-200.  This is a unified fabric white paper fibre channel

23   over Ethernet.  What are you showing here?

24   A    This is, as it's labeled, it's a white paper.  So it's a

1    technical paper to help inform people about a technology,

2    and here, Cisco is saying that FCoE, this fibre channel or

3    Ethernet protocol, has now been adopted all players in the

4    SAN market.  So this is an important innovation that Cisco

5    has developed.

6         And they're specifically saying it's a solution

7    with no gateway.  So if you don't have a gateway, that means

8    there's no middle man, and that means you're going to get a

9    lot of benefits from that.

10   Q   Okay.

11        MR. PACKIN:  Can we have the document camera.

12   Q   So we've been hearing a lot about the Project California

13   book, and we've been seeing it on the projectors, but there

14   is a book, and I'd like to use the book itself.

15   A   Sure.

16   Q   Did you review this book as well?

17   A   I did.

18   Q   And if the jury wants to look at it, it's JTX-202,

19   right?

20   A   That's my understanding.

21   Q   Okay.  Let's look at page 94 of the book.  So that's 94.

22   And this is a section that's talking about fibre channel

23   over Ethernet.  And I don't think we have to go into the

24   details of the figure, but it has Figure 59.

1          So wait, FCoE, could you remind us?

2    A    That's our acronym, fibre channel over Ethernet.  It's

3    the way of transmitting a fibre channel message in an

4    Ethernet packet.

5    Q    And what is that telling us about whether or not Cisco's

6    patented approach requires a gateway?

7    A    So the FCoE technology, this fibre channel over

8    Ethernet, does not need a gateway, and that's a big

9    advantage.

10   Q    And in terms of whether or not addresses are changed,

11   what is it telling us about the actual FC frame, which is

12   the message that we've been talking about?

13   A    So FC here stands for fibre channel, and frame is sort

14   of another word for message.

15          And what they're saying is that because there's no

16   gateway, the fibre channel messages can go from the

17   processing side of your data center to your storage side of

18   your data center without being changed, whereas the patent

19   requires them to be changed because of the incompatible

20   networks that's using them.

21   Q    Is this a small difference from Egenera's patent or a

22   big difference?

23   A    It's a big difference.  As I say, a gateway is a

24   middleman.  And if you eliminate the middleman, things are

1    going to go faster and you'll be able to scale more, meaning

2    you'll be able to have a bigger data center.

3    Q   And so in addition to this not programming the CPUs, are

4    there other big fundamental differences between Egenera's

5    patent and UCS?

6    A   Yes.  This fibre channel over Ethernet is a big

7    difference.

8         MR. PACKIN:  Can we go back to the slide show.

9    Q   Now we're on slide 92.  What did Egenera's inventors

10   admit about fibre channel over Ethernet?

11   A   Well, they all admitted that they didn't invent.

12   Q   And so here you have the testimony of Mr. Smith,

13   Mr. Busby, Mr. Geng and Mr. Greenspan; those are all among

14   the long list of inventors?

15   A   Right.  If you look at the first page of the patent

16   where it lists the inventors, you'll see all these

17   individuals' names.

18   Q   Okay.  So let's just recap with respect to Figure 1.

19        How does what we're talking about relate to Figure

20   1?

21   A   So it relates to Figure 1 because in the Egenera

22   system -- in the Egenera patent, you had to have this

23   centralized I/O gateway in the control node to translate

24   addresses, and the address translation does not happen and

```
 1    it's not required in UCS system.
 2              And in particular, Dr. Jones has claimed that there
 3    is a translation because of the use of a VSAN ID, and in my
 4    opinion, VSAN IDs are not storage addresses.
 5    Q   And the storage, that's the bottom right, that's why you
 6    have the X there?
 7    A   Yes.  The storage network is at the bottom right.
 8    That's where the messages for this claim element are
 9    destined.
10    Q   Let's make sure that we go back to the claim language
11    and make sure that we're focused on the right thing.
12              What claim element does this relate to?
13    A   Again, these are excerpts from claim 3 and 7, so we're
14    sort of in the middle of each claim, and the text that's in
15    blue relates to this requirement that you identify a
16    corresponding storage address.  And so it's the text in blue
17    that I'm specifically saying is not in the UCS, the Cisco
18    UCS system.
19    Q   Okay.  So now let's move from slide 94 to 95.  Are we
20    done with this reason?
21    A   Yes, I believe we're done.
22    Q   Do you have other reasons?
23    A   I'm sorry?
24    Q   Do you have other reasons that Cisco doesn't infringe?
```

1    A    Yes.  I'd like to go through one last reason having to

2    do with this claim element that's about modifying

3    communication messages.

4    Q    Now, again, does the jury need to find all of these

5    reasons, or is just one difference -- I mean, these are big

6    differences.  Are one of these differences enough?

7    A    No.  Again, if you go back to my headphone example, if

8    you're missing one element of the claims, no matter how big

9    or how small that element is, there could be no

10   infringement.  So you don't have to find that all three of

11   these elements are missing to say there's no infringement.

12   You just have to find that one of them is missing.

13   Q    What's the next one that we're -- so we talked about the

14   storage addresses and storage network.  What's the next one

15   we're going to focus on here?

16   A    The next one has to do with how Egenera conceptualized

17   how you would communicate from processors inside the data

18   center to the outside world, to what they call the external

19   communication network.

20            And again, because Egenera was using this

21   proprietary internal network called Giganet, they again had

22   to modify messages to send those messages out to the

23   internet, which was largely based on Ethernet.

24   Q    And what is the claim language that this element relates

1    to?

2    A    It relates to the language that I've highlighted in

3    green, both in claim 3 and claim 7, that it's logic to

4    receive messages from computer processors and then modify

5    the received messages to transmit the modified messages to

6    the external communication network.  And again, we can just

7    think of the external communication network as something

8    like the internet.

9    Q    Okay.  Now, that's on slide 97.

10           Let's go to slide 98, and we're not going to go

11   into this in too much detail, but what is -- what are you

12   showing on slide 98?

13   A    So the language of this claim element in claim 3 is a

14   little different than in claim 7.  It's written in this form

15   that we've heard about called means plus function.

16           And the point here is that in the left-hand box at

17   the top I have the actual claim language.  And the court has

18   told us that the way you understand this claim language is

19   you have to find something that performs a specific

20   function, and that function is listed in the middle box, and

21   that function has to be performed with specific structure,

22   with specific components.  And that structure is in the

23   right hand box.

24           And the structure that's called out here is

1    structure that's in the patent, and I have an excerpt from a

2    figure that just shows the required structure.

3    Q    Now, we're going to focus on the function, but is this

4    structure also required in order to infringe claim 3?

5    A    Yes, you have to show that there exists a VLAN server, a

6    VLAN proxy, and a physical LAN driver.

7    Q    And you believe that Dr. Jones has shown any of that?

8    A    No, I don't believe he has.

9    Q    Let's talk about what's going on here.  So we've X'd out

10   the communications -- I'm sorry, the storage network on the

11   bottom.  Why do you have a red box on the IP network in

12   green on the top?

13   A    Because this is I think a good way to orient a

14   discussion, is that we're talking about, for this claim

15   element, its messages that are going to go from the

16   processors nodes out to the internet, and that's highlighted

17   in the green cloud that has "IP."  You may be familiar with

18   the term IP.  It stands for internet protocol.  As I say,

19   the green cloud, just think of it as the internet.

20          So you want to send messages that will originate

21   from processors, go across this internal network that's

22   called Giganet and make it out to the internet, which is an

23   Ethernet network.

24   Q    Let's show your animation here.  So what are we starting

1    with and where is it?

2    A    So if a processor wants to send data to some client on

3    the internet, it will first generate a Giganet message to

4    get across the data center to the control node.  So you

5    start with a Giganet message.

6    Q    Where does it go?

7    A    And it will ultimately go to the control node, where the

8    control node again has to do a form of translation or

9    modification of the message to get it into the form of

10   Ethernet.

11          So let me just illustrate that in this cheesy

12   little way of, we'll just erase the message and generate an

13   Ethernet message.  So the message is modified as it goes to

14   the external communications network.

15   Q    So let's go back to Dr. Jones' analysis where he talked

16   about the message modification.  Now we're focused on the

17   messages to the communications network as opposed to the

18   storage network, and so, let's Zoom in on that.

19          Why do you have X's on the VLAN ID the VSAN ID and

20   the FLOGI to FDISC?

21   A    Well, for our purposes of this morning, these bottom two

22   messages -- these are messages that are internal to the

23   storage area network.  These are not messages going to the

24   external communications network.  They're not going to the

1    internet.  So they can't satisfy the particular claim

2    element that we're focusing on.

3    Q    Okay.  So what's the one that -- the modification that

4    Dr. Jones pointed out with respect to the communications

5    network?

6    A    It was this one that we talked about before, about how a

7    message, as it leaves a server, as it leaves the network

8    interface card, it gets a tag added to it and how this tag

9    then is later removed by the fabric interconnect.

10   Q    Okay.

11          MR. PACKIN:  Your Honor, can Professor Jeffay come

12   down and use the magnet board to explain this to the jury?

13          THE COURT:  Yes, he may.

14          MR. PACKIN:  Thank you.

15   Q    So let's talk about this VN-Tag and show how the

16   messages start from the CPU and how VN-Tagging works.  We're

17   still in Cisco UCS now, so you have the messages here as

18   well?

19   A    I do.  So I just reconfigured the board here so that

20   this is the nonfailed version of the server.

21          So I have another magnet that is our Ethernet

22   message.

23          So a CPU will generate a message to communicate

24   with somebody out on the internet, could be responding to

1  request for web contents, could be the contents of a web

2  page.

3          This message will go to the network interface card,

4  to one of the VNICs, and the network interface card is the

5  one that's going to physically or electronically actually

6  transmit the ones and zeros.  But before it does that, it

7  will add a tag to the message.  So if I could get a post-it

8  there.

9  Q   There you go.

10  A   We're going to add a little tag to this, and it's a tag

11  called a "VN-Tag," and the VN-Tag will be added here by the

12  network interface card.

13  Q   Let me stop you for one moment.

14          I've got testimony on the screen here.  Does Dr.

15  Jones agree with you -- this is what the jury saw two days

16  ago.

17          Does Dr. Jones agree with you that the VN-Tag is

18  added at the virtual network interface card?

19  A   Yes.  I think there's no dispute that the tag is added

20  at the virtual network interface card.

21  Q   Okay.  So now let's take that message from the virtual

22  network interface card and continue along sending it out to

23  the external communications network.  What happens?

24  A   The VN-Tag is going to be used by the fabric

1    interconnect to process the message appropriately.  So the

2    VN-Tag is for internal UCS purposes.  And so, when it's in

3    the fabric interconnect as it's going to be transmitted out

4    of the fabric interconnect, it just simply takes the tag off

5    and then will transmit the message out to the internet.  In

6    so doing, the important point is that the message that

7    actually goes out to the internet is exactly the same as the

8    message that came from the CPU.

9    Q    And so what does that mean with respect to whether or

10   not the message that came from the CPU and the message that

11   went out to the external communication network, is that a

12   modified message that went out?

13   A    No.  The message that actually goes out to the internet

14   was not modified from the message that the CPU actually

15   generated.

16        The CPU generated this message, sent it to the NIC,

17   the network interface card.  The network interface card

18   added this tag.  The tag was used for processing the fabric

19   interconnect.  The fabric interconnect took off the tag and

20   sent the message.

21        So the message that's sent on the internet is the

22   same message that's being received.

23   Q    Dr. Jones showed us some packet captures showing the VN-

24   tag is on and then the VN-tag is removed.  Were those packet

1    captures wrong?

2    A   No, those packet captures were correct.  They're just,

3    unfortunately, they were taken at the wrong place.  He was

4    capturing the packets here essentially as they're on their

5    way into the fabric interconnect, and so at the time that he

6    captures the packets, this VN-Tag is, in fact, on the

7    packet.  I don't dispute that.

8         But the point is, what he's capturing is not the

9    message or the packet that was generated by the CPU.  He's

10   capturing the packet as it's been modified by the network

11   interface card.

12        So then, when he sees it leave the fabric

13   interconnect, the fabric interconnect takes off the tag, he

14   sees a difference between what's monitored here and what's

15   monitored here.  But that's not what the claim requires.

16   The claim requires that you're comparing the message that's

17   received from the CPU and to the message that goes out to

18   the internet, and those messages are the same.

19   Q   So what do Dr. Jones' packet-captures, what do those

20   tell you about infringement with respect to this element?

21   A   I don't think you can use those packet captures to

22   assess infringement because you're not measuring -- you're

23   not capturing the packet that came from the CPU.

24   Q   Okay.  I think we're good for this one.

1      So we've been talking about VN-tags, and Dr. Jones

2    accused Cisco infringing using VN-tags.

3           Who invented VN-tags?

4    A   So VN-Tags is yet another technology that was invented

5    by Cisco, and Cisco has patents on VN-Tags.

6    Q   Is that what you're showing here from Mr. Chen on slide

7    105?

8    A   Yes, Mr. Chen, remember, was the engineer that we've

9    heard from I think Friday with that very dense presentation

10   via video.  And he's saying yes, that VN-Tags were something

11   that was invented by Cisco.

12          MR. PACKIN:  And on the next slide, we've got DX-SM

13   which I'm marking as JTX-568, and DX-SO, which I'm marking

14   as JTX-569.

