```
 1                  UNITED STATES DISTRICT COURT
                     DISTRICT OF MASSACHUSETTS
 2

 3

 4

 5
       * * * * * * * * * * * * * *
 6     EGENERA, INC.,              *
               Plaintiff          *
 7                                *    CIVIL ACTION
               vs.                *    No. 16-11613-RGS
 8                                *
       CISCO SYSTEMS, INC.,        *
 9             Defendant          *
       * * * * * * * * * * * * * *
10

11

12

13

14          BEFORE THE HONORABLE RICHARD G. STEARNS
                UNITED STATES DISTRICT COURT JUDGE
15                        AND A JURY
                     CIVIL JURY TRIAL DAY 9
16                     August 12, 2022

17

18

19                                    Courtroom No. 21
                                      1 Courthouse Way
20                                    Boston, Massachusetts 02210

21

22             JAMES P. GIBBONS, CSR, RPR, RMR
              CHERYL PALANCHIAN, RPR, RMR, CRR
23                  Official Court Reporter
              1 Courthouse Way, Suite 7205
24            Boston, Massachusetts  02210
                 jamesgibbonsrpr@gmail.com
25
```

```
1     APPEARANCES:

2     On behalf of the Plaintiff:

3          ROPES & GRAY LLP (By Andrew N. Thomases, Esq., and
      James R. Batchelder, Esq.) 1900 University Avenue, East
4     Palo Alto, California 94303
                              - and -
5          ROPES & GRAY LLP (By Josef B. Schenker, Esq. and
      Rachael S. Bacha, Esq.) 1211 Avenue of the Americas, New
6     York, New York 10036-8704
                              - and -
7          ROPES & GRAY LLP (By Scott Taylor, Esq., Emma
      Notis-McConarty, Esq. and Nicholas Bortz, Esq.)
8     Prudential Tower, 800 Boylston Street, Boston,
      Massachusetts 02199

9
      On behalf of the Defendant:
10
           DESMARAIS LLP (By Carson Olsheski, Esq., Tamir
11    Packin, Esq., Peter C. Magic, Esq. and John M.
      Desmarais, Esq.) 230 Park Avenue, New York, New York
12    10169, on behalf of the Defendant

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1                    P R O C E E D I N G S

 2                        (8:45 a.m.)

 3              THE CLERK:  All rise.

 4      (Whereupon, the Court entered the courtroom.)

 5              THE CLERK:  Court is open.  You may be seated.

 6              THE COURT:  All right.  This is our traditional

 7      morning roll call as they say in police business.

 8               First, I think it's been reported to you that, in the

 9      great tradition of Boston commuter rail service, one of our

10      jurors is on a train that has broken down somewhere near

11      Kingston I think.

12          We've sent our own crew out to repair the train.

13          (Laughter.)

14          I think we have her on a route that will get her here

15      but probably not until 9:20.

16          But I think, thanks to the more accurate recalculation

17      of the time, we are still going to be able to finish up

18      today by 1:00, and I appreciate the candid timekeeping that

19      is going on.

20          Today's issue, there's some threatening remarks being

21      made about whatever I said in the impanelment.  I think I

22      may have gotten the date that they started the Erie Canal

23      wrong, but I'm not sure what that's directed to, but I will

24      wait to see it.

25          But the issue I have here is the rebuttal issue, and I
```

 1    am not going to go into the weeds of this, but I'm going to

 2    make the rules very clear.  Yes, there is going go be a

 3    rebuttal.  I said that from the beginning.  However, a

 4    rebuttal is a rebuttal.  It is confined to the scope of

 5    something that we are actually rebutting.  It is not an

 6    opportunity to make arguments that we wish we had made, that

 7    we didn't make, or to interject new theories.

 8        So, yes, there will a rebuttal, but I'm going to be

 9    open to objections based on "beyond the scope."  And if I

10    get one of those, you better be prepared to tell me where --

11    if I don't find it in my notes -- where you're getting this.

12        If Dr. Jeffay said something that Dr. Jones disagrees

13    with, perfectly fine.

14        If he disagrees though for a reason that was never

15    advanced in the case, not so fine, and then I will be

16    sustaining the objection.

17        You now have a draft copy of the jury instructions.  It

18    says "work in progress."  That's what it is.  So don't think

19    anything is in stone.  We are going to have plenty of

20    opportunity, both some this afternoon, more importantly over

21    the weekend before Monday, again, not to write an exegesis

22    on the instructions, but if there are really issues of

23    substance, I will be open to hear them.

24        I have tried to trim as much fluff as I could out, and

25    there are reasons why certain things are included and

1    certain things not, and I will explain those again at the

2    charging conference.

3         But I think you also should read it not simply for

4    substance, but for where we can economize.

5         Right now there are sections of it that reads like the

6    begetting verses in the Book of Genesis where you are just

7    dazed by this mirror and mountain of words that come

8    tumbling out of the judge.

9         So to the extent we can simplify some of that and make

10   it more streamlined, I think that's all to the better.

11        So I think that's the issue that's been matured so far

12   this morning, unless somebody's got something new.

13        Yes?

14        MR. THOMASES:  Yes, your Honor.  Thank you.  Good

15   morning Andrew Thomases on behalf of Egenera.

16        We conferred with counsel for Cisco last night, and

17   after receiving the transcript from the jury impanelment, we

18   saw a misstatement your Honor made -- I'm sure it's

19   inadvertent, but you said, "To 'infringe' in the patent

20   context means to copy essentially without permission."

21        And standard direct infringement doesn't require proof

22   of copying, so we have prepared a curative instruction --

23        THE COURT:  No, we're not going to go there.

24        I am going to be telling them at the outset of the

25   instruction that "nothing I say should have any

1   influence..."

2       If you want, I will ad lib and say, "including any

3   remark I made at the beginning of the case."

4       But they are not controlling.  What's controlling is

5   what's in the instructions.

6           MR. THOMASES:  I understand, your Honor.

7   We may --

8           THE COURT:  If it is the date of the Eire Canal, I

9   will correct that.

10          MR. THOMASES:  We may file the request just to

11  preserve the record, if that's okay, your Honor.  We

12  understand you will likely deny it.

13          THE COURT:  Yes, you can presume that's going to be

14  the resolution.

15          MR. THOMASES:  Thank you very much, your Honor.

16          THE COURT:  Okay.

17      As soon as our juror gets here, we will be off and

18  running, and we will give her some kind of medal for getting

19  here.

20          MS. MOULTON:  Sorry to interrupt.

21      I think we do need a ruling on the demonstratives and

22  whether those can be used with Dr. Jones.

23          THE COURT:  If they are actually rebutting

24  something that you can show me in the case, yes; something

25  new, no.

```
 1              MR. THOMASES:  Thank you, your Honor.

 2              THE COURT:  I know there's a reference to one point

 3    which Egenera did flag something about an off/on switch or a

 4    standby-mode switch.  Well, I don't recall that anywhere

 5    prior in the case, so that's --

 6              MR. THOMASES:  Dr. Jones, will not be mentioning

 7    that.

 8              THE COURT:  Okay.

 9         But those are the kind of things, no.

10         If you can show me where it is, otherwise, if there is

11    a dispute, then it's in.  If you can't show me, it's out.

12         Okay.  I'll see you in about 20 minutes, I hope.

13              MR. THOMASES:  Thank you.

14              MR. DESMARAIS:  Thank you, your Honor.

15              THE CLERK:  All rise.  The court is now in recess.

16         (Recess.)

17              THE CLERK:  All rise for the jury.

18         (Whereupon, the jury entered the courtroom.)

19         (Whereupon, the Court entered the courtroom.)

20              THE CLERK:  Court is open.  You may be seated.

21         Resuming on the record in Case No. 16-11613, Egenera,

22    Inc. versus Cisco Systems.

23              THE COURT:  Good morning again, counsel.

24         And good morning, again, jurors.

25         And I have one juror I want to thank for a heroic
```

 1   effort to be here.  So we are very grateful, and we are

 2   going to do our best to finish as close to one o'clock as we

 3   can.

 4        All right.  Next witness, please.

 5            MR. DESMARAIS:  Thank you, your Honor.

 6        Good morning, everybody.

 7        Cisco calls as its next witness Dr. Stephen Becker, who

 8   will rebut Dr. Sullivan's damages assessment.

 9        And my colleague, Carson Olsheski will do the direct

10   examination.

11            THE COURT:  Excellent.

12            THE CLERK:  Please raise your right hand, sir.

13                    **STEPHEN BECKER, sworn**.

14            THE CLERK:  Thank you.

15        Please be seated.  Please state your name for the

16   record and spell your last name for the court reporter.

17            THE WITNESS:  My name is Stephen Becker.  That's

18   Stephen with a P-H, and B-E-C-K-E-R.

19            MR. OLSHESKI:  May I proceed?

20            THE COURT:  You may.

21                    **DIRECT EXAMINATION**

22   **BY MR. OLSHESKI**

23   Q   Good afternoon [sic], sir.

24        Would you please introduce yourself to the jury.

25   A   Yes.  My name is Stephen Becker, and I live in Austin,

1    Texas.  I run a firm there called Applied Economics.

2    Q    Can you tell us a little bit about yourself?

3    A    Sure.  I was born and raised in Austin.

4         My parents were school teachers.  My dad was the school

5    administrator, ran the school where he also teached, and my

6    mother taught there, and spent most of my life in Austin

7    except for a few forays up to the east coast here to go to

8    school, and a lot of work up here.  My work has brought me

9    up to Boston quite a bit.

10   Q    What is your role in this case, Dr. Becker?

11   A    So I am here as a financial damages expert, and, in

12   particular, I'm here to offer opinions on the patent damages

13   issues in this case.

14   Q    Have you prepared any slides to help with your testimony

15   today?

16   A    I have.

17        MR. OLSHESKI:  Mr. Herzka, will you please display

18   DDX-7.

19   Q    Dr. Becker, are the slides on the screen the slides that

20   you prepared today?

21   A    They are.

22   Q    Please tell us about your educational background?

23   A    So I started out with an undergraduate degree in

24   computer science and electrical engineering from the

25   University of Pennsylvania in Philadelphia.

1          And then after working in the industry for a while, I

2     went back to school in Austin and got a master's in business

3     administration and MBA in finance from the University of

4     Texas.  I received that degree in 1986.

5          And then after working for a number of years, I

6     enrolled in the Ph.D. program at the University of Texas,

7     and in 1998 received a Ph.D. in public policy with a

8     concentration in a field we called "econometrics."

9     Q    Why did you switch from computer science to finance?

10    A    Well, growing up, I always thought I would be an

11    engineer and loved engineering and science.  And, of course,

12    when I got to school that's what I did.  And coming out of

13    college, I worked as an engineer.

14         But I ended up starting my own software and systems

15    company, and it didn't take very long in that role for me to

16    realize that while I was, I thought, a pretty good engineer,

17    I didn't know anything about business.  And I decided that

18    the best thing to do was to go back to school right there in

19    Austin where I had set up my software company and learn that

20    side of the business; and ended up really liking it and just

21    sort of stayed on that track.

22         And other than doing the work that I do at Applied

23    Economics, which is very much focused on high-technology

24    valuation, I never went back to actually practicing as an

25    engineer.

1  Q   Can you walk us through some of your professional

2  experience, please?

3  A   Sure.

4      Starting right out of college I got hired by a company

5  that's well known down in Texas, I think not so well known

6  in the rest of the country, called Schlumberger.  They're a

7  very large oil field services company and have, I think,

8  about 150,000 employees worldwide.  I was hired to be a

9  systems engineer in their R&D labs in Houston, Texas.

10     Then after I left Schlumberger, I started a firm in

11 Austin called a The Solutions Group.  This was -- I'm dating

12 myself, but right around the time when the personal computer

13 was a brand new thing, nobody had ever seen one of these

14 things, and IBM came out with the IBM PC.  And there were

15 really no solutions on that for small- and medium-sized

16 businesses.

17     Accounting software, all kinds of different programs

18 that we take for granted now didn't exist back in 19 --

19 whatever year that was.  I think it was '81 or '82?

20     So I set up this small company with a couple of other

21 engineers to design systems that were targeted toward small-

22 and medium-sized businesses.

23     As I said, I was good at the engineering on that and

24 not so good at the business end of that, so I went back to

25 get my MBA.

1          And when I came out of the MBA program, I went to work

2     for Booz, Allen & Hamilton.  That's a big international

3     management consulting firm, and they do strategy and

4     technology consulting.  I was mostly in the business

5     strategy side of things and had clients all over North

6     America, US, Canada, and Mexico.

7          I then -- the Becker & Associates that you see there

8     was basically me hanging out a shingle when I went to get my

9     Ph.D.

10          For all of my college, undergrad, graduate school and

11     Ph.D., I worked through college, put myself through school,

12     and I needed to actually still be making a living while I

13     was getting a Ph.D. program.  So Becker & Associates was

14     just my version of doing the kind of consulting that I had

15     been doing for Booz Allen.

16          And then Applied Economics is the firm I have today

17     that I started when I finished my Ph.D.

18          I founded Applied Economics with a partner.  We rented

19     a basement office, just the two of us in 19 -- late 1998,

20     and have grown that business now to 25 people in Austin,

21     Houston, and Dallas.

22     Q    What do you do now at Applied Economics?

23     A    Most of the work I do, other than a small amount of my

24     time being spent on managing the firm, is providing the kind

25     of expert opinions that I'm providing here today.

1           A significant part of that is focused on

2    high-technology valuation, things like computer software,

3    networking.

4           I do a lot of work in the cellular telephone and sort

5    of Smartphone networking space as well.

6    Q    How many times have you given expert opinions on patent

7    valuation?

8    A    So I've been retained as an expert on patent valuation

9    and patent damages well over 200 times.  I think it's

10   probably 250 at least different matters.

11          Not every one of those progressed to the point that I

12   issued a report, but I would say well over a hundred of

13   those have.

14          And then I've testified live at trial and given patent

15   infringement damages opinions about 40 times.

16   Q    Do you testify on behalf of both patent holders and

17   those accused of infringement?

18   A    I do.

19          Really consistently, since the first time I testified I

20   think back in '98 or '99, I have been working about 50/50

21   for patent holders and accused infringers.

22   Q    Has your experience in software engineering helped with

23   valuing intellectual property?

24   A    It has.

25          What I find is that when -- there's always a need to

1    read the technical expert reports, even reading the patents

2    and talking to the engineers within the company to

3    understand how the product works.  Not at the level the

4    technical experts in this case are providing opinions on,

5    but I've got to understand how the technology is creating

6    value and sort of where the value proposition is in the

7    accused product.

8        And I find that my software engineering and electrical

9    engineering background at least helps me have productive

10   conversations with the engineers and the technical experts.

11   Q   Are you providing any technical opinions in this case?

12   A   I am not.

13   Q   What was your assignment in this case?

14   A   So I had two basic assignments here.  One was to test

15   the reliability of Dr. Sullivan's opinions; and, second, to

16   the extent that I, in testing those opinions, found that

17   there were problems with them, my second assignment was to

18   offer some corrections to those -- to Dr. Sullivan's

19   approach to get to a more reasonable result.

20   Q   Do you have any opinion on whether or not Cisco

21   infringed Egenera's patent?

22   A   No, I do not.  And it's not something that as a damages

23   expert I would ever have an opinion on.

24       I am required to assume, for the purposes of my work,

25   that the patent is valid and is infringed.  But that only,

1    you know, comes into play if the jury finds that the patent

2    is valid and if the jury finds that it's infringed.  But my

3    assumption of that shouldn't be taken as an inference that I

4    believe that one way or the other.

5    Q   If the jury finds that there is no infringement, would

6    Cisco owe Egenera any damages?

7    A   No.

8    Q   And if the jury finds that the '430 patent is invalid,

9    would Cisco owe Egenera any damages?

10   A   No.

11   Q   Dr. Becker, what materials did you consider in your

12   analysis?

13   A   So in any case both sides produce a huge amount of data.

14       There are court filings, the complaint in the case.

15   Things like -- we call them interrogatories, and requests

16   for admission.  That ends up being a giant pile of paper.

17       There are expert reports, depositions, deposition

18   exhibits, those sorts of things.

19       My staff and I have had access to all of that material

20   in this case, and have reviewed it.  And, in addition to

21   that, we've done some research in sort of publicly available

22   information about the market for the blade server products

23   that are at issue in this case.

24   Q   Let's look at your assignment in this case.

25       So what did you do to test the reliability of

1    Dr. Sullivan's opinions?

2    A    So the first thing I did was I wanted to basically start

3    at the same place that Dr. Sullivan did.

4         And I think in his testimony he did a good job of

5    explaining this concept of the hypothetical negotiation,

6    where, even though the negotiation never occurred, we put

7    Cisco and Egenera at a negotiating table back in July of

8    2009 and asked the question:  What would a reasonable

9    outcome be if these parties had been sitting at a table in

10   July of 2009 for a nonexclusive license, U.S. license, to

11   the '430 patent.

12   Q    There's a few terms to go through here.

13        First, can you remind us, what is a "patent license"?

14   A    So a patent license is the right to use a particular set

15   of technology.

16        It's not unlike an apartment.  If I own an apartment

17   and you want to use it, we will sit down and negotiate a

18   rental agreement.  Typically that would be called a "lease."

19        So a lease for real property, like real estate, is not

20   unlike a patent license for intellectual property.  It just

21   describes the rights to use it.  Are you going to have

22   exclusive use or nonexclusive use?  How long can you use it?

23   And, most importantly, what is the compensation?

24        Equivalent to the rent that you might pay me to rent my

25   apartment, what is the royalty payment that you're going to

1    pay me to use my technology.

2    Q    What does "nonexclusive" mean in the context of a patent

3    license?

4    A    So, unlike real estate, where it's pretty difficult to

5    grant somebody a nonexclusive lease for a house, oh, you

6    know, there's going to be six people living in this house,

7    if you lease a house, you probably have exclusive rights to

8    use that house.

9        But with patented technology and a patent license,

10   Egenera can license Cisco to use that.  They still own the

11   patent.  They could license HP to use it also.  They could

12   license anybody to use it, if it's nonexclusive.

13       But if it's an exclusive license they would say, Okay,

14   HP, you can have the right to use this and none of your

15   competitors are going to use it.  That's the difference.

16       Here what I have to do is assume that the license that

17   Cisco would get is a nonexclusive license, and that's sort

18   of what the price needs to reflect.

19   Q    What is the significance of the date July 2009?

20   A    So July 2009 is the -- we put the parties to the

21   negotiation at the table just before the time that Cisco

22   would be launching the UCS product, so that it's before they

23   actually start selling UCS, and the parties could sit down

24   and say, Okay, we are about to launch this product, what's a

25   reasonable amount of money to pay?

1          It's also important because it sort of puts a stake in

2     the ground for where the -- the market conditions.  I need

3     to look at what's going on with Egenera, what's going on

4     with Cisco, and what's going on in the blade server as of

5     July 2009, not what's happening today, what's happening in

6     2014 or 2016.

7     Q    Dr. Sullivan testified that both parties go to the table

8     in a hypothetical negotiation with all their cards out.  Do

9     you agree?

10    A    Yes, that's one of the fundamental assumptions that any

11    patent damages expert who's using this hypothetical

12    negotiation approach assumes, is that the parties are aware

13    of what we called "all relevant information."

14    Q    So what did you do next?

15    A    So next, sort of picking up with this thought that I

16    have to look at the -- what's going on in July of 2009?  In

17    particular, what has brought Egenera to the table?  What are

18    their circumstances?

19         And to look at that, I constructed a timeline and said,

20    I want to look at the events leading up to July of 2009 so

21    we can understand, Would Egenera be there not wanting to

22    license?  Would they be wanting to license?  Would they be

23    looking at a large company, like Cisco, as an attractive

24    licensee, those sorts of things.

25    Q    What evidence did you look at?

1   A   So the first thing -- I'm a finance and economics guy.

2   So the first question I always have is, Let me look at

3   money.

4        And so I went, and using data that was produced by

5   Egenera -- we have financial statements from them, audited

6   financial statements going back to 2000, and detailed sales

7   data -- I constructed this graph of their Egenera product

8   revenues.  And we can see that they launched product, their

9   BladeFrame product, in 2001.  And those sales grew fairly

10  rapidly up to a level of about 65, 68 million, and hit a

11  peak in 2006 of 84 million and really leveled off there?

12       From 2006 to 2007, there was essentially no growth in

13  the product.

14       And then, following 2007, the product revenues went on

15  a steep decline.

16  Q   The jury has seen a chart from Egenera with somewhat

17  different numbers, can you explain why it is important to

18  look at product revenue in this case instead of total

19  revenue?

20  A   Sure.  I think the chart was used in opening and may

21  have been used with some other witnesses -- does have a

22  slightly different sort of shape to it and the downturn

23  comes a little later.  That is looking at total revenue.

24       And the wedge that's added on on top of product

25  revenues is services revenue.  And that tends to lag your

1    product sales.

2         Like at a car dealership, the service department

3    revenues are going to lag the new car sales.  You don't need

4    to get your car serviced the first year after you buy it,

5    hopefully, and even if you do it's under warranty, so the

6    service department isn't going to be making any revenue off

7    that.

8         And so you really see, just like in a car dealership,

9    the services revenue comes in two or three years after the

10   product sales.

11        And that's why in the case of Egenera, if we look at

12   what's really driving the business, namely their product's

13   sales, that's the engine, that started declining right after

14   2007 and really stopped growing at the end of 2006.

15        The services revenue keeps growing because you have an

16   ever larger growing base of blade frames out there that a

17   couple of years later need servicing.

18        And that's what we see.  There's, you know, a pretty

19   steady amount of service revenue going out into the 2010,

20   2011 time period.  But it's not really what's driving the

21   business, and it's not where the engine of their sales is.

22   Q    What else did you consider?

23   A    So I looked at some sort of timeline events.

24        The first is that in June of 2004, Egenera made some

25   filings to take the company public.  This was when they were

1   on that steep upward trajectory.  But about -- really less

2   than a year later they pulled that filing back.  Their

3   growth had slowed, and the market conditions, at least from

4   the evidence I've seen, they indicated that the market for

5   that company, given their growth profile, really wasn't

6   right.  So they pulled the public filing back.

7        Then following the downturn in 2008 throughout 2008,

8   Egenera actually made a decision to get out of the

9   BladeFrame business and started courting buyers to try to

10  sell the company.

11       Throughout 2008 they were talking to IBM, HP, cisco,

12  Dell, lots of different companies, and working with

13  investment bankers to try and find a buyer for Egenera.

14       Then right around that same time, they were working

15  with Morgan Stanley, the big investment bank, to find a

16  buyer for the company, and Morgan Stanley valued

17  Egenera's -- the sort of -- what we call "enterprise value"

18  of the company between 75 and $100 million, the whole

19  company.

