# EXHIBIT 8

```
              UNITED STATES DISTRICT COURT
               DISTRICT OF MASSACHUSETTS




* * * * * * * * * * * * * * *
EGENERA, INC.,              *
        Plaintiff           *
                            *   CIVIL ACTION
              Vs.           *   No. 16-11613-RGS
                            *
CISCO SYSTEMS, INC.,        *
        Defendant
* * * * * * * * * * * * * * *




         BEFORE THE HONORABLE RICHARD G. STEARNS
           UNITED STATES DISTRICT COURT JUDGE
                      AND A JURY
                CIVIL JURY TRIAL DAY 8
                   August 11, 2022




                         Courtroom No. 21
                         1 Courthouse Way
                         Boston, Massachusetts 02210


        JAMES P. GIBBONS, CSR, RPR, RMR
        CHERYL PALANCHIAN, RPR, RMR, CRR
            Official Court Reporter
         1 Courthouse Way, Suite 7205
          Boston, Massachusetts  02210
           jamesgibbonsrpr@gmail.com
```

Page 34

1  Why does Cisco -- well, does Cisco UCS do that?
2  A  No.  As I've said several times now, Cisco UCS does not
3  do this because they're building networks in a fundamentally
4  different way.  They're building networks of servers, not
5  networks of processors.
6      Cisco UCS will program the network interface card,
7  not the CPUs.
8  Q  Well, how do you know that network interface cards and
9  CPUs aren't the same thing?
10 A  Well, I know that as a technologist based on all my
11 experience, but the patent itself differentiates, explicitly
12 differentiates, between network interface cards and
13 processors.
14 Q  And so is the patent's differentiation, is that
15 consistent with your experience as a computer scientist?
16 A  It is.  And this is an example of a differentiation,
17 that the patent is listing processors and network interface
18 cards, the yellow boxes and the blue boxes, it's listing
19 them as separate devices.  The processors are 106 and the
20 network interface cards are labeled 107.  They're separate
21 devices.
22 Q  So the text that you have, that's from the column and
23 then it has numbers that corresponds to the figures, is that
24 how it works?

Page 35

1  A  Yes, that's how it works.  When we cite the patent, we
2  refer to the column number, and then you'll notice between
3  the columns, there's line numbers, and so that's a cite to
4  column 3 and lines 13-20.
5  Q  Now, did you also review -- we've heard a lot about this
6  at this trial already, so I won't belabor it.  But did you
7  also review documents that describe Cisco's programming of
8  the network interface card versus the CPU in order to
9  establish network topology?
10 A  Yes, I looked at several documents that confirm that
11 Cisco programs the network interface card.
12 Q  So I've turned to the next slide 59.
13     Let's just remind the jury, what are you showing on
14 the top on the left side of the slide before we get to the
15 right side?
16 A  Just to orient the jury in terms of where things are
17 happening on a UCS server, I have a picture of my
18 Magna-Board that's more or less configured the way that I
19 just configured it.
20 Q  And what is the right side of DDX-559, which is JTX-182
21 at 84.  What's that showing?
22 A  This is some screenshots of the UCS Manager program, and
23 we heard that the manager program is what allows a user, a
24 customer, to assign MAC addresses to create virtual NICs and

Page 36

1  assign MAC addresses to those virtual NICs.
2  Q  And remind us again, where is that VNIC or virtual NIC,
3  where is that located on the server?
4  A  It's on the physical network interface card as shown in
5  the figure on the left of the slide.
6  Q  Okay.  And does Dr. Jones agree with you on that?
7  A  Yes.  I think we are in agreement on this, that the
8  actual virtual NIC creation happens on the physical NIC.
9  Q  How about the testimony of Mr. Dvorkin and
10 Mr. Jayakrishnan, is that consistent with your analysis?
11 A  Yes.  When I read their deposition transcripts, they --
12 their testimony about how virtual NICs are created is
13 consistent with my -- results of my analysis.
14 Q  So both Cisco's engineers and Egenera's witness agree
15 that the VNIC is located on the network interface card; is
16 that right?
17 A  Yes.  I think everyone is in agreement with that.
18 Q  Okay.  Let's look at what Dr. Jones is saying, since
19 he's got to be saying something here.  So he was asked this
20 question, "Why is programming the NIC equivalent to
21 programming the processors?"
22     Let me start with your answer.
23     Do you think programming the network interface card
24 is equivalent to programming the CPU in order to establish

Page 37

1  the network topology?
2  A  No.  Programming a CPU is straightforward, and
3  programming a network interface card is not programming a
4  CPU.  They are completely separate devices.
5  Q  Let's look at -- so Dr. Jones, I think he was talking,
6  before we got to his answer, he was talking about a bunch of
7  different physical components, but I highlighted the bottom
8  part, which I think goes to the heart of what he's saying,
9  they're equivalent.  So let's start with the first part.  He
10 says, So they're within the same enclosure.
11     Does the fact that the CPUs and the network
12 interface cards, that they're in the same physical server
13 box, does that make the programming of the two equivalent?
14 A  No.  The fact that they're in the same enclosure really
15 has no bearing on this question.
16 Q  How about his second reason?  He says, "The virtual
17 interface cards," and that's, again, another word for
18 "network interface cards," he says "they're not independent
19 of the CPUs."  Do you agree with that reasoning?
20 A  No.  I don't.
21     As I explained when we were at the magnet board, if
22 a CPU, for example, fails on a UCS server, the UCS Manager
23 can communicate with the physical network interface card to
24 migrate the identity of that server to a new server.

Page 38

```
 1       So even though a CPU may have failed, the network
 2  interface card can still receive and transmit data over the
 3  network.
 4  Q  Okay.  Let's go to the next slide, and I want to show
 5  the jury what Nuova has been saying since way back in 2006.
 6  This isn't a new thing.  What are you showing the jury here?
 7  This is JTX-187 at 15?
 8  A  This is a document that the jury has seen before in this
 9  case.  It is an internal document from Nuova, from 2006.
10  This was what was called a PRD, and this is about system
11  management.
12       And in this particular section of the document,
13  what I've highlighted here is that Nuova is documenting that
14  their platform differs significantly from Egenera.
15       So they have some understanding of Egenera's
16  platform, and they're purposely trying to be different than
17  Egenera.  And one of the ways in which they're trying to be
18  different directly relates to this claim element.
19       And in this blow out towards the bottom, what I've
20  highlighted here is that they're saying that Egenera relies
21  on low-level agents and drivers running on the server.  And
22  we've heard a lot about that.  That means that you modify
23  the operating system.
24       So Egenera is relying on modifying the operating
```

Page 39

```
 1  system because -- they need to do that because ultimately
 2  the CPUs that execute the operating system are going to be
 3  establishing the network topology.
 4       Nuova does a completely different approach.  They
 5  rely on --
 6       MR. THOMASES:  Objection.
 7     Your Honor, in limine number 9 on this?
 8       THE COURT:  No, I think he's all right.
 9  Q  You can keep going.
10  A  Thank you.
11       Nuova is relying on what they call out-of-band
12  mechanisms, meaning off of the CPU, and in particular via
13  Menlo and Palo.  Remember, Menlo and Palo were the code
14  names for the network interface card.
15       So the net of this is that it's saying that they're
16  explicitly documenting that Egenera is going to rely on
17  software as part of the operating system.  Nuova is going to
18  relay on hardware on the network interface card.
19  Q  Okay.  Now, this looks very familiar on the next slide.
20  Why are you also showing JTX-201 at page 42 and 43?  This is
21  slide 65.
22  A  Yes.  This is virtually identical text, and I'm just
23  highlighting this because even in future documents, they're
24  still calling attention -- Nuova is still calling attention
```

Page 40

```
 1  to the fact that there are noticeable differences.
 2       And here I would also so notice in the highlighted
 3  text at the top that they're talking about differences in
 4  philosophy.
 5       So that means that, you know, they're really
 6  thinking about the system differently than the way Egenera
 7  thought about its system.
 8  Q  So Egenera has suggested that because Mr. Sethi who came
 9  from Egenera wrote this document, that somehow means that
10  UCS is a copy.  Does that mean that UCS is a copy?
11  A  No.  This text, as I say, is virtually identical to the
12  text in the previous document that I understand was written
13  by Mr. Dvorkin.
14  Q  And does it say it's a copy or does it say it's
15  different?
16  A  No, it's -- again, it's explicitly calling out that
17  they're different, and again, they're different because of
18  different philosophy.  They're thinking about this
19  differently, and, therefore, the system is going to be
20  fundamentally different.
21  Q  Okay.
22       MR. PACKIN:  Now, you have some green things here.
23  Sorry about that.
24       Let me just go to the ELMO because I think somehow the
```

