1

2                   UNITED STATES DISTRICT COURT
                     DISTRICT OF MASSACHUSETTS
3

4

5

6
        * * * * * * * * * * * * * *
7    EGENERA, INC.,                 *
              Plaintiff             *
8                                   *    CIVIL ACTION
                   Vs.              *    No. 16-11613-RGS
9                                   *
     CISCO SYSTEMS, INC.,           *
10            Defendant             *
        * * * * * * * * * * * * * *
11

12

13

14

15       BEFORE THE HONORABLE RICHARD G. STEARNS
           UNITED STATES DISTRICT COURT JUDGE
16                     AND A JURY
               CIVIL JURY TRIAL DAY 6
17                  August 8, 2022

18

19

20                              Courtroom No. 21
                                1 Courthouse Way
21                              Boston, Massachusetts 02210

22

23       DEBRA M. JOYCE, RMR, CRR, FCRR
         LISA McDONALD, RPR, RMR, CRR
24            Official Court Reporters
         1 Courthouse Way, Suite 7205
25        Boston, Massachusetts  02210
           jamesgibbonsrpr@gmail.com

```
1           APPEARANCES:

2              On behalf of the Plaintiff:

3   ROPES & GRAY LLP (By Andrew N. Thomases, Esq., and James R.
    Batchelder, Esq.) 1900 University Avenue, East Palo Alto,
4   California 94303
                              - and -
5   ROPES & GRAY LLP (By Josef B. Schenker, Esq. and Rachael S.
    Bacha, Esq.) 1211 Avenue of the Americas, New York, New York
6   10036-8704
                              - and -
7   ROPES & GRAY LLP (By Scott Taylor, Esq., Emma Notis-McConarty,
    Esq. and Nicholas Bortz, Esq.) Prudential Tower, 800 Boylston
8   Street, Boston, Massachusetts 02199

9              On behalf of the Defendant:

10  DESMARAIS LLP (By Tamir Packin, Esq., Carson Olsheski, Esq. and
    John M. Desmarais, Esq.) 230 Park Avenue, New York, New York
11  10169, on behalf of the Defendant

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
                      P R O C E E D I N G S
           THE CLERK:  All rise.  Resuming on the record in civil
      action No. 16-11613, Egenera v. Cisco.
           You may be seated.
           THE COURT:  Good morning, counsel.
           ALL:  Good morning, your Honor.
           THE COURT:  I think this morning's issues can be dealt
      with pretty expeditiously.
           Slide 20, I'm overruling the objection.  I think there
      is -- I agree with Egenera that Mr. Brownell's and Mr. Manca's
      testimony is sufficient for the labeling of the slide as it is.
           With respect to slides 25 and 26, I'm going to sustain
      the objection.  This actually goes to an issue that the
      analysis we're given simply isn't supported by the testimony,
      so I do think it's a misleading title.
           Slide 37, I will overrule based on Cisco's use.  I
      think, again, it's a fair characterization of what the expert,
      Dr. Sullivan, will be testifying to.  He has to assume
      infringement to be able to give the opinion that he's being
      called on to offer.
           With respect to PX-AGI, I know there's this tendency
      to want to think simply because it's written down it can't
      possibly be hearsay, but it is hearsay; but it doesn't mean
      that the expert can't rely on it and refer to it in his
      testimony, as an expert can consider reliable history to the
```

1  extent that he thinks that that deserves the credit, so I think

2  it's fine for testimony but not admissible as an exhibit.

3       With respect to the Rule 50(a) motions -- 50(a)

4  motions -- it would be absolutely foolhardy for a judge to ever

5  allow a directed verdict in a case like this, interrupting the

6  evidence before a verdict is returned by the jury.  But I do

7  want to give you the opportunity, which I will, to on the

8  record note that the motion is made and opposed; but I would

9  save your ammunition for post-verdict proceedings.  That's

08:47 10  where we usually engage if we think that the issues are

11  sufficient of the evidence on some critical point of law or

12  some element of the case before the Court.

13       So those are the rulings I think that are required for

14  this morning, and we're waiting for one juror and then we'll be

15  off and running.

16       MR. PACKIN:  Your Honor, just one clarification on the

17  Rule 50 motions.  Sorry, one clarification on the Rule 50

18  motions.  We're going to submit a brief, with your Honor's

19  permission.  I think it will take a day to get the transcript

08:47 20  and then submit the brief, just to preserve the record.

21       THE COURT:  My general rule is that, in a case like

22  this, we conclude the case, we get the jury's verdict; and I

23  know that there are going to be post-verdict motions and it

24  makes sense to give the parties time to prepare something that

25  they think is adequate to the record, so we will take a

         1   reasonable --

         2           MR. PACKIN:  Understood.

         3           There is one issue with respect to the prosecution

         4   history estoppel that we suggest it might be appropriate to

         5   take that out of the case before the jury verdict because if

         6   doctrine of equivalents on certain issues goes to the jury,

         7   then that can create a problem with the verdict after we've all

         8   put so much effort into this case.  So we would, at least on

         9   that narrow issue, urge your Honor to --

08:48   10           THE COURT:  First thing, I know this is going to the

        11   Federal Circuit, but I'm sure their policies are the same.  The

        12   1st Circuit urges over and over again just don't jump the gun

        13   on these motions because otherwise you have to do it all over

        14   again; whereas if we have the verdict, they can either sustain

        15   it or overturn it as the case may be.

        16           MR. PACKIN:  Understood, your Honor.  So you don't

        17   want oral motions?

        18           THE COURT:  No, we're just wasting time.  I do want to

        19   hear it, I just want to hear it at a time when I think is going

08:48   20   to be more valuable and less interruption in the flow of the

        21   case.

        22           Okay.  As soon as we get our next juror, we'll be off

        23   and running.

        24           THE CLERK:  All rise.

        25           (Recess taken.)

```
 1              THE CLERK:  All rise for the jury.

 2              (Jury entered the courtroom.)

 3              THE CLERK:  Resuming on the record in civil action

 4    16-11613, Egenera v. Cisco.

 5              You may be seated.

 6              THE COURT:  Good morning again, counsel.

 7              Good morning again, jurors.  It's great to have

 8    everybody back.

 9              All right.  I think we're ready for our next witness.

08:58 10          MS. NOTIS-McCONARTY:  Good morning, your Honor.

11              Just one small housekeeping issue from yesterday.

12              During Dr. Jones' testimony, the following documents

13    were offered into evidence:  PX-BJV; PX-BJW; PX-BJX; PX-K --

14    BKD, I apologize, that's PX-BKD; PX-BKE; PX-BKH; PX-BKI;

15    PK-BKJ; PX-BKK; PX-BKL; PX-BKM; PX-BKN; PX-BKR; PX-BKZ; and

16    PX-BLD.

17              THE COURT:  Okay.  So noted.  Thank you.

18              MR. McDAVIT:  Counselor, are these the third-party

19    documents?

08:59 20          MS. NOTIS-McCONARTY:  These are the third-party

21    documents.

22              MR. McDAVIT:  Your Honor, this goes to the issue we

23    talked about yesterday morning.  We still maintain our

24    objection.  We don't have all of the -- apparently all these --

25    this is a subset of what was talked about yesterday, and we
```

1    would maintain our objection to those.

2          THE COURT:  All right.  The objections are noted.  If

3    you can fill them further, I'd be happy to look at it

4    separately, but for the time being, it's amazing you can keep

5    track of all these.

6          MR. McDAVIT:  Thank you, your Honor.

7          THE CLERK:  Is there a number?

8          MR. McDAVIT:  So we're still at -- since they're not

9    going in yet, we still have to resolve it, let's -- we'll go

09:00 10   with the next number.

11          MS. NOTIS-McCONARTY:  Your Honor, these are the

12   documents that were already decided on yesterday, the subset

13   that we had agreed upon.

14          THE COURT:  Just work it out between yourselves.

15          MR. McDAVIT:  We will.  Thank you, your Honor.

16          THE COURT:  And we won't lose time.

17          All right.  Next witness.

18          MS. NOTIS-McCONARTY:  At this time, your Honor, I

19   would like to offer an interrogatory into the record.  This is

09:00 20   Cisco's response to Egenera's Interrogatory No. 9; and I would

21   be happy to read it into the record or to offer it in writing.

22          THE COURT:  You can read it.  Go ahead.

23          MS. NOTIS-McCONARTY:  Cisco's -- the interrogatory

24   states:  "Identify and describe all licenses, settlement

25   agreements or covenants not to sue, agreements, entered into by

Cisco which Cisco is a beneficiary, or of which Cisco is aware, that lead to any patent or patent application from any jurisdiction or nationality that, first, relates to the accused product or accused functionalities or technologies similar to the accused product or accused functionalities; or that, 2, Cisco contends is comparable to a license that Cisco and Egenera would have entered into in a hypothetical negotiation in this case.

"Your description of each agreement should include, at a minimum, the parties to the agreement; the number, nationality and owner of all patent or patent applications subject to the agreement; the financial terms of the agreement, including monies paid, royalty rate and royalty base; the effective and termination dates of the agreement; the exclusive or nonexclusive nature of the license; an identification of the person or persons involved in the negotiation and execution of the agreement; an identification of all documents related to the agreement; and whether you, Cisco, contend the agreement is comparable to a license that Cisco and Egenera would have" entered -- "would have agreed to in a hypothetical negotiation in this case."

Cisco's response to Interrogatory No. 9 is as follows: "To the extent this interrogatory is understood and calls for relevant, non-prejudicial information, Cisco will respond to this interrogatory pursuant to Federal Rule of Civil Procedure

1    33(d) at the appropriate time by producing and identifying

2    relevant non-privileged documents, if any, maintained by Cisco

3    in the ordinary course of business and found after a reasonable

4    search.

5         "Cisco reserves its right to supplement or amend its

6    response to this interrogatory as discovery and its

7    investigation in this action proceed in accordance with the

8    court's schedule."

9         Cisco's first supplemental response to Interrogatory 9

09:03 10   is as follows:  "Pursuant to Federal Rule of Civil Procedure

11   33(d), agreements that relate to the accused products can be

12   found in the documents with" productions number -- "production

13   Nos. Cisco 00098393 to Cisco 00098423.

14        "Cisco reserves the right to supplement or amend its

15   response to this interrogatory as discovery and its

16   investigation in this action proceed in accordance with the

17   court schedule."

18        Cisco's second supplemental response to Interrogatory

19   No. 9 is as follows:  "Cisco clarifies that pursuant to Federal

09:03 20   Rule of Civil Procedure 33(d), agreements that relate to the

21   general technical field of the accused products can be found in

22   the documents with production Nos. Cisco 00098393 to Cisco

23   00098423.

24        "Cisco does not concede that any agreement found

25   within the documents within production Nos. Cisco 00098393 to

1    Cisco 00098423 directly relate to any of the accused products,

2    individually or as a whole.

3            "Cisco reserves its right to supplement or amend its

4    response to this interrogatory as discovery and its

5    investigation in this action proceed in accordance with the

6    court's schedule."

7            Cisco's third supplemental response to Interrogatory

8    No. 9 is as follows:  "Cisco supplements its response to this

9    interrogatory by incorporating Dan Lang's February 28, 2018,

09:04 10    deposition transcript, as well as the documents identified with

11    the production Nos. Egenera 02299275 to 76.

12            "Cisco will further respond to this interrogatory

13    through its expert reports which will be served according to

14    the schedule" according -- "schedule entered into this case."

15            And that completes Cisco's response to Interrogatory

16    No. 9.

17            THE COURT:  Very good.

18            MS. NOTIS-McCONARTY:  At this time, your Honor,

19    Egenera will play the deposition video of Mr. Daniel Lang, who

09:05 20    is the vice president of intellectual property and deputy

21    general counsel at Cisco.  And the time is 2 minutes and 56

22    seconds for Egenera.

23            THE COURT:  Let's proceed.

24            (Played video deposition.)

25            THE COURT:  All right.

1          MR. BATCHELDER:  Good morning, your Honor.  Egenera

2     calls as its next witness Dr. Ryan Sullivan.

3          RYAN SULLIVAN, having been duly sworn by the Clerk,

4     was examined and testified as follows:

5          THE CLERK:  Thank you.  You may be seated.

6          Could you please introduce yourself, spelling your

7     last name for the record.

8          THE WITNESS:  Good morning.  I am Ryan Sullivan,

9     S-u-l-l-i-v-a-n.

09:09  10                    DIRECT EXAMINATION

11     BY MR. BATCHELDER:

12     Q.   Dr. Sullivan, good morning.

13     A.   Good morning.

14     Q.   Have you prepared demonstratives to help you explain your

15     testimony to the jury this morning?

16     A.   Yes, I have.

17          MR. BATCHELDER:  Mr. Fitzgerald, would you pull those

18     up, please.

19     Q.   All right.  Are these those slides?

09:09  20     A.   Yes, they are.

21     Q.   All right.  Would you please describe your educational

22     background to the jury, looking at slide No. 2.

23     A.   Yes.  I have a bachelor's degree, a master's degree, and a

24     PhD, all in economics and all from the University of California

25     in San Diego.

1    Q.   And for your PhD studies, why did you choose the

2    University of California San Diego?

3    A.   That gave me an opportunity to work in the field of

4    mathematical economics, and UC San Diego is typically thought

5    of as one of the very top schools for that; and I had the good

6    fortune to work directly with two economists that received the

7    Nobel Prize in mathematical economics.

8    Q.   And since receiving your PhD there, have you had any

9    continuing role at the University of California San Diego?

09:10 10  A.   Yes, I have.  I have continued to serve on what is known

11   as the Economics Leadership Council, and in this role I provide

12   guidance and advise the faculty in the department of economics

13   on the practice of economics in private industry; and I also

14   serve as a mentor to graduate students within the department of

15   economics.

16   Q.   Have you published academic papers?

17   A.   Yes, I have.  I've published articles in what are referred

18   to as top-tier peer-reviewed journals, such as The Journal of

19   Finance, Journal of Econometrics and the International Journal

09:11 20  of Forecasting; and I have also published in journals involving

21   intellectual property and patent damages as well.

22   Q.   What do you mean by a peer-reviewed journal?

23   A.   That is a process by which the work that I perform gets

24   evaluated by other economists, referred to as referees, to

25   determine whether the work I performed is a sufficient advance

           1    in the science of economics that would be worthy of publication
           2    in one of these journals.
           3            And my work has been -- gone through that review
           4    process; and I, too, serve as a referee to evaluate the work of
           5    other economists.
           6    Q.   A moment ago I think I heard you mention the phrase
           7    "intellectual property."  What does that refer to?
           8    A.   Intellectual property generally refers to patents,
           9    trademarks, copyrights, and trade secrets.
09:12     10    Q.   Have you received any accolades in connection with your
          11    work in that field of intellectual property?
          12    A.   I have.  I've been recognized by an organization known as
          13    IAM, Intellectual Asset Management.  They are a data analytics
          14    and news organization in the intellectual property space.  They
          15    recognize economic experts for patents, and I was honored from
          16    2014 -- which was the first year that they started performing
          17    that review and analysis -- every year since then.
          18    Q.   So you've said that you're a professional economist.  What
          19    work do you do as an economist?
09:13     20    A.   Well, I serve as president of a company known as
          21    Intensity.  We are an economics and data science company.  And
          22    in my work as an economist, I use data and information, and
          23    analyze revenue, costs, and profitability to assist companies
          24    in making strategic decisions, so -- this includes work
          25    including performing valuations, license negotiations, market

1    analysis and pricing decisions.

2             I also serve as an expert in litigations, such as this

3    one.  And as president of the company that I work with, I

4    oversee the strategy for the company.

5    Q.   Is this your first time testifying at trial as an expert

6    economist?

7    A.   No, I have done so over 25 times.

8    Q.   And about how much of your work is related to

9    litigation-related work as opposed to other kinds of economic

09:14 10   work?

11   A.   Approximately 50 percent of my work is related to

12   litigation.

13   Q.   And when you're working in that litigation space, how much

14   work is for plaintiffs versus defendants?

15   A.   It is split quite evenly.  So approximately half of my

16   litigation-based work is on behalf of plaintiffs and half on

17   behalf of defendants.

18   Q.   And in that litigation work, what kind of entities have

19   you represented?

09:14 20   A.   All kinds of entities, large and small.  Some companies

21   that you likely would have never heard of, others that you

22   would have.  And I've also had the opportunity to work with a

23   number of universities.

24   Q.   Can you give us some examples?

25   A.   Sure.  In the technology industry I've worked with and on

 1    behalf of Apple, Microsoft, IBM, Adobe.  In the educational

 2    realm I've worked with and on behalf of Harvard, MIT, and

 3    Columbia University, as examples.

 4    Q.   Could you give just a few examples of some of the projects

 5    you've worked on outside of litigation?

 6    A.   Sure.  I had the good fortune of working on some really

 7    interesting projects.  A couple of examples in the sports

 8    industry is I worked with the NBA and the players association

 9    for the NBA in their collective bargaining agreement back in

09:15 10    2016, and I was the lead economist heading up that negotiation

11    so that they could come to an agreement on compensation for the

12    players.

13         A second example, more locally to here, I worked on

14    behalf of the Boston Red Sox to do pricing for their tickets.

15    And the goal there was to be able to have variant differential

16    pricing depending on the game and the location in the stadium

17    to be able to get more fans into the seats of the stadium.

18         Outside of the sports industry I worked on a project

19    involving Home Shopping Network.  You may recall a number of

09:16 20    years ago there was a movie called "Joy," that was based upon

21    the rags-to-riches story of Joy Mangano with the Miracle Mop,

22    and it was a movie with -- played by Jennifer Lawrence, Robert

23    DeNiro, and Bradley Cooper.

24         But the economics side of it was the switch from Home

25    Shopping Network to go from just online and on TV and video

```
 1    into brick and mortar, and they wanted to use that movie to
 2    help generate sales in Bed Bath & Beyond and Target, and so I
 3    worked with them to establish their business plan, their launch
 4    strategy, the logistics, and all the pieces on the economic
 5    analytical side.
 6    Q.   Have you done any work for nonprofit organizations?
 7    A.   I have.  I was honored to serve as a treasurer and an
 8    officer on the board of trustees for an organization known as
 9    San Diego Zoo Global and Wildlife Alliance, wherein I had
10    fiduciary responsibilities over all the financials for the
11    organization.
12    Q.   Can we turn to slide 3 in your deck.
13         What was your task as an expert in this case, sir?
14    A.   I was asked to determine the damages incurred by Egenera
15    as a result of the infringement by Cisco of the '430 patent.
16    And more specifically, Egenera is seeking a form of damages
17    known as a reasonable royalty, and so I have determined, using
18    my expertise, my research, my analysis in this case, what the
19    appropriate reasonable royalty should be.
20    Q.   You have formed opinions regarding the value of the
21    reasonable royalty in this case?
22    A.   Yes, I have.
23    Q.   Why don't we summarize those now and then we can drill
24    into how you got there.
25         Let's look at slide 4.
```

1          What are we looking at here?

2     A.   This is the basic structure and formula that I used to

3     calculate a reasonable royalty.

4          First off, I identified the number of servers that are

5     used in infringing UCS systems.

6          I then identified and determined what the appropriate

7     royalty per server is for each of those infringing systems with

8     those servers, multiplied those two together to get to the

9     reasonable royalty.

09:18 10        And this structure is important because it allows that

11    royalty and the corresponding payment to scale with the extent

12    of use of the patented technology; in other words, the more

13    infringing systems that are sold, the more servers that are

14    sold, the more value to Cisco, and correspondingly, the larger

15    is the reasonable royalty.

16    Q.   That's why you used number of servers on the top to get at

17    that scale issue?

18    A.   Exactly.

19    Q.   All right.  And what were your conclusions?

09:19 20   A.   On the next slide, No. 5, I've populated here the ultimate

21    answer.  And I determined that the number of servers in

22    infringing UCS systems is 353,496 servers.  I determined that

23    the appropriate royalty per server is $1,050, and being an

24    economist, even more precisely it's $1,049.67 plus a bunch of

25    other trailing digits, so that when we perform the actual math

1    here, multiplying those two, the reasonable royalty is

2    $371,056,482.

3            And this is for the period from August 5, 2016,

4    through February 28, 2022.

5            And this is what I would refer to as the damages

6    period.  Damages begin to accrue when the complaint was filed

7    in this case, which is the early date there, the August 5,

8    2016.  And the damages are calculated through the end of the

9    last production of financial data, sales data, by Cisco in this

09:20 10   case.  And those data go through February 28th of this year.

11           So this does not include the time period thereafter,

12   you know, March, April, May, June, July of this year, and then

13   going on out through patent expiration is not included in this

14   damages period.