15        Your Honor, I offer JTX-568 and 569 into evidence.

16          THE COURT:  So admitted.

17   **(Exhibit No. JTX-568 received in evidence.)**

18   **(Exhibit No. JTX-569 received in evidence.)**

19   Q   Thank you.  What are you showing the jury here with

20   respect to these Exhibits?

21   A   These are two patents that Cisco was awarded by the

22   patent office for their innovation in the development of the

23   VN-Tags.

24   Q   All right.

1            Now, I want to switch gears here for a minute and

2    talk about the ramifications of Dr. Jones' infringement

3    analysis.

4            How do his accusations regarding VN-Tags impact the

5    validity, if at all, of the '430 patent?

6    A    So it's my opinion that the use of VN-Tagging is outside

7    of the '430 patent.  But if it's inside the patent and the

8    patent office knew how Egenera was interpreting their

9    claims, if they knew that they were interpreting their

10   claims to cover something like VN-Tagging, I don't believe

11   Egenera ever would have gotten a patent.

12   Q    So, in other words, if VN-tagging -- you know that

13   VN-Tagging can't be enough, because if it were, the patent

14   would be invalid?

15   A    Correct.

16   Q    Okay.  Let's look back at, we saw -- this is JTX-004 and

17   we talked about Aziz early on.

18           Can you just remind us at a high level what the

19   Aziz patent was?

20   A    This is a second patent by Aziz.  And Aziz was the

21   fellow that we talked about when we were talking about

22   virtual local area networks.  And Aziz was the fellow who

23   had invented this notion of a virtual server farm.  So he

24   calls his collection of servers, instead of a data center,

1    he calls it a virtual server farm, and in his virtual server

2    farm, he uses a form of tagging that's equivalent to what

3    Dr. Jones has accused of infringing.

4    Q    And you're showing that here on column 6, lines 47-51 of

5    Aziz?

6    A    Yes.  This is a call-out from the Aziz patent where it's

7    some background, and it's talking about how you can

8    interconnect devices with VLANs, and we talked a lot about

9    that.  And it's also mentioning that hardware devices, these

10   switches that support VLANs, are widely available, and in

11   particular, that Cisco sells switches that support VLANs.

12   Q    This Aziz patent, this came before Egenera's patent, is

13   that right?

14   A    Yes, this is a patent that predates Egenera's patent.

15   Q    And did the patent office know about this Aziz patent?

16   A    They did, and when Egenera was trying to get its patent,

17   Aziz was one of the patents where the examiner said, Aziz

18   invented what you did before you.

19   Q    So you can't have -- your fence can't go over there

20   because that's already in Aziz?

21   A    Right.  So the way they were originally writing their

22   claims, they were broad enough such that Aziz had already

23   done what they did.

24   Q    So let's turn to the next slide.  This is 109.

1        You've got two different dates here; June 2, 2006,

2   that's at page 152 of JTX-002, and October 18, and that's at

3   page 183 of the same exhibit.

4        Why are you showing the jury these two separate

5   excerpts, and what are you showing in each?

6   A   These are excerpts from the back-and-forth between the

7   Egenera inventors and the patent office.  And on June 22 of

8   2006, the examiner told Egenera, I'm sorry, but you can't

9   have a patent because Aziz did what you did, and so you're

10  going to need to change your claims.

11  Q   Then what happened in October?  You know, Egenera tried,

12  and then what happened again in October 2006?

13  A   So between June and October, Aziz -- Egenera tried to

14  convince the patent office that they had a patent, and in

15  October the examiner wrote back and said that they

16  respectfully disagree and that you still can't have a

17  patent.

18  Q   I think this is the first time we've heard of

19  "anticipated."  What does that mean?

20  A   "Anticipated" is a term in patent law that means that a

21  prior system, a prior art system, has each and every element

22  of your claim as your claim is currently written.  So,

23  informally, it means that someone else invented what you

24  did.

1    Q   Okay, let's turn to the next slide.  This is DDX-5.110.

2            You've got these letters, and this is the same

3    lettering sequence that Dr. Jones used in his analysis.  Why

4    are you showing these letters on claim 3?

5    A   What I'd like to do is to walk the jury through the fact

6    that the patent office said virtually all of claim 3 was

7    invented by Aziz before Egenera; and that, in fact, claim 3,

8    as it finally issued, only has one thing in it, one element

9    that the -- that Aziz did not have.

10   Q   Okay.  Let's walk through that analysis, and before we

11   get into the details, just at a high level, can you just

12   explain to the jury, what do you have on the right side of

13   this slide?

14   A   So on the right slide, I have the actual claim language

15   from the '430 patent for claim 3.

16   Q   And what do you have on the left side of the slide?

17   A   The left side are going to be excerpts from these office

18   actions, from the back-and-forth with the patent office, and

19   the right -- the left side is text that's written by the

20   patent examiner where the patent examiner is saying, This is

21   where the text on the right is found in Aziz.

22   Q   Okay.  Now, before we go through the exercise, at a high

23   level, what are you planning to do here?

24   A   I'm planning to walk through claim 3 and show that all

1   of the elements but one in claim 3, the examiner said were

2   in the Aziz reference, and that I agree with that analysis.

3   Q   Now, there a lot of text that we're going to go through,

4   and I don't think we need to read all.  If the jury wants to

5   look at the examiner's language and compare it themselves,

6   they can look at JTX-2 at page 152, is that right?

7   A   Correct.  My understanding is they will have this

8   document.

9   Q   Okay.  So let's start with what we're calling the "pre,"

10  which is the beginning of the claim that starts out with "A

11  platform for automatically deploying."  Is that in Aziz?

12  A   The examiner said it was at Aziz and pointed out where

13  in Aziz it could be found, column 6 of Aziz lines 28-65.

14  Q   And do you agree with that?

15  A   I agree.

16  Q   And just to be clear, have you looked at Aziz in detail

17  yourself?

18  A   Yes.

19  Q   How about the next element that we're showing in blue,

20  which is element a of claim 3, is that one in Aziz?

21  A   Yes.  The examiner found it in Aziz at column 6, lines

22  28 through 46, and I agree with the examiner's analysis.

23  Q   Let's go to the next one in green.  This is element b of

24  claim 3 on DDX-513, starting at least with control node.

```
 1              Is that one in Aziz?
 2    A    Yes.  The examiner said you can find it in figure 2 of
 3    Aziz, and I agree.
 4    Q    Is it only figure 2, or was there also text
 5    describing --
 6    A    There's also text describing figure 2 in the body of
 7    Aziz.
 8    Q    Now, you didn't highlight this element that we see as
 9    element c in DDX-513.  Why not?
10    A    Because this is something that Aziz did not have at the
11    time that the examiner was looking at as Aziz, and we'll see
12    this is text that they added to convince the examiner that
13    they were -- that they had something that Aziz hadn't
14    invented.
15    Q    Okay.  Let's keep going just to make sure we've got all
16    the other elements.
17              So we're on slide 114, element d of claim 3.  Was
18    that one in Aziz?
19    A    Yes.  That was in Aziz also at column 6 lines 28-65.
20    Q    And how about element e, which is highlighted in blue on
21    slide 115?
22    A    Yes, that was also in Aziz.  Again that same citation as
23    before.
24    Q    How about element f in the green at slide 116, was that
```

1    also in Aziz?

2    A    Yes.  Again, it's also in that same citation at column

3    6.

4    Q    And just to be clear, have you yourself also looked at

5    Aziz?

6    A    Yes.

7    Q    And you studied it and you agree?

8    A    Yes.  I wrote a report about Aziz.

9    Q    And let's look at the next element.  This is element g

10   on slide 115.

11         Is that one in -- I'm sorry.  I said 115.  I think

12   it's 117.

13         Is element g of claim 3 also in Aziz?

14   A    It is, and it's highlighted in purple on the left where

15   the examiner found it at column 5, lines 34 through column

16   6, line 18.

17   Q    Okay.  Now we're on -- it's a long claim.  Now we're on

18   element h, the orange element, slide 118.  Was that in Aziz

19   as well?

20   A    Yes, that was in Aziz at the same citation as before.

21   Q    Now, to infringe, all of these things have to be in UCS?

22   A    Yes.  For UCS to infringe, all of these elements that

23   we're going through have to be present in UCS.

24   Q    Let's keep going with Aziz because we need to be

1  complete here.

2          Element i, which is 119, slide 119.  It's claim 3.

3  Is that one this Aziz?

4  A   Yes.  The examiner found that in Aziz at that same

5  citation in column 5 through column 6.

6  Q   And how about element j on slide 120 highlighted in

7  blue, is that one in Aziz?

8  A   Yes.  That's in Aziz at column 26 through column 27 and

9  also at column 10.

10 Q   How about element K, which is on line 1 -- I'm sorry.

11 Which is on slide 151 highlighted in yellow, is that one in

12 Aziz?

13 A   Yes.  This is the last limitation, and this is also at

14 column 12 line 35 through column 13 line 16.

15 Q   Okay.  So now that we've been through all of those

16 elements -- well, before we get there, we didn't talk about

17 claim 7.

18          Are all these same elements, the corresponding

19 pieces in Aziz for claim 7?

20 A   Yes.

21 Q   Now, why did you -- taking a step back on slide 122, why

22 did you gray out all the elements except for what you

23 highlighted as C?

24 A   So everything that's grayed out is material that the

1      examiner said was in Aziz.  So all the gray stuff is stuff

2      that Aziz had already invented.

3   Q    Okay.  So let's look at the next slide.

4          What are you showing the jury with respect to that

5      element of modifying the received messages and transmitting

6      the modified messages?

7          This is on JTX-2 at 203?

8   A    So what I'm showing here -- so we know Egenera did get a

9      patent.  So they had to change their claims.  And this is

10     showing again another amendment that they made to convince

11     the patent office that they had an invention.  And here they

12     added this claim language that we're talking about here, the

13     logic to modify received message and transmit modified

14     message to the external communications network.

15  Q    Now, the underlined, did you add the underline to the

16     slide?

17  A    No, this is verbatim from -- again, it's called the file

18     history, the proceedings at the patent office.  So when

19     Egenera amended their claims, they wrote this and they did

20     the underlining.  I just did the yellow highlighting.

21  Q    Now, if tagging were enough, as Dr. Jones asserts, if

22     tagging were enough to beat the message modification, what

23     does that mean with respect to Aziz?

24  A    In my opinion, it means that Aziz would have, Aziz

1  included the tagging as Dr. Jones has claimed infringes in

2  UCS.

3  Q   Okay.  Let's take a look.

4          So now we have claim 3, that element c that we

5  didn't do before on the right hand.  We have some excerpts

6  from Aziz.  This is JTX-4 at column 21:31-51 at Figure 2.

7          What are you showing on the left side?

8  A   So the left is material from Aziz.  The first at the top

9  is Figure 2.  This is Aziz' representation of its virtual

10 server farm.  And you can see that it's strikingly similar

11 to the Egenera patent, or, since this came first, the

12 Egenera patent is strikingly similar to Aziz.

13         You have a storage area network on top in green

14 with some SAN switches.  You have some processing nodes in

15 yellow, and then you have some switches, VLAN switches that

16 are used to connect all of Aziz to the internet.

17 Q   Okay.  So what are you showing with the messages here on

18 the animation?

19 A   So what Aziz describes in the patent is that they use

20 VLAN technology, and in particular, they use IEEE standard

21 VLANs, which can include VLAN tags.

22         So as Aziz described their invention, they're

23 having VLANs, so as the packets will come from the compute

24 nodes and go into their network of LAN switches, they're

1    going to be tagged, they're going to have VLAN tags, and

2    then per the VLAN standard, those tags are going to be

3    removed when those messages transit to the internet.

4    Q   Very well.

5            Dr. Jones accuses VN-Tag, and we've been talking

6    about VLAN tag, does he say that the format -- is there

7    something special about the format of the tag that he's

8    accusing?

9    A   No.  I believe Dr. Jones is just relying on the fact

10   that a tag gets added and then a tag gets removed.

11   Q   And what did he tell us at this trial about the format

12   of the tagging being important?

13   A   The details of the tag, what's in it, what's

14   specifically out, isn't needed for his analysis.

15   Q   Now, was Aziz the only one to use VLAN tagging before

16   Egenera's patent?

17   A   No.

18           As I testified yesterday when I was describing what

19   VLAN's are, I mentioned the VLANs were incredibly common

20   before Egenera.  I used them in my lab.  And I showed some

21   references, in particular a Cisco book, that walks you

22   through step by step how to use VLAN's and VLAN tags.

23   Q   What are you showing here with respect to JTX-77, which

24   is the book, and JTX-80, which is Mr. Gai's patent which is

1    Cisco's patent also?

2    A   These are two documents I talked about yesterday.  The

3    first is the book by Cisco by this fellow Mr. Lewis that

4    goes into detail about how you use VLANs and VLAN tags, and

5    talks about a Cisco product, a catalyst 5000 switch that

6    supports VLANs.  And then we also talked about Mr. Gai's

7    patent that's related to topology management issues in

8    VLANs.

9    Q   And do you explain -- just for the record -- let me keep

10   going.

11          So given that tagging was already well-known and

12   used by Cisco, Aziz, and others, if the jury were to agree

13   that tagging is enough to meet the modification, what would

14   that mean with respect to the validity of the claims -- the

15   asserted claims of the '430 patent?

16   A   I would believe that it would invalidate the patent

17   because what's being accused of infringement is in Aziz.