20  Q    What specific exhibits did you consider?

21  A    Actually, I've got two more items here.

22  Q    Sorry.

23       Please continue.

24  A    That's all right.

25       The other -- the next significant event that sort of

1    precedes any sitdown with Cisco is that they laid off

2    28 percent of their workforce in November 2008.  So this is

3    before Cisco has launched UCS, before they're sitting at the

4    table.

5         So they're going to come to the table, and they can't

6    say -- at least based on the evidence I've seen, they can't

7    say, Look, Cisco, you're responsible for.  This is just the

8    circumstance we find ourselves in.  They've decided to get

9    out of the BladeFrame business and have laid off a

10   significant portion of their workforce.

11        And right on the heels of that, Egenera internally has

12   put a value of itself at about $50 million for the entire

13   company.

14   Q   Let me try this one again?

15        What specific exhibits did you look at?

16   A   So for the evidence that's shown on this slide, I

17   considered JTX-46, 59, 61 through 64, 298, 313, 368, and

18   DX-HO.

19        MR. OLSHESKI:  And for the record, your Honor, I'm

20   marking DX-HO as JTX-576, and I offer it into evidence.

21        THE COURT:  So received.

22        **(Exhibit No. JTX-576 received in evidence.)**

23   Q   Dr. Becker, did you consider what Egenera was doing with

24   its BladeFrame product going into the hypothetical

25   negotiations?

A    Yes.

So I think it's also important -- an important
circumstance is that well prior to that negotiation, the
evidence is that Egenera had made the decision to exit the
hardware business and get out of selling BladeFrames.

So this testimony here from Mr. Thompson, who is
Egenera's former CEO, is that they made this decision to
"execute on a plan to reduce BladeFrame sales, ultimately
down to zero" in 2008.

So that's significant because -- for a couple of
reasons.  One is that decline in revenue is really in part
Egenera executing on the plan that it had.  They said, We're
getting out of the hardware business, and these sales are
going to go to zero.

It also means that they have transitioned to a
software-only company where they're really going to be
looking to monetize their technology through licensing and
selling software, not through selling hardware.  So they
need companies like HP or Dell or Cisco, who have the
hardware component, in order to monetize their technology.

Q    Can you remind the jury, please, of Dr. Sullivan's
reasonable royalty figure?

A    Sure.  His number is $371 million, and he got that by
taking the number of servers that are accused during that
damage period, 353,000 and some change, and a $1,050 royalty

1  per server.

2  Q   How did you analyze Dr. Sullivan's suggested reasonable

3  royalty?

4  A   So the first thing I did was ask the question to myself

5  and, you know, from an economic standpoint:  Does 371

6  million as a royalty for a nonexclusive license to one

7  patent, does that make sense?  Is there some evidence out

8  there that I can look at to sort of test and weigh whether

9  that makes sense at a high level?

10  Q   What did you find?

11  A   Well, I found two things.  One is that that amount is

12  more than seven times Egenera's internal estimate of the

13  entire value of the company at the time of the negotiation;

14  and, second, that it's more than four times the value of

15  Nuova's server business.  That's the segment that is accused

16  of practicing the '430 patent.

17  Q   Can you please tell us about the first point in more

18  detail?

19  A   Sure.  On that first point I am relying on a couple of

20  things.  One is this -- I think the jury has seen this.  It

21  was played in the testimony yesterday, that in December of

22  2006 -- I mean 2008, so December 6, 2008, about six months

23  before this hypothetical negotiation, Egenera is actively

24  trying to sell itself.  Mr. Thompson gets an email from a

25  board member that says, Where are we on the sale process,

 1    and what do you think about the valuation as of today?

 2          And he says -- he assumes 50 million with one buyer.

 3    He also mentions that Morgan, that's Morgan Stanley, gave

 4    us, that's Egenera, a range of 75 to 100 million a few

 5    months ago.

 6          So we've got kind of -- I can bracket the value between

 7    50 and $100 million going into the hypothetical negotiation.

 8    Q    Why is Mr. Thompson's internal valuation important?

 9    A    Well, Egenera's at the table.  Morgan Stanley is not

10    going to be at the table.  And also that Morgan Stanley

11    valuation was, as he said, a couple of months earlier, which

12    would put it before the significant layoffs and before

13    Egenera had actually decided to transition from being a

14    hardware company to a software company.

15    Q    Why is Morgan Stanley's valuation important?

16    A    That one is -- I find it significant because it's a set

17    of third-party eyes on the company.  Morgan Stanley's in the

18    business of investment banking, and their bread-and-butter

19    work for their investment banking teams is to do valuations

20    of companies.

21          So we've got an independent set of eyes on the company

22    kind of around the same time going into the hypothetical

23    negotiation saying 75 to 100 million.

24    Q    What's the exhibit number for this email?

25    A    This is JTX-059.

1    Q    Dr. Becker, do you recall Dr. Sullivan's testimony in

2    which he suggested that Cisco's planned launch of UCS was a

3    card that Egenera was not aware of when it valued itself at

4    $50 million?

5    A    I did read that testimony, yes.

6    Q    What did you think about that?

7    A    Well, a couple of things.  One is it's not consistent

8    with what -- other testimony that I've seen that suggests

9    that the market actually was aware, well before the launch,

10   was aware of the -- that Cisco was coming out with a

11   product, the UCS product.

12        And there's not only the market was aware, but there

13   has been testimony that Egenera itself was aware of it.

14   Q    What evidence are you referring?

15   A    So, first, Mr. Brownell on the first day of the trial

16   testified that the UCS product release was the worst kept

17   secret in the marketplace.

18        And that's confirmed by Mr. Manca's testimony, the

19   former CEO of Egenera, on the second day of the trial when

20   he testified that in 2008 Egenera heard about something

21   called "Project California," which was the code name Cisco

22   used for the UCS product.

23        So he says, "That's when we first started hearing of

24   the potential for Cisco entering the market."

25   Q    What conclusions do you draw from Mr. Brownell and

1    Mr. Manca's testimony?

2    A    So the -- certainly I don't think it's reasonable to say

3    that sitting in July of 2009, or even at the time in

4    December of 2008 when Egenera is looking at itself and

5    saying, We think we can get 50 million from a buyer for the

6    company, it's just not reasonable to say that that is in an

7    environment where they are completely unaware that Cisco is

8    working on this product.

9        It also doesn't make sense because to say that that

10   card is facedown because all of these sales efforts, where

11   they are going out and saying, Let's see if we can get HP to

12   buy the company, let's see if we can get Dell to buy the

13   company, that is with an expectation that HP or Dell will

14   take the Egenera technology and use it.

15       So I don't think it's really reasonable to say that the

16   $50 million valuation is one that does not have baked into

17   it an expectation that one of the major BladeFrame makers is

18   going to be using this technology.

19       It's, in fact, the price to allow the company, like HP

20   or Dell if they bought the company, to get the '430 patent

21   and all of the other technology that Egenera has.

22   Q    So what was the next step in your analysis?

23   A    So the next step was -- my job and Dr. Sullivan's job is

24   to come up with a value for a nonexclusive license to the

25   '430 patent, not the entirety of Egenera.

1          And so we've got to say, you know, Do we have any sense

2     of what else is in that value of Egenera?  Is Egenera just a

3     shell that has the '430 patent in it?

4          And Mr. Thompson's email describing the $50 million

5     outlines what I think is true about any technology company,

6     that their value consists of the customer base replacement

7     value.  That's that stream of services revenue.

8          Just like a car dealership, some of the value is in all

9     the cars that are already out there that they've already

10    sold that they're going to be able to service in the future.

11         The engineering talent has value.

12         Egenera's core expertise in infrastructure

13    virtualization has value, and the IP has value.

14         So Mr. Thompson in his email outlines these four

15    components, of which the '430 patent is only going to be

16    residing in that bottom cloud, namely, the intellectual

17    property.

18    Q    What conclusions do you draw from the '430 patent being

19    only part of Egenera's value?

20    A    So the conclusion I drew here is that -- back to my

21    reasonableness test.

22         Does this make any sense?

23         Right around the time of the hypothetical negotiation

24    we've got Egenera at a total value of themselves thinking

25    they're worth 50 million, where the '430 patent would be

1    only a portion of that 50 million; yet, at the same time

2    Dr. Sullivan is saying that it's reasonable that they would

3    ask for $371 million, and that Cisco would agree to

4    371 million at the same time, those things just can't

5    coexist.

6    Q    Let's go back to your two points, please.

7        Can you explain your second point to the jury in more

8    detail?

9    A    Sure.

10       Here, instead of looking at Egenera to do this sort of

11    sanity check, I'm looking at Nuova.  That's the business

12    that had the -- the sort of server business in it that

13    became UCS.  And if you dive into that, I think there's been

14    some testimony from Dr. Sullivan that Nuova -- the internal

15    Cisco valuation put the value at about a billion dollars,

16    one billion, sixty-seven million.

17       But if you dive into that valuation and look at the

18    details, what you find is that 55 percent of the value of

19    Nuova was being driven by the Nexus 5000 switch business.

20       Another 37 percent of the value was from the services

21    business.

22       And only 8 percent of the value, based on that cash

23    flow analysis that Cisco had, would be from the UCS server

24    business.

25       It was the lowest gross margin business of these three

1    business lines, and that's why it contributes a lot less to

2    the overall value.

3        When I crunched the numbers using that same document

4    that Dr. Sullivan uses, I get the entire server business

5    being valued at $85 million.

6    Q   And what document are you talking about there?

7    A   It's JTX-54.

8        MR. OLSHESKI:  Mr. Herzka, will you please pull up

9    JTX-54.

10   Q   Dr. Becker, what is JTX-54?

11   A   So this is a March 8, 2007, Cisco document where they're

12   discussing the updated terms and conditions for their

13   acquisition of Nuova.

14       And in this document at page 11, we find what's called

15   a --

16       THE WITNESS:  If you can blow back out so I can see

17   the title.

18   A   It says, "Base Case DCF Analysis."  And "DCF" stands for

19   "discounted cash flow."  It's something that in the finance

20   and valuation world we do all the time.  It's a way to value

21   businesses and assets.  You project out the revenues and the

22   profits and the cash flows and then sort of take into

23   account the time value of money and say, Today, what's that

24   future stream of cash flow's worth.

25       That's a discounted cash flow analysis.

1      And here this is the model that Dr. Sullivan relies on.

2           THE WITNESS:  And if you zoom in on that top left

3      where it's the "revenue" section, this first box up here, it

4      says, "server revenue, switch revenue."

5           MR. OLSHESKI:  Mr. Herzka, can you zoom in?

6           THE WITNESS:  Or at least highlight that up there,

7      if you don't mind.

8           MR. OLSHESKI:  Thank you.

9           THE WITNESS:  There we go.

10  A   You can see within this model they're recognizing that

11  Egenera -- that Nuova is three different, sort of, lines of

12  business and three different revenue streams:  Server

13  revenue, switch revenue, and services revenue.

14      The rest of the model has assumptions about the

15  margins, and the -- how much each one of these three lines

16  of business is going to contribute to the total cash flow of

17  the business.

18           MR. OLSHESKI:  Now, can we go back to the slides,

19  please, Mr. Herzka.

20  Q   And, Dr. Becker, how does the $85 million value of

21  Nuova's server business compare to Dr. Sullivan's suggested

22  reasonable royalty?

23  A   So that 85 million is what I've got charted on the left.

24      And, as I've indicated, just like with Egenera, to the

25  extent that the '430 patent -- if we assume infringement,

1   which I have to assume, the '430 patent isn't the whole of

2   Nuova.  It's not even the whole of their server business.

3   It's some portion of that 85 million.

4       And again, if we compare that to Dr. Sullivan's $371

5   million, I think -- I don't believe that that makes any

6   economic sense.

7   Q   Let's go back to your two points, please.

8       What did you conclude about Dr. Sullivan's $371 million

9   suggested reasonable royalty?

10  A   So when we look at the sort of comparison to the sort of

11  indicators of value on both sides of that negotiating table,

12  we've got Egenera on the one side of the table with a value

13  of 50 to $100 million and the patent being just a small part

14  of that, or Nuova, that the -- Cisco's on the other side

15  having bought Nuova, with an $85 million server business, a

16  $371 million royalty just doesn't make economic sense.

17  Q   So what did you do next?

18  A   So the next step was to try and figure out how

19  Dr. Sullivan got to a number that is so sort of far out of

20  line with what I think the economics of this situation

21  indicate.  There has to be a reason or something along the

22  path that I can identify that tells me why his number got

23  where it did.

24  Q   And how did his number get where it did?

25  A   So back to his basic equation.

1    THE WITNESS:  I don't know -- is there a way to get

2  these things off the screen?

3    (Pause in proceedings.)

4    THE WITNESS:  Thank you.

5  A   Back to his basic equation.

6    It's really, at the highest level, just the number of

7  systems times the royalty rate equals the royalty.

8    The number of systems out there isn't in dispute.

9  That's just a number.  You go add up how many were sold.

10    So the -- if there's a problem, it's going to be found

11  in the derivation of that $1,050 per server royalty.

12    And I went into his work and studied his reports,

13  studied his work papers, looked at the evidence that he

14  considered.

15    And what I found out, at least from my opinion, is that

16  there are problems with each of Dr. Sullivan's steps to

17  determine that royalty.

18    And that's where, when you -- these couple of different

19  problems actually just caused this number to blow up to $371

20  million.

21  Q   So before we discuss those problems, can you explain

22  what the effect of an incorrect royalty per server is on

23  Dr. Sullivan's reasonable royalty?

24  A   So if the royalty rate is incorrect or unreasonable

25  because of some flaws in the steps that he took to get

1    there, the $371 million number is not going to be valid or

2    reasonable.

3    Q    What problems did you find with Dr. Sullivan's royalty

4    per server calculation?

5    A    So there are three major problems that I think help

6    explain why he gets to $371 million when the place he

7    starts -- you know, the circumstances at that table, there's

8    no numbers that would justify 371 million.

9         The first is that he bases his royalty on the total

10   value of Nuova.  His -- right at the beginning of, I think,

11   about seven steps that he takes to derive that 1,050 per

12   server number, is he starts with all of Nuova.  And I think

13   that's a problem because a significant part of Nuova doesn't

14   have anything to do with this case or the '430 patent.

15        The second is there is another step that he calls his

16   "calibration step," where he's looking to come up with one

17   of his factors, and there he uses just a single year of

18   revenues instead of all the years of cash flow.

19        And the third is that he overstates the cost savings

20   from the '430 patent at one of his critical steps.

21   Q    Can you explain that first problem in more detail,

22   please?

23   A    Sure.  The very first step in Dr. Sullivan's methodology

24   to get to 1,050 is to look at the total value of Nuova,

25   which is $1,067M, based on the internal Cisco document --

1    that's that document we just looked, at JTX-54 -- and

2    compare to what Cisco paid for Nuova.

3         But the problem with that is that you're starting at

4    over a billion dollars when the server business that has

5    UCS, if it's in there at all it's in the "server" wedge, not

6    in the "switch" wedge and not in "services," is only

7    85 million.

8         So starting at the wrong place and starting at a place

9    where the number that he's starting with is so much bigger

10   is a problem that does lead him to a -- it contributes a

11   significant amount to that inflation and that 1,050 per

12   server.

13        MR. OLSHESKI:  Let's go back to those three

14   problems, please.

15   Q   Can you explain the problem of using a single

16   calibration year in more detail?

17   A   Yes.  So after the first couple of steps in his

18   analysis, where he's actually using all of the years of the

19   cash flow, he has the next step where he says, I'm not going

20   to use all the years, I'm just going to use 02013.

21        And that, I think -- it's a problem.  And I've run the

22   numbers just with his model if he had used all the years

23   available in that JTX-54 cash flow model.  And that by

24   itself, the number would come down by about 20 percent just

25   using one year versus all the years, both the past and

1     the -- what we call the "terminal value," which is the

2     projected amount out into the future.

3             MR. OLSHESKI:  Let's go back to the three problems,

4     please.

5     Q    Can you explain in more detail the third problem with

6     Dr. Sullivan's analysis?

7     A    So -- yeah, sorry, the shading is wrong on this, but

8     we're talking about the third, the "cost savings from the

9     '430 patent."

10          So here this is perhaps the most critical step in

11    Dr. Sullivan's analysis.

12          Prior to this step, he had gotten to what he calls a

13    $1,897 Payment per Server.  And this, by the way, is his

14    slide.  This is his slide from his presentation.

15          And he applies a 55.5 percent apportionment factor.  I

16    think he called it his "technology apportionment factor."

17          He derived that factor by saying that this pie on the

18    left are different types of cost savings that the UCS

19    product, not UCS Manager but the entire UCS product, if you

20    use that platform, these are cost savings that they generate

21    compared to competitors like HP or Dell.

22          And those cost savings fall into different categories.

23    Like you save on power and cooling, or you save on

24    switching, warranty and cabling.

25          Dr. Sullivan took two of those -- what he has as five

categories, said "Systems Management" and the "Provisioning

& Administration" is literally 100 percent, every last

dollar of those cost savings, his assumption is that it's

all being driven by the '430 patent.

     And that just struck me as, How can that be right?  I

mean, this is a big complex product.  Cisco has, I think the

testimony was, 31 of their own patents on UCS.  How can this

one patent be driving a hundred percent of all the cost

savings from Systems Management and Provisioning & Admin.

Q  So, Dr. Becker, what did you do with Dr. Sullivan's

analysis?

A  So, you know, I didn't want to just assume that he was

wrong.  I need to see what he did and get behind it, get

under the hood, and figure out, you know, Is this a

reasonable number or not?

     So I went to his work papers.  I said, Where does this

55.3 percent come from?

     And he has a work paper that says it comes from looking

at 15 different case studies where you can ask Cisco's Total

Cost of Ownership tool, What's this system versus HP?

What's a UCS system versus Dell?

     And he adds up or averages the savings in these

different categories.

     The problem is, if I -- I went and looked at the source

documents that he's using, and it turns out there's actually

1   a much more complex issue going on.  It's not as simple as

2   just five things.

3            MR. OLSHESKI:  Ms. Tang, may I please have the

4   document camera?

5   Q   Dr. Becker, I'm displaying JTX-410.  Do you see that?

6   A   Yes.

7   Q   What is JTX-410?

8   A   So this is a document -- this is a Cisco document.  It's

9   a presentation that within it contains the results of this

10  sales tool that Cisco has called their "Total Cost of

11  Ownership" tool, where sales engineers can go in and sort of

12  put in if a customer is thinking about buying a hundred

13  servers, let's say with a particular configuration, they put

14  that in, and it will spit out a comparison of the UCS

15  solution to HP or to Dell.

16        And this is the source document that I was able to

17  determine from Dr. Sullivan's work papers is the thing he

18  was using.

19            MR. OLSHESKI:  Let's take a look at one of those

20  case studies Dr. Becker.

21  Q   Displaying page 15, the front of the page, what are we

22  looking at here?

23  A   So this is one of the case studies.  I think it was the

24  very first one in Dr. Sullivan's work paper.  And you can

25  see the five categories that he has.

1          This is comparing on the left-hand side what they call

2     a "traditional" solution.  And in this case it was HP

3     ProLiant versus Cisco UCS.

4          And the waterfall says that you're going to get savings

5     from five categories:  "Server Hardware and Warranty;

6     Switching, Warranty, Cabling; Power & Cooling; Provisioning

7     & Admin; and Systems Management."  And that gets you to the

8     total cost of ownership, meaning, How much is the customer

9     going to spend on power and labor and everything to actually

10    put this in their data center?

11         That is what he used, and these are the categories that

12    he then says that this "Provisioning & Admin" category and

13    the "Systems Management" are 100 percent attributable to the

14    '430 patent.

15    Q    Let's see what's on the back of the page?

16    A    So the numbers on those five bars is actually just a

17    high-level summarization of a lot of different comparisons,

18    very granular, line-item comparisons of the cost of owning

19    HP -- an HP system to the cost of owning a UCS system.

20         And It's not as simple as just, Well, there's one thing

21    that's driving "Systems Management" costs, one thing that's

22    driving "Ongoing LAN Administration," those things.

23         So that "Provisioning & Administration" column summary,

24    for example, it actually includes something called "Per

25    Server Ongoing Administration" and "ongoing LAN

1    Administration."  Very granular, and I don't think you can

2    really attribute the '430 patent to the big category unless

3    you can understand what's going on in the smaller

4    categories.

5            MR. OLSHESKI:  Can we go back to the slides,

6    Ms. Tang.

7        Thank you.

8    Q   So what conclusions did you draw?

9    A   Well, when I got to that point where I was looking at
     that thing and said, Oh, my God, there's like 100 things on
10   this page, I said, I need to understand whether it's
     reasonable to say that the '430 patent is exclusively
11   driving the cost savings in all the things that are rolling
     up to "Provisioning and Administration" and all the things
12   that are rolling up to "Systems Management" because that's
     what's driving Dr. Sullivan's assumption.
13       So I took this information and asked to be put in

14   contact with people at Cisco that understand this tool, this

15   Total Cost of Ownership tool, so that I could interview them

16   and say, What's going on in Systems Management?  When cost

17   savings show up in Systems Management, what's driving that?

18   When cost savings show up in Per Server Ongoing

19   Administration, what would cause that cost savings to show

20   up, so that I can asses whether it's reasonable through

21   talking to the engineers at Cisco and to Dr. Jeffay whether

22   the '430 patent could be impacting that.

23   Q   How should the cost -- sorry.

24       How should the categories of cost savings been divided?

25   A   So Dr. Sullivan had already concluded that the light

1    blue shaded ones were not in the '430 patent, and, as he

2    testified, that everything that's with that darker blue is

3    supposedly exclusively the '430 patent.

4        When I looked at the "Systems Management" wedge, and

5    based on my interviews with Cisco, specifically Mr. Morgan

6    and Mr. Clark at Cisco who know what goes into these

7    categories, they know how that tool works, what they said is

8    that the "Systems Management" wedge is actually the place

9    where this tool captures cost savings attributable to

10    differences in licensing costs.

11        So like when you buy a laptop, you have to make a

12    decision about what suite of programs, for like a

13    spreadsheet or word processor, you're going to use.

14        The same if you got your, you know, your blade servers.

15        With a laptop, if you choose Microsoft, you're going to

16    be paying licensing fees to Microsoft every year.  So over

17    the course of a three-year cost of ownership, you'll will

18    have licensing costs.

19        This wedge is capturing that the fact that with UCS, is

20    what I learned in my interviews, is that the -- when you use

21    UCS, they use Linux, is an open-source program that doesn't

22    require a licensing fee.

23        The competing product, like on HP that we are looking

24    at, uses for one of its pieces an Oracle tool.  And so

25    you've a got to pay ongoing -- you know, Oracle charges a

1    lot of money for their product.