Page 41

```
 1  slides got switched, and we'll get back to the slide deck in
 2  a minute.
 3     Mr. Herzka, while we're on this one, can you make sure
 4  the other slides are okay also?
 5
 6  Q  Okay, so we're on slide 66.
 7       Just to recap, how does this relate, this whole
 8  thing that you've been talking about, relate to Figure 1?
 9  A  So it relates to Figure 1 because what I'm trying to
10  illustrate here is that the Egenera approach was to focus on
11  the CPU and programming the CPU because they wanted to make
12  a network of processors.
13       And the Cisco approach was to make a network of
14  servers, so they focused on the network interface card; and
15  the network interface card is not the same as the CPU, and
16  the patent acknowledges that the network interface card is
17  not the same as the CPU.
18  Q  Okay.  So where does that -- where does that leave us
19  with respect to this element of programming the CPUs to
20  establish the network topology?
21  A  Well, these are the reasons why I say that Cisco does
22  not program the CPUs to establish the virtual local area
23  network topology because it's being done in UCS via the
24  network interface card.
```

Page 46

1  one. What are you showing in the red box here, the box in
2  red?
3  A  This is what I understood was Dr. Jones' second example
4  of how this limitation might be met, and here he was showing
5  a message coming into a network interface, and a particular
6  tag was added to the message called a VN-Tag; and then as
7  this message left the fabric interconnect, the tag was
8  removed.
9  Q  And does Dr. Jones agree with you that the VN-Tag was
10 removed?
11 A  Yes.
12 Q  So there is no dispute that the VN-Tag does not go
13 outside the fabric interconnect?
14 A  Correct. The claims are going to require that you
15 translate the address, and then the address go all the way
16 to the storage network. So here, if the alleged
17 modification or alleged translation was adding a VN-Tag, he
18 agrees that the VN-Tag was taken off. So the VN-Tag does
19 not go to the storage area network, and therefore, it can't
20 satisfy this claim element.
21 Q  All right. So let's go to the last thing. Surely
22 there's something that we should be talking about here.
23    What's the last thing that you boxed in red?
24 A  The last one was -- I understood Dr. Jones to claim

Page 47

1  there is a third type of message that -- for which there is
2  an address translation identifying the corresponding storage
3  address. And this is a message that goes into the fabric
4  interconnect with a VLAN ID and comes out with something
5  called a VSAN ID.
6  Q  Okay. Now, are VLAN IDs and VSAN IDs, are those
7  addresses?
8  A  No. In the field, they're most commonly referred to as
9  tags.
10 Q  And is that actually -- when Dr. Jones was giving his
11 explanation, is that the words that he actually used?
12 A  Yes, he referred to these IDs as tags.
13 Q  How about Mr. Brownell when I asked him the question,
14 what did he say?
15 A  Well, we can see his testimony here, and he thought it
16 was called a tag, and he was just unsure whether or not it
17 was an address.
18 Q  Okay. So now, given that everybody knows that these
19 things are tags, how is Dr. Jones saying that these tags
20 could possibly be addresses?
21 A  Well, he's not saying they're addresses. He's simply
22 saying they act as addresses. And I would disagree with his
23 statement.
24 Q  And why is he saying that they act as addresses?

Page 48

1  A  Well, I believe his more fulsome testimony was that
2  they're involved in -- I think he phrased it as "the routing
3  of the messages."
4  Q  And do you agree with that?
5  A  No. I don't.
6  Q  Okay.
7     And let's look what Mr. Chen said. So we all saw
8  Mr. Chen's testimony last Friday. It was long, but I think
9  this one is actually a relatively clear example. What is
10 Mr. Chen telling us here?
11 A  Right. So Mr. Chen was the one that gave us that fairly
12 dense set of testimony.
13    What he's saying here is that the VLAN ID of a
14 packet coming into the fabric interconnect is not used in
15 making a forwarding decision.
16    And so, I think this contradicts Dr. Jones' claim
17 that things like VLAN IDs are used for the routing of
18 packets.
19 Q  So Mr. Chen is specifically saying that the VLAN IDs are
20 not used as addresses?
21 A  Correct.
22 Q  Okay. Let's try again with the slideshow. We're
23 keeping it dynamic here.
24    This one is good because we have animations on this

Page 49

1  one, so just in time. Let me just make sure I'm at the
2  right place.
3     Okay. I want to talk to you about how else you --
4  what else you looked at to figure out whether there was any
5  basis to say that VSAN or VLAN IDs are equivalent to storage
6  addresses. Did you look at the patent itself?
7  A  I did, and the patent does not say that VLAN IDs are
8  storage addresses -- or VSAN IDs are storage addresses.
9  Q  How about Cisco's documents, what do Cisco's documents
10 say about whether or not VSAN IDs are storage addresses?
11 A  I didn't find any Cisco documents that say VSAN IDs are
12 storage addresses.
13 Q  Did Dr. Jones show any?
14 A  I don't believe he did.
15 Q  How about Egenera documents, what did Egenera documents
16 say about whether VSAN IDs are storage addresses?
17 A  They talk about VSAN IDs, but they never say that the
18 VSAN ID is a storage address or equivalent to a storage
19 address.
20 Q  I think you said VSAN. I think you meant VLAN ID,
21 right, Egenera's documents?
22 A  Egenera's, yes. They don't say for either VLAN or VSAN,
23 they don't say either is a storage address.
24 Q  Okay. And did Dr. Jones show us any documents, Egenera

Page 50

1  documents, that say a VSAN ID is a storage address?
2  A  I don't believe he did.
3  Q  How about Cisco's VSAN patents, do those say that VSAN
4  IDs are storage addresses?
5  A  So we haven't talked about this, but Cisco actually has
6  patents on VSAN technology, and those Cisco patents do not
7  say that VSAN IDs are equivalent to -- are network addresses
8  or are equivalent to addresses.
9  Q  And you have "required feature" on the bottom.  What
10  does that mean?
11  A  It just simply means that the operation of UCS that
12  Dr. Jones was pointing to that will result in the message
13  that he's relying on is not a required feature.  It's
14  optional in UCS.  So it's not a central part of UCS.
15  Q  So all the jury has to go on is Dr. Jones' say-so?
16  A  Yes, that appears to be the case.
17  Q  Let's look at what Egenera's inventors said about VSAN
18  and VSAN IDs.  What did they say?
19  A  Well, essentially they said that these were not part of
20  their inventions.  They did not invent VSAN or VSAN IDs.
21  Q  Okay.
22       If we look at the next slide.  I think you
23  mentioned Cisco's patents earlier, and I just have to do
24  this Exhibit thing for the record first.

Page 51

1       MR. PACKIN:  So DX-SD is JTX-564; DX-SH is JTX-565;
2  and DX-SK is JTX-566; and I offer those, your Honor.
3       THE COURT:  Very well.
4  (Exhibit No. JTX-564 received in evidence.)
5  (Exhibit No. JTX-565 received in evidence.)
6  (Exhibit No. JTX-560 received in evidence.)
7  Q  All right, so what are the documents that I just offered
8  in evidence?
9  A  I believe those are three patents that have been issued
10  to Cisco on some various aspects of VSANs, these virtual
11  storage area networks.
12  Q  And what do they tell you about who was using an
13  invented technology related to the VSAN?
14  A  It tells me two things, that Cisco has some innovation
15  in the space.  They have patents related to VSANs, and as I
16  mentioned, these patents never say, they don't equate VSAN
17  IDs with addresses.
18  Q  All right.  Well, let's take a step back here because
19  we've been talking about everything that's not an address.
20       Surely the messages need to have an address in
21  order to get to storage.  Do they have an address?
22  A  Of course.  I mean, we know that if a processor
23  generates a message for storage in the UCS system, it does
24  make it to the storage network.