15   Q.   All right.  Thank you, sir, for that summary.  Let's back

16   up.

17           What information did you consider in formulating your

18   opinions?

19   A.   On slide 6, I explain and show some of the categories of

09:21 20   materials that I reviewed and considered.

21           There was a lot of information that I reviewed.  This

22   included the '430 patent, of course, other patents that had

23   been produced and cited and referenced throughout the

24   litigation; looked at financial data for both parties, their

25   company documents.

1          I performed marketplace research on the industry to

2     understand the financials.

3          I looked at agreements that were entered into by the

4     parties.

5          Read through, reviewed, considered a lot of witness

6     testimony.   There were over 50 depositions taken of fact

7     witnesses.

8          I conducted an interview with Professor Jones, who

9     testified yesterday.

09:21 10          I've reviewed expert reports, performed research into

11     the academic literature, looked at legal filings.

12          So really a lot of information.

13     Q.   Would you summarize for the jury, please, at a high level

14     what work you did prior to trial in formulating your opinions?

15     A.   Yes.   So on slide 7, I performed my work, I memorialized

16     it all in an expert report that I submitted in April 2018.   All

17     told it was over 1,000 pages, so it included 94 pages of text,

18     and within that was 449 footnotes with supporting citations and

19     information, 954 pages of data, analysis, tables and other

09:22 20     information.   I supplemented that in June 2018, and then I sat

21     and provided deposition testimony that month as well.

22          And then, earlier this year, in March 2022, I updated

23     those calculations with the updated data that came from Cisco

24     to be able to provide that reasonable royalty for the period

25     that goes through February of this year.

            And there's really a couple of purposes to performing
1   all of that work.  One is to memorialize the work that I did,
2   because it is voluminous and based upon a lot of information.
3
4           The second is to be able to provide full transparency
5   to Cisco, to the Court, to you, the jury, in terms of what it
6   is that I did so that can be fully evaluated.
7   Q.   So you said that your role is to provide a reasonable
8   royalty or to determine one.  Can you define that term for us,
9   please?
09:23 10   A.   Sure.  So on slide 8, I have copied here a piece of 35
11   U.S. Code Section 284.  So 35 is the U.S. Code on patents and
12   patent law.  Section 284 relates to damages.  And here, I'm
13   just going to read this for you, because this is what provides
14   context for me as an economist conducting my work.
15          It says that:  Upon finding for the claimant, the
16   court shall award the claimant damages adequate to compensate
17   for the infringement, but in no event less than a reasonable
18   royalty for the use made of the invention by the infringer.
19          And the primary takeaway there in calculating a
09:24 20   reasonable royalty is that it is based upon the use made of the
21   invention by the infringer.  And here, you know, that would be
22   Cisco.  So the reasonable royalty should be based upon Cisco's
23   use of the patented technology.
24   Q.   And in the interrogatory response that my colleague read
25   in this morning by Cisco, it referenced something called a

```
 1    "hypothetical negotiation."  Did you hear that?

 2    A.    I did.

 3    Q.    What is that?

 4    A.    A hypothetical negotiation is a typical -- it's the most

 5    common framework for determining a reasonable royalty.  It's a

 6    negotiation that we hypothesize would have occurred between

 7    Egenera and Cisco right on the eve of infringement, right

 8    before UCS is launched and right before that infringement

 9    begins, to determine what the royalty would be.  It's the

10    outcome of this hypothetical negotiation that is the reasonable

11    royalty.

12             And we refer to it as "hypothetical" because the

13    negotiation did not actually happen.  Had it happened, we all

14    would not be here in this courtroom today because that would

15    have been resolved long ago.  But it didn't happen, and so we

16    construct that framework, and I'm going to walk you through

17    that today in terms of how that royalty is ultimately

18    determined.

19    Q.    Does the law associate legal requirements with that

20    hypothetical negotiation?

21    A.    Yes, it does.  So on slide 9, there are three requirements

22    that, as a damages expert, I am required to implement into my

23    analysis.

24             The first is an assumption that the patent is valid.

25    What this means is that at this hypothetical negotiation, the
```

1  parties would agree and acknowledge that the patent is valid.

2  That would not be disputed at this negotiation.

3         Similarly, the party -- I'm asked to assume that the

4  patent is infringed.  So here again, at this negotiation, both

5  Cisco and Egenera would recognize that the patent is infringed,

6  which is a little bit different than just a typical

7  run-of-the-mill negotiation that might be happening outside of

8  a patent litigation.  There, parties often will dispute whether

9  the patent is valid.  They'll dispute whether the patent is

09:27 10  infringed.  But at this hypothetical negotiation, the parties

11  go into that negotiation actually agreeing and believing in the

12  validity of the patent and that it is infringed.

13         And then finally, I need to assume that the parties

14  are willing to enter into this agreement.  Both Cisco and

15  Egenera would enter into this agreement, and it's a negotiation

16  where neither side can just simply walk away and say, No, thank

17  you.  They have to come to an agreement for a license to the

18  '430 patent and determine the amount that would be payable from

19  Cisco to Egenera.

09:27 20  Q.   So for the hypothetical negotiation here in this case,

21  would you please fill in for the jury some more information

22  about parties and timing.

23  A.   On slide 10, I have a depiction here.

24         So the parties would include Egenera as the patent

25  holder, they would be the licensor; Cisco, the licensee,

1    they're the ones that would be seeking rights to utilize the

2    patent, and, thus, would be paying a royalty for those rights.

3          And this negotiation would occur in July 2009, and

4    that's right at the time that Cisco is launching the UCS

5    system.

6          And one thing to note here is that the hypothetical

7    negotiation occurs back in July of 2009, whereas the damages do

8    not begin until August 2016.  So there's a little bit of a

9    differential there.  And this is part of the reason why it

09:28 10   makes sense for the parties to enter into what's called a

11   running royalty.  I mentioned that the royalty would be per

12   server so that it can cover the time period throughout for

13   different periods of time based upon the actual use of the

14   technology by Cisco.

15   Q.   What information would the parties to that hypothetical

16   negotiation have been discussing and considering?

17   A.   So moving on to slide 11, you know, we refer to this as a

18   hypothetical negotiation, but it is actually based in

19   real-world facts.  And the parties to this negotiation, Egenera

09:29 20   and Cisco, would consider all of the available information.

21   You can think of it as all of the information that has been

22   produced and provided in this litigation, along with research

23   and analysis.

24          What's interesting is in this hypothetical negotiation

25   the parties share all information, and all that information is

1    known.  It's very much like playing a card game where all of

2    the cards are up on the table, and it's not as though one

3    entity is sitting there holding their cards close to their

4    chest and not letting them know that information; but, rather,

5    strategies are known, anticipations of how products are going

6    to perform, the actual sales of those products, things that

7    actually might otherwise be considered private information is

8    shared.  And that's one of the unique aspects of a hypothetical

9    negotiation and the framework used for calculating a reasonable

09:30 10   royalty.

11   Q.   Just to be clear, the cards are face up on the table.

12   A.   That's right.

13   Q.   As an economist, have you handled what are called

14   Georgia-Pacific Factors and applied those?

15   A.   Yeah, so on slide 12, there are a set of 15 factors that

16   were set forth by a court in 1970 in a case involving the

17   Georgia-Pacific paper company.  And these are factors that can

18   be informative and provide guidance in determining a reasonable

19   royalty.  So I considered all of these factors.

09:31 20        There's a lot of verbiage and content here, I'm not

21   going to read through it.  So what I'll do is summarize those

22   into different categories, and then we'll go through each of

23   those categories to help show you how I get to my answer.

24   Q.   All right.  Let's turn to that first category.

25        Slide 14, please.

 1           Actually, here you've just categorized them.  Do you

 2    want to just quickly summarize what you've done?

 3    A.   Yeah, so here, slide 13, for factor -- Georgia-Pacific

 4    Factors 9, 10, and 14, those relate to the importance of the

 5    patent.  Factors 4 and 5 relate to the commercial and

 6    competitive relationship between the parties.  Factors 3, 7,

 7    and 11 involve the structure of the license.  Factors 1, 2, and

 8    4 involve licensing.  Factors 6, 8, 11, 12, 13, and 14 relate

 9    to the contribution of the patented technology to Cisco; and

09:32 10   the ultimate answer is reflected in the outcome of the

11    hypothetical negotiation, and that's Factor 15 from

12    Georgia-Pacific.

13           And there's overlap among these factors, which is why

14    I think the grouping can be very helpful.

15    Q.   All right.  Let's turn to the first one.

16           Next slide, please.

17           This highlights the importance of the patent.  Could

18    you, again, quickly summarize what that is about.

19    A.   Yes.  This is evaluating whether the patented technology

09:32 20   that's at issue is a small or minor incremental improvement or

21    if it is a pioneering breakthrough technology.  And the

22    evidence here clearly demonstrates that the technology as

23    claimed in the '430 patent was a pioneering breakthrough

24    technology for the architecture of the accused products in this

25    case.

1  Q.   First of all, do you have an understanding of the

2  invention claimed in Egenera's '430 patent?

3  A.   I do.  Now, I approach my work as an economist, not as a

4  computer scientist, and so I have evaluated, developed an

5  understanding of the patent in part from Professor Jones, who

6  testified yesterday.  In conducting my work, I held an

7  interview with Professor Jones, and then I have also reviewed

8  his reports and his deposition testimony, and of course was

9  here for his trial testimony yesterday.

09:33  10          Professor Jones explained to me that the technology

11  claimed in the '430 patent provides a platform for server

12  provisioning, management and administration.

13  Q.   Did you memorialize that conversation you had with

14  Professor Jones?

15  A.   Yes, I did.  As part of the report that I submitted,

16  Attachment A4 to my report provides an overview of the

17  interview that I had with Professor Jones.

18  Q.   In your understanding, have any of Egenera's products

19  practiced this '430 patent?

09:34  20  A.   Yes.  Both the -- it's the BladeFrame PAN Manager system

21  that was developed by Egenera that, as I understand it,

22  practiced the claims of the '430 patent.

23  Q.   And you've been in this courtroom since the beginning of

24  trial, right?

25  A.   Yes, I have.

1    Q.    And you heard Mr. Manca's testimony, then?

2    A.    I did.

3    Q.    And he referred to this patent as a huge milestone.

4    A.    He did.  He circulated an email within Egenera at the time

5    of the issuance of the patent and he referred to this as the

6    big one, which really, I think, sets the stage as to how

7    Egenera viewed the technology and as others also -- I'll

8    show -- viewed Egenera's technology and innovations.

9    Q.    So how was Egenera's patented architecture received in the

09:35 10   industry?

11   A.    On slide 16 there were a number of accolades,

12   recognitions, and awards that Egenera received for the work

13   that they do in their innovations from Waters magazine, Ernst &

14   Young, from the YankeeTek Ventures, Network World, Blade

15   Systems Insight.  So a number of different awards and

16   recognitions.

17         In particular on slide 17 for Waters magazine, I

18   found this one to be really interesting from the perspective of

19   an economist evaluating a royalty.  They explained that Egenera

09:36 20   was an early trailblazer and it was the first new server

21   architecture in a generation.  And this is a big deal because,

22   two things:  One, this is not just a feature, this is not just

23   a little piece of the overall system.  This is an all-new

24   architecture.  And this is the first new architecture in a

25   generation and really was disruptive to the industry, as I'll

1    show to you later on.

2    Q.   So applying this back to your first cluster of the

3    Georgia-Pacific Factors, importance of the patent, what is this

4    saying to you?

5    A.   Well, this says that the patent is very important and that

6    Cisco would find it to be very valuable to their products as

7    they are launching into the industry of data center server

8    marketplace.

9    Q.   Has Cisco even recognized Egenera's innovation?

09:37 10    A.   They have.  So on the next slide, 18, up top I have a clip

11    or a piece of the deposition testimony from Jason Shaw, who was

12    a technical marketing engineer for UCS at Cisco.  And he

13    explained that, in his view, Egenera had innovative technology,

14    they were doing something that no one else did, and that he

15    would call them an innovator.

16         And earlier on, he had sent an email that says

17    "Egenera is wicked cool."

18         And I think that's just a fun way to be able to convey

19    that Egenera did have something very unique, special, and

09:38 20    innovative.

21    Q.   That bottom document, the "Egenera is wicked cool"

22    document, did you cite that in your expert report?

23    A.   Yes, I did.

24         MR. BATCHELDER:  Your Honor, that's PX-AJE, move that

25    into evidence, please.

```
 1              THE COURT:  So moved.

 2              THE CLERK:  Can we have a number, what number is next?

 3     It's unclear at this point.

 4              MR. BATCHELDER:  It's 543, JTX.

 5              THE CLERK:  Thank you.

 6              (Exhibit JTX-543 marked for identification.)

 7     BY MR. BATCHELDER:

 8     Q.   In your understanding, sir, how does Cisco use the '430

 9     patent?

09:38 10     A.   On slide 19, I depict this.

11              As I understand it, Cisco has implemented the

12     technology claimed in the '430 patent in their UCS products, so

13     that is the Unified Computing System for Cisco.  And really,

14     this was what allowed them to enter into the data center server

15     marketplace.

16     Q.   Is UCS the same thing as server?

17     A.   Well, the Unified Computing System includes servers, but

18     it is broader than that.  It includes servers, other hardware

19     and software.

09:39 20     Q.   When did Cisco begin selling UCS?

21     A.   July 2009.  And that corresponds to the date of the

22     hypothetical negotiation.

23     Q.   Did Cisco have any other data center server products prior

24     to UCS?

25     A.   No, it did not.  So this was their first data center
```

1    server product and their launch into that marketplace.

2    Q.    You heard the trial testimony of Mr. Manca and

3    Mr. Brownell about Cisco feeling left behind, left out of the

4    data center space?

5    A.    I did.

6    Q.    And how does that fact, that Cisco felt that way, left out

7    of the data center space and wanted to gain access, how does

8    that impact your opinions?

9    A.    On slide 20 I have some pieces from a presentation that

09:40  10   was put together by Egenera based upon a meeting that they had

11   had with Cisco back in 2004, and this reflects what Cisco told

12   Egenera, as memorialized by Egenera at that time, and I discuss

13   this and describe this in my expert report.

14         On the left-hand side here, and this is JTX-0267, you

15   can see that there was high interest on Cisco's part and that

16   Cisco feels left out of the greater consolidation movement and

17   that they want to go further into the data center.

18         This is corroborated on the top right where Mario,

19   Luca, and Soni, who were the ones, the executives who had left

09:41  20   Cisco to form Nuova and develop this system before going back

21   to Cisco, they had high regard for the work that was being

22   performed by Vern Brownell at Goldman Sachs and at Egenera, but

23   they were feeling as though they -- that Cisco was out of the

24   core of the data center.

25         And in the center there at the bottom, from -- as a

1   matter of economics, they're explaining that Cisco views

2   Egenera's technology and the value-added services as key.  So

3   this is a recognition, at-the-time contemporaneous document,

4   that is very important to Cisco and their business strategies.

5           And here again, this is information that would be

6   known at the hypothetical negotiation.

7   Q.   So in your understanding, how does the '430 patent

8   contribute to UCS?

9   A.   On slide 21, there are really two key contributions of the

09:42 10  '430 patent to recognize here.

11          The first is that it is considered the essence of UCS,

12   the essence of the Unified Computing System, and as I

13   understand from Dr. Jones, it is what makes UCS what it is and

14   the benefits that it provides.

15          I also evaluated and considered the alternatives that

16   Cisco could have used instead of using the technology claimed

17   in the '430 patent.  In other words, you know, are there

18   noninfringing alternatives that they could have simply turned

19   to.  And both technologically, as determined by

09:43 20  Professor Jones, and economically in terms of my evaluation,

21   there were no such alternatives that were available to Cisco.

22   And that means that it was this patented architecture, the '430

23   patented architecture, that enabled Cisco to launch into the

24   data center server marketplace.

25   Q.   You're not saying, though, that Cisco didn't add some

1   features to UCS beyond the patented architecture, are you?

2   A.   No, not at all.  I mean, there are other features that

3   were contributed by Cisco to the UCS product, but the

4   fundamental architecture was provided by the technology claimed

5   in the '430 patent.

6   Q.   So what are the benefits that the '430 patented

7   architecture provided to UCS, in your understanding?

8   A.   Two key benefits, here on slide 22:  Cost savings and

9   increased efficiency.

09:44 10         As Professor Jones explained, the patented technology

11   enables a system that has -- that saves on the cost of the

12   hardware, it reduces power consumption, and it has fewer points

13   for management.  And these items provide cost savings to the

14   customers and it provides increased efficiency and business

15   flexibility.  And as I'll show you, it was these patented

16   benefits that allowed Cisco to enter into a marketplace that

17   had entrenched competitors with a differentiated product, a

18   product that was actually priced higher than competitors, and

19   be able to do so in a way that had tremendous sales growth and

09:45 20   success based upon these patented benefits.

21   Q.   So Professor Jones explained these benefits to you?

22   A.   Yes, that's right.

23   Q.   And did Mr. Brownell, Mr. Manca testify about them also?

24   A.   Yes.  It's the same set of benefits that Professor Jones

25   says were conveyed and described and claimed in the patented

 1    technology, same benefits that were being touted by

 2    Mr. Brownell and Mr. Manca in terms of what the technology

 3    provided.  And also, as I'll show you, it's the same set of

 4    benefits that were being touted and promoted by Cisco with

 5    regards to UCS.

 6    Q.   Let's take a look at slide 23 with that last point in

 7    mind.

 8         What are we looking at here?

 9    A.   There are many documents that describe and convey the

09:46 10    value of the patented benefits to Cisco's UCS system.  And I

11    detail these in my expert report, and it includes internal

12    Cisco documents, marketing materials, press releases, company

13    filings, analyst reports, and more.

14    Q.   All right.  And let's look at slide 24, please.

15    A.   So these are two examples of documents that Cisco created

16    that demonstrate that Cisco is promoting the benefits of the

17    patented technology.

18         Up top is JTX-0162, it's a data sheet from Cisco

19    describing that UCS is a next-generation data center platform

09:47 20    designed to reduce total cost of ownership and increase

21    business agility.  These are exactly the items I was just

22    describing.

23         And it is because of the reduced total cost of

24    ownership that Cisco, then, is able to charge higher prices

25    for.

1    Q.    So these are the same benefits you heard about from

2    Professor Jones?

3    A.    Yes.

4    Q.    And from Mr. Brownell and from Mr. Manca?

5    A.    That's right.  In fact, at JTX-0394 on the bottom, it

6    confirms this.  Reduced complexity, simplified management, and

7    the result of lower management and maintenance cost.

8    Q.    Have you seen any evidence that these demands -- excuse

9    me -- these benefits effected the demand for Cisco's UCS

09:47 10   product?

11   A.    I did.  And I have a couple of examples to show, starting

12   on slide 25.  So this is JTX-0142.  It's a document that

13   provides information that Cisco developed in terms of a survey

14   they conducted with over 600 customers asking them, you know,

15   in effect, what was going to be most important in choosing

16   between computer vendors.

17          And here you'll see that what they report, TCO will be

18   two times more important to respondents -- that's customers --

19   than any other factor.

09:48 20          And you can see that in the first line here, right

21   about -- let's see if -- that piece there.  So total cost of

22   ownership at 27.  And that is twice as much as any other.

23          Similarly, if we take a look at the next slide, on

24   slide 26, which is JTX-0404, this is work that was performed by

25   IDC.  They are what is known as a market intelligence company,

1    so they do research and analysis in the market and then report

2    on it.

3         They have a report titled here:  "The Business Value

4    of Cisco UCS Integrated Infrastructure for Big Data."

5         So this is their evaluation on the business value to

6    Cisco, and it explains that the cost-effective and

7    operationally efficient nature of Cisco played a substantial

8    role in these organizations' decisions to use Cisco UCS as a

9    big-data platform.

09:49 10      So what both of these documents are showing is that,

11   as a matter of economics, the benefits of the patented

12   technology, the '430 patented architecture which provides a

13   reduction in total cost of ownership and increased

14   efficiencies, that those benefits are drivers and the primary

15   driver for sales and purchases of the UCS products by

16   customers; which, of course, this means that the technology

17   that is claimed in the '430 patent is very important and

18   valuable to Cisco.

19   Q.   Did you hear yesterday in court the testimony of Cisco's

09:50 20   Sydney Morgan about Cisco's decision to use UCS to run Cisco's

21   own data centers?

22   A.   I did.  Mr. Morgan explained that for Cisco's own data

23   centers that they used to operate for their own business, that

24   they chose to use the UCS system; and that one of the main

25   reasons there was the cost efficiency and cost reductions and

     1    savings associated with the UCS system.