18   Q   Now, if the jury believes Dr. Jones, would the claims

19   also be obvious?

20   A   They would be obvious, which means if you didn't think

21   there was enough information in Aziz, it would have been

22   obvious to combine Aziz with more detailed descriptions of

23   VLANs and VLAN tagging, such as the Lewis book that talks

24   about the catalyst.  Aziz talks about Cisco hardware.  Lewis

1    gives examples of Cisco hardware, the Catalyst 5000.

2          So it would have been obvious to combine Aziz with

3    either the Lewis book or the Catalyst 5000.

4    Q   And the jury has all that information in JTX-361 which

5    gives the detailed charts for the catalyst, right?

6    A   I believe they do.

7    Q   Now, would it have been -- can you tell us why it would

8    have been -- why a person of ordinary skill in the art may

9    have been motivated, or would have been motivated, to

10   combine Cisco -- Cisco references JTX-77 and 88 with Aziz?

11          THE COURT:  We'll end with that question and answer

12   it after the break.

13      Jurors, we'll take the morning break and come back with

14   the answer.

15          THE CLERK:  All rise.

16      (Jury and court adjourn.)

17   (The jury entered the courtroom.)

18          THE CLERK:  Resuming on the record, Civil Action

19   16-11613, Egenera versus Cisco.  You may be seated.

20          THE COURT:  Okay.  I think we left off with a

21   person skilled in the art.

22          MR. PACKIN:  Yes.  I think we were in the middle of

23   the last question I was going to ask.

24

```
 1                        KEVIN JEFFAY, Resumed

 2                   DIRECT EXAMINATION, Cont'd.

 3   BY MR. PACKIN:

 4   Q   Would a person of ordinary skill in the art have been

 5   motivated to combine Aziz and the other sister documents,

 6   JTX-77 and 88?

 7   A   Yes.  And I lay out the basic reasons on this slide.

 8   Q   And that's also in JTX-361, which is your --

 9   A   Yes.  Thank you.  Thank you, yes.

10   Q   You have a much more detailed analysis in this case;

11   right?

12   A   Yes.

13          MR. THOMASES:  Your Honor, that document was not

14   disclosed to us as being used today pursuant to the rules,

15   so we ask the reference to it be stricken.

16          MR. PACKIN:  I'm not using it.

17          THE COURT:  He's not using it.

18          MR. THOMASES:  Okay.  Thank you.

19   Q   Okay.  So wrapping up this last claim element, what does

20   what you showed us about Aziz and the prior art tell you

21   about why Cisco cannot possibly be infringing UCS under

22   Dr. Jones' theories?

23   A   Under Dr. Jones' theory, it can't be infringing because

24   the tag that he is relying on is removed when the message
```

1    goes to the external communication network.  And as a

2    result, the message that goes upstream to the communications

3    network is exactly the same as the message that the

4    processor generated.  So it cannot satisfy this limitation.

5    Q   And if the claim were broad enough to satisfy this

6    limitation, would have Egenera -- sorry.  Let me say that

7    again.

8              If this element were as broad as Dr. Jones is

9    saying it is for infringement, would Egenera have gotten its

10   patent in the first place?

11   A   If simply the insertion and then removal of a tag at a

12   VLAN switch is sufficient for infringement, then in my

13   opinion Egenera would never have gotten this patent.

14   Q   Okay.  And going back to figure 1, we started with

15   the --

16             MR. PACKIN:  Let me go back to the ELMO.  Sorry.

17   Can I go back to the -- oh, I'm sorry about that.  I'm

18   sorry.  I'm making you run.  I apologize.  I timed it so

19   that Mr. Maynard left the room.

20   Q   Okay.  So going back to figure 1, so we talked about the

21   left side and the processors, the CPUs versus the NIC, and

22   we talked about the bottom, the SAN storage.  And now how

23   does this last non-infringement argument that you were

24   explaining to the jury, how does that relate to figure 1?

1   A    So it relates to figure 1 because this last "modifying

2   the messages" limitation was about modifying messages that

3   are coming from the processing nodes through the control

4   node out to the Internet.  And because VN tag removal is not

5   modifying the message, I'm X-ing out the Internet cloud.

6   Q    Okay.  Let's go back to the PowerPoint.  I'm getting

7   myself confused.  I said "PowerPoint" and I'm putting

8   documents on the document camera.

9        So now let's go back to the 2006 Nuova document

10  that, you know, Egenera is saying that somehow shows that

11  Cisco copied Egenera's system.  And this is JTX-186.

12       What was Nuova saying all the way back in 2006

13  before, you know, any of this?

14  A    What it was saying, if you read this document fairly, is

15  that, as I say, Nuova was aware of aspects of Egenera and

16  they designed the system to be significantly different.  And

17  it was purposeful.  Again, I would call out the third line

18  that's highlighted in yellow, about how there's a difference

19  in terms of systems management philosophy.  They're

20  fundamentally thinking about the design of a server

21  differently.  And because they're thinking about it

22  differently, they have architected in different features

23  that take them outside of the claims.

24       And those are highlighted here.  The fact that they

1  don't use an I/O gateway to convert I/O, as a result they're

2  going to be able to scale because they don't have these

3  middlemen doing message translation.  And because they're

4  not lining and modifying the operating system because

5  they're going to be programming the network informing cards

6  to establish the virtual local area network topology.

7  Q   Now, are these differences just to get around the patent

8  or are these differences important to the product?

9  A   They're important to the product because, as this

10 document calls out, there's going to be benefits such as

11 scalability, such as the ability to be OS-independent.  So

12 there are tangible benefits from taking this different

13 approach.

14 Q   We've heard about those throughout the course of this

15 trial?

16 A   Yes.

17 Q   Okay.  Let's recap here.  And so what are we showing on

18 the left of this slide?  This is 132.

19 A   The left side is excerpts, is my simple summation of the

20 three main elements of claims 3 and 7 that I focused on from

21 the '430 patent.  And on the right is the reasons why Cisco

22 does not infringe these three elements.  They don't.

23 Q   So, hold on.  Is this like the headphone analogy that

24 you were showing us at the outset?

1    A    Yes, yes, using a little more simplifying language for
2    the claims.
3    Q    Okay.  And as you walk through these elements, what did
4    you find on the first requirement that we've been talking
5    about, the programming processors to establish the virtual
6    local area network topology?
7    A    Well, I've tried to make the case here today that the
8    UCS products do not, do not program the processors to
9    establish network topology.  Network topology is established
10   on the network interface card.  So we -- it does not have
11   that element of the claims.
12   Q    How about the requirement of identifying the
13   corresponding storage address and sending a message to the
14   storage network using that storage address?
15   A    The patent and the Egenera system relied on an I/O
16   gateway because they had incompatible networks on either
17   side of the gateway, the internal communications network and
18   on the storage network.  Cisco invented this thing called
19   fiber channel over Ethernet where you get rid of the gateway
20   altogether.  And because you get rid of the gateway, there's
21   no need to identify a corresponding storage address because
22   you're not translating addresses.
23   Q    So that one's not there either?
24   A    Correct.

1   Q    Okay.  How about the modifying the messages that are

2   sent to the external communications network?

3   A    Again, the patented system requires this use of a proxy

4   because, again, there's incompatible networks inside the

5   Egenera system and Ethernet on the outside.  UCS is Ethernet

6   all the way and so it does not have to modify communications

7   messages that go to the external communication network.

8   And, in fact, it does not modify messages that go to the

9   external communications network.

10  Q    Now, how many of these differences does the jury have to

11  find in order to find that Cisco does not infringe the

12  asserted claims here?

13  A    One.

14  Q    And how many have you shown in your examples?

15  A    I've shown these three.

16          MR. PACKIN:  No further questions.

17          THE COURT:  Cross-examination.

18          MR. THOMASES:  Good morning, your Honor.  Andrew

19  Thomases on behalf of Egenera.  May I proceed?

20          THE COURT:  You may.

21          MR. THOMASES:  Thank you.

22                          **CROSS-EXAMINATION**

23  **BY MR. THOMASES:**

24  Q    Good morning, Dr. Jeffay.  How are you?

1   A   I'm doing well.  Thank you.

2   Q   Great.

3         Now, I heard you twice say that Cisco purposely

4   tried to go away from the fence, meaning the patent claims,

5   and Cisco purposely intended to design away.  Are you saying

6   that someone at Nuova or Cisco knew of the '430 patent?

7   A   No.  I was -- that was a reference to Egenera as that

8   system existed.

9   Q   So are you saying that they purposely tried to avoid the

10  claim or purposely just did a different design?

11  A   They were trying to build something that was different

12  than the Egenera system.

13  Q   Okay.  So you're not saying that someone was designing

14  around the patent to avoid the patent; right?

15  A   Correct.

16  Q   I'm going to step through a little bit of your work that

17  you did, you said, yesterday to prepare for your opinion.

18  So before you formulated your opinion, you were retained by

19  Cisco; correct?

20  A   Correct.

21  Q   And you spent years looking at material to prepare for

22  your written report, correct, you said?

23  A   I spent several hundred hours over the course of several

24  years.

1    Q    In that time when you were retained by Cisco, Cisco

2    never gave you a UCS system to test; correct?

3    A    That is correct.

4    Q    Cisco never invited you to a lab where you could watch

5    Cisco personnel test a UCS?

6    A    Yes, that's correct.

7    Q    And you actually only saw a UCS system for two hours;

8    correct?

9    A    Yes.

10   Q    And that was Dr. Jones' system that he set up in his

11   lab; correct?

12   A    That's correct.

13   Q    And during that review you didn't even power up the

14   blades; correct?

15   A    That is correct.

16   Q    And you didn't even use the packet tool to investigate

17   packets going through that UCS system; correct?

18   A    That is correct.

19   Q    Now, you said that you reviewed UCS source code;

20   correct?

21   A    Correct.

22   Q    You said there were millions of lines of code, you said?

23   A    There are.

24   Q    And you heard that Dr. Jones spent hundreds of hours

1    reviewing that source code?  You heard that the other day?

2    A    I don't believe I heard that.

3    Q    You spent four or five hours only reviewing millions of

4    lines of code; correct?

5    A    For the Cisco source code, that's correct.

6    Q    Now, you've been working with Cisco's lawyers before you

7    prepared your report, and before you prepared your report

8    you didn't have any interviews with any Cisco engineers;

9    correct?

10   A    That is correct.

11   Q    And you said that you gained an understanding of patent

12   law in order to provide the opinions you have here today;

13   right?

14   A    Yes.  I was advised of the basic principles of patent

15   law by Cisco's counsel.

16   Q    And you had to apply that law to the facts of the case;

17   correct?

18   A    Yes, I did.

19   Q    So you're aware that a company can infringe a patent

20   without even knowing about the patent; correct?

21   A    Sure.  Yeah.

22   Q    And so someone can believe they've developed a product

23   independently but still infringe a patent; right?

24   A    Yes, that can happen.

1    Q    But if someone actually copied the technology, that is

2    going to evidence of willful infringement; right?

3    A    I am not as well versed on willful infringement, but

4    generally that sounds right.

5    Q    And if a company is aware of a patent and then creates a

6    technology or continues to sell the technology, that is also

7    evidence going to willful infringement; right?

8    A    Again, I'm not well versed on the principles of willful

9    infringement, but generally that seems to sound right.

10   Q    And you understand that if a first company gets a patent

11   on an idea and a second company then gets a later patent,

12   that second company can still infringe the first company's

13   patent; correct?

14   A    If the second company makes something that has all the

15   elements of the first company's patent, yes.

16   Q    So let's pull up your slide DDX-584.  You've listed a

17   number of patents on VSAN and you say they're Cisco patents.

18   You're aware that all those patents were filed after the

19   '430 patent; right?

20   A    Yes.

21        MR. THOMASES:  Sorry.  That was 5.84.  I think our

22   slide numbers are different.  How about the next slide?

23   There.  83.

24        MR. PACKIN:  I had the issue as well.  I'm sorry.

```
1    Q    And if we go to probably it's 5.86, you also have

2    another Cisco patent; correct?  86.  This one.

3    A    Yes.

4    Q    Okay.  This was filed, again, after the '430 patent?

5    A    That's correct.

6    Q    And it was filed by Mr. Luca Cafiero and others; right?

7    A    Yes.

8    Q    And it was filed just months after they had meetings

9    with Egenera; correct?

10   A    I don't recall the dates, how the dates line up there.

11   Q    Okay.  You've relied on this in part of your

12   presentation; right?

13   A    Yes.

14   Q    Okay.  So you've studied this patent?

15   A    Yes.

16   Q    It was first filed after the 2004 meetings between

17   Egenera and Cisco; right?

18   A    I actually don't recall off the top of my head when it

19   was filed.  Yes, so it was filed in 2005.  So that would

20   have been after 2004.

21   Q    And Mr. Luca Cafiero, you heard sitting here in court,

22   was one of the people who had high regard for Vern Brownell

23   and Egenera; right?

24   A    I heard that.
```

1    Q    Now, let's go to DDX-5.105, I believe, if I'm doing my

2    math right.  These are two other patents.  You said those

3    are VN tags you put up for Cisco?

4    A    Correct.

5    Q    These are also filed after the '430 patent; correct?

6    A    Yes, that's true.

7         MR. THOMASES:  Now, let's go to 5 point -- could be

8    44.  It's a little bit of a lucky shot here.  There we go.