2         So there is cost savings to use UCS because you don't

3    have to pay licensing fees to people like Oracle.

4         And that's what's in the wedge.  It's not anything in

5    the '430 patent.

6         The title of it may suggest, Well, the patent kind of

7    helps with systems management.  But it's not what's actually

8    rolling up into the cost savings of this wedge.

9    Q    What other evidence about systems management cost

10   savings did you consider?

11   A    So I also, in addition to interviewing a couple of

12   people at Cisco, one of whom being Mr. Morgan, I -- in

13   Mr. Morgan's deposition, he actually noted this fact that

14   it's expensive to license Oracle on Superdomes.  And

15   Superdomes is an HP product.

16        And so if you're comparing using UCS to using HP, he's

17   saying, When we use HP, we pay license fees to Oracle, and

18   when we migrated to UCS, we were using Linux and we didn't

19   have those licensing fees.

20   Q    So what should Dr. Sullivan have done to apportion cost

21   savings from Systems Management?

22   A    So Systems Management in my opinion, and I think the

23   evidence certainly does not support an attribution of that

24   to the '430 patent, it should go back into the pie with that

25   light blue shading.  It's not something that is plausibly

1  being driven in any way by the '430 patent, at least not

2  what's rolling up into it.

3  Q   What did you do with cost savings in the "Per Server

4  Administration Category"?

5  A   So --

6  Q   I'm sorry.  I take that back.  I went ahead.

7      What did you do with cost savings in the "Ongoing LAN

8  Administration & Other" category?

9  A   So just like this Systems Management, kind of the

10  devil's in the details.  We saw that page that had lots and

11  lots of things on there, and the Ongoing LAN

12  Administration -- and when I say "and Other," that's because

13  there's other categories on that details page that roll up

14  to a wedge that is part of a big wedge that Dr. Sullivan

15  used.

16      Again, my interviews with the Cisco engineers say, you

17  know, What's in there, and Is any of the savings in "Ongoing

18  LAN Administration & Other" attributable to the

19  functionality in UCS Manager?  And they said no.

20      And because it's my understanding that it's really UCS

21  Manager running on these systems that is accused of

22  practicing the '430 patent, it would be unreasonable to

23  attribute the savings in this wedge to the '430 patent.

24  Q   And so what should Dr. Sullivan have done with that

25  category?

1    A    Again, that one -- at least I haven't seen any evidence

2    that would suggest that that can be colored the dark blue

3    color that puts it into the royalty.  It needs to be light

4    blue and, at least based on my interviews, all of it would

5    come out.

6    Q    Now, what did you do with cost savings in the "Per

7    Server Ongoing Administration" category?

8    A    Same sort of approach.  This was -- I needed to go talk

9    to people that understand what goes into that category.  And

10   what I found is, through those interviews, is that one of

11   the features of the UCS platform is that it uses something

12   called VMware.  It's a tool for managing.  It allows you to

13   create virtual machines.  That's what the V-M in VMware

14   stands for.

15        And a virtual machine is -- it creates a virtual server

16   on a physical server.

17        And with VMware you can have up to 20 virtual servers

18   on one box.  And that alone dramatically reduces the ongoing

19   administration cost of a Per Server Ongoing Administration.

20   Because you've got a 20-to-1 sort of -- I think the evidence

21   is that it's between 15-to-1 and 20-to-1 savings.

22        That the guys in the data center who are running around

23   doing stuff, they do it on one physical server, and they're

24   actually managing with one server up to 20 servers.  So that

25   creates a huge savings.

1          That's a big part of what's in the "Per Server Ongoing

2     Admin."

3          The other is that the UCS product allows you to use

4     fibre channel over Ethernet.

5          This is kind of getting into beyond my capabilities,

6     but I do understand that it is a technology that generated

7     cost savings because it -- you don't have two different

8     interfaces for all your cables.  The fibre channel

9     connection just goes through your Ethernet cables.

10    Q    So besides your conversation with Mr. Morgan, what other

11    evidence did you consider here?

12    A    So Dr. Jones actually was asked a question about this on

13    Trial Day 5.  The question was:  "So fibre channel over

14    Ethernet helps reduce cabling and makes management of the

15    data center easier, right?"

16         He says, "It can simplify it, yes.

17         "And you agree that Egenera did not invent fibre

18    channel over Ethernet, right?

19         "That's correct."

20         So given that the people who know how this TCO tool

21    works told me in my interview that fibre channel over

22    Ethernet labor savings, from just not having to do as much

23    cabling, that rolls up into Per Server Ongoing

24    Administration.

25         So it can't be the case that 100 percent of that

1    category is the '430 patent.

2    Q    So what should Dr. Sullivan have done to apportion cost

3    savings from the Per Server Ongoing Administration category?

4    A    So this category -- if you take out this huge savings,

5    20-to-1 savings on labor from VMware and savings from things

6    like fibre channel over Ethernet, what might -- based on my

7    interviews, I understand that no more than 5 percent of this

8    wedge can be attributable to the UCS Manager functionality.

9        People that know what UCS Manager does said, That, at

10   best, is contributing 5 percent of this overall wedge;

11   therefore, no more than 5 percent of that category can

12   reasonably be attributable to the '430 patent.

13   Q    And what does 5 percent of that wedge mean to the

14   apportionment overall?

15   A    So if we put that wedge back in, 5 percent of that

16   wedge -- that wedge was about 24 percent -- if you work out

17   the math on what's the resulting overall apportionment, it

18   would be 1.2 percent if you take out the things that can't

19   reasonably be attributed to the '430 patent.

20   Q    Dr. Becker, could you please summarize the problem you

21   found with Dr. Sullivan's analysis?

22   A    Yes.

23       So again, basing the royalty on the total value of

24   Nuova presents a problem.  You're starting with a number

25   that's way too big.

1        I'm not saying you can't get to the right number from

2   that, but you've got to have steps to make sure that you get

3   all the way down to the '430 patent because you started much

4   further away from it than if you started in a different

5   place.

6        The calibration year, single calibration year, that's

7   about 20 percent.

8        And overstating the cost savings from the '430 patent

9   is really the big driver of that $371 million number.

10  Q   So what did you do after identifying the problems with

11  Dr. Sullivan's approach?

12  A   So the next step was to see, Can I make some corrections

13  either within his model or outside of his model to get to a

14  more reasonable number?

15  Q   What did you find?

16  A   Two things.  One is that if I stay in his model, the

17  model that I think -- he called it his "Nuova acquisition

18  approach," but basically the one that he presented to the

19  jury, and stay within that and correct that technology

20  apportionment factor step, that's one way to sort of get to

21  a more reasonable number.

22       The other way is to say, Let's not start with Nuova but

23  instead start with the value of Egenera, kind of the other

24  side of the negotiating table.

25  Q   So let's talk about the first one, "Dr. Sullivan's Nuova

1    Acquisition Approach."  What did you do there?

2    A   So this is really just continuing the analysis from the

3    -- that I had just done.

4       Dr. Sullivan's model gets to 1,050 by applying

5    55.3 percent factor, which is based on this assumption that

6    100 percent of those dark-colored wedges, literally every

7    dollar of it, can be attributed to the '430 patent.

8       If we instead use the 5 percent of the Per Server

9    Ongoing Admin wedge, which work out to 1.2 percent overall,

10   that corrected amount, leave everything else in his model

11   untouched, not a single thing other than that one factor,

12   the royalty per server is 23, and the overall royalty would

13   be $8.8 million.

14   Q   Let's go back to your two corrections, and can you go

15   through that second point, "Begin the Analysis With the

16   Value of Egenera."

17   A   Right.  So I wanted to look at a different path.  If,

18   instead of starting at Nuova and having to work through all

19   the different steps to get from the value of a business that

20   has a switch business in it, et cetera, I said, let me start

21   with Egenera.  They're the oar party at the table.

22      We have valuations of that company from right around

23   the same time.  So we know what would be the value sort of

24   on the Egenera side of the table.

25      And I believe that this can be used to isolate the

1    value of nonexclusive U.S. license to the '430 patent.  We

2    can start there and get to that license.

3    Q    So why is it more reasonable to start with the value of

4    Egenera?

5    A    Well, a couple of reasons.  One is we know that the '430

6    patent is in the value of Egenera, no doubt.  They own that

7    patent.  It's part of their IP portfolio, and we know it's

8    one of the four components of that value.  And so it's

9    closer to the end point that we need to get to.  And it is

10   the value that's in the mind of the people on one side of

11   the table.  They've been offering essentially this price to

12   the server market.

13   Q    So how did you determine the value of a nonexclusive

14   license to the '430 patent starting with the value of

15   Egenera as a whole?

16   A    So I've got basically three things.  Over on the left I

17   sort of got that slide where the value -- this is from

18   Mr. Thompson's slide, where we had the value of $50 to

19   $100 million, and recognizing that the IP is one piece of

20   that, I need a step that isolates the IP value, gets out the

21   value of that stream of service revenue.

22       Second, I need to limit it to the U.S. because the

23   patent license here is going to be just the U.S.  And

24   Egenera has revenues all over the world, so their value is

25   being derived from more than just the U.S.

1          And the last is to adjust for that non-exclusivity.

2     Cisco isn't getting in its license all rights, title, and

3     interest in the patent.  They are not getting exclusive

4     rights to the patent.  They're just licensing their piece of

5     the market.

6     Q    How did you isolate IP value?

7     A    So the first step on the IP value is to deduct the value

8     of that services revenue stream at Egenera.

9          This is what I've got listed here.  It's called the

10    "Value of Egenera's Installed Base."

11         It's not unlike asking your car dealership, You've got,

12    you know, 10,000 customers out there who own cars that they

13    bought from you that are now in that three- to

14    seven-years-old time frame.

15         You've got a stream of services revenue.  We can use

16    that same discounted cash flow valuation approach to take

17    Egenera's financials and pull out that value using a DCF

18    model, exactly the same approach that is in that Cisco model

19    that Dr. Sullivan relies on.

20         That pulls out $27 million of value, to leave

21    73 million -- and again, I am starting at the high end of

22    the range just to keep the presentation simple.  You know,

23    we could run everything from the 50 million end.  But for

24    the benefit of the doubt start at the $100 million end.

25         "Net of the hardware installed base," we are at

1    73 million.

2    Q    How did you limit that value to the United States?

3    A    So the next step is Limit it to the United States.

4        This is a map where Egenera had offices and resellers

5    and OEMs.  It's pretty much all over the world.  Their

6    financial statements reflect that, that more than half of

7    their revenues were coming from outside the U.S.

8        So I've got a step to take the value of Egenera net and

9    use that sales factor, that 42.7 percent of their sales are

10   in the U.S., so that gets us down to $31 million, 31.1.

11   Q    How did you account for a non-exclusive license?

12   A    So, now we are down to a point -- and I might mention

13   that, you know, you're asking the question, What happened to

14   the two other clouds on that chart, the engineering talent

15   and employees?

16       Well, by the time you get to the negotiating table,

17   they've laid off most of their engineers and the sales

18   force.  So to be conservative, given that circumstance, I've

19   just said, We're really down to the situation where you've

20   got the installed base and the IP driving the value.

21       This 31 million is to own the IP, meaning its exclusive

22   rights to it.  They're just going to write a license to

23   Cisco for their portion of the market.

24       So the next step is to apply Cisco's average market

25   share.  This is not what anybody thought Cisco was going to

1    have.  It's actually averaging Cisco's market share from

2    2009 all the way through, I think, 2021.  Their average

3    market share, if we sort of average that back to what -- the

4    sort of value of that back in 2009 is 27 percent.

5         That gets me to an estimated value of a nonexclusive

6    license -- so we've narrowed it to nonexclusive, we've

7    narrowed it to just the patent rights and just to Cisco --

8    of $8.5 million.

9    Q    Now, Dr. Becker, if UCS had been twice as successful as

10   it was in the marketplace, what would have happened to that

11   number?

12   A    It would be $16, $17 million.

13   Q    And how do you know that?

14   A    Because I am using Cisco's actual market share.  So I'm

15   capturing -- by sort of looking forward to today, I'm

16   capturing what Cisco's actual success in the marketplace

17   was.

18        If they were twice as successful and had, you know, a

19   50 percent market share, 60 percent share, that number would

20   double.

21   Q    And if Cisco were only half as successful, what would

22   have happened to your number?

23   A    The number would go down.  So this number is tied to

24   Cisco's success with the UCS product.

25   Q    And what specific exhibits did you consider in

1    determining market share?

2    A   So, JTX-49, 51, 54, and 466 to 470.

3    Q   So ultimately what is the value of a non-exclusive

4    U.S.-only license to the '430 patent to Cisco?

5    A   Based on the analysis and the evidence that I've looked

6    at, whether we -- you know looking at it from Egenera's

7    perspective but also taking into account Cisco's use, that

8    indicates a lump sum of $8.5 million.

9        And that's a new term here, this "lump sum."

10       In the patent licensing world, we can either do things

11   as a sort of up-front, one-time payment for the rights to

12   use the patent for its life, or you can use what's called

13   running royalty, where you pay every time the thing is sold.

14       Dr. Sullivan uses a running royalty.

15       I think a lump sum is more appropriate.  You can also

16   call that a one-time payment.

17   Q   Why would a one-time payment be more appropriate in this

18   circumstance?

19   A   Well, I think there's been a lot of evidence about what

20   would have been Egenera's mindset at the hypothetical

21   negotiation table.  I think there was some deposition

22   testimony played yesterday that in early 2009 Egenera was

23   looking for cash infusions, looking for investment money

24   coming in, so that they could avoid having to do a fire sale

25   of company.

1           And that tells me that they would have wanted all their

2     money up front.  It doesn't make sense for them to be in

3     need of capital but write a license agreement that says, You

4     can pay us in late 2009, a little bit more in 2010, and on

5     out to 2020, 2021, 2022.

6     Q   And if Cisco is found to have infringed the '430 patent,

7     and if the '430 patent is found to be valid, is an

8     $8.5 million royalty reasonable?

9     A   Yes.  In my mind it is.

10    Q   How do you know?

11    A   Well, we've seen that it is -- it is an amount that is

12    consistent with the valuations that Egenera had at the time,

13    and it's also -- if we look at starting with Nuova, even if

14    you start with Nuova, and even if you start with the total

15    value, the whole billion dollar value and you properly and

16    reasonably attribute the role of the '430 patent in those

17    Nuova cash flows, you get to 8.8 million.

18          So I think an $8.5 million royalty is very reasonable

19    in the light of the evidence.

20    Q   Is a royalty of $371 million reasonable?

21    A   No.  It's something that is just -- I can't square that

22    371 million with any of the economic evidence in this case.

23          MR. OLSHESKI:  Thank you, Dr. Becker.

24        I pass the witness.

25          MR. BATCHELDER:  Your Honor, in the interest of

1    time, we will have in our rebuttal case a bit later today

2    Dr. Sullivan respond directly to this witness.  So we have

3    no questions of this witness.

4            THE COURT:  Thank you very much then, Dr. Becker.

5    That concludes your testimony.

6            THE WITNESS:  Thank you.

7        (Witness excused.)

8            THE COURT:  Next?

9            MR. DESMARAIS:  Thank you, your Honor.

10       Cisco rests its case.

11           THE COURT:  All right, jurors, Cisco has completed

12   the evidence that it wishes to present in the case.

13       I think we're moving a little faster, despite the

14   slight delay this morning with the train, than we

15   anticipated.  So why don't we take the morning recess now

16   and come back around 11, and we will finish up the case

17   then, and hopefully well before 1:00.

18       Let's take the recess, and the jury will be excused

19   until 11:00.

20           THE CLERK:  All rise.  Court is now in recess.

21       (Recess.)

22           THE CLERK:  Court is now back in session in case

23   16-11613.  Please be seated.

24           THE COURT:  All right.  Do we have a motion?

25           MR. THOMASES:  Yes.  Thank you, your Honor.  Andrew

1    Thomases on behalf of Egenera.

2         Egenera hereby moves for judgment as a matter of law on

3    Rule 50(a) on a number of topics because no reasonable jury

4    could find otherwise.  The first topic is claims 3 and 7of

5    the '430 patent are not invalid for anticipation or

6    obviousness.  There was a complete failure of proof.

7    Dr. Jeffay did not do any analysis where he applied the

8    Court's claim construction to any of the limitations of the

9    asserted claims.

10        We also move for judgment as a matter of law that Cisco

11   directly infringes claims 3 and 7 of the '430 patent either

12   literally or under the doctrine of equivalents, and no

13   reasonable jury could find otherwise.

14        Also we move that Cisco indirectly infringes claims

15   3 and 7 of the '430 patent through both induced infringement

16   and contributory infringement, either literally or under the

17   doctrine of equivalents, and no reasonable jury could find

18   otherwise.

19        We also move Cisco willfully infringes claims 3 and

20   7 of the '430 patent, and no reasonable jury could find

21   otherwise.

22        And Egenera moves that it is entitled to its requested

23   damages of no less than a reasonable royalty.  And also it's

24   entitled to prejudgment and post-judgment interest.

25        We also move for enhancement of damages, and also that

1    Egenera is entitled to attorneys' fees.

2          Thank you, your Honor.

3              THE COURT:  That's a rather long wish list.

4          No, I deny the motion.  Actually, I think there are

5    significant jury issues on all.  The one I might doubt is

6    willfulness, but I would probably rule, if I had to, in the

7    other direction if I were pushed.

8              MR. DESMARAIS:  So moved, your Honor.  So moved.

9              THE COURT:  Well, for the same reason I deny

10   Egenera's motion, I'm also going to deny that.  For the

11   record.

12             MR. DESMARAIS:  Shall I renew mine, for the record,

13   as long as --

14             THE COURT:  Yes, you should.

15             MR. DESMARAIS:  Cisco renews its motion for

16   judgment as a matter of law for infringement, willful

17   infringement, damages.

18         And we move for judgment as a matter of law on

19   invalidity.

20             THE COURT:  For the reasons I stated earlier at the

21   close of Egenera's evidence, I'm going to reserve that issue

22   until the jury's verdict.

23         All right.  I think we're ready.

24             MR. THOMASES:  Your Honor, does that mean you don't

25   need written briefing from us?

```
1                    THE COURT:  Pardon me?

2                    MR. THOMASES:  Does that mean you would not like

3    written briefing from us?

4                    THE COURT:  You've got enough to do, I think,

5    without taking that task on.

6                    MR. THOMASES:  Thank you.  I just wanted to

7    confirm.

8                         (The jury entered the courtroom.)

9                    THE CLERK:  You may be seated.  Resuming on the

10   record, case number 16-11613.

11                   THE COURT:  All right, jurors.  Egenera has a brief

12   rebuttal case which we will proceed to now.  We're going to

13   finish before 1:00 though is my prediction.  All right.

14                   MR. THOMASES:  Thank you, your Honor.  May I

15   proceed?

16                   THE COURT:  You may.

17                   MR. THOMASES:  Thank you.  For its rebuttal case,

18   Egenera calls Dr. Mark Jones back to the stand.

19                   THE CLERK:  Dr. Jones, please remember that you're

20   still under oath.

21                   THE WITNESS:  Yes.

22                   THE CLERK:  Thank you.

23                         MARK JONES, Recalled

24

25
```

1          **<u>DIRECT EXAMINATION</u>**

2     **BY MR. THOMASES:**

3     Q    Good morning, Dr. Jones.  How are you?

4     A    Good morning, sir.

5     Q    You were present for the testimony throughout this case;

6     is that right?

7     A    Yes.

8     Q    And do you recall Dr. Jeffay, Cisco's expert, saying

9     that he agrees with your explanation of the UCS system and

10    how it operates?

11    A    Yes, I recall that.

12    Q    But you seem to have a disagreement with each other on

13    how he views the patent claims and how you view the patent

14    claims; correct?

15    A    I would put it as the -- how he views -- how he views

16    the system operates mapping to the patent claims.

17    Q    Well, we're first going to talk about Dr. Jeffay's first

18    argument that he calls, "Programming the CPUs."  Do you

19    recall that?

20    A    I do.

21    Q    Do you believe that the UCS Manager running on UCS meets

22    the claim requirement involving programming the processors?

23    A    Yes, I do.

24    Q    Let's look at Dr. Jeffay's slide DDX-5.51, please.  Do

25    you recall this slide?

1    A    I do.

2    Q    And Dr. Jeffay put an X next to, "Programming CPUs to

3    Establish Network"?

4    A    That's correct.

5    Q    Now, the word "topology" is in this claim.  Can we just

6    step back and explain to the jury, in this context, what

7    "topology" means?

8    A    Yes.  Topology here is providing communication among the

9    processors.  It's the interconnectivity among the specified

10   processors of the claim.

11   Q    Dr. Jeffay stopped his highlighting mid-phrase.  There's

12   language after the word "topology" saying, "Providing

13   communication among said corresponding set of computer

14   processors."  Is that important language?

15   A    Well, yes.  All the claim language is important, but

16   this is describing that the topology is going to provide

17   communication among the processors, which we'll see which

18   ones are being referenced.  But the processors are the

19   entities in the system, the CPUs that are going to do the

20   work.  They're the workhorses or the brains of the devices.

21   Q    So is it important that they have communication among

22   them in the topology?

23   A    Yes.  They have to both communicate among themselves as

24   well as externally.

25   Q    Now, there's some language in here that, I guess, is

1   favored by patent lawyers, but it says, "Said corresponding

2   set of computer processors."  What does the word "said" mean

3   in the connection of a patent?

4   A   That means we need to look for when it's been said

5   before, so look previously in the claims to find what is

6   meant or which particular corresponding set of processors

7   this is.

8   Q   And there's also the language "the" in certain phrases

9   like "the specified virtual local area network topology."

10  What does the word "the" mean in that context?

11  A   It's means, again, we should look back in the claims to

12  find what the specified virtual local area network topology

13  is.  It's referencing backwards in the claims.

14  Q   Do you have a slide to help us look at those references?

15  A   Yes.

16  Q   Okay.

17          MR. THOMASES:  Can we please have PDX14.11.

18  Q   So here we have claim 7.  If we advance the slide, you

19  said the plurality of computer processors?

20  A   Yes, that's the first time it's been -- that the

21  plurality of computer processors has been mentioned.

22  Q   And if we look at the further highlighting, there's a

23  specifying, and it says, "A number of processors for a

24  virtual processing area network"?

25  A   Yes.  That's the first time we see "specifying."  That's

1    going to apply to each one of those, one, two, and three.

2    Q    And let's continue.  Here you're specifying a virtual

3    local area network topology defining interconnectivity and

4    switching functionality among the specified processors;

5    right?

6    A    Yes.

7    Q    And in that phrase we'll see again, "Selecting a

8    corresponding set of computer processors for the virtual

9    processing area network."  That's referring back to the

10   network above; right?

11   A    Yes.

12   Q    And then there's the language that we just looked at but

13   with the language that Dr. Jeffay left off added back on.