Page 52

1  Q  Okay.  Let's look at what Dr. Jones' packet capture
2  showed us, and what are you showing on this slide here on
3  the left and the right?
4  A  This is an excerpt from Dr. Jones' expert report where
5  he did what's called a packet capture of looking at packets
6  that are coming into the fabric interconnect and going out
7  of the fabric interconnect.
8       And this is not very easy to digest, but what I'm
9  highlighting here is some elements of the fibre channel
10  packet that comes into the fabric interconnect and the fibre
11  channel packet that goes out of the fabric interconnect.
12  And what I'm specifically calling out are these two fields
13  in the packet that are "D_ID" and "S_ ID."  The D stands for
14  destination, the S stands for source.
15       And what these are, are the addresses of the
16  destination; where is this fiber channel packet going to,
17  which particular node in the storage network.  And the S_ID
18  is who sent it.  So this is an identifier of an element of
19  the storage network that's on the server.
20       And the point here is just simply that the actual
21  addresses that are used to deliver the message to the
22  storage network -- to an element in the storage network
23  don't change.
24       The address coming in, the addresses on the left,

Page 53

1  are exactly the same as the addresses on the right.  So the
2  addresses were never translated.
3  Q  So just to be clear, what do Dr. Jones' own tests
4  confirm with respect to this element of whether or not there
5  is identification of a corresponding storage address?
6  A  It confirms that the actual address that's used to
7  deliver the message to the element in the storage network
8  that's going to service this request does not change.
9  Q  Okay.
10  A  There's no address translation required, so there's no
11  identifying of the corresponding storage address.
12  Q  Why don't addresses, storage addresses, need to be
13  changed in Cisco's approach?
14  A  Well, that's a great question, because it goes to
15  another fundamental design difference between UCS and
16  Egenera, and in particular, to a networking technology that
17  Cisco invented and uses in UCS.
18  Q  Okay.  Let's give the jury a brief overview of that.
19       So what's that technology called, and I think we've
20  heard about it briefly earlier?
21  A  Yes.  It's called "fibre channel over Ethernet."
22       Fibre channel is the name of the protocol that's
23  used to talk on the storage network.  Ethernet is the name
24  of the protocol that's used to talk on the server side of

Page 54

1  the storage network. And Cisco invented something called
2  "fibre channel over Ethernet," which allows you to send
3  fibre channel protocol messages on an Ethernet network.
4  Q  Okay. Let's take a look at how that fibre channel over
5  Ethernet works and how come it doesn't need to change these
6  storage addresses. So let's start with the animation. What
7  are you starting with here?
8  A  So the way fibre channel over Ethernet works is it uses
9  a technique that's called "encapsulation." Encapsulation
10 just simply means you put one letter inside another letter.
11      So what I'm showing here is a server. If a server
12 needs to communicate with a storage device, it's going to
13 generate an Ethernet message, and that's the blue envelope.
14 And inside that Ethernet message, it's going to put a fibre
15 channel message, and that's the orange envelope.
16      So we put the orange envelope inside the blue
17 envelope, and then send the blue envelope to the fabric
18 interconnect.
19 Q  So let's go ahead and do that. What happens next?
20 A  Then as part of the fibre channel over Ethernet
21 protocol, the fabric interconnect is going to open up the
22 Ethernet envelope and it's going to take out the orange
23 fibre channel envelope, and it's simply going to look at the
24 destination address on the fibre channel envelope and then

Page 55

1  just send the fibre channel message to the storage device
2  that has that address.
3       So because it's using this protocol, fibre channel
4  over Ethernet, it does not need to translate addresses, and
5  therefore, it doesn't perform the step of identifying a
6  corresponding address.
7  Q  Now, did Cisco have patents related to its innovative
8  approach of fibre channel over Ethernet?
9  A  Yes. Cisco is recognized as the inventor of this fibre
10 channel over Ethernet protocol.
11      MR. PACKIN: And your Honor, I offer DX-SG as
12 JTX-567.
13      THE COURT: Okay. So admitted.
14 (Exhibit No. JTX-567 received in evidence.)
15 Q  Actually, these names on the inventors of the Cisco
16 patent, I think we've heard about them at this trial.
17      Who is Mr. Luca Cafiero?
18 A  We have heard that name before, and my understanding is
19 that's the same Luca Cafiero that we've heard of who was one
20 of the founders of Egenera -- sorry, of Nuova.
21 Q  How about Silvano Gai. I think I heard Mr. Dvorkin
22 mentioned Mr. Gai yesterday, right?
23 A  He did. He was also at the time an employee of Nuova.
24 Q  So this patent is from July 2009. How come it's

Page 56

1  assigned to Cisco technology and not to Nuova?
2  A  My understanding is at this point in time Cisco had
3  acquired Nuova and undoubtedly acquired the patents that
4  they had.
5  Q  Let's look at what the Nuova original documents say
6  about whether or not Cisco is modifying an address.
7       What are you showing here on? This is slide 88,
8  JTX-187 at 15.
9  A  This is the same document that we looked at before from
10 2006, this PRD document. Again, this is a document that
11 explicitly calls out how Nuova wants to do things
12 differently than Egenera. And one of the ways they want to
13 do things differently has to do with the way they do I/O.
14 "I/O" stands for input/output, and that refers, for example,
15 to communicating with the storage devices. And they're
16 saying that in Egenera's model, they needed to use a
17 gateway.
18      So remember in the patent, they had one type of
19 network internally and another type of network on the
20 storage network, and they need to translate between them,
21 and that translation function happens in something that in
22 the field we call a "gateway." A gateway is something that
23 sits between two different types of networks, and this
24 gateway converts the I/O.

Page 57

1       So Egenera's model was based on a gateway to
2  convert I/O, and the Cisco -- or the Nuova approach at that
3  time, and today, was different, to not use a gateway.
4  Q  How does that relate to the patent element that we're
5  talking about in terms of identifying the corresponding
6  storage address?
7  A  If you can get away from using a gateway, you don't have
8  to perform the step of identifying a corresponding storage
9  address because the storage addresses that are going to be
10 generated by the processor can go all the way to the storage
11 network without having to be changed.
12 Q  And does Egenera dispute that it has this centralized
13 I/O gateway?
14 A  No.
15 Q  Mr. Brownell admitted that even here in this courtroom?
16 A  Correct. Mr. Brownell, his name -- is the first
17 inventor on the patent, and he was asked if they had a
18 centralized I/O gateway and he agreed.
19 Q  Now, have you reviewed any Cisco documents about whether
20 or not Cisco has the gateway?
21 A  I have.
22 Q  Let's take some examples. Now we're on slide 90,
23 JTX-200. This is a unified fabric white paper fibre channel
24 over Ethernet. What are you showing here?

Page 58

1    A   This is, as it's labeled, it's a white paper.  So it's a
2    technical paper to help inform people about a technology,
3    and here, Cisco is saying that FCoE, this fibre channel or
4    Ethernet protocol, has now been adopted all players in the
5    SAN market.  So this is an important innovation that Cisco
6    has developed.
7           And they're specifically saying it's a solution
8    with no gateway.  So if you don't have a gateway, that means
9    there's no middle man, and that means you're going to get a
10   lot of benefits from that.
11   Q   Okay.
12          MR. PACKIN:  Can we have the document camera.
13   Q   So we've been hearing a lot about the Project California
14   book, and we've been seeing it on the projectors, but there
15   is a book, and I'd like to use the book itself.
16   A   Sure.
17   Q   Did you review this book as well?
18   A   I did.
19   Q   And if the jury wants to look at it, it's JTX-202,
20   right?
21   A   That's my understanding.
22   Q   Okay.  Let's look at page 94 of the book.  So that's 94.
23   And this is a section that's talking about fibre channel
24   over Ethernet.  And I don't think we have to go into the

Page 59

1    details of the figure, but it has Figure 59.
2           So wait, FCoE, could you remind us?
3    A   That's our acronym, fibre channel over Ethernet.  It's
4    the way of transmitting a fibre channel message in an
5    Ethernet packet.
6    Q   And what is that telling us about whether or not Cisco's
7    patented approach requires a gateway?
8    A   So the FCoE technology, this fibre channel over
9    Ethernet, does not need a gateway, and that's a big
10   advantage.
11   Q   And in terms of whether or not addresses are changed,
12   what is it telling us about the actual FC frame, which is
13   the message that we've been talking about?
14   A   So FC here stands for fibre channel, and frame is sort
15   of another word for message.
16          And what they're saying is that because there's no
17   gateway, the fibre channel messages can go from the
18   processing side of your data center to your storage side of
19   your data center without being changed, whereas the patent
20   requires them to be changed because of the incompatible
21   networks that's using them.
22   Q   Is this a small difference from Egenera's patent or a
23   big difference?
24   A   It's a big difference.  As I say, a gateway is a