     2    Q.    So did use of these added features drive success for

     3    Cisco?

     4    A.    Yes.  So just taking it logically, and you can see that

     5    the industry recognized the importance of the patented

     6    technology.  There's many industry accolades associated with

     7    it.  The benefits are important to the decisions that are made

     8    by customers to purchase products, and the result of that is

     9    that Cisco experienced exceptional financial performance.

09:51 10    Sales and profits were very significant upon the launch.

    11         You can start to see that on slide 27.  And on the

    12    left, JTX-0141 explains that UCS is changing the industry.

    13    Again, a fundamental difference.  And that UCS has moved the

    14    industry forward by unifying network storage access and

    15    virtualization into one cohesive system.

    16         MR. BATCHELDER:  Put that on the right, the two years

    17    since launching UCS slide.

    18    Q.    This is a Cisco document, by the way, correct?

    19    A.    It is.  So JTX-0394, that within two years of launch, they

09:52 20    obtained an analyzed run rate of sales of $1.1 billion, and

    21    that this reflected a year-over-year growth of 245 percent, and

    22    they had, by this time, already obtained 7,400 customers.  And

    23    this was just in the first two years.

    24         At the bottom you'll see that they had already

    25    obtained the number two spot in the United States in terms of

 1  market share, which is exceptional.

 2  Q.   Coming back up to that on the upper right, that $1.1

 3  billion number, what did Mr. Jayakrishnan here say about that

 4  number and how it changed over time?

 5  A.   He explained that as of 2016, the sales had achieved a run

 6  rate of $3.5 billion annually and has hovered around that

 7  level, give or take, since that point in time.

 8       And I'm going to show you some other data as well on

 9  kind of that growth trajectory.

09:53 10  Q.   Let's take a look at your next slide, slide 28.

11       What do we see here?

12  A.   Clear that off.

13       So these are two documents of research that were

14  performed by investment banks that perform research into the

15  marketplace.  The top one, PX-AAP, from Cantor Fitzgerald

16  explaining that, in their view, Cisco's introduction of UCS in

17  2009 has been nothing short of a home run.

18       On the bottom there, William Blair explains in PX-CDH

19  that UCS continues to shine, that it continues to be a great

09:54 20  success story, and that Cisco now holds the number two U.S.

21  market share in server blades, an amazing feat given that the

22  company is a relatively new entrant to the market.

23       And both of these are demonstrating that there was

24  something special about the Cisco UCS system for it to have

25  this much success.

1    Q.    Let's take a look at slide 29.

2          What does this document show?

3    A.    So this is PX-ABF.  This is from ZDNet, and they're having

4    a bit of fun with the UCS acronym, which, as we know, stands

5    for Unified Computing System.  They do a play on that saying it

6    is Undisputed Computing Success, recognizing that it is the

7    fastest-growing product in Cisco's history.

8    Q.    You cited this document in your report?

9    A.    Yes, I did.

09:55 10          MR. BATCHELDER:  Your Honor, we mark that as JTX-544.

11          THE COURT:  Very well.

12          (Exhibit JTX-544 received into evidence.)

13   BY MR. BATCHELDER:

14   Q.    Let's turn to the next slide, slide 30.

15          What does this show?

16   A.    So this is a document that was produced and created by

17   Cisco, it's JTX-0142, and it is providing financial metrics of

18   the UCS product system for the years 2012, '13, and '14.

19          Actually, if we could go to the document itself,

09:56 20   probably be a little bit cleaner, I can blow up the left-hand

21   side.

22          So on the left-hand side you'll see that up top the

23   highlighted numbers, 1.3, 2.0, 2.8, those are the sales dollars

24   in billions for the UCS system each of those years.  So in

25   2012, UCS obtained $1.3 billion in sales; in 2013, $2 billion

1    in sales; and by 2014, it was up to $2.8 billion in sales.

2           You'll see the red highlighted or circled oval piece

3    that says "45% p.a.," that's 45 percent per annum.  What that

4    means is they had sales growth of 45 percent per year.

5           And then on the right-hand side, this is a comparison

6    that Cisco is doing of themselves and the blade server

7    marketplace relative to other industry participants, including

8    HP, Dell, IBM, and Sun.  And what it's showing is that the

9    CAGR -- C-A-G-R, which stands for cumulative annual growth

09:57 10   rate -- in terms of market share, Cisco is growing at 19.2

11   percent whereas HP was declining, Dell had a modest uptick of

12   only 3.4 percent, IBM was declining, and the Sun system was

13   substantially declining.

14          So here again, this is showing that Cisco had a

15   product that was outperforming others in the marketplace and

16   those other participants were entrenched into that marketplace

17   with their customer base demonstrating that Cisco was coming in

18   with something new and innovative, which, as we know now, is

19   based upon the patented architecture of the '430 patent.

09:58 20   Q.   So coming back to your first cluster of Georgia-Pacific

21   Factors, what does all this evidence we just looked at say

22   about that question?

23   A.   It demonstrates that the '430 patented architecture was

24   very important, it was fundamental, a driver of demand, and,

25   thus, would have been considered highly valuable by Cisco at

1    the hypothetical negotiation.  They would have been willing and

2    wanting to pay a substantial royalty to have these benefits;

3    and Egenera would be expecting substantial royalty as well.

4              MR. BATCHELDER:  Mr. Fitzgerald, can you pull up,

5    please, JTX-59.

6    Q.    You've looked at this document, sir?

7    A.    I have.

8    Q.    What is it?

9    A.    This is an email that was sent by Mike Thompson in

09:59 10   December of 2008.  At the time Mr. Thompson was the CEO of

11   Egenera, and he is explaining a couple of items.

12             One here up at the top is that he had met recently,

13   the previous week, with Ned Hooper, who was the senior vice

14   president of corporate business development at Cisco.  And at

15   this time, what Cisco was conveying and explaining to Egenera

16   is that they had no interest in the server business.

17             And this is, of course, directly contrary to the

18   information that would be available at the hypothetical

19   negotiation.  Now, this is just about half a year prior to the

10:00 20   launch of UCS, and there was even sales efforts that were

21   already under way with customers for the UCS system, but, yet,

22   what's being disclosed here to Egenera is not that; but,

23   rather, hiding the fact that they were actually very interested

24   in the server business.

25             Also in this email Mr. Thompson provides a couple of

numbers on informal values of the Egenera business.  Here you
can see, regarding valuation, I am assuming about $50 million
with one buyer.  And then it goes on that Morgan, which is a
bank, gave us a range of 75 to 100 million a few months ago.

And these numbers do not reflect the basic facts of
the hypothetical negotiation.

At the hypothetical negotiation, the parties and
Egenera recognize, believe, and understand that the '430 patent
is valid and that that patent is about to be infringed by Cisco
with the sales and launch of the UCS system, which of course
would have had a dramatic effect on the value of Egenera.

Q.   So just coming back to that top portion where the senior
vice president of corporate business development, Ned Hooper,
tells Mike Thompson at Egenera that Cisco has no interest in
the server business, this was said to him when?  This is
December 2008?

A.   That's right.

Q.   So this was three or four months before the announcement
of UCS to the world?

A.   That's right.

Q.   So you've told us that at the hypothetical negotiation the
parties have their the cards face up on the table; is that
right?

A.   That's right.

Q.   Is this the way you act when your cards are face up on the

1    table?

2    A.    Not at all.

3    Q.    Why not?

4    A.    This is just strategic gamesmanship, to put it nicely; and

5    it is something that would not be part of the hypothetical

6    negotiation because all of this information would be shared.

7    And so Egenera and Cisco would be sitting at that negotiation,

8    both knowing that the patent is going to be used in the UCS

9    system that is about to be launched.

10:02 10    Q.    So a year before this, in December of 2007, what was Cisco

11    doing with respect to one of Egenera's customers?

12    A.    They were -- in fact, if we go to slide 32 and JTX-526, so

13    it's just -- so at the bottom left here, you can see -- anyway,

14    four different documents here.

15            Bottom left is JTX-526, and if we could pull that up,

16    it's an email from December of 2007, so this was a year prior

17    to the email from Mike Thompson that I was just referencing.

18            And here this is explaining that at Cisco they had a

19    meeting with a company called Savvis, S-a-v-v-i-s, which was

10:03 20    one of Egenera's very top customers.  And they were already

21    beginning to -- that sales process of the UCS system,

22    prelaunch.  Sometimes software companies call it selling

23    vaporware; you know, selling a part that has not been fully

24    developed.  It's not ready for sales yet, but developing

25    customer interest and doing the presale.

1           And that's what was occurring back in December 2007.

2    And this, too, would have then been known and revealed at the

3    hypothetical negotiation to Egenera.

4    Q.   The fact that these meetings between Cisco and Savvis were

5    happening a year before Ned Hooper said, We have no interest in

6    the server business, what does that tell you whether that was

7    true?

8    A.   It demonstrates that it was false, that the information

9    being conveyed by Mr. Hooper in December 2018 suggesting that

10:04 10   Cisco had no interest in the server market, that that was

11   false.

12   Q.   So those dollar valuations that we just saw in JTX-59, how

13   do they impact a reasonable royalty based on value to Cisco?

14   A.   Well, they don't, because they -- the valuation of Egenera

15   inherently on its own cannot reflect the use of Cisco.  The

16   reasonable royalty is based upon Cisco's use of the patented

17   technology.  The valuation of Egenera does not reflect Cisco's

18   use; in fact, it explicitly does not consider it.

19   Q.   And as an economist, if Cisco had said to Mike Thompson in

10:05 20   December 2008, We're about to launch an infringing product that

21   infringes the '430 patent to the tune of billions of dollars a

22   year, how would that have affected, economically, an evaluation

23   by Egenera or Morgan Stanley at that time?

24   A.   It would have had a dramatic upward effect on the

25   valuation to know that Egenera's '430 patent is agreed to be

```
 1   valid, infringed, and used in the Cisco UCS system that was

 2   expected and did become very financially successful.

 3           MR. BATCHELDER:  Can we turn to slide 31, please,

 4   Mr. Fitzgerald.

 5   Q.   Let's turn to your next cluster of Georgia-Pacific

 6   Factors.

 7           Competitive relationship, what is this directed to?

 8   A.   This is evaluating whether there -- what the relationship

 9   is between the parties at the hypothetical negotiation and

10   whether that relationship would be considered competitive such

11   that there could be anticipated harm to Egenera as a result of

12   entering into the agreement.

13   Q.   Is competition between the parties required for someone to

14   recover a reasonable royalty as a result of someone else's

15   infringement?

16   A.   No.  Now, I suppose a very simple example, you can imagine

17   an inventor in the garage tinkering around and they come up

18   with a groundbreaking new invention and technology.  That

19   patented technology gives them the right to exclude others from

20   using that technology, and, thus, just because they haven't

21   commercialized a product, but, rather, are just an inventor in

22   their garage does not mean that they cannot enforce their

23   patent, does not mean that they cannot collect damages, does

24   not mean that they should not be paid for that invention.

25           In fact, it's the very basics of patents are designed
```

1 to encourage innovation.  And, thus, even if you don't have a

2 product, even if you're not being harmed by lost sales, there

3 still is entitlement to a reasonable royalty.

4 Q.   So as compared to the tinkerer in the garage that never

5 productizes its patent, does this cluster of Georgia-Pacific

6 Factors 4 and 5, does it punish a company like Egenera that

7 does productize its patent in terms of lowering the reasonable

8 royalty?

9 A.   No, there's certainly not a punishment, it's just the

10:08 10 opposite, that as there's been demonstration of the product,

11 the launch of it, although there may be headwinds by -- that

12 were encountered by Egenera, the fact that they had developed

13 the product and were selling it and now were in competition

14 with a company that was competing against it using its very own

15 technology, that only would cause the royalty to be greater

16 than it otherwise would be.

17 Q.   Have you formed any conclusions as to the competitive

18 relationship between Cisco's UCS and Egenera's BladeFrame and

19 PAN Manager product?

10:09 20 A.   Yes, the economic evidence demonstrates that Egenera and

21 Cisco were direct competitors.

22 Q.   Let's take a look at the next slide, please.

23       This is slide 32.  What are we looking at here, sir?

24 A.   These are just a few documents demonstrating competition.

25 I already talked about JTX-526 at the bottom left.

1        At the top left, JTX-136 is a document that Cisco

2   developed evaluating the competitive nature of the Egenera

3   BladeFrame and PAN Manager system.

4        Similarly, at the bottom right, JTX-393, is a Cisco

5   document exploring the differences between Egenera's BladeFrame

6   and Cisco's UCS architecture.

7        And at the top right is an interesting document, it's

8   JTX-132.  And, actually, if we could pull up the document

9   itself.

10:10 10        Okay.  So this is a document where the title is

11   "Cisco" -- and this is market research demonstrating that --

12   Cisco to Compete Against Egenera, Rather Than HP or IBM, with

13   Code Name California.

14        And as you'll recall, Project California became UCS.

15        It goes on to say that -- and this was upon there

16   being announcements and discussion of UCS in the marketplace

17   but it had not yet started the sales.  This is in March of

18   2009.

19        It says, This will validate the Egenera approach more

10:10 20   than a hundred of case histories.

21        Said another way, the fact that Cisco was adopting the

22   Egenera architecture was viewed as a validation of that

23   architecture.

24        Secondly, here it says that, "The resulting platform

25   is far away from what HP and IBM offer today and much, much

1    closer (actually competing) with the Egenera solution."

2    Q.   So they were competitors.

3    A.   Correct.

4    Q.   Let's look at the next slide, please.

5    A.   Here is PX-ADX, and this is a Cisco email scheduling

6    meetings to execute and determine the strategy for competition

7    and what they call competitive takeouts.  In other words, being

8    able to go into particular accounts to take customers away from

9    Egenera, amongst others.  And that is evidence of competition.

10:12 10          And then on slide 34 is another document.  It is

11   PX-AEO, and this is an email that was sent within Cisco, and it

12   explains that they were needing to develop a test plan that

13   positions UCS to shine and Egenera to fall short.

14          And this is showing that they were going to set up a

15   test for a customer to be able to demonstrate, in a rigged

16   fashion, that UCS is better than Egenera, which, again,

17   evidence of direct competition.

18   Q.   Can we go back just momentarily to slide 33.  It

19   references PX-ADX.  You cited that in your report.

10:12 20   A.   Yes, I did.

21          MR. BATCHELDER:  Your Honor, I'll move that, and that

22   will become JTX-545, please.

23          THE COURT:  Very well.

24          (Exhibit JTX-545 received into evidence.)

25          MR. BATCHELDER:  All right, let's look at slide 35.

1    What do we see here?

2    A.    This is kind of a culmination.  When we're at the

3    hypothetical negotiation between Egenera and Cisco, there would

4    be a recognition and understanding of the competitive

5    relationship.  At that negotiation, you can imagine that

6    Egenera is going to look at this as there being -- that

7    BladeFrame PAN Manager system was their only product.

8         Not surprisingly, they had never licensed their

9    patents to a direct competitor; and at this negotiation, both

10:13 10  Egenera and Cisco would recognize that Cisco, using the '430

11   patented architecture, had the ability to dominate Egenera in

12   the marketplace, have tremendous success, some of which would

13   be at the expense of Egenera.

14   Q.    So did Cisco, in fact, inflict harm on Egenera in the

15   marketplace with this competition?

16   A.    Oh, yes, definitely.

17   Q.    You were here for opening statements, correct?

18   A.    I was.

19   Q.    Okay.  And you heard Cisco's lawyer, the great flourish at

10:14 20  the easel, write his bedrock fact number one?

21   A.    I do recall that.

22   Q.    I'm going to read it to you, and then I'd like to ask you

23   both whether it's true and whether it matters to your

24   reasonable royalty analysis.  Okay?

25         "The Cisco UCS did not cause the BladeFrame to fail.

1    The BladeFrame failed in the market on its own because its

2    design did not work."

3            So first of all, is that true?

4    A.   No, it's not.  Clearly the evidence demonstrates that

5    Egenera was harmed and its sales were harmed by Cisco's actions

6    in the launch of UCS.

7    Q.   And was Cisco's use of the patented architecture the only

8    challenge that Egenera was facing in the market?

9    A.   Of course not.  I mean, this was also at a time when there

10:15 10   was the financial crisis affecting banks, which were Egenera's

11   primary customers.  There was challenges with Egenera just

12   being a smaller company, and thus not having access and

13   resources to, say, to Microsoft, as well as other situations.

14   But even though there's those headwinds and challenges, that

15   does not mean that Cisco's actions had no effect on Egenera,

16   but, rather, there was clear competition, clear taking away of

17   sales.

18            Beyond the hypothetical negotiation, Egenera

19   continued to compete with Cisco in multiple ways.  Egenera was

10:16 20   continuing to sell their BladeFrame system, they were providing

21   their PAN Manager on an OEM basis to other providers such as

22   Dell and Fujitsu, and they had services that they were

23   continuing to provide for their customer base.  And the

24   documents that are after the hypothetical negotiation

25   demonstrate that there was continuing competition there.

1    Q.   And harm?

2    A.   Yes, and harm.

3    Q.   All right.  So we talked about whether when Cisco's

4    counsel told the jury it was true, now let's turn to whether it

5    matters.  Does it matter to a reasonable royalty calculation

6    under 35 USC Section 284, the patent code provision you showed

7    the jury at the outset?

8    A.    No, it doesn't.  And perhaps the easiest way to recognize

9    that is going back to the garage tinkerer, the person that

10:17 10   develops a groundbreaking invention in their garage.  They do

11   not have to show competition, they do not have to show that

12   they've been harmed in sales in order to have a patent that

13   they can enforce to obtain a reasonable royalty.

14        The reasonable royalty does not require there to be

15   harm to the patent holder in order to get proper compensation.

16        Now, that's not to say that the competitive

17   relationship and that heated competition and the potential harm

18   that Egenera is going to face, that the parties would recognize

19   that at the hypothetical negotiation; it would be a

10:17 20   consideration, it would cause the ultimate reasonable royalty

21   to be higher than it otherwise would, but it's not a

22   requirement in order to be entitled to a reasonable royalty.

23   Q.   So if the focus of the reasonable royalty calculation

24   isn't on harm to Egenera, what is it?  What's the focus?

25   A.   It's based on Cisco's use.  That's what the statute

1    provides, that a reasonable royalty is for the use made of the

2    invention by the infringer, which in this case is Cisco.

3    Q.   Let's turn to slide 36, please, to your next question, the

4    Georgia-Pacific Factors.

5         Can you go back to 36, please.

6         This is the license structure, 3, 7, and 11.  What is

7    this about?

8    A.   License structure refers to the financial terms of the

9    agreement that would result from the hypothetical negotiation

10:18 10   in terms of the duration of the license agreement, whether it's

11   exclusive or nonexclusive, and the structure of the royalty.

12   Q.   So what is the duration?

13   A.   Here the license would begin at the hypothetical

14   negotiation in July of 2009 and would go certainly through the

15   sales data that were produced up through February of 2022, and

16   then really would continue beyond that through to patent

17   expiration in May of 2024.  Recognizing, again, that the

18   damages period begins in 2016, August 2016.

19   Q.   Would that license have been exclusive or nonexclusive?

10:19 20   A.   Nonexclusive.  And by being nonexclusive, that means that

21   Egenera could continue to utilize the technology and that they

22   would be able to have the benefits of the technology in the

23   marketplace; and, thus, the royalty that I have calculated does

24   not include any value associated with exclusivity by Cisco,

25   which would allow Cisco to be the only one to use the

 1  technology in the industry.

 2  Q.   All right.  Now let's move to your next slide, 37.

 3       What is this depicting?

 4  A.   It's just reiterating that the appropriate royalty

 5  structure that the parties would agree to is one that reflects

 6  the extent of use of the patented technology by Cisco in their

 7  UCS systems.  Again, the statute states that the reasonable

 8  royalty is for the use made of the invention by the infringer,

 9  which in this case is Cisco.

10:20 10  Q.   Let's turn to the next slide, please.

11  A.   So here on slide 38, in my view, the best way to

12  accomplish this is through what is known as a running royalty.

13  Running royalties are typically either a percentage of revenue,

14  percentage of the sales price or a per-unit royalty.  And the

15  notion is that as sales increase, that the royalty would

16  increase; if sales decline, then the royalty would be lower;

17  that the two go in lockstep together.

18       And this makes a lot of sense, not only with respect

19  to the statute that looks to the reasonable royalty being based

10:21 20  upon Cisco's use, but if you put yourself in the shoes of

21  Egenera and Cisco at the hypothetical negotiation, they would

22  want a royalty that reflects the actual value contribution,

23  whether the product is super successful or less so.