9    Okay.

10   Q    This is your analogy of a simplified patent; right?

11   A    Correct.

12   Q    Okay.  So here is a claim you say that has four

13   elements?

14   A    Yes.

15   Q    Okay.  So if someone builds some headphones that have a

16   volume adjustor, a right earpiece, a left earpiece, an audio

17   jack and wireless connectivity, that would still infringe

18   that claim; right?

19   A    Yes, it would.

20   Q    Just adding that wireless to this still infringes the

21   claim; right?

22   A    If you have all these elements but you just add

23   something you would still infringe this patent.

24   Q    Now, let's turn to your discussion of the file history,

1    the communication that happened between Egenera and the

2    Patent Office, DDX-5.54, please.

3              Okay.  Do you remember this slide?

4    A    I do.

5    Q    Okay.  And this is the interview summary written by the

6    examiner?

7    A    Yes.

8    Q    Okay.  You did underline some language there right after

9    you stopped.  He says "emphasize," and then you stopped.

10   "To emphasize the automatic configuration process."  Right?

11   Am I reading that right?

12   A    Yes.  There's an unfortunate typo, but I believe that

13   was supposed to be "automatic."

14   Q    The automatic configuration process.

15             So then you put up on the next slide, DDX-5.55,

16   some amendments to the claim that occurred three days after

17   that interview; right?

18   A    Correct.

19   Q    But what you didn't show the jury was Egenera's remarks

20   when they made these amendments, right; you just put this

21   one slide?

22   A    That's true.

23   Q    Okay.  Let's pull up those remarks, JTX-2 at page 129.

24   This is the record between Egenera and the Patent Office.

1    There's the remarks.  Do you see that?

2    A    I do.

3    Q    Okay.  So on the next page they conclude and they

4    explain reasons based out of the interview for why they

5    amended the claims.  They said, "In this fashion, the

6    deployment is completely automated and human beings are not

7    required to manual cable power lines, network connectivity,

8    physically move and deploy server cabinets, et cetera, as

9    discussed in the interview and explained in the

10   specification."

11          So really Egenera is just saying our claims are

12   broad enough to cover manual configuration, now we've made

13   automatic configuration; right?  That's what they're saying?

14   There's nothing here about CPUs or NICs?

15   A    No.  I mean, this is a summary and there's nothing here

16   specifically about CPUs or NICs.  But this is part of what

17   was the automatic -- automatic creation of the LANs.  That

18   was going to be done automatically and you weren't going to

19   have to move cables.

20   Q    Okay.  But on these two pages, their remarks, no mention

21   of CPUs, no mention of NICs?

22   A    Certainly in what you've highlighted here, that's

23   correct.

24   Q    And, in fact, in the claims there's no mention of NICs;

1   correct?

2   A   Yes, that is true.

3   Q   And the Patent Office reviewed this patent for five

4   years and then issued it; correct?

5   A   Yes, the patent did eventually issue.

6   Q   And if you look at the patent, JTX-1, on the cover,

7   please, the title page.

8        MR. THOMASES:  JTX-1, please.  I could do it on the

9   overhead projector, if you switch to that, please,

10  Mr. Maynard.

11  Q   Okay.  This is the '430 patent, correct, JTX-1?

12  A   Yes.

13  Q   On the right side there's a column called "References

14  Cited," and under that U.S. patents?

15  A   Yes.

16  Q   And you see it says "continued" at the bottom there?

17  A   Yes.

18  Q   If we go to the next page you see the Aziz '956 patent;

19  correct?

20  A   Yes.

21  Q   And also the Aziz '016 patent; correct?

22  A   Yes, that's correct.

23  Q   The patent examiners reviewed those two Aziz patents and

24  considered them and then issued the patent; correct?

1    A    That's absolutely true.

2            MR. THOMASES:  Can we go back to the slide

3    presentation?  Now we have it highlighted on the slides.

4    Thank you.

5    Q    Can we turn to DDX-5.120, I believe.  This is more on

6    the file history you put up.

7            Okay.  This is your slide; correct?

8    A    Yes.  This is the claim language.

9    Q    Okay.  And you're using claim 3 here; correct?

10   A    Yes.

11   Q    Okay.  And you were saying to the jury that Aziz

12   discloses every requirement except the "modifying messages"

13   requirement in yellow; correct?

14   A    Yes.  An examiner, that's what the examiner said.

15   Q    But that's your understanding of what the patent

16   examiner thought; right?

17   A    As I said, the patent examiner said where they found --

18   that they found all the text that's grayed out in Aziz, and

19   that I had done my own analysis and I agreed with what the

20   examiner had found.

21   Q    And the patent claims had actually changed a little bit

22   from the time you did your analysis to the final; right?

23   A    The text that I was looking at?  Yes, the patent -- the

24   inventors amended the claims, yes.

1   Q   Now, you understand that patents issued and awarded by

2   the Patent Office are presumed valid; correct?

3   A   Absolutely.

4   Q   And that especially applies when the Patent Office has

5   considered the prior art reference that you are trying to

6   invalidate with; right?

7   A   Absolutely true.

8   Q   And because of this presumption of validity, there's a

9   heightened burden to prove invalidity in a trial; right?

10  A   That is absolutely my understanding.

11  Q   And as the Court will instruct the jury, in order to

12  even consider validity the jury must apply the Court's claim

13  constructions; right?

14  A   Yes.

15  Q   And that includes what are called "means plus function"

16  terms; correct?

17  A   Correct.

18  Q   And that has function and structure identified with it

19  as in the table in the jurors' book of claims constructions;

20  right?

21  A   Yes.

22  Q   And in your presentation today nowhere did you show the

23  jury how you applied the Court's claim construction for any

24  of the limitations A through K; correct?

1   A   Correct.  I just referenced the -- the exhibit, and I

2   unfortunately don't remember the exhibit number.

3   Q   Okay.  And this "logic to modify" language is not in

4   claim 7; correct?

5   A   Correct.

6   Q   Okay.  Let's turn to your DDX-5, I think it's 97.  Okay.

7   Remember this?  You showed the jury?

8   A   I do.

9   Q   All right.  The words "Giganet Message" are nowhere in

10   the claims; correct?

11   A   That's true.

12   Q   And the word "Ethernet Message" is nowhere in the claim?

13   A   That is true.  This was just an example.

14   Q   And the claim does not require modifying a Giganet

15   message into an Ethernet message; correct?

16   A   Absolutely right.

17   Q   Now, this was about the Special VLAN Proxy you have up

18   top there.  Do you see that title?

19   A   Yes.

20   Q   Okay.  The virtual LAN proxy was something new in

21   September of 2000 when the inventors conceived of this

22   invention; correct?

23   A   I don't recall if that's the case or not.

24   Q   Do you remember testifying --

1      MR. PACKIN:  Your Honor, I object to the conception

2  date.  There's an order on that and your Honor already ruled

3  on the conception date.  It's not September 2000 on that

4  claim.

5          THE COURT:  I think that's correct.

6          MR. THOMASES:  Okay.  Let me rephrase then.

7  Q   The virtual LAN proxy was something new as of

8  September 2000?

9          MR. PACKIN:  Your Honor, that's the same issue that

10  we've already dealt with.

11         THE COURT:  Agreed.

12  Q   Well, before you read this patent you had not heard of a

13  virtual LAN proxy; correct?

14  A   I believe that's correct.  I believe that was a term

15  that the inventors coined in the patent.

16  Q   And a virtual LAN proxy was not known to persons of

17  ordinary skill in the art prior to the '430 patent; correct?

18  A   Again, because I think that was a term that they had

19  coined, it wasn't a term that was used.  So a person of

20  skill in the art wouldn't have known what that was before

21  the '430 patent.

22  Q   Now, let's look at your slide DDX-594, please.  This has

23  to do with the storage addresses you discussed; correct?

24         MR. THOMASES:  Can we go back one slide?  There we

1   go.

2   Q   Do you remember this?

3   A   Yes.  Yes, I do.

4   Q   It's on the storage address, your second term there;

5   right?

6   A   Yes.

7   Q   Okay.  So you said that this is not met because there's

8   no translation of addresses; right?

9   A   That was my high-level summary to the jury.

10  Q   Where's the word "translation" in the language that

11  you've highlighted in blue?  It does not appear; right?

12  A   It does not.  And, as I say, I was just trying to make

13  this language more accessible to the jury and I used the

14  word "translation."

15  Q   Now, you mentioned some of your personal work on

16  something called Catalyst.  Do you recall that?

17  A   I don't believe I actually -- I certainly do have

18  personal work with the Catalyst.  I don't believe we covered

19  that.

20  Q   You mentioned Catalyst yesterday in the red article?

21  A   Yes, I did mention red -- or I mentioned Catalyst.  Yes,

22  I've used a Catalyst switch.

23  Q   Okay.  And, in fact, your group at UNC has received

24  research to develop products and -- sorry -- research grants

1    to develop products, and one of those research grants was

2    from Cisco; correct?

3    A    Correct.  Twenty-some years ago Cisco gave the

4    university a grant to support research in my lab.

5    Q    In your lab for $212,000; correct?

6    A    That sounds about right.

7    Q    And you continued to seek funding from Cisco; correct?

8    A    Yes, I seek funding from all sorts of companies.

9    Q    And, in fact, Cisco is a corporate partner of your

10   department at UNC; correct?

11   A    I actually don't know that that is true, but the

12   corporate partners is more related to recruiting

13   undergraduates for jobs.  It's not related to research.

14          MR. THOMASES:  Can we please put up the website

15   from UNC?

16   Q    There at the bottom here it says -- well, UNC, computer

17   science.  That's your department; right?

18   A    Yes, it is.

19   Q    "Our corporate partners 2021 to 2022" and it says Cisco;

20   correct?

21   A    Yes.

22   Q    And you're still seeking funding from Cisco from time to

23   time; correct?

24   A    Me personally, no.

1    Q    The department is?

2    A    The department is to support undergraduate programs,

3    yes.

4    Q    Can we turn to DDX-514, please.  Do you remember talking

5    about the BladeFrame?

6    A    Yes.

7    Q    Okay.  You were trying to argue that the test wasn't

8    relevant, right, the test that Cisco did?

9    A    I think I was just trying to share with the jury that

10   Cisco did test the product but, unfortunately, it failed

11   their tests.

12   Q    Okay.  This picture you have here is not a BladeFrame;

13   correct?

14   A    That is correct.

15   Q    This is just a picture you selected?

16   A    It's -- that is true.  It's just a generic rack, rack

17   server photo.

18   Q    Now, yesterday when you were putting this slide up, do

19   you remember Cisco's counsel referring to my opening

20   statement and saying that I said that Cisco never told

21   Egenera about the failure?  Do you recall that?

22   A    Yes, I recall that.

23   Q    Now, you were here for my opening; right?

24   A    I was.

1    Q    I didn't say that.  What I said was Cisco did not tell

2    Egenera about the failure before the 2004 April meeting or

3    before the May 2004 meeting.  Do you recall that?

4    A    Yes, I think I do recall that.

5    Q    And that it was suspicious that they had these meetings

6    about the technology and the product but Cisco never even

7    mentioned a crash on the BladeFrame.  Do you remember me

8    saying that?

9    A    Yes.

10    Q    Now, in your next slide you actually put up an email

11    about that BladeFrame crash when it finally came back to

12    Egenera; right?

13    A    Yes.

14    Q    And the email is dated May 29th, 2004; right?

15    A    Yes.

16    Q    But you cut off the email at the bottom.  There's a

17    whole other paragraph.  Do you recall that?

18    A    That's true.

19    Q    Okay.  Let's pull up JTX-32.  Okay.  The actual exhibit

20    is on the -- right now, left.

21         MR. THOMASES:  On the left can we highlight that

22    bottom paragraph?

23    Q    "Investigation of the logs showed that one of the

24    switches had failed about a month ago, but was never

1    reported to EES," Egenera; right?

2    A   I believe that's what EES refers to.

3    Q   And that was in May, and they're saying it was never

4    reported until after the meetings between Cisco and Egenera;

5    right?

6    A   I don't think they're referencing the meetings between

7    Cisco and Egenera.  I think --

8    Q   Timingwise you remember Mr. Manca went to Cisco to do a

9    presentation to the chief technology officer, and then a

10   second meeting with Mr. Hanafi on May 12th, 2004; right?

11   A   That's all true.

12   Q   And no one in those meetings mentioned anything about a

13   crash on the BladeFrame; right?

14   A   I believe that's correct.

15   Q   Now, you also mentioned Mr. Thompson during your

16   testimony yesterday when you were regarding this email;

17   right?

18   A   Yes.

19   Q   And you actually mentioned that he, you thought he was

20   the CEO at the time; right?

21   A   I believe I did say that.

22   Q   Okay.  That's a mistake though.  He was not the CEO.

23   Let's go up to see the message right above this one, please.

24   Mike Thompson was the chief operating officer at that time.

1    Okay.  And the email you left out of your slide says, "We

2    should study these C-blades to see if they are screwing with

3    them (if possible).  Mike."  Right?

4    A    That's what it says.

5    Q    So at the time, Egenera was suspicious about how those

6    BladeFrame server blades failed during the test; right?

7    A    I think that's a reasonable inference.

8    Q    Can we turn to your slide DDX-5.8.  You're trying to

9    respond to allegations of copying.  Do you recall putting

10   this up yesterday?

11   A    Yes.  Well -- yes.

12   Q    Okay.  Now, you say source code from UCS Manager and PAN

13   Manager showed different code bases and no copying; right?

14   A    Yes.

15   Q    Okay.  This is a bit of a red herring though because

16   there's been no allegation of source code copying; right?