14   That's the language that we're looking at in this dispute

15   between you and Dr. Jeffay; right?

16   A    Yes.  We're looking at that language in the context of

17   what it references elsewhere in the claim.

18   Q    There's one more phrase we want to highlight here.

19   "Messages from the plurality of computer processors."  Why

20   is that important?

21   A    Well, that's describing the ability for sending messages

22   from the processors.  And we'll see it again later.  But the

23   processors are the things that send messages in this -- in

24   these claims.

25   Q    So looking at this claim, can you or a jury ignore the

1    processors when considering the topology?

2    A    No.  Remember, it's a topology for providing

3    communication among the processors.  So we need to look at

4    that aspect of the topology.

5    Q    And is it your understanding, from sitting here in

6    court, that Cisco and Dr. Jeffay are saying that the

7    topology stops at the NICs in the UCS and that the

8    processors of the UCS are not included in the topology?

9    A    That's what I understood the argument to be, yes.

10   Q    Is that correct?

11   A    No, that's not correct.  The processors in the UCS

12   system become part of the topology.  They're able to send

13   messages, and there's a topology that's formed that includes

14   those processors.

15   Q    And is that important because the topology must provide

16   communication among said corresponding set of computer

17   processors?

18   A    That's part of the reason.  It's also because the

19   topology defines the interconnectivity and switching

20   functionality among the processors.

21   Q    And does either claim 7 or claim 3 include the language

22   regarding NICs or network interface cards?

23   A    No.  The network interface cards don't appear in the

24   claims 3 and 7.

25   Q    Okay.  We're just going to go to the next slide, which

1    is claim 3, not walk through, but is the language similarly

2    structured such that the topology has to include processors

3    that communicate with each other?

4    A    Yes.  It's similar language.  We can look at 3E2.  It

5    has the same definition of the topology in that it's among

6    the processors.

7    Q    Now, with this in mind, let's turn to Dr. Jeffay's

8    argument regarding programming the CPUs.  Did you address

9    programming the CPUs in your expert report?

10   A    Yes, I did.

11   Q    Okay.

12        MR. THOMASES:  Your Honor, may we approach the

13   witness?

14        THE COURT:  You may.

15        (Handing.)

16   Q    Dr. Jones, is that at least portions of your expert

17   report that you provided in this case?

18   A    Yes, that's portions of it.

19   Q    There are a lot more exhibits, but to save trees we

20   didn't include them all.  But there is Appendix A and

21   Exhibit 23 there; right?

22   A    That's correct.

23   Q    And if you turn to your Appendix A, starting around

24   page 237, do you see a number of paragraphs explaining how

25   the UCS system programs the UCS CPUs?

1    A    I do.

2    Q    And at pages 155, 158 and elsewhere do you describe the

3    PNUOS in the UCS system?

4    A    I see it.  Starting at 158 I see discussion of PNUOS,

5    that's correct.

6    Q    And there's also some at, I think I said the page number

7    wrong, but 154.  I apologize.

8    A    That's correct, at 154.

9    Q    Thank you.  And in a number of places in your expert

10   report you describe how what are called service profiles in

11   UCS are associated with the physical servers; correct?

12   A    Yes.  I describe that in overview as well as in detail

13   in Exhibit 23, et cetera.

14   Q    And did you create a visual aid to help explain this

15   association of service profiles in UCS?

16   A    Yes, I did.

17   Q    Okay.  Let's put up what is marked as PDX14.1.  What is

18   this, please?

19   A    Well, this is a figure from Cisco from one of their

20   documents that I talked about on Monday, and I've expanded

21   it out and blown up parts of it for the discussion.

22   Q    And the original is from JTX-49; is that right?

23   A    That's correct.

24   Q    And can you briefly remind us what some of the key

25   components are in the UCS system as shown here?

1    A    Yes.  So in light blue, that's the outline of a blade,

2    the server blade, and it has -- I've shown it with CPUs and

3    a VIC here.  It's a high-level diagram.  Then you see the

4    fabric extenders in orange above that, the fabric

5    interconnects above that, and their connections to the

6    external storage and communication networks.

7    Q    As we heard, the UCS Manager runs on the fabric

8    interconnects?

9    A    That's correct.

10   Q    And at this time, showing here, are any service profiles

11   associated with any server?

12   A    No.  What I'm depicting here, there are no service

13   profiles on the servers.  So the servers aren't -- they

14   don't have their personality or identity configured at this

15   point.

16   Q    And is that why the CPUs are showing gray?

17   A    That's correct.

18   Q    Can you just explain for the jury, again at a high

19   level, what a service profile is?

20   A    A service profile describes the identity or

21   configuration that I want for the server.  So it's the

22   logical version of the server, that I'm going to associate

23   that with a physical server and give it that identity.

24   Q    Okay.  Let's go to the next slide and just show how the

25   system is initially.  What are you describing here?

1    A    I'm describing at this point the VIC, or which is a form

2    of NIC, doesn't have any created VNIC, so that VNIC doesn't

3    have a MAC address at this point.

4    Q    And VNIC, again, stands for virtual network interface

5    card?

6    A    Yes, it's the virtual version.

7    Q    And are the CPUs booted at this time?

8    A    They are not.

9    Q    Now, let's look at the process for associating a service

10   profile.  That is now shown in the left fabric interconnect.

11   And where is that service profile going to be associated?

12   A    So it's going to be associated with the left blade, and

13   I'll just show an overview of the process.  But that service

14   profile is going to be associated by the user, or an

15   automated portion of it, indicating that UCS Manager should

16   associate that profile with that blade.  And when it does

17   that, it will send down software to the processor on the

18   blade.

19   Q    And what is the name of that software?

20   A    That is PNUOS.

21   Q    And does that software run or be executed on that CPU?

22   A    Yes, it does.

23   Q    And just stepping back, CPUs are processors in the

24   claim; correct?

25   A    That's correct.

1    Q    So at the time that this code runs on the CPU, is there

2    a VNIC?

3    A    No, not in what I'll show you here.  There's not a VNIC

4    created at that point.

5    Q    Okay.  Let's progress, then, the animation.  We're going

6    to see that code coming down; right?

7    A    Yes.

8    Q    And that little spinning, showing booting up and doing

9    what?

10   A    It's configuring the blade so it can do things such as

11   update firmware, as well as update other parts of the blade.

12   Q    So what happens next after that's run?

13   A    Well, it stops running and the service -- UCS Manager is

14   still managing the process of associating the service

15   profile.  So the next thing it's going to do is send a

16   configuration down to the adapter card.

17   Q    Okay.  Let's show that.  It's got to come from the

18   service profile; correct?

19   A    Yes.

20   Q    Okay.  What happens now that it's there?

21   A    When that configuration is sent to the virtual interface

22   card it will create a VNIC, and as part of that creation and

23   that configuration it's given a MAC address, as well as a

24   lot of other configuration information.

25   Q    At this time can the left CPU in that server blade send

1    messages to any other CPU in the UCS system?

2    A    No, it cannot.  It doesn't have its operating system

3    loaded, for example.  It's not booted up.  But also it

4    doesn't know how -- it doesn't have the information it needs

5    to communicate with another processor.

6    Q    And what happens next?

7    A    Next the UCS Manager will tell the CPU to boot.  So it

8    will send a command down.

9    Q    Okay.  Let's show that.  It's coming from the green on

10   the left; correct?

11   A    Yes.

12   Q    The fabric interconnect.  Okay.  So the CPU turned blue.

13   What does that mean?

14   A    Well, that means it's been given the instructions on --

15   to boot, as well as how to boot, by the UCS Manager on the

16   fabric interconnect.  So now it's going to load an operating

17   system and run it.

18   Q    Okay.  Is that what "OS" stands for?

19   A    Yes.

20   Q    And next what happens?

21   A    It's going to --

22             MR. PACKIN:  Your Honor, I object.  This is outside

23   the scope of the expert report.

24             THE COURT:  Sustained.

25   Q    At this time can the CPU on the left-hand side

1   communicate with any CPU in the topology of UCS?

2   A    No, it can't.  The service profile hasn't been fully

3   associated and the CPU, including the OS, does not have the

4   information it needs to communicate with, for example,

5   communicate through the VNIC.

6   Q    So at this time --

7          MR. PACKIN:  Your Honor, I object.  Can we please

8   take down the slide?  He's doing it even though you

9   sustained the objection.

10         MR. THOMASES:  Your Honor, you had -- I understood

11  the rule that this was okay this morning.  But also drivers

12  are discussed in the sections we just talked about in the

13  expert reports.

14         THE COURT:  All right.  I'll take your word, as far

15  as that goes.

16         MR. THOMASES:  Thank you.

17         MR. PACKIN:  Move to strike, for the record, your

18  Honor.

19         THE COURT:  So noted.

20  Q    At this point in time, Dr. Jeffay, [sic] the drivers are

21  loaded on the CPU.  Can anything on that CPU communicate

22  among a topology of CPUs within the UCS network?

23  A    Not yet.  Not with the information they have.

24  Q    So what happens next?

25  A    The drivers communicate with the VNIC to ask it for

1    configuration of --

2          MR. PACKIN:  Your Honor, I object and move to

3    strike.

4          THE COURT:  Sustained.

5          MR. THOMASES:  Your Honor, the MAC addresses and

6    how they get on --

7          THE COURT:  No, I think you're outside the scope.

8          MR. THOMASES:  Okay.

9    Q    All right.  So at what point in time can the CPUs on the

10   left-most server blade communicate with other CPUs in the

11   network?

12   A    When it has, when the MAC address is on the CPU, the

13   operating system, it can communicate with the other devices

14   in the system.

15   Q    And do you show that?

16   A    I do.

17   Q    Okay.  On the left there a little "HR" came up.  What

18   does that indicate?

19   A    That's an indication, a representation of an

20   application, program that would run on the CPU.

21   Q    Okay.

22          MR. PACKIN:  Your Honor, I object to these slides.

23   It's showing this MAC address on the drivers, which is never

24   talked about, not in the report, and it's not --

25          THE COURT:  Yeah, why don't we take down the slide.

1    I think it's half right and half wrong.

2              MR. THOMASES:  The drivers are in Exhibit 23 to his

3    report.  But I will continue.  Can I see it on my screen?

4              THE COURT:  Yes.

5              MR. THOMASES:  Okay.  I don't have it up yet.

6    Q   Okay.  At some point the CPU --

7              MR. PACKIN:  Your Honor, he's doing the same exact

8    thing.

9              MR. THOMASES:  No, it's not up.  I'm just using --

10             MR. PACKIN:  Oh, I'm on my screen.  Oh, I'm sorry,

11   your Honor.

12             THE COURT:  He can see it.

13             MR. PACKIN:  I didn't realize.  I could see it too.

14   Sorry.

15   Q   At some point -- or at what point can a CPU on one UCS

16   server send messages to communicate among the topology of

17   other processors in the UCS network?

18   A   When that CPU has the MAC address of the VNIC then it

19   can use -- and the VNIC configuration information, it can

20   then communicate, using that VNIC, to the rest of the

21   processors that are within the virtual processing area

22   network.

23   Q   Now, as we recall, Dr. Jeffay says that the UCS Manager

24   does not program the CPUs in order to create a topology of

25   CPUs communicating among the specified processors.  Do you

1   recall that?

2   A   I do.

3   Q   Is that accurate?

4   A   No.  I don't agree.  As I've explained, the UCS Manager

5   controls this process.  It sends -- it directs the CPU how

6   to boot, where to get its operating system.  It initially

7   runs PNUOS on the system to configure it.  It also is

8   responsible for programming the VNIC into the virtual

9   network card.  So all of that is under the control of the

10  UCS Manager and it results in the CPU receiving that MAC

11  address.

12  Q   Okay.

13        MR. THOMASES:  Can we turn back to Dr. Jeffay's

14  slide, DDX-5.51.  5.51, please, the whole one.  Without the

15  blowup, please.

16  Q   Okay.  Dr. Jeffay has an X next to, "Program CPUs to

17  Establish Network."  Do you agree with that?

18  A   I don't agree with that.

19  Q   Do you believe UCS Manager does program the CPUs in

20  order to establish a virtual local area topology providing

21  communication among said corresponding set of computer

22  processors?

23  A   I do.  As I've explained, it currently results in the

24  CPU being programmed.

25  Q   And do you recall Dr. Jeffay discussing the third

1    bedrock fact of Cisco's at slide 5.67?

2    A    I do.

3    Q    Let's put that up.  Do you agree with this third bedrock

4    fact?

5    A    The first sentence I do not agree with.  And the last

6    sentence I don't agree with.

7    Q    They say, "We program the NICs, we designed the NIC

8    ourself."  Is that relevant?

9    A    No.  You can -- I agree they program the NICs.  And you

10   can program the NICs, it's not something the claims

11   prohibit.

12   Q    And, "The NIC is not a CPU."  Is that relevant?

13   A    No, it's not.

14   Q    Because there are CPUs that are programmed to establish

15   the topology, we discussed; is that right?

16   A    That's correct.  The claims are comprising claims.  They

17   allow other operations.  You just have to do all of the

18   limitations of the claims.

19   Q    Let's turn to Dr. Jeffay slide 5.70, it's regarding the

20   storage addresses.  Do you recall this?

21   A    I do.

22   Q    First, does -- did Dr. Jeffay say that UCS doesn't

23   infringe because it doesn't translate addresses?  Do you

24   recall that?

25   A    I heard him explain that a few times, yes.

1    Q    Do claims 3 and 7 require translating of addresses to

2    meet this limitation?

3    A    No, that's not in the claim language.

4    Q    And even if translation were required, do you recall

5    testimony that would support translation?

6    A    Yes.  I believe Mr. Chen's testimony addresses

7    translation with respect to the storage addresses.

8    Q    Okay.  Can we just quickly put up Mr. Chen's deposition

9    transcript at 104, 17 to 24, and do you recall Mr. Chen was

10   a Cisco engineer?

11   A    Yes.

12   Q    And this testimony is supporting your claim that there

13   is translation?

14   A    That's correct.  He's talking about with respect to the

15   VLAN-to-VSAN translation, and that's the -- one of the

16   operations that addresses this limitation.

17   Q    Let's put up DDX-579, Dr. Jeffay's slide quoting your

18   testimony.  And Dr. Jeffay puts "access an address" in

19   quotes in the title, inferring that you were saying they

20   were not addresses.  Is that true?

21   A    No.  What I'm explaining here is why they're addresses.

22   Q    So is it, in your opinion, these items here, V tags,

23   VLAN IDs and VSAN IDs, are addresses?

24   A    Yes.

25   Q    And you did say that during your testimony on Monday;

1    correct?

2    A    Yes.

3    Q    And was that supported by the testimony of Justin Chen

4    that you cited to?

5    A    Yes, it was.

6         MR. THOMASES:  Okay.  Let's put up DDX-5.8.  Sorry,

7    5.80.  Thank you.

8    Q    And here they're recording some testimony from

9    Dr. -- sorry -- Mr. Chen about forwarding, saying that VLAN

10   IDs are not used to forward packets.  Do you agree with

11   this?

12   A    I don't agree with it.

13   Q    And why not?

14   A    Because of my examination of the system, as well as

15   other testimony from Mr. Chen where he was asked in more

16   detail about how it operates, and with respect to certain

17   documents of Cisco.

18        MR. THOMASES:  And can we put up Mr. Chen's depo at

19   9524, 9612, please?

20   Q    Is this the testimony that you were referring to where

21   he talks about forwarding decisions?

22   A    Yes.  He's describing that they're going to do a

23   forwarding decision using a lookup key.  If we look further

24   down, the lookup key, about at line 7, it's the destination

25   MAC and the VLAN information is used as the lookup key.  And

 1    that's going to be used to decide how to forward the packet.

 2              MR. THOMASES:  Can we have Exhibit PX-AVE at 67.

 3    Q    This is cited in your appendix at paragraph 30.  What is

 4    this showing?

 5    A    This is a document that is -- well, it's entirely

 6    devoted to how forwarding works within one of the PHY ASIC

 7    chips that I discussed.  If we look at line 9 or item 9, it

 8    indicates that the forwarding is based on the combination of

 9    the VSAN and the destination ID.  So the VSAN ID, in this

10    case, is used as -- for forwarding.

11    Q    Do you recall --

12              MR. THOMASES:  Put up 5.73, please.

13    Q    Do you recall Dr. Jeffay talking about your FLOGI to

14    FDISC conversion?

15    A    I do.

16    Q    And in your opinion does that meet the claim

17    limitations?

18    A    Yes, it does.

19    Q    And why is that?

20    A    What I'm describing is the translation, and I indicated

21    how it operates, including how an address is extracted from

22    FLOGI, and that is used to find the corresponding port which

23    is used to forward the information.

24              MR. PACKIN:  Objection, your Honor.  Move to

25    strike.  There was not any testimony about an address being

1   extracted from FLOGI.

2           THE COURT:  That's not what my note indicates.

3           MR. THOMASES:  Your Honor, day 5 transcript,

4   line -- page 93, lines 15, to page 94, line 1.

5           THE COURT:  I have that in my notes.

6           MR. THOMASES:  Thank you.

7   Q   So in your mind does the limitation that is X'd out in

8   blue here on the screen, is that met in the UCS system?

9   A   Yes, it is.

10  Q   Let's turn to his third argument.

11          MR. THOMASES:  Let's put up DDX-5.128, please.

12  Q   This is regarding modifying communication messages.  Do

13  you recall him saying that he says that there is no

14  modifying of communication messages?

15  A   I do, yes.

16  Q   Okay.  And do you agree or disagree?

17  A   I disagree.  This is the removal of the VN tags that I

18  described in my testimony on Monday.

19  Q   Okay.  Why does removal of VN tags by the UCS Manager

20  running on the fabric interconnect modify a message?

21  A   Well, it's removing the tag from the message.  So that's

22  a modification of the message.  And it's being done within

23  the control node.

24  Q   And do you recall Dr. Jeffay saying that removal of the

25  VN tags cannot be modification of the messages from the CPU

1    because those tags are added by the VNICs?

2    A    I do recall that, yes.

3    Q    Do you agree or disagree?

4    A    I disagree.

5    Q    And why is that?

6    A    Because the removal of the VN tag is done at the control

7    node, and that's what the claim requires, and the messages

8    are coming from the processors.

9              MR. THOMASES:   Can we put up the patent, claim 7,

10   JTX-1 at 32, lines 33 to 38.

11   Q    So there's highlighting, the control node is doing the

12   receiving and modifying; correct?

13   A    Yes.

14   Q    Okay.  And so the actual language of the claim says that

15   you need to look for whether a message is modified by the

16   control node; is that right?

17   A    That's right.  Messages from the processors.

18   Q    Now, the claim is what is called a comprising claim.

19   Does that also impact your opinion?

20   A    Yes, it does.  The "comprising" means that other things

21   can happen.  In other words, the message can be formatted,

22   modified along the way before it gets to the control node.

23   There's no limitation that says that can't happen.  It's

24   just indicating that messages that are received from the

25   plurality of computer processors are going to be modified by

1    the control node.

2    Q    Is it your understanding that patent claims that use

3    comprising, the accused device may have additional steps but

4    that doesn't avoid infringement?

5    A    That's right.  It has the limitations and then you can

6    add things to that.

7    Q    Now, Dr. Jeffay also mentioned that Cisco has a later

8    patent, later than the '430 that discusses VN tags.  Does

9    that avoid infringement?

10   A    No, it doesn't.  It doesn't bear on infringement.  The

11   infringement for this patent is based on comparing the UCS

12   system to the claims of the patent as construed by the

13   Court.

14   Q    Now, you just heard Dr. Becker testify; correct?

15   A    That's correct.

16   Q    And he put up a slide with your testimony about Fibre

17   Channel over Ethernet; right?

18   A    Yes.

19   Q    And it was testimony saying that, Well, Egenera didn't

20   invent Fibre Channel over Ethernet.  Do you recall that?

21   A    I do.

22   Q    So even if Egenera didn't invent Fibre Channel over

23   Ethernet, could it contribute to UCS's cost savings?

24   A    Yes.  Fibre Channel over Ethernet, we've heard that

25   discussed, and I've described how that is an accused part of

1    the UCS system.  Fibre Channel over Ethernet is how messages

2    are getting from the -- or stored messages come from the

3    processors to the fabric interconnect.  But that's accused

4    and falls within the scope of the claims.

5    Q    Can you turn to Appendix A of your report, please?

6    Page 6, starting at paragraph 3, several pages, all the way

7    to page 9.  And you talk about benefits of the accused

8    products and the economics of UCS.  Do you recall that?

9    A    I do.

10   Q    And you actually have a waterfall slide similar to what

11   Mr. Becker put on the screen in his presentation.

12   A    That's correct.

13   Q    I apologize.  I should call him Dr. Becker.  I

14   apologize.

15        And so you analyzed the cost savings of UCS

16   attributable to the '430 patent claims; correct?

17   A    Yes.  I provided that analysis and I based it upon

18   Cisco's documents and their own analysis of cost savings

19   that are the result of UCS.

20   Q    Can you look at the paragraph that goes from page 7 to

21   page 8, and can you answer, please, whether provisioning an

22   ongoing administration and system management software

23   savings are caused by the claims in the '430 patent?

24   A    They are caused by the claims in the '430 patent, and I

25   base that on my -- the benefits of the '430 patent as well

1   as Cisco's descriptions of those benefits, and how they

2   attribute them to the UCS system, UCS Manager, and UCS

3   Manager's role in managing the architecture.  Those are all

4   benefits from the '430 patent.  Other parts of that figure,

5   for example cabling and reduced servers, also are, in part,

6   benefits due to the '430 patent.

7   Q   And those are portions that were even in the light blue

8   by Dr. Sullivan; correct?

9   A   That's correct.

10  Q   So would you say that Dr. Sullivan's estimate was even

11  conservative?

12  A   Based on my understanding of it, yes.

13  Q   And you heard that Dr. Becker said that there's no

14  benefits to system management attributed to the '430 patent.

15  Do you agree or disagree?

16  A   I disagree.  The aspects related to system management

17  are addressed by the '430 patent.  I don't agree with his

18  description of it.  It's inconsistent with Cisco's

19  documents.  It's also inconsistent with the benefits of the

20  '430 patent.  The '430 patent describes the ability to

21  manage the system with software commands, that it's

22  programmable, and its stateless aspects.

23  Q   And in that paragraph we discussed from 7 to 8, you cite

24  to a number of Cisco documents; correct?

25  A   That's correct.

1    Q    So based on your analysis, do you believe Dr. Becker is

2    correct or incorrect when he says that provisioning an

3    administration should not be considered a benefit of the

4    claimed '430 invention?