Page 60

1    middleman.  And if you eliminate the middleman, things are
2    going to go faster and you'll be able to scale more, meaning
3    you'll be able to have a bigger data center.
4    Q   And so in addition to this not programming the CPUs, are
5    there other big fundamental differences between Egenera's
6    patent and UCS?
7    A   Yes.  This fibre channel over Ethernet is a big
8    difference.
9           MR. PACKIN:  Can we go back to the slide show.
10   Q   Now we're on slide 92.  What did Egenera's inventors
11   admit about fibre channel over Ethernet?
12   A   Well, they all admitted that they didn't invent.
13   Q   And so here you have the testimony of Mr. Smith,
14   Mr. Busby, Mr. Geng and Mr. Greenspan; those are all among
15   the long list of inventors?
16   A   Right.  If you look at the first page of the patent
17   where it lists the inventors, you'll see all these
18   individuals' names.
19   Q   Okay.  So let's just recap with respect to Figure 1.
20          How does what we're talking about relate to Figure
21   1?
22   A   So it relates to Figure 1 because in the Egenera
23   system -- in the Egenera patent, you had to have this
24   centralized I/O gateway in the control node to translate

Page 61

1    addresses, and the address translation does not happen and
2    it's not required in UCS system.
3           And in particular, Dr. Jones has claimed that there
4    is a translation because of the use of a VSAN ID, and in my
5    opinion, VSAN IDs are not storage addresses.
6    Q   And the storage, that's the bottom right, that's why you
7    have the X there?
8    A   Yes.  The storage network is at the bottom right.
9    That's where the messages for this claim element are
10   destined.
11   Q   Let's make sure that we go back to the claim language
12   and make sure that we're focused on the right thing.
13          What claim element does this relate to?
14   A   Again, these are excerpts from claim 3 and 7, so we're
15   sort of in the middle of each claim, and the text that's in
16   blue relates to this requirement that you identify a
17   corresponding storage address.  And so it's the text in blue
18   that I'm specifically saying is not in the UCS, the Cisco
19   UCS system.
20   Q   Okay.  So now let's move from slide 94 to 95.  Are we
21   done with this reason?
22   A   Yes, I believe we're done.
23   Q   Do you have other reasons?
24   A   I'm sorry?

Page 62

1  Q  Do you have other reasons that Cisco doesn't infringe?
2  A  Yes. I'd like to go through one last reason having to
3  do with this claim element that's about modifying
4  communication messages.
5  Q  Now, again, does the jury need to find all of these
6  reasons, or is just one difference -- I mean, these are big
7  differences. Are one of these differences enough?
8  A  No. Again, if you go back to my headphone example, if
9  you're missing one element of the claims, no matter how big
10 or how small that element is, there could be no
11 infringement. So you don't have to find that all three of
12 these elements are missing to say there's no infringement.
13 You just have to find that one of them is missing.
14 Q  What's the next one that we're -- so we talked about the
15 storage addresses and storage network. What's the next one
16 we're going to focus on here?
17 A  The next one has to do with how Egenera conceptualized
18 how you would communicate from processors inside the data
19 center to the outside world, to what they call the external
20 communication network.
21      And again, because Egenera was using this
22 proprietary internal network called Giganet, they again had
23 to modify messages to send those messages out to the
24 internet, which was largely based on Ethernet.

Page 63

1  Q  And what is the claim language that this element relates
2  to?
3  A  It relates to the language that I've highlighted in
4  green, both in claim 3 and claim 7, that it's logic to
5  receive messages from computer processors and then modify
6  the received messages to transmit the modified messages to
7  the external communication network. And again, we can just
8  think of the external communication network as something
9  like the internet.
10 Q  Okay. Now, that's on slide 97.
11      Let's go to slide 98, and we're not going to go
12 into this in too much detail, but what is -- what are you
13 showing on slide 98?
14 A  So the language of this claim element in claim 3 is a
15 little different than in claim 7. It's written in this form
16 that we've heard about called means plus function.
17      And the point here is that in the left-hand box at
18 the top I have the actual claim language. And the court has
19 told us that the way you understand this claim language is
20 you have to find something that performs a specific
21 function, and that function is listed in the middle box, and
22 that function has to be performed with specific structure,
23 with specific components. And that structure is in the
24 right hand box.

Page 64

1       And the structure that's called out here is
2  structure that's in the patent, and I have an excerpt from a
3  figure that just shows the required structure.
4  Q  Now, we're going to focus on the function, but is this
5  structure also required in order to infringe claim 3?
6  A  Yes, you have to show that there exists a VLAN server, a
7  VLAN proxy, and a physical LAN driver.
8  Q  And you believe that Dr. Jones has shown any of that?
9  A  No, I don't believe he has.
10 Q  Let's talk about what's going on here. So we've X'd out
11 the communications -- I'm sorry, the storage network on the
12 bottom. Why do you have a red box on the IP network in
13 green on the top?
14 A  Because this is I think a good way to orient a
15 discussion, is that we're talking about, for this claim
16 element, its messages that are going to go from the
17 processors nodes out to the internet, and that's highlighted
18 in the green cloud that has "IP." You may be familiar with
19 the term IP. It stands for internet protocol. As I say,
20 the green cloud, just think of it as the internet.
21      So you want to send messages that will originate
22 from processors, go across this internal network that's
23 called Giganet and make it out to the internet, which is an
24 Ethernet network.

Page 65

1  Q  Let's show your animation here. So what are we starting
2  with and where is it?
3  A  So if a processor wants to send data to some client on
4  the internet, it will first generate a Giganet message to
5  get across the data center to the control node. So you
6  start with a Giganet message.
7  Q  Where does it go?
8  A  And it will ultimately go to the control node, where the
9  control node again has to do a form of translation or
10 modification of the message to get it into the form of
11 Ethernet.
12      So let me just illustrate that in this cheesy
13 little way of, we'll just erase the message and generate an
14 Ethernet message. So the message is modified as it goes to
15 the external communications network.
16 Q  So let's go back to Dr. Jones' analysis where he talked
17 about the message modification. Now we're focused on the
18 messages to the communications network as opposed to the
19 storage network, and so, let's Zoom in on that.
20      Why do you have X's on the VLAN ID the VSAN ID and
21 the FLOGI to FDISC?
22 A  Well, for our purposes of this morning, these bottom two
23 messages -- these are messages that are internal to the
24 storage area network. These are not messages going to the

Page 66

1  external communications network.  They're not going to the
2  internet.  So they can't satisfy the particular claim
3  element that we're focusing on.
4  Q  Okay.  So what's the one that -- the modification that
5  Dr. Jones pointed out with respect to the communications
6  network?
7  A  It was this one that we talked about before, about how a
8  message, as it leaves a server, as it leaves the network
9  interface card, it gets a tag added to it and how this tag
10 then is later removed by the fabric interconnect.
11 Q  Okay.
12       MR. PACKIN:  Your Honor, can Professor Jeffay come
13 down and use the magnet board to explain this to the jury?
14       THE COURT:  Yes, he may.
15       MR. PACKIN:  Thank you.
16 Q  So let's talk about this VN-Tag and show how the
17 messages start from the CPU and how VN-Tagging works.  We're
18 still in Cisco UCS now, so you have the messages here as
19 well?
20 A  I do.  So I just reconfigured the board here so that
21 this is the nonfailed version of the server.
22       So I have another magnet that is our Ethernet
23 message.
24       So a CPU will generate a message to communicate

Page 67

1  with somebody out on the internet, could be responding to
2  request for web contents, could be the contents of a web
3  page.
4        This message will go to the network interface card,
5  to one of the VNICs, and the network interface card is the
6  one that's going to physically or electronically actually
7  transmit the ones and zeros.  But before it does that, it
8  will add a tag to the message.  So if I could get a post-it
9  there.
10 Q  There you go.
11 A  We're going to add a little tag to this, and it's a tag
12 called a "VN-Tag," and the VN-Tag will be added here by the
13 network interface card.
14 Q  Let me stop you for one moment.
15       I've got testimony on the screen here.  Does Dr.
16 Jones agree with you -- this is what the jury saw two days
17 ago.
18       Does Dr. Jones agree with you that the VN-Tag is
19 added at the virtual network interface card?
20 A  Yes.  I think there's no dispute that the tag is added
21 at the virtual network interface card.
22 Q  Okay.  So now let's take that message from the virtual
23 network interface card and continue along sending it out to
24 the external communications network.  What happens?