24  Q.   And did you also consider using something called a

25  lump-sum infrastructure instead of a running royalty?

A.   I did give that consideration.  You know, ultimately,
what's important is the overall amount of the royalty, not just
the structure, but the amount, because that's what is based
upon Cisco's use.

There are situations that -- where parties do agree to
a lump sum in actual license agreements; and a lump sum is just
a single, fixed payment.

And what I'm depicting here is this hypothetical
negotiation with the black box in the middle, and the black box
is intended to represent all the information that isn't known,
it's hidden in this black box; and it also reflects a barrier
between the parties in terms of their negotiation.

So oftentimes we'll see situations where what the
technology provides and is, is not known, not articulated; its
use and the extent of use, what products use it, over what time
periods, that's unknown; that the success of the products is
not known, the success of the technology is not known; where
the parties are withholding information, confidential
information, where they put their cards close to their chest
versus the hypothetical negotiation where the information is
put out for everybody to see.

Oftentimes there are agreements with cross-licenses,
where consideration, kind of like the payment is being made in
the form not just of money, but in terms of patent licenses for
both entities' patents going both directions.

```
 1              And importantly is dispute over whether the patent is
 2     valid and infringed, which, again, we don't have at the
 3     hypothetical negotiation.
 4              And because of that, in my view, a lump sum is a less
 5     likely outcome in this hypothetical negotiation between Egenera
 6     and Cisco.
 7     Q.   Have you ever used a lump sum yourself?
 8     A.   Oh, of course.  There are situations where it makes sense
 9     to structure a royalty as a lump sum, again, so long as it is
10:24 10   based upon the actual use of the technology and how that's
11     anticipated.
12     Q.   All right.  So back to your damages calculation here.
13              Did you use a running royalty to determine a
14     reasonable royalty in this case?
15     A.   So here on slide 40 is -- the same slide I was showing you
16     earlier, and this is the formula of number of servers used in
17     an infringing system multiplied by the royalty per server to
18     get to the reasonable royalty.
19              So what I'm going to do is first talk through how to
10:24 20   get to the black box here up top on number of servers and then
21     go through to the green box on the royalty per server to get to
22     the answer.
23     Q.   All right.  Let's go to the next slide.
24              What do you show here?
25     A.   I, as an economist, did not determine what products
```

1    infringe and which ones do not.  That is -- was up to

2    Professor Jones to make that determination.

3              I learned from him that the infringing products are --

4    is the UCS system which includes architectures that use

5    B-series blade servers and C-series rack servers in particular

6    configurations.  And, thus, I used the number of servers in

7    those infringing systems to calculate the royalty.

8    Q.    Did you use every single B-series server and every single

9    C-series server in your analysis?

10:25 10   A.    No, not at all.

11             On slide 42 I explain that I take the sales data from

12   Cisco, I exclude non-U.S. sales.  I exclude sales that are made

13   to the United States government.  I exclude sales with zero

14   revenue.  I excluded sales with servers that were used with UCS

15   mini and the UCS mini configuration.  I excluded hyperflex

16   servers, I excluded storage servers, and I excluded servers

17   that were used without UCS Manager.  So I made those reductions

18   in determining the number of servers used in infringing UCS

19   systems.

10:26 20   Q.    Okay.  So after all that, what did you determine the

21   royalty base to be?

22   A.    On slide 43 I explain that the number of servers in

23   infringing UCS systems is 353,496 servers.  This is for the

24   damages period from August 5, 2016 to February 28, 2022.

25             I have a bunch of depictions of blue servers on this

slide, each one is intended to represent 1,000 servers so you
can get an idea of the magnitude of the sales of the infringing
systems.

Q.   So each of these is a thousand?

A.   That's right.

Q.   That's a lot of infringement.

A.   It was a lot of servers that were infringing, yes.

Q.   How do you know that your number here, 353,496, is the
right number of servers?

A.   I base this on a tabulation of the sales data that was
produced by Cisco in this litigation.

     On slide 44 I'm listing now documents, there is 31 of
them ranging from JTX-0397 to JTX-0403; and then JTX-0418 to
JTX-0431; and the range from JTX-0439 to JTX-0448.

Q.   All right.  Let's turn to slide 45.

     You've now -- we've filled in that black box on the
top, the number of servers you just showed us.

     How do we get to the green box?

A.   It takes some effort.  There's a lot of work that I did.
So I -- it's going to take us a little bit to get through it,
but, effectively, I'm looking at other potential license
agreements to see if they might be informative and other
transactions that I might be able to utilize to determine the
answer.

Q.   All right.  Let's turn to slide 46.

         1           You mentioned licensing, and that's your next cluster
         2    of Georgia-Pacific Factors.  What are we looking at here?
         3    A.    Sometimes in some situations other patent license
         4    agreements that have been entered into by either party, both
         5    parties or even another party might be informative for
         6    determining a reasonable royalty.
         7           As I'm going to show here, there are no such
         8    informative agreements that we can rely upon.
         9    Q.    Let's look at slide 47.
10:29   10           You first focused on Egenera's past agreements?
        11    A.    I did.  There's a couple of agreements that Egenera
        12    entered into, they are not for the '430 patent.  The technology
        13    is not considered comparable.  It was not for Cisco's use of
        14    patented technology, which is the basis for the reasonable
        15    royalty; but, rather, looking at Egenera's use potentially of
        16    technology.  And they were related to litigation, which
        17    reflects particular compromises that would not be present at
        18    the hypothetical negotiation, and, thus, these agreements are
        19    not informative.
10:29   20    Q.    All right.  Let's look at the next slide where you
        21    examined Cisco's license agreements.  What did you find there?
        22    A.    So here on slide 48, Cisco produced approximately 25
        23    different agreements that they had entered into.  None of those
        24    agreements are for comparable technology.  There is not any
        25    known use of the technology by Cisco underlying those

1    agreements, no information surrounding what products might or

2    might not use the technology, what the technology really

3    encompasses, and how that technology might have been used.  So

4    there's no known use.

5          Many of the agreements are cross-licensed, and, thus,

6    there's not an ability to be able to unpack the agreement to be

7    able to determine how much is actually payable for any

8    particular patents within those agreements.

9          And some of the agreements are based upon litigation

10:30 10   settlements that again reflect a compromise and recognition of

11   particular litigation costs that would not be present at the

12   hypothetical negotiation, and, thus, these agreements are not

13   informative.

14   Q.   Is there any disagreement about that point?

15   A.   No.  Cisco's damages expert agrees with me that these are

16   not comparable agreements and informative.

17   Q.   Let's go to the next slide, slide 49.

18          This is an excerpt from the interrogatory response

19   that my colleague read in this morning.  Why does it matter

10:31 20   here?

21   A.   This is Cisco recognizing that the agreements that they

22   produced in this litigation, that could be considered at the

23   hypothetical negotiation, that they do not concede that any

24   agreement directly relates to any of the accused products,

25   individually or as a whole.  And it's just another way for

1    demonstrating that Cisco does not believe the agreements to be

2    comparable.

3    Q.   Did you consider how Cisco itself determines how much to

4    pay for patent licenses?

5    A.   I did.  On slide 50, I am highlighting some of the

6    testimony that we heard this morning from Dan Lang, who was

7    Cisco's vice president of intellectual property.

8         It's interesting because he says that there's a number

9    of factors that Cisco considers in determining how much to pay

10:32 10   for a license, a patent license.  The first two that I've

11    listed here, the likelihood of infringement of the patent; and

12    the likelihood of validity, whether the patent is valid.

13         Those two items are not issues at the hypothetical

14    negotiation because, of course, under the law, I have to assume

15    that the patent is valid and infringed.

16         The other items here:  The strength of the patent, I

17    addressed with the importance of the patent and its

18    contributions, discussed that earlier; same with the

19    incremental value of the patent; and then how much value the

10:32 20   patent adds to Cisco's product.

21         I've explained the basis for that already, and I'm

22    going to quantify that for you here as we proceed.

23    Q.   All right.  Let's turn to your next Georgia-Pacific

24    cluster.  Looking at slide 51, please.

25         Contribution to Cisco, what is this?

A.   This really gets to the heart of the quantitative analysis

that I performed.

In effect, what I did is I looked at the transaction

between Nuova and Cisco.  Nuova was the company by which Cisco

did a spin-out back in 2005-'6 time period, and then they

purchased Nuova in 2008.  And part of that acquisition involved

the UCS, the Unified Computing System.  And I used that

transaction to calibrate what Cisco would pay for the patented

technology, and I do so in multiple steps.

Q.   What is that Nuova acquisition?  Would you elaborate a

bit?

A.   So in the 2005-2006 time period, Cisco performed a

spin-out.  That means their executives, some of them left

Cisco, started a company called Nuova.  This company received

an investment from Cisco of $70 million.  Nuova then developed

the UCS system, along with another product referred to as the

switch, the Nexus switch.  And then in 2008, there was a

spin-in, and that's where Cisco then acquired Nuova with

payments totaling another $677,500,000, and brought UCS and the

Nexus switch into Cisco, which then they launch UCS in July

2009.

Q.   So, overall, how much did Cisco pay for the Nuova

acquisition?

A.   It was a total amount of $747,500,000.

MR. BATCHELDER:  Mr. Fitzgerald, please, can we pull

1    up, please, JTX-391.  And can we turn to page 11.

2    A.    Page 2.

3    Q.    Go ahead, please.

4    A.    Sorry.  So here on page 2 of the document is a summary of

5    the Nuova acquisition, kind of sets forth the basic facts of

6    it.

7         You can see up top for the deal terms that the total

8    cash consideration was approximately $748 million, and this was

9    a combination of a $70 million initial investment plus there

10:35 10   was a performance-based earn-out with potential to reach $678

11   million.  I'm going to describe that in more detail in a

12   minute, but, in effect, those were based upon the revenue and

13   profit performance of the company and the business; and all of

14   those monies were ultimately paid.

15        The acquisition was announced in April of 2008 and

16   then closed May 2008.

17        And as you can see a little further down, the deal

18   rationale, that the acquisition of Nuova supports Cisco's data

19   center 3.0 vision in the blade server market transition.

10:36 20        And that the benefits are that it creates data center

21   relevance for Cisco, and it provided both the Nexus switch

22   product and the UCS server system.  So it was those two sets of

23   products; the switch launched into the marketplace before the

24   server.

25        MR. BATCHELDER:  Mr. Fitzgerald, can you please pull

1    up JTX-389.

2    Q.   So here let's look at page 11.

3    A.   Yes, so document 11.  So this is the merger agreement

4    between Cisco and Nuova.

5           Here on this page you'll start to see the definitions

6    of what they call the earn-out amounts.  Again, this is based

7    upon, then, the subsequent performance of revenue and

8    profitability for the business lines that Cisco was acquiring

9    in the Nuova purchase.

10:37 10          On the next page you'll see that -- also the

11    definition for another third earn-out payment, and at the

12    bottom is the recognition that the total amount that would be

13    payable for the acquisition would not exceed $677,500,000.

14          So this was the amount that ultimately was paid for

15    the cash flows that were generated by Nuova.

16    Q.   So how did you make use of this Nuova acquisition in

17    determining a reasonable royalty here?

18    A.   So if we go to slide 52, we know that Cisco paid this

19    $747,500,000 for Nuova, and in effect, they were paying for the

10:38 20    cash flows of that company.  Cash flows sometimes are thought

21    of as similar to profits.  It's the total amount of free cash

22    that is available to the owner after all the costs are paid and

23    making sure they have enough working capital in the business.

24    So this is the amount of cash that can be taken out of the

25    business.  I'm going to explain that more.

1          So there's really two steps that I take.  The first is
2   to determine what would Cisco pay for UCS revenues, okay.  So
3   if you compare the top thing here to number one, there's two
4   differences, one is Nuova cash flows, the other is UCS
5   revenues.
6          And I'm going to be drawing a comparison or a parallel
7   between Nuova and UCS, and I'm going to do a conversion from
8   cash flows to revenues so that we can convert this, ultimately,
9   into a royalty.
10:39 10          Now, it's important to recognize that I'm using the
11  Nuova transaction as a parallel to calibrate the relationship
12  that -- between what Cisco pays to what they get in cash flows
13  for businesses that are related to, ultimately, the patented
14  technology.
15          I am not taking the $748 million, roughly, and
16  whittling that down to determine the value that they would pay,
17  but, rather, using it as a comparator, using the Nuova
18  transaction to calibrate ultimately what the royalty would be.
19          And the second step is then taking that payment amount
10:40 20  and apportioning that down to the technology claimed in the
21  '430 patent specifically.
22  Q.   Okay.  So the way that you're using this Nuova
23  acquisition, have you seen any documents in this case that
24  support your doing so?
25  A.   Yes.  There was a press release that was issued by Cisco

 1    around this time.

 2              MR. BATCHELDER:  Pull up JTX-396, please.

 3    A.   So this is upon the announcement of the acquisition by

 4    Cisco, a press release that was put forward by Cisco

 5    referencing a quote made by John Chambers, who at the time was

 6    the CEO of Cisco, explaining the significance of the

 7    acquisition.  It was Cisco's 126th acquisition at that time.

 8              And what it states here towards the bottom is that a

 9    spin-in allows Cisco to tie an acquisition price to product

10:41 10   revenues and the margins associated with those revenues.  And

11    that this results-oriented approach avoids the typical

12    challenges of estimating the value of an acquisition.

13              So this is Cisco demonstrating and explaining that the

14    way I use the Nuova transaction to determine a reasonable

15    royalty is the very same way that Cisco approaches determining

16    the value of an acquisition as it relates to revenues and

17    profits.

18    Q.   Let's come back to the first in two steps you mentioned a

19    moment ago.

10:41 20        Can we get slide 53, please.

21              So based on Cisco's payments for Nuova, which was that

22    $747,500,000 figure, how do you determine what Cisco would be

23    willing to pay for UCS revenues?

24    A.   So on the left, I'm showing that there's -- we have two

25    pieces of information from the Nuova transaction, the payment

1    of roughly $748 million, and there are cash flows that were

2    expected to arise from that transaction of $1,067,000,000.  I'm

3    going to show where that comes from here in just a moment, but

4    it's that ratio that's roughly 70 percent, when you take the

5    748 divided by the 1,067.  That ratio I then apply over on the

6    right-hand side when we're thinking about UCS, where I'm going

7    to first determine the revenue on a per-server basis, that will

8    be the teal box at the bottom right; and once I have that, I

9    can then figure out the payment, because I can use the very

10:43 10    same relationship.

11              And again, you're going to notice at the bottom on

12    the left is cash flow, on the right is revenue.  And so I'm

13    going to be making a translation there using a little bit of

14    data and algebra, just a little arithmetic to make that work.

15    Q.   So focusing on that $1.067 billion figure on the lower

16    left.

17              MR. BATCHELDER:  Let's look at JTX-54, Mr. Fitzgerald.

18    Q.   What is this document?

19    A.   This is a really neat document that shows the financial

10:43 20    analysis that was performed by Cisco for the Nuova transaction.

21              And if we zoom in on the right-hand side for this

22    base-case DCF analysis -- so "DCF" stands for discounted cash

23    flow -- and this breaks down their analysis from 2008 through

24    2013 for the different products: the server revenue, you got

25    switch revenue, we have services that go with it; so this is

1    the businesses for both the UCS and the Nexus switch.  Then

2    after 2013, they just put this out into perpetuity.

3         What I would highlight is that you'll see there's a

4    row for present value cash flows, PV cash flows, towards the

5    bottom.

6         And over at the far right you'll see a total for

7    1,067, that's $1,067,000,000; so that's where the overall cash

8    flow amount on a present value basis that I obtain for that

9    1,067,000,000.

10:44 10   Q.   Let's go back to our slide 53.

11        So now how do we figure out the right-hand side?

12   A.   So the first step of that is to look at the revenue

13   associated with UCS.

14        Now, keep in mind the first step is looking at how

15   much they would pay for corresponding UCS cash flows and then

16   converting that to revenue.

17        So let's start with looking at revenue, which you can

18   see on slide 54.

19        So what I am showing here is that for UCS systems,

10:45 20   based upon Cisco's sales data, that they were earning in

21   revenue $14,254 per server.  So that's taking the revenue for

22   the systems and dividing by the number of servers in those

23   systems to get the $14,254.

24   Q.   What products were included?

25   A.   So these are all of the UCS products, because at this

1   stage of the analysis I need to do an apples-to-apples

2   comparison between the Nuova transaction that included UCS

3   revenues and then drilling down to UCS.

4          I then make -- you'll see that I apply the overall

5   royalty just to servers used in infringing UCS configurations

6   for United States sales.

7   Q.   Let's look at slide 55.

8          What have you done here?

9   A.   Well, I've added a box that is salmon or coral-colored.

10:46  10   This is the payment share.  So the Nuova transaction gives us

11   the payment relative to cash flows, as I showed you.  So what I

12   now need to figure out is what share of this $14,254 would

13   Cisco pay for the UCS systems?  And you'll see on the next

14   slide that I have determined that amount to be 13.3 percent,

15   and I'm going to show you how I get that.

16   Q.   Please do.

17   A.   So on the next slide, 57, the 13.3 percent, that payment

18   share is based upon two pieces of data:  The first, the payment

19   for cash flow; and the second, the cash flow to revenue.

10:47  20          So you'll recall that we already know the ratio or the

21   relationship for the payment for cash flow, that's the first

22   black box with the question mark.  But because we're looking at

23   the $14,254, which is a revenue number -- cash flow is smaller,

24   right, because -- it's even smaller than profit -- that I need

25   to make a translation to revenue.  And so I'm going to do that

1    in two steps.

2            On slide 58 you'll see that the payment for cash flow,

3    that relationship is 70.1 percent.  And I alluded to that

4    earlier.

5            Could we go back to slide 53?

6            So here you'll recall on the left that the payment was

7    $747,500,000, the cash flow of $1,067,000,000, that ratio of

8    those two, or the fraction, is 70.1 percent.  And that's what's

9    on slide 58, that's where those data come from.

10:48 10   Q.   All right.  What do you do next?

11   A.   Then I have to figure out the far right box, the cash flow

12   to revenue translation, and that's on slide 59, where I provide

13   that the answer is 19 percent.

14           And the way to think about this, for those of you who

15   have enjoyed math and science, where when you're either

16   cancelling out units or cancelling out the numerator and

17   denominator as you're doing arithmetic, that's what I'm doing

18   here.

19           And the 19 percent comes from that same cash flow

10:49 20   document that we were looking at earlier.

21   Q.   This is JTX-54.

22           MR. BATCHELDER:  Can we see that again,

23   Mr. Fitzgerald, on page 11.

24   Q.   Is this that document?

25   A.   Yes, it is.

1          And so what I did is I calculated 19 percent from the

2     year 2013.  And you'll see that in that year for that snapshot,

3     the free cash flow is 190, that means $190 million, as compared

4     to the total revenue, which here it shows as 1,000, and that's

5     reflective of $1 billion.

6          So what this is saying is that the ratio between

7     revenue and free cash flow is 19 percent, the 190 divided by a

8     thousand, or 190 million divided by 1 billion.

9          THE COURT:  I'm sorry to interrupt.  Finish that

10:50 10     thought, and then I think we'll take the break.  My watch is

11     telling me it's time to stand up, so I think it's reminding me

12     that the break is due.

13          So go ahead.  Finish your thought.

14          THE WITNESS:  Sure, thank you.

15     A.   So one thing to note here is I use the year 2013 as the

16     calibration year, and there's good reason for this.  Because

17     the agreement between Cisco and Egenera would be going out

18     across a significant period of time -- in fact, the damages

19     period does not even begin until 2016 -- wanted a relative more

10:51 20     mature year than just the startup phase.

21          Another thing to note here is that the server revenue

22     across the top, you'll see in 2013 that's showing $397 million,

23     and you'll recall from the document that I was showing you

24     earlier that by 2013 -- this was a financial document that

25     showed it was already at $2 billion in actuality.

1          So this was a very conservative cash flow analysis

2     that was being performed.

3          I would also note, very briefly, that you can see that

4     the server revenue takes longer to ramp up than the switch

5     revenue, and -- but, yet, it keeps going, it's accelerating its

6     growth; whereas the switch revenue by that point in time had

7     peaked in terms of the analysis that was being conducted and

8     the expectation going into this.  And that helps really show

9     the importance of the server in the financial analysis; and

10:52 10   then, of course, going forward in the real world, the

11    performance was exceptional.

12         THE COURT:  All right.  Jurors, let's take the

13    25-minute morning recess, and we'll come back and finish this

14    analysis.