17   And someone can copy a fundamental idea without stealing the

18   source code; right?

19   A    Sure.  But if you're talking about the product being

20   copied, the dominant way products are copied is people copy

21   the source code.

22   Q    Even when you're talking about a fundamental

23   architecture, not the copy of PAN Manager to UCS Manager?

24   A    Architecture is referring to the very high level design.

1    And at the end of the day, what matters is the

2    implementation, how did you actually realize that

3    architecture.

4    Q    Now, you were here during the whole trial; right?

5    A    Yes.

6    Q    And you understand that Egenera's not claiming that

7    there's a copying or copyright infringement of source code,

8    but that Egenera's allegation is that Cisco felt left behind

9    and left out of the data center market, they sent their

10   team, including Mr. Hanafi and engineers and others to first

11   have a Webex for some technical information, then they went

12   to Marlborough, Massachusetts to get a deep dive under an

13   NDA, and then they had Mr. Manca come to their offices,

14   Cisco's offices in California to meet with the CTO, and then

15   Mr. Hanafi and his engineers again.  And then after those

16   meetings those executives went and formed Nuova.  You

17   understand that that is the allegation; right?  You heard

18   that?

19   A    I heard all of that, yes.

20   Q    Okay.  And so you weren't at the 2004 meetings; right?

21   A    No, of course not.

22   Q    And you don't know exactly what Cisco learned in those

23   deep-dive conversations; right?

24   A    I haven't heard anything specific about what Cisco

1    learned.

2    Q   And those executives who got that information and then

3    went and founded Nuova were working for Nuova for six months

4    before Mr. Michael Dvorkin came; correct?

5    A   I believe that chronology is correct.

6    Q   Now, let's pull up your slide DDX-8.2.  This is from the

7    other day.  These are the founders of Nuova; right?

8    A   Yes.

9    Q   Mr. Mario Mazzola, Luca Cafiero, and Soni Jiandani were

10   the ones identifying as having high regard for Vern Brownell

11   and Egenera in 2004.  Do you remember that?

12   A   I do.

13   Q   And you recall that the people who got the deep dives

14   reported to Mario Mazzola and his team; right?

15   A   Yes.

16   Q   Now, you did not, in your investigation about whether

17   there was copy or not, interview Mr. Mazzola; correct?

18   A   That is correct.

19   Q   You did not interview Mr. Cafiero; correct?

20   A   Mr. Cafiero, no, I did not interview him.

21   Q   And Soni Jiandani, you did not interview her?

22   A   No.

23   Q   In fact, you didn't interview anybody on this slide;

24   correct?

```
1    A    That is correct.

2    Q    So you have no personal knowledge if they used the

3    information they got from Egenera while at Nuova; correct?

4    A    That is correct.

5              MR. THOMASES:  I pass the witness, your Honor.
```

## REDIRECT EXAMINATION

**BY MR. PACKIN:**

```
8    Q    Let me just start with where Mr. Thomases left off

9    because that makes no sense to me.

10             Are you here as a personal witness who was

11   involved?

12   A    No.  I had nothing to do with Egenera or Nuova.

13   Q    In what capacity are you here?

14   A    I was retained to do an analysis of the UCS system and

15   compare it to the '430 patent to assess whether or not there

16   was infringement of the '430 patent.

17   Q    Now, in terms of evidence, have you had access to all

18   the evidence, whether or not you were personally involved in

19   the meetings?

20   A    I believe I had access to everything that was produced

21   in this case.

22   Q    Based on all of that evidence, everything that was

23   produced through this whole case, have you found any

24   evidence of copying?
```

```
1    A    No.

2    Q    Has Mr. Thomases shown you evidence of copying?

3    A    No.

4    Q    You've been sitting here this whole trial, sitting right

5    there.  Have they shown the jury any evidence of copying?

6    A    I don't think so.

7    Q    Now, he tried to impugn you by saying that Cisco, you

8    have funding from Cisco.  Do you remember that?

9    A    I do.

10   Q    Tell the jury a little bit about research grants and how

11   they work in computer science.

12   A    Sure.  Research is done mostly by graduate students.

13   And to get good graduate students you have to pay them.  So

14   they're typically in their early twenties, they're gone from

15   their families, they're independent adults, they need a job.

16   And so in order to do research, you hire students, you have

17   to pay them a salary.  So a big thing to do as a researcher

18   is you raise money.  Most of the money will come from

19   federal research grants, but it's quite common to get grants

20   from companies if your research aligns with the interests of

21   them.

22              And in the late 1990s, so almost twenty-five years

23   ago, I was doing some work that happened to be of interest

24   to Cisco, and Cisco approached me to learn more about the
```

1    research.  We had a bunch of technical meetings where we

2    described what we were doing, where we were going.  And in

3    2000, yeah, so twenty-two years ago, Cisco gave a grant.

4    And, technically, these are gifts to the university.  So I

5    personally don't get any money.  They give money to the

6    university.  I use that money to pay graduate students a

7    salary.  I pay their tuition.  I pay their health care.

8    They do work and they get a degree.

9    Q    And is Cisco the only company to fund your lab?

10   A    No.  I've been very lucky in that the research we've

11   been doing has been of interest to a variety of companies.

12   I received money from IBM, from AT&T, from Sprint, the

13   telecommunications company, certainly Cisco, some other

14   networking hardware folks, a company called -- at the time

15   it was called Cabletron, now it's called Extreme Networks.

16   So a variety of companies have funded my research over the

17   years.

18   Q    Does that money go to you personally in any way?

19   A    No, I don't get a nickel.  As I say, it literally pretty

20   much all goes to fund students and pay their tuition and

21   their health care.

22   Q    What does it tell the jury about your lab and your

23   research that leading companies fund your research?  What

24   does that -- what can the jury take away from that?

1  A   Well, I don't want to be boastful here but these

2  companies can fund whoever they want across the country.  If

3  they come to your lab and they say, We'd like to fund you,

4  it's an indication that you're doing useful, consequential

5  stuff, that the research you're doing matters.

6  Q   Now, Mr. Thomases -- well, let me step back.

7       Does the fact that Cisco is a good corporate

8  citizen and contributes to universities, tries to recruit

9  from the universities, does that cause any bias for you in

10  this case whatsoever?

11  A   No.  I mean, I wasn't actually completely aware that

12  Cisco was one of our corporate partners.  And, again, that

13  program exists to fund undergraduate programs.

14  Q   Now, Mr. Thomases asked you about a UCS test system that

15  Dr. Jones set up?

16  A   Yes.

17  Q   Now, just to orient ourselves, how does the process work

18  in terms of these cases?  Who goes first and puts on their

19  evidence and then who responds?

20  A   So the patent owner goes first and they retain an

21  expert, like Dr. Jones, who does his analysis and then he

22  writes a report.  I get a copy of that report, I study it,

23  and then I do my own independent analysis to see if I agree

24  or disagree with his conclusions.

1    Q    And how much time had you spent learning about the UCS

2    system before you visited Dr. Jones' lab?

3    A    Probably several hundred hours.

4    Q    And so what was the purpose of visiting the lab?

5    A    It was primarily just to confirm that Dr. Jones had set

6    the system up correctly and that the results in his report

7    could be trusted.  And I confirmed he set it up correctly

8    and the results that were in his report were accurate.

9    Q    Mr. Thomases also showed you a number of Cisco patents

10   that came after Egenera; right?

11   A    Yes.

12        MR. PACKIN:  If I could have the ELMO, please.

13   Q    Did you also show the jury Cisco patents on VLAN that

14   came before Egenera's patent?

15   A    Yes.  Yesterday when we were talking about VLANs I had

16   mentioned that there was this Cisco patent that came before

17   Egenera.  And this was the one, remember, that has that

18   unfortunate typo in the assignee, that it's "Cisc."

19   Q    Now, as a final note, Mr. Thomases asked about source

20   code, and I think he said something that's just not right

21   about Dr. Jones.  So I'd like to show you Dr. Jones'

22   testimony.  He said Dr. Jones spent hundreds of hours

23   reviewing code.  Let me show you Dr. Jones' deposition, and

24   this was the question that was asked:

```
 1            "QUESTION:  Well, okay.  Let me try to help you
 2      out.  How many hours did you spend, roughly, at the actual
 3      source code computer that Cisco has made available for
 4      Egenera consultants to work with in this case?
 5            "ANSWER:  I believe it was four to five.
 6            "QUESTION:  Four to five hours.  Okay.  Four to
 7      five hours; is that correct?
 8            "ANSWER:  Yes."
 9      Q    Right?
10      A    Yes.
11      Q    So is the amount of time you spent at the source code
12      computer comparable to the amount of time Dr. Jones spent to
13      the source code computer?
14      A    For the UCS code it is.  And in addition I also spent
15      time with the Egenera source code.
16      Q    And in addition you heard Mr. Jayakrishnan tell the jury
17      that he spent over a decade of his life and thousands of
18      hours with the code; right?
19      A    Yes.  I don't think anybody probably beats
20      Mr. Jayakrishnan in terms of time with the code.
21      Q    And in preparing your analysis of this case, did you
22      review and study Mr. Jayakrishnan's deposition testimony to
23      help you understand the code?
24      A    I did.
```

1          MR. PACKIN:  No further questions.

2          THE COURT:  Mr. Thomases?

3          MR. THOMASES:  No questions, your Honor.  We'll

4  reserve for Mr. Jones later in the case on rebuttal.  Thank

5  you.

6          THE COURT:  Thank you.

7  (Whereupon the witness stepped down.)

8          MR. DESMARAIS:  Thank you, your Honor.  At this

9  time I'd like to introduce two discovery requests and

10  responses.

11  (Whereupon counsel conferred.)

12          MR. DESMARAIS:  So we'll mark as JTX-570 the

13  Egenera's responses to the first set of interrogatories

14  1 through 14.  Would you like me to hand that up?  Thank

15  you.

16  (Handing.)

17  **(Joint Exhibit No. 570 received in evidence.)**

18          MR. DESMARAIS:  May I have the document camera,

19  please?

20          MR. THOMASES:  Counsel, do you have a copy for us,

21  please?

22  (Whereupon counsel conferred.)

23          MR. DESMARAIS:  Okay.  So this is Egenera's

24  objections and responses to Cisco's first set of

1    interrogatories, 1 through 14.

2        So interrogatories are -- in these cases we get to ask

3    each other questions and we're obligated under the rules to

4    tell the truth in response.  I'm going to read from the --

5    the blackout is just their attorney objections.  We agreed

6    that we would just show the question and answer.

7        So interrogatory number 3:  "Identify the

8    circumstances, date, all people involved with, and all

9    documents relating to each of the following instances of

10   Egenera's awareness of each accused instrumentality" -- that

11   means the UCS switch, the accused things, the switches --

12   "and tell the first date on which Egenera was aware of the

13   existence of the UCS switch and every instance in which

14   Egenera purchased, took possession of, reviewed, analyzed,

15   examined, inspected or handled any accused instrumentality"

16   or UCS switch.

17       And here's their answer:  "Egenera was first aware of

18   the existence of one or more accused products on or about

19   December 12, 2008, with the publication of 'Cisco Planning

20   Significant Data Center Assault' by IDG News Service, as

21   well as other publicly available information published by

22   Cisco and others related to UCS on or about this time.  To

23   its knowledge, Egenera has never purchased, taken possession

24   of, reviewed, analyzed, examined, inspected or handled an

1    actual accused product."

2        For the next exhibit, your Honor, will be -- this is

3    JTX-571.  And it is a Egenera response to requests for

4    admissions.  And I'm going to particularly refer to

5    admission number 1 and admission number 2.  Let me hand that

6    up.

7    (Handing.)

8    (Whereupon counsel conferred.)

9    **(Joint Exhibit No. 571 received in evidence.)**

10        MR. DESMARAIS:  Here we go.  Okay.  So this is

11   Egenera's objections and responses to Cisco Systems' first

12   set of Requests for Admissions.  And I'm going to look

13   particularly at number 1 first:  "Admit that Egenera's

14   BladeFrame system embodies at least one claim of the

15   '430 patent."  And their answer was, "As stated in those

16   responses, Egenera's BladeFrame system, when relevant

17   hardware and software were included, embody at least one

18   claim of U.S. Patent Number 7,231,430.  Except as stated,

19   Egenera denies this request."

20        And Request for Admission number 2:  "Admit that

21   Egenera's PAN Manager" -- that's the software they switched

22   to after 2008 -- "embodies at least one claim of the

23   '430 patent."  Egenera's answer was:  "As stated in those

24   responses, Egenera's BladeFrame system, when relevant

1    hardware and software were included, embody at least one

2    claim of U.S. patent 7,231,430.  To the best of Egenera's

3    understanding, Cisco's use of PAN Manager refers to only a

4    limited set of software, which would not, alone, embody any

5    claim of U.S. Patent Number 7,231,430.  Egenera therefore

6    denies this request."

7              MR. THOMASES:  Your Honor, can I just correct

8    something?  I think it might be a misstatement.  The PAN

9    Manager was on the original BladeFrame, it did not start

10   selling at 2008.  Thank you.

11         I think that was just your commentary, counsel.  Thank

12   you.

13              THE COURT:  Okay.

14              MR. DESMARAIS:  For our next witness, your Honor,

15   Cisco calls Mr. Daniel Busby by deposition.  He is one of

16   the '430 patent inventors.  Cisco's time is two minutes and

17   fifty seconds.  Egenera's time is twenty-five seconds.