5    A    I believe he's incorrect.  The -- he has apportioned or

6    broken that into pieces that I don't believe correspond to

7    what Cisco's benefits describe.  For example, indicating

8    that the ability to administer the LAN, for example, is not

9    part of UCS Manager.  UCS Manager sets up the -- all, as

10   we've seen throughout the trial, sets up the network

11   connections with the servers.  It also configures their

12   communication with the outside world.  And the capabilities

13   as enabled by the '430 patent read directly on that.

14   Q    So, in your opinion, are the provisioning and

15   administration category and the systems management category

16   cost savings of UCS that are enabled by the '430 patent?

17   A    Yes, they are.

18   Q    Let's quickly turn back to Dr. Jeffay's opinion because

19   he discussed a part of our patent called Aziz.  Do you

20   recall that?

21   A    I do.

22   Q    And Aziz was considered by the patent examiner during

23   the application of the '430 and it still issued; right?

24   A    That's correct.

25   Q    Dr. Jeffay seems to suggest that because you read the

1  claim language regarding modification of messages by the

2  control node to read on the removal of VN tags, that somehow

3  makes the claims invalid.  Do you agree?

4  A   I don't agree, and I don't believe he explained a reason

5  basis for that, including applying the Court's

6  constructions.

7  Q   Now, he also put up a slide about obviousness, DDX-5127.

8  Do you agree that claims 3 and 7 of the '430 patent are

9  obvious?

10 A   No.  I disagree that they're obvious.  And his analysis

11 of that did not provide any detail.  It was a very cursory

12 analysis where he did not walk through and show the evidence

13 from each of the references and then apply the Court's

14 constructions.

15 Q   And are there other factors you've heard in trial that

16 would make a claim not obvious?

17 A   Well, when you're considering obviousness, you both

18 consider what's -- the combination of the references.  And

19 in this instance, that combination of references was neither

20 well-specified nor something that was explained that would

21 work.

22     But then once you consider that, you also take into

23 account whether there are what's known as secondary

24 considerations to determine whether -- it's basically a

25 check against hindsight to show that if -- whether -- it

1   reveals whether or not hindsight's being used.  Hindsight is

2   something, right, I look back, I use the patent as a road

3   map and I try to combine references.  That's what the

4   secondary considerations are there to, in part, to prevent.

5   Q   And one of those factors, secondary considerations, is

6   praise of the invention by the industry.  Did you see any

7   evidence of praise of the invention?

8   A   Yes, yes.  We heard that discussed from witnesses last

9   week.  From, for example, from Mr. Manca.  There were

10  various articles shown.  And I've considered all those and

11  indicated that there is praise for the invention.  We also

12  saw evidence of the commercial success when they were

13  rapidly growing, selling.  This product was welcomed into

14  the marketplace and they were able to sell and grow very

15  quickly.

16       Another additional factor is what's known as long-felt

17  need; was this meeting a need that was existing in the

18  market.  And in this instance it -- I see two indicators

19  there.  One, the rapid growth.  But, two, also Cisco was

20  looking and did not have a product in this area and felt

21  left out of the server market and, in my view, essentially

22  adopted this architecture.

23  Q   And is another factor copying by another company?

24  A   Yes.  Copying is another of the secondary

25  considerations.  And the jury has heard evidence,

1    circumstantial evidence that -- of copying that they can

2    consider as one of the secondary considerations.

3    Q    Now, in your mind, can a patented architecture be

4    copied?

5    A    Yes.  You can copy a -- you're not allowed to copy a

6    patent, but you can copy an architecture.  What matters is

7    what's in the claims for that determination.  But you can

8    copy an architecture if that's what the patent is

9    addressing.

10   Q    And can you copy an architecture without even having the

11   source code for the original product?

12   A    Absolutely.  You don't have to have the source code to

13   copy an architecture.

14   Q    Now, let's just summarize some of your opinions.  Do you

15   believe Cisco provided clear and convincing evidence that

16   either claim 3 or 7 was invalid?

17   A    No.  We didn't -- we didn't really see much evidence at

18   all for that.

19   Q    And do you have an opinion about whether Cisco infringes

20   claims 3 and 7?

21   A    Yes.  It's my opinion that Cisco infringes claims 3 and

22   7 literally, and under the doctrine of equivalents as well

23   as directly and indirectly.

24        MR. THOMASES:  Thank you.  I pass the witness, your

25   Honor.

```
 1              THE COURT:  All right.  Cross-examination.

 2              MR. PACKIN:  Yes, your Honor.  Just one moment

 3    while I get my index cards ready.
```

**CROSS-EXAMINATION**

**BY MR. PACKIN:**

```
 6    Q    Still morning.  Good morning.

 7    A    Good morning, sir.

 8    Q    Okay.  So you just told the jury about this copying.

 9    Right?  You said something about copying?

10    A    I indicated there was evidence, circumstantial evidence

11    that they could consider.

12    Q    And we heard a big deal about, earlier in this trial,

13    about Cisco IT buying the BladeFrame.  You were here for

14    that; right?

15    A    I was here, yes.

16    Q    And you know that Cisco bought a BladeFrame in 2004;

17    right?

18    A    Yes.

19    Q    And you know that Cisco IT tested a BladeFrame product;

20    right?

21    A    That's my understanding, yes.

22    Q    And they also tested other products from leading server

23    providers like HP and IBM; right?

24    A    That's the testimony we've heard, yes.

25    Q    And after Cisco IT tested those products they decided to
```

1    go with HP instead of the BladeFrame.  We've heard that;

2    right?

3    A    We have.

4    Q    Now, you've mentioned circumstantial evidence of

5    copying; right?

6    A    That's correct.

7    Q    And Mr. Brownell and Mr. Manca, they got up and they

8    told this jury that they think Cisco copied; right?

9    A    That's my recollection but it's been a couple weeks.

10   But generally I believe that was what was said.

11   Q    It feels like a couple of weeks, but it's only been last

12   week.

13        Now, Mr. Brownell, Mr. Manca, they couldn't -- you were

14   here when Mr. Desmarais was cross-examining Mr. Manca;

15   right?

16   A    That's correct.

17   Q    And Mr. Manca couldn't identify anything specific that

18   was copied because Egenera's lawyer said Mr. Manca didn't

19   have all the evidence; right?

20   A    I -- that's not how I recall what was said.

21   Q    Okay.  We'll all recall it how we recall it.

22        You, you were hired as Egenera's outside consultant in

23   this case; right?

24   A    Yes.

25   Q    And you were given confidential information for both

1    sides; right?

2    A    Yes.

3    Q    In fact, you were hired by Egenera as their outside

4    consultant; right?  They're the ones who are paying you?

5    A    Yes.

6    Q    And you've had access to all the documents, the millions

7    of documents.  We've been through that.  We don't need to go

8    through it again?

9    A    That's correct.

10   Q    Now, you talked about source code.  You'd agree with me

11   that if Egenera's source code was taken and put into UCS

12   that would be a copy; right?

13   A    It would be copied, yes.

14   Q    And you understand the source code that describes how

15   the underlying software works; right?

16   A    Yes.

17   Q    It's the internal secret code, if you will?

18   A    I -- you could put it that way, yes.

19   Q    Now, Egenera made its source code available to you;

20   right?

21   A    That's correct.

22   Q    And on a special source code computer, if you will?

23   A    It was available, yes.

24   Q    And even though you had access to it, you didn't present

25   the jury with any information about Egenera's PAN Manager

1    source code; right?

2    A    That's correct.

3    Q    And, in fact, in your reports you didn't even analyze

4    Egenera's PAN Manager source code; right?

5    A    That's correct.

6    Q    You also haven't presented the jury with any information

7    about Egenera's BladeFrame source code; right?

8    A    That's correct.

9    Q    And in your reports you didn't even analyze Egenera's

10   BladeFrame source code; right?

11   A    That's correct.

12   Q    In fact, you didn't even bother to review Egenera's

13   source code in this case; right?

14   A    That's correct.

15   Q    Now, Cisco made its source code available also; right?

16   A    Yes.

17   Q    And you mentioned that, I think, earlier; right?

18   A    Yes.

19   Q    And you spent four to five hours reviewing the UCS

20   source code on the source code machine that was available to

21   you; is that right?

22   A    On the source code machine, but that wasn't the totality

23   of my review.

24   Q    Then you got printed copies after -- you go on the

25   source code machine, you look at what you want, you print

```
 1    them out, we saw, on special blue paper, that Redweld;
 2    right?
 3    A   Yes.
 4    Q   When we asked at your deposition how much time you spent
 5    reviewing that paper, you couldn't even recall if you spent
 6    any time reviewing that paper; right?
 7    A   I don't -- it's been four years so I couldn't say one
 8    way or the other.
 9    Q   All right.  So let's just keep going here in the
10    interest of time.  I keep -- not watch the video.
11        As Egenera's outside consultant, you had access to both
12    Cisco's code and Egenera's code; right?
13    A   Yes.
14    Q   Now, even though you had access to both sets of code,
15    you never compared Egenera's code to Cisco's code; right?
16    A   That's correct.
17    Q   In fact, you never even looked for any similarities
18    between Egenera's code and Cisco's code; right?
19    A   That's correct.
20    Q   So let's make sure we're all on the same page.  You
21    talked about circumstantial evidence but you, sir, you have
22    no opinion in your report that Cisco actually copied any
23    technology from Egenera; isn't that true?
24    A   If we're referring to at the technology level, copying
25    the --
```

```
1    Q    Sir, is it true or not true?

2    A    I would say the -- I've provided an answer that they

3    printed the claims.  I don't have any direct evidence that

4    they actually took --

5         MR. THOMASES:  Your Honor, can counsel provide the

6    rebuttal report that he's referring to?

7         MR. PACKIN:  I'm not referring to a report.  I'm

8    referring to exactly what he said in his deposition.

9    Q    Actually, let's take a look.  Page 78, line 14, clip

10   J46.

11        "QUESTION:  You have no opinion in your report that

12   Cisco actually copied any technology from Egenera; is that

13   true?

14        "ANSWER:  That's correct."

15        Now, you also don't actually know, as a matter of fact,

16   whether Cisco copied anything from Egenera; isn't that true,

17   sir?

18   A    Beyond infringement of the claims, that's correct.

19   Q    Sir, is that true or not true?

20   A    I would indicate with respect to what I'm saying, yes.

21   Q    It's true?  Yes, it's true?  Just making sure.  We can

22   watch the video but I just want to make sure.

23   A    It is true if you set aside the patent infringement.

24   Q    All right.  Why don't we take a look at page 78,

25   lines 18 through 21, J48.
```

1    "QUESTION:  And you actually don't know as a matter of

2  fact whether Cisco copied anything from Egenera.  True?

3    "ANSWER:  That's correct."

4    Now, we heard about a bunch of Egenera employees going

5  from Egenera to Cisco.  You didn't say anything about that;

6  right?

7  A   In my report?

8  Q   To this jury.  I'm sorry.  You haven't told the jury

9  anything about Egenera employees going to Cisco; right?

10 A   That's correct.

11 Q   And you haven't shown the jury any source code, for

12 example, that any Egenera employees took over to Cisco;

13 right?

14 A   That's correct.

15 Q   You haven't shown the jury of any technical documents

16 that Egenera employees took over to Cisco; right?

17 A   That's correct.

18 Q   I'm getting spun around here.

19    Now, you agree that all the features that are accused

20 of infringing in UCS were developed at Nuova; right?

21 A   I would agree that the development took place there.

22 Q   And so anyone who joined Cisco after Nuova developed UCS

23 couldn't possibly have helped Cisco copy anything from

24 Egenera; right?

25 A   I'm sorry.  Can you ask it again?  I --

1    Q    Sorry.  This is a long one.  I'm looking at your

2    deposition, so trying to make sure I get it right here.

3         You agree, sir, that anyone who joined Cisco after

4    Nuova developed UCS -- so far so good?

5    A    Yes.

6    Q    Those folks, and we saw a lot of those folks on the -- I

7    mean, I have the table, but we saw a lot of those -- to

8    remind ourselves.  We're not going to go through it in

9    detail, but we've seen this graphic of all of the folks;

10   right?

11   A    Yes.

12   Q    So any of the folks who joined Cisco after Nuova

13   developed UCS couldn't possibly have helped facilitate copy

14   any infringing features from Egenera; right?

15   A    For those features that, if they were finished at Nuova

16   before Cisco bought them, then yes.

17   Q    Right.  And those are the ones you're accusing?

18   A    I'm accusing the UCS system that was put into the

19   market.

20   Q    Okay.  Let's look at page 94, 7 through 16.  This is

21   J66.  This one -- question is a little long but...

22         MR. PACKIN:  You've got to go to Mr. Herzka.

23   Ms. Tang?  Sorry.

24   Q    "QUESTION:  You're not asserting, Dr. Jones, that anyone

25   who joined Cisco after it had -- after Nuova had developed

1    UCS could possibly be responsible for -- for facilitating

2    Cisco copying any features that -- from Egenera that went

3    into UCS that matter for infringement; right?

4        "ANSWER:  I don't believe so, no.

5        "QUESTION:  Meaning correct?  You're not making that

6    assertion; right?

7        "ANSWER:  That's correct."

8        Now, we also heard about meetings Egenera had with

9    Cisco in 2004; right?

10   A    That's correct.

11   Q    And you talk about some of those meetings in your

12   report; right?

13   A    Yes.

14   Q    You haven't told the jury about any of those meetings

15   though; right?

16   A    I have not, no.

17   Q    Now, even though you had access to all the information

18   that was provided in the case, you haven't identified any

19   specific information that Egenera provided, Egenera provided

20   to Cisco in 2004 that wasn't already public; right?

21   A    That's correct.

22   Q    And now let's switch gears here for a minute to talk

23   about invalidity.

24       Now, you mentioned invalidity.  You were here when

25   Professor Jeffay talked about Aziz and the Catalyst switch;

1    right?

2    A    Yes.

3    Q    And I think you said his -- well, let me step back.

4         You agree that Aziz, that comes before Egenera's

5    patent; right?

6    A    Yes.

7    Q    It's agreed prior art by everyone; right?

8    A    I agree it comes before, yes.

9    Q    You agree that it's prior art in terms of coming before?

10   A    Yes.

11   Q    And the Catalyst switch you --

12             MR. THOMASES:  Objection, your Honor.  I did not

13   raise Catalyst during my direct examination.

14             THE COURT:  Sustained.  You're right.

15             MR. PACKIN:  He raised the obviousness combination

16   between the two.

17             THE COURT:  But not that topic.

18   Q    Okay.  Well, you talked about the obviousness

19   combination; right?

20   A    I did.

21   Q    You didn't respond to the Catalyst switch, we'll get

22   that clear; right?  You didn't say anything about that just

23   now?

24   A    I responded to the combination that he put forward with

25   Internet working.

1    Q    And you said that Professor Jeffay didn't provide enough

2    detail, it was a cursory analysis that you saw here; right?

3    A    That he provided here, yes.

4    Q    But you know that -- you reviewed Dr. Jeffay's --

5    Professor Jeffay's reports; right?

6    A    I did.

7    Q    And you know that he provides a significant analysis in

8    those reports; right?

9         MR. THOMASES:  Objection.  Beyond the scope of

10   their invalidity case in this case.

11        THE COURT:  Let him ask the question.  I don't

12   think it is.

13   Q    You know that; right?

14   A    I don't believe it was a significant or specific

15   analysis.  I agree there were a lot of pages, but there are

16   many things that weren't identified.

17   Q    All right.  Well, the jury could look at that.  It's

18   JTX-361; right?

19        MR. THOMASES:  Your Honor, that is an expert

20   report.  If it was marked, it was marked inadvertently.  It

21   should not go to the jury.

22        THE COURT:  Agreed.

23        MR. THOMASES:  Thank you.

24   Q    Now, Professor Jeffay, you know that he's -- you don't

25   have any disputes with his qualifications; right?

1    A    That's correct.

2    Q    You know that he's a leading researcher in the area of

3    computer science; right?

4    A    I respect him, yes.

5    Q    You know him -- you've known of him before you got

6    involved in this particular case; right?

7    A    Yes.

8    Q    Okay.  So I want to -- let's talk about this -- these

9    specifics.  All right.  I'm hitting the mic here.

10       The specific elements.  And I want to show your figure

11   here.

12            MR. PACKIN:  If I could have the ELMO, please.

13   Q    Now, we talked about VN tags.  And I just want to make

14   sure that you agree with Professor Jeffay.  You were here

15   when he walked through his explanation; right?

16   A    Yes.

17   Q    Now, you agree first, starting off, you agree that VN

18   tags did not exist at the time of the '430 patent; right?

19   A    The specific type of tag did not exist.  Tags existed

20   and are described in the patent.

21   Q    And we saw Professor Jeffay explain some of those tag

22   information; right?

23   A    Yes.

24   Q    And we saw -- actually, I have it here, I think.  We saw

25   Mr. Chen's testimony; right?  We were all here for that?

1    A    Yes.

2    Q    On video.  And Mr. Chen said that VN tags originally was

3    invented by Cisco; right?

4    A    I heard that, yes.

5    Q    And you don't have an opinion on that?  You're not

6    disputing that; right?

7    A    That's correct.

8    Q    Now, the messages that we're talking about in the

9    claims -- this is your diagram, right, that you've shown the

10   jury?

11   A    Yes.

12   Q    The messages that we're talking about in the claims,

13   they're coming from the CPU; right?

14   A    That's correct.

15   Q    And they're either going out to the external

16   communications network or the external storage network;

17   right?

18   A    Yes.

19   Q    So let's talk about the ones going to the external

20   communications network first.  Do you see that arrow that I

21   drew there?

22   A    I do.

23   Q    Now, Professor Jeffay explained to the jury that the VN

24   tags are added at the adapter or the NIC; right?

25   A    That's correct.

1    Q    And you agree with that; right?

2    A    Yes.

3    Q    And then the VN tag, so here's the message -- the VN tag

4    is removed here at the fabric interconnect; is that right?

5    A    That's correct.

6    Q    Now, Professor Jeffay also told the jury a little bit

7    about your packet captures with respect to the VN tags;

8    right?

9    A    Yes.

10   Q    And he told the jury that you captured packets on this

11   side of the fabric interconnect; right?

12   A    Yes.

13   Q    And that's right, in fact?  He was right about that;

14   right?

15   A    Yes.

16   Q    So this is "Dr. Jones packet capture."

17        And then you also captured packets on the other side of

18   the fabric interconnect; right?

19   A    That's correct.

20   Q    And so everything that -- that part of what Dr. Jeffay

21   told the jury, you don't have any disputes with him on that;

22   right?

23   A    That's correct.

24   Q    Okay.  Let's look at your packet captures themselves.  I

25   want to focus on this claim element that your counsel

1    focused on, which was one that Professor Jeffay also talked

2    about, which is this "Identifying the Corresponding

3    Address"; right?

4    A    Yes.

5    Q    And so you need to have addresses; right?  It needs to

6    be:  Identify corresponding address in the external storage

7    space.  Right?  That's the outside address?

8    A    That's correct.

9    Q    And then you need to provide the message on the external

10   storage network corresponding to the received storage

11   network having the corresponding address.  So we're talking

12   about addresses here; right?

13   A    Yes.

14   Q    Now, what Mr. -- I'm sorry.  Professor Jeffay, he showed

15   this packet capture to the jury; right?  Do you see that?

16   A    Yes.

17   Q    And this is actually your -- this is correctly one of

18   your packet captures for the incoming packet and outgoing

19   packet?  It's on both sides of that fabric interconnect;

20   right?

21   A    It appears to be.  I mean, I'd have to go back and look

22   at the report to compare but it looks similar.

23   Q    Now, the D-ID, you agree that at least as far as your

24   tests, the D-ID does not change in the messages when they go

25   out to the external storage network; right?

1    A    That's correct.

2    Q    And Professor Jeffay told the jury that the D-ID, that

3    that's an address; right?

4    A    It is, yes.

5    Q    And you agree that the D-ID is an address?

6    A    Yes.

7    Q    It's defined by the Fibre Channel standard; right?

8    A    It is.

9    Q    And what you're saying is an address is the VSAN ID;

10   right?

11   A    Yes.

12   Q    And you agree that the Fibre Channel standard never

13   refers to a VSAN ID as an address; right?

14   A    Not that I know of.  That's correct.

15   Q    Okay.  Now let's talk about this, the programming

16   language that we've been talking about here.  Let's just put

17   it up on the screen here so that we're all on the same page.

18       This is the requirement that we're showing here on the

19   slide to "program said corresponding set of computer

20   processors," and then it talks about the internal network

21   "to establish the internal virtual local area network

22   topology"; right?

23   A    Uhm --

24   Q    I'm sorry.  Let me ask it more clearly.

25       One of the things you need to do in the claims is to

1    program the corresponding set of computer processors to

2    establish the specified virtual local area network topology;

3    right?

4    A    Yes.

5    Q    And what was interesting, I was listening to your --

6    what you just testified.  And your counsel, he identified

7    certain paragraphs for you to look at with respect to PNUOS.

8    Do you recall that in your report?

9    A    I do.

10   Q    And let's look.  Because I was listening carefully.  He

11   told you look on page 154.  And on page 154 what you're

12   quoting there is Mr. Jayakrishna; right?  "Jayakrishnan,"

13   sorry.  Right?

14   A    Yes.  So I reviewed his testimony and then quoted there

15   as describing the process.

16   Q    And so you're relying on his testimony here; right?

17   A    I'm indicating that it's consistent with my

18   understanding, yes, and I'm citing to it.

19   Q    Okay.  And then let's look at the other page you showed

20   the jury, because there's only two.  I wrote them down.  And

21   so here it says, "Part of the deployment" -- and this was

22   page 158 where your counsel told you to look at that PNUOS.

23   And you have a quote from the deposition here; right?

24   A    Yes.

25   Q    And then let's look.  That quote, again, is

1    Mr. Jayakrishnan; right?

2    A    Yes.  He's reading from a document he was shown and this

3    is language from the document.

4    Q    So Mr. Jayakrishnan is the one that you're relying on.

5    I want to see what Mr. Jayakrishnan said here at this trial

6    about this.  I mean, Mr. Jayakrishnan has spent thousands of

7    hours with this code.  You know that; right?

8    A    Certainly, yes.

9    Q    Let's pull up what Mr. Jayakrishnan said here.  He

10   actually spoke about the network topology, and what he said

11   is, he was asked:  "How does the virtual network relate to

12   the network topology?"  He said:  "The VNIC is the network

13   topology."

14        You were here when he said that; right?

15   A    Yes.

16   Q    Now, let's talk about that VNIC to make sure that we're

17   on the same page.

18        Now, you were also here when Professor Jeffay, he

19   explained the VNIC to the jury using his magnet board;

20   right?

21   A    I was, yes.

22   Q    And Mr. -- I'm sorry -- Professor Jeffay, he said that

23   the VNIC creation actually happens on the network interface

24   card or the adapter; right?