Page 68

1  A  The VN-Tag is going to be used by the fabric
2  interconnect to process the message appropriately.  So the
3  VN-Tag is for internal UCS purposes.  And so, when it's in
4  the fabric interconnect as it's going to be transmitted out
5  of the fabric interconnect, it just simply takes the tag off
6  and then will transmit the message out to the internet.  In
7  so doing, the important point is that the message that
8  actually goes out to the internet is exactly the same as the
9  message that came from the CPU.
10 Q  And so what does that mean with respect to whether or
11 not the message that came from the CPU and the message that
12 went out to the external communication network, is that a
13 modified message that went out?
14 A  No.  The message that actually goes out to the internet
15 was not modified from the message that the CPU actually
16 generated.
17       The CPU generated this message, sent it to the NIC,
18 the network interface card.  The network interface card
19 added this tag.  The tag was used for processing the fabric
20 interconnect.  The fabric interconnect took off the tag and
21 sent the message.
22       So the message that's sent on the internet is the
23 same message that's being received.
24 Q  Dr. Jones showed us some packet captures showing the VN-

Page 69

1  tag is on and then the VN-tag is removed.  Were those packet
2  captures wrong?
3  A  No, those packet captures were correct.  They're just,
4  unfortunately, they were taken at the wrong place.  He was
5  capturing the packets here essentially as they're on their
6  way into the fabric interconnect, and so at the time that he
7  captures the packets, this VN-Tag is, in fact, on the
8  packet.  I don't dispute that.
9        But the point is, what he's capturing is not the
10 message or the packet that was generated by the CPU.  He's
11 capturing the packet as it's been modified by the network
12 interface card.
13       So then, when he sees it leave the fabric
14 interconnect, the fabric interconnect takes off the tag, he
15 sees a difference between what's monitored here and what's
16 monitored here.  But that's not what the claim requires.
17 The claim requires that you're comparing the message that's
18 received from the CPU and to the message that goes out to
19 the internet, and those messages are the same.
20 Q  So what do Dr. Jones' packet-captures, what do those
21 tell you about infringement with respect to this element?
22 A  I don't think you can use those packet captures to
23 assess infringement because you're not measuring -- you're
24 not capturing the packet that came from the CPU.

Page 70

1  Q  Okay. I think we're good for this one.
2     So we've been talking about VN-tags, and Dr. Jones
3  accused Cisco infringing using VN-tags.
4     Who invented VN-tags?
5  A  So VN-Tags is yet another technology that was invented
6  by Cisco, and Cisco has patents on VN-Tags.
7  Q  Is that what you're showing here from Mr. Chen on slide
8  105?
9  A  Yes, Mr. Chen, remember, was the engineer that we've
10 heard from I think Friday with that very dense presentation
11 via video. And he's saying yes, that VN-Tags were something
12 that was invented by Cisco.
13    MR. PACKIN: And on the next slide, we've got DX-SM
14 which I'm marking as JTX-568, and DX-SO, which I'm marking
15 as JTX-569.
16    Your Honor, I offer JTX-568 and 569 into evidence.
17    THE COURT: So admitted.
18 (Exhibit No. JTX-568 received in evidence.)
19 (Exhibit No. JTX-569 received in evidence.)
20 Q  Thank you. What are you showing the jury here with
21 respect to these Exhibits?
22 A  These are two patents that Cisco was awarded by the
23 patent office for their innovation in the development of the
24 VN-Tags.

Page 71

1  Q  All right.
2     Now, I want to switch gears here for a minute and
3  talk about the ramifications of Dr. Jones' infringement
4  analysis.
5     How do his accusations regarding VN-Tags impact the
6  validity, if at all, of the '430 patent?
7  A  So it's my opinion that the use of VN-Tagging is outside
8  of the '430 patent. But if it's inside the patent and the
9  patent office knew how Egenera was interpreting their
10 claims, if they knew that they were interpreting their
11 claims to cover something like VN-Tagging, I don't believe
12 Egenera ever would have gotten a patent.
13 Q  So, in other words, if VN-tagging -- you know that
14 VN-Tagging can't be enough, because if it were, the patent
15 would be invalid?
16 A  Correct.
17 Q  Okay. Let's look back at, we saw -- this is JTX-004 and
18 we talked about Aziz early on.
19    Can you just remind us at a high level what the
20 Aziz patent was?
21 A  This is a second patent by Aziz. And Aziz was the
22 fellow that we talked about when we were talking about
23 virtual local area networks. And Aziz was the fellow who
24 had invented this notion of a virtual server farm. So he

Page 72

1  calls his collection of servers, instead of a data center,
2  he calls it a virtual server farm, and in his virtual server
3  farm, he uses a form of tagging that's equivalent to what
4  Dr. Jones has accused of infringing.
5  Q  And you're showing that here on column 6, lines 47-51 of
6  Aziz?
7  A  Yes. This is a call-out from the Aziz patent where it's
8  some background, and it's talking about how you can
9  interconnect devices with VLANs, and we talked a lot about
10 that. And it's also mentioning that hardware devices, these
11 switches that support VLANs, are widely available, and in
12 particular, that Cisco sells switches that support VLANs.
13 Q  This Aziz patent, this came before Egenera's patent, is
14 that right?
15 A  Yes, this is a patent that predates Egenera's patent.
16 Q  And did the patent office know about this Aziz patent?
17 A  They did, and when Egenera was trying to get its patent,
18 Aziz was one of the patents where the examiner said, Aziz
19 invented what you did before you.
20 Q  So you can't have -- your fence can't go over there
21 because that's already in Aziz?
22 A  Right. So the way they were originally writing their
23 claims, they were broad enough such that Aziz had already
24 done what they did.

Page 73

1  Q  So let's turn to the next slide. This is 109.
2     You've got two different dates here; June 2, 2006,
3  that's at page 152 of JTX-002, and October 18, and that's at
4  page 183 of the same exhibit.
5     Why are you showing the jury these two separate
6  excerpts, and what are you showing in each?
7  A  These are excerpts from the back-and-forth between the
8  Egenera inventors and the patent office. And on June 22 of
9  2006, the examiner told Egenera, I'm sorry, but you can't
10 have a patent because Aziz did what you did, and so you're
11 going to need to change your claims.
12 Q  Then what happened in October? You know, Egenera tried,
13 and then what happened again in October 2006?
14 A  So between June and October, Aziz -- Egenera tried to
15 convince the patent office that they had a patent, and in
16 October the examiner wrote back and said that they
17 respectfully disagree and that you still can't have a
18 patent.
19 Q  I think this is the first time we've heard of
20 "anticipated." What does that mean?
21 A  "Anticipated" is a term in patent law that means that a
22 prior system, a prior art system, has each and every element
23 of your claim as your claim is currently written. So,
24 informally, it means that someone else invented what you

Page 106

1  Q  I didn't say that. What I said was Cisco did not tell
2  Egenera about the failure before the 2004 April meeting or
3  before the May 2004 meeting. Do you recall that?
4  A  Yes, I think I do recall that.
5  Q  And that it was suspicious that they had these meetings
6  about the technology and the product but Cisco never even
7  mentioned a crash on the BladeFrame. Do you remember me
8  saying that?
9  A  Yes.
10 Q  Now, in your next slide you actually put up an email
11 about that BladeFrame crash when it finally came back to
12 Egenera; right?
13 A  Yes.
14 Q  And the email is dated May 29th, 2004; right?
15 A  Yes.
16 Q  But you cut off the email at the bottom. There's a
17 whole other paragraph. Do you recall that?
18 A  That's true.
19 Q  Okay. Let's pull up JTX-32. Okay. The actual exhibit
20 is on the -- right now, left.
21       MR. THOMASES: On the left can we highlight that
22 bottom paragraph?
23 Q  "Investigation of the logs showed that one of the
24 switches had failed about a month ago, but was never

Page 107

1  reported to EES," Egenera; right?
2  A  I believe that's what EES refers to.
3  Q  And that was in May, and they're saying it was never
4  reported until after the meetings between Cisco and Egenera;
5  right?
6  A  I don't think they're referencing the meetings between
7  Cisco and Egenera. I think --
8  Q  Timingwise you remember Mr. Manca went to Cisco to do a
9  presentation to the chief technology officer, and then a
10 second meeting with Mr. Hanafi on May 12th, 2004; right?
11 A  That's all true.
12 Q  And no one in those meetings mentioned anything about a
13 crash on the BladeFrame; right?
14 A  I believe that's correct.
15 Q  Now, you also mentioned Mr. Thompson during your
16 testimony yesterday when you were regarding this email;
17 right?
18 A  Yes.
19 Q  And you actually mentioned that he, you thought he was
20 the CEO at the time; right?
21 A  I believe I did say that.
22 Q  Okay. That's a mistake though. He was not the CEO.
23 Let's go up to see the message right above this one, please.
24 Mike Thompson was the chief operating officer at that time.