15              THE CLERK:  All rise.

16              (Recess taken.)

17              THE CLERK:  All rise for the jury.

18              (Jury and court enter.)

19              THE CLERK:  Resuming on the record, Civil Action

11:19 20   16-11613 Egenera versus Cisco.  Thank you.  You may be seated.

21                   DR. RYAN SULLIVAN RESUMES THE STAND

22              THE COURT:  All right.  I think we are ready to

23    resume.

24              MR. BATCHELDER:  Thank you, your Honor.  May I

25    proceed?

```
 1              THE COURT:  You may.
 2                 DIRECT EXAMINATION, resumed
 3   BY MR. BATCHELDER:
 4   Q.   Dr. Sullivan, we left off on slide 59, and you had just
 5   filled in the box on the right, that 19 percent cashflow; do
 6   you see that?
 7   A.   I do.
 8   Q.   Who gets that in your analysis?
 9   A.   That goes to Cisco.
10   Q.   Is that a good return, bad return?
11   A.   It is a very good return because this is based upon free
12   cashflow, which as I mentioned is even smaller and lower than
13   profit, and so this allows Cisco to have a very significant
14   return on -- after paying -- what I'll show you, making this
15   payment as well as making the royalty.
16   Q.   Let's turn to slide 60.  What are we looking at here?
17   A.   So this is where I apply the 13.3 percent payment share.
18   So I apply -- I use the revenue per server of $14,254.  I apply
19   the payment share of 13.3 percent.  That math yields a payment
20   per server of $1,897, and so this is the payment that is
21   reflective of how much Cisco would pay relative to the UCS
22   system, and then my next step is to apportion that down based
23   upon the specific contributions of the '430 patent.
24   Q.   How do you do that apportionment?
25   A.   On the next slide, 61, I have represented this payment per
```

1    server of $1,897 as a big blue pie, and in effect, I split that

2    using quantitative data between the contributions of the

3    claimed technology and the '430 patent, separate and apart from

4    other contributions to that amount.

5    And on slide 62, the next slide, there it is.  I, you'll see

6    that I split this, where 55.3 percent of that amount is

7    attributable to the '430 patent and the technology claimed in

8    there, and the benefits that are derived from it, and the

9    remainder is attributable to other features, functionalities,

11:22 10    and contributions.

11    Q.   How did you come up with that 55.3 percent number?

12    A.   If we go to slide 63, based upon the work that was

13    performed by Dr. Jones, he had identified that there are two

14    pieces of cost savings that are fully attributable to the

15    technology claimed in the '430 patent, and that includes

16    provisioning and administration, and systems management.  And

17    those are what are on the right here.

18    On the left-hand side are other components that deliver to

19    reduced cost and reduced total cost of ownership.  That

11:23 20    includes server hardware and warranty, power and cooling, and

21    switching warranty and cabling.  And there are some

22    contributions that the '430 patent is making to the left-hand

23    side; you can think of that as cabling.  We saw pictures of

24    crazy amounts of cables reducing to very few.  But in terms of

25    what is solely attributable to the technology claimed in the

'430, that's on the right-hand side; the systems management,
the provisioning and administration.

I looked at 15 different case studies that Cisco conducted
based upon actual implementations of the UCS system with
customers, and in those case studies, they determined the cost
savings that were attributable to each of these categories, and
thus, I used that data to determine the 55.3 percent.

Q.   So looking at that power and cooling slice on the lower
left, remember yesterday Cisco's lawyer took a fan out of the
UCS server and waved it around, and in your analysis, what
happens to that fan?

A.   That -- and the value of that all stays with Cisco.  That
is not part of the royalty.  Because that's on the left-hand
side here, that's not being attributed to the patented
technology.  So this is a way in which I separate out the
contributions of the patented technology from other
contributions.

Q.   So how do you make use of that 55.3 percent number in your
reasonable royalty determination?

A.   Well, we're getting very close now to that green box that
I told you we were going to get to.  So on slide 64, the next
one, it is simple mathematics of multiplying the $1,897 of the
payment per server by 55.3 percent, and that number is $1,050.
As I mentioned more precisely, it's $1,049.67 and other
trailing digits.  And it's that precise number that I apply,

1    but ultimately, I have determined that the appropriate royalty

2    per server is this approximately $1,050.

3    Q.   Let's look at slide 65.  What are you showing here?

4    A.   There are multiple pieces of apportionment that I have

5    implemented, starting with revenue per server of $14,254.

6    First utilizing the Nuova transaction as a comparator to

7    calibrate the payment, I have in that step isolated for costs

8    and profitability.  In other words, I have separated out

9    revenue from cost, and thus been able to apportion down just to

11:26 10   the benefits that Cisco would receive recognizing a healthy

11   rate of return.  And then I also do a technological

12   apportionment that applies specifically to get us to the

13   patented technology from the '430 patent.

14   Q.   So now that we have our royalty per server number, where

15   do we go next?

16   A.   This is what provides ultimately the answer.  So if we go

17   to slide 67, which is the culmination of the hypothetical

18   negotiation, you know, we now have the two primary components

19   that feed into the calculation; the number of servers used in

11:26 20   infringing UCS systems of 353,496, and again, that amount of

21   servers are only the servers that are sold for United States

22   sales in infringing configurations.  And then I apply the

23   royalty per server of approximately $1,050, and as I noted up

24   front in my testimony, on slide 68 is the ultimate amount of

25   the reasonable royalty of $371,056,482.  And that is for the

1    damages period that goes from August 5, 2016 through

2    February 28 of this year, 2022.

3    Q.   Just so the jury is crystal clear on this, in your opinion

4    as an expert economist, is that number in the blue box,

5    $371,056,482, is that a reasonable royalty in this case based

6    on all the evidence you've considered?

7    A.   It is.  It is a substantial amount of royalties, but it

8    reflects really two items; the breakthrough technology that was

9    patented in the '430 patent, that architecture, combined with

11:28 10    the use by Cisco that achieved very significant financial

11    performance, and thus, in my view, this is reasonable to both

12    parties.

13    In fact, on the next slide, on 69, there is a couple of items

14    to keep in mind here.  The way this royalty is structured is

15    such that Cisco keeps more than 92 percent of the revenues,

16    even after paying the royalty, and they get to maintain more

17    than 61 percent of the profits, and in fact, since that's

18    really based upon the cashflow, thinking about that 19 percent,

19    it's more than 61 percent in profits, and that's just based

11:29 20    upon what was articulated in that cashflow analysis, the DCF

21    analysis that was conducted.  The actual performance far

22    outstripped that financial analysis such that the profits for

23    Cisco were much greater.  By using a running royalty on a per

24    server basis, this would be a highly profit-enhancing agreement

25    and endeavor for Cisco to enter into.  They would be very

1   interested in paying a royalty of this magnitude in order to

2   enjoy far greater financial benefits that would accrue.

3   Q.   Good deal or bad deal for a patent infringer?

4   A.   Very good deal.

5        MR. BATCHELDER:  Your Honor, I pass the witness.

6        THE COURT:  All right.  Cross-examination?

7                       CROSS-EXAMINATION

8   BY MR. McDAVIT:

9   Q.   Dr. Sullivan, I just have some binders for you.

11:31 10  So Dr. Sullivan, one of the first things you did -- can I get a

11  document camera, please?

12  Before we start, I just -- you know, one of the first things

13  you showed us was your PDX-13 slide 18, and you showed this

14  from an email, right?  Do you remember that?

15  A.   That was on slide 18, that's right.

16  Q.   So I just want to look at the whole email and see what we

17  didn't show the jury.  Okay?

18  A.   Sure.

19  Q.   So in 2013, there's some sales guy who's asking -- this is

11:32 20  2013, right, so this is after the hypothetical negotiation,

21  right?

22  A.   It is.

23  Q.   Okay.  And then, so there's some sales guy who is saying

24  here, he's asking a question, "Are we seeing any Egenera on

25  UCS, or better yet, ways to displace them," do you see that?

```
 1    A.   I do.  I cite that in my report as evidence of

 2    competition.

 3    Q.   And then another sales guy, right, at Cisco says -- he is

 4    responding and he says, "Toby, there must be over 1740

 5    different ways to displace Egenera.  The only people that know

 6    about the Egenera -- and this is a new product they have -- are

 7    the employees at Egenera and maybe Emory."

 8    Do you see that?

 9    A.   I do.

10    Q.   Right.  And then Jason Shaw, the part that you showed us,

11    right, he says, "You know what, I don't know about that claim.

12    Egenera is wicked cool."

13    That's where this comes from, right?

14    A.   That's right.  And then it goes on with the "cool but weak

15    because everybody is now at Cisco."

16    Q.   Right.  Right.

17    A.   It's a colorful email.

18    Q.   It's a colorful email, right.  And you didn't show the

19    entire email to the jury, did you?

20    A.   No.  Ironically, I was actually thinking about it but, you

21    know, we have limited time, so I --

22    Q.   This is JTX-543.

23    Now, you told us that you received degrees in economics, right?

24    A.   That's right.

25    Q.   You're not an engineer, correct?
```

```
 1    A.    Correct.

 2    Q.    You're not a computer scientist, correct?

 3    A.    That's right.

 4    Q.    You're not an expert in the operation of data centers,

 5    correct?

 6    A.    No, I am not.

 7    Q.    You're not an expert in the operation of servers, are you?

 8    A.    No, I'm not.

 9    Q.    Okay.  Now, we heard about -- we heard Dr. Jones talk

10    about a person of ordinary skill in the art.  You don't

11    consider yourself a person of ordinary skill in the art, right?

12    A.    No, I'm not.

13    Q.    Now, you relied on Dr. Jones to form your opinions in this

14    case, right?

15    A.    I did.  I reviewed his work.

16    Q.    And specifically, you relied on Dr. Jones to identify what

17    does and what doesn't infringe with the UCS, right?

18    A.    That's right.

19    Q.    Okay.  When you formed your damages opinions in this case,

20    you did not speak to a single person at Egenera to form your

21    opinions, correct?

22    A.    That's right.

23    Q.    Okay.  And you didn't speak to a single inventor of the

24    '430 patent to help form your opinions, right?

25    A.    That is correct.
```

1    Q.   Okay.  Now, for the purpose of your analysis, and I think

2    you told us this, you assume that the '430 patent, the asserted

3    claims of the '430 patent, right, because we're only talking

4    about two claims?

5    A.   Claims 3 and 7.

6    Q.   Right.  And you assumed those claims are valid, right?

7    A.   That's right.  That's part of a damages expert's exercise

8    and task.

9    Q.   And you assumed that those claims are infringed, right?

11:35 10   A.   That's right.

11    Q.   You make those assumptions, but you don't know that the,

12    the asserted claims of the '430 patent are actually valid or

13    actually infringed, right?

14    A.   That's correct.  It's part of the construct or the

15    framework for determining a reasonable royalty.

16    Q.   And you know, don't you, that if the asserted claims are

17    not infringed, there are no damages, right?

18    A.   If there's an ultimate determination in that regard, that

19    would be my understanding.

11:35 20   Q.   And you know, don't you, that if the asserted claims are

21    found to be invalid, there's no damages, right?

22    A.   Again, if there is an ultimate finding in that regard,

23    that would be my understanding.

24    Q.   So you agree with me, right, that there's no damages if

25    the claims are invalid, right?

A.   I would put it the way I did, which I think is more
accurate.

Q.   Okay.  So you figured out reasonable royalties based on, I
think you told us, Cisco's acquisition of Nuova, right?

A.   I did use that transaction as a comparator.

Q.   Now, you've shown us some documents, and I think you told
us that, during direct, that you know, at the time Cisco
acquired Nuova, it had two product lines, right?

A.   That's right.  It was the switch and the server.  So the
UCS and the Nexus Switch.

Q.   Right.  So just so we're all clear, the "Switch" is the
Nexus, sometimes referred to as the Nexus 5000 Switch, right?

A.   That's right.  That's what I was referencing earlier.

Q.   And the server is UCS, right?

A.   That's right.

Q.   And that's what we're talking about in this case, right,
is UCS?

A.   Yes.  I also talked about the Nexus Switch.  For example,
we were looking at JTX-54 and breaking that down.

Q.   The Nexus Switch isn't accused of being covered by the
asserted claims, right?

A.   That's right.

Q.   And you didn't hear Dr. Jones talk about the Nexus Switch
as being covered by the asserted claims, right?

A.   That's correct.

```
 1    Q.    Right.   Okay.   So it's two different product lines.   One

 2    is being asserted to being covered by the asserted claims and

 3    one is not, correct?

 4    A.    That's right.

 5    Q.    So you calculated that the total cost by Cisco to acquire

 6    Nuova, which has the two product lines, equals $747 million,

 7    right?

 8    A.    $747,500,000.

 9    Q.    Okay.   So let's look at one of the documents that you

10    think was really neat, I think is what you said.

11    This is JTX-54.   Right?   I think you said you liked this one,

12    right, this Nuova Systems Terms and Conditions from March 8,

13    2007?

14    A.    Well, as an economist, this is the type of document we

15    geek out on.

16    Q.    Right.

17    A.    It is.   It's neat because, you know, on the page I suspect

18    we're going to here, the Base Case Assumption with the

19    discounted cashflow analysis really shows how Cisco broke down

20    their view of this and talks -- actually, it was the next page

21    that I was pointing to, but this is the prior page which kind

22    of breaks some things down as well.

23    Q.    So you really like this next page, which is page 11,

24    right?

25    A.    Well, I like both.   They go hand-in-hand.
```

1   Q.   So what I want to concentrate on is what this says.  This

2   is Cisco's evaluation of Nuova before it acquired Nuova, right?

3   A.   That's right.  This was the analysis that was used for

4   that purchase price.

5   Q.   And this page shows that Cisco treated the server revenue

6   and the switch revenue differently, correct?

7   A.   Up to a point, up until 2013 before they combine it.

8   Q.   Okay, so --

9   A.   And that's why I use it as a comparator, and I explained I

11:39 10   don't whittle it down, but it's a comparator to figure out

11   payment relative to cashflow.

12   Q.   The financial projections for this document forecasts that

13   the revenue from the switch product would be greater than the

14   revenue from the server product, right?

15   A.   Yes.  I talked about this a few minutes ago during my

16   direct.

17   Q.   And then you agree with me -- let's not just talk about

18   revenue, let's talk about gross margins.  Gross margin is

19   another word for "profit"?  You agree with me?

11:39 20   A.   It is a type or particular measure of profit.  There's

21   different measures of profit, "gross margin" being one.

22   Q.   Okay.  So you would agree with me that Cisco projected

23   that the gross margin for the server product was going to be

24   different from the gross margin for the switch product, right?

25   A.   During the first period of years up to 2013, before they

1    then combine it thereafter.

2    Q.   Would you agree --

3    A.   And again, just on a percentage basis, not a dollar basis.

4    Q.   Would you agree with me that the profit margin for the

5    switch business was expected to be higher than the profit

6    margin for the server business?

7    A.   Close but not quite.  So on a percentage gross margin

8    basis for this time period, the switch has higher profit

9    margins.  You can see that going across 50 percent, 55, 60, 65,

11:40 10   and that's greater than the server gross margin percentages

11   which are lower, and --

12   Q.   Just make sure I understand your answer, sir.  Would you

13   agree with me that the profit margin for the switch business

14   was expected to be higher than the profit margin for the server

15   business?

16   A.   Only for a period of time.

17   Q.   Okay.  But Cisco, as it's doing its projections, projected

18   the profit margin for the server base was going to be different

19   than the profit margin for the switch business, right?

11:41 20   A.   For a period of time.

21   Q.   Right.

22   A.   Again, if we can just go up.  Yup, right there,

23   "terminal."

24   Q.   Yes.  Up through 2013, right, sir?

25   A.   Exactly.  Then they do a terminal value out into

1    perpetuity, which again, it's neat that they did that.

2    Q.   You would agree with me that Cisco considered the switch

3    business to be a greater driving force in the purchase price of

4    Nuova, right?

5    A.   No.  There's been some dispute and debate over that, and I

6    recognize that Cisco has made some of those claims.

7    Q.   I just want you to concentrate on what my question was,

8    sir.

9    A.   I thought I was.

11:41 10   Q.   It's fair to say that Cisco would have considered the

11   switch business a greater driving force in the purchase price

12   it was willing to pay for Nuova, right, sir?

13   A.   There is dispute over that.

14   Q.   Okay.  Can I get Mr. Herzka again, please, can you play

15   clip S84.  It's just, so you can follow along with your

16   deposition, it's 212 lines 8-11.

17         "QUESTION:  So is it fair to say that Cisco would have

18   considered the switch business a greater driving force in the

19   purchase price it was willing to pay for Nuova?

11:42 20         "ANSWER:  That's possible."

21   Q.   Now, one of the things you did in order to measure the

22   value of the '430 patent was to measure the cost savings to

23   Cisco's customers -- true?

24   A.   I have considered cost savings.

25   Q.   And you agree that the economic benefit of the '430 patent

1    can be measured by a cost saving benefit of UCS to Cisco's

2    customers, right?

3    A.   I utilized cost savings as a means of relative

4    apportionment.  That was the 55.3 percent.

5    Q.   And I think you mentioned something called TCO in your

6    direct, is that right, sir?

7    A.   Yes, we've heard that a lot.

8    Q.   And TCO is the total cost; that is just the initial

9    purchase of the product and all expenses for the product over

11:43 10   its lifetime, right?

11   A.   Generally speaking.  It's the upfront capital costs and

12   the maintenance costs going forward; you know, power

13   consumption, cost of electricity, for example.

14   Q.   And it's your position that the customer cost savings were

15   the primary driver of Cisco's UCS sales, right?

16   A.   It is.

17   Q.   Okay.  Now, let me talk about cost savings for a second.

18   In your work on this case, you looked at what some actual

19   customers reported as to what cost savings they had with UCS,

11:44 20   right?

21   A.   I'm not sure if you're referring to the 15 case studies.

22   Q.   Actually, I'm referring to, in your work on this case, you

23   told us all you looked at lots of different documents, right?

24   A.   I did.

25   Q.   Right, and one of the things that you looked at was, you

1    looked at actual case studies, where actual customers report

2    with respect to how they use UCS, right?

3    A.    I did, and that's why it's referencing the 15 that's

4    feeding into the 55.3 percent.  I mean, there are lots of other

5    documents in the case, but I'm guessing that's what you're

6    referring to.

7    Q.    Well, sir, this binder contains what we got from Egenera's

8    lawyers when they asked Cisco's customers about how they use

9    UCS.  So can you turn to tab PX-BLK in your binder?  Are you

11:45 10   there, sir?

11   A.    I think so.

12   Q.    Yeah.  It's PX-BLK.

13   A.    Okay.

14   Q.    And that's a document from -- now, we have to, I think the

15   judge told us yesterday that we have to talk about some of

16   these, some of this correspondence without saying, revealing

17   the identity of the actual names of the customers and actual

18   names of the people, but you recognize this as a large

19   financial institution, right?

11:46 20   A.    I do.

21   Q.    Okay.  So, that document is correspondence from that large

22   financial institution that Egenera's lawyers solicited, right?

23   A.    If you say so.  I don't have personal knowledge of that,

24   but it very well may be.

25   Q.    So if you go to page three of that document, you can see

1    that Egenera's lawyers asked this customer if it had ever saved

2    money by choosing UCS over alternative options or its previous

3    solutions, right?

4    A.   No.  But there is a question like that in this document.

5    Q.   The question that you're referring to says, "Did you save

6    money by choosing UCS over alternative options or your previous

7    solutions; if so, please describe how you saved money."  Do you

8    see that, question number 12?

9    A.   I do.

11:47 10   Q.   The actual customer said "no."  Correct?

11   A.   That's what's listed here.

12   Q.   Okay.  So at least this customer reports that it did save

13   money by using the UCS, right?

14   A.   I can tell you what they say here, which is that they did

15   not describe how they saved money.

16   Q.   I read that accurately, didn't I, sir?

17   A.   That is how it reads, yes.

18   Q.   Now, you know that, you know -- maybe you don't.  We

19   talked to Dr. Jones, and we had a discussion yesterday about

11:47 20   fibre channel over Ethernet, do you recall that?