18                   DANIEL BUSBY VIA DEPOSITION

19                          **EXAMINATION**

20   Q   Good morning, Mr. Busby.

21   A   Morning.

22   Q   Mr. Busby, when did you begin working at Egenera?

23   A   I started in May of 2000.

24   Q   And you've worked at Egenera ever since May of 2000?

1   A    I have.

2   Q    You agree that just because a product provides similar

3   functionality to customers and serves similar customer needs

4   as BladeFrame doesn't mean that the way it was developed

5   involved any copying of technology.  True?

6   A    I would agree with that, yes.

7   Q    Mr. Busby, to your knowledge, do you allow any of your

8   employees or people who work for you to have Cisco

9   confidential information in their possession?

10   A    Not to my knowledge.

11   Q    It's not something you would permit; right?

12   A    Yes, it's not something that I would promote or permit.

13   Q    The same rule would apply to yourself?

14   A    Yes.

15   Q    Mr. Busby, I am handing you Exhibit 5.  Exhibit 5 is a

16   document that Egenera produced from Mr. Busby's files marked

17   with the production number on the first page

18   EGENERA00212769.

19        And, Mr. Busby, I'll represent to you that Egenera

20   produced Exhibit 5 from your files.  Exhibit 5 is marked

21   "Copyright 2005 Cisco Systems" and "Cisco Confidential" in

22   the footer.  True?

23   A    Where is that?

24   Q    In the footer on every page.

```
 1   A   All right.  Yes, it does say -- yes.

 2   Q   Exhibit 5 is titled, "Cisco Server Fabric Switch, Server

 3   Virtualization Technology."  Right?

 4   A   Yes, it is.

 5   Q   Do you know why you would have had Exhibit 5 in your

 6   files?

 7   A   I don't.

 8   Q   Do you recall showing or sharing Exhibit 5 with anyone

 9   at Egenera?

10   A   I don't.

11   Q   So counsel for Cisco asked you a number of questions

12   about what appears to be a marking that says "Cisco

13   Confidential" on Exhibits 5 and 6.  Do you recall that?

14   A   I do.

15   Q   Did you obtain these documents in Exhibits 5 and

16   6 through any inappropriate means?

17   A   Not to my knowledge.

18        MR. DESMARAIS:  Our next witness we'll call by

19   deposition will be Maxim Smith, by deposition.  Mr. Smith is

20   another of the '430 patent inventors who joined Egenera from

21   Hitachi.  And the time is two minutes fifty-five seconds for

22   Cisco.

23              MAXIM SMITH VIA DEPOSITION

24
```

1                         **EXAMINATION**

2    Q    Good morning, Mr. Smith.

3    A    Morning.

4    Q    Mr. Smith, you used to work at Egenera; is that right?

5    A    Yes.

6    Q    Can you name some of those individuals who joined

7    Egenera from Hitachi?

8    A    Peter Manca, Ewan Milne, Alan Greenspan, Ted Duffy.

9    That's all I recall right now.

10   Q    Okay.  So several of the early key contributors to

11   building Egenera came from Hitachi; correct?

12   A    Yes, that is right.

13   Q    Yourself included?

14   A    Yes.

15   Q    Did it seem odd to you that employees at Egenera came

16   from, you know, several came from the same company, namely

17   Hitachi?

18   A    No, it did not seem odd because, as I said, Hitachi was

19   winding down, Hitachi Computer Products America was winding

20   down at the time, so many of us were looking for a new

21   opportunity.  It's also true that many of that collection of

22   people, we had worked together in the past, so we knew and

23   respected each other and it was natural that we would want

24   to work together again.

124

1  Q   But your recollection is that Egenera decided to stop

2  selling BladeFrame largely because of how their relationship

3  with Dell was progressing?

4  A   I would restate that to say that Egenera was looking for

5  a way to avoid manufacturing its own hardware.  Whatever

6  that way was would allow us to exit from that costly affair.

7  It turned out that the Dell relationship adequately met that

8  need.  Therefore, we were able to curtail our own hardware

9  manufacture.

10  Q   Why did you eventually leave Egenera?

11  A   I was laid off.

12  Q   Do you know why you were laid off?

13  A   No, I don't.  I was not told and I do not know the

14  answer.

15  Q   Around the time you were laid off, were others in the

16  company laid off as well?

17  A   Yes, there were many rounds of layoffs and many people

18  were being laid off.

19  Q   You would agree that there are ways to build stateless

20  server systems without violating Egenera's patent rights?

21  A   Yes.

22      MR. DESMARAIS:  Cisco's next witness, also to be

23  called by deposition, will be Thomas Sheehan.  He's a former

24  chief financial officer at Egenera.  And the time is

1    three minutes and twenty-seven seconds for Cisco.

2                    THOMAS SHEEHAN VIA DEPOSITION

3                            **EXAMINATION**

4    Q    Please state your name and your address for the record?

5    A    Thomas Sheehan, 92 Maynard Farm Road, Sudbury,

6    Massachusetts 01776.

7    Q    When you joined Egenera, you joined as their chief

8    financial officer; correct?

9    A    That's correct.

10   Q    When you left Egenera, who were Egenera's competitors in

11   the marketplace?

12   A    The competitors that we discussed at that time mostly

13   were IBM and HP.

14   Q    Was it your practice when you were CFO that you would

15   enter into non-disclosure agreements on behalf of the

16   company?

17   A    It was our practice that I would be the signatory.

18   Q    How many non-disclosure agreements did you enter into

19   while you were a CFO?

20   A    I don't know, but many, many, many.

21   Q    When you say "many, many, many," approximately what

22   number?

23   A    I couldn't even guess.

24   Q    Over a hundred?

```
 1   A    Easily.
 2   Q    It's a common practice among technology companies to
 3   enter non-disclosure agreements?
 4   A    Very common.
 5   Q    Is it fair to presume that either Egenera or Cisco, by
 6   virtue of entering into the non-disclosure agreement, stole
 7   confidential information from each other?
 8   A    By the existence of this agreement, does that then --
 9   does one -- is it reasonable that one concludes that there
10   was theft?
11   Q    Correct.
12   A    I don't know how you could conclude that.
13   Q    It would not be reasonable to conclude that; true?
14   A    In my opinion, yeah.
15   Q    I'm going to hand you what's been marked as Exhibit 15
16   to your deposition.  It's a multipage document beginning
17   with Bates number EGENERA01242077.
18          This is a presentation titled, "Initial Public
19   Offering Discussion for Egenera," dated March 8th, 2004.
20   And it was -- it's labeled with the name "Wachovia
21   Securities" on it.  Do you see that?
22   A    I do.
23   Q    Is this presentation given by Egenera to Wachovia
24   Securities or the other way around?
```

1    A    It would be the other way around.

2    Q    So Wachovia Securities is pitching itself to Egenera to

3    be its underwriter for the IPO?

4    A    It appears that way.

5    Q    Can you turn to slide 22.  There's a slide that says,

6    "Potential issues and mitigants."

7    A    I do.

8    Q    And it's correct to say that the key issues are

9    potential issues for taking Egenera public?

10   A    The way I read the slide were these were key issues that

11   had to be overcome by the company in order to have a

12   successful IPO.

13   Q    And one -- another -- underneath that they said,

14   "Potential competitive threats from larger, well established

15   vendors.  For example, IBM, HP, Sun."  Do you see that?

16   A    I do.

17   Q    And those were the competitors that you mentioned to me

18   earlier today who were Egenera's competitors when you were

19   CFO; right?

20   A    Yes.  Correct.

21          MR. DESMARAIS:  Cisco calls its next witness, also

22   by deposition, is Kevin Kerrigan.  He was also a CFO at

23   Egenera.  And the time is two minutes fifteen seconds for

24   Cisco, and fifteen seconds for Egenera.

1    KEVIN KERRIGAN VIA DEPOSITION

2    **EXAMINATION**

3    Q   Please state your name and address for the record?

4    A   My name is Kevin Kerrigan.  My address is 22 Laurel

5    Lane, Reading, Mass. 01867.

6    Q   And where do you work, Mr. Kerrigan?

7    A   I work at Egenera.

8    Q   And what is your position?

9    A   I'm the chief financial officer.

10   Q   At any time has Egenera not relied on debt financing to

11   maintain a positive cash flow?

12   A   I mean, the company throughout its life has generated

13   more losses than income.  But there have been periods where

14   the company would be cash flow positive.

15   Q   Has Egenera ever been cash flow positive for a year?

16   A   I don't believe so for a year, no.

17   Q   What was the first time Egenera did a reduction in

18   force?

19   A   First time that I recall was fall of 2008, approximately

20   October, I believe.

21   Q   How many people were let go in that --

22   A   In that time.

23   Q   -- reduction in force?

24   A   I believe it was more than a hundred, or approximately a

1    hundred.

2    Q   And that reduction in force was prior to Cisco releasing

3    UCS; correct?

4    A   Yes.  I believe -- I believe you -- I believe Cisco

5    announced UCS in March of '09.  If I have that timing right

6    then, yes, it would be before that.

7    Q   I'm focusing on technical information about -- you

8    understand that this is a patent lawsuit; correct?

9    A   I do, yes.

10   Q   And you understand that in order to find infringement,

11   you have to compare the claims of a patent to a product;

12   right?

13   A   So I'm not a patent attorney or I'm not an engineer.  So

14   I understand now because you've told me.

15   Q   Do you understand generally the case --

16   A   Yes.

17   Q   -- is a patent infringement claim that involves

18   comparing a product to a patent; right?

19   A   Yes, I do understand that.  Yes.

20   Q   And you understand that just because a product competes

21   with another product doesn't mean it infringes a patent;

22   right?

23   A   Yes.

24   Q   Well, what information does Egenera have that any of the

1    individuals on this list provided technical information

2    about Egenera's products to Cisco or Nuova?

3    A   I can't give you a specific example at this time.

4         MR. DESMARAIS:  Our next witness, also by

5    deposition, will be Scott Geng.  He's another '430 inventor

6    and he was chief technical officer at Egenera.  The time is

7    Cisco, three minutes fifty seconds; and Egenera, fifteen

8    seconds.

9                    SCOTT GENG VIA DEPOSITION

10                         **EXAMINATION**

11   Q   Could you please introduce yourself for the jury?

12   A   Hi.  My name is Scott Geng.

13   Q   And do you remember when you joined Egenera?

14   A   In 2000.

15   Q   And as part of that transition from selling hardware to

16   selling software, Egenera laid off employees; correct?

17   A   There was a period of time of layoffs, yes.

18   Q   So, to your knowledge, you're not aware of any

19   individual who worked on the development of the PAN Manager

20   software going to Cisco; is that correct?

21   A   That's correct.

22   Q   That's all I'm looking at.  So just so we're clear, you

23   don't know whether or not the invention disclosed in the

24   '430 patent is related to any of the differentiators that

1    you described that the BladeFrame have -- had from the -- in

2    the early 2000s; is that correct?

3    A    Correct.

4    Q    In the early 2000s were there any disadvantages or

5    weaknesses that the BladeFrame had?

6    A    You mean technical disadvantages or --

7    Q    Technical disadvantages, yes.

8    A    So, yeah, I guess any -- there are advantages and

9    disadvantages to different architecture types, and our

10   BladeFrame product had a centralized I/O capacity, and there

11   were potential disadvantages in that context.

12   Q    What were those disadvantages?

13   A    Mostly in the context of scalability and latency.

14   Q    From the, I guess, mid-2000s on, were there any

15   differentiators or strengths for Egenera's BladeFrame

16   product?

17   A    I don't think there were any additional ones.

18   Q    Did any of those no longer become advantages in the 2000

19   time period, mid-2000 and on?

20   A    Yeah, after mid-2000s they started to -- there were

21   other products that came on the market that did things that

22   were -- started to be similar.

23   Q    And what products were those?

24   A    They were products from all the major vendors, hardware

1   vendors that, in essence, competed with BladeFrame.

2   Q   That would be HP, Dell, Fujitsu --

3   A   IBM.

4   Q   -- IBM, NEC.  Any others?

5   A   No.

6   Q   What were the competitive disadvantages for PAN Manager

7   from mid-2000s on?

8   A   Compared to what?

9   Q   Compared to other competitive products on the market.

10  A   I don't think there were any disadvantages there.

11  Q   So, to your knowledge, there was nothing particularly

12  special about the meeting between Egenera and Cisco; is that

13  correct?

14  A   Not from my perspective.

15  Q   You'd agree with me that Egenera did not invent VLANs;

16  correct?

17  A   I don't think we invented VLANs.

18  Q   You'd agree with me that Egenera did not invent setting

19  up a VLAN using a software interface?

20  A   I agree.

21  Q   Did Egenera invent storage area networks?

22  A   No.

23  Q   Did Egenera invent VSANs?

24  A   What do you mean by a VSAN?

1   Q   Virtual storage area network.

2   A   No.

3   Q   Did Egenera invent VN tags?

4   A   Not that I'm aware of.

5   Q   Did Egenera invent VLAN IDs?

6   A   No.

7   Q   How about VSAN IDs; did Egenera invent those?

8   A   Not that I'm aware of.

9   Q   So Egenera didn't invent storage zoning; correct?

10  A   I think that's correct.

11  Q   Did Egenera invent fiber channel over Ethernet?

12  A   No.

13          MR. DESMARAIS:  Almost done.  Two more.

14      The next witness will be Mike Thompson, also by

15  deposition.  He was Egenera's CEO from 2006 to 2009.  His

16  testimony is particularly relevant to better our fact

17  number 1 about Egenera's business decision to stop selling

18  the BladeFrame and have nothing to do with Cisco.  The time

19  is twenty minutes and fifty seconds for Cisco, and

20  four minutes and twenty-eight seconds for Egenera.