25   A    Yes.

1    Q    And you agree that the VNIC creation actually happens on

2    the network interface card or the adapter; right?

3    A    Yes.

4    Q    You're actually even showing it in your own slide;

5    right?

6    A    Yes.

7    Q    So let's just make sure that we're on the same page as

8    to what this VNIC creation actually does.

9         You would agree with me, sir, that the VNIC -- that's

10   this VNIC here -- that the programming of the VNIC creates a

11   relationship between the VNIC through the FX to the fabric

12   interconnect?  So it creates this relationship; right?

13   A    It's part of creating that relationship.  I would agree

14   with that.

15   Q    The programming of the VNIC creates a virtual

16   relationship between the VNIC, through the FX, and/or IOM,

17   to the fabric interconnect; correct?

18   A    Yes.  What I'm referring to there is more than just

19   programming the virtual interface card with the VNIC.

20   There's programming of the VNIC that has to be set up for

21   the fabric interconnect to establish that relationship.

22   Q    Got it.  And that's talking about essentially creating a

23   virtual pipe between the adapter and the fabric

24   interconnect?  That's part of the process; right?

25   A    That's correct.

1    Q    Let's look at what you -- you actually talk about that

2    in your report.  You say, and this is what we are just

3    talking about, but I wanted to use the diagram so we can try

4    to understand it.

5        You say, "The programming of the VNIC creates a virtual

6    relationship between the VNIC that we're looking at through

7    the FX and IOM" -- that was the middle box -- "to the fabric

8    interconnect."  Right?

9    A    Yes.

10   Q    "This programming establishes the virtual local area

11   topology specified in the claim."  Correct, sir?

12   A    Yes.

13        MR. PACKIN:  No further questions.

14        THE COURT:  All right.  Egenera has

15   thirty-two minutes remaining.

16        MR. THOMASES:  Thank you, your Honor.

17        MR. PACKIN:  I'm sorry.  The index cards work very

18   well, but putting them together is not so...

19                    **REDIRECT EXAMINATION**

20   **BY MR. THOMASES:**

21   Q    Hi, Dr. Jones.

22   A    Hello.

23   Q    Do you need to copy source code to infringe a patent?

24   A    No, you don't.  You have -- the question is whether or

25   not you meet the limitations of the claims, not whether you

1    copied source code.

2    Q   And you said that you've seen evidence of copying, but

3    you didn't make a final conclusion of copying because that's

4    for the jury; is that right?

5    A   I've seen circumstantial evidence of copying, we've all

6    seen it during this, what's been discussed in the case, but

7    I'm not an expert on circumstantial evidence so I'm not

8    going to opine on that.

9    Q   And part of this is because you haven't been provided

10   access to Mr. Mazzola, Mr. Cafiero, Ms. Soni Jiandani;

11   correct?

12            MR. PACKIN:  Objection, your Honor.  They were

13   provided with everything they needed in discovery in this

14   case and that has not been an issue.

15            THE COURT:  Sustained.

16   Q   Now, counsel was talking about your packet analysis on

17   the UCS system that you had; right?

18   A   Yes.

19   Q   And he kind of switched gears in the middle there.  He

20   was showing packet analysis going to the LAN.  Do you recall

21   that?

22            MR. THOMASES:  Can I actually borrow the exhibit?

23            MR. PACKIN:  Yeah.

24            MR. THOMASES:  Can we have the overhead, please?

25   Q   Do you see he's looking at the analysis before and after

1    the fabric interconnect going to the LAN?

2    A   I do.

3    Q   And then he then started asking you about your packet

4    inspection results regarding storage; is that right?

5    A   That's correct.

6    Q   So the results you put up there were not the ones for

7    the packet capture that he was drawing here; right?

8    A   Well, the packet capture -- no, those would be the

9    packets that -- packet capture we saw there would be going

10   to the storage area network or external communication

11   network.

12   Q   And the claim language about modifying messages to the

13   external communication network is different than the

14   messages going to the storage area network; right?  They're

15   different claim limitations?

16   A   He was addressing -- they're addressing two different

17   claim limitations there, yes.

18   Q   For modifying messages going to the external

19   communication network here, the LAN, there does not need to

20   be anything about addresses; right?

21   A   That's correct.

22   Q   And he mentioned VN tags.  And you testified earlier

23   that the VN tag is removed by the fabric interconnect on

24   the -- and you tell it from the capture lines he drew on

25   this drawing; right?

1    A    That's correct.

2    Q    Does that meet the modifying-the-messages limitation

3    that was disputed by Dr. Jeffay?

4    A    Yes, it does.

5    Q    Now, counsel just asked you questions about the creation

6    of the VNIC alone.  If the VNIC is created but the CPU has

7    not been configured or booted, is there a topology such that

8    messages from the CPU can be communicated among a set of

9    processors in the UCS system?

10   A    No.  Until the CPU is booted and has the information,

11   such as the MAC address and information about the VNIC, it

12   can't communicate with the other processors in the topology.

13   Q    So the process that we discussed today of sending the

14   PNUOS from the UCS Manager to the CPU, and then configuring

15   the CPU, and then the UCS Manager telling the CPU to boot,

16   booting the CPU, to then inquire about the VNIC and get the

17   MAC address from the VNIC, are all those something that you

18   would consider programming the CPU in order to get it into

19   the topology that would be able to communicate with other

20   CPUs in the network?

21   A    That all falls into that category of programming the

22   CPU.  Yes.

23   Q    And all of that, all of those steps were confirmed in my

24   examination of Mr. Jayakrishnan this week; correct?

25   A    That's correct.

1          MR. THOMASES:  No further questions, your Honor.

2          THE COURT:  Any concluding?

3          MR. PACKIN:  Can I have my document back?  Yes.

4                    **RECROSS-EXAMINATION**

5   **BY MR. PACKIN:**

6   Q    Now, sir, you were asked about discovery.  And without

7   going into it in too much detail, you understand that as

8   part of the discovery process Egenera can subpoena anybody

9   it wants and get whatever information it wants?  That's part

10  of the process; right?

11  A    I -- at a high level I understand that.  I don't know

12  how it's worked out, who gets subpoenaed and who doesn't.

13  Q    I mean, you've worked in a lot of these cases; right?

14  A    I have.

15  Q    So if they wanted to subpoena Mr. Mazzola, if they

16  wanted to get information, that's part of the litigation

17  process; right?

18  A    I -- I assume it's part of the process.  I just don't

19  know -- I've never been involved in subpoenaing people.

20          MR. PACKIN:  May I?  Oh.

21  Q    Now, I was trying to keep it short, but I just want to

22  make sure that we're on the same page here because I think

23  you, yourself, were not sure.

24      So you have messages going to the communications

25  network; right?

```
 1    A    That's correct.

 2    Q    We also -- I mean, I don't want to draw, I only have so

 3    many -- let me try on this side.  I'll try not to draw over

 4    each other.  That's the only point here.

 5         We also have messages going to the storage network;

 6    right?

 7    A    That's correct.

 8    Q    And what we were talking about was the D-ID, that was

 9    the messages going to the storage network; right?

10    A    Those captures went to the storage network.

11    Q    And the captures were in the same, effectively the same

12    place they were here and here, "Dr. Jones packet capture."

13    Right?

14    A    That's correct.

15               MR. PACKIN:  No further questions.

16               THE COURT:  All right.  Any last --

17               MR. THOMASES:  The last half an hour we're going to

18    call, in rebuttal, Dr. Sullivan to rebut Dr. Becker.  And

19    Mr. Batchelder will be handling the questioning.  Thank you,

20    your Honor.

21               (Whereupon the witness stepped down.)

22               MR. BATCHELDER:  Can you put up the slide, please,

23    Mr. Fitzgerald, in the interest of time?  Scroll right in.

24               THE CLERK:  Dr. Sullivan, please be reminded you're

25    still under oath.
```

```
1              THE WITNESS:  Yes.  Thank you.

2                    RYAN SULLIVAN, Recalled

3                    DIRECT EXAMINATION

4   BY MR. BATCHELDER:

5   Q   Dr. Sullivan, welcome back.

6   A   Thank you.

7   Q   You were here for Dr. Becker's commentary this morning

8   about the reasonable royalty calculation that you presented

9   to the jury; correct?

10  A   Yes, that's right.

11  Q   And this is that overview slide you presented?

12  A   Yes, it is.

13  Q   All right.  Well, we'll get into his specific points but

14  first, at a high level, would you provide the jury your

15  reaction to his commentary?

16  A   Yes.  At a high level I disagree with the work that was

17  performed and presented by Dr. Becker for a couple of

18  reasons.  First off, it is inconsistent with the basic

19  requirements and assumptions that we need to make for

20  purposes of calculating a reasonable royalty.  And as I'll

21  explain, in my view, there are some fundamental issues with

22  the work that he performed, such that the data and the

23  results that he presented, in my view, are misleading.

24  Q   Let's go to the next slide and let's just take it point

25  by point.  So this first one he put up and underlined and
```

1    read what he called, "Valuations of Egenera."  Do you see

2    those numbers?

3    A    I do.

4    Q    And his position was you should have started your

5    analysis here.  Did you hear that?

6    A    I did.

7    Q    Is that right?  Is that what the patent statute says you

8    should do as an economist?

9    A    No, it's not.  I -- in fact, if we take a look at the

10   basic requirements and framework for calculating a

11   reasonable royalty, I think it makes it clear that this is

12   not the appropriate place to begin.

13        If we were to take a look, first off, at slide 37, and

14   you'll recall that the statute provides that the reasonable

15   royalty should be for the use made of the invention by the

16   infringer.  Here that is Cisco.  And thus, the focus needs

17   to be on Cisco's use of the invention, not on Egenera's use.

18              MR. BATCHELDER:  Can we turn to slide 9,

19   Mr. Fitzgerald?

20   Q    Now, Dr. Becker acknowledged these rules that are on

21   slide 9, patent is valid, patent is infringed, willing

22   licensor and licensee?

23   A    Yes.  He agrees with me regarding the framework, he just

24   does not apply it in his work.

25   Q    And then can we turn to slide 11, please.  He also

1    agreed with you on this one, cards faceup on the table;

2    right?

3    A    That's right.  We need to assume and believe that the

4    parties know and agree that the patent is valid, that the

5    patent is infringed, and that that knowledge, that

6    information is recognized and reflected at the hypothetical

7    negotiation.

8    Q    Did he apply this rule?

9    A    No, he did not.

10   Q    Let's turn back to the so-called valuations.

11        What does the framework that you've just stepped us

12   through, how does that apply to his opinions about

13   valuations and his suggestions that you should have started

14   here and used this?

15   A    Inherent in Dr. Becker's view of using Egenera's

16   valuation is that this includes Cisco's use of the patent

17   and that the patent just has a singular value.  But you will

18   recall from the testimony I provided on Tuesday, as well as

19   the testimony that Dr. Becker just provided, that an asset

20   such as a patent has value.  That value can be determined

21   based upon DCF, discounted cash flow.  And that's because an

22   asset has value when it provides a cash flow stream, an

23   income stream in the future.  And here that means that the

24   patent would have a different value in the hands of Egenera

25   than it would in the hands of Cisco.

1          If we go back to the simple example of a garage

2     tinkerer, the person who is in their garage.  They're

3     developing a patented technology.  They get that patent.

4     Simply because they have not commercialized it does not mean

5     it's of no value.  And, in fact, the patent system is set up

6     and designed to promote innovation and to encourage

7     innovation.  That means that the patent holder has a right

8     to exclude others from using that patent and that

9     technology, and in return can collect a reasonable royalty

10    for the use of that invention by others.

11    Q   Can I just pause for a second?  With your example, the

12    guy in the garage, the fact that he hasn't commercialized

13    his invention himself, does that mean a company like Cisco

14    could come along, steal his patented invention, and use it

15    for some purposes without paying for it?

16    A   No.  And, in fact, that's part of why using the

17    valuation is directly contradictory to the framework,

18    because there is no assumed infringement, known infringement

19    by Cisco that is reflected in the valuation.  And, in fact,

20    that -- there was no infringement that was acknowledged or

21    set forth by Cisco at that time, saying, We're launching

22    into the marketplace with an infringing product.  That's

23    part of the cards faceup at the hypothetical negotiation.

24    That information would be known.  That was not known in the

25    real world back for these valuations.  So it cannot reflect

1    Cisco's use.

2    Q    And so what if Mr. Hooper, who was in contact with Mike

3    Thompson at Egenera, what if Mr. Hooper had said, We're

4    about to launch this product, it's going to practice your

5    '430 patent, and we're going to start generating billions of

6    dollars in revenue from that product.  What influence would

7    that have had on these valuation numbers?

8    A    It would significantly increase the valuations.  Again,

9    the value being based upon those future cash flows, there

10   would then be a royalty stream that would be coming into

11   Egenera as a result.  But that's not in these valuations.

12   And so that would be a very fundamental shift, a very big

13   change.

14   Q    So is Dr. Becker starting at the right place or the

15   wrong place?

16   A    In the wrong place.

17   Q    And the statute says so?

18   A    Yes.

19   Q    Let's look at the next slide.  This is Dr. Becker slide

20   number 8.  What are we looking at here?

21   A    Again, there's been a very substantial focus on

22   Egenera's circumstances at the time of the hypothetical

23   negotiation.  And certainly they were experiencing

24   challenges in the marketplace.  There was the financial

25   crisis, and they unfortunately had to lay off a number of

1    their employees.  But that simple fact does not mean that

2    they would accept below market value for their patented

3    technology.  But rather what it indicates is that they were

4    managing their company through the challenges and, as such,

5    they would be looking for a reasonable royalty.

6        Just like the example that Dr. Becker provided

7    regarding leasing or renting an apartment or a house.  Well,

8    here too Egenera would expect that there would be a royalty

9    payment, paid every month or every quarter to them for the

10   use of their technology.  That would provide them with cash

11   flow into their company which would then help them, of

12   course, with their growth plans.

13   Q   So just so we're clear, as compared to the guy in the

14   garage who never commercializes at all, does the law, when

15   it comes to calculating a reasonable royalty, does it punish

16   a company like Egenera, a small company who does have the

17   temerity to try to commercialize its own invention in the

18   marketplace?

19   A   No.  There's no punishment or penalty for seeking to

20   commercialize.  In fact, Egenera demonstrated that they were

21   carefully managing their company in spite of the challenges.

22   And that suggests that they would be very thoughtful in

23   terms of wanting a royalty stream coming into their company.

24   Q   Okay.  So the law doesn't punish Egenera.  Does the law

25   create a windfall for Cisco?  That is, can it say, Well,

1    here's a company suffering, I can go in, kick it while it's

2    down, take its patent and exploit it?  Does Cisco get a

3    break under these kind of circumstances that Dr. Becker was

4    presenting?

5    A    No.  That would be contrary to the time frame work.  And

6    this really is reflected in that Dr. Becker's analysis is

7    focused on the historical components which he refers to as a

8    lump sum.  He wants the royalty to be a singular amount that

9    would have been determined back in July 2009.

10        But that misses the very basics of this situation and

11   most royalties.  The royalties are paid across time on

12   actual sales.  If you will recall, there's approximately

13   350,000 servers that are used in infringing systems, UCS

14   systems.  And there is not a dispute or a disagreement on

15   that.  We both agree that that's the right amount to be

16   using.

17        The issue is how much should be paid for each one of

18   those.  And that's what's derived back in July 2009 at the

19   hypothetical negotiation, a determination that, in my view,

20   should be $1,050 per server.  That amount gets applied out

21   into the future as those sales progress.  And that's the key

22   distinction.

23   Q    Let's turn to the next slide which is -- this is Becker

24   slide 50.  And you've circled in red his bullet here.  Why

25   did you circle that?

1    A    Well, he begins his analysis where he gets to his answer

2    from the Egenera valuation.  That's what he starts with.

3    And of course once you start there, which, in my view, is a

4    flawed place to begin, there's not a way to fix it by simply

5    reducing it.  Because, again, the value of Cisco's use is

6    not contained within Egenera's value.

7    Q    The statute says this is the right or the wrong place to

8    start?

9    A    The wrong place.

10   Q    All right.  Let's look at slide 58 from Dr. Becker.  The

11   top line you've highlighted, "Egenera Value."  What's your

12   point there?

13   A    Here there's a couple of points to take away.  The first

14   is he is starting with Egenera's value, and then he is

15   making reductions to that value.  And so having that

16   starting point is, again, it's fundamentally incorrect

17   because it does not have Cisco's use in it.  He then is just

18   making reductions from there and reducing that amount.

19        And there's a couple of interesting points here.  The

20   first is that he's making a reduction for Egenera's

21   installed base.  And he's doing that because he's saying

22   that the services business is tied to the product sales.

23   You'll recall the auto dealership selling the car and then

24   having to service it.  So here he's saying those two are

25   tied together and that's why he's making a reduction.

1        I'll show you in a minute just the opposite; when he

2    does the analysis for Nuova he makes a reduction by saying

3    the two are separate.

4    Q    I'm sorry to interrupt.  I just want to be clear.

5        When he starts with total Egenera value, instead of

6    Cisco's use to the tune of billions of dollars, is he

7    starting with the right number or too low a number?

8    A    Starting with too low of a number and, frankly, one that

9    is fundamentally disconnected from Cisco's use.

10   Q    So he starts too low and every one of his adjustments

11   does what?

12   A    Just reduces the amount.

13   Q    So starts too low and then goes down from there?

14   A    That's right.

15   Q    You've also highlighted Cisco's average market share.

16   What are you getting at there?

17   A    Well, this is kind of a funny one because he makes an

18   adjustment, he says, for a non-exclusive license.  But Cisco

19   is the only one that is infringing upon the '430 patent

20   here.  So a market-share adjustment does not make sense.

21       And he also says that, Well, the market-share

22   adjustment accounts for Cisco's use, that that's where the

23   use is accounted for.  But if you think about it, that, too,

24   doesn't pass muster.  Because they can grow in terms of

25   sales, and they could grow at the same rate as the market.

1    Suppose they double their sales and the market doubles in

2    sales.  Well, the market share stays the same and they don't

3    pay anything more for their additional use of the

4    technology.

5         You know, I was sitting back in the courtroom trying to

6    think of a simple example to try to convey this, and the

7    best one I came up with, it's not perfect, but imagine

8    you're in your back yard and you're digging around and you

9    eventually find some oil that's down in there under the

10   ground.  And you manage to get out, say, 100 barrels of that

11   oil and you have it sitting there, and it's all collected.

12        And somebody comes along, a local oil or gas dealer,

13   and they swipe it.  They swipe those barrels of oil and they

14   take them away.  And they come back and say, Well, you know

15   what?  There's other market participants.  There's Chevron,

16   there's ExxonMobil.  Our market share is very small, so even

17   though we took 100 barrels, we're only going to pay for

18   three of those barrels because we only have a 3 percent

19   market share.

20        Whatever the numbers are.  The numbers aren't material.

21   It's just, you know, the point that if there is infringement

22   for Cisco's use, they should be paying a royalty for all of

23   that use, not have it be reduced by their market share.

24   Q    So if somebody swipes 100 barrels of your oil, you don't

25   care if Chevron has a bigger market share, what you care

1    about is he took 100 barrels of your oil?

2    A    Correct.

3    Q    That's what you should get the royalty on?

4    A    That's right.

5    Q    All right.  Let's look at Becker slide 25.  He says,

6    "Dr. Sullivan starts with a total value of Nuova."  So this

7    is a different transaction.  Here he's criticizing your use

8    of the Nuova acquisition, and he says you start with a total

9    value over the top.  Is that accurate?

10   A    No, it is false.  I did not start with the billion

11   dollar value of Nuova and then whittle it down to get to the

12   value of UCS.  I very, I thought, specifically explained in

13   my testimony on Tuesday, as I set forth in my report, I used

14   it as a comparator to figure out the relationship between

15   how much Cisco pays relative to cash flows.  It's a

16   relationship, a ratio, not --

17              (Simultaneous speakers.)

18              MR. BATCHELDER:  Let's look at that next slide,

19   Mr. Fitzgerald.

20   Q    I'm sorry to interrupt you, sir.  In the interest of

21   time I want to move along.

22        Is this what you were talking about?

23   A    Yes, it is.  So I utilized that Cisco made a payment of

24   $747,500,000 for cash flow of $1,067,000,000.  You'll recall

25   that I used that ratio of those two, which is 70.1 percent.

1    It's that ratio that feeds into my analysis, not the

2    $1 million.

3    Q    And why was it appropriate, as your numerator, the top

4    part of the fraction, to use that 747 number?

5    A    Well, this is a related business that Cisco -- this was

6    their 126th acquisition.  Their CEO at the time, John

7    Chambers, indicated that the way they structure these

8    acquisitions is based upon them being tied to revenues and

9    profits.  We had the cash flow analysis that underlies their

10   transaction to demonstrate that the proper way to do this is

11   to look at the payment relative to cash flows, which I then

12   converted to a payment relative to revenue.

13   Q    All right.  Let's look at Becker slide 26.  What is he

14   doing here?

15   A    Well, there's two issues here.  One, he's starting with

16   the overall value of Nuova which, again, is not appropriate.

17   Here's where he says services are unrelated to the products.

18   Keep in mind a moment ago with Egenera he said, you know,

19   that certain product and services are related so I'm going

20   to deduct.  Here he says they're unrelated so that I can

21   deduct.  So an inconsistency.

22        And I just simply have to take issue with the

23   $85 million that he's suggesting is the portion attributable

24   to this server.  It is contrary to the facts.

25   Q    Let's take a look at that document, JTX-54.  You

1    presented this on Tuesday.  You said you geeked down on this

2    document.  And now you've highlighted and drawn a red box.

3    What are you doing here?

4    A   That's true.  So just to reorient, the highlighted rows,

5    those are revenue for the different products: the server

6    revenue, that's for UCS, and the switch revenue.  And these

7    are estimates for the years that are listed from 2008 to

8    2013.

9        And note that the server revenue between, as it's

10   progressing and especially between 2012 and 2013, has a very

11   significant increase.  Meaning, it's continuing to grow.

12   But if you look at the switch revenue in 2012 of

13   408 million, it then drops the following year.  It's then

14   becoming a declining product at that point in time.  And

15   this is consistent with what actually occurred going

16   forward, which is that the server business, UCS, became the

17   fastest growing product in Cisco's history.  The switch was

18   not.

19       And so what's being ignored here in Dr. Becker's work

20   is really what's happening going forward.  He's assuming

21   that the future looks just like this snapshot of the past.

22   And that's not true because of the trends that are going

23   forward for these products.

24   Q   So the trends are the switch is going down, UCS is going

25   up, and he's trying to fix us in that past time frame?

1   A    That's right.  And that doesn't make sense when you're

2   applying a running royalty, especially given that the

3   damages period doesn't begin until 2016.  The patent doesn't

4   expire until 2024.  So to fix things back in this historical

5   period of time is kind of a rather convenient way to reduce

6   the overall amount.