Page 108

1  Okay. And the email you left out of your slide says, "We
2  should study these C-blades to see if they are screwing with
3  them (if possible). Mike." Right?
4  A  That's what it says.
5  Q  So at the time, Egenera was suspicious about how those
6  BladeFrame server blades failed during the test; right?
7  A  I think that's a reasonable inference.
8  Q  Can we turn to your slide DDX-5.8. You're trying to
9  respond to allegations of copying. Do you recall putting
10 this up yesterday?
11 A  Yes. Well -- yes.
12 Q  Okay. Now, you say source code from UCS Manager and PAN
13 Manager showed different code bases and no copying; right?
14 A  Yes.
15 Q  Okay. This is a bit of a red herring though because
16 there's been no allegation of source code copying; right?
17 And someone can copy a fundamental idea without stealing the
18 source code; right?
19 A  Sure. But if you're talking about the product being
20 copied, the dominant way products are copied is people copy
21 the source code.
22 Q  Even when you're talking about a fundamental
23 architecture, not the copy of PAN Manager to UCS Manager?
24 A  Architecture is referring to the very high level design.

Page 109

1  And at the end of the day, what matters is the
2  implementation, how did you actually realize that
3  architecture.
4  Q  Now, you were here during the whole trial; right?
5  A  Yes.
6  Q  And you understand that Egenera's not claiming that
7  there's a copying or copyright infringement of source code,
8  but that Egenera's allegation is that Cisco felt left behind
9  and left out of the data center market, they sent their
10 team, including Mr. Hanafi and engineers and others to first
11 have a Webex for some technical information, then they went
12 to Marlborough, Massachusetts to get a deep dive under an
13 NDA, and then they had Mr. Manca come to their offices,
14 Cisco's offices in California to meet with the CTO, and then
15 Mr. Hanafi and his engineers again. And then after those
16 meetings those executives went and formed Nuova. You
17 understand that that is the allegation; right? You heard
18 that?
19 A  I heard all of that, yes.
20 Q  Okay. And so you weren't at the 2004 meetings; right?
21 A  No, of course not.
22 Q  And you don't know exactly what Cisco learned in those
23 deep-dive conversations; right?
24 A  I haven't heard anything specific about what Cisco

28 (Pages 106 to 109)

Page 110

1    learned.
2    Q   And those executives who got that information and then
3    went and founded Nuova were working for Nuova for six months
4    before Mr. Michael Dvorkin came; correct?
5    A   I believe that chronology is correct.
6    Q   Now, let's pull up your slide DDX-8.2. This is from the
7    other day. These are the founders of Nuova; right?
8    A   Yes.
9    Q   Mr. Mario Mazzola, Luca Cafiero, and Soni Jiandani were
10   the ones identifying as having high regard for Vern Brownell
11   and Egenera in 2004. Do you remember that?
12   A   I do.
13   Q   And you recall that the people who got the deep dives
14   reported to Mario Mazzola and his team; right?
15   A   Yes.
16   Q   Now, you did not, in your investigation about whether
17   there was copy or not, interview Mr. Mazzola; correct?
18   A   That is correct.
19   Q   You did not interview Mr. Cafiero; correct?
20   A   Mr. Cafiero, no, I did not interview him.
21   Q   And Soni Jiandani, you did not interview her?
22   A   No.
23   Q   In fact, you didn't interview anybody on this slide;
24   correct?

Page 111

1    A   That is correct.
2    Q   So you have no personal knowledge if they used the
3    information they got from Egenera while at Nuova; correct?
4    A   That is correct.
5        MR. THOMASES: I pass the witness, your Honor.
6             REDIRECT EXAMINATION
7    BY MR. PACKIN: :
8    Q   Let me just start with where Mr. Thomases left off
9    because that makes no sense to me.
10       Are you here as a personal witness who was
11   involved?
12   A   No. I had nothing to do with Egenera or Nuova.
13   Q   In what capacity are you here?
14   A   I was retained to do an analysis of the UCS system and
15   compare it to the '430 patent to assess whether or not there
16   was infringement of the '430 patent.
17   Q   Now, in terms of evidence, have you had access to all
18   the evidence, whether or not you were personally involved in
19   the meetings?
20   A   I believe I had access to everything that was produced
21   in this case.
22   Q   Based on all of that evidence, everything that was
23   produced through this whole case, have you found any
24   evidence of copying?

Page 112

1    A   No.
2    Q   Has Mr. Thomases shown you evidence of copying?
3    A   No.
4    Q   You've been sitting here this whole trial, sitting right
5    there. Have they shown the jury any evidence of copying?
6    A   I don't think so.
7    Q   Now, he tried to impugn you by saying that Cisco, you
8    have funding from Cisco. Do you remember that?
9    A   I do.
10   Q   Tell the jury a little bit about research grants and how
11   they work in computer science.
12   A   Sure. Research is done mostly by graduate students.
13   And to get good graduate students you have to pay them. So
14   they're typically in their early twenties, they're gone from
15   their families, they're independent adults, they need a job.
16   And so in order to do research, you hire students, you have
17   to pay them a salary. So a big thing to do as a researcher
18   is you raise money. Most of the money will come from
19   federal research grants, but it's quite common to get grants
20   from companies if your research aligns with the interests of
21   them.
22       And in the late 1990s, so almost twenty-five years
23   ago, I was doing some work that happened to be of interest
24   to Cisco, and Cisco approached me to learn more about the

Page 113

1    research. We had a bunch of technical meetings where we
2    described what we were doing, where we were going. And in
3    2000, yeah, so twenty-two years ago, Cisco gave a grant.
4    And, technically, these are gifts to the university. So I
5    personally don't get any money. They give money to the
6    university. I use that money to pay graduate students a
7    salary. I pay their tuition. I pay their health care.
8    They do work and they get a degree.
9    Q   And is Cisco the only company to fund your lab?
10   A   No. I've been very lucky in that the research we've
11   been doing has been of interest to a variety of companies.
12   I received money from IBM, from AT&T, from Sprint, the
13   telecommunications company, certainly Cisco, some other
14   networking hardware folks, a company called -- at the time
15   it was called Cabletron, now it's called Extreme Networks.
16   So a variety of companies have funded my research over the
17   years.
18   Q   Does that money go to you personally in any way?
19   A   No, I don't get a nickel. As I say, it literally pretty
20   much all goes to fund students and pay their tuition and
21   their health care.
22   Q   What does it tell the jury about your lab and your
23   research that leading companies fund your research? What
24   does that -- what can the jury take away from that?