21   A.   You and I did not have that discussion.

22   Q.   Okay.

23   A.   Perhaps you're referring to --

24   Q.   You were here throughout the whole trial though, right?

25   A.   I have been.

```
 1    Q.    And you were here when Dr. Jones said that, you know,
 2    using fibre channel over Ethernet helps reduce cabling, right?
 3    Do you remember that?
 4    A.    To a degree.
 5    Q.    Okay.
 6    A.    Again, I did not approach my work as a computer scientist
 7    because I'm not.  I'm an economist.
 8    Q.    So you agree, don't you, that Egenera didn't invent fibre
 9    channel through Ethernet, right?
10    A.    It is my understanding that they did not do so, but I do
11    not have an independent opinion in that regard.
12    Q.    Right, you only get your opinions on technical matters
13    from Dr. Jones, right?
14    A.    On matters of infringement.
15    Q.    You don't have any other opinions in this case other than
16    on matters that have to do with the infringement that's alleged
17    in this case, right?
18    A.    I did not follow that.
19    Q.    Your work in this case is limited to what technical
20    information you got from Dr. Jones, correct, in terms of
21    technical analysis of the products, right?
22    A.    Well, no.  I mean, certainly I interviewed Professor Jones
23    and I reviewed his reports.  I've also seen reports of other
24    experts and other testimony.
25    Q.    Okay.  But your technical analysis of what infringes and
```

1    what doesn't infringe comes from Dr. Jones, right?

2    A.    Close but not quite.  I did not perform a technical

3    analysis of what infringes and what does not infringe.  For

4    that I rely upon Dr. Jones to make that determination, and then

5    that's what feeds into my economic analysis for damages.

6    Q.    Okay.  Now, you know that Cisco has its own damages

7    expert, right?

8    A.    Yes, I do.

9    Q.    And you're going to hear -- Cisco's damages expert is

11:49 10   going to come up and testify, and his name is Doctor Stephen

11   Becker, right?

12   A.    That is his name and I presume he will come up here and

13   testify.

14   Q.    And he had the same access to the same materials that you

15   did, right?

16   A.    I would presume it's largely the same.

17   Q.    And he reached a different conclusion than you, correct?

18   A.    He did.

19   Q.    Okay.  Well, let's see where you and Dr. Becker might

11:50 20   agree.  Now, you talked about a framework called "the

21   hypothetical negotiation," right?

22   A.    I did.

23   Q.    Okay.  And you both applied that framework, that

24   hypothetical negotiation framework to determine what would be a

25   reasonable royalty in this case, right?

1    A.   We both used that framework, yes.

2    Q.   And we heard about the Georgia-Pacific Factors I think.

3    You put a slide up listing out all the Georgia-Pacific Factors,

4    right?

5    A.   I did.   Then I put them into buckets and I used that to

6    help organize my presentation.

7    Q.   And you agree that both you and Dr. Becker considered the

8    Georgia-Pacific Factors in your presentations, right, in your

9    damages opinions, right?

11:51 10   A.   We did consider the Georgia-Pacific Factors, yes.

11   Q.   Now, one of the things that we talked about, or you talked

12   about on direct, was that determining a reasonable royalty at

13   the hypothetical negotiation involves figuring out what a

14   willing licensor, which would be Egenera in this case, and a

15   willing licensee, would have bargained for in an arms-length

16   negotiation, right?

17   A.   That's right.   That's slide nine.

18   Q.   Yes.   That's, actually, I can put up your slide if it

19   helps you.   Actually, I'm going to show you slide 10.   Is that

11:51 20   all right, sir?

21   A.   As you wish.

22   Q.   Okay.   So, and the reason why I'm showing this slide 10,

23   we all agree that this hypothetical negotiation between Egenera

24   and Cisco would have happened in July of 2009, right?

25   A.   That's right, that is not disputed.

1    Q.   And we expect that at this table, both Egenera and Cisco

2    would have behaved reasonably, correct?

3    A.   Yes.  Cisco's damages expert agrees with me on that.

4    Q.   And the royalty resulting from the hypothetical

5    negotiation is not something that either side would prefer,

6    right?  It's just, it's you do the negotiation, you come up

7    with a, you come up with an agreement, right?

8    A.   It's the outcome based upon all the information that's

9    shared among the parties and having a willing licensor and a

11:52 10    willing licensee, again recognizing known infringement, known

11    validity.  That's the framework.

12    Q.   And you know, I think you made this point on direct, this

13    negotiation is hypothetical because Cisco never licensed the

14    '430 patent, right?

15    A.   That's right.

16    Q.   In fact --

17    A.   Otherwise, we would not be here.

18    Q.   Right.  And no one ever licensed the '430 patent, right?

19    A.   Not in a patent license, that's right.

11:53 20    Q.   So let's look at what this Egenera person would have known

21    at the hypothetical negotiation table in July of 2009, okay,

22    because the real world doesn't go away, right, at this table?

23    A.   Well, the hypothetical negotiation is based in real world

24    facts, as I explained, and it's a, you know, on the next slide

25    11, where I explain it's a cards up on the table where the

1    information is known and shared.

2    Q.   So let's look at the cards up on the table.

3    A.   Which is slide 11.  Yes, that's the one.

4    Q.   That's the one, right?  So these are the cards up on the

5    table that everybody knows exists in the real world, right?

6    A.   It's all the available information, but in the real world,

7    this information was not disclosed to Egenera, and Egenera's

8    information was not disclosed to Cisco.  There was information

9    that was withheld, but the hypothetical negotiation, that's all

11:54 10   put out on the table.  That's the distinction I was seeking to

11   draw.

12   Q.   So let's talk about what the Egenera person would have

13   known.  Now, you looked, in your work in this case, at

14   Egenera's financials, right?

15   A.   I did.

16   Q.   Okay.  And in order to find out what Egenera's income was

17   for the relevant time period, you reviewed Egenera's financial

18   statements, right?

19   A.   I wouldn't put it that way, but I did review their

11:54 20   financial statements that has revenue, various forms of costs,

21   and different types of profit and income measures.

22   Q.   And this is the financial statements that Egenera told its

23   accountants, right?

24   A.   It's really a joint process.

25   Q.   Egenera -- I'm sorry, the information about Egenera's

        1   financials that you took into consideration came from Egenera's

        2   financial statements, right?

        3   A.   If I heard you right.  I mean, the financial information

        4   comes from financial statements.  There is other information

        5   too, but that's where the financial metrics are conveyed.

        6   Q.   What I'm showing you, this is from your report, correct,

        7   sir?

        8   A.   That's right.  That's one of the attachments.

        9   Q.   Right.  So it's a financial summary of Egenera, right?

11:55  10   A.   That's right.

       11   Q.   Okay.  And you know that Egenera reported a decline in its

       12   product revenue starting in 2006, right?

       13   A.   So yes, in 2006 for product revenue was the peak.

       14   Q.   Right, and then it started going down in 2007, right?

       15   A.   I wouldn't -- it's effectively flat.  I mean that's --

       16   Q.   Then it went down in 2008 to 62.4, right?  This is before

       17   the hypothetical negotiation, right?

       18   A.   That's right.

       19   Q.   Okay.  And then in 2009 -- the hypothetical negotiation

11:56  20   would have occurred in 2009, right?

       21   A.   That's right.

       22   Q.   And the revenues continued to go down to 37 million,

       23   right?

       24   A.   They do go down at roughly 37 million.

       25   Q.   You also have something in here called, that you, again

```
 1   from Egenera's financial statements, something called,

 2   "operating income," do you see that on here?  I highlighted it

 3   on the left, "operating income"?

 4   A.   I do see that.

 5   Q.   Okay.  And just so we're all clear, when you look at

 6   financial statements, if it's in parentheses, a number that's

 7   in parentheses like we see here, that's negative, right?

 8   A.   It can be.  In this case, that is what it conveys.

 9   Q.   Okay.  So from the inception of the company, all the way
11:57 10   through the hypothetical negotiation, Egenera never had a

11   positive operating income, correct?

12   A.   That was the intention, that's right.

13   Q.   Okay.  Let's look at some other things that would happen

14   right before the hypothetical negotiation.  Now, you know that

15   Egenera laid off 28 percent of its workforce in around the

16   hypothetical negotiation, right?

17   A.   Around that time, yes, I'm aware of that fact.

18   Q.   So if we look at JTX-368, this is an article about Egenera

19   doing layoffs, and it happened in November of 2008, do you see
11:57 20   that?

21   A.   I see that.

22   Q.   And at the time of the hypothetical negotiation, these

23   layoffs would have occurred, right?

24   A.   I'm sorry, I couldn't hear you.

25   Q.   Sure.  At the time of the hypothetical negotiation, these
```

1  layoffs would have occurred, right?

2  A.   Not quite.  I mean, this is November 2008, so it's not at

3  the time of the hypothetical negotiation which was July 2009,

4  but yes, this is information that I documented in my report.

5  Q.   Right.  So just to make sure I'm clear, the layoffs would

6  have already had occurred by the time of the hypothetical

7  negotiation; you agree with me, right?

8  A.   That's right.

9  Q.   Now, the jury's seen some video clips from Egenera's

11:58 10  former CEO, Mr. Thompson.  Do you remember seeing some of those

11  clips, sir?

12  A.   Yes, I do.

13  Q.   Now, you know that Egenera made the decision to stop

14  selling hardware and transition to a software-only company at

15  the end of 2008, right?

16  A.   As I understand, a decision to a software-centric company,

17  although they did continue to sell the BladeFrame product.

18  Q.   At least by October 30, 2008, Egenera had made the

19  decision to stop selling hardware and transition to a

11:59 20  software-only company, true?

21  A.   I don't recall the exact date, but around that time there

22  was this transition.  As we know, they continued to sell

23  BladeFrame thereafter, but there was a software-centric focus

24  for the company from that point forward.

25  Q.   And you were here when Mr. Manca testified that up until

1    2008, they had planned to release a second hardware product

2    called the BladeFrame 2, right?

3    A.    I recall that.

4    Q.    And they canceled that project, right?

5    A.    I do understand that.

6    Q.    And that happened before the hypothetical negotiation,

7    right?

8    A.    I believe so.

9    Q.    Right.  Now, you were here when Egenera's counsel

11:59 10   questioned Mr. Jayakrishnan regarding a company called

11    "Savvis," right?

12    A.    Yes.

13    Q.    And that, and I think you showed us an email from Nuova

14    when they were negotiating with or reporting something about

15    talking to Savvis, right?

16    A.    December 2007, that's right.

17    Q.    All right.  So if you go to your binder, I think it should

18    be, there is a document in there, DX-EN.  Let me know when

19    you're there.

12:00 20   A.    I've got a few binders here.  Do you happen to know which

21    one?

22    Q.    It's binder number one, and there should be a tab saying

23    "DX-EN."

24    A.    E-N as in Nancy?

25    Q.    Correct, N as in Nancy.

```
 1    A.    Okay.

 2    Q.    And these are notes that Egenera's CEO took when he had a

 3    conversation with an executive at Savvis, right?

 4    A.    I do not know.

 5    Q.    Okay.  So let's take a look together, and this will be the

 6    next Exhibit number, which is JTX- 546.

 7              (Exhibit JTX-546 received into evidence.)

 8    Q.    So just look at the top.  Mike Thompson, that's the CEO,

 9    former CEO of Egenera, correct?

12:01 10   A.    Correct.

11    Q.    And it's happening on February 12, 2009, do you see that?

12    A.    I don't know what you mean by "it's happening," but there

13    is a date up there.

14    Q.    Right.  So the date of these notes are, is February 12,

15    2009.  Do you see that?

16    A.    I see it listed on the document, but I cannot represent

17    what that means, given that I do not have personal knowledge of

18    the document.

19    Q.    You don't have personal knowledge of the document.  So

12:01 20   let's see what Mr. Thompson recalls talking to Savvis about.

21    So this is a memo.  I'm sorry, in this memo, in the third

22    paragraph, do you see where he says, "I then switched to

23    relationship."  Do you see that paragraph?

24    A.    I do.

25    Q.    Right.  And he says, he asked -- Savvis is asking
```

           1    Mr. Thompson whether Egenera was a mainstream partner.  Do you
           2    see that?  Right?  First sentence of the third paragraph?
           3    A.   I see what it states for sure.  I mean, I am capable of
           4    reading, but again, I did not prepare this document so I can't
           5    validate those pieces for you, but happy to read through with
           6    you.
           7    Q.   Okay.  And it says, "Bill," who is the executive at
           8    Savvis, right?
           9    A.   I can take your representation for it.
    12:02 10    Q.   And he discussed how -- well, don't take my
          11    representation.  These are notes from Egenera's CEO, right?
          12    A.   If that's your representation.
          13    Q.   You read Mr. Thompson's deposition, right?
          14    A.   Yes.  Among 50 depositions.
          15    Q.   And you looked at the Exhibits to the depositions, right?
          16    A.   I did.
          17    Q.   And so this is a document that was -- you know, this isn't
          18    coming out of some archive somewhere.  This was used at
          19    Mr. Thompson's deposition, do you see that?
    12:03 20    A.   It appears that way.
          21    Q.   Okay.  So getting back to that third paragraph, they said,
          22    Savvis says, "discussed how they originally chose BladeFrame."
          23    You see that?  You see where I'm pointing?
          24    A.   I do.
          25    Q.   Okay.  And then they "switched to HP."  Do you see that?

1   I read that correctly, didn't I?

2   A.   The parts you read, I believe you read correctly.

3   Q.   And then it says, later in that paragraph, you see

4   paragraph that says, "It all became clear to me"?

5   A.   Right.  It starts a different paragraph.

6   Q.   Right.  The sixth paragraph now says -- we're counting the

7   notes -- says, "Savvis uses BladeFrame/PAN for shared physical

8   hardware."  Do you see that?

9   A.   I see where you're pointing and what you're reading.

12:04 10   Q.   Then it says Savvis uses HP C-class for dedicated

11   hardware."  Do you see that?

12   A.   I believe you're paraphrasing, but I see it.

13   Q.   "And HP VMWare for cloud/virtual offerings," do you see

14   that?

15   A.   I do.

16   Q.   Okay.  And talks about what's going on with the company,

17   and then he says at the end, "I believe they now see us,"

18   meaning Egenera, "as legacy."  Do you see that?

19   A.   I see the, "I believe they now see us as legacy."

12:04 20   Q.   Okay.  So as of February 2009, four or five months before

21   the hypothetical negotiation and before UCS ever launched,

22   Egenera's CEO reports its largest customer, Savvis, was moving

23   away from BladeFrame into HP, correct?

24   A.   I could not validate that for you without going back and

25   taking a look at his deposition.

1   Q.   Okay.  Now, can I get -- well, you know what, let me start

2   with the document camera.  We talked about an email and you

3   showed it on your direct.  It was JTX-59, and it was an email

4   from, again, from Mr. Thompson to an investor in Egenera.  Do

5   you recall that?

6   A.   I do.

7   Q.   Okay.  So we looked at a little bit of it.  I just think

8   it's interesting to look at the original question that the

9   investor asked for Mr. Thompson to provide a response to

12:05 10  because it wasn't coming out of the blue, right?  It was a

11  response to a question from Egenera's investors, right?

12  A.   One of them, yes.

13  Q.   Okay.  So Mr. Dave Epstein, right, who is an investor in

14  Egenera, you agree with that, right?

15  A.   My understanding it's Crosslink Capital, but yes.

16  Q.   Okay.  And so he asked, he asked Mr. Thompson to report on

17  certain things, do you see that?  And he says "To that end, can

18  you provide me, verbally or written, with the latest color on

19  possible buyers, this" -- and you would say that's quarterly

12:06 20  sales, right, "Q sales" is quarterly sales?

21  A.   That would be my inference.

22  Q.   "Your assessment of revenue for 2009, assuming the

23  headcount we can get without triggering Warren."  Do you see

24  that?

25  A.   I do.

1   Q.   And it has to do with a statute in Massachusetts, right?

2   A.   That is my understanding.  I mean, I'm not a legal scholar

3   but that is my understanding.

4   Q.   And then he says, "And your gut sense as to the

5   conservative dollar value assuming one bidder," and that dollar

6   value is asking for the dollar value that someone would pay for

7   Egenera, right?

8   A.   A gut sense conservative value assuming one bidder.

9   Q.   So Mr. Thompson answers the next day, December 6, 2008,

12:07 10   and provides answers to Mr. Epstein's questions, right?

11   A.   He responds to the email, which is what I was showing

12   earlier, right?

13   Q.   So let's go to -- can I get, Mr. Herzka again please, and

14   Mr. Herzka, can you go to DDX 10.6 just so we can talk about

15   the specifics of the valuation question.

16   So regarding the valuation part of Mr. Epstein's question, he

17   assumes $50 million for Egenera with one buyer, do you see

18   that?

19   A.   I do.  That's what I was mentioning and describing during

12:07 20   my direct exam.

21   Q.   And he says, "With one buyer "based on our customer base

22   replacement value, engineering talent, and core expertise in

23   infrastructure virtualization, and IP."  He says that, right?

24   A.   He does.

25   Q.   Okay.  So the valuation that Mr. Thompson is providing to

1    one of Egenera's investors includes customer base replacement

2    value, engineering talent, core expertise in infrastructure

3    virtualization, and IP, true?

4    A.   It does, reflecting that it does not reflect Cisco's use

5    of known valid patent technology and known infringement.

6    Q.   I understand that's your testimony, sir, but you agree

7    that I read that correctly, right?  Mr. Thompson is telling an

8    investor from Egenera that his valuation includes customer base

9    replacement value, engineering talent, core expertise in

12:08 10  infrastructure virtualization, and IP.  I read that correctly,

11   didn't I, sir?

12   A.   You paraphrased some of it, but yes.

13   Q.   What did I paraphrase?

14   A.   The beginning part.  It's all good.  I mean it's -- I mean

15   I can read it too.  We talked about it.

16   Q.   Now, around the time of the hypothetical negotiation, you

17   know that Egenera and its bankers reached out to 23 companies,

18   right?  You heard that testimony?

19   A.   That is my understanding.

12:09 20  Q.   And they're trying to gauge their interest in acquiring,

21   engage anyone's interest in acquiring Egenera, right?

22   A.   As a potential transaction.

23   Q.   Cisco was one of those 23 companies that was reached out

24   to, right, sir?

25   A.   I believe there were discussions in that regard.

```
 1   Q.   And you know, don't you, that none of those 23 companies
 2   acquired Egenera, right?
 3   A.   That's right.  There were not terms that were agreeable.
 4   Q.   And you know, don't you, that no one ever took a license
 5   to the '430 patent, right?
 6   A.   That's right.
 7            MR. McDAVIT:  I pass the witness.
 8            THE COURT:  All right.  Redirect?
 9                      REDIRECT EXAMINATION
10   BY MR. BATCHELDER:  :
11   Q.   Can we start, please, Mr. Fitzgerald with slide 18 from
12   Dr. Sullivan's demonstratives.  This was the first subject
13   raised in your cross-examination.  It was the "Egenera is
14   wicked cool" from Jason Shaw, and I believe Cisco's lawyer was
15   asking you to second guess your conclusion that Jason Shaw
16   believed that Egenera had innovative technology.  Let's put up
17   the slide, please.
18   Here is the "Wicked Cool" on the bottom, and then here is a
19   quote from Jason Shaw's deposition.  What does it say in the
20   answer there?
21   A.   So here Mr. Shaw was explaining that Egenera had
22   innovative technology, that they were doing something that no
23   one else did, and that he would call them an innovator.
24   Q.   Okay.  So any doubt in your mind from the evidence you see
25   that Mr. Shaw at Cisco believed that Egenera had done something
```

        1   innovative here?

        2   A.   Not at all.  This was his deposition testimony under oath

        3   and I would expect it to be truthful.

        4   Q.   Did something no one else did, right?

        5   A.   That's right.

        6   Q.   Okay.  You were next, I believe, asked a question about

        7   this binder number three, and you were asked to turn to a tab,

        8   and you were asked, by the way, not to identify the name of the

        9   financial institution involved, and I respect that request.

12:11  10   It's PX-BLK.

       11   Do you recall that questioning?

       12   A.   I do.

       13   Q.   Okay.  And it was in connection with your use of cost

       14   savings as a technical apportionment in your analysis.  Do you

       15   remember that?

       16   A.   That was the suggestion.

       17   Q.   Okay.  And the predicate for that was your explanation to

       18   the jury that cost savings was a benefit of the '430 patent

       19   infringing it, right?

12:12  20   A.   It is a benefit.

       21   Q.   Okay.  Now, keep that in mind if you would, and can we

       22   have the document camera for a moment, please?

       23   You were here during Dr. Jones' testimony of course, correct?

       24   A.   Yes.

       25   Q.   And he explained that he had looked at 29 Cisco customers

1    who provided information in response to questioning; do you

2    remember that?

3    A.    I do.

4    Q.    And he says here, "28 of the 29 customers have UCS set up

5    in an infringing way."  Do you see that?