21              MICHAEL THOMPSON VIA DEPOSITION

22                      **EXAMINATION**

23  Q   Mr. Thompson, when you first joined Egenera, you joined

24  as a COO, chief operating officer?

```
 1    A    That's correct.

 2    Q    And you joined Egenera in 2002?

 3    A    That's correct.

 4    Q    You became president and CEO in 2006; right?

 5    A    Yes.

 6    Q    What was your mission as CEO of Egenera?

 7    A    Grow the company.  For the most part, you know, try to

 8    achieve some form of an exit for the investment -- investors

 9    in the company, whether through acquisition or IPO.

10    Q    Great.  So one of your missions as CEO of Egenera was to

11    take the company to a successful exit; yes?

12    A    As any CEO of any VC company, that's the objective.

13    Q    When did you finish your tenure as CEO of Egenera?

14    A    I don't recall the exact date.  In 2009, 2010 time frame

15    I left Egenera and became executive chairman of the company

16    for a period of time.

17    Q    When did you leave Egenera entirely in any -- in terms

18    of any capacity of employment?

19    A    I left Egenera when I joined the next company, which was

20    Sepaton, as CEO.  That's when I resigned from the board of

21    Egenera.

22    Q    That was in 2010?

23    A    That's correct.

24    Q    Mr. Thompson, is it correct that you don't have a
```

1    technical background?

2    A    Yes.

3    Q    You don't have a degree in engineering?

4    A    Correct.

5    Q    Your background before Egenera was in sales; is that

6    right?

7    A    Correct.  Sales and marketing.

8    Q    And you've not ever held an engineering position at any

9    company?

10   A    That's correct.

11   Q    How did you learn the details of what this case is

12   about?  I'm asking that at a high level.

13   A    I first heard about the lawsuit from one of the board

14   member investors.

15   Q    Mr. Thompson, you personally have no opinion on whether

16   Cisco infringes any claim in the '430 patent?

17   A    Correct.

18   Q    What was the purpose of your meeting with Cisco?  In

19   2008; correct?

20   A    Correct.  To determine if they were interested in

21   acquiring the company.

22   Q    And what was the answer?

23   A    The answer was no.

24   Q    Your contact at Cisco was Ned Hooper for your meeting?

```
 1   A    Both John Morgridge and Ned Hooper.

 2   Q    In 2008, what was the floor amount of money that Egenera

 3   was seeking as a dollar amount by which it would agree to be

 4   acquired?

 5   A    That was never discussed.

 6   Q    Never discussed between who?

 7   A    Between me and the investors/board.

 8   Q    Did you ever receive an offer, a dollar amount offer to

 9   acquire Egenera in 2008?

10   A    No.

11   Q    Did you ever receive a monetary offer of any kind to

12   acquire, in whole or in part, Egenera's business in 2008?

13   A    No.

14   Q    How about in 2009?

15   A    No.

16   Q    How about at any time during which you were CEO?

17   A    No.

18   Q    Which companies held the position -- or communicated the

19   position to you in 2008 that Egenera's product offering

20   would have been competitive with that company's product

21   offering?

22   A    Their future product.  It would have been competitive

23   with their future product, what they had under development.

24   HP, IBM.  I don't recall, maybe Dell.
```

1    Q    Not Cisco?

2    A    No, Cisco -- Cisco played it differently.  Cisco -- Ned

3    Hooper talked about how, you know, kind of said how can

4    anybody make money in the storage -- in the server business

5    with those low margins.  So he made an unusual comment,

6    being the fact that he had a product under development in

7    the server area.

8    Q    Now, your notes in Exhibit 6 from your meeting with

9    Cisco say, "I shared info re: valuations by the investment

10   bankers when we were considering IPO, and how we recognized

11   times are much different now."  Do you see that?

12   A    Yes.

13   Q    What valuations by investment bankers did you share with

14   Cisco in your meeting with Cisco?

15   A    That was the billion dollar number.

16   Q    When you were CEO of Egenera from 2006 to 2009, Egenera

17   was never profitable on an annual basis; is that true?

18   A    That's true.

19   Q    Mr. Thompson, while you were CEO Egenera decided to stop

20   selling hardware and become a software-only company; right?

21   A    Yes.

22   Q    Exhibit 11 is a board of directors' meeting

23   presentation, slides, from October 30, 2008; right?

24   A    Yes.

1    Q    Is it correct that Egenera made the decision to become a
2    software-only company in 2008?
3    A    Yes.
4    Q    Why?
5    A    We thought it would be the best economic model going
6    forward.
7    Q    Egenera was under a lot of financial strain in the
8    financial downturn; right?
9    A    Yes.  Although we were considering software-only prior
10   to the downturn because the economic model was attractive.
11   But, yes, we were under further strain, or started to get
12   under strain after the meltdown.
13   Q    Why did Egenera consider a software-only model to be
14   attractive?
15   A    Because of the economic model.
16   Q    What's the economic model that you're referring to?
17   A    So your margins are far higher than in a
18   hardware/software -- gross margins are far higher than a
19   hardware/software combination and your expenses are lower.
20   Q    So as part of Egenera's decision to transition to a
21   software-only company, it eliminated over half of its sales
22   force; correct?
23   A    Correct.
24   Q    So as part of its decision to transition to a

1    software-only company, Egenera cut over forty positions in

2    its sales force; right?

3    A   Correct.

4    Q   But when the employees in the planned reduction of head

5    count in sales and services were let go by Egenera, that

6    occurred in late 2008 and early 2009; right?

7    A   Sounds right.

8    Q   All right, Mr. Thompson.  At least by October 30, 2008,

9    Egenera had made the decision to stop selling hardware and

10   transition to a software-only company; yes?

11   A   Yes.

12   Q   Now, I want to go back to the reduction in head count.

13   Mr. Thompson -- Mr. Thompson, Egenera let a lot of people go

14   in late 2008?

15            COURT REPORTER:  What?

16   Q   Egenera let a lot of people go in 2008; true?

17   A   Yes.

18   Q   A significant percentage of the company's workforce, in

19   fact; right?

20   A   Yes.

21   Q   And a lot of the folks that Egenera let go were folks

22   who made their living by selling Egenera's data center

23   products; right?  True?

24   A   I guess, yeah.

1    Q    I mean, it's true though; right?

2    A    Yeah.

3    Q    Mr. Thompson, you not only laid off a lot of sales and

4    services folks at the end of twenty -- 2008, but you also

5    asked those who remained to take a 15 to 25 percent salary

6    cut; right?

7    A    If I remember correctly, yes.

8    Q    In the United States Egenera was no longer attempting to

9    directly sell to any new customers after the point in late

10   2008 in which it had laid off a significant percent of its

11   sales and services force; true?

12   A    Well, BladeFrame.  So our hardware/software business,

13   I'm sure the company would have been opportunistic to sell

14   to anybody, but we weren't going to continue to support

15   hardware, future hardware products.  So it's unlikely that a

16   buyer would buy that product.

17   Q    Exhibit 12 is an email from you to Christine Crandell on

18   November 28, 2008; right?

19   A    Yes.

20   Q    So you mentioned that "We" -- Egenera -- "are putting

21   together another financial model where we cut expenses

22   further in order to stay alive until June 2009, giving us

23   enough time to sell the company at the best value (versus

24   fire sale.)" Right?

1    A    Yep.

2    Q    You were concerned in late 2008 that the company might

3    not even have enough money to stay in business until

4    June 2009; right?

5    A    In this particular moment, yes.

6    Q    And one concern you had was that you wanted to give the

7    company enough runway to avoid a fire sale; right?

8    A    That's -- yes, as one of the options.

9    Q    Fire sale is when you sell the company to whoever will

10   buy it because you don't have time to reject -- reject

11   offers for purchasing the company; right?

12   A    You don't have time to go through a thorough process.

13   Q    Right.  In other words, it's like a clearance sale;

14   right?

15   A    It's like an auction, yes.

16   Q    A very urgent auction; right?

17   A    Yes.  We didn't go down that path, but that's what that

18   option is, yes.

19   Q    Sir, you don't put the blame on Cisco for Egenera's

20   financial condition in 2008, do you?

21   A    I do not.

22   Q    And ultimately you did order a limited shutdown of

23   Egenera in the United States in the holiday, Christmas

24   holiday time period in 2008?

```
1    A     Yes.
2    Q     And the limited shutdown of Egenera that you ordered in
3    the Christmas holiday of 2008 was a shutdown in which
4    employees didn't get paid unless they used vacation time;
5    right?
6    A     That's correct.
7    Q     You ordered a limited shutdown of Egenera in the
8    Christmas holiday time of 2008 because Egenera was in bad
9    financial condition at that time; right?
10   A     We were taking every step we can to reduce expenses at
11   the time.
12   Q     Why?
13   A     Because of the economic meltdown and the financial
14   situation of Egenera.
15   Q     Meaning it was worth it for Egenera to shut down as a
16   company for a number of days to save the costs it would have
17   otherwise incurred by operating during that time; right?
18   A     Correct.
19   Q     Had Egenera shut down its offices to save money during
20   any year prior to 2008 that you were CEO?
21   A     No.
22   Q     Okay, Mr. Thompson.  In 2008 and 2009 Egenera reached
23   out to several companies looking for a possible acquirer of
24   Egenera; yes?
```

1    A    Yes.

2    Q    And ultimately Egenera didn't find a company that agreed

3    to acquire Egenera; right?

4    A    Correct.

5    Q    Mr. Thompson, Exhibit 16 is an email that you wrote to

6    Dave Epstein on December 6, 2008; right?

7    A    Yes.

8    Q    Who is Dave Epstein?

9    A    He was an investor representing Crosslink Capital.

10   Q    And Crosslink Capital was a firm that owned part of

11   Egenera?

12   A    Correct.  And he was a board member as well.

13   Q    When you write emails to investors of Egenera, while you

14   were CEO, you made every effort to be as truthful and honest

15   as you could be; right?

16   A    Yes.

17   Q    When you -- when you wrote to Dave Epstein in Exhibit 16

18   regarding the valuation, which you should see at the bottom

19   of page 16, you told him, "I'm assuming around $50 million

20   with one buyer, based on our customer base replacement

21   value, engineering talent, and core expertise in

22   infrastructure virtualization and IP."  Right?

23   A    Yes.

24   Q    Okay.  So what you said to Dave Epstein in December 2008

1    is that Morgan Stanley had given a valuation range of a

2    seventy-five to $100 million a few months ago; right?

3    A    Yes.

4    Q    When Morgan Stanley had given you an estimated valuation

5    for the company of seventy-five to $100 million, that was

6    before you had significantly reduced Egenera's head count in

7    November 2008; right?

8    A    I assume so, based on the dates.

9    Q    And the estimate you provided to Dave Epstein as the

10   valuation of Egenera, assuming one buyer was interested in

11   December 2008, several months after the last estimate Morgan

12   Stanley provided, your figure was approximately $50 million;

13   true?

14   A    That's what I told Dave at the time.

15   Q    You don't have any reason to doubt the accuracy of the

16   board presentation in --

17   A    None at all.

18   Q    -- Exhibit 11, right?

19   A    No.

20   Q    The nine companies that, by December 2008, Egenera had

21   reached out to or was in the process of reaching out to to

22   gauge interest in acquiring Egenera were IBM, HP, Cisco,

23   Avocent, Sun, Lenovo, Rackable, Dell, and FSC; right?

24   A    Correct.

1   Q    Were there other investment banks that you were working

2   with at the time --

3   A    No.

4   Q    -- that were helping you find a suitor?

5   A    No, just Jeffries.  I was keeping the executive team

6   informed as to what was happening here.

7   Q    By January 6, 2009, you had been in touch with at least

8   Avocent, Cisco, Dell, HP, IBM, Rackable and Sun to gauge

9   their interest in acquiring Egenera; right?

10  A    Yes.

11  Q    And as of January 6, 2009, you identified to the team

12  additional companies that you were considering contacting to

13  gauge their interest in acquiring Egenera; right?

14  A    Yes.

15  Q    And those companies included Adaptec, Brocade, Citrix,

16  EMC, F5, Microsoft, NEC, NetApp, Novell, Oracle, SAP,

17  Symantec, BMC and VMware; right?

18  A    Correct.

19  Q    Your recollection is none of the companies that you

20  spoke with to gauge interest in acquiring Egenera actually

21  made an offer of any kind to acquire Egenera?

22  A    Correct.

23  Q    Mr. Thompson, Cisco was one of at least twenty companies

24  that Egenera or its investment bankers were reaching out to

1    to gauge interest in potentially acquiring Egenera?

2    A    Yes.

3    Q    Exhibit 26, Mr. Thompson, is an email -- at the top it's

4    an email from you to Dave Epstein; right?

5    A    Yes.

6    Q    Okay.  Your understanding, though, in communicating with

7    Dave Epstein in the email, Exhibit 26, is that Cisco's

8    business units didn't have an interest in acquiring Egenera;

9    right?