7   Q    Windfall for Cisco?

8   A    Correct.

9   Q    He also said that by using 2013 as your calibration year

10  you were inflating your number.  Is that accurate?

11  A    No, actually just the opposite.  Because this is

12  continuing forward on a growth path, that's even reflected

13  within this document, the expectation of growth and profit

14  margins, profit dollars are continuing to grow.  Cash flow

15  is continuing to grow.  Using 2013 actually is conservative.

16       Just by way of example, I was pointing out the revenue

17  for the server revenue of 2013 here of 397 million.

18  However, in reality, that was at $2 billion in that year.

19  And, as we know, it continued to increase.

20  Q    All right.  I've just got to note that I have

21  five minutes left so let's keep moving along.

22            MR. BATCHELDER:  Let's look at the next slide,

23  Mr. Fitzgerald.

24  Q    This was your "Patent Apportionment" slide you

25  presented; correct?

1  A   That's right.

2  Q   Dr. Becker was criticizing your 55.3 number; right?

3  A   That's right.

4  Q   Briefly, what did you base it on?

5  A   This is based upon two things.  One, Cisco's case

6  studies that they did of the actual cost savings, both the

7  categories that are listed here including the subcategories

8  that build into it.  And based upon the work performed by

9  Dr. Jones where he evaluated the overall patented

10 architecture to determine what was attributable in terms of

11 cost savings to the '430 patent.  And that is what I based

12 it on.

13 Q   Okay.  And he pointed to discussions with three people.

14 He said he talked to engineers and he mentioned Mr. Clark

15 and Mr. Morgan.  First of all, is Mr. Clark an engineer?

16 A   No, not to my understanding.

17 Q   And did Mr. Clark, he testified at this trial, did he

18 provide any testimony about the '430 patent apportionment to

19 these costs?

20 A   No, he did not.

21 Q   And what about Mr. Morgan?  They presented testimony

22 from him by deposition.  Did he do that?

23 A   No, he did not.

24 Q   Did the word "patent" even come up in his deposition?

25 A   No.  I took a look through it actually and it is not in

1    there.

2    Q    And he mentioned Dr. Jeffay, but cited no opinion of

3    Dr. Jeffay; is that right?

4    A    That's right.

5    Q    Did Dr. Jeffay speak to this in his deposition?  Let's

6    take a look.

7          MR. BATCHELDER:  Can we have the document camera,

8    please?

9    A    He did.  Dr. Jeffay explained that he, himself, had not

10   performed any cost analysis.

11   Q    "QUESTION:  So you have not done any analysis on whether

12   UCS does actually reduce the total cost of ownership?

13         "ANSWER:  Correct.  I've done no independent analysis.

14         "QUESTION:  You've done no independent cost analysis of

15   the savings; correct?"

16         His answer was:  "That's correct."

17         That was Dr. Jeffay?

18   A    That's right.

19   Q    And you relied, for this apportionment, on Dr. Jones,

20   including when we just heard his testimony about this?

21   A    That's right.  And as a matter of economics that makes

22   good sense because the cost savings attributable to the '430

23   patent depend also on the infringement.  Right?  It's the

24   use of that patented technology.  And that's what Dr. Jones

25   determined.

1          MR. BATCHELDER:  All right.  Last slide, please,

2     Mr. Fitzgerald.

3     Q    Coming back to your calculation slide, is this based on

4     Egenera's use or Cisco's use?

5     A    This is based upon Cisco's use.  Again, the number of

6     servers used and sold in infringing UCS systems is not

7     disputed.  That's what occurs over time.  And at the

8     hypothetical negotiation, that's where the $1,050 royalty

9     per server would be fixed.  And that would be then applied

10    to the sales going forward.  And thus, the reasonable

11    royalty of $371 million, which in my view is very

12    reasonable.

13    Q    And Dr. Becker's suggestions that for the billions of

14    dollars of infringing revenue that Cisco's obtained here

15    that they should pay only $80 million.  As an economist, how

16    does that sound to you?

17    A    Well, with all due respect to Dr. Becker, it just is

18    fundamentally flawed.

19         MR. BATCHELDER:  Pass the witness, your Honor.

20         THE COURT:  All right.  A few minutes left.

21                       **CROSS-EXAMINATION**

22    **BY MR. DESMARAIS:**

23    Q    Good afternoon, Mr. Sullivan.

24    A    Good afternoon.

25    Q    Now, let's take a look.  Let's jump right in.

1          MR. DESMARAIS:  May I have the document camera,

2     please?

3     Q    Now, this is your slide; right?

4     A    That's right.

5     Q    And this is your hypothetical negotiation construct;

6     right?

7     A    It is part of it.

8     Q    Yeah.  And it takes place in July 2009; is that right,

9     sir?

10    A    Correct.  We all agree on that.

11    Q    Yeah.  We don't agree much on the law, the way that you

12    and your counsel are discussing it.  It's funny, because

13    I've been a patent lawyer for thirty years and never heard

14    it put that way.  But, for the jury's benefit, the judge is

15    going to tell the jury what the law is; right?

16    A    That is my understanding, yes.

17    Q    It's not your view of the law.  You're not a lawyer;

18    right?

19    A    That's right.

20    Q    But what's supposed to happen, what you're supposed to

21    be determining in this negotiation construct is what would a

22    willing licensor and a willing licensee pay; right?

23    A    The -- it's what the willing licensee would pay, what

24    they ultimately agree to, both of them being willing.

25    Q    You're modeling a real-world negotiation based on what

1    really was going on in July 2009; true?

2    A    No.  It's hypothetical.  Because in the real world Cisco

3    did not take a license.  Cisco did not get a license to the

4    patent.  Cisco did not --

5    Q    I didn't ask you what happened, sir, I asked you what

6    you are modeling.  You are modeling what would have happened

7    in the real world had Egenera and Cisco sat down and got a

8    license; right?

9    A    Under the assumptions of infringement and validity and

10   the constructs of the hypothetical negotiation, having all

11   of the relevant and available information to them, yes.

12   Q    Exactly.  Having all of the relevant information that

13   was available in July 2009 about what was going on at that

14   time, Egenera and Cisco sit at a table and have a

15   negotiation and conclude a license; right?

16   A    Under the appropriate construct, correct.

17   Q    So let's take a look at what was going on in the real

18   world at that time.  Now, these two people would know, and

19   this is Cisco and this is Egenera; right?

20   A    I haven't labeled them here.

21   Q    Okay.  So, well, I'll put an "E" for Egenera and a "C"

22   for Cisco.  Okay.

23        Now, one of the things that these two people would know

24   is that nobody ever took a license to the '430 patent, never

25   paid a nickel for it; right?

1   A   That's right.

2   Q   Okay.  Let's put that down.

3   A   Egenera never provided a license to a competitor.

4   Q   They never provided a license to anyone.  They begged

5   everyone to take one and nobody took one; right?

6   A   Oh, I disagree.

7   Q   Did they or did they not hire an investment banker who

8   canvassed the entire tech industry looking for a buyer and

9   they got zero offers?  Right, sir?

10  A   That's a --

11  Q   Yes or no.  They got zero offers?

12  A   For the purchase of their company.

13  Q   And as we stand here today, no one has ever taken a

14  license to the '430 patent; true?

15  A   That's my understanding, correct.

16  Q   Now, before this hypothetical negotiation in July 2009,

17  because Egenera couldn't make a profit selling the

18  BladeFrame, Egenera decided to switch and become a

19  software-centric company.  You heard that testimony?  You

20  were here all week; right?

21  A   Ah --

22  Q   Yes or no, sir.  Did they switch to become a

23  software-centric company?

24  A   They did.  Your preamble or predicate was inaccurate.

25  Q   You don't disagree that they switched to become a

1   software-centric company, did you?

2   A    I do not disagree with that.

3   Q    So there's shifting from BladeFrame to become

4   software-centric, and this happened before the July 2009

5   negotiation; true?

6   A    The decision to make the shift, yes.

7   Q    And we also know that they canceled entirely the second

8   generation BladeFrame 2; right?

9   A    That is my understanding.

10  Q    And we know that, we heard from Mr. Thompson, the CEO at

11  this time, that they stopped manufacturing new BladeFrames.

12  You heard him say that yesterday, right, in the video?

13  A    My understanding was new, you know, new product

14  BladeFrames, but they were continuing to sell BladeFrames to

15  those who were asking for it.

16  Q    They were continuing to sell ones they already made.

17  And the CEO, Mr. Thompson, told us yesterday in the video

18  that they stopped making new ones.  You were here for that,

19  weren't you, sir?

20  A    In how I heard it was not manufacturing new product.

21  Q    Exactly.  Stopped manufacturing new product.  And they

22  stopped?

23  A    Being clear, I mean, it's, you know, still producing the

24  original BladeFrame but not the V2.

25  Q    Well, that's not what Mr. Thompson said, is it?

1    A    That is what I heard him say in his testimony.  I think

2    we just established that.

3    Q    Well, all right.  We'll take a look.  This is

4    Mr. Thompson from yesterday.

5         "QUESTION:  How about 2009?

6         "ANSWER:  I'm not certain.  Remember, at this time we

7    were morphing the software.  So the revenue decline was,

8    one, intentional, based on the fact that we were no longer

9    producing hardware."

10        Do you see that, sir?

11   A    I do.

12   Q    Yeah.  And you were here when he said that?

13   A    I was, yes.  That's consistent with what I said.

14   Q    And they stopped selling BladeFrames to new accounts;

15   right?  They were just dealing with their existing accounts?

16   You remember him saying that; right?

17   A    That was their focus.  He said they would be

18   opportunistic.

19   Q    Stopped selling to new accounts.

20        Now, you know they laid off, before this hypothetical

21   negotiation at the end of 2008, they laid off a third of the

22   company in the first wave and then ultimately got up to half

23   of the company, just wiped out, fired.  You remember that;

24   right?

25   A    I do not recall the precise magnitude.  I recall a

1   28 percent number.

2   Q   All right, we'll go with that.  28 percent layoffs

3   across the company?

4   A   Yeah, it was a tough time.

5   Q   Now, you remember, and I think you mentioned it in your

6   last cross-examination, Savvis, that was their largest

7   customer, had already, at the end of '08, switched to become

8   an HP client; right?  You remember that?

9   A   I do.

10  Q   Okay.  So largest customer switched to HP.

11      And you recall Mr. Thompson saying yesterday that he

12  wasn't sure they had enough money in the bank to last

13  through 2009; right?

14  A   Yes.  And thus they were managing the company in a way

15  to ensure they would meet payroll.

16  Q   So not sure enough money to last through 2009.

17      And they hired an investment banking firm, Jeffries, to

18  go out and solicit bids from all the folks in the tech

19  industry; right?

20  A   I wouldn't say all, but to -- and I wouldn't say -- I

21  wouldn't think of it as bids, per se, but marketing of the

22  company.

23  Q   They were trying to sell Egenera to people in the

24  industry; right?

25  A   If the price was proper.

1    Q    And they went to twenty-three different people; right?

2    A    I believe it was twenty-three firms or thereabouts.

3    Q    And they got zero bids; right?

4    A    On a formal basis, that is my understanding.

5    Q    So investment banker marketing Egenera, zero bids.

6    That's fair; right?  Right?

7    A    I think so.

8    Q    And then at this time the CEO, Mr. Thompson, who the

9    jury heard from yesterday, at this time, the end of '08,

10   looking at all of that and the massive layoffs and what was

11   going on at the company, all the stuff we just talked about,

12   he looked at that and he responded to one of his investors

13   and he said, I think we're probably worth about $50 million.

14   That's what he said we were looking at; right?

15   A    We've looked at it many times.  Thereabouts, yes.

16   Q    CEO Thompson values Egenera at $50 million.

17        And this is in December '08, right before the

18   hypothetical negotiation; right?

19   A    Yes, and sort of.

20   Q    And at that time, while CEO Thompson has in his head

21   that Egenera's worth is about $50 million, and at that time

22   while the investment bankers are canvassing the industry and

23   cannot find a bidder, CEO Thompson, himself, the same guy,

24   goes to Cisco and says, Buy Egenera for $50 million.  You

25   heard that testimony, didn't you, sir?

1    A    It was a bit different than that.

2    Q    You heard that Thompson, the CEO at the time, reached

3    out to Cisco at this time and asked Cisco to buy them?  You

4    heard that testimony, didn't you?

5    A    I believe there was a discussion in that regard.  I

6    mean, I think one fundamental point you're overlooking is

7    that --

8    Q    Sir, we're on time clock.  I wish you would do

9    explanations with your counsel.  I'm going to ask you

10   yes-or-no questions and I wish you would cooperate with me.

11   A    Well, I --

12   Q    CEO Thompson reaches out to Cisco and asks to be

13   purchased.

14        And that happened in December 2008 into early 2009;

15   right?

16   A    I -- November 2008.

17   Q    And so just to put a microscope or a magnifying glass on

18   what you're asking this jury to conclude, is that the

19   negotiations, because we're modeling the real world based on

20   the real-world facts of what was happening at that time, and

21   what you're asking this jury to conclude is that

22   Mr. Thompson sat across the table from Cisco and said, You

23   know what, Cisco?  I've got two options for you.  One, you

24   can have my whole company for $50 million.  Or you could

25   take option 2:  I'm going to give you a non-exclusive

1    license to one of my patents, and for that I would like

2    $371 million.

3         And you expect this jury to conclude that Cisco would

4    have taken option 2; right?

5    A   You have fundamentally misrepresented the hypothetical

6    negotiation and my analysis.  It is a running royalty.  They

7    would agree on $1,050 per server.  The $371 million is not

8    payable in July 2009.

9    Q   You are so far off the mark at $371 million, sir.  The

10   $50 million was for the entire company.  It was for all the

11   clients, all the manufacturing, all the employees, all of

12   the patents.  It was for everything for $50 million.  And

13   what we're trying to model here is what is the value of one

14   patent.  One patent.  When the entire company was trying to

15   be sold for $50 million.  Think about it.  That's what your

16   opinion is; right?  $371 million for one patent.  And it's

17   not even exclusive; right?  This is a non-exclusive license;

18   right?

19   A   It would be payable across time, not --

20   Q   Just answer my question, sir.  It's a non-exclusive

21   license; right?

22   A   In all fairness, Mr. Desmarais, you just had a monologue

23   and you're asking me to agree to the whole thing, and I am

24   not willing to --

25   Q   Are you an advocate or a witness, sir?  I ask the

1    questions, you give the answers.

2        The question is:  In this hypothetical negotiation it's

3    for a non-exclusive license; right?

4    A    That is correct.

5    Q    So Egenera would keep the patent; right?  They would

6    just give Cisco the license to use it; right?

7    A    It's kind of like the apartment rental.

8    Q    Right.  But if Cisco had bought the entire company,

9    Cisco would own the patent; right?

10   A    If they had done so, which they did not.

11   Q    Right.  If they did at this time, when it was offered to

12   them, buy it for $50 million, they would have owned all the

13   patents themselves, they would have owned the entire company

14   themselves, or they could have negotiated a non-exclusive

15   license for ten times the amount.  Right?

16   A    Over time.  Difference between purchasing an apartment

17   and renting.

18   Q    Now, you said in your testimony something that surprised

19   me.  You said it last time and you mentioned it again today.

20   You said that Egenera would have never come up with a $50

21   million valuation if they had known about Cisco's UCS.  Do

22   you recall saying that?

23   A    Had they known there would be infringement of UCS by --

24   that -- that's the key point, is whether it would be known

25   by the parties or known at the valuation that Cisco was

1    launching and using UCS, and known, believed and agreed

2    infringement of the '430 patent.

3    Q    Because you know you didn't say that last time because

4    you know now that Egenera did know about Cisco coming out

5    with the UCS at the time they came up with that $50 million

6    figure.  You know that, right, sir?

7    A    No.  And I disagree with your characterization.

8    Q    Are you saying Egenera didn't know about the UCS in

9    December of 2008?

10   A    There was conflicting information.  There was beliefs

11   and understandings in the marketplace, and there was an

12   understanding that they were not going to do so.  So there

13   was conflicting information.  But the issue is whether they

14   knew, Egenera, that -- and Cisco knew that there was

15   infringement of the '430 patent.

16   Q    Yesterday I read to the jury Egenera's answer to an

17   interrogatory in this case where they admitted that they

18   were first aware of the existence of one or more accused

19   products, that's the UCS, on or about December 12, 2008.

20        Do you see that, sir?

21   A    I do.

22   Q    And you were here for Mr. Manca's testimony, the former

23   CEO of Egenera, when he admitted he knew about the UCS in

24   2008?  You were here for that, weren't you, sir?

25   A    In that period of time.

1          THE COURT:  May I have a minute with the jury?

2      Jurors, basically Egenera's used all of its time.

3  There's roughly a half hour or so that Cisco is entitled to.

4  We could stop, it being 1:00, but I recommend that we just

5  finish so we can start fresh on Monday, if that's agreeable

6  with you.

7      All right.  Let's -- I think that's fine with the jury.

8          MR. DESMARAIS:  Thank you, your Honor.  I won't

9  take too much longer.  I won't take much longer.

10  Q    Okay.  So now if we go back to this hypothetical

11  negotiation, I think one of the other things you told us in

12  your testimony was that the '430 patent, this patent that no

13  one would license, and no one wanted to buy Egenera for, was

14  pioneering breakthrough technology.  And I think that's one

15  of the reasons you stated for justifying the high royalty.

16  Right, sir?

17  A    It is a fact, yes.

18  Q    Now, were you in court yesterday when Dr. Jeffay took

19  the jury through the Patent Office proceedings on how it

20  went with the '430 patent?

21  A    I was here.  I did not follow all of it, but I was here.

22  Q    Because one of the things Dr. Jeffay told this jury was

23  that when Egenera filed for their patent, the patent

24  examiner found every single limitation of the claims that

25  this case is about, every single one, except one, in a

1    patent by Oracle called Aziz.  You were here for that

2    testimony, weren't you, sir?

3    A   Again, I was here for the testimony.  I did not follow

4    all of it.

5    Q   And the only element that the Patent Office did not find

6    in the Oracle invention, which came before Egenera, was this

7    limitation about modifying the messages.  Do you recall

8    that?

9    A   No, not with precision.

10   Q   So what does the basis -- well, let me not ask you that,

11   sir.

12       Did you do any analysis about the value of the Egenera

13   patent, the incremental value of Egenera over the Oracle

14   invention that came before?  Did you do any analysis about

15   that at all?

16   A   I, given that I'm an economist and not a computer

17   scientist, I did not do a claim evaluation between the two

18   patents.

19   Q   But you told this jury under oath that the '430 patent,

20   Egenera's patent, was pioneering breakthrough revolutionary

21   technology, you relied on that statement to support your

22   $371 million, and you'd done no analysis to prove that

23   that's the case?

24   A   I disagree.

25   Q   Did you look at the Oracle patent from Aziz and see what

1    Egenera did that was different?

2    A    I did not evaluate the claims, I evaluated the economic

3    evidence.

4    Q    Now, you also testified that another reason Cisco would

5    pay such an astronomical amount for that patent was because,

6    in your words, there were no noninfringing alternatives.  In

7    other words, Cisco had no choice but to infringe the patent.

8    Do you remember saying that?

9    A    The first part is reasonably accurate.  The second

10   isn't.  The point is that they would not have other

11   alternatives that would not be infringing that were

12   available and commercially viable.

13   Q    Right.  That's exactly what I said.

14        Now, let's explore that a little bit.  So I think I

15   have your slide here.  Let me put up PDX-1330 from your

16   slide.  This is yours; right?

17   A    It's my demonstrative of a Cisco document.

18   Q    Right.  So now you know, sir, don't you, that in the

19   market at the time HP had a product; right?

20   A    Yes.

21   Q    And you know, sir, that they were a fierce competitor?

22   A    There was competition with all the entities listed here:

23   HP, Dell, IBM, Sun.

24   Q    We're going to go one at a time.  You don't have to

25   rush.

1        So you know, don't you, that nobody in this case is

2    saying HP infringed the '430 patent; right?

3    A    That is my understanding.

4    Q    And so when you talk about are there noninfringing

5    alternatives, we know at least HP is making a product in

6    this market and competing and nobody's charging them on

7    infringement; right?

8    A    That is my understanding.

9    Q    And Dell makes a product in this market and competes;

10   right, sir?

11   A    That's right.

12   Q    And there's nobody in this case saying that Dell

13   infringes the '430 patent; isn't that right, sir?

14   A    That, too, is my understanding.

15   Q    And IBM makes products in this space, they're a fierce

16   competitor, and nobody's charging IBM with infringement of

17   the '430 patent; right?

18   A    My understanding is they're not.  There is not

19   allegation of infringement by IBM.

20   Q    And the same for Sun; right?  Sun's a competitor in this

21   market and there's nobody in this case saying that Sun

22   infringed the '430 patent; is that right, sir?

23   A    My understanding is that there is -- there are not

24   allegations of infringement of the '430 against Sun.

25   Q    In fact, you were in court -- and again this is on this

1    issue of are there noninfringing alternatives, did Cisco

2    have no other choice to infringe.

3         You were in the court when Dr. Jones testified that the

4    '430 patent, in fact, does not cover all ways of doing

5    server virtualization?  You were here for that; right?

6    A   Cisco did have --

7    Q   You were here for that; right?

8    A   Excuse me, sir.  Cisco did have a choice on whether to

9    infringe or not.

10   Q   That's not your testimony.  You told this jury under

11   oath, under oath that there were no noninfringing

12   alternatives in this market?  That's what you said?

13   A   No.  Happy to explain for you, if you'd like.

14   Q   Page 31 of your testimony, line 21.  "There were no such

15   alternatives that were available to Cisco."

16        Did you say that, sir?

17   A   Precisely.

18   Q   And you know, sir, that Dr. Jones admitted that the '430

19   patent does not cover every way of doing server

20   virtualization?  You know that; right?  You were here for

21   that?

22   A   I agree.  That's my understanding.

23   Q   And, for instance, he said VMware server virtualization

24   doesn't infringe the patent; right?

25   A   That is my understanding.

1   Q    And you know a lot of equipment vendors like Cisco, in

2   fact, use VMware for their virtualization, right, to compete

3   in this market with these folks?

4   A    There's two pieces to that.  But the former is accurate,

5   to my understanding.

6   Q    And Cisco uses VMware; you know that, too, right?

7   A    That, too, is my understanding.

8   Q    Did you take into account in your analysis the price to

9   use VMware and compete in the server virtualization market?

10  VMware sells their software just like Egenera sells PAN

11  Manager; right?

12  A    The former part of that, yes, that's my understanding.

13  Q    Did you take into account that Cisco could have used

14  VMware on their servers to do virtualization?

15  A    I -- well, that's separate from whether or not they are

16  infringing upon the '430 patent.  I focused my analysis on

17  the contributions of the '430 patent.