Page 118

1  interrogatories, 1 through 14.
2      So interrogatories are -- in these cases we get to ask
3  each other questions and we're obligated under the rules to
4  tell the truth in response. I'm going to read from the --
5  the blackout is just their attorney objections. We agreed
6  that we would just show the question and answer.
7      So interrogatory number 3: "Identify the
8  circumstances, date, all people involved with, and all
9  documents relating to each of the following instances of
10 Egenera's awareness of each accused instrumentality" -- that
11 means the UCS switch, the accused things, the switches --
12 "and tell the first date on which Egenera was aware of the
13 existence of the UCS switch and every instance in which
14 Egenera purchased, took possession of, reviewed, analyzed,
15 examined, inspected or handled any accused instrumentality"
16 or UCS switch.
17     And here's their answer: "Egenera was first aware of
18 the existence of one or more accused products on or about
19 December 12, 2008, with the publication of 'Cisco Planning
20 Significant Data Center Assault' by IDG News Service, as
21 well as other publicly available information published by
22 Cisco and others related to UCS on or about this time. To
23 its knowledge, Egenera has never purchased, taken possession
24 of, reviewed, analyzed, examined, inspected or handled an

Page 119

1  actual accused product."
2      For the next exhibit, your Honor, will be -- this is
3  JTX-571. And it is a Egenera response to requests for
4  admissions. And I'm going to particularly refer to
5  admission number 1 and admission number 2. Let me hand that
6  up.
7  (Handing.)
8  (Whereupon counsel conferred.)
9  (Joint Exhibit No. 571 received in evidence.)
10     MR. DESMARAIS: Here we go. Okay. So this is
11 Egenera's objections and responses to Cisco Systems' first
12 set of Requests for Admissions. And I'm going to look
13 particularly at number 1 first: "Admit that Egenera's
14 BladeFrame system embodies at least one claim of the
15 '430 patent." And their answer was, "As stated in those
16 responses, Egenera's BladeFrame system, when relevant
17 hardware and software were included, embody at least one
18 claim of U.S. Patent Number 7,231,430. Except as stated,
19 Egenera denies this request."
20     And Request for Admission number 2: "Admit that
21 Egenera's PAN Manager" -- that's the software they switched
22 to after 2008 -- "embodies at least one claim of the
23 '430 patent." Egenera's answer was: "As stated in those
24 responses, Egenera's BladeFrame system, when relevant

Page 120

1  hardware and software were included, embody at least one
2  claim of U.S. patent 7,231,430. To the best of Egenera's
3  understanding, Cisco's use of PAN Manager refers to only a
4  limited set of software, which would not, alone, embody any
5  claim of U.S. Patent Number 7,231,430. Egenera therefore
6  denies this request."
7      MR. THOMASES: Your Honor, can I just correct
8  something? I think it might be a misstatement. The PAN
9  Manager was on the original BladeFrame, it did not start
10 selling at 2008. Thank you.
11     I think that was just your commentary, counsel. Thank
12 you.
13     THE COURT: Okay.
14     MR. DESMARAIS: For our next witness, your Honor,
15 Cisco calls Mr. Daniel Busby by deposition. He is one of
16 the '430 patent inventors. Cisco's time is two minutes and
17 fifty seconds. Egenera's time is twenty-five seconds.
18         DANIEL BUSBY VIA DEPOSITION
19               EXAMINATION
20 Q   Good morning, Mr. Busby.
21 A   Morning.
22 Q   Mr. Busby, when did you begin working at Egenera?
23 A   I started in May of 2000.
24 Q   And you've worked at Egenera ever since May of 2000?

Page 121

1  A   I have.
2  Q   You agree that just because a product provides similar
3  functionality to customers and serves similar customer needs
4  as BladeFrame doesn't mean that the way it was developed
5  involved any copying of technology. True?
6  A   I would agree with that, yes.
7  Q   Mr. Busby, to your knowledge, do you allow any of your
8  employees or people who work for you to have Cisco
9  confidential information in their possession?
10 A   Not to my knowledge.
11 Q   It's not something you would permit; right?
12 A   Yes, it's not something that I would promote or permit.
13 Q   The same rule would apply to yourself?
14 A   Yes.
15 Q   Mr. Busby, I am handing you Exhibit 5. Exhibit 5 is a
16 document that Egenera produced from Mr. Busby's files marked
17 with the production number on the first page
18 EGENERA00212769.
19     And, Mr. Busby, I'll represent to you that Egenera
20 produced Exhibit 5 from your files. Exhibit 5 is marked
21 "Copyright 2005 Cisco Systems" and "Cisco Confidential" in
22 the footer. True?
23 A   Where is that?
24 Q   In the footer on every page.

Page 122

1  A  All right. Yes, it does say -- yes.
2  Q  Exhibit 5 is titled, "Cisco Server Fabric Switch, Server
3  Virtualization Technology." Right?
4  A  Yes, it is.
5  Q  Do you know why you would have had Exhibit 5 in your
6  files?
7  A  I don't.
8  Q  Do you recall showing or sharing Exhibit 5 with anyone
9  at Egenera?
10  A  I don't.
11  Q  So counsel for Cisco asked you a number of questions
12  about what appears to be a marking that says "Cisco
13  Confidential" on Exhibits 5 and 6. Do you recall that?
14  A  I do.
15  Q  Did you obtain these documents in Exhibits 5 and
16  6 through any inappropriate means?
17  A  Not to my knowledge.
18      MR. DESMARAIS: Our next witness we'll call by
19  deposition will be Maxim Smith, by deposition. Mr. Smith is
20  another of the '430 patent inventors who joined Egenera from
21  Hitachi. And the time is two minutes fifty-five seconds for
22  Cisco.
23         MAXIM SMITH VIA DEPOSITION

Page 123

1              EXAMINATION
2  Q  Good morning, Mr. Smith.
3  A  Morning.
4  Q  Mr. Smith, you used to work at Egenera; is that right?
5  A  Yes.
6  Q  Can you name some of those individuals who joined
7  Egenera from Hitachi?
8  A  Peter Manca, Ewan Milne, Alan Greenspan, Ted Duffy.
9  That's all I recall right now.
10  Q  Okay. So several of the early key contributors to
11  building Egenera came from Hitachi; correct?
12  A  Yes, that is right.
13  Q  Yourself included?
14  A  Yes.
15  Q  Did it seem odd to you that employees at Egenera came
16  from, you know, several came from the same company, namely
17  Hitachi?
18  A  No, it did not seem odd because, as I said, Hitachi was
19  winding down, Hitachi Computer Products America was winding
20  down at the time, so many of us were looking for a new
21  opportunity. It's also true that many of that collection of
22  people, we had worked together in the past, so we knew and
23  respected each other and it was natural that we would want
24  to work together again.

Page 124

1  Q  But your recollection is that Egenera decided to stop
2  selling BladeFrame largely because of how their relationship
3  with Dell was progressing?
4  A  I would restate that to say that Egenera was looking for
5  a way to avoid manufacturing its own hardware. Whatever
6  that way was would allow us to exit from that costly affair.
7  It turned out that the Dell relationship adequately met that
8  need. Therefore, we were able to curtail our own hardware
9  manufacture.
10  Q  Why did you eventually leave Egenera?
11  A  I was laid off.
12  Q  Do you know why you were laid off?
13  A  No, I don't. I was not told and I do not know the
14  answer.
15  Q  Around the time you were laid off, were others in the
16  company laid off as well?
17  A  Yes, there were many rounds of layoffs and many people
18  were being laid off.
19  Q  You would agree that there are ways to build stateless
20  server systems without violating Egenera's patent rights?
21  A  Yes.
22      MR. DESMARAIS: Cisco's next witness, also to be
23  called by deposition, will be Thomas Sheehan. He's a former
24  chief financial officer at Egenera. And the time is

Page 125

1  three minutes and twenty-seven seconds for Cisco.
2        THOMAS SHEEHAN VIA DEPOSITION
3              EXAMINATION
4  Q  Please state your name and your address for the record?
5  A  Thomas Sheehan, 92 Maynard Farm Road, Sudbury,
6  Massachusetts 01776.
7  Q  When you joined Egenera, you joined as their chief
8  financial officer; correct?
9  A  That's correct.
10  Q  When you left Egenera, who were Egenera's competitors in
11  the marketplace?
12  A  The competitors that we discussed at that time mostly
13  were IBM and HP.
14  Q  Was it your practice when you were CFO that you would
15  enter into non-disclosure agreements on behalf of the
16  company?
17  A  It was our practice that I would be the signatory.
18  Q  How many non-disclosure agreements did you enter into
19  while you were a CFO?
20  A  I don't know, but many, many, many.
21  Q  When you say "many, many, many," approximately what
22  number?
23  A  I couldn't even guess.
24  Q  Over a hundred?