6    A.    I do.

7    Q.    This document that you were just shown, this PX-BLK, it

8    was from the one customer who was not using it in an infringing

9    way, correct?

12:12 10    A.    That's right.

11    Q.    How misleading is that?

12    A.    In my view, quite.

13    Q.    Does this undercut your technical apportionment using cost

14    savings in any way?

15    A.    No.  Not at all.  The cost savings analysis and

16    apportionment is applied to the entities and the sales that are

17    used in an infringing UCS system, and this would not apply.

18    Q.    So he cherry-picked the one that wasn't infringing and

19    used that?

12:13 20    A.    Correct.  It just simply is not applicable.

21    Q.    All right.  Can we pull back up JTX-54 at page 11, please.

22    A.    This is the cashflow analysis that I've alluded to

23    multiple times.

24    Q.    Exactly.  So Mr. Fitzgerald is pulling that up now.  I

25    believe it was suggested that you should have just used the

1    $747.5 million acquisition price as a cap and then somehow

2    apportioned UCS versus the Nexus Switch.  Why didn't you do

3    that?

4    A.   Well, simply put, it would be wrong.  The transaction with

5    Nuova, between Nuova and Cisco, is a comparator.  It's a

6    comparable in the sense that it demonstrates the relationship

7    between payment and cashflows.  If one were to cap the overall

8    amount at $747,500,000 and be whittling that down, it would

9    provide a windfall to Cisco because the hypothetical

12:14 10    negotiation yields a royalty per server, a running royalty, and

11    that royalty applies then to actual sales.  That's the way the

12    parties would structure the hypothetical license.  That's the

13    way parties do this in the real world.  It's also the way that

14    Cisco structured the transaction because the transaction, as I

15    noted from Mr. Chambers who was then their CEO, indicated that

16    the transaction, the payments were based upon those earnout

17    payments of revenue and profitability.

18    So if one were to just simply whittle down versus using it as a

19    comparator, one would be omitting tremendous value that was

12:15 20    actually supplied by the technology claimed in the '430 patent.

21    Q.   What became of the UCS revenues as compared to these early

22    projections?

23    A.   They were much larger.  And just by way of example, I was

24    indicating that within two years, they were at a run rate of

25    $1.1 billion annually, two years after launch.  And then, by

1     2013, as I showed, they were actually at $2 billion in server

2     revenue.  And, you know, you recall here from 2013, the server

3     revenue is 397 million.  That's roughly 400 million.  That

4     means the actual revenue was five times that amount, and then,

5     as we know, it grew from there up to $3.5 billion.

6     So if one were to cap the value at that Nuova transaction price

7     of 747,500,000, that would ignore all of the value contribution

8     of the '430 patent and, you know, would not be, in my view,

9     reasonable.

12:16 10   Q.    It would ignore the contributions to what became a

11    300 billion-dollar running rate?

12    A.    That's right.

13    Q.    Would that be fair or a windfall to Cisco?

14    A.    In my view, it would not be reasonable to exclude that,

15    but rather, that would generate a windfall for Cisco being able

16    to utilize the patented technology in the marketplace that

17    allowed them to enter, allowed them to have these sales, but

18    then to not compensate for it.  As an economist, that would not

19    be reasonable.

12:17 20         MR. BATCHELDER:  May I have one moment, your Honor.

21         THE COURT:  You may.

22    Q.    Dr. Sullivan, coming back to your reasonable royalty

23    determination, how can the jury be assured that the royalty

24    you've determined is indeed reasonable?

25    A.    In multiple ways.  One, I have done extensive research and

1    analysis.  I've done my best to convey that in a condensed

2    period of time here today.  I took strong details each step

3    along the way to ensure that the framework, the royalty

4    structure, and the analysis is well-founded based upon, you

5    know, reliable facts.

6    What's interesting here to me as an economist is -- I suppose I

7    would relate this as a perfect storm.  It's an unusual

8    situation where you have a breakthrough-pioneering technology

9    that is coupled with Cisco's position in the marketplace to

12:18 10   commercialize this just at the right time.  So they use this

11   once-in-a-generation change in the server architecture to

12   tremendous financial success, and ultimately, that yields a

13   royalty that I've determined of $371 million that is very

14   substantial; yet, as I also indicated, this allows -- this

15   would be a profit-enhancing endeavor for Cisco and Egenera.

16   They would be a willing licensor and a willing licensee because

17   it allows Cisco to maintain most of the revenue and most of the

18   profits.

19   So they would, even after paying this royalty, still be in a

12:19 20   very strongly profit-enhancing endeavor with the technology.

21   Q.    Thank you, Dr. Sullivan.

22          MR. BATCHELDER:  Your Honor, I pass the witness.

23          THE COURT:  All right.  Anything further?

24          MR. McDAVIT:  Just briefly, your Honor.

25

**RECROSS EXAMINATION**

BY MR. McDAVIT:  :

Q.   Counsel for Egenera asked if I cherry-picked the customers
that reported no cost savings.  Do you recall those questions?

A.   I do.

Q.   Okay.  So can you look at your binder again, just the ones
that have the cost savings.  I think there is a third-party
binder that you have, and there's one called PX-BKP?

A.   I did not follow the letters.

Q.   I'm sorry, it's bravo, kila, papa?

A.   Bravo, kila?

Q.   Bravo, kila, papa.

A.   Oh, "papa."  Sorry, I didn't follow that one.

Q.   I've got to use, break out the phonetic alphabet for that.

A.   Okay.  BKP, I'm there.

Q.   This is a customer that's a large financial institution,
right, or investment bank?

A.   No.  It's not an investment bank.

Q.   How would you characterize it, sir?

A.   Asset management.

Q.   Okay.  Let's call it an asset management group.  And they
report -- again, if you look at their responses to Egenera's
lawyers' request for information, their -- if you look at the
declaration that was provided, they don't report saving any
money with UCS, right?

```
 1    A.    Actually, in contrast, they do talk about the --
 2    Q.    If you look at paragraph 14, sir.  It says, "money was not
 3    a primary driver for this customer's decision," right?
 4    A.    That's right.  The Cisco product is more expensive.
 5    Q.    And if you go to PX-BLJ, so that's bravo, lima, Juliette,
 6    this is a virtualization company, right, sir?
 7    A.    That is my understanding.
 8    Q.    And if you look at paragraph 15 of this Declaration, it
 9    says that UCS was not the cheapest solution that this customer
12:22 10    considered; right, sir?
11    A.    Precisely.
12    Q.    Okay.  And if you look at another large company called --
13    it's, your tab should be PX-bravo, kila, Mike.  You're really
14    testing my phonetic alphabet memory.  It should be in your
15    binder, sir.
16    A.    Okay.  I'm there.
17    Q.    And Egenera's lawyers again asked, "Did you save money by
18    choosing UCS over alternative options?"  Do you see that in
19    paragraph 20, that customer said "no."  Do you see that, sir?
12:22 20    A.    I do.
21    Q.    Okay.  No further questions.
22          THE COURT:  Okay.  Egenera?
23          MR. BATCHELDER:  Nothing further with this witness,
24    your Honor, thank you.
25          THE COURT:  Okay.  Anything further for the record?
```

1          MR. THOMASES:  Good afternoon, your Honor.  Andrew

2     Thomases.  Before we rest, we did have some documents to move

3     in.  I don't know if there's been a resolution on the documents

4     from the Cisco customers that were in that summary form that

5     Dr. Jones had with the redacted names.

6          THE COURT:  I think I can address that very quickly.

7     There might be some confusion but I thought I ruled clearly

8     they're admissible but my concern is protecting the

9     confidentiality.  So the thought is the jury would see them but

12:23 10    not the public.  They will remain sealed for the jury's

11    purposes.

12          MR. THOMASES:  Can I just read in the prior number and

13    the new JTX number for the record?

14          THE COURT:  You may.

15          MR. THOMASES:  Thank you.  So PXB-JV is JTX-547;

16    PXB-JW is JTX-548; PXB-JX is JTX-549; PXB-KD is JTX-550; PXB-KE

17    is JTX-551; PXB-KH is JTX-552; PXB-KI is JTX-553; PXB-KJ is

18    JTX-554; PXB-KK is JTX-555; PXB-KL is JTX-556; PXB-KM is

19    JTX-557; PXB-KN is JTX-558; PXB-KR is JTX-559; PXB-KZ is

12:25 20    JTX-560; and PXB-LD is JTX-561.

21    Thank you, your Honor.  With that, Egenera rests its case.

22          (Exhibits JTX-547, JTX-548, JTX-549, JTX-550, JTX-551,

23    JTX-552 received into evidence.)

24          (Exhibits JTX-553, JTX-554, JTX-555, JTX-556, JTX-557,

25    JTX-558 received into evidence.)

1           (Exhibits JTX-559, JTX-560, JTX-561 received into

2     evidence.)

3           THE COURT:  All right, jurors.  That concludes the

4     evidence that Egenera wishes to present as part of its case.

5     As I explained, there are three times in a trial I actually do

6     have lawyers at side bar, this will be very brief, as we move,

7     now we're going to make the transition to the case that Cisco

8     will be putting on.  If I could just see lead counsel briefly

9     at side bar, and then we'll go right back to work.

12:25 10    [SIDE BAR AS FOLLOWS:

11          THE COURT:  I just wanted to give Cisco the

12    opportunity to put on the record a motion that I know it wishes

13    to make at this point.

14          MR. DESMARAIS:  Thank you very much, your Honor.

15    Cisco at this point would move for judgment as a matter of law

16    as no infringement, and, no willful infringement.  And I

17    understand your Honor is going to permit us to file the reasons

18    behind that motion in paper form, which we'll do later this

19    afternoon.

12:26 20    THE COURT:  Yes, so for the record, the motion is

21    made.  I will take it under advisement.  I invite, again, the

22    initial briefing and maybe something we'll be discussing later

23    in the trial.

24          MR. THOMASES:  Would you like Egenera to file an

25    opposition or after the case on the material?

```
 1          THE COURT:  I don't think you have to do it now, but
 2   certainly by the time we get to the conclusion of the case, you
 3   will want to reply I think.
 4          MR. THOMASES:  Thank you.
 5          MR. DESMARAIS:  Thank you.
 6          ..END OF SIDE BAR]
 7          THE COURT:  Okay.  I think we're ready to go ahead.
 8   Cisco may call its first witness.
 9          MR. DESMARAIS:  Thank you, your Honor.  Cisco is
10   pleased to finally call its witness.  Our first witness will be
11   Mike Dvorkin.  He was at Nuova and he was the system architect
12   for the UCS system that this case is about.  He'll explain how
13   it's designed, how it's different from the Egenera approach,
14   and his testimony relates to bedrock fact number three.
15   My colleague, Peter Magic, will do the direct examination.
16   Thank you, you Honor.
17          MIKE DVORKIN, having been duly sworn by the Clerk, was
18   examined and testified as follows:
19          THE CLERK:  You may be seated.  Could you please
20   introduce yourself to the jury, spelling your last name for the
21   record.
22          THE WITNESS:  My name is Mike Dvorkin.  M-I-K-E, D as
23   in David, V as Victor, O-R-K-I-N as in Nancy.
24                        DIRECT EXAMINATION
25   BY MR. MAGIC:
```

```
 1    Q.   Good morning, Mr. Dvorkin.

 2    A.   Good morning.

 3    Q.   Would you please introduce yourself?

 4    A.   My name is Mike Dvorkin.

 5    Q.   And where do you live?

 6    A.   I live in Redwood City in the heart of Silicon Valley.

 7    Q.   Do you have a family?

 8    A.   Yes, I do.  I live with my girlfriend of three years and

 9    we share three kids; a girl who is in high school and two boys,

10    a 22-year old who is in college and a seven-year old boy.

11    Q.   And who is your current employer?

12    A.   My current employer is Cisco Systems.

13    Q.   And in total, how many years have you worked at Cisco?

14    A.   Well, gee, about a dozen.

15    Q.   And is this actually your last week with Cisco?

16    A.   Yes.  This is my last week at Cisco.

17    Q.   And why is that?

18    A.   I'm a software entrepreneur.  I am about to pursue

19    something new and interesting, hopefully.

20    Q.   Okay.  Well, today we're going to talk about your time at

21    Cisco and Nuova.  So what's your current job title at Cisco?

22    A.   I am a distinguished engineer.

23    Q.   What is that title?  What is a distinguished engineer?

24    A.   Distinguished engineer is a type of engineer that looks at

25    new technologies and new markets and combines those things
```

1    together and decide what products we need to pursue and how to

2    implement that at an architectural level.

3    Q.    And how many years of total work experience do you have

4    across your career?

5    A.    Twenty-nine.

6    Q.    And did you previously work at the company called Nuova?

7    A.    Yes, I did.

8    Q.    Did you work on UCS at Nuova?

9    A.    Yes, that's correct.

12:30 10   Q.    And what aspect in particular of UCS did you work on?

11   A.    I was responsible for the architectural implementation of

12   the UCS Manager, management control plane for the UCS system.

13   Q.    You said architecture and implementation?

14   A.    Yes, that's correct.

15   Q.    And did you ever work at Egenera, Mr. Dvorkin?

16   A.    No, never did.

17   Q.    All right.  So we'll talk a little about your background

18   before you worked at Nuova.  So where did you go to college?

19   A.    I went to college in University of Illinois, in

12:30 20   Urbana-Champlaign.

21   Q.    Where did you -- I'm sorry, what degree did you get?

22   A.    I got a double major in, I have bachelors of science in

23   computer science and electrical engineering.

24   Q.    And when did you graduate, what year?

25   A.    I graduated at the end of '92.

1    Q.   And before you even got to Nuova, about how much

2    experience did you have in management software for data

3    systems?

4    A.   I had about 12, 13 years.

5    Q.   And just prior to coming to Nuova, what company did you

6    work at?

7    A.   I was at Xsigo Systems.

8    Q.   And what years were you with the company Xsigo Systems?

9    A.   Approximately, from 2004 to 2006 right until I joined

10   Nuova.

11   Q.   What kind of work did you do there at Xsigo Systems?

12   A.   I was a systems management architect.  I was responsible

13   for implementation and architecture of all the management

14   system for the Xsigo systems.

15   Q.   What parts of the system did your software manage at

16   Xsigo?

17   A.   The Xsigo management system managed the switch, the

18   server, and the network adapter cards.

19   Q.   Why did you leave Xsigo ultimately?

12:32 20   A.   Ultimately, it was about the technical approach they were

21   taking.  I thought that it was a suboptimal way of building

22   systems.

23   Q.   What did you not like about Xsigo's architecture?

24   A.   Xsigo relied on so-called gateway approach for

25   virtualization of the IO functions, and that required heavy

1    modifications to the operating system and emulation of the

2    standard things like Ethernet and fibre channel.

3    Q.   So the modifications of the operating system at Xsigo,

4    were those the operating system on the server CPU?

5    A.   Yes, that's correct.

6    Q.   Did you disagree with that approach?

7    A.   Yes.  It's a suboptimal way of implementing things like

8    this.

9    Q.   Did that approach of modifying the operating system on the

12:32 10   server CPU in Xsigo's architecture have an impact on customer

11   experience?

12   A.   Absolutely.  The user experience was absolutely affected.

13   One, number one issue is that you have, you have to include a

14   lot of software into the operating system that does very

15   unnatural things, and that restricts the number of operating

16   systems you can support and when you can support those

17   operating systems, so complicating a user's management

18   procedures.  And second problem is, because it's a

19   sophisticated piece of software sitting inside the server

12:33 20   within operating system, the CPUs, it introduces slowdowns; the

21   performance is a lot slower because of the software, and the

22   reliability issues are also very common.

23   Q.   So who at Nuova recruited you?

24   A.   Mr. Prem Jain.

25   Q.   And who is Mr. Prem Jain?

1    A.    Prem is a legendary figure in the valley.  He is a very

2    well-known entrepreneur and he's been a Cisco exec responsible

3    for some of the important products lines at Cisco.

4    Q.    Okay.  Was there anything from a technical perspective

5    about the Nuova opportunity that made you want to join?

6    A.    Yes.  Their architecture was drastically different from

7    what I was doing before.  It addressed some of the issues that

8    I had in my previous job.

9    Q.    And when did you end up joining Nuova?

12:34 10    A.    I joined Nuova in the beginning of 2006.

11    Q.    Okay.  So let's talk about Nuova a little bit.

12    Mr. Dvorkin, do you have slides that leads your testimony

13    today?  We are going to put them on the screen.

14           MR. MAGIC:  Your Honor, I offer DDX-8 as

15    demonstratives, and we've got those on the screen right now.

16           THE COURT:  Very well.

17           MR. MAGIC:  Thank you, your Honor.

18    Q.    When was Nuova founded, Mr. Dvorkin?

19    A.    Nuova was founded, second half of 2005.

12:34 20    Q.    Okay.  And why was the company called "Nuova" originally?

21    A.    The original name was Nuova Impresa.  The focus of the

22    startup was to disrupt the way enterprise data centers worked

23    and how computer was consumed.

24    Q.    Where did the initial source of funds come from to start

25    Nuova to get it off the ground?

1    A.    The initial funding came from the founders.  They

2    basically put in their own money.

3    Q.    And so, you said the company was founded in 2005.  When

4    exactly did Cisco make its initial investment in Nuova?

5    A.    That was in the second half of 2006.

6    Q.    And that's after you were already there?

7    A.    That was after my arrival, that's correct.

8    Q.    Okay.  So about a year after Nuova was formed, Cisco

9    invested?

12:35 10   A.    Yes.

11   Q.    Did Cisco provide the initial funding to start Nuova?

12   A.    No.

13   Q.    Did Cisco commit to funding Nuova from the very start of

14   the company?

15   A.    No.  It was completely unclear who would provide funding

16   at that time.

17   Q.    If you could just get a little closer to the microphone,

18   Mr. Dvorkin.  You can pull it toward you.

19   A.    Okay.  Thank you.

12:35 20   Q.    When you started working at Nuova, was there any certainty

21   that Cisco would fund the company at all?

22   A.    No.

23   Q.    But eventually, in 2008, did Cisco acquire Nuova?

24   A.    Yes, they did.

25   Q.    Okay.  So this trial has been focused on one of the

 1  products that Nuova made called UCS.  Was UCS Nuova's main

 2  product?

 3  A.   UCS was one of the two product lines we had.

 4  Q.   And what was the other one?

 5  A.   The other one was the Nexus 5000 switch product line.

 6  Q.   And was the Nexus product the main product from Nuova?

 7  A.   Yes, that was the main product.

 8  Q.   Did the Nexus product compete with Egenera's product?

 9  A.   No, it didn't.

12:36 10  Q.   Which product did Nuova bring to the market first, the

11  Nexus product or the UCS product?

12  A.   The Nexus switch family, Nexus 5000 specifically.

13  Q.   And which product was Nuova positioning as the main reason

14  Cisco should invest in and then acquire Nuova?

15  A.   Nexus 5000, as it was very innovative in its switching

16  strategy.

17  Q.   And when Cisco ended up acquiring Nuova, did you have

18  knowledge of whether most of the payouts for the acquisition

19  were tied to UCS or to Nexus?

12:37 20  A.   Majority of the payouts were attached to performance of

21  the Nexus 5000.

22  Q.   Not UCS?

23  A.   Not UCS.

24  Q.   Okay.  Let's talk about who founded Nuova.  So let's go to

25  the next slide, please, 8.2.  So this slide that's on the

1   screen right now shows six people:  Mario Mazzola, Prem Jain,

2   Luca Cafiero, Soni Jiandani, Ed Bugnion and Tom Lyon.  Are

3   those the founders of Nuova?

4   A.   Yes, they are.

5   Q.   And let's just talk a little bit about each person, each

6   founder.  So who was Mario Mazzola?

7   A.   Mario Mazzola was the CEO of Nuova and one of the

8   co-founders.  He is a very well-known guy in the valley, in the

9   infrastructure business and specifically in enterprise

12:38 10   networking.  He was the man who was responsible for putting or

11   getting Cisco into the switch market.  He was the CEO and

12   founder of Crescendo System that Cisco acquired like in the

13   early '90s.

14   Q.   And about how many years of experience did Mr. Mazzola

15   bring to Nuova?

16   A.   Way over 20.  He's been around.

17   Q.   Okay.  How about Mr. Prem Jain?  You did briefly mention

18   him but who is he?

19   A.   Prem Jain is the software engineering mind behind the

12:38 20   operation.  He's been a longtime associate and business partner

21   of Mario and Luca.  He has done lots of interesting things.

22   He's been a Cisco exec for over a decade, and he was

23   responsible, again, for some of the most important product

24   lines at Cisco at that time.