10   A    Yes.

11   Q    And you state to Dave Epstein in Exhibit 26, "I think

12   their" -- meaning Cisco -- "Nuova team is doing their own

13   thing in this space and don't need/want our IP."  Right?

14   A    Yeah.  And when I say "IP," I think of our software and

15   our IP as basically the same thing.

16   Q    So what you said is that you think Nuavo, meaning Nuova,

17   doesn't need or want our, meaning Egenera, IP; right?

18   A    Software IP, yes.

19   Q    Exhibit 27 is an email, Mr. Thompson, that you wrote to

20   John Chambers of Cisco on May 13, 2009; right?

21   A    Yes.

22   Q    Do you know if your email in Exhibit 27 ever actually

23   reached John Chambers?

24   A    I -- I can't recall what the outcome of this email was

1    back then.  I can't recall if I got a response from Ned or

2    John or no response whatsoever.

3    Q   And finally, another point that you thought would be of

4    interest to Cisco in your email in Exhibit 27 is that

5    Egenera had "relevant IP and patents which may prove to be

6    of great value to Cisco."  Right?

7    A   Yes.

8    Q   You never told Cisco, Mr. Thompson, that you or anyone

9    else at Egenera thought Cisco UCS was infringing any Egenera

10   patents; right?

11   A   Not that I recall.

12   Q   How about 2009?

13   A   I'm not certain.  Remember, at this time we were

14   morphing the software.  So the revenue decline was, one,

15   intentional based on the fact that we were no longer

16   producing hardware, and also based on the economy and

17   budgets getting slashed.

18   Q   Would you agree that Egenera's reduction in sales of

19   BladeFrame after 2008 was intentional as a part of its plan

20   to transition to a software-only company?

21   A   It was intentional based on two things.  One, the

22   economic downturn and reducing expenses, and transition to

23   software-only.

24   Q   But your reaction to it was planned?

1    A    Of course, yeah.  Our reaction to the downturn was to

2    move to software-only business, and as part of software-only

3    business we reduced expenses knowing -- knowing that our

4    revenues were going to decline as we made that transition.

5    Q    As a result of the financial downturn and Egenera's

6    decision to transition to a software-only company in 2008,

7    it executed on a plan to reduce BladeFrame sales, ultimately

8    down to zero; right?

9    A    Eventually.

10   Q    Who did Egenera consider to be its biggest competitor in

11   2008?

12   A    Well, from a timing point of view, once Cisco announced

13   UCS, we considered them to be our biggest competitor.

14   Before that we considered HP to be our biggest competitor.

15   Q    Mr. Thompson, you wrote to John Cronin on May 6, 2009,

16   "On the IP front we are waiting on more detailed information

17   to be released by Cisco (for their recently new major

18   product announcement) to determine if there are patent

19   infringements.  It's a copy of our product architecture."

20   Right?

21   A    Yes.

22   Q    There is no information from Egenera that you believe

23   Cisco actually took and copied to build Cisco's product;

24   right?

1    A    Yeah, I mean, other than the fact that their product

2    looked a lot like ours, they bought an IT BladeFrame that

3    they put in a lab, and they hired our people, those were

4    reasons why we thought highly suspect that there could be

5    some patent infringement and -- but we didn't catch them,

6    you know, doing anything specific.

7    Q    You're not testifying that Cisco hired anyone from

8    Egenera who actually did any software coding for UCS; right?

9    A    Not that I'm aware.

10   Q    And you're not testifying that Cisco hired anyone from

11   Egenera who actually did any architectural design of UCS;

12   right?

13   A    Not that I'm aware.

14   Q    Do you have any idea where in the product development

15   timeline Cisco was by the time it hired the first person who

16   used to work at Egenera?

17   A    I wouldn't know.

18   Q    Scott Clark wasn't an engineer or developer of any kind

19   at Egenera; right?

20   A    Correct.

21   Q    Are you familiar with the fact -- or what department

22   Satinder Sethi worked in at Egenera?

23        COURT REPORTER:  What department who?

24   Q    Satinder Sethi worked at at Egenera?

1    A    I don't recall.  I know he was technical in nature.  I

2    don't recall if he was part of the service group or the

3    engineering group.

4    Q    You don't recall Satinder Sethi was a technical

5    marketing services person?

6    A    No.  Like I said, I recall he was technical, so you're

7    telling me he was part of the service group.

8    Q    It's not your testimony that Satinder Sethi developed

9    the BladeFrame; right?

10   A    Correct.

11   Q    You have no basis to dispute that Cisco had already

12   developed UCS by the time it hired anyone from Egenera;

13   right?

14   A    I wouldn't know.

15   Q    You have no basis to dispute that all people that Cisco

16   hired who used to work at Egenera did not work on Cisco UCS

17   development or engineering; right?

18   A    I wouldn't know.

19   Q    Egenera hired many employees from other companies in the

20   industry; right?

21   A    Yes.

22   Q    Many of the early Egenera employees came from Hitachi;

23   right?

24   A    Yes.

1    Q    And at Hitachi those individuals had worked on

2    server-related technologies; right?

3    A    I believe they worked on the mainframe system for

4    Hitachi.

5    Q    The Hitachi mainframe system was a data center related

6    product; right?

7    A    Yes.

8         MR. DESMARAIS:  Your Honor, I'd like to offer a

9    couple of the exhibits that were mentioned in the

10   depositions.  The board of directors meeting on

11   October 30th, 2008 is JTX-344.  What was referred to in the

12   deposition as Thompson 12, being marked as DX-DZ, needs a

13   new number, and that will be JTX-572.  Referred to in the

14   clip as Thompson 16 is JTX-284.  Referred to in the clip as

15   Thompson 27, and also marked as PX-BGB will become JTX-573.

16   Referred to as Thompson 31, and also labeled PX-BYC will

17   become JTX-574.  And DX-D2 will become JTX-575.  And I think

18   I got the others.  So I'll offer those.

19        **(Joint Exhibit Nos. 344, 572, 284, 573, 574 and 575 received**

20             **in evidence.)**

21        MR. DESMARAIS:  Okay.  Last video.  It's short.

22   Cisco calls as its next witness Richard McCormack by

23   deposition.  Mr. McCormack worked at Fujitsu America in

24   marketing and worked on Egenera products.  The time is

1   four minutes eighteen seconds for Cisco.

2                RICHARD MCCORMACK VIA DEPOSITION

3                        **EXAMINATION**

4   Q   Could you please introduce yourself to the jury?

5   A   Richard McCormack from Fujitsu America.  I've worked at

6   Fujitsu America for -- since 2001.

7   Q   And generally speaking, what's your job at Fujitsu

8   America?

9   A   I've been responsible for enterprise products and for

10  the marketing of enterprise products during that time

11  period.

12  Q   And did there come a time when you became aware of a

13  relationship between Fujitsu and Egenera?

14  A   Yes, yes.

15  Q   Approximately what time frame was that?

16  A   Probably something like 2004, '5, around that time

17  frame.

18  Q   And that was in connection with an OEM agreement that

19  Egenera had with Fujitsu Siemens Corp.; is that right?

20  A   Was it Fujitsu Siemens at the time?  We resold a product

21  that had the Egenera software on it, yes.

22  Q   And in the 2005 time frame how was the bundle of Fujitsu

23  hardware and Egenera software received by customers?

24  A   It was one of a number of options at the time that

1   people had to -- to look at, whether they took stand-alone

2   servers or blade servers, whether you used an internal

3   interconnect or Ethernet, an external interconnect.  That

4   was a choice customers had.  And then virtualization

5   software was in its infancy at the time, as well, from

6   companies like Microsoft and VMware.  That was another

7   choice they had to make the system work.

8   Q    Was the Egenera software on the Fujitsu hardware a -- a

9   popular option, if you will, in terms of the number of

10  customers who sought it out as opposed to the other Fujitsu

11  product offerings in the 2005 time frame?

12  A    No.  It was not -- it was not particularly popular.

13  Q    How about going forward past 2005; did the Egenera

14  software coupled on the Fujitsu hardware gain traction with

15  customers or become more popular over time, or did it -- or

16  did it not?

17  A    Certainly towards 2010 blade servers themselves had lost

18  market share in our portfolio.  We had other options, such

19  as a converged infrastructure.  So I would say it diminished

20  in its interest during that time period.

21  Q    What --

22  A    There were more choices available, not less.

23  Q    Okay.  So the customers could, from Fujitsu's

24  perspective, purchase Fujitsu with the PAN installed on it,

1    they can get Fujitsu and install Microsoft on it, they could

2    install VMware on it?  They had a number of different

3    offerings to achieve the same general functionality; is that

4    fair?

5    A    That is correct.

6    Q    And Egenera's software offering was less well-received

7    by customers than Microsoft or VMware's software offering,

8    for example; is that right?

9    A    Yes.

10   Q    In your view, did the lack of the popularity of

11   Egenera's software offering have anything to do with

12   products or software sold by Cisco Systems?

13   A    Not that I'm aware of.

14          MR. DESMARAIS:  That's the end of the videos.

15   Cisco calls as its next witness Mr. Becker, to respond to

16   Egenera's damages expert, Mr. Sullivan.

17          THE COURT:  It being five of one, this is your last

18   witness, correct?

19          MR. DESMARAIS:  It is, your Honor, yes.

20          THE COURT:  And then I believe that Egenera plans

21   to recall Dr. Jones briefly.  Is that my understanding?

22          MR. THOMASES:  Yes, your Honor.  In our remaining

23   time we plan on having rebuttal from Dr. Jones, and

24   Dr. Sullivan to rebut to Dr. Becker's.

1          THE COURT:  I think that, Jurors -- and correct me

2     if I'm wrong, but I think Dr. Becker is going to be --

3          MR. DESMARAIS:  More than five minutes, yes.

4          THE COURT:  So we're going to finish tomorrow.  And

5     the reason I know that is that presently Egenera has about

6     forty minutes left, and about three hours on the other side.

7     I don't think Cisco will use all of the three hours.  So

8     whatever happens we're going to finish tomorrow.  I've taken

9     the liberty of ordering you a small special treat so we can

10    celebrate the end of the evidence.  We're going to be right

11    on schedule.  So let's start up again, as usual, at

12    9:00 tomorrow morning.

13         THE CLERK:  All rise.

14    (The jury left the courtroom.)

15         THE COURT:  Okay.  I think I'm right in my

16    forecast.  Cisco, by my count, has used two hours -- I'm

17    sorry, Egenera, two hours and twenty-one minutes.  Cisco,

18    eleven hours and fifty minutes.  So I'm pretty confident we

19    will finish.

20         MR. DESMARAIS:  So what do we each have left, your

21    Honor?  I'm sorry.

22         THE COURT:  You have three hours and ten minutes.

23    Egenera has about a little less than forty minutes.

24         MR. THOMASES:  We'll just confirm with our

1    paralegals who have been tracking along with you, your

2    Honor.

3           THE COURT:  Oh, I count on that.  It will be the

4    first thing I'll see tomorrow, you know, a countdown to the

5    seconds.

6           MR. THOMASES:  Thank you, your Honor.

7           THE COURT:  Okay.  But I think the jurors will be

8    delighted.  We do have -- the juror who did have vacation

9    plans Monday has canceled her vacation.  So we've committed,

10   I'd like to see it get through.  So it's good that we're

11   going to have it to them on Monday as we promised.

12       All right.  We'll see you tomorrow morning.

13          ALL:  Thank you, your Honor.

14   (Proceedings adjourned.)

```
 1                          I N D E X

 2     WITNESS               DIRECT   CROSS   REDIRECT   RECROSS

 3     KEVIN JEFFAY, resumed

 4      By Mr. Packin           3                111

 5      By Mr. Thomases                  89

 6     DANIEL BUSBY VIA DEPOSITION   120

 7     MAXIM SMITH VIA DEPOSITION    123

 8     THOMAS SHEEHAN VIA DEPOSITION 125

 9     KEVIN KERRIGAN VIA DEPOSITION 128

10     SCOTT GENG VIA DEPOSITION     130

11     MICHAEL THOMPSON VIA DEPOSITION 133

12     RICHARD MCCORMACK VIA DEPOSITION 152

13                      E X H I B I T S

14     JTX                                    IN EV

15     564      Cisco '533 Patent              51

16     565      Cisco '360 Patent              51

17     560      Cisco '628 Patent              51

18     567      Cisco '869 Patent              55

19     568      Cisco '069 Patent              70

20     569      Cisco '919 Patent              70

21     570      Responses to Interrogatories   117

22     571      Respons to Request for Admissions 119

23     344      Meeting presentation           151

24                           cont'd
```

```
 1   JTX                                            IN EV

 2   572        Thompson Depo Exhibit 12             151

 3   284        Thompson Depo Exhibit 16             151

 4   573        Thompson Depo Exhibit 27             151

 5   574        Thompson Depo Exhibit 31             151

 6   575        DX-D2                                151

 7

 8                      C E R T I F I C A T E

 9

10        We, James P. Gibbons and Cheryl B.

11   Palanchian, Court Reporters for the United States

12   District Court for the District of Massachusetts, do

13   hereby certify that the foregoing pages are a true

14   and accurate transcription of our shorthand notes

15   taken in the aforementioned matter to the best our

16   my skill and ability.

17

18

19

20            /s/ James P. Gibbons 8/11/2022
                  JAMES P. GIBBONS
21

22            /s/ Cheryl B. Palanchian 8/11/2022
                 CHERYL B. PALANCHIAN
23

24
```