18  Q    Let's talk about the '430 patent for a second.  The --

19  you know that we just talked about, with the CEO here, and

20  what was going on at Egenera, with shifting from the

21  BladeFrame to software.  You recall that; right?  We were

22  just talking about that?

23  A    We just talked about that, yes.

24  Q    And you know, sir, don't you, that in addition to

25  leaving the BladeFrame, Egenera switched to PAN Manager;

1    right?

2    A    I did not follow the question.  Please try again.

3    Q    Egenera switched to selling software and they called the

4    software PAN Manager; right?

5    A    That is part of what they were doing.

6    Q    That's their new software product, right, PAN Manager?

7    A    I would not put it that way, but it is a software

8    product that they were selling through an OEM basis.

9    Q    Right.  And I read to the jury a request to admit

10   yesterday.  And let me remind them. "To the best of

11   Egenera's understanding, Cisco's use of PAN Manager" -- they

12   don't mean our use in the sense of using the software, they

13   mean our use in using the word in this question.  "PAN

14   Manager refers only to a limited set of software which would

15   not alone embody any claim of the '430 patent."

16       Do you see that, sir?

17   A    I do.

18   Q    So when Egenera switched from the BladeFrame to selling

19   software, they weren't even using their own patent any

20   longer?

21   A    That I can't say, given how it gets used with hardware.

22   That just is beyond my scope as an economist.

23   Q    This '430 patent is so valuable that not only did

24   Egenera stop making BladeFrames, which embody the patent,

25   they started selling software that doesn't even use it,

1    after 2008.  And you want this jury to award $371 million

2    for this patent that now nobody's using, right, even the

3    patentee?

4    A    If there is a finding of infringement, in my view, a

5    running royalty resulting in $371 million is reasonable.

6    Q    Now, you were here in court when Mike Dvorkin testified;

7    right?

8    A    Yes, I was.

9    Q    And he put up this chart.  Do you recall that?

10    A    I do.

11    Q    And he told us he used to work for Xsigo; right?

12    A    I seem to recall that.

13    Q    And he told us when he worked for Xsigo they used to set

14    up their network topology by programming the CPUs.  Do you

15    remember that?

16    A    Not exactly, no.

17    Q    He said the -- programming the CPUs at Xsigo was, I

18    think he used the word "nightmare," and the customers hated

19    it and had a lot of problems.  Do you remember that

20    testimony?

21    A    Not exactly, no.

22    Q    Are you saying he didn't say that or are you saying you

23    don't remember it?  Because I can show you the testimony.

24    A    I'm not saying he didn't say it, but that is not

25    material to my economic analysis, just like it was not

 1    material to Dr. Becker's analysis.  So I don't have that

 2    type of memory.

 3    Q   So you're not disputing it.  So we don't have to go

 4    through it.

 5    A   I'll take your representation for it.

 6    Q   And you know that Mr. Dvorkin told us Xsigo didn't do

 7    all that well in the market; right?

 8    A   He may have.  Again, I don't have that degree of memory.

 9    Q   And we know that Egenera's BladeFrame programs CPUs;

10    right?

11    A   I had not made any determination in that regard.

12    Q   And you were here when we showed the trouble tickets

13    where Egenera's customers were complaining about the

14    complicated problems with programming the operating system

15    software in the BladeFrame?  You were here for that

16    testimony; right?

17    A   I was here, but I cannot characterize it in the way that

18    you did.

19    Q   Let me just refresh you a little bit so I can make the

20    point.  We saw, for instance, JTX-024 where the customer

21    from Bear Stearns, the big investment bank in Wall Street,

22    which is an internal email of Egenera saying, "We are in a

23    shit storm at Bear."  Does that refresh your recollection of

24    this colorful testimony we had at the trial, sir?

25    A   I remember that line.

1    Q    Yeah.  And what they were complaining about is the

2    BladeFrame not running on Windows because they couldn't get

3    the operating system software modifications to work.  Do you

4    remember that?

5    A    I could not say.

6    Q    And it wasn't just Bear Stearns, it was Lehman Brothers

7    and other banks.  Do you remember that, sir?

8    A    I could not confirm that for you.  This is not material

9    to the determination of a reasonable royalty.

10   Q    We're going to get there.  We're going to get there.

11        And it wasn't just the investment banks, it was their

12   largest customer, Savvis; do you remember that, sir?

13   A    Do I remember --

14   Q    The --

15        (Simultaneous speakers.)

16   A    I remember Savvis.  Well, I remember that y'all

17   presented various trouble tickets, or what have you, some

18   involving Savvis.

19   Q    This is their largest customer saying, "What the blank

20   is up with the damn drivers?  What about your outages?  Why

21   doesn't your platform work?  Why don't you work with the

22   Windows platforms like everybody else?"

23        Do you remember this testimony, sir?

24   A    I remember some of the documents.  It has colorful

25   language and so I suppose that has a little pizzazz for

1   memory.  But, again, this is not related to determining a

2   reasonable royalty.

3   Q   Well, I want to talk about that.  So Mr. Dvorkin told us

4   Xsigo programmed the CPUs, and it had trouble with the

5   customers, and the product didn't work, and they didn't do

6   well in the market; right?

7   A   I would take your word for it.  I cannot validate that

8   for you.

9   Q   And Egenera, we know, programs their network topology on

10  their CPUs, and we saw some of the trouble tickets, and I

11  can show you more.  We talked about them in the trial.  All

12  from 2004 all the way through 2008, 2009.  And the

13  BladeFrame didn't do well in the market; right?

14  A   I cannot confirm all of your testimony there,

15  Mr. Desmarais.

16  Q   Well, you know that -- well, they stopped making the

17  BladeFrame; right?

18  A   They did phase out and become a software-focused

19  company.  I think we've established that.

20  Q   And we know then that in 2006 HP launched a product;

21  right?

22  A   I'm sorry.  I did not hear that.

23  Q   In 2006 HP launched a product; right?

24  A   I do not recall the date.

25  Q   Well, I can show you JTX-489.  "Building on the

1    acquisitions of Compaq and RLX Technologies, HP has been a

2    blade market leader throughout this decade.  Since the 2006

3    introduction of its latest blade generation, HP has

4    recaptured market leadership and now sells more blade

5    servers than the rest of the market combined."

6         Do you remember that testimony?

7    A    I remember seeing this document.

8    Q    And do you remember Mr. Dvorkin's testimony where he

9    told us that HP doesn't program the CPUs, HP programs their

10   network interface cards?  Do you remember that?

11   A    No, I do not.  He may have testified to it, but that's

12   not --

13   Q    You're not disputing that Mr. Dvorkin testified to that,

14   are you?

15   A    I'm not disputing it or validating it.  I couldn't say

16   one way or the other as it is, again, not relevant to my

17   work.

18   Q    And no one's accusing HP of infringement in this case;

19   right?

20   A    That is my understanding.

21   Q    And HP, when they launched that new product that didn't

22   program the CPUs, they became the market leader in this

23   field; right?  That's what we just saw in the Gartner

24   report?

25   A    I could not validate your testimony.

1   Q    We just saw that.  It said -- it said more than anybody

2   combined.  "Since the 2006 introduction of its latest blade

3   generation, HP has recaptured market leadership and now

4   sells more blade servers than the rest of the market

5   combined."  That's not me, that's Gartner saying that.

6   A    The predicate to your question had to do with CPU

7   programming.

8   Q    Well, Mr. Dvorkin testified that HP programs their

9   network topology on the network adapter.  You were here for

10  that?

11  A    And, again, I have not made any determination in that

12  regard one way or the other as it is not relevant to a

13  reasonable royalty.

14  Q    It's true that HP, when they launched that new product

15  in 2006, became the market leader; true?  We just saw that

16  in the Gartner report?

17  A    I have not sought to validate that or refute it.  I do

18  not disagree with it, I just have not sought to validate it.

19  Q    And then Cisco, or Nuova, launched its product in 2009;

20  right?

21  A    Correct.

22  Q    And you know it's our position in this case that Cisco

23  is programming their network topology on the network

24  adapter?  You know that's our position; right?

25  A    I generally have heard that.  It seems to have come up a

1    fair bit in this trial.

2    Q    And let's look at some of your slides from yesterday

3    about the press that came out when Cisco launched the UCS in

4    2009.  This is your slide; right?

5    A    From Tuesday, not yesterday.

6    Q    Okay.  Thank you.  But it's your slide; right?

7    A    Yes, that's right.

8    Q    And you pointed this out to the jury, and it says, "In

9    our view, Cisco's introduction of UCS in 2009 has been

10   nothing short of a home run."  Do you see that?

11   A    I do.

12   Q    And it says here, "UCS continues to be a great success

13   story."  Right?

14   A    Yes.

15   Q    "Cisco now holds the number 2 U.S. market share in

16   server blades (number 3 globally) an amazing feat given that

17   the company is a relatively new entrant to the market."  Do

18   you see that?

19   A    I do.

20   Q    Now, these stories don't say what Cisco just did is old

21   news, it's the same as Egenera's BladeFrame which was

22   launched back in 2001; right?

23   A    I do not believe those words are in those documents.

24   Q    They don't say what Cisco just launched in UCS has been

25   done in the market for the last decade?  It doesn't say

1    that; right, sir?

2    A    No.   There are other documents that make that comparison

3    but not these.

4    Q    These documents are glowing about the quality of the UCS

5    and its innovation; right?

6    A    Yes.

7    Q    And that innovation now has resulted in HP and Cisco

8    vying for number 1 and number 2 in the market; right?

9    A    Yes.   And, as I understand it, the '430 patented

10   architecture has played a significant role.

11   Q    Well, I know you want to assume that because in your

12   analysis you assumed infringement.   And what I'd like you to

13   do is step back a minute, right, and act like an unbiased

14   economist.   I just want you to look at the market.   I don't

15   want you to be Egenera's economist at this moment.   I want

16   to ask you a hypothetical question.   I just want you to be

17   an objective economist.   Okay?

18   A    I have been.

19   Q    Okay.   Well, do it one more time.

20       Xsigo programs their CPUs and is a failure in the

21   market.   Egenera programs their CPUs, is a failure in the

22   market, customers hated it.   HP launches a new product in

23   2006, customers love it, they become the number 1.   Nuova

24   launches a product in 2009 and these two companies are vying

25   for number 1 because they don't program their CPUs, they

1    program their NICs, and they don't have trouble with the

2    operating system.  Now, as an economist, not Egenera's

3    economist, an objective economist, that is a rational

4    explanation for what's going on in this market and that

5    would explain why Egenera crashed and why Cisco is so

6    successful, wouldn't it, sir?

7    A    No.  If you go back to the logic of Aristotle, he says

8    when you encounter a contradiction, go back and check your

9    assumptions because one of them is wrong.

10   Q    Let's step back.  The BladeFrame is no longer being

11   manufactured and Egenera could never make it profitable;

12   true?

13   A    The first part is accurate; the second isn't because of

14   the business model of taking the profits into new products

15   and innovation.

16   Q    And there's no doubt that the new architectures by HP

17   and Cisco are successful in the market; right?

18   A    Certainly the UCS system has been successful.

19           MR. DESMARAIS:  Five more minutes, is that okay?

20   Q    Okay.  So I want to do one other thing with you, sir,

21   because you made me a little sad by taking issue with my

22   bedrock fact.

23   A    Well, somehow I don't buy that.  But okay.

24   Q    People hate my bedrock facts, but some people like them

25   and I like them.  So let's talk about this for a second.

1      Now, the bedrock fact simply says -- I know it's been

2   used a little bit by your counsel here, but I think they're

3   misreading it, so I want to read it again.  And I want to

4   talk about the purpose of that.

5      It says, "Cisco UCS did not cause the BladeFrame to

6   fail."  Do you see that?

7   A   I do.

8   Q   "The BladeFrame failed in the market on its own because

9   its design didn't work."  That's the bedrock fact; right?

10  A   It's your fact.  I --

11  Q   Right.  That's what --

12  A   -- I believe that's what you've presented.

13          (Simultaneous speakers.)

14  Q   Now, you know that, as we just looked at in the other

15  slide, this BladeFrame was canceled by CEO Thompson in the

16  end of 2008; right?

17  A   V2.

18  Q   And they stopped manufacturing in the end of 2008;

19  right?

20  A   My understanding is that they continued to sell the

21  BladeFrame thereafter.  It was not a focus, but they

22  continued to sell it.

23  Q   Let's take a look at that.  So let's take a look at

24  JTX-513.  You were here when we talked about this, when

25  Mr. Manca talked about this architecture review; right?

1    A    I believe so.  That was --

2    Q    Let's look at slide 4.

3    A    -- last Wednesday perhaps.

4    Q    So "Business challenges with today's architecture."  Do

5    you see that?

6    A    I do.

7    Q    And this is about the BladeFrame; right?

8    A    Perhaps.

9    Q    "Too many resources working on driver porting."  Right?

10   A    I can read that.

11   Q    "Large part of R&D budget dedicated to operating system

12   porting."  Right?

13   A    That's how I read it.

14   Q    "50 percent of our software resources work on operating

15   system drivers."  Do you see that?

16   A    I see it.

17   Q    "Complicated drivers require large quality assurance

18   releases and document effort."  Right?

19   A    I believe that's how it reads.

20   Q    "Return on investment is questionable."  Do you see

21   that?

22   A    I do.

23   Q    "Customer impact too severe."  Do you see that?

24   A    I do.

25   Q    This is the end of 2008; right?

1    A    Perhaps.

2    Q    It has a date on it.  Weren't you here for Mr. Manca's

3    testimony?

4    A    I was.

5    Q    November 2008.  And at the board meeting at the end of

6    2008 is when they made the decision to stop selling the

7    BladeFrame, and that was October 2008.  This is JTX-344.  Do

8    you remember this, sir?

9    A    I do remember the document.

10   Q    And if we look at the Egenera board meeting slide on

11   page 18, "The New Egenera."  Do you see that?

12   A    I do.

13   Q    "Transition to a pure play software company."  Do you

14   see that?

15   A    I do.

16   Q    "BladeFrame Business.  BladeFrame 2 project has been

17   canceled."  Right?

18   A    Yes.  We've talked about V2.

19   Q    "No sales or marketing investment in selling to new

20   accounts."  Right?

21   A    I see that.

22   Q    And they say, "Our revenues are going to decline."

23   Right?

24   A    Not precisely.

25   Q    They say, "Revenues Decline."  Right?

1    A    That's how the document reads.

2    Q    And CEO Thompson told us yesterday in his deposition the

3    decline in revenue was planned and it was intentional

4    because they were switching to software and stopping making

5    BladeFrames?  That's what he said; right?

6    A    A little bit different than that, but close.

7    Q    And this is in October 2008; right?

8    A    Yes.

9    Q    And the Cisco UCS wasn't launched until July 2009;

10   right?

11   A    That's right.

12   Q    Did you see anything in these board minutes that says,

13   We're going to cancel the BladeFrame because of the Cisco

14   UCS?  Is that in any of the board notes?

15   A    I do not know.  Again, bedrock fact number 1 is not

16   relevant for calculating a reasonable royalty.

17   Q    Is it in any Egenera slide deck to the board ever, from

18   the history of time until today, that they canceled the

19   BladeFrame because of the Cisco UCS which didn't even

20   release until a year later?  Is it in any board slide deck?

21   A    I do not know.  I have not sought to make that

22   determination.  It does not matter.

23   Q    Well, you said my bedrock fact 1 was wrong, sir, and it

24   matters to me and I want to get to the bottom of it.  So the

25   answer is you don't know; right?  Right?

1    A    That I do not know what?

2    Q    That it was in any board presentation, that canceling

3    the BladeFrame had anything to do with the Cisco UCS?  It's

4    not in there?

5    A    I could not verify that for you one way or the other.

6    Q    You were here when Mr. Manca testified; right?

7         I'm going to show you now page 92, line 11.

8         "QUESTION:  Thank you.  And it was a business decision,

9    it was a business strategy decision at Egenera to cancel the

10   BladeFrame 2 and to become more software-centric, and that

11   business decision had nothing whatsoever to do with Cisco

12   UCS; true?

13        "ANSWER:  I think that's true."

14        That's the CEO Manca, he testified here to this jury

15   from that same box; isn't that right, sir?

16   A    It sounds consistent with what I recall.

17   Q    And you were here when Thompson testified yesterday?  We

18   established that already; right?

19   A    Multiple times.

20             THE COURT:  You have two minutes.

21             MR. DESMARAIS:  Yes, your Honor.  Wrapping up now.

22   Q    So Mr. Thompson testified:

23        "QUESTION:  It is correct that Egenera made the

24   decision to become a software-only company in 2008?

25        "ANSWER:  Yes.

1        "QUESTION:  Why?

2        "ANSWER:  We thought it would be the best economic

3    model going forward.

4        "QUESTION:  Egenera was under a lot of financial strain

5    in the financial downturn; right?

6        "ANSWER:  Yes, although we were considering

7    software-only prior to the downturn because the economic

8    model was attractive.  But, yes, we were under further

9    strain or started to get under further strain after the

10   meltdown.

11       "QUESTION:  Why did Egenera consider a software-only

12   model to be attractive?

13       "ANSWER:  Because of the economic model.

14       "QUESTION:  What's the economic model that you're

15   referring to?

16       "ANSWER:  So your margins are higher than

17   hardware/software -- gross margins are far higher than

18   hardware/software combination and your expenses are lower."

19       Do you see that, sir?

20   A   I do.

21   Q   He doesn't cite the system UCS as a reason why he made

22   that decision; he cites business considerations, right?

23   A   UCS is not mentioned in that passage.

24   Q   And then he also testified:

25       "QUESTION:  All right, Mr. Thompson.  At least by

1    October 30, 2008, Egenera had made the decision to stop

2    selling hardware and transition to software-only company,

3    yes?

4         "ANSWER:  Yes."

5         Do you see that, sir?

6    A    I do.

7    Q    That was before the Cisco UCS was even on the market;

8    isn't that right, sir?

9    A    That's right.

10   Q    And he says here:

11        "QUESTION:  How about 2009?

12        "ANSWER:  I'm not certain.  Remember, at this time we

13   were morphing the software, so the revenue decline was, one,

14   intentional based on the fact that we're no longer producing

15   hardware, and also based on the economy and budgets getting

16   slashed."

17        Do you see that?

18   A    I do.

19   Q    He doesn't mention that's because of Cisco UCS at all,

20   does he, sir?

21   A    Not there.

22   Q    And lastly:

23        "QUESTION:  As a result of the financial downturn and

24   Egenera's decision to transition to a software-only company

25   in 2008, it executed on a plan to reduce BladeFrame sales,

```
 1    ultimately down to zero; right?

 2         "ANSWER:  Eventually."

 3         Do you see that, sir?

 4    A    I do.

 5    Q    It was an Egenera business plan to reduce the BladeFrame

 6    sales down to zero; isn't that a fact, sir?

 7    A    Eventually.

 8              MR. DESMARAIS:  No further questions, your Honor.

 9              MR. BATCHELDER:  Your Honor, I'm told by my team I

10    have ninety more seconds.  Do I?

11              THE COURT:  You have exactly ninety seconds.  Use

12    them well.

13              MR. BATCHELDER:  Mr. Desmarais, can I borrow your

14    notated graphic of the hypothetical negotiation with your

15    squiggly on the side?

16              MR. DESMARAIS:  Yeah.  This one?

17              MR. BATCHELDER:  Yes.  Thanks so much.

18         Can I have the document camera, please?
```

                        **REDIRECT EXAMINATION**

```
20    BY MR. BATCHELDER:

21    Q    So you saw Mr. Desmarais write all these notes on the

22    left side of this graphic; right, sir?

23    A    I did.

24    Q    Everything is on the Egenera side?

25    A    And nothing on the right side.
```

1    Q    Here's the statute.  It says, "Reasonable royalty for

2    the use made of the invention by the infringer."  Who's

3    that?

4    A    That is Cisco.

5    Q    Cisco's on the right side.  It doesn't say anything

6    about Cisco making billions of dollars and infringing;

7    right?

8    A    Correct.

9    Q    Thank you, sir.

10            MR. BATCHELDER:  Thank you, your Honor.

11            THE COURT:  All right, jurors.  Thank you for your

12    stamina.  I think that brings us to the end of the evidence

13    in the case.

14        Monday I'm going to have the instructions for you

15    verbatim.  So, unfortunately, they're longer than I'd like.

16    I hope they're not difficult.  I try to be as clear as I

17    possibly can.  But we're going to start Monday morning right

18    with the attorneys' arguments at 9:00.  They each have an

19    hour for final argument.  We'll take the break.  Then I

20    think I'm about forty minutes.  And then the case is going

21    to be yours.  And, of course, we'll provide lunch on Monday

22    for you.

23        So the jury is excused until 9:00 on Monday morning.

24    And, counsel, let's meet at 2:15 to talk about the charge.

25    It's going to be a fairly brief meeting because I have to

 1     leave by 3:00.  Okay?

 2           All right.  The jury is excused until Monday.

 3               THE CLERK:  All rise.  Court is now in recess.

 4               THE COURT:  All right, counsel.  I know it's not a

 5     lot of time to eat lunch.  I'm sorry.  I have a relative

 6     coming into town that I have to go pick up.  Actually,

 7     Egenera could have insisted on another minute because Cisco

 8     went a minute over.

 9               MR. DESMARAIS:  Thank you for your indulgence, your

10     Honor.

11               THE COURT:  All right.  We'll be back shortly.

12               (Proceedings adjourned.)

13

14

15

16

17

18

19

20

21

22

23

24

25

1

**I N D E X**

2
WITNESS:           <u>DIRECT</u>    <u>CROSS</u>   <u>REDIRECT</u>   <u>RECROSS</u>

3
STEPHEN BECKER

4
By Mr. Olsheski     8

5
MARK JONES, Recalled

6
By Mr. Thomases:    59                 107

7
By Mr. Packin:            87                110

8
RYAN SULLIVAN, Recalled

9
By Mr. Batchelder:  112             164

10
By Mr. Desmarais:       129

11

12

**E X H I B I T S**

13
NUMBER                              IN EV.

14
JTX-576    DX-HO                    23

15

16

17

18

19

20

21

22

23

24

25

C E R T I F I C A T E


        We, James P. Gibbons and Cheryl B. Palanchian,

Court Reporters for the United States District Court for the

District of Massachusetts, do hereby certify that the

foregoing pages are a true and accurate transcription of our

shorthand notes taken in the aforementioned matter to the

best our my skill and ability.




        /s/ James P. Gibbons 8/12/2022
        JAMES P. GIBBONS


        /s/ Cheryl B. Palanchian 8/12/2022
        CHERYL B. PALANCHIAN