Page 146

1  to gauge interest in potentially acquiring Egenera?
2  A  Yes.
3  Q  Exhibit 26, Mr. Thompson, is an email -- at the top it's
4  an email from you to Dave Epstein; right?
5  A  Yes.
6  Q  Okay.  Your understanding, though, in communicating with
7  Dave Epstein in the email, Exhibit 26, is that Cisco's
8  business units didn't have an interest in acquiring Egenera;
9  right?
10 A  Yes.
11 Q  And you state to Dave Epstein in Exhibit 26, "I think
12 their" -- meaning Cisco -- "Nuova team is doing their own
13 thing in this space and don't need/want our IP."  Right?
14 A  Yeah.  And when I say "IP," I think of our software and
15 our IP as basically the same thing.
16 Q  So what you said is that you think Nuavo, meaning Nuova,
17 doesn't need or want our, meaning Egenera, IP; right?
18 A  Software IP, yes.
19 Q  Exhibit 27 is an email, Mr. Thompson, that you wrote to
20 John Chambers of Cisco on May 13, 2009; right?
21 A  Yes.
22 Q  Do you know if your email in Exhibit 27 ever actually
23 reached John Chambers?
24 A  I -- I can't recall what the outcome of this email was

Page 147

1  back then.  I can't recall if I got a response from Ned or
2  John or no response whatsoever.
3  Q  And finally, another point that you thought would be of
4  interest to Cisco in your email in Exhibit 27 is that
5  Egenera had "relevant IP and patents which may prove to be
6  of great value to Cisco."  Right?
7  A  Yes.
8  Q  You never told Cisco, Mr. Thompson, that you or anyone
9  else at Egenera thought Cisco UCS was infringing any Egenera
10 patents; right?
11 A  Not that I recall.
12 Q  How about 2009?
13 A  I'm not certain.  Remember, at this time we were
14 morphing the software.  So the revenue decline was, one,
15 intentional based on the fact that we were no longer
16 producing hardware, and also based on the economy and
17 budgets getting slashed.
18 Q  Would you agree that Egenera's reduction in sales of
19 BladeFrame after 2008 was intentional as a part of its plan
20 to transition to a software-only company?
21 A  It was intentional based on two things.  One, the
22 economic downturn and reducing expenses, and transition to
23 software-only.
24 Q  But your reaction to it was planned?

Page 148

1  A  Of course, yeah.  Our reaction to the downturn was to
2  move to software-only business, and as part of software-only
3  business we reduced expenses knowing -- knowing that our
4  revenues were going to decline as we made that transition.
5  Q  As a result of the financial downturn and Egenera's
6  decision to transition to a software-only company in 2008,
7  it executed on a plan to reduce BladeFrame sales, ultimately
8  down to zero; right?
9  A  Eventually.
10 Q  Who did Egenera consider to be its biggest competitor in
11 2008?
12 A  Well, from a timing point of view, once Cisco announced
13 UCS, we considered them to be our biggest competitor.
14 Before that we considered HP to be our biggest competitor.
15 Q  Mr. Thompson, you wrote to John Cronin on May 6, 2009,
16 "On the IP front we are waiting on more detailed information
17 to be released by Cisco (for their recently new major
18 product announcement) to determine if there are patent
19 infringements.  It's a copy of our product architecture."
20 Right?
21 A  Yes.
22 Q  There is no information from Egenera that you believe
23 Cisco actually took and copied to build Cisco's product;
24 right?

Page 149

1  A  Yeah, I mean, other than the fact that their product
2  looked a lot like ours, they bought an IT BladeFrame that
3  they put in a lab, and they hired our people, those were
4  reasons why we thought highly suspect that there could be
5  some patent infringement and -- but we didn't catch them,
6  you know, doing anything specific.
7  Q  You're not testifying that Cisco hired anyone from
8  Egenera who actually did any software coding for UCS; right?
9  A  Not that I'm aware.
10 Q  And you're not testifying that Cisco hired anyone from
11 Egenera who actually did any architectural design of UCS;
12 right?
13 A  Not that I'm aware.
14 Q  Do you have any idea where in the product development
15 timeline Cisco was by the time it hired the first person who
16 used to work at Egenera?
17 A  I wouldn't know.
18 Q  Scott Clark wasn't an engineer or developer of any kind
19 at Egenera; right?
20 A  Correct.
21 Q  Are you familiar with the fact -- or what department
22 Satinder Sethi worked in at Egenera?
23    COURT REPORTER:  What department who?
24 Q  Satinder Sethi worked at at Egenera?

Page 150

1  A  I don't recall. I know he was technical in nature. I
2  don't recall if he was part of the service group or the
3  engineering group.
4  Q  You don't recall Satinder Sethi was a technical
5  marketing services person?
6  A  No. Like I said, I recall he was technical, so you're
7  telling me he was part of the service group.
8  Q  It's not your testimony that Satinder Sethi developed
9  the BladeFrame; right?
10 A  Correct.
11 Q  You have no basis to dispute that Cisco had already
12 developed UCS by the time it hired anyone from Egenera;
13 right?
14 A  I wouldn't know.
15 Q  You have no basis to dispute that all people that Cisco
16 hired who used to work at Egenera did not work on Cisco UCS
17 development or engineering; right?
18 A  I wouldn't know.
19 Q  Egenera hired many employees from other companies in the
20 industry; right?
21 A  Yes.
22 Q  Many of the early Egenera employees came from Hitachi;
23 right?
24 A  Yes.

Page 151

1  Q  And at Hitachi those individuals had worked on
2  server-related technologies; right?
3  A  I believe they worked on the mainframe system for
4  Hitachi.
5  Q  The Hitachi mainframe system was a data center related
6  product; right?
7  A  Yes.
8       MR. DESMARAIS: Your Honor, I'd like to offer a
9  couple of the exhibits that were mentioned in the
10 depositions. The board of directors meeting on
11 October 30th, 2008 is JTX-344. What was referred to in the
12 deposition as Thompson 12, being marked as DX-DZ, needs a
13 new number, and that will be JTX-572. Referred to in the
14 clip as Thompson 16 is JTX-284. Referred to in the clip as
15 Thompson 27, and also marked as PX-BGB will become JTX-573.
16 Referred to as Thompson 31, and also labeled PX-BYC will
17 become JTX-574. And DX-D2 will become JTX-575. And I think
18 I got the others. So I'll offer those.
19 (Joint Exhibit Nos. 344, 572, 284, 573, 574 and 575 received
20      in evidence.)
21      MR. DESMARAIS: Okay. Last video. It's short.
22 Cisco calls as its next witness Richard McCormack by
23 deposition. Mr. McCormack worked at Fujitsu America in
24 marketing and worked on Egenera products. The time is

Page 152

1  four minutes eighteen seconds for Cisco.
2       RICHARD MCCORMACK VIA DEPOSITION
3            EXAMINATION
4  Q  Could you please introduce yourself to the jury?
5  A  Richard McCormack from Fujitsu America. I've worked at
6  Fujitsu America for -- since 2001.
7  Q  And generally speaking, what's your job at Fujitsu
8  America?
9  A  I've been responsible for enterprise products and for
10 the marketing of enterprise products during that time
11 period.
12 Q  And did there come a time when you became aware of a
13 relationship between Fujitsu and Egenera?
14 A  Yes, yes.
15 Q  Approximately what time frame was that?
16 A  Probably something like 2004, '5, around that time
17 frame.
18 Q  And that was in connection with an OEM agreement that
19 Egenera had with Fujitsu Siemens Corp.; is that right?
20 A  Was it Fujitsu Siemens at the time? We resold a product
21 that had the Egenera software on it, yes.
22 Q  And in the 2005 time frame how was the bundle of Fujitsu
23 hardware and Egenera software received by customers?
24 A  It was one of a number of options at the time that

Page 153

1  people had to -- to look at, whether they took stand-alone
2  servers or blade servers, whether you used an internal
3  interconnect or Ethernet, an external interconnect. That
4  was a choice customers had. And then virtualization
5  software was in its infancy at the time, as well, from
6  companies like Microsoft and VMware. That was another
7  choice they had to make the system work.
8  Q  Was the Egenera software on the Fujitsu hardware a -- a
9  popular option, if you will, in terms of the number of
10 customers who sought it out as opposed to the other Fujitsu
11 product offerings in the 2005 time frame?
12 A  No. It was not -- it was not particularly popular.
13 Q  How about going forward past 2005; did the Egenera
14 software coupled on the Fujitsu hardware gain traction with
15 customers or become more popular over time, or did it -- or
16 did it not?
17 A  Certainly towards 2010 blade servers themselves had lost
18 market share in our portfolio. We had other options, such
19 as a converged infrastructure. So I would say it diminished
20 in its interest during that time period.
21 Q  What --
22 A  There were more choices available, not less.
23 Q  Okay. So the customers could, from Fujitsu's
24 perspective, purchase Fujitsu with the PAN installed on it,