25   Q.   And about how many years of experience did Mr. Prem Jain

1    bring to the new company, Nuova?

2    A.   Way over 20.

3    Q.   Over 20?

4    A.   Yes.  That's correct.

5    Q.   And who is Mr. Luca Cafiero?

6    A.   Luca Cafiero is the hardware, is the hardware person in

7    the bunch.  So again, like Prem, Luca has been working with

8    Mario Mazzola and the team for many years, and he was, again, a

9    Cisco exec, and he was responsible for many hardware

12:39 10   innovations that Cisco had.

11   Q.   About how many years did Mr. Cafiero bring?

12   A.   Way over 20.

13   Q.   Years of experience, I meant?

14   A.   Yes.

15   Q.   Who is Miss Soni Jiandani?

16   A.   Soni Jiandani again is associate and partner of Luca,

17   Prem, and Mario.  She was a marketing person, so she was always

18   responsible for marketing projects when she was working

19   together with Luca, Prem, and Mario.

12:39 20   Q.   And how many years, about how many years of marketing

21   experience did Miss Jiandani bring?

22   A.   Way over 20.

23   Q.   And now, how about Ed Bugnion who is he?

24   A.   Ed Bugnion was the father of server virtualization.  He

25   was a founder of a company called VMWare who was the pioneer of

 1    the server virtualization market.  Before that, he was a

 2    researcher at Stanford University, and that's where they come

 3    up with the idea for VMWare.

 4    Q.    Okay.  About how many years of virtualization experience

 5    did Mr. Bugnion bring to Nuova?

 6    A.    Probably a dozen at that time.

 7    Q.    Okay.  And then finally Mr. Tom Lyon, who is he?

 8    A.    Tom Lyon is a hardware legend.  He was early on in a

 9    company called Sun Microsystems.  I don't know if you remember,

12:40 10    they were putting the "dot" in .com back in the late '90s, and

11    he was the first distinguished engineer and core designer of

12    Sun's most critical platforms.

13    Q.    And about how many years of experience did Mr. Lyon bring

14    to Nuova?

15    A.    Again, way over 20.

16    Q.    So just in total, about how many years of experience did

17    all of these founders collectively bring to Nuova?

18    A.    More than a century.  Very experienced people.

19    Q.    In what area?

12:41 20    A.    In infrastructure, networking, servers, virtualization,

21    and system design.

22    Q.    After Cisco acquired Nuova, did Cisco launch UCS as a

23    product?

24    A.    Yes.

25    Q.    And when was that; when did Cisco start selling UCS?

```
 1   A.    Cisco started selling UCS in summer 2009, I'm going to
 2   say.
 3   Q.    Okay.  Who was Cisco's first customer for UCS?
 4   A.    Cisco's first customer for UCS was Cisco IT.
 5   Q.    The IT department?
 6   A.    Yes.
 7   Q.    Okay.  And at Nuova, did UCS have a code name?
 8   A.    Yes, it was called "California."
 9   Q.    And what's the story behind the code name "California"?
10   A.    They original name was "computer array," and that
11   abbreviated to C-A, and we live in California, so it looked
12   like the abbreviation for California that we put into our
13   addresses.
14   Q.    So coincidence of sorts?
15   A.    Purely coincidental, yeah.
16   Q.    Okay.  Let's talk about UCS and its development.  So to
17   start, can you give an example of a type of application that a
18   customer might run on UCS?
19   A.    A customer would run any enterprise application.  For
20   example, at one of our customers, Fedex, they ran package
21   tracking software, and a lot of, like, warehouse-related
22   software; and financial, at financial customers, they ran
23   training software, like, for, like, in bank operation stuff.
24   At retail customers, they basically ran all of the retail
25   software for people, but they also ran, like, customer
```

```
 1    relationship management type of application, HR software, like
 2    database, like anything that a normal enterprise would normally
 3    run.
 4    Q.   Okay.  Let's turn to the next slide, DDX 8.3.  So in
 5    total, about how many employees at Nuova worked on UCS?
 6    A.   About a hundred.
 7    Q.   A hundred?
 8    A.   Yes.
 9    Q.   And where did Nuova hire its developers from?
10    A.   Well, we hired from any company that had any experience
11    with building sophisticated infrastructure in data centers.
12    Q.   So that would be a range of companies across the industry?
13    A.   Yes.
14    Q.   Can you give some examples?
15    A.   Like for example, Cisco.  This is where Cisco drew the --
16    where we got the majority of the networking talent because they
17    were literally networking.
18    Google, you hire people because they have experience with mass
19    scaling for structure and animation, and dealing with aol to
20    scale that nobody else has.
21    The VMWare, for example, would be the source of the best server
22    virtualization people.
23    Sun Microsystems, they made some of the best servers in the
24    '90s.  They made amazing hardware.
25    Veritas was the leader in storage virtualization, so getting
```

          1    storage people would be reasonable -- that's where you would

          2    get reasonable storage people.

          3    Xsigo virtualizations, that's where I came from.  There were

          4    also people from Intel because most servers ran Intel chips.

          5    Q.    Okay.

          6    A.    CPUs.

          7    Q.    Thank you, Mr. Dvorkin.  Is it, in your experience in the

          8    computer networking, you know, companies that you've worked at,

          9    is there anything unusual about hiring from across the

12:44    10    industry?

         11    A.    You want to hire the best team with, like, most diverse

         12    background.

         13    Q.    Did Nuova's UCS product developers come from Egenera?

         14    A.    No, they didn't.

         15    Q.    Okay.  Let's talk more about the components of UCS and the

         16    work that went into building those components.  So we can go to

         17    the next slide, please, DDX 8.4.  So how many years did it take

         18    for Nuova to design and then actually implement that design to

         19    create UCS?

12:45    20    A.    About three years.

         21    Q.    And can you explain the difference between design and

         22    implementation?

         23    A.    Design is identification of the architecture, major

         24    components, and what goes into, like, how customer interacts

         25    with a system.

```
 1    Q.   Around when was the design process complete for UCS?
 2    A.   Much of the design was complete in 2006.
 3    Q.   All right.  Now, let's just go back to the slide and talk
 4    about the components.  So we're going to start with the "Fabric
 5    Interconnect."  Actually, before I get there, about how many
 6    engineers total worked on the team that designed UCS?
 7    A.   About 60 engineers.
 8    Q.   And you were there at the time?
 9    A.   Yes, I was there at the time.
10    Q.   All right.  Let's start with the fabric interconnect and
11    talk about the different components.  So would you just remind
12    us first what that is, what's the fabric interconnect?
13    A.   Fabric interconnect is basically a switch.  It's a device
14    that connects servers together, allows them to talk to each
15    other and also connects them to external servers, like other
16    servers that are sitting outside of the system storage and the
17    internet.
18    Q.   Is there special software on the fabric interconnect?
19    A.   Yes, fabric interconnect also included UCS Manager, the
20    stuff that I was responsible for.
21    Q.   And I want to just briefly detour to a term.  Did Nuova
22    ever refer to the fabric interconnect as a "control node"?
23    A.   Yes, they did.
24    Q.   Okay.  And why did Nuova call the fabric interconnect a
25    control node?
```

1   A.   Because that's where management function was running.

2   Q.   And had you used that term since before the 2000s when

3   Egenera was found?

4   A.   Yes, it's a very commonly-used term.

5   Q.   Based on your experience, was Egenera the first company to

6   use the term "control node"?

7   A.   Absolutely not.

8   Q.   Okay.  Back to the slide.  How big was the team of

9   engineers that worked on the fabric interconnect?

12:46 10   A.   Twenty.

11   Q.   Okay.  Now, the chassis, that's the next component.  Can

12   you remind us what that is?

13   A.   Chassis is a hardware shelf into which servers or blades

14   are inserted.  Also, it houses the mezzanine cards, which are

15   the network adaptors, and also, you put in power supplies and

16   fans for cooling.

17   Q.   And servers are also called "blades," you said?

18   A.   Yes.

19   Q.   Okay.  We heard from Egenera that their product was called

12:47 20   the BladeFrame.  For how long has the industry used the blade

21   in a chassis formation?

22   A.   For a very long time.

23   Q.   Is that before Egenera existed?

24   A.   Yes, that's correct.

25   Q.   Did Egenera invent blades in a frame?

```
 1   A.    No.
 2   Q.    And how big was that team of engineers that worked on a
 3   chassis?
 4   A.    About five people.
 5   Q.    All right.  We're moving onto servers, and so, how big was
 6   the engineering team that built the servers at Nuova?
 7   A.    About 15 people.
 8   Q.    And another term that I want to briefly address is
 9   processing nodes.  Did Nuova ever refer to the server as the
12:48 10  "processing node"?
11   A.    Yes, they do.
12   Q.    And why was that?
13   A.    Because it's a commonly-used term for anything with a
14   processor you run applications on it.
15   Q.    And had you used that term in your work before Egenera
16   existed in the 2000s?
17   A.    Yes.
18   Q.    How far back?
19   A.    Like '90s.
12:48 20  Q.    Okay.  Was Egenera the first company then to use the term
21   "processing node" in your experience?
22   A.    No.
23   Q.    Now we're going to move onto the network adapter in the
24   UCS.  So, how big was the engineering team that designed the
25   network adapter?
```

```
 1   A.   Fifteen people.

 2   Q.   And that's also called a "NIC," right?

 3   A.   Yes, that's also called a NIC.

 4   Q.   Did Nuova design its own network adapter?

 5   A.   Yes, a lot of work went into it.

 6   Q.   Can you remind us of the special role that the network

 7   adapter has in UCS?

 8   A.   Network adapter was the device into which we programmed

 9   network identities, as well as the network topology and all of

10   the network information.

11   Q.   Okay.  Now we'll move onto UCS Manager.  So how big was

12   the engineering team that designed UCS Manager?

13   A.   Twelve people.

14   Q.   And is UCS Manager, software?

15   A.   Yes, it's purely software construct.

16   Q.   Does software involve computer code?

17   A.   Yes.

18   Q.   So about how many lines of code did the Nuova team have to

19   write to make UCS Manager?

20   A.   A lot of codes, like over a million lines.

21   Q.   And what role did you have in particular in Nuova's UCS

22   Manager?

23   A.   I was the chief architect.  I was one of the main

24   implementers.

25   Q.   And the purpose of UCS Manager is, can you remind us of
```

12:48 (line 10)
12:49 (line 20)

1    that again?

2    A.   The purpose of the UCS Manager was to manage the UCS

3    system, which means programming the -- allocate, programming

4    the network adapters and programming the fabric interconnect.

5    Q.   Egenera's expert witness told the jury that UCS Manager

6    programmed server CPUs to establish the network topology.  Is

7    Egenera's expert witness correct about that?

8    A.   No.

9    Q.   Why not?

12:50 10    A.   Because we programmed the interface card.

11    Q.   How do you know that, Mr. Dvorkin?

12    A.   I was there.  I was one of the core architects of the

13    system.

14    Q.   Now, Egenera's expert also said that the CPUs in the

15    servers in UCS are programmed because they know about or

16    discover the information about the network adapters as

17    peripheral devices in the servers.  Do you agree that the

18    process Egenera's expert's referring to means UCS programs the

19    CPUs?

12:50 20    A.   No.

21    Q.   And Egenera, as I mentioned, referred to the network

22    adapter as a peripheral device.  What's an every day example of

23    a peripheral device that can be plugged into a computer?

24    A.   Like a USB thumb drive.

25    Q.   And when you plug in a USB thumb drive, the CPU of the

 1   computer, like, becomes aware that it exists, right?

 2   A.   It gets discovered by the operating system.

 3   Q.   Can the CPU interact with and talk to the USB drive in

 4   that example?

 5   A.   Yes.

 6   Q.   When a person plugs their USB drive into a computer, does

 7   that program the CPU of the computer?

 8   A.   No, it doesn't.

 9   Q.   In your analogy, is the USB drive like a network adapter

12:51 10   in UCS?

11   A.   Yes, absolutely.

12   Q.   And in UCS, does the computer code of the server operating

13   system actually change when the network --

14        MR. SCHENKER:  Objection.  He is leading the witness.

15        MR. MAGIC:  I'm asking a question about how UCS works.

16        THE COURT:  No, it's acceptable.

17   Q.   In UCS, Mr. Dvorkin, does the computer code of the server

18   operating system change when the network adapter gets its

19   network identity from UCS Manager?

12:51 20   A.   No.

21   Q.   All right.  Mr. Dvorkin, I'm going to show you what we've

22   been calling Cisco's bedrock fact number three.  Okay.  Showing

23   you the trial transcript actually from day one, page 67 lines

24   11-15.  And so, we have Cisco bedrock fact number three.  I'll

25   just read it to you to start.  "Cisco UCS does not set up the

1    network by programming the processors.  We program the NICs.

2    We designed the NIC ourself.  The NIC is not a CPU.  We do not

3    infringe the claim."

4    Egenera's expert told the jury that Cisco bedrock fact number

5    three is false, it's incorrect.  But you designed UCS Manager

6    and how it works with the servers and the NICs.  So I want to

7    ask you a question about bedrock fact number three.  In the

8    first sentence, or is the first sentence -- we'll go sentence

9    by sentence -- is the first sentence true, "Cisco UCS does not

12:52 10    set up the network by programming the processors"?

11    A.    The statement is true.

12    Q.    And the second sentence, is that true that Cisco programs

13    the NICs and designed the NIC itself?

14    A.    Yes.

15    Q.    And is it also true, the third sentence, that the NIC is

16    not a CPU in UCS?

17    A.    That is true, the NIC is not a CPU.  These are completely

18    different things.

19    Q.    And as the designer of UCS Manager, is it true in this

12:53 20    regard, that UCS operates differently from Egenera's patent?

21    A.    Very much, yes.

22    Q.    So bedrock fact number three is true?

23    A.    Yes.

24    Q.    Okay.  Thank you, Mr. Dvorkin.  Let's talk about who

25    designed UCS.  That's our next topic.

1    Did any anyone from Egenera work on designing UCS, Mr. Dvorkin?

2    A.    No.

3    Q.    Okay.  Let's look at a slide.  Let's look at a slide that

4    Egenera used in this trial.  It's on the screen right now.

5    It's PDX 7-15.  So Egenera has told the jury that Cisco must

6    have copied the BladeFrame because it hired the people on the

7    slide here who used to work at Egenera, and so, I have a few

8    questions for you, Mr. Dvorkin.

9    The company that created UCS, is that Nuova or was it Cisco?

12:54 10   A.    Nuova.

11   Q.    And this slide is titled:  Egenera Employees Hired By

12   Cisco, right?

13   A.    That's correct.

14   Q.    Okay.  So, what I'd like to do with you is I'd like to

15   correct this slide so that we can actually talk about the

16   individuals who actually worked at Nuova, just those

17   individuals, whoever had Egenera in their employment

18   background.

19   So to do that, I'd like to refer to JTX-518, which is a list of

12:55 20   individuals who worked at either Nuova or Cisco, and it's

21   already in evidence, so I'm going to put that on the ELMO for a

22   second.

23   So Mr. Dvorkin, as you can see in JTX-518, there is a table,

24   right?  And there is an "Employer" column, do you see that?

25   A.    Yes, I can see that.

```
 1    Q.   Okay.  And in this table that's JTX-518, there is a "Both"
 2    for any employee listed as having worked at both Nuova and
 3    Cisco, meaning they started at Nuova and eventually ended up at
 4    Cisco from the acquisition.  Do you follow me?
 5    A.   Yes.
 6    Q.   Okay.  So what I've done is I've pre-circled the "both"
 7    entries, anyone who actually worked at Nuova.  So that would be
 8    five entries total.  I've got three on the first page, and let
 9    me know if you see any others.  And then, yeah, two on the
10    second page, so five total.  And you follow me so far?
11    A.   Yes.
12    Q.   Okay.  All right.  So, in total we've got five people in
13    JTX-518 who actually had an Egenera employment background and
14    ended up at Nuova, right?
15    A.   Right.
16    Q.   Okay.  All right.  So what I want to do is go back to the
17    slide, and I'm going to, I'm going to first change the title to
18    focus on just Nuova so we're talking about only Nuova now.  And
19    what I'm going to do is I'm going to circle just the five
20    people that we saw in JTX-518 as having an entry for "both;" so
21    that's Scott Clark, that is Blaine Lincoln, that is, let's see,
22    Jeremy Moulton, and that is Satinder Sethi, and Jason Shaw.
23    And what I'm going to do is I'm going to cross out everyone
24    else because they didn't work at Nuova.  It's just the five
25    people from Exhibit 518 that we're focused on now on the slide.
```

1    Follow me so far, Mr. Dvorkin?

2    A.   Yes.

3    Q.   So now I want to ask you some questions about those five

4    people.  Did any of those five people, Mr. Scott Clark, Blaine

5    Lincoln, Jeremy Moulton, Satinder Sethi, Jason Shaw work on

6    your team that designed the management software of UCS?

7    A.   No, none of them did.

8    Q.   Were you in all the design and architecture meetings for

9    UCS at Nuova?

12:58 10    A.   Yes.

11    Q.   And how many design and architecture meetings are we

12    talking about?

13    A.   In the first year, hundreds.

14    Q.   Hundreds?

15    A.   Yes.

16    Q.   Okay.  Were any of these five people ever present in any

17    of those design and architecture meetings for UCS?

18    A.   No.

19    Q.   Let's look at the timing of when each of those five

12:59 20    individuals joined Nuova.  So we're going to now go back to the

21    dates that are on JTX-518.  Mr. Blaine Lincoln, according to

22    JTX-518, joined on April 21, 2008; do you see that?

23    A.   Yes.

24    Q.   In April 2008, is that when Cisco acquired Nuova?

25    A.   That was right around there sometime, yup.

```
         1   Q.    Okay.  So what was the state of the design of UCS by the

         2   time Mr. Lincoln joined the company?

         3   A.    Oh, that was very much done by that time.

         4   Q.    So did Mr. Lincoln work on the design of UCS?

         5   A.    No, he didn't.

         6   Q.    What was his job function?

         7   A.    He was in the services organizations.

         8   Q.    And what's the "services organization;" what's that kind

         9   of role?

12:59   10   A.    Service organization works with a customer and helps the

        11   customer adopt a product through their environment and help,

        12   for example, move applications from other platforms to the new

        13   platform or adopt the management tools.

        14   Q.    Is services a product design role?

        15   A.    No.

        16   Q.    Does a services person get to decide the product design?

        17   A.    No, they don't.

        18         THE COURT:  All right.  This might be a good place to

        19   stop, it being 1:00.  So we don't make a mistake again, I have

01:00   20   plaintiff at 12 hours 23 minutes; defendant, six hours and 47

        21   minutes.

        22   All right, jurors.  Good day, good progress in the material,

        23   and we'll meet again tomorrow at 9 o'clock.

        24         THE CLERK:  All rise.

        25         (Jury and court depart.)
```

1          (Court adjourned at 1:00 p.m.)

2          C E R T I F I C A T E.

3

4   We, Debra M. Joyce, Official Court Reporter for the United

5   States District Court for the District of Massachusetts, and

6   Lisa McDonald, RPR, RMR, CRR, do hereby certify that the

7   foregoing pages are a true and accurate transcription of our

8   shorthand notes taken in the aforementioned matter to the best

9   of our skill and ability.

10

11          /s/Debra M. Joyce              August 9, 2022
            Debra M. Joyce

12

13          /s/Lisa McDonald              August 9, 2022
            Lisa McDonald

14

15
            JAMES P. GIBBONS, CSR, RPR, RMR
16          Official Court Reporter
            1 Courthouse Way, Suite 7205
17          Boston, Massachusetts 02210
            jmsgibbons@yahoo.com
18

19

20

21

22

23

24

25

1                              INDEX

2

3    WITNESS                                              PAGE

4

     RYAN SULLIVAN
5
       Direct Examination                                  11
6      By Mr. Batchelder
       Cross-Examination                                   76
7      By Mr. McDAVIT

8    MIKE DVORKIN

9      Direct Examination                                 113
       By Mr. Magic
10

11                         E X H I B I T S

12
     Exhibit No.          Description              Received
13

14      JTX-543      Egenera is wicked cool document      29

15      JTX-544      NDNet document                       38

16      JTX-545      Cisco email                          47

17      JTX-546      Notes of conversation                97

18      JTX-547,     Documents                           111
        JTX-548,
19      JTX-549,
        JTX-550,
20      JTX-551,
        JTX-552
21      JTX-553,     Documents                           111
        JTX-554,
22      JTX-555,
        JTX-556,
23      JTX-557,
        JTX-558
24      JTX-559,     Documents                           112
        JTX-560,
25      JTX-561